FINKELSTEIN & KRINSK LLP
Jeffrey R. Krinsk, Esq. (*pro hac vice* pending)
jrk@classactionlaw.com
William R. Restis, Esq. (*pro hac vice* pending)
wrr@classactionlaw.com
David J. Harris, Jr., Esq. (CA Bar #286204)
djh@classactionlaw.com
550 West C Street, Suite 1760
San Diego, California 92101
Telephone: (619) 238-1333
Facsimile:  (619) 238-5425

Attorneys for Plaintiff

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WISCONSIN

_____

| | |
|---|---|
| MEREDITH D. DAWSON<br><br>          Plaintiff,<br><br>   v.<br><br>GREAT LAKES EDUCATIONAL LOAN SERVICES, INC., GREAT LAKES HIGHER EDUCATION CORPORATION, JILL LEITL, DAVID LENTZ, MICHAEL WALKER, THE UNITED STATES OF AMERICA, THE UNITED STATES DEPARTMENT OF EDUCATION, and ARNE DUNCAN in his official capacity as United States Secretary of Education<br><br>          Defendants. | CASE NO: 15-cv-475<br><br><br>**CLASS ACTION COMPLAINT** |

1.      Pursuant to Rule 23 of the Federal Rules of Civil Procedure, Plaintiff Meredith D. Dawson brings this class action against Great Lakes Higher Education Corporation, Great Lakes Educational Loan Services, Inc. (collectively, "Great Lakes"), certain of Great Lakes' executive officers, and against the United States Department of Education ("Department of Education" or "Department"), U.S. Secretary of Education Arne Duncan, and the United States of America (collectively, "Government Defendants").  Plaintiff makes the following allegations based on the investigation of her counsel and based on personal knowledge as to herself and her own acts. Plaintiff and her counsel believe that additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## INTRODUCTION

2.      In recent years, the United States government has provided or insured hundreds of billions of dollars in student loans ("federal student loans") to millions of undergraduate and graduate students nationwide.  The repayment periods for federal student loans typically range from 10 to 25 years.  To avoid the administrative burden of managing millions of borrowers' loans through decades of repayment, the Department of Education has contracted with several private companies to act as student loan servicers.

3.      Great Lakes is one of those servicers.  As a federal student loan servicer, Great Lakes manages borrowers' loans from origination through final repayment on behalf of the Department and other lenders.  This includes, among other things: calculating borrowers' principal and interest balances, issuing billing statements to borrowers, collecting and processing borrower payments, transmitting balance information to lenders, responding to borrower inquiries, and helping borrowers who suffer financial hardship avoid default.  The Department of Education pays Great Lakes over $100 million each year to service federal student loans.

4.      Great Lakes is legally and contractually required to manage borrowers' loans in accordance with their terms as well as federal and state law.  Great Lakes has not met these requirements.  Specifically, Great Lakes has engaged in a continuous and systematic practice of wrongfully compounding (or "capitalizing") interest on borrowers' loans in direct violation of the loans' terms, federal law and Great Lakes' explicit representations to borrowers.  As a result, Great Lakes has wrongfully inflated the principal balances on many borrowers' loans and charged borrowers unlawful interest on a daily basis over a multi-year period.

5.      Great Lakes and its executives actually recognized the illegal nature of their interest capitalization practices in or before November 2011.  Instead of ceasing their illegal practices and rectifying borrowers' accounts, Great Lakes and its executives have ***knowingly*** continued to send borrowers and their lenders illegally inflated account statements and ***knowingly*** charge borrowers illegal interest on a daily basis: even to this day.  In addition, Great Lakes has continued to bill the Department of Education for servicing illegally inflated loans in direct violation of its servicing contract with the Department.  Great Lakes has repeatedly and intentionally acted to conceal all of this wrongdoing from borrowers as well as its lender-customers.

6.      Because of Great Lakes' illegal interest capitalization practices, the Department of Education—as the largest lender of federal student loans—has breached the plain terms of its loan agreements with borrowers.  These breaches have caused Government Defendants to wrongfully account for borrowers' loan balances and charge borrowers unlawful interest on a daily basis.

7.      Plaintiff seeks relief on behalf of hundreds of thousands of borrowers who have been defrauded by Great Lakes and wrongfully overcharged by Government Defendants on their federal student loans.

## PARTIES

8.      Defendant Great Lakes Educational Loan Services, Inc. is a Wisconsin corporation with its principal place of business located at 2401 International Lane, Madison, Wisconsin 53704-3121.   Great Lakes Educational Loan Services, Inc. is the wholly owned servicing subsidiary of Great Lakes Higher Education Corporation.   Great Lakes Educational Loan Services, Inc. services millions of federal student loans on behalf the United States Department of Education and other lenders.   As a servicer, Great Lakes Educational Loan Services, Inc. is a borrower's primary point of contact for obtaining information regarding his or her student loan accounts.

9.      Defendant Great Lakes Higher Education Corporation is the sole owner of Defendant Great Lakes Educational Loan Services, Inc.   Defendant Great Lakes Higher Education Corporation is a Wisconsin corporation with the same principal place of business, located at 2401 International Lane, Madison, Wisconsin 53704-3121.

10.     Defendant Jill M. Leitl ("Leitl") is a natural person domiciled in Wisconsin. Defendant Leitl is the Chief Operating Officer of Defendant Great Lakes Educational Loan Services, Inc.  At all relevant times prior to May 2015, Defendant Leitl was the Chief Servicing Officer of Defendant Great Lakes Educational Loan Services, Inc.

11.     Defendant David Lentz ("Lentz") is a natural person domiciled in Wisconsin. Defendant Lentz is and was at all relevant times the Chief Technology Officer of Defendant Great Lakes Educational Loan Services, Inc.

12.     Defendant Michael Walker ("Walker") is a natural person domiciled in Wisconsin.  Defendant Walker is the Chief Information Officer and/or the Chief Technology Strategy Officer of Defendant Great Lakes Higher Education Corporation.  At all relevant times prior to July 2012, Defendant Walker was the Chief Infrastructure Officer of Defendant Great Lakes Educational Loan Services, Inc.[1]

13.     The United States of America ("United States" or "U.S.") is a sovereign nation.

14.     The United States Department of Education ("Department of Education" or "Department") is a U.S. government agency responsible for administering portions of the Higher Education Act of 1965.  This includes originating and insuring loans to undergraduate and graduate students throughout the United States.  The Department of Education is the lender and/or loan holder for most of the federal student loans at issue in this action.[2]

15.     Defendant Arne Duncan ("Secretary") is the Secretary of the United States Department of Education vested with the authority to sue and be sued on behalf of the United States pursuant to 20 U.S.C. § 1082(a)(2).  Plaintiff names the Secretary as a defendant only in his official capacity.[3]

---

[1]  Defendants Leitl, Lentz and Walker are referred to collectively herein as "Individual Defendants."   Individual Defendants and Great Lakes are referred to collectively herein as "Great Lakes Defendants."

[2]  For the sake of simplicity, this Complaint refers to both original lenders ("originators") and subsequent purchasers of federal student loans as "lenders."   Entities that purchase federal student loans after origination assume the originator's rights and responsibilities under the original loan agreements.  Thus, at any given time, the loan holder stands in the place of the originator for all relevant purposes.

[3]  The United States of America, United States Department of Education and Secretary Arne Duncan are referred to collectively herein as "Government Defendants."

16.     Plaintiff Meredith D. Dawson is a natural person domiciled in California.  Since the summer of 2012, Ms. Dawson has been the borrower of approximately $25,000 in federal student loans serviced by Great Lakes.

## JURISDICTION AND VENUE

17.     With respect to Plaintiff's claim against Great Lakes Defendants brought under 18 U.S.C. § 1964, this Court has jurisdiction pursuant to 18 U.S.C. § 1964 and 28 U.S.C. § 1331. Pursuant to 18 U.S.C. § 1965, venue is proper as to this claim because Great Lakes resides in this district.  In addition, pursuant to 28 U.S.C. § 1391(b), venue is proper because a substantial part of the events giving rise to the claim occurred in this district.

18.     With respect to Plaintiff's common law tort claims against Great Lakes, this Court has jurisdiction pursuant to 28 U.S.C. § 1332(d) because the aggregate amount in controversy exceeds $5,000,000 and the overwhelming majority of Class members are citizens of States different from Great Lakes and/or Government Defendants.  Pursuant to 28 U.S.C. § 1391(b), venue is proper as to Plaintiff's common law tort claims against Great Lakes because a substantial part of the events giving rise to such claims occurred in this district.  If the Court determines that it lacks jurisdiction under 28 U.S.C. § 1332(d) over Plaintiff's common law tort claims, it may exercise supplemental jurisdiction over such claims pursuant to 28 U.S.C. § 1367.

19.     With respect to Plaintiff's breach of contract claim against Government Defendants, this Court has jurisdiction pursuant to 28 U.S.C. § 1346(a) because such claim is founded upon an express contract with the United States and because no individual member of the Class has been damaged by more than $10,000.  Pursuant to 28 U.S.C. § 1391(e), venue is proper as to Plaintiff's breach of contract claim against Government Defendants because a

defendant in this action (Great Lakes) resides in this district, and because a substantial part of the events giving rise to the claim occurred in this district.

## SUBSTANTIVE ALLEGATIONS

### The Federal Student Loan Programs

20.     Congress passed the Higher Education Act of 1965 ("Higher Education Act") primarily to promote student access to college regardless of socioeconomic status.  To that end, Congress has established two parallel student loan programs: the Federal Family Education Loan Program ("FFELP") and the William D. Ford Federal Direct Loan Program ("Direct Loan Program").  Under FFELP, non-Department lenders made student loans to borrowers that were ultimately insured by the United States government ("FFELP loans").  FFELP incentivized lending to student borrowers by providing lenders with a financial safety net in the event of default.  Under the Direct Loan Program, Congress allowed students to borrow directly from the Department of Education ("Direct loans").

21.     For many years, students were able to obtain hundreds of billions of dollars in loans under both programs.  In 2008, however, the financial crisis shook credit markets to an extent that immediately threatened the availability of new FFELP loans for students.  Congress quickly responded by passing the Ensuring Continued Access to Student Loans Act, under which the Department of Education would purchase a large volume of outstanding FFELP loans from the private sector to temporarily fund the origination of new FFELP loans.  The following year, the Student Aid and Fiscal Responsibility Act of 2009 eliminated the making of new FFELP loans, so that substantially all federally backed student loans could and would be originated by the Department as Direct loans, effective July 1, 2010.  Both of these changes resulted—and

would continue to result—in an enormous increase in the number of student loans held by the Department. This necessitated an increase in the Department's student loan servicing capacity.[4]

**Great Lakes' Servicing Contract with the Department of Education**

22.     On June 17, 2009, the Department of Education issued a press release stating:

> U.S. Secretary of Education Arne Duncan today announced that four companies were awarded contracts to service a portion of the approximately $550 billion outstanding federal student loan portfolio held by the Department.  The selected contractors will also service loans originated by and sold to the Department in the future.  The award of these contracts provides the Department with the necessary capacity to support anticipated increases in the number of loans owned by the Department and ensures borrowers receive the assistance they need to effectively manage their federal student loan obligations.

The press release identified Great Lakes as one of the four servicers.

23.     Great Lakes' student loan servicing contract with the Department of Education ("Servicing Contract") is dated June 17, 2009.  The base term of the Servicing Contract was June 17, 2009 through June 16, 2014.  The Servicing Contract also included an optional term from June 17, 2014 through June 16, 2019.  The Department exercised that option in June 2014.  Thus, the Servicing Contract remains in force to this day.

24.     Great Lakes began servicing Department-held FFELP loans in September 2009 and began servicing Direct loans in July 2010.  By year-end 2013, Great Lakes was servicing over 9 million Department-held student loan accounts totaling roughly $157 billion in

---

[4] As of June 2009, the Department of Education held approximately $550 billion in student loans. That amount only increased following the Department's large-scale purchase of FFELP loans and its pivot to Direct-only lending.  The Department's most recently published data shows that, as of March 31, 2015, it held more than $1.1 trillion in federal student loans: $379 billion in FFELP loans and $787 billion in Direct loans.  As of the same date, that money was owed by approximately 40 million borrowers, yielding an average debt load of approximately $28,000 per borrower.

outstanding loans, substantially all of which were FFELP or Direct loans.[5]  In addition, Great Lakes was servicing over $10 billion dollars in FFELP loans held by over 1,000 non-Department lenders.  Great Lakes was servicing FFELP loans held by non-Department lenders for many years before it entered into the Servicing Contract with the Department, and it continues to do so today.

**Mechanisms for Aiding FFELP and Direct Borrowers in Repayment**

25.      The overarching policy behind FFELP and Direct loans is to make higher education affordable for students.  To that end, the Higher Education Act and corresponding Department regulations provide mechanisms to simplify the repayment process and aid borrowers who struggle during the course of repayment.  Four such mechanisms are pertinent to this action.  All four are available to both FFELP and Direct borrowers.

26.      The first mechanism is an income-driven repayment ("IDR") plan.  An IDR plan calculates a borrower's monthly student loan payment based upon the borrower's income, if any.  IDR plans generally set the monthly payment on a borrower's FFELP or Direct loans at 10%, 15% or 20% of the borrower's discretionary income, which is calculated according to a set formula.  IDR plans require borrowers to provide information regarding their income and debt levels so that servicers like Great Lakes can determine each borrower's eligibility for IDR and calculate appropriate monthly payments.  Thus, borrowers seeking to qualify for an IDR plan must send their servicers a standard Department of Education IDR application form along with some type of income documentation, such as tax returns or paystubs.

---

[5] Likely included in this statistic is a third category of federal student loans made under the Federal Perkins Loan program, but Perkins loans have consistently represented less than 1% of federal student loans outstanding.  Perkins loans are outside the scope of this action.

27. The second mechanism available to struggling borrowers is deferment. A deferment allows borrowers to stop making payments on their Direct or FFELP loans for a period of time without defaulting. Borrowers may qualify for a deferment for a variety of reasons, such as in-school status, economic hardship or active duty in the military. For all types of deferment, borrowers must provide their student loan servicer with some form of documentation to demonstrate their eligibility.

28. The third mechanism is forbearance. Like a deferment, a forbearance allows borrowers to temporarily cease payments on their student loans without defaulting. Borrowers who do not qualify for deferment may still qualify for a forbearance for reasons such as economic hardship, illness, medical or dental residency, or AmeriCorps service. Like deferments, these types of forbearance require borrowers to provide their servicer with documentation demonstrating their eligibility.

29. The fourth mechanism is consolidation. Consolidation serves to simplify the repayment process for borrowers generally. Rather than making multiple monthly payments on multiple student loans, borrowers can combine all of their outstanding FFELP and Direct loans into a single Consolidation Loan and make one payment, one time each month. Borrowers seeking consolidation must provide their servicer with documentation regarding their various outstanding loans, so the servicer knows which loans to consolidate and can properly facilitate the consolidation process.[6]

---

[6] The consolidation process involves paying off the outstanding loans to be "consolidated," and replacing those with a newly originated Consolidation Loan that is similar to the prior loans in terms of total outstanding balance and effective interest rate. Due to the similarity of terms between FFELP and Direct loans, they can often be consolidated together into a single Consolidation Loan.

30.     All four of the above mechanisms exist to aid Direct and FFELP borrowers in the repayment process.  All four require a standard Department application form along with some form of documentation to support a borrower's eligibility and facilitate the appropriate changes to the borrower's account(s).

**<u>The Regulations and Loan Terms Violated by Great Lakes</u>**

31.     Congress and the Department contemplated that it would take time for servicers to process borrowers' applications, determine borrowers' eligibility, and make the necessary calculations and/or status changes to borrowers' accounts.  Congress and the Department also contemplated that borrowers seeking payment relief or simplification might already be strained or unable to make their loan payments in the interim.  That is why, at all relevant times, Department regulations have permitted lenders and their servicers to place borrowers' loans in "administrative forbearance" status for up to 60 days while the servicer processes the necessary documentation.

32.     For all FFELP loans, 34 C.F.R. § 682.11(f) provides:

> A lender [or servicer acting on the lender's behalf] may grant forbearance, upon notice to the borrower . . . , with respect to payments of interest and principal that are overdue or would be due . . . [f]or a period not to exceed 60 days necessary for the lender [or servicer] to collect and process documentation supporting the borrower's request for a deferment, forbearance, change in repayment plan, or consolidation loan. ***Interest that accrues during this period is not capitalized.***

34 C.F.R. § 682.11(f)(11). Similarly, for all Direct loans, 34 C.F.R. § 685.205(b) provides:

> Administrative forbearance. In certain circumstances, the [U.S.] Secretary [of Education] grants forbearance without requiring documentation from the borrower. These circumstances include but are not limited to . . . [a] period of up to 60 days necessary for the Secretary to collect and process documentation supporting the borrower's request for a deferment, forbearance, change in repayment plan, or consolidation loan. ***Interest that accrues during this period is not capitalized***.

34 C.F.R. § 685.205(b)(9).[7]

33.    Similar language appears on the standard form Master Promissory Notes (or "MPNs") issued by the Department and signed by borrowers who take out FFELP or Direct loans.[8]  For example, the standard form Master Promissory Notes for Direct loans state:

> Under certain circumstances, we [the Department of Education] may also give you a forbearance without requiring you to submit a request or documentation. These circumstances include, but are not limited to, the following: . . .  [a] period of up to 60 days in order for us to collect and process documentation related to your request for a deferment, forbearance, change in repayment plan, or consolidation loan *(we do not capitalize the interest that is charged during this period)*.

Similarly, the form Master Promissory Notes for FFELP loans state:

> *Interest may not be capitalized if my lender grants an administrative forbearance for up to 60 days in order to collect and process documentation supporting my request for a deferment, forbearance, change in repayment plan, or consolidation.*[9]

34.    Those same provisions from the B-9 Forbearance Regulations and MPNs also appear on the standard application forms issued by the Department of Education for IDR plans,

---

[7] For ease of reference, this Complaint refers to an administrative forbearance provided in accordance with either of these provisions as a "B-9 Forbearance."  Similarly, this Complaint refers to 34 C.F.R. § 682.11(f)(11) and 34 C.F.R. § 685.205(b)(9) collectively as the "B-9 Forbearance Regulations."  This Complaint refers to any accrued interest on a FFELP or Direct loan that remains unpaid at the end of a B-9 Forbearance period as "B-9 Interest."

[8] The Master Promissory Notes are the student loan contracts that govern the rights and responsibilities of lender and borrower.  The lender for every Direct loan is the Department of Education.  For FFELP loans purchased by the Department, the Department—as owner of the FFELP loan—assumes the rights and responsibilities of the original FFELP lender.  Every other FFELP loan is owned either by the original FFELP lender or by some other non-Department entity that purchased the FFELP loan after origination.

[9] Great Lakes receives and maintains the originals or copies of all of its borrowers' Master Promissory Notes.  Each MPN received by Great Lakes is reviewed and then scanned or otherwise copied into a document imaging/storage system, directly into a folder that Great Lakes maintains for each borrower.

deferments and consolidation loans.  For example, the standard form IDR application—which is signed by all FFELP or Direct borrowers who apply for an IDR plan—states:

> I understand that . . . my loan holder may grant me a forbearance for up to 60 days to collect and process documentation supporting my request for the selected [IDR] plan. I am not required to make loan payments during this period of forbearance, but interest will continue to accrue. ***Unpaid interest that accrues during this forbearance period will not be capitalized.***

Great Lakes itself provides all of these application forms to borrowers through its website (www.mygreatlakes.org), email and regular mail.  Borrowers sign the appropriate application forms and return them to Great Lakes, along with the supporting documentation necessary to obtain the desired deferment, consolidation or change in repayment plan.  As with the MPNs, Great Lakes carefully reviews each application and scans or otherwise copies every application and every piece of supporting documentation into its document imaging/storage system. Great Lakes maintains those records for each borrower throughout the life of the borrower's loan(s), and for years after that.

35.    As a FFELP and Direct loan servicer, Great Lakes has one job: to manage borrowers' student loans in accordance with the loans' plain terms, as well as federal and state law.  Nevertheless, for the better part of a decade, Great Lakes has violated the plain terms of the B-9 Forbearance Regulations, the plain terms of the Master Promissory Notes that Great Lakes reviews and maintains for each borrower, ***and*** the plain terms appearing on the application forms that Great Lakes provides to borrowers nationwide.

## Great Lakes Illegally Capitalizes B-9 Interest on Class Members' Loans: While Expressly Claiming the Right to Do It

36.    When a FFELP and/or Direct borrower indicates his or her desire to apply for a deferment, forbearance, Consolidation Loan or IDR plan, Great Lakes places that borrower's loans into an "administrative forbearance" of the type described in ¶¶31-34 above (a "B-9

Forbearance").   In addition, every time Great Lakes places a borrower's loan(s) in B-9 Forbearance status, it records the timing of and reason for the forbearance in the borrower's loan history: namely, that his or her payment obligations are suspended for up to 60 days to allow for the submission and processing of his or her documentation in support of the requested deferment, forbearance, Consolidation Loan or IDR plan.   The problem is—at all relevant times up until February 2014 (at the earliest)—Great Lakes' automated Student Loan Servicing System was programmed to capitalize accrued interest ***every single time*** that a borrower's FFELP or Direct loans switched from forbearance status to repayment status, regardless of whether the forbearance was a B-9 Forbearance.   This aspect of Great Lakes' Student Loan Servicing System ("System") squarely violates the B-9 Forbearance Regulations, the governing Master Promissory Notes, as well as the standard IDR, deferment, and Consolidation Loan application forms that Great Lakes has provided to millions of borrowers over many years.[10]

37.   The effect of Great Lakes' wrongful B-9 Interest capitalizations is straightforward and quantifiable.   The day that a B-9 Interest capitalization occurs on a loan ("Capitalization Date"), all outstanding interest (i.e., accrued and unpaid interest) is converted into principal. This transaction creates a wrongfully inflated principal balance on the loan.   Consequently, on the Capitalization Date, the newly and illegally created principal dollars begin to accrue illegal interest ***on a daily basis*** based on a simple formula that is uniform for all FFELP and Direct loans.[11]   Hence, beginning on the wrongful Capitalization Date, both the purported principal balance and the daily interest accruals for the given loan are wrongfully inflated ***every day until the loan is repaid in full***.

---

[10] The System is also referred to by Defendants as "GOALS" or "the Great Lakes Computer System (GLCS)."

[11] The daily amount of interest charged to any outstanding FFELP or Direct loan is calculated as follows:  (Principal Balance x Annualized Interest Rate) / 365 days.

38.     At all relevant times, Great Lakes has communicated the purported principal and interest balances for every FFELP and Direct loan it services directly to the corresponding borrowers and lenders.  To each borrower, Great Lakes provides the daily principal and interest balances—which are automatically calculated by Great Lakes' System—for the borrower's Direct and/or FFELP loans through Great Lakes' website, www.mygreatlakes.org.  Great Lakes also provides FFELP and Direct loan account balances directly to borrowers through automated electronic and regular mailings in the ordinary course of business.  To each FFELP or Direct lender—including, but not limited to, the Department—Great Lakes automatically provides the same daily loan balances through the internet so that the lender can at all times know the precise dollar value of its federal student loan portfolio down to the borrower or loan level.

39.     Thus, when Great Lakes' System automatically executes an illegal B-9 Interest capitalization, the System *automatically* transmits an artificially and illegally inflated principal balance and interest accrual to both borrower and lender *on a daily basis*, beginning on the Capitalization Date and continuing each day thereafter until the illegally inflated loan is repaid in full.  Borrowers and lenders alike have relied and continue to rely on the illegally inflated loan balances represented to them by Great Lakes in order to determine their respective repayment obligations (borrowers) and rights (lenders).   That is the very purpose of a student loan servicer: to serve as both lenders' and borrowers' primary source of financial and other information regarding their loans.

40.     Great Lakes executed these systematic and illegal B-9 Interest capitalizations— and the resultant false balance transmissions to both borrowers and lenders—on a continuous basis *for at least seven years*, beginning in 2007 (at the latest) and continuing until February

2014 (at the earliest).  In fact, for several years, Great Lakes expressly and wrongly claimed the right to do this.

41.     Plaintiff's counsel has obtained a series of detailed internal audit reports regarding Great Lakes' loan servicing operations (the "Control Reports") for most of the last eight years. These Control Reports describe the technical and operational structure of Great Lakes in detail, along with various policies and procedures adhered to by Great Lakes in the servicing of FFELP and Direct loans.  The Control Reports are intended primarily for **lenders**, on whose behalf Great Lakes acts, to assure lenders that their loan portfolios are being serviced in a manner that is operationally and financially sound as well as legally compliant.  The Control Reports focus on the controls that Great Lakes has in place to ensure the operational effectiveness, legal compliance, and overall quality and security of its loan servicing systems and procedures.

42.     To that end, in each Control Report, Great Lakes details a set of operational control objectives established by executive management (including Individual Defendants), and further details the policies and procedures that Great Lakes has put in place to ensure that those objectives are achieved.  In addition, for each Control Report, Great Lakes retained Ernst & Young LLP ("Ernst & Young") as an independent auditor to test and confirm the effectiveness of Great Lakes' stated policies and procedures.  Ernst & Young attached to each Control Report an opinion letter along with its operational test results to confirm the accuracy and effectiveness of Great Lakes' stated operational controls.

43.     The 2007 Control Report is dated November 7, 2007 and covers the period of October 1, 2006 through September 30, 2007.  Throughout this period, Great Lakes was servicing FFELP loans, but not Direct loans.[12]  The 2007 Control Report contains a section titled

---

[12] *See* ¶24, *supra*.

"Deferment and Forbearance Processing."   This section describes Great Lakes' policies and procedures with respect to deferment and forbearance processing.   The section includes the following paragraph:

> Forbearance requirements are explained in Parts 682.202 and 682.211 and various other sections of the regulations.  When a borrower is in repayment and cannot make regular monthly payments, the lender may grant forbearance to that borrower to prevent default.  There are certain circumstances, such as a period of internship that exceeds the deferment limit, during which the lender ***must*** grant forbearance.   In addition, the lender is able to grant an "administrative forbearance" to cover a delinquency period that existed prior to the deferment eligibility date.   ***The lender is authorized to capitalize the accrued unpaid interest at the end of any forbearance period.***[13]

The last sentence of this paragraph blatantly contradicts the cited regulation (34 C.F.R. § 682.211) as well as the plain terms of the standard form MPNs for FFELP loans.  Nevertheless, beginning in November 2007 at the latest—and continuing through January 2014 at the earliest—Great Lakes' System ***was in fact*** programmed as described in this paragraph: in other words, programmed to automatically charge interest on every outstanding FFELP loan on a daily basis (this is permitted), and then automatically capitalize interest every time that a FFELP loan exited a B-9 Forbearance period and entered repayment status (this is ***not*** permitted).

44.     The 2008 Control Report is dated November 11, 2008 and covers the period of October 1, 2007 through September 30, 2008.  Throughout this period, Great Lakes was still servicing FFELP loans, but not Direct loans.  The 2008 Control Report contains an identical section titled "Deferment and Forbearance Processing," including the following identical paragraph:

> Forbearance requirements are explained in Parts 682.202 and 682.211 and various other sections of the regulations.  When a borrower is in repayment and cannot make regular monthly payments, the lender may grant forbearance to that borrower to prevent default.  There are certain circumstances, such as a period of

---

[13] Emphasis on the word "must" exists in the original.

internship that exceeds the deferment limit, during which the lender ***must*** grant forbearance.   In addition, the lender is able to grant an "administrative forbearance" to cover a delinquency period that existed prior to the deferment eligibility date.  ***The lender is authorized to capitalize the accrued unpaid interest at the end of any forbearance period.*** [14]

45.    The 2009 Control Report is dated November 12, 2009 and covers the period of October 1, 2008 through September 30, 2009.   Throughout this period, Great Lakes was servicing FFELP loans, but not Direct loans.   The 2009 Control Report contains an identical section titled "Deferment and Forbearance Processing," including the following identical paragraph:

> Forbearance requirements are explained in Parts 682.202 and 682.211 and various other sections of the regulations.  When a borrower is in repayment and cannot make regular monthly payments, the lender may grant forbearance to that borrower to prevent default.  There are certain circumstances, such as a period of internship that exceeds the deferment limit, during which the lender ***must*** grant forbearance.   In addition, the lender is able to grant an "administrative forbearance" to cover a delinquency period that existed prior to the deferment eligibility date.  ***The lender is authorized to capitalize the accrued unpaid interest at the end of any forbearance period.***

46.    The 2010 Control Report is dated November 9, 2010 and covers the period of October 1, 2009 through September 30, 2010.  During this period, Great Lakes began servicing Direct loans in addition to FFELP loans.[15]  The 2010 Control Report contains an identical section titled "Deferment and Forbearance Processing," including the following identical paragraph:

> Forbearance requirements are explained in Parts 682.202 and 682.211 and various other sections of the regulations.  When a borrower is in repayment and cannot make regular monthly payments, the lender may grant forbearance to that borrower to prevent default.  There are certain circumstances, such as a period of internship that exceeds the deferment limit, during which the lender ***must*** grant forbearance.   In addition, the lender is able to grant an "administrative forbearance" to cover a delinquency period that existed prior to the deferment

---

[14] The overwhelming majority of the 60-plus page (single-spaced) Control Reports are simply copied and pasted verbatim from the previous year.

[15] *See* ¶24, *supra*.

18

eligibility date.  ***The lender is authorized to capitalize the accrued unpaid interest at the end of any forbearance period.***

47.     Remarkably—through four years—none of Great Lakes Defendants, their auditors, or the lender-recipients of these Control Reports seemed to recognize the discrepancy between the cited regulation ("Part 682.211") and Great Lakes' wrongful claim of capitalization rights in the same paragraph.  In 2011, however, something finally changed.

### Great Lakes Defendants Recognize Their Systematic B-9 Interest Capitalization Practices as Illegal, And Continue Them Anyway

48.     The 2011 Control Report is dated November 9, 2011 and covers the period of October 1, 2010 through September 30, 2011.  Throughout this period, Great Lakes was servicing both FFELP and Direct loans.  Like the 2007-2010 Control Reports, the 2011 Control Report contains a section titled "Deferment and Forbearance Processing," which is ***almost*** identical to its predecessors.  The section includes the following paragraph:

> Forbearance requirements are explained in ***Parts 682.202, 682.211 and 685.205*** and various other sections of the regulations.  When a borrower is in repayment and cannot make regular monthly payments, the lender may grant forbearance to that borrower to prevent default.  There are certain circumstances, such as a period of internship that exceeds the deferment limit, during which the lender ***must*** grant forbearance.  In addition, the lender is able to grant an "administrative forbearance" to cover a delinquency period that existed prior to the deferment eligibility date.  ***Generally, the lender is authorized to capitalize the accrued unpaid interest at the end of the forbearance period.***[16]

There are only two changes in this paragraph relative to the 2007-2010 paragraphs.  Both changes are meaningful.

49.     First, the additional citation to 34 C.F.R. 685.205 (in the first sentence) belatedly acknowledges the forbearance regulation that applies to Direct loans.[17]  Second, the absolute and

---

[16] Emphasis is added only in the first and last sentences of this paragraph; these are the only two portions of the paragraph that are not identical to the corresponding 2007-2010 paragraphs.

[17] *See* ¶24, *supra*.  Given the fact that Great Lakes began servicing Direct loans in July 2010, it is unclear why this was not included in the 2010 Control Report.

unqualified right to capitalization that Great Lakes claimed from 2007 to 2010 (in the last sentence) was now tempered and qualified.[18]   Individual Defendants Leitl, Lentz and Walker were ***directly*** responsible for these two changes.

50.     Included in the 2011 Control Report is a section entitled "Assertions of Great Lakes Educational Loan Services, Inc." ("Defendants' 2011 Assertion").   Defendants' 2011 Assertion states in pertinent part:

> The Company confirms to the best of its knowledge and belief, that: . . .
>
> 1. The Description [of Great Lakes' servicing operations] fairly presents the Loan Servicing System (System) as made available to user entities . . . for processing their transactions.
> ***
> The criteria we used in making this assertion were that the Description . . .
>    a. presents how the System as made available to user entities was designed and implemented, including . . . the procedures . . . by which transactions are initiated authorized, recorded, processed, corrected as necessary, and transferred to the reports presented to user entities . . . [and presents] specified control objectives and controls designed to achieve those objectives[;] [and]
>    b. does not omit or distort information relevant to the scope of the System . . . .
> 2. The Description includes relevant details of changes to the System during the period from October 1, 2010 to September 30, 2011[;] [and]
> 3. The controls related to the control objectives stated in the Description were suitably designed and operated effectively throughout the period October 1, 2010 to September 30, 2011 to achieve those control objectives . . . .   The criteria we used in making this assertion were that:
>    a. the risks that threaten the achievement of the control objectives stated in the Description have been identified.[19]
> ***

51.     The 2011 Assertion was personally signed by Defendant Leitl (Great Lakes' Chief Servicing Officer at the time), Defendant Michael Walker (Great Lakes' Chief

---

[18] *Compare* ¶43-46, *supra* ("The lender is authorized to capitalize the accrued unpaid interest at the end of ***any*** forbearance period."), *with* ¶48, *supra* ("***Generally,*** the lender is authorized to capitalize the accrued unpaid interest at the end of ***the*** forbearance period.").

[19] Among the "control objectives" provided in Great Lakes' 2011 Control Report are "reliability of financial reporting" and "compliance with applicable laws and regulations."

Infrastructure Officer at the time), and Defendant David Lentz (Great Lakes' Chief Technology Officer at the time), and dated November 9, 2011.  All three Individual Defendants thus expressed to their lender-customers their personal knowledge and control of Great Lakes' Loan Servicing System as well as the particular contents of the Control Report.  Individual Defendants were therefore personally aware of and responsible for the subtle—but very meaningful— changes to the 2011 Control Report relative to its predecessors.  Great Lakes Defendants made and signed off on those changes for one reason, and one reason only: ***after four full years of admitted noncompliance, Great Lakes Defendants finally realized that their false claim of capitalization rights was contrary to the cited regulations, contrary to the Master Promissory Notes that govern Direct and FFELP loans, and contrary to the standard IDR, deferment and consolidation application forms that Great Lakes provides to borrowers nationwide.***  Such an obvious realization was inevitable for Great Lakes Defendants, and it occurred on or before November 9, 2011.

52.     The next Control Report that Plaintiff's counsel was able to obtain is dated August 13, 2013, and covers the period of January 1, 2013 to June 30, 2013 ("August 2013 Control Report").[20]  Like all prior Control Reports, the August 2013 Control Report contains a section titled "Deferment and Forbearance Processing," including a paragraph that is ***mostly*** identical to its predecessors:

> When a borrower is in repayment and cannot make regular monthly payments, the lender may grant forbearance to that borrower to prevent default.  There are certain circumstances, such as a period of internship that exceeds the deferment limit, during which the lender must grant forbearance.  In addition, the lender is able to grant an "administrative forbearance" to cover a delinquency period that existed prior to the deferment eligibility date.

---

[20] Curiously, Plaintiff's counsel was unable to obtain a Control Report for 2012 or even confirm that one exists.

Remarkably, however, ***only the last sentence from the predecessor paragraphs is removed completely from the face of this Control Report.***[21]  Great Lakes Defendants' wrongful claim to capitalization was not merely qualified this time.  It was erased.  Great Lakes Defendants erased that sentence, and only that sentence, for the same reason they had revised it in the 2011 Control Report:  Great Lakes Defendants ***knew*** that their System was programmed to illegally capitalize the interest at the end of every forbearance—including every B-9 Forbearance—and acted to conceal that fact from Government Defendants and other FFELP lenders reviewing the Control Reports.

53.    The August 2013 Control Report includes an Assertion ("Defendants' August 2013 Assertion") substantially similar to Defendants' 2011 Assertion:

> We have prepared the accompanying Student Loan Servicing Program description (Description) of Great Lakes Educational Loan Services, Inc. (Service Organization) for users of the Student Loan Servicing Program (Program) during some or all of the period from January 1, 2013 through June 30, 2013 . . . .  The management of Great Lakes Educational Loan Services, Inc. confirms, to the best of its knowledge and belief, that:
>
> 1.  The Description fairly presents the Program made available to user entities during the period from January 1, 2013 through June 30, 2013, for processing their transactions.
>
> ***
>
> The criteria we used in making this assertion were that the Description:
>
>    a.  presents how the Program made available to user entities was designed and implemented, including  . . . the procedures, within both automated and manual systems, by which . . . transactions are initiated authorized, recorded, processed, corrected as necessary, and transferred to the reports presented to user entities . . . [and further presents] specified control objectives and controls designed to achieve those objectives[;] [and]
>
>    b.  does not omit or distort information relevant to the scope of the System . . . .

---

[21] Great Lakes' citation to forbearance regulations (i.e., the first sentence of the predecessor paragraphs) was now included in an introductory paragraph at the beginning of the August 2013 "Deferment and Forbearance Processing" section.

    2.   The Description includes relevant details of changes to the System during the period from January 1, 2013 through June 30, 2013[;] [and]

    3.   The controls related to the control objectives stated in the Description . . . were suitably designed and operated effectively throughout the period from January 1, 2013 through June 30, 2013, to achieve those control objectives. The criteria we used in making this assertion were that:

        a.   the risks that threaten the achievement of the control objectives stated in the Description have been identified by the Service Organization.[22]

    54.    The August 2013 Assertion was signed only by Defendant Leitl (Great Lakes' Chief Servicing Officer at the time), and dated August 13, 2013. Defendant Leitl thus expressed to Great Lakes' lender-customers her personal knowledge and control of Great Lakes' Loan Servicing System as well as the particular contents of the August 2013 Control Report. Defendant Leitl was therefore personally aware of and responsible for meaningful changes in the August 2013 Control Report relative to its predecessors, including the complete removal of Great Lakes' prior claims to capitalization from this Control Report. Defendant Leitl made and signed off on that change for one reason, and one reason only: ***Defendant Leitl—like Defendants Lentz and Walker—knew that Great Lakes' ongoing, automated B-9 Interest capitalization practices were contrary to the cited regulations, contrary to the Master Promissory Notes governing Direct and FFELP loans, and contrary to the standard IDR, deferment and Consolidation Loan application forms that Great Lakes was providing to millions of borrowers on a continuous basis.*** Defendant Leitl therefore acted to remove from the August 2013 Control Report any reference to Great Lakes' purported right to capitalize interest at the end of forbearance periods (whether stated "generally," as in 2011, or with respect to "any" forbearance period, as from 2007 to 2010).

---

[22] Among the "control objectives" provided in Great Lakes' August 2013 Control Report are "reliability of financial reporting" and "compliance with applicable laws and regulations."

55.     Great Lakes' Control Report dated February 13, 2014 ("February 2014 Control Report") covers the period of July 1, 2013 through December 31, 2013.  The February 2014 Control Report is similar to the August 2013 Control Report in all relevant respects.  Plaintiff's counsel was unable to obtain a Control Report for 2014 or any period beyond 2014.

56.     All three Individual Defendants recognized—on or before November 9, 2011— the discrepancy between Great Lakes' well-established compliance obligations and its B-9 Interest capitalization practices through their personal involvement in designing, implementing and monitoring Great Lakes' Student Loan Servicing System.   Indeed, the Control Reports alleged herein state that:

> Great Lakes has established an independent Internal Audit Department, which reports  . . . to the Chief Privacy Officer and Deputy General Counsel.  The Internal Audit Department is responsible for performing internal reviews related to Great Lakes' operations, financial reporting and compliance with applicable laws and regulations.

> The officer group meets *weekly* to discuss general operational issues, as well as to periodically review various operational reports.  *In addition, when issues are identified, the management team will evaluate appropriate corrective actions.*

The Control Reports further state:

> Risk assessments related to Great Lakes' loan servicing activities are performed continually.  *Significant risks and the measures to mitigate those risks are discussed as part of periodic officer group meetings and management team meetings*.

Once Great Lakes' noncompliance with B-9 Forbearance Regulations was recognized—and it was, on or before November 9, 2011—Individual Defendants personally learned of that noncompliance through the above channels and evaluated potential corrective actions. Nevertheless, *Great Lakes Defendants took no corrective action for several years, and instead, took further actions to conceal and continue Great Lakes' illegal capitalization practices*.

57.     In fact, continuing at least through January 2014, Great Lakes Defendants were still—on a continuous basis—willfully and automatically capitalizing accrued interest every single time that a FFELP or Direct loan transitioned from B-9 Forbearance status to repayment status.  Great Lakes Defendants have therefore known every single day, since the time that they recognized their own noncompliance, that:

(a) *on a daily basis*, including to this day, Great Lakes has represented to—and would continue to represent to and collect from—hundreds of thousands of FFELP and Direct borrowers fraudulently and illegally inflated principal and interest balances, through www.mygreatlakes.org and through e-mail;

(b) *on a daily basis*, on behalf of its lender-customers, Great Lakes has illegally sought to collect and actually collected—and would continue to illegally seek and actually collect—from FFELP and Direct borrowers principal and interest balances that were and are wrongly and measurably inflated;

(c) *on a daily or near-daily basis*, Great Lakes has automatically mailed and would continue to automatically mail to many borrowers artificially inflated account statements that purport to require payment on principal and interest balances that are in fact illegal and illegitimate;

(d) *on a daily basis*, Great Lakes has fraudulently represented through the internet to its lender-customers—including the Department of Education—illegally inflated principal balances and interest accruals for outstanding Direct and FFELP loans held by such lenders; and

(e) Great Lakes' automated, unlawful B-9 Interest capitalizations had financially harmed and would continue to financially harm the very FFELP and Direct borrowers that

Congress and the Department intended to aid in repayment: namely, borrowers

seeking financial relief through an IDR plan, deferment, forbearance or Consolidation

Loan.

58.     When Great Lakes Defendants realized on or before November 9, 2011 that their

systematic practice of capitalizing B-9 Interest was illegal, Great Lakes Defendants could have:

(1) reprogrammed Great Lakes' automated System to immediately cease this illegal practice

("Reprogramming"); (2) after Reprogramming, *analyzed their own database* to identify the

FFELP and Direct borrowers that Great Lakes had placed into B-9 Forbearance prior to

Reprogramming; (3) recalculated the proper balances for such borrowers' accounts and/or

provided appropriate cash refunds to borrowers as necessary; and (4) notified borrowers and

lenders of Great Lakes' error and the steps that Great Lakes was taking to rectify the error

(collectively, "Remediation")*.*

59.     Instead, Great Lakes Defendants *knowingly* continued their illegal capitalization

practices for several years and thereby perpetrated a massive financial fraud on struggling

borrowers.  Great Lakes Defendants had the motive and opportunity to do so.

**Great Lakes Defendants' Motive and Opportunity to Defraud Plaintiff and the Class**

60.     Great Lakes' Servicing Contract with the Department of Education has always

provided that Great Lakes would be paid by the Department on a per-borrower basis.  The

Servicing Contract also provides a methodology for allocating borrowers (and therefore

revenues) between Great Lakes and other major servicers.  The Servicing Contract expressly and

repeatedly provides that Great Lakes is *"responsible for maintaining a full understanding of all*

*federal and state laws and regulations and [Department of Education] requirements and*

26

*ensuring that all aspects of the service continue to remain in compliance . . . .*" That provision

is anything but toothless.  The Servicing Contract further provides:

> **Invoicing and Non-Compliance** — Borrowers whose loans are not being serviced in compliance with the Requirements, Policy and Procedures for servicing federally held debt due to the fault of the servicer (***i.e., correct interest calculations, correct balances, interest determination and calculations,*** notices sent properly, proper due diligence, etc.), ***will not be billable to the Government from the initial point of non-compliance.  Any funds that have been invoiced for these borrowers and paid shall be returned to the Government via a credit on the next invoice.***

The Servicing Contract also permits the Department to **"*unilaterally shift borrowers [between*

*servicers] in the best interest of the Government or Borrowers, at no additional cost to the*

*Government.*"**  The Servicing Contract also explicitly provides:

> *If a servicer is out of compliance (for example, but not limited to, financial management or reporting, security, OMB Circular A-123, Legislative Mandates, Program Compliance, etc.), that servicer's new [borrower] volume may be re-allocated to one or more other servicers until compliance has been achieved.  In addition, that servicer's current account volume may be transferred to another servicer, at the non-compliant servicer's expense.*

In other words, in the event of significant non-compliance on the part of Great Lakes,

Government Defendants have reserved the explicit right to eviscerate Great Lakes' past, current

and future revenue under the Servicing Contract.

      61.    Once Great Lakes Defendants recognized that they were wrongfully overcharging

hundreds of thousands of FFELP and Direct borrowers on a daily basis, Great Lakes Defendants

knew:

> (a) that there was no way to engage in a full scale Remediation without admitting to the
>
> Department (and all of their other lender-customers) their ***years*** of inexcusable
>
> noncompliance with respect to FFELP and Direct loans;[23]

---

[23] This is because altering FFELP and Direct borrowers' ***existing*** account balances (as opposed to merely changing the way ***future*** balances are calculated) would require changes to the federal government's general ledger, as provided in the Servicing Contract.

(b) that they would *immediately* owe the Department at least millions of dollars due to years of non-compliance on hundreds of thousands of borrowers' accounts;

(c) that the Department could and would likely transfer some *or all* of Great Lakes' existing borrowers to another servicer capable of reading and adhering to regulations and loan documents written in plain English;

(d) that the Department could and would strictly limit *or eliminate completely* the assignment of future borrowers to Great Lakes; and

(e) that they could and would likely lose many of their non-Department lender-customers as a result of their inexcusable noncompliance.

62.     The Department has been far and away Great Lakes' largest customer since the inception of the Servicing Contract.  Indeed, the overwhelming majority of student loans serviced by Great Lakes have consistently been FFELP or Direct loans held by the Department.[24] Thus, the above consequences above would be financially and professionally devastating to Great Lakes Defendants.  Those consequences would cause not only a devastating reduction in revenue (i.e., $100+ million per year), but a commensurate explosion in costs as Great Lakes would have to spend *at least* tens of millions of dollars to refund the Department (and other lenders), fund and execute a massive Remediation, and potentially fend off numerous lawsuits. All of this would have seriously threatened not only Individual Defendants' jobs, but Great Lakes' ability to continue operating.

63.     Instead of facing all of that trouble and uncertainty, Great Lakes Defendants instead sought to avoid the above consequences at the smaller individual expenses of Plaintiff and the Class.

---

[24] *See* ¶24, *supra* (approximately $157 billion in Department-held FFELP and Direct loans, versus $10+ billion in FFELP loans held by non-Department lenders).

**The Daily Accruing Damages Suffered by Plaintiff and the Class as a Result of Great Lakes Defendants' Ongoing Fraud**

64.     Plaintiff is a borrower of both FFELP and Direct loans serviced by Great Lakes. The lender (i.e., loan holder) for all of Plaintiff's FFELP and Direct loans is the Department of Education.   The outstanding principal balances on Plaintiff's loans currently amount to $25,686.43.  Exactly $819.65 of those principal balances are improper and fraudulent.

65.     On October 3, 2013, Great Lakes placed Plaintiff's FFELP and Direct loans into B-9 Forbearance status while she applied to switch from a standard repayment plan to an IDR plan.  Plaintiff submitted the standard form IDR application provided to her by Great Lakes, along with documentation of her income.  On November 28, 2013—more than two full years (at least) after Defendants learned that their System was wrongly programmed—Great Lakes approved Plaintiff's IDR application, switched her account from a B-9 Forbearance status to repayment status, and wrongfully capitalized a total of $819.65 in B-9 Interest on Plaintiff's FFELP and Direct loans.

66.     Those illegal and fraudulently created principal dollars have been accruing wrongful interest charges against Plaintiff on a daily basis since November 28, 2013, at a rate of approximately 14 cents per day, $51 per year.  These illegal interest charges will continue to accrue against Plaintiff *every single day* until Plaintiff repays—in fact, overpays—all of her student loans in full.   Great Lakes Defendants knowingly and directly transmit fraudulent principal balances and interest accruals every day, not only to Plaintiff (and the Class) through www.mygreatlakes.org, e-mail and regular mail, but also to Plaintiff's and the Class's lenders (predominantly the Department) through the internet, e-mail and regular mail.

67.     As of year-end 2014, Great Lakes was servicing approximately $30.8 billion of Direct and FFELP loans set on an IDR plan, owed by close to 700,000 borrowers.  In addition,

there were hundreds of thousands of borrowers who had applied for consolidation or various types of deferment or forbearance in recent years.  Great Lakes has placed such borrowers' FFELP and Direct loans into B-9 Forbearance in order to process the necessary borrower applications and documentation.  Great Lakes has placed some of these loans into B-9 Forbearance multiple times and capitalized B-9 Interest on such loans multiple times: causing wrongful principal balances to accrue wrongful interest, which itself begins to accrue wrongful interest at the time of the second capitalization, and so on.  Even proper capitalizations that post-date a wrongful capitalization compound the damage caused by the wrongful capitalization, as interest that never should have accrued is later added to the principal balance along with properly accrued interest.

68.     Based in part on the above statistics, Plaintiff estimates that Great Lakes Defendants have illegally capitalized at least hundreds of millions of dollars against FFELP and Direct borrowers nationwide.  Those dollars *continue* to accrue interest against Plaintiff and the Class on a daily basis, for all inflated and outstanding FFELP and Direct loans.  In addition, borrowers who have paid off their illegally inflated loans in full have paid measurably more than their lawful debt required.

69.     Great Lakes Defendants have known all of this for years, but have not rectified damaged borrowers' accounts.  Instead, Great Lakes Defendants have taken affirmative actions to conceal their enormous and ongoing financial fraud.

**Great Lakes Defendants Engage in a Cover-Up to Conceal Their Fraudulent Transactions**

70.     On February 16, 2015, Great Lakes put Plaintiff's FFELP and Direct loans into the exact same type of forbearance status (a B-9 Forbearance) as the one that her loans had been in from October 3, 2013 through November 27, 2013**.**  Then, on April 17, 2015 (60 days later),

30

Plaintiff's loans again switched from B-9 Forbearance status to repayment status, just as they had in 2013. *Id.* But this time, not one cent of interest was capitalized at the end of Plaintiff's B-9 Forbearance. ***That is because, after several years of willfully, continuously and illegally capitalizing B-9 Interest, Great Lakes Defendants finally reprogrammed their System to stop these wrongful capitalizations from occurring in the future.***

71.     That Reprogramming occurred somewhere between February 1, 2014 and April 16, 2015: most likely in mid-2014.  Yet Great Lakes Defendants still, to this very day, have intentionally done ***nothing*** to remediate the accounts of FFELP or Direct borrowers like Plaintiff, who they know are continually being harmed by illegal B-9 Interest capitalizations that occurred ***before*** the Reprogramming.

72.     Instead, Great Lakes Defendants have taken ***further*** actions to conceal their wrongful capitalizations.  In or around January 2015, Great Lakes "remodeled" its borrower account management interface on www.mygreatlakes.org.  The new account management website ***looks*** different from the old interface that had been in place for years: new shapes, new colors, new fonts, etc.  Functionally, however, the borrower interface on www.mygreatlakes.org remains substantially similar to the old, providing the same tools and information: with just one relevant exception. ***Borrowers can now view only the last 12 months of their loan transaction histories.***

73.     Before Great Lakes Defendants remodeled their borrower interface on www.mygreatlakes.org, borrowers could navigate the website to see complete transaction histories for their FFELP and Direct loan accounts (including all interest capitalizations).  The source of these viewable transaction histories has always been the same for both the old and new web interfaces; the records are uploaded to the web interface directly from Great Lakes' System.

In fact, Great Lakes still maintains on its System complete transaction (and loan status) histories for every FFELP and Direct borrower it services.  The difference now is: a borrower must not only navigate to their transaction history on www.mygreatlakes.org, but also notice that it is incomplete, desire to view a transaction occurring over a year ago, and call Great Lakes' borrower services department to specifically request transaction histories for their loans.

74.   In sum, in or around January 2015, *Great Lakes suddenly rendered the overwhelming majority of their illegal B-9 Interest capitalizations invisible to borrowers on www.mygreatlakes.org.*  To the extent that a few straggler B-9 Interest capitalizations remained visible on the website even after the "remodeling," those too would be rendered invisible soon enough, once the last ones fell outside the new 12-month range of visibility.  Given that the Reprogramming most likely occurred in mid-2014, all remaining B-9 Interest capitalizations would be taken off the web within a few short months.

75.   This has become Great Lakes Defendants' modus operandi: subtly tweaking their disclosures to lenders and borrowers in order to conceal their fraud, and hoping no one notices as they continue to overcharge hundreds of thousands of borrowers for years into the future.  This cannot continue.  Plaintiff seeks relief on behalf of the Class from all of Great Lakes Defendants' wrongful B-9 Interest capitalizations occurring over nearly nine years.

## CLASS ALLEGATIONS

76.   Plaintiff brings this class action pursuant to Rule 23 of the Federal Rules of Civil Procedure ("Rule 23") on behalf of a Class consisting of all persons who, at any time on or after October 1, 2006 ("the Class Period"): (1) was a borrower of any FFELP or Direct loan serviced by Great Lakes; (2) applied for an IDR plan, deferment, forbearance or consolidation for any such loan; (3) had Great Lakes apply an administrative forbearance to any such loan for a period of up to 60 days concurrent with the processing of his or her application; and (4) had accrued

interest on such a loan capitalized at the end of the administrative forbearance (as terms are defined in this Complaint).  Excluded from the Class are all Defendants named herein, the officers and directors of such entities at all relevant times, members of Defendants' immediate families and their legal representatives, heirs, successors or assigns, as applicable, and any entity in which any Defendant has or had a controlling interest.  Plaintiff also seeks to represent a Subclass of any Class member who has (or had, in the case of loans now repaid in full) the Department as a lender of the FFELP or Direct loan(s) that render him or her a Class member.

77.    Class members and Subclass members are so numerous and geographically dispersed that joinder of all members is impracticable.  During the course of the Class Period, Great Lakes has serviced over 10 million Direct and/or FFELP borrowers widely dispersed across the United States.  Members of the Class are readily identifiable through comprehensive database records maintained by Defendants.  Moreover, because Great Lakes Defendants maintain all of the latest, direct contact information for every Class member, Class members may be notified of the pendency of this action by electronic mail, regular mail, and other means using the form of notice similar to that customarily used in Rule 23 class actions. While the exact numbers of Class and Subclass members are currently unknown to Plaintiff, Plaintiff estimates that the number of Subclass members alone is at least in the hundreds of thousands.

78.    Plaintiff's claims are typical of Class and Subclass members' claims, as all Class members have suffered the same harm as a result of the same illegal course of conduct by Defendants.  In addition, Plaintiff's and Class members' claims for relief arise under precisely the same federal and state laws.

79.     Plaintiff will fairly and adequately protect the interests of Class and Subclass members and has retained counsel that is competent and experienced in prosecuting class actions.

80.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.   Common questions of law and fact among Class members include, among many other things:

(a)     Whether Defendants violated the Higher Education Act of 1965 and regulations promulgated thereunder;

(b)     Whether Defendants violated the terms of the standard form Master Promissory Notes governing Direct and FFELP loans;

(c)     Whether Great Lakes automatically and wrongfully capitalized B-9 Interest (as that term is defined herein) during the Class Period;

(d)     Whether and when Great Lakes Defendants learned that their systematic practice of capitalizing B-9 Interest on Direct and FFELP loans was illegal;

(e)     Whether Great Lakes Defendants knowingly continued to violate federal and state law by continuing to automatically capitalize B-9 Interest on FFELP and Direct loans during the Class Period;

(f)     Whether Great Lakes Defendants have taken affirmative actions to conceal their fraud from borrowers and lenders; and

(g)     The extent to which Class members have sustained damages and the proper measure thereof.

81.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy because joinder of all members is impracticable. Furthermore,

because the damages suffered by individual Class members are relatively small (in all cases, less than $10,000), the expense and burden of individual litigation make it impossible for Class members to redress the wrongs done to them on an individual basis.  There will be no difficulty in the management of this case as a class action.

**COUNT I**
**Violations of the Racketeer Influenced and Corrupt Organizations Act**
**18 U.S.C. §§ 1961-1964**
**(Against Great Lakes Defendants)**

82.     Plaintiff repeats and realleges each and every allegation above as if fully set forth in this paragraph.

83.     Great Lakes is an "enterprise" within the meaning of 18 U.S.C. § 1961(4) engaged in interstate commerce at all relevant times.

84.     At all relevant times, Individual Defendants Leitl, Lentz and Walker have conducted and directly participated in the conduct of Great Lakes as a federal student loan servicer.  Specifically, Defendant Leitl (as Chief Servicing Officer and Chief Operating Officer of Great Lakes), Defendant Lentz (as Chief Technology Officer of Great Lakes) and Defendant Walker (as Chief Technology Strategy Officer, Chief Information Officer and Chief Infrastructure Officer of Great Lakes), have admittedly, and at all relevant times, had personal and detailed knowledge of and control over Great Lakes' federal student loan servicing operations, including, but not limited to, the structure and function of Great Lakes' automated Student Loan Servicing System.  Individual Defendants have also maintained interests in and/or control of Great Lakes through a pattern of racketeering activity.

85.     Great Lakes Defendants' pattern of racketeering activity has consisted of continuous, daily acts indictable as wire fraud under 18 U.S.C. § 1343 and mail fraud under 18 U.S.C. § 1343, acts which began on or before November 9, 2011 and are ongoing to this day.

Specifically, Great Lakes Defendants have engaged in a scheme to defraud—and to obtain money from, by means of false or fraudulent pretenses and representations—both (1) borrowers with Direct or FFELP loans serviced by Great Lakes *and* (2) the Department of Education, as a FFELP and Direct lender and party to Great Lakes' Servicing Contract. Great Lakes Defendants' scheme to defraud, and to obtain money by means of false or fraudulent pretenses and representations, began on or before November 9, 2011 and can be summed up as follows: knowingly charging hundreds of thousands of FFELP and Direct borrowers illegal interest on a daily basis (continuing to this day), and knowingly concealing the same from Government Defendants for the purpose of preserving and receiving hundreds of millions of dollars in revenue from the Department of Education, in fraudulent violation of the Servicing Contract.

86.     In furtherance and for the purpose of executing this scheme, Great Lakes Defendants have knowingly, for at least the last four years:

(a)     transmitted and continue to transmit, through the internet, World Wide Web (www.mygreatlakes.org), electronic mail and regular mail, illegally inflated principal balances and interest accruals on a daily basis (continuing to this day) to FFELP and Direct borrowers like Plaintiff and their lenders nationwide;

(b)     transmitted and continue to transmit—through the World Wide Web, electronic mail and regular mail—the Department's standard form IDR, deferment and Consolidation Loan applications to FFELP and Direct borrowers, while knowing that the otherwise proper disclosures on the face of those standard form applications were verifiably false as to Great Lakes and its lender-customers[25]; and

_____

[25] The standard deferment application forms for both FFELP and Direct loans state: "My loan holder may grant a forbearance on my loan(s) for up to 60 days, if necessary, for the collection and processing of documentation related to my deferment request. Interest that accrues during this forbearance will not be capitalized." The standard Consolidation Loan application forms

(c)      submitted and continue to submit to the Department regular invoices for

payment—through regular mail (to 830 First Street, NE, Suite 54B1, Washington, D.C.,

20202), electronic mail (to invoiceadmin@ed.gov) or fax (to (202)-275-3477) pursuant to

the Servicing Contract—for servicing borrowers whose loans were and are ***not*** being

serviced in compliance with federal or state law, as required by the Servicing Contract.

87.      In addition to violating 18 U.S.C. §§ 1962(b) and (c) as described above, Great

Lakes Defendants have conspired to violate the same, in violation of 18 U.S.C. § 1962(d).

88.      By direct reason of Great Lakes Defendants' numerous and ongoing indictable

acts described above, Plaintiff and the Class have been injured (and continue to be injured) in

their business and property by being overcharged on a daily basis—in quantifiable amounts—by

Great Lakes and their FFELP and Direct lenders.

### COUNT II
### Negligence
### (Against Great Lakes)

89.      Plaintiff repeats and realleges each and every allegation above as if fully set forth

in this paragraph.

90.      Great Lakes owes a duty to the FFELP and Direct borrowers whose loans it

services.  Great Lakes' duty arises under the Servicing Contract, Great Lakes' servicing contracts

with non-Department FFELP lenders, and federal law governing all FFELP and Direct loans as

---

state: "Under certain circumstances, we [the Department of Education] may also give you a forbearance without requiring you to submit a request or documentation. These circumstances include, but are not limited to, the following: . . .  A period of up to 60 days in order for us to collect and process documentation related to your request for a deferment, forbearance, change in repayment plan, or consolidation loan (we do not capitalize the interest that is charged during this period)." The standard form IDR applications state: "I understand that . . . my loan holder may grant me a forbearance for up to 60 days to collect and process documentation supporting my request for the selected plan. I am not required to make loan payments during this period of forbearance, but interest will continue to accrue. Unpaid interest that accrues during this forbearance period will not be capitalized."

well as student loan servicers.  Great Lakes' duty includes, without limitation, the duty to service borrowers' FFELP and Direct loans in accordance with the loans' plain terms, and a duty ***not*** to charge borrowers with (and report to borrowers' lenders) artificially inflated principal balances and interest accruals on a daily basis.

91.     Great Lakes has breached its duty to borrowers by failing to adhere to the plain terms of the Master Promissory Notes governing the FFELP and Direct loans it services, and by charging borrowers wrongful interest accruals on a daily basis in violation of the MPNs and federal law.

92.     Plaintiff and the Class have been harmed as a direct result of Great Lakes' breach, by being overcharged on a daily basis by both Great Lakes and the lenders of their FFELP and Direct loans, in violation of the governing Master Promissory Notes as well as federal law.

## COUNT III
### Negligent Misrepresentation
### (Against Great Lakes)

93.     Plaintiff repeats and realleges each and every allegation above as if fully set forth in this paragraph.

94.     Great Lakes has negligently (at the very least) made false and misleading misrepresentations of fact to Plaintiff and the Class, including false and misleading loan balances and false and misleading statements regarding interest capitalization contained in the standard form FFELP and Direct loan applications for deferments, Consolidation Loans and IDR plans. *See* ¶86(b), n.25 *supra*.

95.     Plaintiff and the Class necessarily relied on such representations because Great Lakes is their primary source of information and point of contact for all information regarding their student loans, including (without limitation) daily loan balances, which are calculated and provided to borrowers and lenders by Great Lakes.  In fact, if Plaintiff or Class members attempt

to contact their lender(s) regarding their FFELP or Direct loans, they are referred to their servicer, Great Lakes, for loan-related inquiries.  Moreover, Plaintiff and every Class member personally read and signed the standard form deferment, IDR and Consolidation Loan applications provided by Great Lakes, thereby indicating their reliance on the misrepresentations contained therein.

96.     Plaintiff and the Class have been—and continue to be—directly damaged by all of the above misrepresentations on the part of Great Lakes, in being wrongfully overcharged on a daily basis by Great Lakes with respect to their FFELP and Direct loans.

**COUNT IV**
**Breach of Contract**
**(Against Government Defendants)**

97.     Plaintiff repeats and realleges each and every allegation above as if fully set forth in this paragraph.

98.     Plaintiff asserts this Count IV on behalf of the Subclass only, as this Count applies only to Direct loans and FFELP loans held by the Department.

99.     With respect to Direct loans, Plaintiff and Subclass members entered into binding contracts with Government Defendants when they executed the standard form Master Promissory Notes for Direct loans.  With respect to FFELP loans, Plaintiff and Subclass members entered into binding contracts with Government Defendants by executing the standard form Master Promissory Notes for FFELP loans, and by Government Defendants' subsequent purchase of Plaintiff's and Subclass members' FFELP loans from previous FFELP lenders.

100.     In violating the plain terms of the governing Master Promissory Notes as alleged herein, Great Lakes acted on Government Defendants' behalf pursuant to both the Servicing Contract and federal law.  Government Defendants—as the lenders and parties to the MPNs at

39

issue—have breached the plain terms of the Master Promissory Notes by failing to rectify Great Lakes Defendants' wrongful acts on Government Defendants' behalf.

101.    Plaintiff and Subclass members have been damaged by Government Defendants' ongoing breach of the applicable Master Promissory Notes, in quantifiable dollar amounts to be proven at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment as follows:

A.    Declaring that Great Lakes Defendants are jointly and severally liable for threefold the damages sustained by the Class, pursuant to 28 U.S.C. § 1964(c), by reason of Great Lakes Defendants' violations of 28 U.S.C. § 1962;

B.    Declaring that Great Lakes Defendants are jointly and severally liable for compensatory damages sustained by the Class as a direct result of Great Lakes Defendants' misrepresentations to Class members (and their lenders) regarding their FFELP and Direct loan accounts;

C.    Declaring that Government Defendants are jointly and severally liable for compensatory damages sustained by the Subclass as a direct result of Government Defendants' breach of the MPNs governing Plaintiff's and Subclass members' FFELP and Direct loans;

D.    Permanently enjoining Great Lakes Defendants from charging Plaintiff and Class members interest based on wrongfully capitalized principal dollars;

E.    Ordering Defendants to take all actions necessary to bring each and every outstanding FFELP and Direct loan account affected by the illegal acts alleged herein into compliance with the relevant laws and loan terms identified herein;

F.     Determining and certifying that this action is a proper class action, and certifying Plaintiff as Class representative and Plaintiff's counsel as Class counsel pursuant to Rule 23;

G.     Awarding Plaintiff and the Class pre-judgment and post-judgment interest (justly accruing on a daily basis) as well as reasonable attorneys' fees, costs and expenses incurred in this action;

H.     Awarding such other relief as the Court may deem just and proper.

**JURY DEMAND**

Plaintiff demands a trial by jury.


Respectfully submitted,

FINKELSTEIN & KRINSK LLP
Jeffrey R. Krinsk, Esq. (*pro hac vice* pending)
jrk@classactionlaw.com
William R. Restis, Esq. (*pro hac vice* pending)
wrr@classactionlaw.com
David J. Harris, Jr., Esq. (CA Bar #286204)
djh@classactionlaw.com




Dated: July 31, 2015          By: _____ s/ David J. Harris, Jr. _____
                                   David J. Harris, Jr., Esq.

                                   550 West C Street, Suite 1760
                                   San Diego, California 92101-3579
                                   Telephone: (619) 238-1333
                                   Facsimile:  (619) 238-5425

                                   Counsel for Plaintiff