FINKELSTEIN & KRINSK LLP
Jeffrey R. Krinsk, Esq. (*pro hac vice*)
jrk@classactionlaw.com
William R. Restis, Esq. (*pro hac vice*)
wrr@classactionlaw.com
David J. Harris, Jr., Esq. (CA Bar #286204)
djh@classactionlaw.com
Trenton R. Kashima, Esq. (*pro hac vice*)
trk@classactionlaw.com
550 West C Street, Suite 1760
San Diego, California 92101
Telephone: (619) 238-1333
Facsimile:  (619) 238-5425

*Attorneys for Plaintiff*

**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF WISCONSIN**

_____

| | |
|---|---|
| MEREDITH D. DAWSON,<br><br>                              Plaintiff,<br><br>    v.<br><br>GREAT LAKES EDUCATIONAL LOAN SERVICES, INC., GREAT LAKES HIGHER EDUCATION CORPORATION, JILL LEITL, DAVID LENTZ, and MICHAEL WALKER,<br><br>                              Defendants. | Case No. 15-cv-00475-bbc<br><br>**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S FIRST MOTION TO COMPEL PRODUCTION OF DEFENDANTS' EMAILS AND INSTANT MESSAGES** |

0

## I. INTRODUCTION

This is a somewhat unusual motion to compel the production of documents under Fed. R. Civ. P. ("Rule") 37.  Plaintiff Meredith D. Dawson and Defendants Great Lakes Higher Education Corporation, Great Lakes Educational Loan Services, Inc. (together, "Great Lakes"), Jill Leitl, David Lentz and Michael Walker agree on a particular population of documents to be produced to Plaintiff in this case.  Yet the parties disagree about *how* these documents should be produced.  The electronically stored information ("ESI") the parties have already isolated for production consists of Defendants' and their employees' emails and instant messages during the Class Period.  All of that ESI is contained in Defendants' Third Hit Report ("THR Documents"), which was generated based upon Plaintiff's third proposed list of ESI search terms and custodians.  *See* Declaration of David J. Harris, Jr. in Support of Plaintiff's Motion to Compel Production of Defendants' Emails and Instant Messages ("Harris Decl."), Ex. A.

Defendants have already offered to "produce" all non-privileged THR Documents by loading them onto a server maintained exclusively by defense counsel.  *See* Harris Decl., Ex. B.  Defense counsel would then allow Plaintiff to *view* the THR Documents through a secure web interface.  *Id.*  But neither Plaintiff nor her counsel would be able to *obtain* (i.e., print or download) the documents unless they make specific requests to defense counsel to actually produce particular documents.  *Id.*  Defendants' proposal is the digital equivalent of holding relevant documents up against their office window, and allowing Plaintiff's counsel to read them from across the street with a pair of binoculars.

Such a proposed "production" might be educational, but it is not useful in litigation. Furthermore, it is prejudicial to Plaintiff because—in addition to manifold inefficiencies—it would allow Defendants to know exactly which documents Plaintiff intends to use in deposition, long before Plaintiff has an opportunity to use them.  If that does not constitute the disclosure of

1

attorney work product, then it is the functional equivalent.  It amounts to Plaintiff's counsel telling defense counsel, "Here are all the documents we think are most important in proving our client's claims, and we intend to use these documents in a deposition sometime soon."

The purported reason why Defendants' refuse to actually **send** Plaintiff the THR documents is their fear that Plaintiff counsel's data systems will be hacked by computer hackers, causing Class members' personally identifying information ("PII") to be compromised. *See, e.g.,* Harris Decl., Ex. E.  Defendants refuse actual production because they purport to believe that housing the THR Documents on Foley & Lardner LLP's data systems is (somehow) safer than housing documents on Finkelstein & Krinsk LLP's systems.  Defendants have no evidence that Plaintiff's counsel's law firm has ever been hacked, or that Finkelstein & Krinsk LLP is abnormally vulnerable to data breaches (it hasn't, and it isn't).  Nor can Defendants point to any precedent where a court actually blocked the production of relevant documents—which are subject to a Protective Order—based on entirely speculative data security risks at some law firm.

On the contrary, as Defendants well know, Judge Peterson ordered them just nine months ago to produce relevant PII in a putative class action without any preconditions about data security at class counsel's law firm. *Groshek v. Great Lakes Higher Education Corporation*, No. 15-cv-143-jdp, 2015 WL 7294548, at *4 (W.D. Wis. Nov. 16, 2015).  Federal courts are ill-equipped to evaluate private law firms' data-breach risks whenever a litigant is entitled to receive personally or commercially sensitive documents in discovery.  If federal courts would like civil discovery to devolve into a nationwide circus of inefficiency, then they should go the route that Defendants suggest here.  Otherwise, federal courts should do what they have always done, which is ***not*** require third-party technology audits of counsel, *Daubert* motions, and data security experts every single time sensitive information is discoverable under Rule 26. *Id.*  The

2

Court's (like every other court's) Protective Order is sufficient, as is Plaintiff's willingness to work with her expert ESI liaisons to mitigate speculative hacking risks.

If Defendants' position seems a bit feigned, that is because it is feigned.  The Court can be confident of this because Plaintiff previously offered to allow Defendants to *redact* all relevant PII from the documents in question: thereby eliminating any conceivable risk that Class members' PII could be hacked out of Plaintiff's counsel's systems.  Defendants, however, claimed that it would be too burdensome to review and redact PII (if any) from the THR Documents.  Defendants claimed this burden even *after* Plaintiff satisfied Defendants' specific (and arbitrary) request to limit their initial ESI production burden to under 100,000 documents.  Harris Decl., Ex. B.  So on the one hand, Defendants say they will not produce PII—with or without a stipulated Court order—because Plaintiff's law firm might be hacked; but on the other hand, Defendants refuse to redact the PII because they now say it would be too burdensome for them to do so, despite their prior representations to the contrary.  *Id.*; *see also* Harris Decl. Ex. E.

As fully explained below, Defendants' production of the THR Documents is not merely "proportional" to Plaintiff's claims under Rule 26, it is critical.  This Class action alleges a complex student loan fraud by Defendants under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961, *et seq.* ("RICO").  *See generally* Plaintiff's Memorandum of Law in Support of Plaintiff's Motion for Class Certification (Dkt. 55) ("Opening Class Certification Brief"), at 1-9.  Defendants have already *admitted* to substantially overcharging hundreds of thousands of Class members for several years.  *Id.*  (citing Defendants' interrogatory responses, which were filed concurrently with Plaintiff's Opening Class Certification Brief and admitted to overcharging more than 360,000 Class members).  One vital question remaining in this case is whether and when Defendants *knew* that they were overcharging the Class.  *Id.*

3

Without the requested production of Defendants' emails, attachments and instant messages during the Class Period, Plaintiff's ability to prove her claims would be crippled if not destroyed. This is particularly true where—as here—Defendants have provided material, adverse (to them) deposition testimony on the question of fraudulent intent, and later attempted to **contradict** that damaging testimony using the deponent's Errata Sheet and subsequent declaration. *See* Plaintiff's Reply Brief in Support of Motion for Class Certification (Dkt. 70) ("Class Certification Reply Brief"), at 21-28 (detailing Defendants' deposition rewrites regarding their knowledge of wrongdoing during the Class Period). Contemporaneous email communications between Great Lakes executives and employees during the Class Period is necessary here, to resolve Defendants' "confusion" about their own fraudulent intent. *Id.*

The Court must order Defendants to produce, not merely show, the THR Documents to Plaintiff, so that Plaintiff can actually use them to prove her claims. Plaintiff can and will work with her expert ESI Liaisons at Altep, Inc.—not her legal adversaries at Foley & Lardner LLP— to manage discovery in a way that reasonably protects Class members' PII and Defendants' other confidential data under the Court's Protective Order. But Defendants' speculative hacker nonsense has run its course as a tool for obstructing Plaintiff's most crucial discovery.[1]

## II. STATEMENT OF FACTS

On July 31, 2015, Plaintiff filed her Class Action Complaint (Dkt. 1) ("Complaint") in this Court. The Complaint alleged that Great Lakes and Individual Defendants Leitl, Lentz and

---

[1] More recently, in response to Plaintiff's counsel's "Final Offer" to Defendants regarding the THR Documents, Great Lakes proposed producing the THR Documents directly to Plaintiff's ESI Liaison's at Altep, Inc., **contingent upon** (among other things) Plaintiff's counsel agreeing to "indemnify" Great Lakes against every conceivable cost that Great Lakes could theoretically incur in the event of a data breach at Altep. *See* Harris Decl., Ex. C; Ex. D. Plaintiff's counsel declined Great Lakes' request for free liability insurance from Plaintiff's counsel. *See* Harris Decl., Ex. E.

4

Walker knowingly overcharged Plaintiff and other borrowers of FFELP and Direct student loans over a multiyear period. *Ibid.* at ¶¶2-6 (Complaint's summary allegations).  Specifically, the Complaint alleged that Defendants routinely and illegally capitalized interest against borrowers who were placed in a particular type of forbearance period: a "B-9 Forbearance" period.  *Id.* at ¶¶2-6, ¶¶31-39.[2]  Wrongful capitalizations cause borrowers to suffer wrongful, *daily* interest charges until their loans are paid in full.  *Id.*  The Complaint contained detailed allegations about the nature of Defendants' illegal interest capitalizations and the fact that Defendants have known about them for years, but done nothing to fix them.  *See generally* Complaint.  In discovery, the Complaint has proven practically prophetic.  By way of example only:

| PLAINTIFF'S COMPLAINT (Dkt. 1) | DEFENDANTS' ANSWER (Dkt. 24) | EVIDENCE |
|---|---|---|
| "Great Lakes' automated Student Loan Servicing System was programmed to capitalize accrued interest *every single time* a borrower's FFELP or Direct loan switched from [a B-9 Forbearance] status to repayment status." ¶36; ¶61 (Great Lakes overcharged "hundreds of thousands" of borrowers). | "[C]onsistent with the federal regulations (for FFELP Loans, 34 C.F.R. § 682.211(f)(11), and for Direct Loans, 34 C.F.R. § 685.205(b)(9)), . . . Great Lakes has never pursued a policy of capitalizing interest accrued during an administrative-forbearance period." ¶113. | "Currently, . . . some of the interest that accrued during the non-capping forbearance [period is being] included in the capitalized amount." Harris Decl. in Support of Opening Class Certification Brief (Dkt. 58), Ex. BB; *see also id.*, Ex. A and B (hundreds of thousands of Class members affected in a four-year period). |

---

[2] A "forbearance" is a discrete period of time during which a borrower's obligation to make payments on his or her student loans is suspended.  There are many different types of forbearances under the U.S. Department of Education regulations governing FFELP and Direct loans.  *See generally* 34 C.F.R. §§ 682.211 (for FFELP loans), 685.205 (for Direct loans).  A "B-9 Forbearance" is a forbearance of the type described in 34 C.F.R. §§ 682.211(f)(11) (FFELP loans) and 685.205(b)(9) (Direct loans).  B-9 Forbearances are "non-capitalizing administrative forbearances" under the rules.  *See* Harris Decl. in Support of Opening Class Certification Brief (Dkt. 58), Ex. F.

5

| | | |
|---|---|---|
| The end of a B-9 Forbearance period is ***not*** a proper capitalization trigger under federal regulations. *See, e.g.,* ¶¶4, 31-34, 36; *see also* p. 12, n.7 (defining "B-9 Interest" as "any accrued interest on a FFELP or Direct loan that remains unpaid at the end of a B-9 Forbearance period," regardless of when that interest accrued). | The end of a B-9 Forbearance period ***is*** a proper capitalization event under the applicable regulations. *See, e.g.,* ¶¶117, 132. | Harris Decl. in Support of Opening Class Certification Brief (Dkt. 58), Ex. F (Change Request 1492); Kielhofer Decl. (Dkt. 66), Ex. D (Change Request 2785). |
| "Great Lakes and its executives actually recognized the illegal nature of their interest capitalization practices in or before November 2011." ¶5. | *See* ¶5 (denying the allegation in Complaint ¶5); *see also* Defendants' Prayer for Relief at pp.30-31 (Defendants illegal interest capitalizations "were not [done] knowingly or intentionally."). | GLELSI Deposition (Dkt. 53) at 67:5-25; 68:5-9; 69:12-16; 70:16-22; 70:23-24 (Great Lakes' Chief Servicing Officer testifying ***five times*** that Defendants understood CR1492 to require them to stop capitalizing any interest at the end of B-9 Forbearances). |
| "[S]omewhere between February 1, 2014 and April 16, 2015: ***most likely in mid-2014***," said the Complaint, "Defendants finally reprogrammed their System to stop these wrongful capitalizations in the future." But Defendants "have intentionally done ***nothing*** to remediate the accounts of FFELP or Direct borrowers like Plaintiff, who they know are being continually harmed by illegal B-9 Interest capitalizations that occurred ***before*** the Reprogramming." ¶¶70-71. | "Nor did Great Lakes change its system, *pace* Dawson's allegations, 'somewhere between February 1, 2014 and April 16, 2015'" in an effort to cover-up a fraud." ¶125 (citing Complaint ¶¶70-71). | GLELSI Deposition Errata Sheet (Dkt. 63) at 20 ("Later, in April 2014, [Defendants] discovered that [their] interest capitalization rules for [two B-9 Forbearance identifiers in Great Lakes' System] were inconsistent with each other. [Defendants then changed their System programming.] "This change meant that no interest was capitalized at the conclusion of [B-9 Forbearance] periods . . . ." |

6

| | | |
|---|---|---|
| "When [Defendants] realized on or before November 9, 2011 that their systematic practice of capitalizing B-9 Interest was illegal, Great Lakes Defendants could have: (1) reprogrammed [their] System to immediately cease this illegal practice ("Reprogramming"); (2) after Reprogramming, *analyzed their own database* to identify the FFELP and Direct borrowers that Great Lakes had placed in B-9 Forbearance prior to Reprogramming; (3) recalculated the proper [loan] balances for such borrowers' accounts and/or provided appropriate cash refunds to borrowers as necessary; and (4) notified borrowers and lenders . . . ." ¶58. | *See* ¶58 (denying the allegations in Complaint ¶58). | GLELSI Deposition (Dkt. 53) at 76:19-80:24 (Great Lakes' Chief Servicing Officer testifying to Defendants' post-lawsuit use of the ***exact*** process described in Complaint ¶58 to "fix" Class members' wrongfully inflated loan balances.)[3] |

*See also* Opening Class Certification Brief at 1-9; Class Certification Reply Brief at 21-28.

### III. PLAINTIFF IS ENTITLED TO THE UNREDACTED (OR, IN THE WORST CASE, REDACTED) PRODUCTION OF DEFENDANTS' THR DOCUMENTS.

#### A. Plaintiff has already proven that borrowers' PII is directly relevant to the claims and defenses at issue, so the THR Documents should be produced without redaction.[4]

The "general rule" is that class members' PII is not discoverable before a class is certified. *Groshek v. Great Lakes Higher Education Corp.*, No. 15-cv-143-jdp, 2015 WL

---

[3] But Defendants' post-lawsuit "fix" is not a proper fix at all. *See* Class Certification Reply Brief, at 1-3.

[4] The Court should note at the outset of this analysis that none of the parties even know how much—if any—PII exists within the requested THR Documents, because Defendants refuse to even *review* these documents for PII. The incidence of PII is likely very low, given that Great Lakes executives, managers and GOALS System developers have a great deal more to talk about than individual borrower issues.

7294548, at *4 (W.D. Wis. Nov. 16, 2015).  "However, [Plaintiff] may be entitled to this information if [it has] 'any bearing . . . on issues in the case." *Id.* (citing *Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 352-54 (1978)).  Accordingly, just nine months ago, Judge Peterson ordered Great Lakes to produce putative class members' PII—without any preconditions about putative class counsel's data security—because communicating with class members was relevant to a statute of limitations defense. *Id.*

Here, Class members' PII is highly relevant to Plaintiff's claims and Defendants' defenses.  In Defendants' Answer, they allege that *if only* Plaintiff had made a phone call to Great Lakes about the alleged overcharges in this case, then Great Lakes would have fixed them for Plaintiff and other Class members. *See* Defendants' Answer and Counterclaim (Dkt. 24), at ¶¶ 107-110. Defendants have already admitted here that there are 360,000+ Class members whose loans have been wrongly inflated over a multiyear period. *See* Opening Class Certification Brief at 2 (citing Defendants' interrogatory responses, which were filed concurrently with Plaintiff's Opening Class Certification Brief).  Did *any* of them contact Great Lakes about the alleged overcharges?  How many?  What did Great Lakes do about such Class member complaints?  One thing is certain; Great Lakes did *not* fix these overcharges on a Classwide basis. *See id.*  "[T]he best way to learn whether and when [Class members contacted Great Lakes about] an alleged violation is by communicating with them." *Groshek*, 2015 WL 7294548, at *4.

Moreover, Great Lakes' Chief Servicing Officer, Tammy Kielhofer, has already testified that *if* a Class member had called Great Lakes about one of the alleged overcharges in this case, ***then she or her predecessor, Defendant Leitl, would have become personally aware of these overcharges in the ordinary course of Great Lakes' business***.  GLELSI Deposition (Dkt. 53), at

8

210:4-215:25.  Far beyond having "any bearing on issues in the case," whatever Class member PII might exist in the THR Documents is highly relevant to determining a key element of Plaintiff's claims: Defendants' knowledge of Classwide overcharges during the Class Period. *Groshek*, 2015 WL 7294548, at *4.  Because Defendants have personally put Class members' phone calls at issue, *and* because Plaintiff has already proven that Class members' communications with Great Lakes are relevant to its executives' intent to defraud, this Court should order Defendants to produce PII contained in the THR Documents (if any) to Plaintiff, without redaction.  Plaintiff is absolutely entitled to identify and interview such percipient borrower-witnesses.  *Id.*

Plaintiff's counsel is already obligated by the Court's Protective Order to take reasonable steps to prevent the unauthorized disclosure of confidential information.  *See* Stipulated Protective Order (Dkt. 44-1), at 7 ("Protected Material must be stored and maintained by a Receiving Party at a location and in a secure manner that ensures that access is limited to the persons authorized under this Order."); Dkt. 45 (the Court's text-only Order entering the Stipulated Protective Order as filed at Dkt. 44-1).  Accordingly, Plaintiff will work with her expert ESI Liaisons to protect relevant PII (if any) from any (imaginary) computer hacks that could theoretically be perpetrated on Plaintiff's law firm by unidentified actors.  *See, e.g.*, Harris Decl., Ex. C at 2-3 (Plaintiff's "Final Offer on Emails and Instant Messages" to Defendants).

Nevertheless, if this Court is somehow disinclined to give Class members' relevant PII to Plaintiff's counsel, then it should still order Defendants to produce the THR Documents to Plaintiff (with PII redacted, if it even exists in the THR Documents) because Plaintiff is entitled to the THR Documents under Rule 26.

### B. Production of Defendants' THR Documents is "proportional" to the needs of Plaintiff's case under Rule 26, regardless of whether PII is redacted.

Rule 26 provides that "[p]arties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case." Fed. R. Civ. P. 26(b)(1). There can be no serious dispute here that Defendants' THR Documents—their emails, attachments and instant messages containing relevant search terms—are relevant for discovery purposes. *See, e.g.,* Harris Decl., Ex. A (listing relevant search terms); Ex. F (Plaintiff's First Set of Requests for Production of Documents to Great Lakes Defendants), at Request Nos. 9, 14-17, 21-29, 33-39, 44, 47; Ex. G (Plaintiff's Second Set of Requests for Production of Documents to Great Lakes Defendants), at Request Nos. 49-53, 55-60. The relevance of Defendants' THR Documents is only corroborated by the fact that Defendants have already agreed to "produce" *this exact document population* to Plaintiff on their own preferential terms. Harris Decl., Ex. B; Ex. D.

Thus, the only remaining dispute is whether Defendants' (potential) need to review and redact THR documents for PII is proportional to the needs of Plaintiff's case. In applying Rule 26's proportionality standard, this Court should analyze the following factors: (1) the amount in controversy; (2) the parties' relative access to relevant information; (3) the parties' resources; (4) the importance of the discovery in resolving the issues; (5) whether the burden or expense of the requested discovery outweighs its likely benefit; and (6) the importance of the issues at stake in the action. Fed. R. Civ. P. 26(b)(1); *see also Perez v. Mueller*, No. 13-C-1302, 2016 WL 3360422, at *1 (E.D. Wis. May 27, 2016); *Arcelormittal Indiana Harbor LLC v. Amex Nooter, LLC*, No. 2:15-CV-195-PRC, 2016 WL 614144, at *7 (N.D. Ind. Feb. 16, 2016); *In re IKB Deutsche Industriebank AG*, No. 09-cv-7852, 2010 WL 1526070, at *5 (N.D. Ill. Apr. 8, 2010).

Importantly, the December 1, 2015 amendments to Rule 26 did nothing to alter the broad proportionality standards that have governed civil actions in federal courts for the last 33 years. *Arcelormittal Indiana Harbor*, 2016 WL 614144, at *6-7; *see also* Fed. R. Civ. P. 26(b)(1), Advisory Committee note to 2015 amendments ("[I]f the parties continue to disagree [about proportionality], the discovery dispute could be brought before the court and ***the parties' responsibilities would remain as they have been since 1983***."). An analysis of all six long-standing proportionality factors here shows that Plaintiff is entitled to the production of Defendants' THR Documents: whether redacted for PII or not.

### 1. The amount in controversy favors production of the THR Documents.

In her Class Action Complaint (Dkt. 1) ("Complaint"), Plaintiff estimated that Defendants' had "illegally capitalized hundreds of millions of dollars against FFELP and Direct borrowers," and were continuously "overcharg[ing] hundreds of thousands of borrowers" on a daily basis. Complaint, ¶¶61, 68. Those allegations have proven true. *See* Opening Class Certification Brief, at 2-9; *see also* Class Certification Reply Brief at 1-3 (demonstrating that most of the original amount in controversy remains in dispute). This translates to ***at least*** tens of millions of dollars in illegal interest charges against Plaintiff and other Class members. Opening Class Certification Brief, at 24 ("Great Lakes estimates that '[a]bout $2.79 in interest accrues monthly for every $500 of principal.'") (quoting Great Lakes' own representations to borrowers). Moreover, Defendants owe the United States Department of Education ("Department" or "ED") ***at least*** millions of dollars based on the overcharges to which Defendants have already admitted. *See id.* at 9, n.16. The amount in controversy here is large, and this favors discovery. *See Mueller*, 2016 WL 3360422, at *1 (finding that Rule 26 proportionality factors "easily tilt[ed] in favor of disclosure" because a $13 million transaction was at issue).

11

### 2. The parties' relative access to relevant information favors production of the THR Documents.

There are three overarching disputes at the center of in this action: (1) how Great Lakes' automated student loan servicing System was programmed to capitalize interest in connection with B-9 Forbearance periods; (2) the extent to which Great Lakes' System programming inflated Class members' student loan balances in violation of federal regulations during the Class Period; and (3) the extent to which Defendants knew their System was illegally inflating Class members' loans during the Class Period. *See, e.g.,* Class Certification Reply Brief at 1-3 (Part I.A, titled "What This Case Is About")

Substantially all of the information relevant to these central issues is *exclusively* in Defendants' possession, not Plaintiff's. Plaintiff does not know how Great Lakes' complex System was programmed during the Class Period, but Defendants know. Plaintiff does not know when Defendants realized that their System was illegally inflating borrowers' loan balances on a daily basis, but Defendants know. Indeed, Plaintiff has no independent access to the most relevant information about her claims; she must get substantially all of what she can use to prove her claims from Defendants and third parties.

This too counsels strongly in favor of producing the THR Documents, which consist of Defendants' internal emails and instant messages about relevant facts during the Class Period.

### 3. The parties' resources favor production of the THR Documents.

Plaintiff is an individual living in Los Angeles, California. Plaintiff's annualized income is relatively low, her student debt is relatively high (several times her income), and her net worth is negative.

Defendants, on the other hand, are prominent corporate contractors with the United States Department of Education, as well as 1,000+ private lenders across the United States. Defendant

Great Lakes Educational Loan Services, Inc. ("GLELSI") grosses hundreds of millions of dollars per year and nets tens of millions of dollars per year thanks to its lucrative loan servicing contracts with lenders. *See, e.g.,* Harris Decl., Ex. H; Ex. I. Defendant Great Lakes Higher Education Corporation ("GLHEC")—GLELSI's "non-profit" parent company—struggles to **give away** many millions of dollars per year in order to maintain its 501(c)(3) status with the Internal Revenue Service. *Id.* Defendants should invest a few thousand dollars in an action to make whole the hundreds of thousands of borrowers they have defrauded **before** Defendants go looking to sprinkle their excess millions across myriad entities entitled to nothing from Defendants. GLHEC, a corporation without any shareholders, can write off its relatively minor litigation expenses in its inconsequential (to Defendants) tax filings.

Moreover, if Defendants did not want to incur discovery costs in a nationwide RICO and economic-tort Class action, they had every opportunity to move to dismiss Plaintiff's Complaint under Rule 12(b). Instead, they chose to answer the Complaint and assert a Counterclaim against Plaintiff, without moving to dismiss. *See generally* Defendants' Answer and Counterclaim (Dkt. 24). Defendants chose to subject themselves to discovery in this complex action, without any Court order, and Plaintiff is entitled to prove her claims. As one court recently stated:

> One final word. Defendants submit that Plaintiffs' discovery requests are disproportionate "in the face of the thin and largely inapplicable allegations regarding condenser coils." (ECF No. 46 at 17.) By rule, discovery is available regarding any "matter that is relevant to any party's *claim*." Fed. R. Civ. P. 26(b)(1). As noted above, this Court has already found Plaintiffs' condenser coil claims sufficient to withstand Defendants' Rule 12(b)(6) challenge. Defendants' efforts to relitigate their Rule 12(b)(6) motion through this discovery motion are not well-taken.

*Siriano v. Goodman Manufacturing, L.P.*, No. 2:14-cv-1131, 2015 WL 8259548, at *7 (S.D. Ohio Dec. 9, 2015) (emphasis in original). That is well said, and that reasoning applies equally where, as here, Defendants have waived their right to file a Rule 12(b)(6) motion by answering a

13

complaint and filing a counterclaim. Fed. R. Civ. P. 12(b) ("A motion asserting any of these defenses must be made before pleading if a responsive pleading is allowed."). Any rule contrary to *Siriano* would raise serious constitutional questions, in addition to being unworkable as a practical matter. Plaintiff has stated "complex," high-value Class claims, and she is entitled to prove them unless and until this Court dismisses her case on the merits. Opinion and Order on Motions to Dismiss (Dkt. 46), at 16 ("[For Defendants] [t]o frame their narrative as a 'counterclaim' . . . simply adds to the confusion in this complex action.").

### 4. The importance of the THR Documents to resolving key issues in this case favors production of the THR Documents.

Plaintiff's Complaint alleged that Defendants' have wrongfully capitalized hundreds of millions of dollars in interest against hundreds of thousands of Class members. Complaint, ¶¶61, 68. That has already proven true. *See* Opening Class Certification Brief, at 2-9; *see also* Class Certification Reply Brief at 1-3 (demonstrating that most of the original amount in controversy remains in dispute). This translates to *at least* tens of millions of dollars in illegal interest charges against Plaintiff and other Class members. Opening Class Certification Brief, at 24 ("Great Lakes estimates that '[a]bout $2.79 in interest accrues monthly for every $500 of principal.'") (quoting Great Lakes' own representations to borrowers). The Complaint alleged that Defendants knew about these sizable overcharges against Class members beginning "in or before November 2011." Complaint, ¶5. That too appears to be true based on the currently available evidence. *See* Class Certification Reply Brief at 21-28. Nevertheless, it is crucial that Plaintiff find out what Defendants and their employees were learning and saying about these issues in the years *before* this lawsuit was filed. This is particularly true where—as here—Defendants have provided material deposition testimony on the question of intent, and later attempted to contradict their own damaging testimony using the deponent's Errata Sheet and a

subsequent declaration. *See id.* (citing *Thorn v. Sundstrand Aerospace Corp.*, 207 F.3d 383, 389 (7th Cir. 2000), and *Citgo Petroleum Corp. v. Ranger Enterprises, Inc.*, 632 F.Supp.2d 878, 883-84 (W.D. Wis. 2009) (striking the deposition rewrites and prohibiting the offending parties from adducing further evidence on the material fact in question)). Contemporaneous communications between Great Lakes executives and other employees during the Class Period is especially necessary here to help clear up Defendants' purported "confusion" about their own knowledge of wrongdoing during the Class Period. *Id.*[5]

Defendants THR Documents likely contain the most important pieces of evidence available in this high-stakes RICO class action. That counsels strongly in favor of compelling production.

### 5. The burden and expense of THR Document production is minimal in relation to the likely benefit.

In the event that this Court orders Defendants to produce the THR documents without redacting PII (if any), most of Defendants' economic burden has already been spent. Defendants have already collected these documents, de-duplicated them, and run search terms on them three times. And Plaintiff has already agreed to a comprehensive, stipulated Clawback Order for any potentially privileged documents, which this Court entered on March 30, 2016. (Dkt. 49)**.** Defendants' production burden is clearly minimal.[6]

---

[5] Defendants have produced less than 2,000 total documents to date, substantially none of which include their internal communications from *before* this lawsuit was filed.

[6] While Defendants will likely assert all kinds of specific facts in response to Plaintiff's Motion to Compel in an effort to justify their feigned proportionality objections, Defendants have failed to do this through the meet and confer process. A response to a motion to compel is not the proper time for a party to begin substantiating its objections. Fed. R. Civ. P. 34(b)(2)(B) (requiring a responding party to "state with specificity the grounds for objecting to the request, including the reasons"). Uttering the word "proportionality" is not a statement of the reasons, nor is decrying the expenditure of tens of thousands of dollars in an action with hundreds of thousands of damaged Class members.

*Even if* the Court orders that the THR documents be reviewed and redacted for PII prior to production, any review burden (which Defendants have yet to even estimate during the meet-and-confer process) for those 97,000 documents would be clearly proportional to the needs of this RICO Class action, having at least several hundred thousand Class members (and potentially over 2 million), and having at least tens of millions of dollars at stake. *See* Opening Class Certification Brief at 1-9; Class Certification Reply Brief at 1-3, 21-28. Accordingly, the benefit in resolving key questions of fact in this case—particularly questions concerning Defendants' fraudulent intent—is great.

Thus, the benefit of production greatly outweighs Defendants' burden in either scenario (PII produced or PII redacted), and this factor favors production.

### 6. The importance of the issues at stake in this action strongly favors production of the THR Documents.

The issues at stake in this litigation are currently of significant public importance. First, it is widely recognized that the current $1.4 trillion student debt portfolio held by the Department constitutes a major economic problem throughout the United States, so much so that candidates for President of the United States are actively campaigning on the issue. *See, e.g.,* https://www.hillaryclinton.com/issues/college. The last thing that the public needs is to have its gigantic student debt burden *illegally* and exponentially inflated, even by relatively small percentages. That is why the United States Consumer Financial Protection Bureau is currently spending exorbitant resources investigating and bringing enforcement actions against student loan servicers like Great Lakes for overcharges similar to the ones alleged here. *See, e.g.,* http://www.consumerfinance.gov/about-us/newsroom/cfpb-takes-action-against-wells-fargo-illegal-student-loan-servicing-practices (CFPB Press Release dated Aug. 22, 2016, announcing settlement with Wells Fargo because "Wells Fargo hit borrowers with illegal fees" in the course

of servicing student loans); http://files.consumerfinance.gov/f/201509_cfpb_student-loan-servicing-report.pdf (CFPB's September 2015 Report on Student Loan Servicing, which summarizes over 150+ pages the CFPB's findings after extensive investigation of the student loan servicing industry); http://www.consumerfinance.gov/data-research/research-reports/midyear-update-student-loan-complaints/ (CFPB's "Midyear Update on Student Loan Complaints"). If the federal government can spend billions of dollars addressing student loan servicing problems, then Defendants can spend a few thousand dollars addressing such problems in this action.

Second, Great Lakes has not only charged hundreds of thousands of struggling borrowers daily interest on hundreds of millions of illegal principal dollars, it has also wrongfully collected at least several million dollars of loan servicing fees from the U.S. Department of Education: servicing fees that it is expressly not entitled to under its Servicing Contract with the Department. *See* Opening Class Certification Brief, at 9, n.16. It is one thing to defraud hundreds of thousands of people, and it is another thing to defraud hundreds of thousands of people while knowingly overcharging the United States government. The public has a right to know whether Great Lakes has been engaged in a long-term pattern of mail and wire fraud ***before*** Great Lakes becomes eligible for its next Servicing Contract renewal with the Department in 2019. Harris Decl. in Support of Opening Class Certification Brief, Ex. X (Servicing Contract), at 3 (showing the combined 10-year term of Great Lakes' 2009 Servicing Contract with the Department of Education); *see, e.g.,* https://www.insidehighered.com/news/2014/03/28/education-department-official-defends-agencys-loan-servicing-contracts (concerning congressional questions to the Department about the Department's oversight of student loan servicers like Great Lakes);

17

http://www.reuters.com/article/usa-education-salliemae-idUSL1N0MO2CG20140327 (concerning controversy around Department's renewal of a major servicer's federal contract, shortly after servicer was found to have overcharged service members in violation of federal law).

The importance of issues at stake in this case are significant enough to favor Defendants' production of THR Documents.

## IV. CONCLUSION

For all of the foregoing reasons, Plaintiff respectfully requests that the Court enter an order compelling Defendants to produce the THR Documents *without* PII redactions, within 10 days of the entry of this Court's order compelling production. Alternatively, the Court should order production of the THR Documents, with PII (if any) redacted, within 21 days of this Court's order compelling production.

Respectfully submitted,

FINKELSTEIN & KRINSK LLP

Dated: August 24, 2016

By:    s/ David J. Harris, Jr.
      David J. Harris, Jr., Esq.

Jeffrey R. Krinsk, Esq.
William R. Restis, Esq.
Trenton R. Kashima, Esq.
550 West C Street, Suite 1760
San Diego, California 92101-3579
Telephone: (619) 238-1333
Facsimile: (619) 238-5425

*Counsel for Plaintiff*