FINKELSTEIN & KRINSK LLP
Jeffrey R. Krinsk, Esq. (*pro hac vice*)
jrk@classactionlaw.com
David J. Harris, Jr., Esq. (CA Bar #286204)
djh@classactionlaw.com
Trenton R. Kashima, Esq. (*pro hac vice*)
trk@classactionlaw.com
A. Trent Ruark, Esq. (*pro hac vice*)
atr@classactionlaw.com
550 West C Street, Suite 1760
San Diego, California 92101
Telephone: (619) 238-1333
Facsimile:  (619) 238-5425

*Attorneys for Plaintiff*


# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF WISCONSIN

_____

| | |
|---|---|
| MEREDITH D. DAWSON,<br><br>                                    Plaintiff,<br><br>    v.<br><br>GREAT LAKES EDUCATIONAL LOAN SERVICES, INC., GREAT LAKES HIGHER EDUCATION CORPORATION, JILL LEITL, DAVID LENTZ, and MICHAEL WALKER,<br><br>                                  Defendants. | Case No. 15-cv-00475-bbc<br><br>**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S RENEWED MOTION FOR CLASS CERTIFICATION**<br><br>**\* \* \* REDACTED \* \* \*** |

# TABLE OF CONTENTS

TABLE OF CONTENTS.............................................................................................................. i

TABLE OF AUTHORITIES ...................................................................................................... iii

I.      INTRODUCTION AND SUMMARY OF ARGUMENT ........................................1

II.     BACKGROUND ......................................................................................................4

      A.      For FFELP and Direct loans, capitalization is the rare exception, not the "general rule."......................................................................................................................4

      B.      The Court's Order misstates the Complaint's allegation about Plaintiff's Capitalization Event.............................................................................................6

      C.      The Department's general capitalization rules only allow capitalization of "intra-forbearance interest," which is why the Department's specific B-9 Forbearance rules only address "intra-forbearance interest."...............................................8

III.    THE UNDISPUTED HISTORY OF THIS CASE ...................................................10

IV.     PLAINTIFF HAS RICO "STANDING," BUT THIS IS NOT A JURISDICTIONAL ISSUE ...................................................................................................................14

      A.      Several RICO-school cases show that unpaid student debt can be a cognizable RICO injury. ....................................................................................................14

      B.      *Bible* was a RICO case where the plaintiff had RICO standing despite her lawful debt obligations to the defendant. .......................................................................19

      C.      *Haroco* provides the guiding principles this Court should follow in applying RICO's injury requirement to Plaintiff's claims.............................................21

      D.      The "out-of-pocket" loss requirement articulated in the Court's Order is foreclosed by *Bridge* and *Phoenix Bond & Indemnity Co.*..........................23

      E.      Plaintiff's RICO "standing" presents common merits questions, not a jurisdictional question. ...................................................................................27

      F.      Plaintiff's Article III standing is a non-issue, and it will remain a non-issue until this case is adjudicated on the merits or until Defendants provide all of the relief that Plaintiff demands for the Class. ..................................................................29

V.      PLAINTIFF'S CASE SATISFIES RULE 23 ........................................................30

      A.      The Class is numerous. ....................................................................................30

      B.      Common questions of law and fact exist among Class members................................31

      C.      Plaintiff's claims are typical of Class claims..............................................................32

D.      Plaintiff and her counsel are adequate to represent the Class. ....................................33

E.      Rule 23(b)(3) is satisfied. ...........................................................................................35

    1.      Common questions and answers predominate over individual questions
    and answers. ............................................................................................................35

    2.      A Class action is the superior method of resolving these issues .....................38

VI.     CONCLUSION.............................................................................................................38

# TABLE OF AUTHORITIES

**Cases**

*Allen v. International Truck & Engine Corp.*,
    358 F.3d 469 (7th Cir.2004) ............................................................................ 37

*Amchem Prods., Inc. v. Windsor*,
    21 U.S. 591 (1997) ........................................................................... 28, 33, 36

*American Nat'l Bank and Trust Co. of Chicago v. Haroco, Inc.*,
    473 U.S. 606 (1985) ........................................................................................ 21

*Anza v. Ideal Steel Supply Corp.*,
    547 U.S. 451 (2006) ................................................................................. 27, 28

*Arreola v. Godinez*,
    546 F.3d 788 (7th Cir. 2008) ......................................................................... 29

*Bell Atlantic Corp. v. AT&T Corp.*,
    339 F.3d 294 (5th Cir. 2003) ......................................................................... 37

*Bell v. PNB Bank, Nat'l Ass'n*,
    800 F.3d 360 (7th Cir. 2015) ......................................................................... 36

*Bible v. United Student Aid Funds, Inc.*,
    799 F.3d 633 (7th Cir. 2015) .......................................................... 19, 20, 24, 25

*Bridge v. Phoenix Bond & Indem. Co.*,
    553 U.S. 639 (2008) ........................................................... 18, 21, 23, 26

*Carnegie v. Household Int'l, Inc.*,
    376 F.3d 656 (7th Cir. 2004) ......................................................................... 37

*Citgo Petroleum Corp. v. Ranger Enterprises, Inc.*,
    632 F.Supp.2d 878 (W.D. Wis. 2009) ........................................................... 13

*De La Fuente v. Stokely-Van Camp, Inc.*,
    713 F.2d 225 (7th Cir. 1983) ......................................................................... 33

*Evans v. City of Chicago*,
    434 F.3d 916 (7th Cir. 2006) .............................................................. 15, 16, 27

*General Telephone Co. of Southwest v. Falcon*,
    457 U.S. 147 (1982) ........................................................................................ 33

*Gonzalez v. North American College of Louisiana, Inc.*,
    700 F.Supp. 362 (S.D. Tex. 1988) ................................................................. 17

*Haroco, Inc. v. American Nat. Bank and Trust Co. of Chicago*,
    747 F.2d 384 (7th Cir. 1984) .............................................................. 17, 21, 22, 23

*Holmes v. Sec. Investor Protection Corp.*,
   503 U.S. 258 (1992) .......................................................................... 27

*In re Bridgestone/Firestone, Inc. Tires Prods. Liability Litig.*,
   155 F.Supp.2d 1069 (S.D. Ind. 2001) ....................................... 16, 17

*In re Visa Check/MasterMoney Antitrust Litigation*,
   280 F.3d 124 (2d Cir. 2001) ........................................................... 37

*Keele v. Wexler*,
   149 F.3d 589 (7th Cir. 1998) .................................................... 32, 33

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
   134 S.Ct. 1377 (2014) ...................................................................... 27

*Liquid Air Corp. v. Rogers*,
   834 F.2d 1297 (7th Cir. 1987) ........................................................ 27

*Maio v. Aetna, Inc.*
   221 F.3d 472 (3d. Cir. 2000) ......................................................... 16

*Morrison v. YTB Int'l, Inc.*,
   649 F.3d 533 (7th Cir. 2011) .......................................................... 29

*Parko v. Shell Oil Co.*,
   739 F.3d 1083 (7th Cir. 2014) ........................................................ 36

*Pella Corp. v. Saltzman*,
   606 F.3d 391 (7th Cir. 2010) .......................................................... 36

*Phoenix Bond & Indemnity Co. v. Bridge*,
   477 F.3d 928 (7th Cir. 2007) ................................... 14, 23, 25, 26

*Robinson v. Metro–North Commuter R.R.*,
   267 F.3d 147 (2d Cir. 2001) ........................................................... 37

*Rodriguez v. McKinney*,
   878 F.Supp. 744 (E.D. Pa. 1995) ................................................... 17

*Rosario v. Livaditis*,
   963 F.2d 1013 (7th Cir. 1992) ....................................... 14, 15, 17, 32

*Smith v. Greystone Alliance, LLC*,
   772 F.3d 448 (7th Cir. 2014) .......................................................... 29

*Spano v. The Boeing Co.*,
   633 F.3d 574 (7th Cir. 2011) .......................................................... 31

*Thorn v. Sunstrand Aerospace Corp.*,
   207 F.3d 383 (7th Cir. 2000) .......................................................... 13

*Torres v. CareerCom*,
   No 91 Civ. 3487, 1992 WL 245923 (E.D. Pa. Sep. 18, 1992) ........... 17

*Walmart v. Dukes,*
  131 S.Ct. 2541 (2011) ........................................................................................ 31

**Statutes**

18 U.S.C. § 1964 .................................................................................... 18, 23, 26

**Regulations**

34 C.F.R. § 682.202 .......................................................................................... 5, 8
34 C.F.R. § 682.211 .................................................................................. 10, 31, 33
34 C.F.R. § 685.205 ............................................................................. 9, 10, 31, 33

**Rules**

Fed. R. civ. p. 23 ........................................................................................ *Passim*

## I.     INTRODUCTION AND SUMMARY OF ARGUMENT

Plaintiff Meredith D. Dawson submits this brief in support of her Renewed Motion for Class Certification.  On September 28, 2016, the Court entered an Opinion and Order (Dkt. 85) ("Order") denying Plaintiff's Motion for Class Certification (Dkt. 54), and allowing Plaintiff to file a Renewed Motion for Class Certification to address certain issues.  Order at 12.  The Court raised three overarching issues in its Order, all of which Plaintiff addresses herein.

*First*, the Court decided that Plaintiff's originally proposed class definition was overbroad because "it include[d] all borrowers that were subject to a B-9 Forbearance, regardless [of] whether any of the interest that accrued on their accounts was capitalized."  Order at 3.  In response to this concern, Plaintiff has amended her proposed Class definition to include only borrowers who incurred a capitalization at the end of their B-9 Forbearance period(s).  *See* Plaintiff's Renewed Motion for Class Certification.  As Plaintiff will show herein, the revised Class definition is proper, and perfectly consistent with the Complaint and the undisputed evidence in this case.

*Second*, the Court expressed a lack of clarity as to which of "three disparate theories" Plaintiff is pursuing to prove that Defendants' interest capitalizations were unlawful.  Order at 7.  The answer is actually none of them, and Plaintiff's counsel apologizes to the Court for that confusion.  Plaintiff's capitalization theory is and was always this: B-9 Forbearances are not "Capitalization Events" under Department regulations; they are instead "Capitalization Exceptions."  This means that zero interest can be capitalized (no "pre-forbearance interest," no "intra-forbearance interest") at the end of B-9 Forbearance periods.  It does not matter which type of interest was capitalized because any capitalization at all is and was always unlawful.

1

This is the only theory in Plaintiff's Complaint, the entirety of which is properly framed in terms of "B-9 Interest," defined as "any accrued interest [at all]."  *See* Complaint (Dkt. 1) at ¶32, n.7.

As applied to the new, undisputed evidence in this case, Plaintiff's regulatory theory means one thing and one thing only: ████████████████████████████ ████████████████████████████████ Had they been there—as they are today—zero accrued interest (zero "B-9 Interest") would have been capitalized on Plaintiff's and the Class's loans.  Defendants admit this; Defendants are now treating all B-9 Forbearances this way; and this is what the Department's rules have always required.  Zero capitalization.

In Plaintiff's original class certification brief, she was unable to apply the Complaint's capitalization theory to the ***true*** facts about Defendants' System because Plaintiff did not discover the true facts until June 23, 2016. *See generally* Declaration of David J. Harris, Jr. in Support of Plaintiff's Renewed Motion for Class Certification ("Renewed Harris Decl."). Plaintiff's capitalization theory is now clear and immovable, and it is her Complaint's original theory: Defendants were always required to treat every B-9 Forbearance as a Capitalization ***Exception*** (zero capitalization, always) rather than a Capitalization ***Event*** (partial or total capitalization) during the Class Period.  Defendants did not do this, and they knew they had broken the Department's regulations and instructions by not doing this.  The Court can be confident that Defendants understood the Complaint's zero-capitalization theory because they acted in accord with Plaintiff's theory in response to the Complaint, and furthermore, their System remains perfectly in line with the Complaint's requirements to this day.

***Third,*** the Court's Order expressed doubt that unpaid student debt by itself is "a cognizable injury under RICO."  Order at 11.  The Court further found the question of RICO

"standing" to be jurisdictional under Seventh Circuit law, and therefore, asks Plaintiff to "state whether she ever submitted [payments] in excess of the amount she actually owes." Order at 10-11. The Court has allowed the parties "additional briefing" on Plaintiff's standing based on this factual clarification. Order at 11.

To answer the Court's factual question, Plaintiff, like substantially all Class members, has not made payments in excess of her lawful student debt.[1] Plaintiff will seek to persuade the Court that unpaid student debt incurred as a proximate result of RICO violations constitutes a cognizable RICO injury. Plaintiff will proffer a thorough analysis of controlling and persuasive RICO precedent to demonstrate that Plaintiff is not asking the Court to extend RICO. She is merely asking the Court to apply RICO to her slightly new fact pattern. But in any event, the Supreme Court has recently clarified that federal statutory "standing," including RICO standing, is *not* a constitutional or jurisdictional issue. The Court need not decided Plaintiff's RICO standing here because it is actually a common merits issue faced by over 99.9% of the Class.

*At bottom*, there are no major Rule 23 issues in this case because there are no major factual disputes between the parties that are relevant to Rule 23. The parties agree that every transaction at issue was executed by and recorded in Defendants' automated GOALS System. The parties agree that individual damages can be determined down to the penny with nothing but "some programming" in Defendants' System.[2] The parties agree that Class members can be readily identified and notified of this action.

---

[1] She has, however, made payments in excess of her *unlawful* student debt. *See generally* Renewed Declaration of Meredith D. Dawson in Support of Plaintiff's Renewed Motion for Class Certification ("Renewed Dawson Decl.").

[2] *See* Declaration of Jamie M. Brown, Ex. F. (Dkt. 83-8) at 3.

Class certification thus remains proper for many of the reasons set forth in Plaintiff's original class certification briefing, based on all of the parties' accompanying evidence. The Renewed Class is numerous because it contains 362,305 members, all of whom suffered some amount of interest capitalization at the end of their B-9 Forbearance periods when zero capitalization was allowed.[3] Rule 23's commonality and typicality requirements are satisfied because Plaintiff and every Class member allege the same capitalization misconduct by Defendants (which is any capitalization at all at the end of any B-9 Forbearance period), and rely on the same RICO and negligence theories to establish Defendants' liability. Plaintiff and her counsel are adequate for the reasons asserted in Plaintiff's original class certification briefing, and then some. Finally, predominance and superiority exist because all of the salient questions and answers of law and fact are common—not individualized—among Class members. Plaintiff's case satisfies Rule 23.

## II.   BACKGROUND

### A.   For FFELP and Direct loans, capitalization is the rare exception, not the "general rule."

In its Order, the Court found that for FFELP and Direct loans, "[t]he general rule is that accrued interest is capitalized when the interest accrues." Order at 3; *see also* Order at 2 ("Generally, interest that accrues on student loans is subject to capitalization."). But that is not the case, at least not as Plaintiff's counsel understands the Court's Order. Instead, the parties agree on the "general rule" that no capitalization occurs on a FFELP or Direct loan—ever— unless and until a specific federal regulation allows lenders to capitalize some amount of accrued

---

[3] *See* Declaration of David J. Harris, Jr. in Support of Plaintiff's ***[Original]*** Motion for Class Certification (Dkt. 58) ("Opening Harris Decl."), Exhibits A, B (Defendants' Responses to Plaintiff's Interrogatory Nos. 6 and 11).

interest.  If ever, capitalization occurs *only* on a one-off basis, at some point in time when certain regulatory conditions are satisfied.  There is no regular, continuous or periodic capitalization "when the interest accrues."  Order at 3.  Instead, borrowers' outstanding interest balances grow every day (*i.e.,* interest accrues every single day), unless of course a borrower payment reduces that interest balance.  The "general rule," however, is that accrued interest *never* capitalizes unless and until specific regulatory conditions are satisfied.

The Department's general regulations and guidance on capitalization reflect this general no-capitalization policy.  *E.g.,* 34 C.F.R. § 682.202 ("The charges that lenders may impose on borrowers, either directly or indirectly, are limited to the following: . . . ¶(b) Capitalization.  ¶(1) A lender may [capitalize interest only] in accordance with this section."); *accord* Opening Harris Decl. (Dkt. 58), Ex. F (Change Request 1492, providing that: "Capitalization for [FFELP and Direct] loans is only permitted as explicitly authorized below.").  Thus, if a borrower never incurs one of the specific "Capitalization Events" enumerated in the Department's regulations, then the borrower never suffers *any* interest capitalization.  Defendants do not dispute any of this, though parts of their Answer may have suggested otherwise.[4]

The Court can see this "general rule" of no capitalization (ever) illustrated in Plaintiff's Account Histories.[5]  The last capitalization that she incurred on any of her loans was the unlawful capitalization on November 28, 2013.  The Court can see that no other capitalization has occurred since, and rightly so.  So to address the Court's concern about "how plaintiff was injured . . . if [her "B-9 Interest"] was subject to eventual capitalization anyway": the answer is

---

[4] If the Court was misled by Defendants' Answer, the Court would not be alone.  *See generally* Renewed Harris Decl.

[5] *See* Declaration of Meredith D. Dawson in Support of Plaintiff's ***[Original]*** Motion for Class Certification (Dkt. 57) ("Opening Harris Decl."), Ex. A (Plaintiff's Account Histories).

that none of the $819.65 in accrued interest ("B-9 Interest") that was capitalized was permitted to be capitalized, and that accrued interest may **never** have been capitalized against her in the future.  Order at 9.  Plaintiff may or may not incur a lawful Capitalization Event in the future, but even **if** she does, her total debt will **still** be inflated by at least the daily interest charged on those capitalized dollars between the time of the unlawful capitalization and the time of the (imaginary) lawful capitalization in the future.  When it comes to capitalization, time is money; and later, if at all, is better.

**B.**    **The Court's Order misstates the Complaint's allegation about Plaintiff's Capitalization Event.**

The Court's Order found the Complaint's capitalization theory to be that: "the $819.65 in wrongfully capitalized interest was interest that accrued during the B-9 Forbearance period." Order at 8.  That finding was inaccurate, but Plaintiff's counsel could have done a better job of highlighting this point in her Complaint.  The Complaint alleges that "[o]n November 28, 2013 . . . Great Lakes . . . wrongfully capitalized a total of $819.65 in **B-9 Interest** on Plaintiff's FFELP and Direct loans." Complaint at ¶65.  The Complaint properly defines "B-9 Interest" as "any accrued interest [at all] on a FFELP or Direct loan that remains unpaid at the end of a B-9 Forbearance period."  ¶32, n.7.  Plaintiff had both intra-forbearance and pre-forbearance interest capitalized, but the Complaint did not distinguish between the two interest types because there was (and is) no legal or factual reason to do.[6]

The Complaint consistently decried Defendants' capitalization of "B-9 Interest," not just "intra-forbearance interest" alone or "pre-forbearance interest" alone because the difference is

---

[6] The only reason Plaintiff veered from her original—and still operative—"B-9 Interest" theory in the first round of class certification briefing was that Plaintiff's counsel misunderstood Defendants' System at the time Plaintiff's Original Motion for Class Certification was filed.  *See generally* Harris Decl.

irrelevant in the context of B-9 Forbearances. *See, e.g.,* ¶37 ("The effect of great Lakes' wrongful ***B-9 Interest*** capitalizations is straightforward and quantifiable."); ¶39 ("Thus, when Great Lakes' System automatically executes an illegal ***B-9 Interest*** capitalization, the System automatically transmits and artificially and illegally inflated principal balance and interest accrual to both borrower and lender on a daily basis . . . ."); ¶40 ("Great Lakes executed these systematic and illegal ***B-9 Interest*** capitalizations . . . ."). Any accrued interest ("B-9 Interest") capitalization at the end of B-9 Forbearances periods is unlawful and contrary to the Department's regulations.

The evidence now shows that Defendants' System matches the Complaint's zero-capitalization theory perfectly. Indeed, when filing Plaintiff's original class certification motion on June 17, 2016, Plaintiff's counsel did not know that Defendants' System had in fact been treating B-9 Forbearances as "Capitalization Exceptions" throughout this lawsuit, such that zero accrued interest (zero "B-9 Interest") is capitalized at the end of every B-9 Forbearance period.[7] This is all that the Complaint and the Department's rules ever required: zero "B-9 Interest" capitalization. There is no longer any reason for the parties to quibble about different interest types because Plaintiff's ***only*** point is this: B-9 Forbearances were supposed to be Capitalization Exceptions—not Capitalization Events—in Defendants' System throughout the entire Class Period, exactly as they are today.

---

[7] *See generally* Renewed Harris Decl.; Kielhofer Errata Sheet (Dkt. 63) at 16, 19-21; Kielhofer Decl. (Dkt. 66) at ¶¶14, 18-21;

C.    **The Department's <u>general</u> capitalization rules only allow capitalization of "intra-forbearance interest," which is why the Department's <u>specific</u> B-9 Forbearance rules only address "intra-forbearance interest."**

While the general rule for FFELP and Direct loans is that no interest capitalization occurs (ever), the HEA and Department regulations provide exceptions to that rule in the form of enumerated "Capitalization Events."  Most of the Capitalization Events in the regulations are borrower relief programs, allowing borrowers to cease making normal payments (without facing delinquency) during periods of unemployment, military service, medical residency or other times when making payments would be difficult.  Such extended periods of nonpayment are a detriment to the lender, so the lender is compensated in the form of a Capitalization Event.[8] However, even the Department's *general* regulations governing Capitalization Events properly align the duration of a borrower's repayment relief (*e.g.,* length of the deferment or general forbearance) with the compensation provided to the lender: the amount of capitalization.  This is why the only *general* Department rules and guidance ever in effect provide that interest accrued *during* (not before) such relief periods may be capitalized.

The *general* rule of capitalizing only "intra-forbearance" interest is reflected in the text of the Department's *general* regulations governing interest capitalization.  *See* 34 C.F.R. § 682.202(b) ("[A] lender may capitalize interest payable by the borrower that has accrued . . . ¶(iv) *For* a period of authorized forbearance."); 34 C.F.R. § 685.202(b)(3) ("[F]or all Direct loans *during* periods of forbearance, the Secretary capitalizes the unpaid interest that has accrued on the loan upon the expiration of the deferment or forbearance.").   If there was any ambiguity

---

[8] B-9 Forbearances do not fit this general mold.  B-9 Forbearances are initiated by the lender, at the lender's sole discretion, so that the lender—if and only if it chooses—can have ample time to complete mere administrative tasks.  B-9 Forbearances last for a *maximum* of 60 days, often much less, rather than the several months or years often associated with Capitalization Events. 34 C.F.R §§ 682.211(f)(11), 685.205(b)(9).

in the Department's **general** capitalization regulations, the Department eliminated that ambiguity when it issued Change Request 1492 in August 2011.  *See* Opening Harris Decl. (Dkt. 58), Ex. F (Change Request 1492); Kielhofer Decl. (Dkt. 66), Ex. D (Change Request 2785).  Change Request 1492 provided the Department's official "clarification" of capitalization regulations for FFELP and Direct loans.  *Id.*  The Department officially implemented Change Request 1492 in June 2012, and this Change Request remains in effect to this day; it is the only Change Request *ever* in effect.[9]

If the Court looks at the first page of Change Request **2785**, it will see that Change Request **1492** set forth the following general rule for Capitalization Events like deferments and general forbearances: "The servicer shall ensure that the only interest that capitalizes at the end of a deferment or forbearance period **is the interest that accrues during the deferment or forbearance period.**'").  This was the Department's August 2011 clarification to Great Lakes and to all of the Department's other FFELP and Direct loan servicers.  Even where there is a Capitalization Event, limit the capitalization to so-called "intra-forbearance interest."[10]

Because the Department's **general** capitalization rules governing Capitalization Events only allow for capitalization of "intra-forbearance interest," it is unsurprising that the Department's **specific** capitalization rules for B-9 Forbearances only expressly address "intra-forbearance interest."   34 C.F.R. § 682.211(f)(11) (prohibiting capitalization of interest that accrues "during" B-9 Forbearances); 34 C.F.R. § 685.205 (b)(9) (prohibiting capitalization of interest that accrues "during" B-9 Forbearances); *accord* Order at 3 ("Government regulations

---

[9] The parties agree that the Department never implemented Change Request 2785; it has never been in effect, so it is not the cause of any Class members' capitalization transaction.

[10] Defendants have yet to produce a complete copy of Change Request 1492, so for now, the Court has to look at the **never-implemented** Change Request 2785 in order to see what the general capitalization rule was (and still is) under Change Request 1492.

[34 C.F.R. § 682.211(f)(11) and 34 C.F.R. § 685.205(b)(9)] clearly provide that interest that accrues during a B-9 Forbearance ('intra-forbearance interest') is not subject to capitalization.") Indeed, "intra-forbearance interest" is all that was ever allowed to be capitalized anyway: even for forbearances that constitute Capitalization Events.  So when the Department expressly prohibited the capitalization of "intra-forbearance interest" in 34 C.F.R. §§ 682.211 (f)(11) and 685.205(b)(9), the Department expressly prohibited *any accrued interest (any "B-9 Interest") capitalization at all*.

Plaintiff's Complaint took this regulatory framework for granted in defining "B-9 Interest" the way it did; the Complaint viewed "any accrued interest" capitalization at the end of a B-9 Forbearance as unlawful because Plaintiff's counsel always understood that B-9 Forbearances were *not* lawful Capitalization Events.  *See* Complaint at n.7.  This is why the entire Complaint is framed in terms of "B-9 Interest," meaning "*any* accrued interest."  *Id.*; *see also* Complaint ¶¶36, 39-40, 48 (heading), 54, 56, 57(e), 58, 65, 67, 70-71, 74.  Whatever was capitalized—however it was capitalized—should not have been capitalized.  That was always Plaintiff's and the Complaint's capitalization theory.

Defendants' consistent actions throughout the last three and a half years suggest that they not only understood the Complaint's capitalization theory, but agreed with it.

## III.    THE UNDISPUTED HISTORY OF THIS CASE

The Court should analyze the following timeline with a clear understanding of the material, undisputed evidence in this case.  Here are the undisputed facts.  █████████████████

██████████████████████████████████████████████████████

████████████████████████████████  ███████████████████████████

---

[11] Kielhofer Errata (Dkt. 63) at 15; Kielhofer Decl. (Dkt. 66) at ¶11.



---

[12] Kielhofer Errata (Dkt. 63) at 16; Kielhofer Decl. (Dkt. 66) at ¶14.

[13] GLELSI Deposition (Dkt. 53) at 67:19-70:24; 144:25-145:12.

[14] GLELSI Deposition (Dkt. 53) at 144:25-145:12.

[15] Kielhofer Errata (Dkt. 63) at 19-20; Kielhofer Decl. (Dkt. 66) at ¶18.

[16] Kielhofer Errata (Dkt. 63) at 20; Kielhofer Decl. (Dkt. 66) at ¶¶19-20.  This is exactly what Plaintiff alleged as the secret "Reprogramming" that occurred "most likely in mid-2014." *See* Complaint ¶¶70-71.



Throughout all of this, since April 2013—both before and after this case began—Defendants have consistently and affirmatively acted *out-of-Court* as if they know B-9 Forbearances are Capitalization Exceptions under the rules.  Over and over again—with and without the Department as their co-defendant—Defendants have taken nothing but affirmative actions for the last three-plus years to ensure that *zero "B-9 Interest"* is capitalized by their System, even to this day.  Yet Defendants have refused to make Plaintiff or Class members whole throughout the first year of this litigation, even as they were enforcing a zero-capitalization rule *in response to the Complaint.*  Why?  Because simply admitting post-Complaint that they understood the Department's rules, and offering to make Class members' whole, would have amounted to an admission of fraud.  So Defendants made something up: they pleaded one capitalization rule to the Court in October 2015 (B-9 Forbearances are

---

[17] *See* Kielhofer Errata (Dkt. 63) at 20-21; Kielhofer Decl. (Dkt. 66) at ¶21.

[18] *But see* August 2011, April 2013, April 2014 *and* August 2015 above.

Capitalization Events, and our System properly recognizes this), even as they were enforcing the opposite rule in their own System (B-9 Forbearances are Capitalization *Exceptions*).[19]

Plaintiff highlighted these contradictions and the impropriety of Ms. Kielhofer's deposition rewrite in Plaintiff's original class certification Reply Brief.  *See* Plaintiff's [Original] Reply Brief (Dkt. 70) at 21-28 (relying on *Thorn v. Sunstrand Aerospace Corp.*, 207 F.3d 383, 389 (7th Cir. 2000); *Citgo Petroleum Corp. v. Ranger Enterprises, Inc.*, 632 F.Supp.2d 878, 883-84 (W.D. Wis. 2009)).  After Plaintiff "highlighted" Defendants' contradictions for the Court, Defendants finally became willing to concede in their Court filings what they have been consistently conceding with their own actions *and* deposition testimony over the last three-plus years.[20]   Defendants are now willing to concede that B-9 Forbearances were always Capitalization *Exceptions*, if only someone named Cynthia Battle sends an email.  *See generally* Declaration of Jamie M. Brown (Dkt. 83-2).

Plaintiff and the Class have always been entitled to be treated just like borrowers placed ███████████ after April 2013, who have all incurred zero capitalization; and like borrowers ███████████████ after April 2014, who have incurred zero capitalization; and like borrowers ███████████████ after August 2015, who have all incurred zero capitalization; and like every borrower that Defendants *will* put in B-9 Forbearance status for the foreseeable future: all of whom will incur zero capitalization.

Plaintiff's capitalization theory is now quite simple.  The rules have always said "don't do it."  The Department's specific instructions to Defendants—the only instructions ever in

---

[19] *See* Answer (Dkt. 24) at ¶¶119,125; Renewed Harris Decl.

[20] *See* Defendants' Supplemental Brief Regarding Defendants' Opposition to Class Certification (Dkt. 83-1) at 1 (filed Sep. 16, 2016) ("Class certification briefing 'highlighted' a legal dispute between the parties . . . .").

effect—said "don't do it."  Defendants kept doing it.  Meanwhile, Defendants have not only testified that they understood the rules, they have also **_acted_** like they understood the rules for the last three-plus years: both before and after this lawsuit commenced.  Yet every time Defendants have been given the opportunity to make Class members whole—in June 2012, April 2013, April 2014 **_and_** August 2015—they have refused to do so.

Defendants admit that Plaintiff and the Class have incurred over $20 million in real, quantifiable, daily growing debt obligations to the Department and other lenders as a direct result of their actions.  Those debt obligations are compensable under RICO because Class members' are the first and only victims of Defendants' fraud, and their injuries "can be redressed by damages."  *Phoenix Bond & Indemnity Co. v. Bridge*, 477 F.3d 928, 930 (7th Cir. 2007).

## IV.   PLAINTIFF HAS RICO "STANDING," BUT THIS IS NOT A JURISDICTIONAL ISSUE

### A.   Several RICO-school cases show that unpaid student debt <u>can</u> be a cognizable RICO injury.

In *Rosario v. Livaditis*, 963 F.2d 1013 (7th Cir. 1992), cosmetology students sued their former school under RICO and under an Illinois consumer fraud statute ("CFA").  The students' RICO theory was that their school's pattern of fraud had proximately caused them to incur federal student loan obligations, which the students had not repaid.  Some or all of these students had actually defaulted on their loans, which amounted to an "undisputed" $3,478,836.96.  *Id.* at 1020-22.  The jury returned a verdict awarding $640,224 in actual damages under the CFA, while awarding zero damages for RICO liability; this occurred despite the trial court's instruction that an "[i]njury to property [under RICO] includes loss of governmental student loans which plaintiffs are obligated to repay." *Id.*

The plaintiffs sought a new trial on damages, which the trial court denied because it concluded: "that the jury could have found the federal government suffered the loss from the

14

defaulted student loans, not the students." *Id.* The Seventh Circuit held that the trial court's

conclusion was *"not supported by law,"* stating:

> It is the plaintiffs who remain liable to the federal government for repayment of
> the loans, and the jury was instructed that this liability amounted to an injury to
> business or property for purposes of RICO liability. We emphasize that we are not
> reversing the trial court's denial of the class'[s] motion for [a] new trial on
> damages simply because we believe the damages for the RICO counts were
> inadequate. The jury did not award even nominal damages on the RICO counts.
> The amount of the students' outstanding loan obligations was presented to the jury
> by both parties in a joint exhibit. The jury in this case clearly did not consider as
> damages the students' undisputed loan obligations to the government of
> $3,478,836.96, yet the jury found D'or liable for RICO violations—a finding
> which was predicated on determining that the class was injured in business or
> property, defined as obligations to pay student loans.

*Id.* The Seventh Circuit emphasized its highly deferential standard of review for ordering a new

trial, but stated that the jury's finding of $0 in RICO damages flew "[i]n the face of [RICO's]

statutory provisions and the Judge's instructions on the law." *Id.*

Plaintiff's case is much like *Rosario*. In *Rosario*, a RICO perpetrator proximately caused

former students to incur debt obligations to the government. Here, a RICO perpetrator

proximately caused former students to incur debt obligations to the government and private

lenders. The *Rosario* plaintiffs had not paid *any* of their debt and had in fact defaulted on it.

Plaintiff has not paid off *all* of her debt, but she is making payments that exceed her RICO debt

and has never defaulted. *See* Renewed Dawson Decl. Plaintiff has as much RICO standing as

the *Rosario* victims had.

By contrast, *Evans v. City of Chicago*, 434 F.3d 916, 925-26 (7th Cir. 2006) is inapposite

by its own terms. The Court's Order cited *Evans* for the proposition that: "injuries proffered by

plaintiffs in order to confer RICO standing must be 'concrete and actual,' as opposed to

speculative and amorphous." Order at 10-11. *Evans* was a case in which a convicted drug dealer

sued his arresting officers under RICO, alleging lost employment opportunities from his arrest.

*Evans*, 434 F.3d at 919-24.  The Seventh Circuit's holding in *Evans* was expressly "limited to plaintiffs such as Evans, whose claims of injury are framed in terms of pecuniary losses incurred as a result of what can only properly be classified as ***personal injury***."  *Id.* at 928-29.  *Evans* did not foreclose fraudulently created debt obligations as RICO injuries.  Instead, *Evans* suggested that the defaulting debtor-plaintiffs in *Rosario* had proper RICO standing.  *Id.* at 928  (citing *Rosario*).

The Court's Order also cited *In re Bridgestone/Firestone, Inc. Tires Prods. Liability Litig.*, 155 F.Supp.2d 1069, 1091 (S.D. Ind. 2001) for the proposition that "[f]ederal courts have consistently and repeatedly held that" RICO requires an "out-of-pocket" monetary loss.  Order at 11.  *Bridgestone/Firestone* was a run-of-the-mill product defect case, which held that buying a defective product (or generally getting less than what one pays for) does not by itself confer RICO standing in the context of a ***sale transaction***.  *Id.* at 1094-95 ("The principle that emerges from all of the decisions discussed above is that a plaintiff alleges a cognizable injury (one that is concrete, tangible, and not speculative or contingent) ***as a result of a purchase*** only where the diminished value of the plaintiff's property has actually been realized or when the alleged infirmity in the purchased property has otherwise tangibly manifested itself.").  *Bridgestone/Firestone* did not mention *Rosario*, any other Seventh Circuit cases, or any cases in which a pattern of mail or wire fraud proximately caused plaintiffs to incur concrete debt obligations.  *Bridgestone/Firestone* did, however, rely substantially on *Maio v. Aetna, Inc.* 221 F.3d 472 (3d. Cir. 2000), which cited *Rosario* approvingly even as the Third Circuit adopted an "out-of-pocket loss" requirement under RICO.  *See Maio*, 221 F.3d at 484 (citing *Rosario* for the

proposition that "plaintiffs' RICO injury was manifested by their governmental student loans [that] they remained obligated to repay [out-of-pocket]").[21]

Other federal courts have more overtly held that students "saddled with debt" as a proximate result of mail and wire fraud have valid RICO injuries.  *E.g., Gonzalez v. North American College of Louisiana, Inc.*, 700 F.Supp. 362, 364-65 (S.D. Tex. 1988); *Rodriguez v. McKinney*, 878 F. Supp. 744, 748-49 (E.D. Pa. 1995) ("That plaintiffs' injury was sufficiently foreseeable to satisfy the proximate cause test is further supported by the students' place as the first victims in the alleged fraud chain.  In assuming liability for tuition debts, plaintiffs experienced an immediate, cognizable injury [under RICO].") (citing *Rosario*); *Torres v. CareerCom,* No 91 Civ. 3487, 1992 WL 245923, at *4 (E.D. Pa. Sep. 18, 1992) (allegations that plaintiffs assumed debt obligations adequately pleaded RICO injury); *cf. Rosario v. Livaditis*, 1988 WL 105303, at n.2 (N.D. Ill. Oct. 4, 1988) ("Students are not obligated to repay federal **grants**, and therefore, federal **grant** beneficiaries do not suffer actual damages [under RICO]."), *aff'd in part, Rosario v. Livaditis*, 963 F.2d 1013 (7th Cir. 1992).

In all of these RICO-school cases, the plaintiffs' mere ***assumption*** of student debt as a proximate result of a third party's mail and wire fraud constituted a cognizable RICO injury.  While factually distinct, Plaintiff's RICO-servicer case is legally similar in that Plaintiff has incurred student debt to the government as a proximate result of a third party's pattern of

---

[21] *Bridgestone/Firestone*'s analysis was also questionable to the extent that it purported to confer RICO standing on tire owners who replaced their defective tires ***after*** failure on a highway, but denied RICO standing to tire owners who (wisely) replaced their defective tires ***before*** failure on a highway.  *Id.* at 1090 ("The Master Complaint does not allege that those Plaintiffs who have replaced their tires did so as a result of their tires failing . . . ."). *But see Haroco, Inc. v. American Nat. Bank and Trust Co. of Chicago*, 747 F.2d 384, 389-99 (7th Cir. 1984) ("[I]t does not seem fitting for us to attempt to narrow [RICO] in ways which are nearly impossible to rationalize merely to exclude subjects of this kind."). *Bridgestone/Firestone* did not even mention *Haroco*, the seminal RICO injury case in this Circuit.

racketeering activity. *Cf. Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 654 (2008) ("Proximate cause, we [have] explained, is a flexible concept that does not lend itself to a black letter rule that will dictate the result in every case."). The Court's Order raises a causation issue,[22] but Plaintiff has never contended that she incurred fraudulently originated debt just because she received fraudulent account statements.

Instead, she is contending that she incurred and continues to incur daily expanding, unlawful debt ***that would not otherwise exist*** because Defendants have fraudulently reported that debt not just to her, but also to the Department and to every other stakeholder and financial authority for several years and counting. *See, e.g.,* Plaintiff's ***[Original]*** Class certification Reply Brief (Dkt. 70) at 17-19; *accord* Complaint at ¶¶38-40, 57(d), 58, 66, 75, 80(f), 86(a) (emphasizing fraudulent loan balance transmissions to lenders). The undisputed fact that Great Lakes' routine loan balance transmissions to ***lenders***, ***the Department***, ***NSLDS***, ***guaranty agencies*** and ***credit bureaus*** proximately caused Class members to incur real (not imaginary) debt obligations is confirmed by Defendants' own declaration: which represents that all of the affected loans of both defaulted and paid-in-full borrowers were, in fact, paid off in the inflated amounts. *See* Kielhofer Decl. (Dkt. 66) at ¶¶36(c), 37(a).

The evidence shows that before this action, nobody on Earth knew that Plaintiff's or Class members' debt was inflated outside of Great Lakes. But the debt was and is very real now. *See* Declaration of Jamie M. Brown, Ex. F. (Dkt. 83-8) at 3. If anything, Plaintiff's RICO-servicer injury is worse than the widely accepted RICO-school cases of the past because rather than "assuming" debt like defunct school students, Plaintiff's debt has been fraudulently,

---

[22] Order at 10 ("[Plaintiff asserts that] simply receiving an inflated account statement is enough to state a claim.").

illegally and ***unilaterally*** imposed upon her without her knowledge or consent. That is a RICO "injury" to Plaintiff's "property." 18 U.S.C. § 1964(c).

### B. *Bible* was a RICO case where the plaintiff had RICO standing despite her lawful debt obligations **to the defendant.**

In *Bible*, a lender (not a third party to a loan) imposed $4,500 in collection costs on a plaintiff after she defaulted in violation of the HEA and Department regulations. *Bible v. United Student Aid Funds, Inc.*, 799 F.3d 633, 638 (7th Cir. 2015). The plaintiff alleged that her defendant-lender breached her Master Promissory Note ("MPN") by violating federal regulations, which were incorporated by reference. *Id.* The Plaintiff further alleged that the defendants fraudulently mailed her an offer to rehabilitate her loans ***out*** of default status, for $50 per month, representing that she would not be charged collection costs. *Id.* at 642. She accepted the offer and proceeded to pay her lender back at $50 per month: ***nowhere near what she actually owed her lender as a matter of law.*** *Id.* When the plaintiff found out that the defendant-lender was imposing $4,500 in collection costs, which she viewed as noncompliant with the HEA, she sued under RICO.

The *Bible* defendant argued that the plaintiff was undamaged as a matter of law because "she defaulted on her student loan and continues to owe money on that obligation." *Id.* at 651. As this Court knows, the Seventh Circuit rejected the lender's "no damages" argument out of hand, holding that the unlawful collection costs "constitute[d] new charges that she must pay." *Id.* While the Court's Order distinguished *Bible* as a breach of contract case,[23] the Seventh Circuit did not cite Indiana contract law (or anything else) for its contract damages holding, appearing instead to rely on its own prudential reasoning. *Id.* Moreover, the defendant-lender in

---

[23] Order at 10.

*Bible* made the same exact "no damages" argument in relation to the plaintiff's RICO claim, but to no avail. The Seventh Circuit noted:

> On the RICO claims, USA Funds repeats the same argument it made on Bible's breach of contract claim, contending that she has failed to allege an injury. ***For the same reasons, we reject this contention***.

*Id.* at n.8.

While Bryana Bible's RICO theory was different than Plaintiff's RICO theory here, there is an important parallel between these two cases. In *Bible*, ***if*** the plaintiff ultimately won a favorable RICO judgment, with her $50 payments as her RICO injury, no one could seriously argue that she was entitled to receive ***more*** cash from her already aggrieved lender. Ms. Bible already lawfully owed ***her RICO perpetrator*** over $18,000 and had defaulted on that obligation. Ms. Bible had no discernable entitlement to ***cash*** damages from her RICO perpetrator: even if she won her case. Yet Ms. Bible still had RICO standing: even if her only remedy could have been account credits. *Id.*

Here, however, ***Plaintiff has never owed her RICO perpetrators one cent.*** Her RICO perpetrators have instead caused her to owe ***somebody else*** money in amounts that are increasing daily. Plaintiff needs—and is entitled to—cash damages to pay those fraudulently created debt obligations to the government. Whether Defendants, upon a RICO verdict, would have to pay Plaintiff cash or (perhaps) could properly obtain Plaintiff's lender's ***consent*** to reduce her debt obligations is of little moment here. In either scenario, Plaintiff is entitled to a judgment on liability if she proves Defendants' RICO violations and proximate causation. Plaintiff's debt

alone constitutes a RICO injury under *Rosario* and the other RICO-school cases, and the potential availability of account credits as a remedy here is no bar to recovery under *Bible*.[24]

Moreover, because Plaintiff has made and continues to make cash payments to her lender on her ever-accruing RICO debt, portions of every cash payment are wiped out just to get Plaintiff back to her ***true*** debt levels: just to get her back to square one had there been no RICO violations. So long as Plaintiff's principal balances remain illegally inflated, that remains true every time she makes a payment. Some portion of her cash payments are spent ***just to get her back to the financial position she would be in absent Defendants' RICO violations***. This "constitutes a financial loss. Nothing more is required to plead an injury under [§ 1964(c)]." *Bible*, 799 F.3d at n.8 (citing *Haroco*, 747 F.2d 384).

### C.     *Haroco* provides the guiding principles this Court should follow in applying RICO's injury requirement to Plaintiff's claims.

One of the seminal cases on RICO's injury requirement is *Haroco, Inc. v. American Nat'l Bank and Trust Co. of Chicago*. 747 F.2d 384, *aff'd American Nat'l Bank and Trust Co. of Chicago v. Haroco, Inc.*, 473 U.S. 606 (1985) ("The only injuries alleged were the excessive interest charges themselves."). In *Haroco*, corporate plaintiffs took out large business loans from a bank-defendant. *Id.* at 385. The interest rate on the loans was tied to the bank's stated "prime rate." *Id.* The plaintiffs alleged that "defendants had defrauded them in the calculation of the prime rate which determined their own variable interest payments[;] [t]he only alleged injuries

---

[24] The potential availability of account credits to make Plaintiff whole is contingent—at a minimum—upon her lender's consent, which Defendants currently lack. *See* Renewed Harris Decl., Ex. C. As of today, Plaintiff owes her lender daily accruing "RICO money" just like the RICO-school plaintiffs did. So unlike Ms. Bible, Plaintiff is entitled to cash damages from Defendants.

were excessive interest charges resulting from defendants' calculation of the prime rate." *Id.* The defendants argued that this was not a cognizable RICO injury. *Id.* at 386.

The Seventh Circuit analyzed RICO's injury requirement in great depth, from RICO's text to the legislative history to public policy. While *Haroco*'s primary concern was whether RICO standing required a "racketeering injury" as various courts thought at the time, the Seventh Circuit provided a number of guiding principles that should inform this Court's application of RICO's injury requirement to this case. *Id.* at 387 ("The central issue in this case concerns the type of injury a plaintiff must allege to sustain a RICO claim.").

*Haroco* fully considered the fact that civil RICO has extended into economic arenas not specifically contemplated by Congress:

> Congress was fully aware of the extraordinary breadth of [RICO's] language. Even though Congress might not have fully contemplated all of the consequences or applications of those very broad terms, Congress nevertheless deliberately chose to use the broad terms to ensure that the criminal and civil provisions would be effective. Further, even if Congress had meant to invite the courts to limit the broad reach of RICO, it provided few if any textual pegs which could permit courts to develop reasoned, consistent and principled limits without simply redrafting the statute. If, for policy reasons, it appears to be the better course to restrict the scope of RICO, then Congress—not the courts—is the body to do it.

*Id.* at 392. *Haroco* provided additional guidance "that may be useful to other courts," including the following:

> Even if Congress did not anticipate all of the consequences of RICO, the breadth of the statute, including the civil provisions, was the result of deliberate policy choices on the part of Congress. In these circumstances, ***to impose special standing and injury requirements cannot in our view be defended as efforts to improve or polish a statute which was carelessly or inartfully drafted.*** RICO may be very broad, but there was nothing careless about its drafting. When Congress deliberately chooses to unleash such a broad statute on the nation, in the absence of constitutional prohibitions, complaints must be directed to Congress rather than to the courts. [citation omitted]
>
> With respect to the case before us, ***it does not seem at all likely that Congress anticipated the application of civil RICO to improperly calculated interest***

> *charges by a commercial bank. And this may or may not be an appropriate subject for this federal statute.* Nevertheless, it does not seem fitting for us to attempt to narrow the statute in ways which are nearly impossible to rationalize merely to exclude subjects of this kind. For to say that Congress did not anticipate this subject is not to say that Congress would have excluded it if the subject had been brought explicitly to its attention. Congress appears to have preferred a broad statute, even if overinclusion might result.
>
> We do not believe we could limit RICO in the ways argued by the defendants or approved by the Second Circuit without disturbing the policy choices Congress has made. If the safety or stability of the Republic demanded, we might be justified in pursuing such an aggressive jurisprudence. But, particularly at the pleading stage, we seem to be dealing with much smaller stakes—legal fees and the sensibilities of prominent defendants alleged to be "racketeers." Those stakes do not appear high enough to justify our rejecting Congress's choice of a statute that sweeps broadly.

*Id.* at 398-99 (emphasis added).   The *Haroco* plaintiffs had RICO standing despite lawfully owing their RICO perpetrator millions of principal dollars.  Plaintiff, by contrast, owes her RICO perpetrators ***nothing***, yet she continues to accrue and pay "improperly calculated interest charges" as a direct consequence of her RICO perpetrators' ongoing fraud.  Renewed Dawson Decl.

It would be difficult to distinguish Plaintiff's case from all of *Rosario, Bible* and *Haroco* without running afoul one or more of these decisions.  As demonstrated herein, all three decisions are readily reconciled by a determination that Plaintiff and the Class have cognizable RICO injuries in the form of their unlawful debt: regardless of whether their lawful debt to the government (not Defendants) has been paid off.  *If* Plaintiff can ultimately prove RICO violations by Defendants, then whether she is entitled to cash or account credits and in what amounts are questions better left for summary judgment or trial.

> **D.   The "out-of-pocket" loss requirement articulated in the Court's Order is foreclosed by *Bridge* and *Phoenix Bond & Indemnity Co.*.**

In a RICO case arising under 18 U.S.C. 1964(c) and predicated on mail fraud, the Supreme Court articulated the following fact pattern:

Each year the Cook County, Illinois, Treasurer's Office holds a public auction at which it sells tax liens it has acquired on the property of delinquent taxpayers. Prospective buyers bid on the liens, but not in cash amounts. Instead, the bids are stated as percentage penalties the property owner must pay the winning bidder in order to clear the lien. The bidder willing to accept the lowest penalty wins the auction and obtains the **right** to **purchase** the lien **in exchange for paying the outstanding taxes on the property.** The property owner **may** then redeem the property by paying the lienholder the delinquent taxes, plus the penalty established at the auction and an additional 12% penalty on **any** [if they exist] taxes subsequently paid by the lienholder. **If the property owner does not redeem the property** within the statutory redemption period, the lienholder **may** obtain a tax deed for the property, thereby in effect purchasing the property for the value of the delinquent taxes.

Because property acquired in this manner **can** often be sold at a significant profit over the amount paid for the lien, the auctions are marked by stiff competition. As a result, most parcels attract multiple bidders willing to accept the lowest penalty permissible—**0%, that is to say, no penalty [profit] at all.** (Perhaps to prevent the perverse incentive taxpayers would have if they could redeem their property from a winning bidder for less than the amount of their unpaid taxes, the county does not accept negative bids.) The lower limit of 0% creates a problem: Who wins when the bidding results in a tie? The county's solution is to allocate parcels "on a rotational basis" in order to ensure that liens are apportioned fairly among 0% bidders.

But this creates a perverse incentive of its own: Bidders who, in addition to bidding themselves, send agents to bid on their behalf **will** [presumably] obtain a disproportionate share of liens. To prevent this kind of manipulation, the county adopted the "Single, Simultaneous Bidder Rule," which requires each "tax buying entity" to submit bids in its own name and prohibits it from using "apparent agents, employees, or related entities" to submit simultaneous bids for the same parcel. *Id.*, at 67. **Upon registering for an auction, each bidder must submit a sworn affidavit affirming that it complies with the Single, Simultaneous Bidder Rule.**

*Bridge*, 553 U.S. at 642-43. Both the plaintiffs (respondents) and defendants (petitioners) in this case were "regular participants" in Cook County's tax bidding. *Id.* at 643. The plaintiffs alleged that the defendants defrauded the County by using a bunch of related entities to win more bids than they were entitled to under the "Single, Simultaneous Bidder Rule." *Id.* at 643-44. This allegedly caused the plaintiffs to win less bids than they were entitled to under the rule. *Id.*

24

A walk through the above fact pattern shows the many orders of speculation that existed between the plaintiffs' alleged RICO "injury" (lost zero-dollar bids) and the plaintiffs' "actual, concrete monetary loss (*i.e.,* an 'out-of-pocket' loss)." Order at 11. First, the *Bridge* plaintiffs allegedly lost the mere ***right*** to ***purchase*** a lien from the County; no money was actually lost here as a result of the fraud. *Bridge,* 553 U.S. at 642. Second, ***if*** these plaintiffs' had ultimately exercised that right to ***buy*** a lien, then they would only have paid exactly what the lien was worth: the back taxes. So once again, no money was lost. Third, ***if*** the plaintiffs bought the lien at fair value, then they still would only have purchased their next ***right*** to do one of the following: (a) collect ***exactly what they paid for the lien*** from the property owner; or (b) obtain a tax deed, effectively "purchasing the property" for the price of the lien. No money is actually lost so far; the plaintiff ***still*** has only lost the right to hold exactly what—maybe—he would have paid for. Fourth, "property acquired in this manner ***can often*** be sold at a significant profit over the amount paid for the lien." *Id.,* at 642-43.

There was a lot of economic and financial speculation injected into this alleged RICO injury. Perhaps—after four full levels of wild speculation—the RICO plaintiffs in *Bridge* might have ended up with an "actual, concrete monetary loss (*i.e.,* an 'out-of-pocket' loss)." Order at 11. But they certainly had not suffered such a loss at the time of suit, nor could they possibly ***prove*** their actual monetary damages: ever.

In *Bridge*, the district court had (understandably) dismissed the plaintiffs' RICO complaint for lack of RICO "standing," deeming this a jurisdictional issue. *See Phoenix Bond & Indem. Co.,* 477 F.3d at 930. The Seventh Circuit, however, reversed:

> ***Standing is not a problem in this suit. Plaintiffs suffer injury in fact, and that injury can be redressed by damages***. Extra bids reduce plaintiffs' ***chance*** of winning any given auction, and loss of a (valuable) ***chance*** is a real injury.

*Id.*   The Seventh Circuit continued: "Injury in fact is not sufficient under RICO, however; the plaintiff also must establish that its injury was proximately caused by defendants' scheme."  *Id.* That Court then went on to hold that these zero-bidder-plaintiffs had cognizable RICO injuries because they were the first (if not only) victims of the alleged mail and wire fraud.  *Id.* at 930-33. This reality, along with the plaintiffs' entirely speculative, unprovable monetary losses placed them within the "zone of interests" protected by RICO's private right of action.  *Id.*

The Supreme Court then affirmed. *See Bridge*, 553 U.S. at 645 (acknowledging plaintiffs' "real injury" when they lost the "valuable chance" to acquire more liens).  These zero-bidder, speculation-driven plaintiffs had proper RICO standing.  And neither the Seventh Circuit nor the Supreme Court dismissed the speculating *Bridge* plaintiffs for lack of Article III jurisdiction.

Here, Plaintiff has a "valuable chance" to keep some of the little money she earns from working two jobs as she tries to make ends meet.  Unfortunately, there is already a fraudulently created "lien" on her existing "property" and on all of her future earnings thanks to Defendants' fraud.  This is an "injury" to Plaintiff's "property," as every applicable case demonstrates.  18 U.S.C. § 1964(c).  If the plaintiffs in *Bridge* had RICO standing (let alone the plaintiffs in *Rosario, Bible* and *Haroco*), then Plaintiff and the Class certainly have "concrete" RICO injuries in the form of their daily growing $20+ million obligations to their lenders.  Plaintiff's debt obligations "can be addressed by damages."  *Phoenix Bond & Indem. Co.,* 477 F.3d at 930. Defendants need to pay Class members money so that Class members can pay their ***lenders*** the RICO debt that they currently owe.  If Great Lakes wants to obtain lenders' official consent to eliminate Class members' RICO debt, and "set-off" Class members' damages that way, Plaintiff

might agree to that. But in either event, Plaintiff and the Class now have other statutory entitlements. Providing a 100% remedy post-suit will not, without more, end this case:

> While the return of the cylinders may compensate Liquid Air for the replacement value of the cylinders, it does not compensate it for rents lost prior to litigation. More importantly, it does not negate the frauds perpetrated by defendants. We conclude that setting-off damages ***after*** trebling is more likely to effectuate the purposes behind RICO. (emphasis in original)

*Liquid Air Corp. v. Rogers*, 834 F.2d 1297, 1310 (7th Cir. 1987).

Plaintiff and the Class have cognizable RICO injuries as a matter of law, but this is not a jurisdictional issue.

### E.    Plaintiff's RICO "standing" presents common merits questions, not a jurisdictional question.

As the Court's Order pointed out, the Seventh Circuit in *Evans* and elsewhere stated that RICO standing "represents a jurisdictional requirement which remains open to review at all stages of the litigation." *Evans*, 434 F.3d at 924 (internal quotation omitted). More recently, however, the Supreme Court has clarified the difference between Article III standing (which is a jurisdictional issue) and statutory "standing" where a federal statute provides a private right of action (which is ***not*** a jurisdictional issue). Whether Plaintiff has a cognizable injury to business or property under RICO is simply a question of statutory interpretation and application, rather than a constitutional issue. *See Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S.Ct. 1377, 1386-88 (2014). *Lexmark Int'l* was a Lanham Act case, not a RICO case, but the Supreme Court's discussion of statutory "standing" versus constitutional standing was generalized and relied on RICO cases. *Id.* (citing *Holmes v. Sec. Investor Protection Corp.*, 503 U.S. 258 (1992) (a RICO case) and *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451 (2006) (a RICO case)).

The question of RICO "standing"—as opposed to Article III standing—is simply whether Plaintiff "falls within the class of plaintiffs whom Congress has authorized to sue" under RICO. *Id.* at 1387-88; *see also ibid.* at n.4 ("We have on occasion referred to this inquiry as *'statutory standing'* and treated it as effectively jurisdictional. [citations] That label is an improvement . . . , since it correctly places the focus on the statute.  But it, too, is misleading, since '*the absence of a valid (as opposed to arguable) cause of action does not implicate subject-matter jurisdiction, i.e.,* the court's statutory or constitutional power to adjudicate the case.'") (citations omitted).  As demonstrated above, Plaintiff is within the "class of plaintiffs whom Congress has authorized to sue."  *See* Parts IV. A-D, *supra.*

But the Court need not decide that here because Plaintiff's RICO standing is not necessary to the Court's Rule 23 decision.  Out of 362,305 Class members, Defendants have identified only 112 of them who actually paid off their fraudulently inflated loans.  *See* Kielhofer Decl. (Dkt. 66), at ¶36(c).  Therefore, the same RICO "standing" issues that Plaintiff addresses above relative to *Rosario*, *Bible, Haroco* and *Bridge* apply to more than 99.9% of the Class. Whether Plaintiff and the Class have cognizable RICO injuries in the form of their illegal interest charges represents one of many predominating common questions in this case.  And "Rule 23(b)(3) [only] requires a showing that *questions* common to the class predominate, not that those questions will be answered, on the merits, in favor of the class." *Amgen, Inc. v. Connecticut Ret. Plans and Trust Funds*, 133 S. Ct. 1184, 1191 (2013).  The Court need not determine the existence or measure of the Class's RICO damages here, because whatever the answers to those issues are, they are common answers under Rule 23.  This Court has the power to adjudicate Plaintiff's claims on the merits, and will retain that power for the foreseeable future.

28

**F.     Plaintiff's Article III standing is a non-issue, and it will remain a non-issue until this case is adjudicated on the merits <u>or</u> until Defendants provide all of the relief that Plaintiff demands for the Class.**

Plaintiff's Article III standing in this case goes without saying.  Plaintiff is being saddled with—and has made payments on—concrete, quantifiable, fraudulent student debt created by (but not owed *to*) the Defendants.  Plaintiff has therefore "suffer[ed] injury in fact, and that injury can be redressed by damages."  *Phoenix Bond*, 477 F.3d at 930.  It is settled law that Defendants cannot moot the Article III controversy in this case by providing any less relief than Plaintiff and the Class demand: including threefold the Class's damages and attorneys' fees. *See, e.g., Arreola v. Godinez*, 546 F.3d 788, 794-95 (7th Cir. 2008) ("Standing is a prerequisite to *filing suit*, while the underlying merits of a claim (and the laws governing its resolution) determine whether the plaintiff is ***entitled to relief***."); *Morrison v. YTB Int'l, Inc.*, 649 F.3d 533, 536 (7th Cir. 2011) ("Plaintiffs allege that they are victims of a pyramid scheme that saddled them with financial loss, which YTB caused. The judiciary can redress that injury by ordering YTB to pay money to the victims. Nothing more is required for standing."); *Smith v. Greystone Alliance, LLC*, 772 F.3d 448, 450 (7th Cir. 2014) ("A court can't decide the merits and then dismiss for lack of jurisdiction. *** If the plaintiff asks for the moon, only offering the moon extinguishes the controversy.").

It is far too late for Defendants to eliminate Plaintiff's and the Class's Article III controversy, unless they provide the whole Class with triple damages, attorneys' fees, and allow for confirmatory discovery that Defendants have ***in fact*** done all of this.   One surprise

declaration sprung mid-discovery, without any documentary evidence or confirmatory discovery, is hardly going to cut it.[25]

## V.      PLAINTIFF'S CASE SATISFIES RULE 23

### A.      The Class is numerous.

Defendants admit that there are 362,305 Class members who suffered a Capitalization Event (*i.e.,* some amount of interest capitalization) at the end of their B-9 Forbearance period(s), none of which would have occurred if Defendants had treated B-9 Forbearances as Capitalization Exceptions as required by law. ████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

---

[25] Defendants originally filed an opposition brief and surprise declaration at class certification that said, in total: "We have provided all the compensation that we have decided the class is entitled to, and this marks the end of the controversy under Article III. We offer no documentary evidence to support our declaration, and the Constitution now precludes discovery into these matters and further precludes ***any*** decision by the Court on the relief to which Class members are entitled." *See generally* Defendants' ***[Original]*** Opposition Brief (Dkt. 65); Kielhofer Decl. (Dkt. 66). The extremely high quality defense counsel that Defendants have retained in this case should know better than that.  Article III should not be raised again in this case for the foreseeable future.  The only parties that have ever, or will ever, lack Article III standing are the Defendants' who Counterclaimed against Plaintiff, without an injury, and based on a false pretense: that pretense being that their System operated in a way that their System, in fact, did not operate at the time of their Counterclaim. *See generally* Renewed Harris Decl.

███████████████████████████████████████████████████████

███████████████████████████████.

## B.  Common questions of law and fact exist among Class members.

Rule 23(a)(2) requires the existence of "common questions of law or fact" among class members.  FED. R. CIV. P. 23(a)(2).  This standard "does not demand that every member of the class have an identical claim."  *Spano v. The Boeing Co.*, 633 F.3d 574, 585 (7th Cir. 2011).  Indeed, "even a single common question will do."  *Walmart v. Dukes,* 131 S.Ct. 2541, 2556 (2011).  In this case, there are many common questions of law and fact.  They include, but are not limited to:

(1) whether and when Defendants' GOALS System was programmed to capitalize interest at the end of B-9 Forbearance periods;

(2) whether Great Lakes' System programming violated 34 C.F.R. §§ 682.211(f)(11) and 685.205(b)(9), as well as Change Request 1492, by capitalizing "B-9 Interest" (*i.e.,* treating B-9 Forbearances as Capitalization ***Events*** rather than Capitalization ***Exceptions***);

(3) whether and when Defendants became aware of their wrongful interest capitalizations and the resultant interest charges against FFELP and Direct loan borrowers;

(4) whether Change Request 1492 objectively showed that B-9 Forbearances are Capitalization Exceptions rather than Capitalization Events;

(5) what Defendants subjectively understood Change Request 1492 to mean with respect to B-9 Forbearances;

(6) whether the Department ever instructed Defendants to make Change Request 2785 effective in their System;

(7) why Defendants ██████████████████████████n in their System in April 2013;

(8) why Defendants ████████████████████████n in their System in April 2014;

(9) why Defendants ████████████████████████ in their System after being served with the Complaint in August 2015;

31

(10)   Defendants' motives for executing and concealing their unlawful capitalizations and interest charges against Class members;

(11)   Defendants' reasons for saying one thing to this Court while doing the exact opposite throughout the first year of this action (and in the years before this action);

(12)   whether Defendants in fact provided the Classwide cash and account credits that Ms. Kielhofer claims in her declaration;[26]

(13)   the proper measure of damages suffered by Class members who experienced a Capitalization Event at the end of their B-9 Forbearance period(s);

(14)   whether Defendants violated 18 U.S.C. § 1962(c);

(15)   whether borrowers' unpaid student loan obligations proximately caused by a servicer's RICO violations may constitute a RICO injury;

(16)   whether Class members are entitled to cash damages or account credits in the amounts of their injuries, and whether they have a choice;

(17)   Whether a legal entitlement to cash damages (as opposed to account credits) in the event of a RICO judgment is a prerequisite to RICO standing; and

(18)   Whether the Class is entitled to triple damages and attorneys' fees in the event that RICO violations and proximate causation are proven.

Rule 23's commonality requirement is satisfied.

### C.    Plaintiff's claims are typical of Class claims.

Rule 23(a)(3) requires that a class representative's claims or defenses be "typical of the claims or defenses of the class." FED. R. CIV. P. 23(a)(3).  This inquiry is "closely related to the commonality inquiry."  *Keele v. Wexler*, 149 F.3d 589, 595 (7th Cir. 1998); *see also Rosario v. Livaditis*, 963 F.2d 1013, 1018 (7th Cir. 1992) ("The question of typicality in Rule 23(a)(3) is closely related to the . . . question of commonality.").  "A 'plaintiff's claim is typical if it arises

---

[26] Plaintiff disputes that Defendants have even done what Ms. Kielhofer declared in the first round of class certification briefing, but there was no reason to explain why then, and there is no reason to explain why now.  Kielhofer Decl. (Dkt. 66).

from the same event or practice or course of conduct that gives rise to the claims of other class members[,] and his or her claims are based on the same legal theory.'" *Keele*, 149 F.2d at 595 (quoting *De La Fuente v. Stokely-Van Camp, Inc.*, 713 F.2d 225, 232 (7th Cir. 1983)).

Here, Plaintiff's and the Class's claims arise from the same course of conduct by Defendants: namely, treating B-9 Forbearances as Capitalization Events rather than Capitalization Exceptions in violation of 34 C.F.R. §§ 682.211(f)(11) and 685.205(b)(9) and Change Request 1492. Plaintiff and Class members assert the same legal theories under RICO and negligence theories. Complaint (Dkt. 1), at ¶¶82-101. Plaintiff's claims are thus typical of the Class's claims under Rule 23. *See Keele*, 149 F.2d at 595 ("[Plaintiff and the Class] are now suing [Defendants] under [two statutes], alleging violations of the same statutory sections under the same legal theory. We are confident that [plaintiff] has met Rule 23's typicality requirement.").

### D. Plaintiff and her counsel are adequate to represent the Class.

Rule 23(a)(4) requires that a "representative [plaintiff] will fairly and adequately protect the interests of a class." FED. R. CIV. P. 23(a)(4). An adequate class representative "must be part of the class and possess the same interest and suffer the same injury as the class members." *Amchem Prods., Inc. v. Windsor*, 21 U.S. 591, 625-26 (1997). This inquiry "tend[s] to merge" with Rule 23's commonality and typicality criteria. *General Telephone Co. of Southwest v. Falcon*, 457 U.S. 147, 157-58, n.13 (1982). A court should also evaluate class counsel's competence and whether representative plaintiffs have a conflict of interest with absent class members. *Id.*; *Amchem Prods.*, 21 U.S. at 625-26.

Here, Plaintiff is adequate because she is a member of the Class suffering the same injury as absent Class members: daily interest charges accruing from Defendants' unlawful capitalization of ***B-9 Interest*** (any accrued interest) during the Class Period. Stated differently,

Defendants unlawfully treated Plaintiff's B-9 Forbearance as a Capitalization Event rather than a Capitalization Exception, just as they wrongfully treated every other Class members' B-9 Forbearances.

Importantly, Plaintiff and her counsel have done nothing but substantially benefit absent Class members since the outset of this case.  Defendants initially criticized Plaintiff for even filing her Complaint; they pleaded that a phone call to Great Lakes' borrower services line would have sufficed.  Answer (Dkt. 24) at ¶¶108, 110.  That was doubtful because in response to the Complaint, Defendants' *still* refused to make Plaintiff and the Class whole; Defendants insisted that her and everyone else's B-9 Forbearances were proper Capitalization Events, even as they continued to treat millions of *non*-Class members' B-9 Forbearances as Capitalization Exceptions.  Defendants provided Plaintiff with a fraudulent "Adjustment Confirmation Letter," purporting to give her all the relief to which she was entitled.  Opening Harris Decl. (Dkt. 58) at Ex.  AA.  But Plaintiff and her counsel were not fooled by that, and at their own great risk, continued to fight for the Class for many months thereafter.

Defendants then proceeded (purportedly) to "remediate" all Class members' accounts in that same way that they "remediated" Plaintiff's: ***by continuing to treat all Class members' B-9 Forbearances as Capitalization Events***, while everyone else on Earth continued to receive Capitalization Exceptions, and continue to receive Capitalization Exceptions to this day.  Defendants argued in their original opposition to class certification that the entire Class was whole, and that Plaintiff and her counsel were actually harming the Class by continuing to litigate.  Opposition Brief at 27 ("[Plaintiff] omits the one critical detail that makes [her adequacy argument] absurd: her account, like those of every affected proposed class member,

34

has already been corrected in full by Great Lakes." (citing Kielhofer Decl.)).  Again, Plaintiff did not relent.

Instead, Plaintiff fully exposed Defendants' "Remediation Project" charade and their GLELSI Deposition rewrite in her original class certification Reply Brief.  *See* Plaintiff's *[Original]* Reply Brief (Dkt. 70) at 21-28.  As a result, the Class is now one Department email away from Defendants ***agreeing*** that the Class is entitled to ***another*** $20+ million in cash and account credits on top of Defendants' first Remediation Project. *See* Declaration of Jamie M. Brown, Ex. F. (Dkt. 83-8) at 3.  Plaintiff and her counsel have done and continue to do a rather high-value service for the whole Class.  Rule 23(a)(4) is satisfied, and Plaintiff is disinterested to hear more from Defendants about how she not representing the Class's interests.

### E.      Rule 23(b)(3) is satisfied.

Rule 23(b)(3) requires that "questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  FED. R. CIV. P. 23(b)(3).  Based on the undisputed evidence in this case, both requirements are satisfied here.[27]

#### 1.      Common questions and answers predominate over individual questions and answers.

In general, Rule 23's predominance inquiry "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation."  *Amchem Prods., Inc. v.*

---

[27] To avoid an enormous duplication of filings on the Court's docket, Plaintiff hereby incorporates by reference into this Renewed Brief the entirety of the parties original class certification papers, including: Dkt. Nos. 55, 57, 58, 60, 65, 66, 67, 68, 69, 70, 71, 83, 84, along with any and all attachments thereto.  Plaintiff will succinctly summarize the previously filed evidence and arguments as necessary herein, citing back to the parties' original, extremely detailed class certification papers as necessary.

*Windsor*, 521 U.S. 591, 623 (1997); *see also Parko v. Shell Oil Co.*, 739 F.3d 1083, 1085 (7th Cir. 2014) (explaining that Rule 23 predominance "goes to the efficiency of a class action as an alternative to individual suits").  Importantly, predominance "does ***not*** require a plaintiff seeking class certification to prove that each element of her claim is susceptible to classwide proof." *Amgen*, 133 S.Ct. at 1196  (emphasis in original); *see also Bell v. PNB Bank, Nat'l Ass'n*, 800 F.3d 360, 381 (7th Cir. 2015) ("[O]ur cases demonstrate that commonality as to every issue is not required for class certification.").  Courts should instead evaluate "the central questions in the litigation" and determine whether "a decentralized process of multiple trials is necessary for an accurate evaluation of the claims." *Pella Corp. v. Saltzman,* 606 F.3d 391, 394 (7th Cir. 2010).

Every "central question" in this case is either common by definition or otherwise amenable to Classwide proof.  The first predominating common question is how Defendants' automated System was programmed to treat B-9 Forbearances in comparison to the Department's rules throughout the Class Period.  Specifically, the central regulatory questions are: (1) whether B-9 Forbearances are Capitalization ***Events*** (allowing partial or total "B-9 Interest" capitalization) or Capitalization ***Exceptions*** (allowing zero "B-9 Interest" capitalization); and (2) whether Defendants' GOALS System treated B-9 Forbearances as Capitalization Events or Capitalization Exceptions during the Class Period.  Nothing else about the System matters for purposes of this case.  *Accord* Order at 9 (Defendants' fraudulent "miscalculation" defense has "nothing to do with plaintiff's claim"); Joint Rule 26(f) Preliminary Pretrial Conference Report (Dkt. 36) at 2 ("Plaintiff is unpersuaded by Great Lakes' characterization of the problem as a mere 'miscalculation.'  This is a compliance problem, not an arithmetic problem.").

The second predominating common question is whether Defendants conducted an enterprise through a pattern of mail and wire fraud within the meaning of RICO; this presents nothing but common issues by definition and is sufficient *by itself* to find predominance under Rule 23:

> The number of class members need have no bearing on the burdensomeness of litigating a violation of RICO. Whether particular members of the class were defrauded and if so what their damages were are another matter, and it may be that if and when the defendants are determined to have violated the law separate proceedings of some character will be required to determine the entitlements of the individual class members to relief. Fed. R. Civ .P. 23(c)(4)(A); *Allen v. International Truck & Engine Corp.,* 358 F.3d 469 (7th Cir.2004); *Bell Atlantic Corp. v. AT&T Corp.,* 339 F.3d 294, 307 n. 16 (5th Cir. 2003); *In re Visa Check/MasterMoney Antitrust Litigation,* 280 F.3d 124, 141 (2d Cir. 2001); *Robinson v. Metro–North Commuter R.R.,* 267 F.3d 147, 168–69 (2d Cir. 2001).

*Carnegie v. Household Int'l, Inc.,* 376 F.3d 656, 661 (7th Cir. 2004). *See also* Plaintiff's *[Original]* Opening Brief in Support of Class Certification (Dkt. 55) at 15-24; Plaintiff's *[Original]* Reply Brief (Dkt. 70) at 15-19.

The third predominating common question is the amount of damages suffered by individual Class members because of Defendants' fraud. Defendants have now repeatedly confirmed to both the Court and the Department that they can calculate everyone's financial harm down to the penny with "some programming" that can be done "within a few weeks." *See* Declaration of Jamie M. Brown (Dkt. 83-2), ¶11; Ex. F. (Dkt. 83-8) at 3.[28] There are many other common questions of law and fact that predominate in this case. *See* Part V.B, *supra*. Common questions predominate.

---

[28] It will, however, take much longer than a few weeks for Plaintiff to confirm or dispute that Defendants have actually done what they say, and that they have obtained proper Department consent to do what they say. One inadmissible email from one Department official does not prove the Department's consent for purposes of this action.

### 2.      A Class action is the superior method of resolving these issues.

A Class action is superior for the reasons articulated in Plaintiff's original Opening Brief in support of certification.  *See* Dkt. 55 at 25-31.  Defendants did not contest superiority in the parties' original class certification briefing.  Absent Class members have relatively small financial interests in this case and have not brought any of their own actions because it would be cost preclusive.  *Id.*  There is every reason to concentrate litigation in this forum.  *Id.*  Wisconsin law applies to every negligence claim.  *Id.*[29]  And importantly, the entire Class is readily identifiable and efficiently notifiable through ███████████████████████████  *Id.*; *see also* Declaration of Jamie M. Brown (Dkt. 83-2), ¶11; Ex. F. (Dkt. 83-8) at 3.

## VI.      CONCLUSION

For all of the foregoing reasons, Plaintiff respectfully requests that the Court certify the Class proposed in Plaintiff's Renewed Motion for Class Certification, naming Plaintiff as Class Representative and Finkelstein & Krinsk LLP as Class Counsel.

---

[29] Defendants did not dispute this in the first round of class certification briefing.

Respectfully submitted,

FINKELSTEIN & KRINSK LLP

Dated: October 20, 2016                    By:     s/ David J. Harris, Jr.
                                                   David J. Harris, Jr., Esq.

                                           Jeffrey R. Krinsk, Esq.
                                           Trenton R. Kashima, Esq.
                                           A. Trent Rurak, Esq.
                                           550 West C Street, Suite 1760
                                           San Diego, California 92101-3579
                                           Telephone: (619) 238-1333
                                           Facsimile:  (619) 238-5425

                                           *Counsel for Plaintiff*