UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WISCONSIN

_____

MEREDITH D. DAWSON,

            Plaintiff,

 -vs-                        Case No.  15-CV-475-JDP

GREAT LAKES EDUCATIONAL LOAN       Madison, Wisconsin
SERVICES, INC., GREAT LAKES        May 18, 2017
HIGHER EDUCATION CORPORATION,     1:06 p.m.
JILL LEITL, DAVID LENTZ,
and MICHAEL WALKER,

            Defendants.

_____

STENOGRAPHIC TRANSCRIPT OF ORAL ARGUMENT
HELD BEFORE CHIEF U.S. DISTRICT JUDGE JAMES D. PETERSON

APPEARANCES:

For the Plaintiff:

                Finkelstein & Krinsk LLP
                BY:   DAVID J. HARRIS, JR.
                     TRENTON R. KASHIMA
                550 West C Street, Suite 1760
                San Diego, California  92101

For the Defendants:

                Foley & Lardner LLP
                BY:   THOMAS L. SHRINER, JR.
                     AARON R. WEGRZYN
                777 East Wisconsin Avenue
                Milwaukee, Wisconsin  53202

              Jennifer L. Dobbratz, RMR, CRR, CRC
             U.S. District Court Federal Reporter
               United States District Court
             120 North Henry Street, Rm. 410
               Madison, Wisconsin  53703
                 (608) 261-5709

```
 1          (Proceedings called to order at 1:06 p.m.)

 2          THE CLERK:  Case No. 15-CV-475-JDP, *Meredith Dawson v.*

 3  *Great Lakes Educational Loan Services, et al.*  Court is called

 4  for oral argument.  May we have the appearances, please.

 5          MR. HARRIS:  Your Honor, David Harris with the law firm

 6  of Finkelstein & Krinsk on behalf of the plaintiff, Meredith

 7  Dawson, and with me is Mr. Trenton Kashima, also on behalf of

 8  plaintiff.

 9          THE COURT:  All right.  Good afternoon to you.

10          MR. SHRINER:  Good afternoon, Your Honor.  Tom Shriner

11  and Aaron Wegrzyn, Foley & Lardner, for the defendants.

12          THE COURT:  And good afternoon to you.

13      All right.  This case is one that I inherited from Judge

14  Crabb, and the law clerk that's assigned to it wasn't here when

15  this case began, and, frankly, it just seems to be kind of --

16  from my perspective splicing into it while it's rolling along

17  here, there are certain things that seem confusing and unclear

18  to me, so I thought the simplest thing to do, having gone

19  through what is fairly described as pretty voluminous briefing

20  on the class certification issue, is just to get people in here

21  so you can just answer my questions, and maybe beneath all of

22  this there's the underlying simplicity that will allow us to get

23  this case going on the right track one way or the other.

24      So here -- let me just start by asking some questions.  I'm

25  not even sure which side I should address first, but it seems to
```

1    me at the heart of this there is a simple claim by the

2    plaintiffs, and that is that Great Lakes Higher Education has

3    been wrongfully capitalizing interest that accrues during a B-9

4    forbearance period, and the B-9 forbearance period is one which

5    can endure for up to 60 months [verbatim] while the lender

6    figures out if some application for another repayment plan or

7    another kind of forbearance is appropriate.

8         So you got -- the lender has 60 days to process this

9    application, and during this 60-day period, the interest is

10   going to accrue, but it's not supposed to be capitalized.  And

11   that's an exception to the general rule that is during a

12   forbearance period, such as you go to college, you decide you're

13   going to get a degree, you want to get a master's degree so

14   you're going to take two years, get a master's degree, during

15   that time you're not going to pay your student loans.  The

16   interest that accrues during that period, that's ordinarily

17   capitalized, but the B-9 exception is for a little short period

18   where there's some processing of an application, and so the

19   interest is not supposed to accrue during that B-9 application

20   forbearance period against the general rule that forbearances

21   usually result in the capitalization of interest.

22        How far off have I gotten so far?  Who wants to start?

23             MR. HARRIS:  I'll start, Your Honor.  Thank you.  And

24   thank you for hearing our motion.

25             THE COURT:  And we're just going to do it a little

1    piece at a time.  We'll drill down into the complications, but

2    have I got it right so far?

3              MR. HARRIS:  Your Honor, as I heard you, almost.

4              THE COURT:  Okay.

5              MR. HARRIS:  So our claim in the complaint, and it has

6    been consistent for the full almost two years --

7              THE COURT:  Okay.  Now, just stick to the questions,

8    okay?  I want to stay focused on the questions that I have.

9              MR. HARRIS:  Sure.  Your Honor, the only difference

10   between what you said and our position, our claim, is, as I

11   heard Your Honor, we're challenging whether interest that

12   accrued during the B-9 forbearance can be capitalized, and what

13   we're actually challenging is that at the end of a B-9

14   forbearance period, no interest can be capitalized at all

15   regardless of when it accrued.

16             THE COURT:  Okay.

17             MR. HARRIS:  So there's interest that accrued before

18   the forbearance, and then there's interest that accrued during

19   the forbearance, and we're saying no capitalization under the

20   rules.

21             THE COURT:  For during the B-9 forbearance period?

22             MR. HARRIS:  At the end of the B-9 forbearance period.

23   So typically, Your Honor -- or actually always, as I understand

24   the regulations, is when you have a deferment or a forbearance

25   or some period that's generally what they call cappable, a

1    capitalization event, capitalization happens at the last -- or

2    the day after the end of the period, so it's a one-time

3    capitalization.  So the regulations first ask, "Is this a

4    capitalization" -- "is this a capitalization event?"  If the

5    answer to that question is "yes," the question then becomes,

6    "What interest is supposed to be capitalized at this time?"  If

7    the answer is "no," then nothing happens.  And our position is

8    that the answer to, "Is this a capitalization event at all?" is

9    "no."

10            THE COURT:  Okay.  Now, I think what we're going to get

11    into is a discussion about whether it's a free-standing B-9

12    forbearance or whether it's a back-to-back with another

13    forbearance event; is that right?  Now we're getting -- I

14    haven't gotten the full answer to my first question.  Now we

15    have this little refinement now where we're talking about I'll

16    call it the stacking of forbearance periods.

17            MR. HARRIS:  Sure.  So, Your Honor, for standalone B-9

18    forbearances, I think we're all in agreement at this point that

19    no capitalization happens, period, end of story.

20            THE COURT:  Okay.

21            MR. HARRIS:  For the back-to-back situation I think is

22    where we may currently have a difference of opinion.  Our

23    position is that -- well, let me start with the evidence, if I

24    may, with how Great Lakes has been doing it and then show how

25    that matches up --

```
 1              THE COURT:  That's getting into a detail that I'm not
 2    ready for.
 3              MR. HARRIS:  Okay.
 4              THE COURT:  We're going to get there.
 5              MR. HARRIS:  Okay.
 6              THE COURT:  We're just doing this one step.  Let me
 7    pivot over to the other side and let's find out how much --
 8    whether they think I've made mistakes in my understanding of
 9    just this basic forbearance principles, and then we'll start to
10    talk about the stacked forbearance periods.
11         Mr. Shriner, are you on the hot seat for this for today?
12              MR. SHRINER:  Okay.  Glad to be there.  Your Honor is
13    correct, in our view, that the complaint said that we were
14    improperly capitalizing interest that accrued during a B-9
15    forbearance period and that that was barred by B-9.  That's how
16    we read it.
17              THE COURT:  Okay.
18              MR. SHRINER:  In fact, we didn't think we were but --
19              THE COURT:  You didn't think you were what?
20              MR. SHRINER:  Capitalizing any interest that accrued
21    during the B-9 forbearance period because we're not supposed to,
22    and we agree with that.  That's common understanding.
23              THE COURT:  All right.  So far I don't feel like I've
24    been completely befuddled.
25              MR. SHRINER:  Yeah.  B-9 says you don't do that.
```

1          THE COURT:  Okay.

2          MR. SHRINER:  When the lawsuit got filed, we found that

3     due to some programming errors -- Judge Crabb mentions this in

4     her opinion -- we had, in fact, been doing a couple -- our

5     system had been doing a couple things wrong that led to $125 too

6     much interest being charged to --

7          THE COURT:  In Ms. Dawson's case.

8          MR. SHRINER:  In Ms. Dawson's case.  We found out about

9     that, and we fixed it.

10          THE COURT:  Okay.

11          MR. SHRINER:  You also said something about interest

12     does accrue during a B-9 forbearance period.  It does.  It just

13     isn't capitalized, and it is never capitalized, okay?  Then we

14     get into the question of what we understand the plaintiff is

15     saying now.  This has actually come out from the class

16     certification briefing.  Now they're saying that you may not

17     capitalize interest that accrued before the B-9 forbearance

18     period because we all agree you can't --

19          THE COURT:  So that seems to be the one thing that

20     seems secure here.  Everybody agrees that just the B-9 -- the

21     B-9 forbearance itself --

22          MR. SHRINER:  Right.

23          THE COURT:  -- doesn't allow the capitalization of

24     interest.

25          MR. SHRINER:  It says you can't.  It's one of the only

1     two regulations there are actually when we talk about -- talk

2     about the law.  There's no statute, and there are two

3     regulations, and they are the B-9, which says you can't

4     capitalize interest that accrues during; there is 685.205(a)

5     that says except for B-9 forbearances, if payments of interest

6     are forborne, they're capitalized --

7              THE COURT:  Uh-huh.

8              MR. SHRINER:  -- and then there's the basic rule,

9     685.202(b), "The Secretary may add unpaid accrued interest to

10    the borrower's unpaid principal balance."  Period.  Doesn't give

11    anything like that, and there aren't any regulations.  There are

12    regulations saying some forbearance periods are cappable; some

13    of them aren't.

14            THE COURT:  So tell me a little bit more about that

15    last sort of -- sounds kind of like a catch-all.  It says, "The

16    Secretary may add" -- read it to me again.

17            MR. SHRINER:  It says, "The Secretary may add unpaid

18    accrued interest to the borrower's unpaid principal balance,"

19    period.  "This increase in the principal balance of a loan is

20    called 'capitalization,'" and it's 34 CFR 685.202(b).  That's

21    the only law.  The rest of this is instructions from the

22    Secretary -- from the Department, which owns all these loans

23    either because they issued them -- they've been doing nothing

24    but Direct loans since 2010 -- or they bought up some of the

25    FFEL loans that were in existence by private lenders in 2010.

1    By law the government now owns them all.  It's the only

2    creditor, and we work for them.  We have a contract with them.

3            THE COURT:  We're getting off the point here.

4            MR. SHRINER:  I agree.

5            THE COURT:  That last regulation surely can't give the

6    Secretary the authority to just capitalize accrued but unpaid

7    interest whenever he feels like it.

8            MR. SHRINER:  Sure, it can.

9            THE COURT:  Well --

10           MR. SHRINER:  Sure, it can.  Now, what it does is he

11   issues regulations saying, as I said to you, generally you will

12   cap at the end of the forbearance period except if it's a B-9

13   where you may not.

14           THE COURT:  Uh-huh.

15           MR. SHRINER:  But that is the basic rule, and the point

16   I want to make -- I don't want to go into great length about

17   it -- is what we end up arguing about are servicing

18   requirements, servicing requirements which are instructions,

19   guidance, whatever you want to call them, from the Department to

20   servicers.  There are four principal --

21           THE COURT:  Okay.  Now, let me just ask a question here

22   about this because normally if you've got a beef about a loan,

23   it's a contract claim.

24           MR. SHRINER:  Right.

25           THE COURT:  Like you made a loan.  You agreed to

1       certain terms --

2               MR. SHRINER:  Yep.

3               THE COURT:  -- and you either followed them or you

4       didn't, and so, gosh, from my naive perspective it still seems

5       like this is basically a contract claim.  Somebody borrowed some

6       money, and they agreed to pay it back on certain terms and --

7               MR. SHRINER:  They tried that.  They sued the

8       government, which got kicked out on sovereign immunity.

9               THE COURT:  Yeah.  I got that too, and that's another

10      little --

11              MR. SHRINER:  So we're now -- so they're now after the

12      government's agent for servicing the loans on a tort claim.

13              THE COURT:  Uh-huh.  Well, isn't it still basically an

14      agreement between the borrower and the lender to --

15              MR. SHRINER:  Absolutely, absolutely.  And --

16              THE COURT:  So how does Great Lakes come up with the

17      idea that they can just capitalize interest whenever they feel

18      like it?

19              MR. SHRINER:  Because -- and here Mr. Harris will

20      disagree with me.  He reads the record differently than I do,

21      but because this is very complicated, and I will show you at

22      some point a document this thick that points out that this whole

23      question of when you can capitalize and when not has been the

24      subject of endless debate for the last six years.  Indeed, a new

25      rule was imposed, a new requirement was imposed May 3rd.  So

1   this 5785 or whatever the number is that we keep talking about,

2   the change request, actually went into effect May 3rd, just two

3   weeks ago.  So, you know, again, I don't want to get ahead of

4   the game.  I have some other things I want to say about that.

5           THE COURT:  So that's one question that's kind of

6   lurking in the background here is it just seems like this is

7   fundamentally -- you know, was it according to the terms of the

8   loan?  Is Great Lakes doing to the borrower something that it's

9   not authorized to do by the agreement?  And I guess we'll get to

10  that but --

11          MR. SHRINER:  That's my point about the regulation --

12          THE COURT:  Well --

13          MR. SHRINER:  -- putting the Secretary as -- his

14  discretion is to say when interest is going to be capitalized.

15  That's the basic rule.  That's what -- that's all that the

16  borrower has against the Secretary is the discretion of the

17  Secretary is the only law that's in place here.

18          THE COURT:  And so does the terms of the agreement that

19  the borrower has say basically I'm going to pay this back --

20          MR. SHRINER:  Right.

21          THE COURT:  -- according to the interest rate that's in

22  the contract, but it's all subject to the Department of

23  Education regulations, and those give a lot of discretion to the

24  Secretary to do whatever he or she wants --

25          MR. SHRINER:  I think that's what it says, yes.  I'm

1    not sure they highlight how much discretion the Secretary has,

2    but that's essentially what it says.

3        THE COURT:  All right.  Let's focus in where I think

4    we're going because the agreement is that B-9 capitalization

5    on -- or B-9 interest on its own during that B-9 period, that

6    doesn't get capitalized.  I gather the common problem is that a

7    B-9 period, B-9 forbearance period, that's often tacked onto or

8    arises at the end of another forbearance period.  So again I use

9    the example -- maybe it's not realistic -- but you might have a

10   forbearance period because you went to college or you joined the

11   military, so you're in the service for two years, and you don't

12   have to pay back your student loan during that time; is that

13   right?  Is that a good example?

14       MR. SHRINER:  Or you're unemployed.  That's a very

15   common one.  Out of work.  You get a deferment.  Same

16   difference.

17       THE COURT:  Okay.  So at the end of that, commonly

18   enough, that might be when a B-9 forbearance period pops up; is

19   that right?

20       MR. HARRIS:  Yes, Your Honor.

21       MR. SHRINER:  Yes.

22       THE COURT:  Okay.  So then the question, I'm guessing,

23   and this is what I think from reading the papers here, is that

24   the question arises is what happens to the interest that accrued

25   during your unemployment forbearance when you cap it off with a

1    B-9 for two months while your application for some other payment

2    comes up?

3           MR. SHRINER:  It's capped.  It would be capped at the

4    end of the deferment, but if you go to a B-9 -- this again --

5    discussions went on for years.  The Department eventually said

6    don't cap until the B-9 is over.

7           THE COURT:  Okay.  And then when you do that, you

8    capitalize the interest that accrued from the beginning of the

9    original deferment --

10          MR. SHRINER:  Right.

11          THE COURT:  -- until the end of the B-9, the beginning

12   of the B-9?

13          MR. SHRINER:  Well, that's one of the issues because

14   sometimes there's a gap.

15          THE COURT:  Damn, I knew that.  Okay.

16          MR. SHRINER:  So generally the idea is from the

17   beginning of the deferment until the end of the deferment and --

18          THE COURT:  Now, when you say "the deferment," now

19   we're talking about two different --

20          MR. SHRINER:  Let's say it's unemployment or go to

21   school, one of those deferments or forbearances.  There are lots

22   of cappable forbearances that you don't pay during that time,

23   but the interest accrues, and at the end of the time, the

24   interest will be capitalized.  But if a B-9 follows immediately,

25   as it often does because this is all about getting the paperwork

1    in order, you defer -- if I can say that -- the capping of the

2    accrued cappable interest until the end of the B-9.

3              THE COURT:  Okay.  And my question is when you

4    capitalize it at the end of the B-9, do you capitalize all the

5    interest that accrued during both periods now?

6              MR. SHRINER:  No.  You never capitalize a B-9 interest.

7              THE COURT:  Okay.  So my unemployment deferment lasts

8    for ten months.

9              MR. SHRINER:  Right.

10             THE COURT:  Then I've got two months of B-9 forbearance

11   while they're doing the paperwork, and so at the end of the B-9,

12   they're going to capitalize ten months of interest.

13             MR. SHRINER:  Right.

14             THE COURT:  Okay.

15             MR. HARRIS:  Your Honor --

16             THE COURT:  Is he wrong?

17             MR. HARRIS:  I would respectfully disagree with that.

18             THE COURT:  Okay.  Good.  Now we're getting somewhere.

19   How is he wrong?

20             MR. HARRIS:  So I'm going to start with what Your Honor

21   said, which is that these are loans, and there are standard form

22   contracts --

23             THE COURT:  Let's loop back to that.  How is he wrong

24   on the -- because I can only keep that kind of stuff in my head

25   for a brief period of time.

1          MR. HARRIS:  Your Honor, the reason he's wrong is on

2     the second page of Change Request 1492, which is the

3     Department's only effective guidance or interpretation of its

4     own regs during the class period up until this lawsuit.  On the

5     second page of 1492, it has an interpretation for what to do in

6     back-to-back situations.  The regulations don't address

7     back-to-back at all, so 1492 is all --

8          THE COURT:  So what do you think it says?

9          MR. HARRIS:  What I can tell Your Honor it says is when

10    you have a back-to-back -- should I pull it out?

11         THE COURT:  This is an open book exam.  Go ahead.

12         MR. HARRIS:  What it says is a back-to-back situation

13    only includes periods that would, quote, "otherwise result in

14    interest capitalization."  So when 1492 says B-9 is not a

15    capitalization event, period, and then for back-to-back it says

16    here is how you deal with back-to-back capitalization events,

17    it's not talking about B-9 at all.  What 1492 says is when you

18    get to the end of the last true capping event, that's when you

19    capitalize, and you capitalize interest accrued during that

20    period, and so what would be -- what Great Lakes did is because

21    they were treating B-9 as a capping --

22         THE COURT:  Before we do that, just take my example.

23         MR. HARRIS:  Sure.

24         THE COURT:  I got ten months of deferment from my

25    unemployment.  Then I got two months of B-9 forbearance.  When

1    is the -- is there any capitalization there?

2           MR. HARRIS:  Yes, Your Honor.  There's a capitalization

3    event that occurs at the end of the deferment that will be

4    smaller than what it would have been had it been at the end of

5    the B-9 instead.

6           THE COURT:  Okay.  So there's capitalization of the ten

7    months of interest that should occur at the end of my deferment

8    for the unemployment, okay?

9           MR. HARRIS:  Yes.

10          THE COURT:  Now, Mr. Shriner said, "Well, the

11   capitalization occurs at the end of the B-9, but it's only ten

12   months' worth of the interest."

13          MR. HARRIS:  So, Your Honor, that's not what Great

14   Lakes was --

15          THE COURT:  Well, before we get to what they've done --

16          MR. HARRIS:  Yeah, okay.  Sorry.  Can you repeat your

17   question, Your Honor?

18          THE COURT:  Mr. Shriner -- you tell me if I get this

19   wrong.  Mr. Shriner says in the example that I give you where

20   you've got ten months of unemployment followed by two months of

21   B-9, Mr. Shriner says, "You capitalize at the end of the B-9,

22   but it's only the ten months of interest that accrued during the

23   unemployment."

24          MR. HARRIS:  So, Your Honor, that may or may not be.  I

25   haven't seen this new guidance that came out May 3rd.

```
 1                   THE COURT:  Uh-huh.
 2                   MR. HARRIS:  That sounds like what it might be as of
 3        May 3rd on a going-forward basis, but that has never been the
 4        Department's actual instructions to servicers --
 5                   THE COURT:  So what do you think should happen?
 6                   MR. HARRIS:  Your Honor, what should happen is a proper
 7        capitalization event should occur at the end of the deferment
 8        excluding everything after it.
 9                   THE COURT:  Okay.  That's worse for your client.
10                   MR. HARRIS:  So -- because of the timing, Your Honor?
11                   THE COURT:  Yeah.  Because the interest is capitalized
12        two months earlier, and now under his version you'd actually get
13        a little bit less interest for two months.  On your version, you
14        get a little bit more.
15                   MR. HARRIS:  So, Your Honor, that would be true if it's
16        the same capitalization amount, but what we have here is because
17        Great Lakes was capitalizing at the end of the B-9, that's up --
18                   THE COURT:  Now you're talking about what they're
19        actually doing.  Right now I'm just talking about what's
20        supposed to happen.
21                   MR. HARRIS:  So, Your Honor, if what happened -- if
22        what would happen at the end of the B-9 is that a cap would
23        occur only for that deferment interest --
24                   THE COURT:  Uh-huh.
25                   MR. HARRIS:  -- Your Honor would be correct.  That
```

1    would be a worse situation because you'd have the capitalized

2    interest accruing for up to 60 days longer.

3            THE COURT:  Okay.

4            MR. HARRIS:  But no class member, the evidence shows,

5    actually experienced that.  What they got is higher

6    capitalizations later.

7            THE COURT:  Okay.  All right.  Okay.  So I think I

8    understand the basic problem.  I'm not sure what the real true

9    answer is, but at least I think I see the lay of the land here.

10   Mr. Shriner?

11           MR. SHRINER:  I just want to refer you to my friend,

12   Mr. Wegrzyn, who is helping me --

13           THE COURT:  I figured he was there for something.

14           MR. SHRINER:  Docket 66.5, example 5, is the question

15   you asked, and it's the Department's answer.

16           THE COURT:  Okay.  Give me the docket again.

17           MR. SHRINER:  Docket 66-5, example 5.  This is the *Job*

18   *Aid* you may have seen us referring to.  Basically this is all

19   the servicers talk to the Department before the change request

20   is put into effect, and they say, "Well, it's going to cost this

21   to do that and how do we do that," and all of those dialogues

22   are collected and then put out, and they are used as guidance.

23   And there's been a new one within the last two weeks after May

24   3rd which basically summarizes everything under 1492 and the

25   recent one.

```
1              THE COURT:  All right.

2              MR. HARRIS:  Your Honor, may I just correct a fact

3       that's undisputed in the evidence?

4              THE COURT:  Sure.

5              MR. HARRIS:  Mr. Shriner's clients have testified

6       repeatedly that the Department never effected Change Request

7       2785 until well after this lawsuit was filed.

8              THE COURT:  Okay.  Let's talk a little bit about then

9       what you say Great Lakes has done.  So help me understand what

10      the allegations are at the heart.  I know -- you don't have to

11      repeat that it's been consistent from day one.  I don't want to

12      really get into all that.  I just want to get to the answer

13      here.

14         So what's the claim that -- and I look at the complaint,

15      and I gather you've got all sorts of stuff that they're really

16      conspiring to conceal and cover up the fact that they've been

17      gouging people with interest.  Just cutting all that to the side

18      for the moment, just explaining what it is that Great Lakes did

19      that was improper.

20             MR. HARRIS:  Sure, Your Honor.

21             THE COURT:  Okay?

22             MR. HARRIS:  So the evidence that's undisputed between

23      the parties right now is that during the class period for both

24      standalone and back-to-back class members, at all times for both

25      those sets of people Great Lakes was either treating B-9
```

1    forbearances as capping events --

2            THE COURT:  Uh-huh.

3            MR. HARRIS:  -- or not capping events at all, and, Your

4    Honor, what the system has been doing up until, you know, what

5    I'm hearing today at this hearing is never ever capitalizing at

6    the end of the B-9 forbearance, whether it's standalone or

7    back-to-back, and we allege that the way the system is

8    programmed today is what it always should have been.  Instead,

9    what it was was a capitalization event always in the system

10   which caused standalone people to get capitalizations they never

11   should have had and caused back-to-back people to get inflated

12   capitalizations at a slightly later date.

13           THE COURT:  Uh-huh.  And so the back-to-back people --

14   so that's the people like the example I just gave --

15   back-to-back people were getting interest capitalized at the end

16   of the B-9 forbearance period, and it included capitalizing the

17   interest that accrued during the B-9.

18           MR. HARRIS:  Yes, as well as the pre-forbearance gap

19   between the deferment and the --

20           THE COURT:  Okay.  So some of these weren't -- are kind

21   of what we've been talking about as noncontiguous forbearances.

22           MR. HARRIS:  I'm sorry.  Could you explain that?

23           THE COURT:  So there's a forbearance.  It ends, and

24   then sometime later then a B-9 forbearance appears.

25           MR. HARRIS:  Yes, Your Honor.  That has occurred

1    sometimes.

2              THE COURT:  Okay.  All right.  And does that make a

3    material difference in what's going on here or --

4              MR. HARRIS:  Yes, Your Honor, because what the system

5    did, and it's undisputed, is when it capped at the end of the

6    B-9 period, it included both intra-forbearance interest and the

7    in-between interest --

8              THE COURT:  And that in-between period, that's when the

9    loan is in repayment again.

10             MR. HARRIS:  Correct, Your Honor.

11             THE COURT:  Okay.  All right.  Okay.  All right.  And

12   so now Mr. Shriner tells me, and you apparently agree, that they

13   don't do that anymore.  They fixed it; is that right?

14             MR. HARRIS:  That's correct, Your Honor.  We believe

15   it's fixed as of today on a going-forward basis for the nonclass

16   members.

17             THE COURT:  All right.  And so when they fixed it, they

18   not only stopped doing it then, they fixed the balances that

19   people had too I assume, right?

20             MR. HARRIS:  Your Honor, that is yet to be done as far

21   as the evidence shows.

22             THE COURT:  Uh-huh.

23             MR. SHRINER:  I didn't hear your question, Your Honor.

24   I'm sorry.

25             THE COURT:  The question was, well, according to Mr.

 1    Harris, Great Lakes has now fixed this B-9 capitalization

 2    problem.  They're not doing that anymore.

 3            MR. SHRINER:  Right.

 4            THE COURT:  And so they fixed it, and so I guess my

 5    question is fixing it means going forward you're not doing it

 6    anymore, but also then you've remediated the problem with

 7    respect to the loan balances that people had when they had the

 8    capitalization wrongfully done.

 9            MR. SHRINER:  Wrong.

10            THE COURT:  Okay.

11            MR. SHRINER:  Two things I want to say:  First of all,

12    we're doing it the way he thinks we should be doing it because

13    the government has told us to do it --

14            THE COURT:  Going forward.

15            MR. SHRINER:  Going forward.  And that applies to his

16    class members too.

17            THE COURT:  Uh-huh.

18            MR. SHRINER:  Because obviously the class period is

19    still running.  But the other aspect of this, and I want to be

20    clear on this, is we have not fixed -- we want to.  We have not

21    fixed the mistake, if you want to call it that.  I don't call it

22    that because I think we were doing what we thought we were

23    supposed to be doing.

24            THE COURT:  Right.

25            MR. SHRINER:  But we haven't fixed it because we

1    haven't gotten permission from the Department to do it yet.

2    We've given them a plan of how we would do it.  We'd go back and

3    remediate and undo all the transactions and do them the way that

4    we now do them rather than the way we used to do them.  We've

5    sent that plan to the government in January.  We're still

6    waiting to be told to do it.  They're not moving very quick.  We

7    expect they will.  We don't know, but we expect they will, and

8    since they're the principal and we're the agent, we do what they

9    tell us to do, but we're ready to do it.  We want to do it.

10   We've always wanted to do it.  We really don't like capping

11   interest because it increases the loan balance and makes it more

12   likely that they're going to go into default, and then we don't

13   get paid as much as we get paid if they're in repayment because

14   that's the compensation scheme.

15            THE COURT:  All right.  So the issue is the fix going

16   forward, and you can't fix it until the Department of Education

17   tells you --

18            MR. SHRINER:  Right.

19            THE COURT:  -- "This plan seems to work.  Go ahead and

20   recalculate people's balances."

21            MR. SHRINER:  Right.  We did that in the first

22   remediation for the mistake that was discovered when we were

23   actually capping some of the intra-forbearance interest.

24            THE COURT:  So tell me what the mistake is because I

25   gather there's -- it's described in some of the briefing, I

1    guess, as a programming error.

2         MR. SHRINER:  Right.

3         THE COURT:  That's not the main issue here but --

4         MR. SHRINER:  I think it's not an issue anymore, but I

5    don't know.  That's what we thought he was complaining about

6    when we read the complaint, and it's what Judge Crabb thought he

7    was complaining about.  When we looked at the complaint and we

8    went back and looked at things, we found out that actually we

9    had two programming errors with respect to the issue of capping

10   intra-forbearance period -- intra B-9 noncappable interest.  We

11   always knew we couldn't do that.  We thought we had our program

12   set up so that it wouldn't happen, but there were two mistakes

13   in the programming which we discovered when we got the complaint

14   and looked.  One of them was it was supposed to be a 60-day

15   period, and the computer was told to do -- to count through 60

16   days rather than to 60 days.  So there was one day extra on

17   everybody.

18        THE COURT:  Uh-huh.

19        MR. SHRINER:  And the other one had to do with

20   something really arcane but clear again.  We thought we were

21   doing it right.  It had to do with how you allocate payments

22   that come in during the B-9 period because what happened was

23   Ms. Dawson went into a B-9 on one day and the next day made a

24   payment, and some of that payment got allocated to the

25   intra-forbearance period interest, and we weren't supposed to do

1    it.  We knew we weren't supposed to do that, but it had

2    happened.  So we found out we had done it.  We went back and

3    cleaned that up for everybody, and that's happened.  That's over

4    with.

5          THE COURT:  Okay.  All right.  So --

6          MR. SHRINER:  We refer to that as remediation one, and

7    we're waiting to do remediation two.

8          THE COURT:  And that one is more fundamental and

9    larger.

10         MR. SHRINER:  Yeah.  We clearly knew we shouldn't do

11   that.  We didn't want to do that.  We thought we weren't doing

12   it.  We found out we had, and we fixed it.  It's different from

13   this.  This is a dispute about what we were supposed to be

14   doing, and, again, now with the new rule that went into effect

15   May 3rd, we're all -- all the servicers are doing it the same

16   way because the Department has finally made it clear what they

17   want done.

18         THE COURT:  Uh-huh.  Help me understand what the

19   ambiguity -- because this seems very logical --

20         MR. SHRINER:  Yeah.

21         THE COURT:  -- to me.  I mean, I know it's endlessly --

22         MR. SHRINER:  That's because you haven't gotten far

23   enough into it yet.

24         THE COURT:  Maybe so, but it just seems to me that the

25   idea is that if your loan is not in repayment --

1          MR. SHRINER:  Right.

2          THE COURT:  -- the general idea is that you're going to

3     have to have that interest that didn't get paid added to your

4     balance.  That's capitalization, but there's a special rule for

5     this B-9 thing because the lender is doing the paperwork on the

6     stuff, so you're not capitalizing there and so --

7          MR. SHRINER:  It still accrues as interest.  It just

8     doesn't get capitalized.

9          THE COURT:  Oh, yeah, yeah, yeah.  But the solution

10    that we have now seems like the logical answer.  What am I

11    missing?

12         MR. SHRINER:  I don't think you're missing a thing, and

13    when you let us do a little argument, I'll explain why I think

14    that has significance for class certification.

15         THE COURT:  Okay.  Maybe we're there.

16         MR. SHRINER:  Okay.  This is a lawsuit for damages.

17         THE COURT:  Uh-huh.

18         MR. SHRINER:  Ms. Harris -- Ms. Harris.  Mr. Harris.

19    Ms. Dawson -- I have made that mistake before; I apologize.

20    Ms. Dawson hasn't paid a penny more.  It isn't just because she

21    hadn't gotten into that point yet in her loan.  It's because

22    she's on an income-driven repayment system -- has been since

23    before we made the mistake -- in which she pays a percentage of

24    her income.  She's been on that for three-and-a-half years.  She

25    still is.  So she has never had -- she has never had an interest

1    payment called for or repayment called for that is tied to the

2    balance of her loan.

3              THE COURT:  Uh-huh.

4              MR. SHRINER:  It's just tied to her income.  So from

5    our point of view, that means she hasn't sustained any damage.

6              THE COURT:  Uh-huh.

7              MR. SHRINER:  But this is a damages lawsuit.  Clearly

8    the plaintiffs are looking for a damages recovery here, and from

9    our point of view, this is not an appropriate situation for a

10   damages claim, and it's being -- even though the plaintiff

11   herself --

12             THE COURT:  I think I understand the basic trajectory

13   of the argument here, which is that she isn't out of pocket

14   anything.

15             MR. SHRINER:  Right.

16             THE COURT:  She's got a balance though that she's stuck

17   with.

18             MR. SHRINER:  She isn't stuck with it.  You used that

19   in your order.  She isn't stuck with it because it's going to

20   get fixed.  If she ended up having to pay the, whatever it is,

21   six hundred and something extra principal balance, that would be

22   a different beef than she has.

23             THE COURT:  Uh-huh.

24             MR. SHRINER:  But the real question is, is a lawsuit,

25   particularly a class-action lawsuit for damages, the way to

1     handle this?

2              THE COURT:  Well, that's another question.

3              MR. SHRINER:  Well --

4              THE COURT:  But let's just talk about her financial

5     impact here.  I get it.  She's not out of pocket.

6              MR. SHRINER:  Right.

7              THE COURT:  But there's a balance that's hanging out

8     there that she's got to wait for Great Lakes to decide, and I

9     know that it's really the Department of Education has got to

10    decide, but until then, you know, she's really -- she's got this

11    balance that is hanging out there.  So she surely -- she doesn't

12    have to wait until -- I don't know what her repayment plan is,

13    but way late in her career she pays off the last couple of

14    hundred bucks, and then she has the -- she doesn't have to wait

15    until that long to have a claim.

16             MR. SHRINER:  Well, this gets back to the point I tried

17    to make at the beginning about the --

18             THE COURT:  And in the meantime, her balance is

19    reported on her credit report and so on.  I get it.  It's only a

20    little bit of money, but conceivably if it were a larger amount,

21    you know, the balance that she's got as credit gets reported and

22    could conceivably have some sort of impact here.  It's a small

23    amount but --

24             MR. SHRINER:  It could conceivably --

25             THE COURT:  That's kind of speculative.  I get that.

```
 1            MR. SHRINER:  Yeah.  The plaintiff hasn't said that.
 2     The plaintiff has had opportunity to say that.  She didn't say
 3     it in her deposition, and counsel has not said it in the
 4     briefing.  They haven't said she's been denied a loan, her
 5     credit report has gone down, and really I think it is highly
 6     unlikely that in the three-and-a-half years of her $25,000
 7     balance loan, the added $700 on there has hurt her a bit.  It
 8     certainly hasn't cost her a penny nor is that really plausible
 9     that it has hurt her.  Looking forward into the future if this
10     didn't get fixed, I see your point, I take it, but that isn't
11     where we are, and it isn't where we're going.
12            So, you know, why would -- why would this be a lawsuit for
13     damages when she hasn't sustained any, in our view, if the
14     government tells us we can do what we want to do, is never gonna
15     sustain damages.  We're not talking about breach of the terms of
16     the note or the regulations, but rather the plaintiff's
17     assertion that we're not properly carrying out the Department's
18     instructions, which we think we always have been.  I mean, he's
19     got a different view, but --
20            THE COURT:  Yeah.
21            MR. SHRINER:  -- why does what the principal tells its
22     agent to do in servicing give rise to a claim by the debtor?  As
23     you say, the debtor owes the government, doesn't owe us.  We're
24     not getting any money from the debtor.  That's sort of -- to me
25     that's a very significant issue here about why a --
```

1          THE COURT:  So if they had -- it gives rise to two

2     questions for me.  So if they had a class representative that

3     was somebody who was not in an income-dependent repayment plan,

4     then they'd have the right class representative, and we'd be off

5     to the races.

6          MR. SHRINER:  Well, maybe.  I don't know, but we only

7     know --

8          THE COURT:  You wouldn't have that argument.

9          MR. SHRINER:  I wouldn't have that argument, but that's

10    who we've got.  That's the plaintiff, and that's the answer to

11    question number one.

12         THE COURT:  The second question then is isn't the

13    reason that she's now in a position to have this fixed as soon

14    as the Department of Education gets off its butt because of this

15    lawsuit?

16         MR. SHRINER:  That's what has precipitated our looking

17    at it, but, in fact, the whole issue of when to capitalize

18    interest is what has taken up discussions between the Department

19    and its servicers since 2012.  The *Job Aid* that just came out in

20    connection with the adoption of the new rules has five years of

21    the back-and-forth between the Department and its servicers

22    about what the Department wants us to do, and Mr. Harris sees it

23    with the clarity of day that we've always been doing the wrong

24    thing.  You know, if we ever get to trial to this, I would show

25    you I think quite clearly that we've always been doing what we

1    thought was the right thing and that we've often been told by

2    the government was the right thing.

3        But, again, the point of it is she doesn't owe us money.

4    She owes money to the government, and I think if the government

5    were to say, "Look, that's what we were telling you, but, you

6    know, we've changed our mind, and we don't want that corrected.

7    We have a right to capitalize interest when we want to.  Don't

8    pay it back," I still don't think they've got a claim against

9    us.  They've got a claim against the government which they can't

10   bring because of sovereign immunity, but we didn't do it.  And,

11   yes, that's where we find ourselves.  We're in the pinch.

12       THE COURT:  Walk me back just a little bit because I

13   see some complications here, but it just seems like the basic

14   B-9 problem --

15       MR. SHRINER:  Right.

16       THE COURT:  -- you know, let alone the difficulties

17   with the stacking of the forbearances or deferments, but just

18   the basic B-9, where was that ever controversial?

19       MR. SHRINER:  Of not charging interest --

20       THE COURT:  Not capitalizing the interest that accrued

21   during a B-9 forbearance.

22       MR. SHRINER:  We've never thought we could do that.

23   Regulations always said we couldn't.

24       THE COURT:  But you were doing it at some point.

25       MR. SHRINER:  We made a mistake and did it and fixed

1    it, and it was not a very big mistake, and it didn't amount to

2    much, and we didn't know it.  We thought we had it programmed

3    right.  We found a programming error, and we fixed it.  But why

4    should that give rise to a claim?  Who's hurt?  As soon as

5    somebody brought it to our attention -- of course, we found out

6    about it when we got sued; nobody talked to us -- we fixed it.

7    I don't think this is a tort.  I don't think it's negligence.

8    Certainly isn't fraud.  So I don't get it.

9         THE COURT:  Mr. Harris?  Sounds like a good invitation

10   to pivot over to your side.  Let's take it one at a time.  Let's

11   take the money damages issue.

12        MR. HARRIS:  Sure, Your Honor.

13        THE COURT:  I think I understand the basic parameters

14   here.  I have a little bit of sympathy for the idea that

15   Ms. Dawson has a balance that she's, I'll say, stuck with until

16   the government decides she's not stuck with it, but according to

17   Mr. Shriner -- you can tell me whether what he said is factually

18   inaccurate or anything -- they're waiting for authorization from

19   the Department of Education to do what they think is the right

20   thing, which is to fix the people's accounts, including

21   Ms. Dawson's, who were wrongly -- had the interest capitalized

22   improperly, and they're going to fix her balance.

23        MR. HARRIS:  So, Your Honor, this whole "we're waiting

24   on the Department" thing creates really big problems with

25   controlling law.  As Your Honor pointed out, these are loan

1    contracts, and what we allege in the complaint and they admitted

2    in the answer is that there are standard terms governing these

3    loan contracts.  It's also undisputed that these standard form

4    contracts incorporate by reference the Higher Education Act and

5    Department regulations promulgated thereunder.

6         Now, Mr. Shriner said something untrue earlier.  He said

7    there's no statute.  Section 428 big H, I believe, subsection

8    little E of the Higher Education Act of 1965 expressly provides

9    for these B-9 forbearances, and Section 432 of the Higher

10   Education Act expressly delegates rulemaking authority to the

11   Department to promulgate regulations to carry out the purposes

12   of the part.  All the Department did in promulgating these two

13   regulations that we rely on is essentially copy the Higher

14   Education Act and broaden the B-9 forbearance provisions to all

15   FFELP and Direct loans.

16        So what we have here is a question of law, and if you look

17   at our complaint, we never allege that Great Lakes violated the

18   Department's instructions.  What we allege is that Great Lakes

19   violated the terms of the promissory notes and that Great Lakes

20   violated the federal regulations as promulgated under the Higher

21   Education Act.  So this is a question of law, and the Court is

22   the arbiter of what these B-9 forbearances are and what the

23   capitalization rules are with respect to them.  This notion that

24   every time the Department comes out with a new private email to

25   servicers the law somehow changes for everyone in America is

1    just not realistic.

2         THE COURT:  Well, the fundamental dispute here is that

3    Mr. Shriner says really the capitalization rules are

4    discretionary with the Department of Labor.  You say they're

5    not.

6         MR. HARRIS:  They're not, Your Honor.

7         THE COURT:  Okay.  All right.  I have the clear-cut

8    dispute here.

9         Okay.  What about the problem that Mr. Shriner has pointed

10   out, which is that whether you think they should be doing

11   something different or not, they're waiting for approval of the

12   remediation plan from the Department of Labor -- I'm sorry, the

13   Department of Education -- and if they get that, then Ms. Dawson

14   is going to have her balance corrected before she ever is out of

15   pocket even a dime.

16        MR. HARRIS:  So, Your Honor, that may or may not happen

17   in the future.  I sued the Department two years ago, and this

18   hasn't gotten done, and, you know -- but let's assume it does

19   get done because I think that's what the Court is getting at.

20   The question presented here for standing purposes, if you will,

21   let's call it statutory standing, is whether -- and this is RICO

22   claims only, not common law negligence -- but the question

23   presented as far as we're concerned is whether the imposition of

24   wrongful federal student loan obligations themselves constitute

25   an injury to business or property under 18 U.S.C. Section 1964,

1    and we briefed that exhaustively in the renewed motion, and I

2    won't belabor all that case law here.

3         So our view is that Ms. Dawson either had a RICO claim at

4    the time of suit or she did not, and if she did, if she had an

5    entitlement to damages because she had a RICO injury at the time

6    of suit, under *Liquid Air,* which is a decision from the Seventh

7    Circuit a couple of decades ago, you can't set off damages just

8    by providing prejudgment one hundred percent relief.  Seventh

9    Circuit said, "We think setoff after trebling would better

10   effectuate the purposes behind RICO."

11        THE COURT:  Okay.  And that's just on the RICO claim.

12   What about your fundamental --

13        MR. HARRIS:  I think if they -- if they literally --

14        THE COURT:  -- your breach of contract.

15        MR. HARRIS:  -- give everyone a hundred percent relief,

16   and we agree on what that is -- now, the Department could come

17   out tomorrow and say triple everyone's debt.  Does that end the

18   case?  No, Your Honor, because we're going to have a

19   disagreement with the Department itself about what the law is

20   and what the contracts say.

21        THE COURT:  Okay.  So let me drill down on your side of

22   the equation here then.  Tell me who is in the class.  I mean,

23   fundamentally I don't really have to resolve the merits of the

24   case here, but I do have to be able to figure out who is in the

25   class, and that is not entirely clear to me.

1    MR. HARRIS:  Your Honor, who is in the class is, as

2    it's defined, anyone who received -- anyone for whom a B-9

3    forbearance was treated as a capitalization event by Great

4    Lakes, and it includes currently both back-to-back and

5    standalone people.  Now, what I would say is a really important

6    point is if at the end of the day and after all the argument the

7    Court determines that these back-to-back people are uninjured

8    because, as you said in your order, they had some other event

9    that warranted capitalization, if the Court determines they're

10   uninjured or too problematic under Rule 23, the better course

11   here is to amend the class definition to write them out, and if

12   they want to bring their own claims, they can do that properly.

13   But the Seventh Circuit in *Messner* back in I think it was

14   2010-ish, Footnote 15 of the *Messner* case from the Seventh

15   Circuit said, you know, where there's an overbreadth problem

16   with the class definition, the better course is to amend the

17   definition rather than deny certification altogether.

18       THE COURT:  And remind me, is Ms. Dawson just in the

19   free-standing B-9?

20       MR. HARRIS:  She is standalone only.  Yes, Your Honor.

21       THE COURT:  Okay.  I thought --

22       MR. HARRIS:  And, Your Honor --

23       THE COURT:  I'm easily confused here because I thought

24   there was a detail where she had something else.

25       MR. HARRIS:  No, Your Honor.

```
1              THE COURT:  So she's just --

2              MR. HARRIS:  She was standalone only.

3              THE COURT:  She applied for this income-based repayment

4    plan, had the B-9 forbearance as a result of that application,

5    and that's all that is.

6              MR. HARRIS:  Correct.

7              THE COURT:  Okay.

8              MR. HARRIS:  And, Your Honor, if -- you know, I can

9    give the Court the language that I would use to amend the class

10   definition if the Court wanted to include standalone people only

11   because what we see in Docket 83 and in defendant's response to

12   my motion to vacate is that they literally said in their email,

13   "We have identified all the caps that need to be removed," and

14   they estimated the damages to standalone people only at $20

15   million.  That's a large class of people with wrongful debt.

16             THE COURT:  That's the 360,000 people?  Is it 360,000?

17             MR. HARRIS:  So, Your Honor, we currently don't know

18   how many standalone people there are out of the 360,000.  What

19   we know is however many standalone people there are have $20

20   million worth of debt inflation approximately.

21             THE COURT:  Okay.  And what does the 360,000 borrowers

22   represent?

23             MR. HARRIS:  The 360,000 is both standalone and

24   back-to-back people.

25             THE COURT:  Okay.
```

```
1              MR. HARRIS:  And we allege that none of them should
2     have a cap.  Standalone people should have had zero cap.
3     Back-to-back people should have had a smaller cap, and, Your
4     Honor, we have a process that's in the undisputed evidence by
5     which we can both reduce back-to-back members' capitalizations
6     properly and eliminate standalone people's capitalizations
7     properly in one stroke, in one process, the same damages
8     methodology for everybody.  Defendants right now are refusing to
9     do anything for the back-to-back people.  They're saying, "Okay.
10    You got us on the standalone people now, but the back-to-back
11    people the Department is now saying, you know, they deserved a
12    cap -- they deserved the cap that they got."
13             THE COURT:  And clarify for me how -- what happened to
14    them.  With the back-to-back people -- I thought we were at the
15    outset sort of in agreement about what should be happening.
16             MR. HARRIS:  We are not, Your Honor.  I mean, the
17    defendants -- so Mr. Shriner said a while ago, you know, that
18    they read our complaint to say we were only challenging
19    intra-forbearance interest.
20             THE COURT:  That's what he thought.
21             MR. HARRIS:  But, Your Honor, it's not because they
22    expressly came against that -- our regulatory theory in their
23    answer.  They read our footnote -- I believe it was Footnote 12
24    or Footnote 7 in our complaint -- where we defined what was and
25    was not cappable for a B-9 forbearance period, and we said
```

 1    nothing is cappable, and they came in in their answer and said,

 2    "No, the plaintiff, quote, 'fundamentally misunderstands the

 3    regulations.'  What the regulations really say is that

 4    intra-forbearance interest is not cappable, but it's still a

 5    capping event, and we capitalize everything before that.

 6    Everything before that 60 days the regs say we can capitalize."

 7        That's the first remediation they did, and they came in at

 8    class cert and said, "Your Honor, everyone has been made whole.

 9    The entire class now lacks standing," and we said, "Wait a

10    minute, Your Honor.  That's not our case.  What our case is is

11    that no capitalization is allowed at the end of these periods,"

12    and we fought that hard on reply.  In response to our reply

13    brief, they emailed the Department and said, "Hey, guys, are you

14    sure about this?"  And they even put in Docket 83 in the motion

15    to supplement that the briefing highlighted the regulatory

16    dispute between the parties, and then a year after I sued the

17    Department alongside them, they somehow can find out from the

18    Department for the first time that we were right all along and

19    that nothing is supposed to be capitalized at the end of these

20    periods.  Now, as they come out admitting that these are not

21    capitalization events at all, starting with Docket 83 they're

22    saying, "Well, they're still capitalization events for

23    back-to-back people."  That's nowhere to be found in

24    the record --

25                THE COURT:  So what was their previous position on what

1    should have been capitalized?

2              MR. HARRIS:  Their original position in this case?

3              THE COURT:  You indicated that prior to Docket 83 they

4    had a different position on what should have been capitalized.

5    What was the previous position?

6              MR. HARRIS:  Yes, Your Honor.  Their previous position

7    was B-9 -- the end of the B-9 forbearance is a capitalization

8    event under the rules.  However, all that can be capitalized is

9    interest that accrued before the B-9 period and that these two

10   regulations that we cite --

11             THE COURT:  Now, hold on.  I think that's what Mr.

12   Shriner said at the top of the hearing when I asked him.  I

13   think that's what he said is that at the end of the B-9

14   forbearance period, that is the point at which you would

15   capitalize the prior forbearance interest or deferment interest.

16   You would do it at the end of the B-9, but it would only cover

17   the pre B-9 interest.

18             MR. HARRIS:  So, Your Honor, as I understand their

19   current position today, that is their position only for

20   back-to-back class members.  I do not believe it is currently

21   their position that a standalone gets any cap at all.

22             THE COURT:  I think that was also what we agreed on at

23   the beginning and -- that if you have -- Ms. Dawson should not

24   have had any of her interest capitalized.

25             MR. HARRIS:  Yes, Your Honor, along with all other

1    standalone class members.

2              THE COURT:  So I'm still -- that's what confuses me

3    here about prior to Docket 83 there was a different position

4    taken.  I still don't know what that was.

5              MR. HARRIS:  Their position was that for standalone

6    periods -- before Docket 83 their position was that for

7    standalone periods, you capitalized at the end of every single

8    one of them.  You just limit that capitalization to most of the

9    interest, which is the interest that accrued before the B-9

10   period.  They read the regulations in isolation, 682.211(f)(11)

11   and 685.205(b)(9).  They read those two regulations in

12   isolation, and all they say is interest that accrues during the

13   period is not capitalized, so they went, "Oh, okay.  So we can

14   still capitalize.  We just have to do a carve-out."

15             THE COURT:  Just not the period of the B-9 itself.

16             MR. HARRIS:  Right.

17             THE COURT:  That's the thing that's, I guess, confusing

18   me because -- you can clarify this for me.  Maybe I'm just not

19   sensitive enough to the varieties of occasions on which somebody

20   might find themselves in a B-9 forbearance that's called a

21   standalone because I think of somebody who is in a deferment or

22   forbearance because of education, military service,

23   unemployment, what have you, and then they go into a B-9

24   capitalization.  That's the back-to-back situation.  The person

25   who is in a standalone B-9 situation goes from repayment into a

1    B-9.

2         MR. HARRIS:  Yes, Your Honor.

3         THE COURT:  If you're in repayment, you're paying the

4    interest as you go, so the way I envision the typical B-9

5    forbearance period, standalone forbearance period, there isn't

6    any other interest to capitalize.  There's no accrued interest

7    to capitalize because normally when you're in repayment, you're

8    paying off the interest as you go and maybe a little bit of

9    principal, so there isn't this interest that has accrued and

10   ready to be capitalized except for the interest that accrues

11   during the B-9 period itself.  Now, am I wrong about that?

12        MR. HARRIS:  Yes, Your Honor, technically.

13        THE COURT:  Good.  So how is that?

14        MR. HARRIS:  There are different situations that could

15   cause someone who is in repayment to have substantial amounts of

16   pre-forbearance interest outstanding at the time of the B-9

17   forbearance.  If you look at one of plaintiff's accounts that

18   are in the record -- she has three accounts -- one of them she

19   had -- it was a consolidation loan, so what happened is she had

20   a bunch of loans got consolidated with principal and interest,

21   so she had this big interest balance at the time that she

22   began -- at the time of the origination of this consolidation

23   loan.  So she had this big interest balance, and her standard

24   payment plan had her paying that down, but it was going to take

25   her a couple of years to get to the point where she was even

1    hitting principal because she had this big bucket here at the

2    beginning.

3            THE COURT:  Okay.

4            MR. HARRIS:  Another way, Your Honor, apart from

5    consolidation loans would be in general for all loans, it

6    depends on when your payment due date is.  It depends on the

7    last time you made a payment.  If you're making a payment every

8    30 days, that covers all interest.  You know, your last payment

9    may have been 29 days or 30 days before the time you enter B-9

10   forbearance, so you've got --

11           THE COURT:  So you could end up with a payment period

12   worth of interest.

13           MR. HARRIS:  Right.

14           THE COURT:  Okay.

15           MR. HARRIS:  And, Your Honor, we know all this adds up

16   to $20 million at this point.  I know we can say, well, we're

17   just nickel-and-diming here --

18           THE COURT:  No.  I've never really had the view that

19   it's just nickel-and-diming.  I just want to make sure that I

20   understand it, and that's the situation that I hadn't really

21   contemplated was that somebody in a standalone B-9 actually is

22   going to have a significant amount of interest that is at

23   jeopardy of being capitalized.

24           MR. HARRIS:  Yes, Your Honor.  The standalone people

25   had enough interest wrongfully capitalized to accrue $20 million

```
1    worth of wrongful interest just over the last few years.  So

2    we're talking $100 million or more probably in wrongful

3    standalone capitalizations.

4            THE COURT:  All right.

5            MR. SHRINER:  Not true, Your Honor.  The $20 million --

6            THE COURT:  All right.  Go ahead.

7            MR. SHRINER:  -- is the whole shooting match.

8            THE COURT:  What's that?

9            MR. SHRINER:  The $20 million is the whole shooting

10   match.

11           THE COURT:  Standalone and back-to-back.

12           MR. SHRINER:  Yes.  And I want to make sure --

13           MR. HARRIS:  Your Honor, that's not what the record

14   says.

15           MR. SHRINER:  I thought we were clear earlier on, and

16   now I'm not so sure.  We have thought that the standalone B-9

17   forbearance period, the end of that was the occasion for

18   capitalizing accrued interest.  That has been our interpretation

19   of the Department's guidance up until the time last summer when

20   they told us that they were going to change things going

21   forward.  So we're now, because the Department has told us to do

22   that, not doing that, but we used to have that view, that that

23   was the right way to do it.  We still think that was the right

24   way to do it based on what we were told at the time, and that's,

25   you know -- so, again, you know, there are people who owe a lot
```

1       of money before they go into a changeover --

2               THE COURT:  Yeah.

3               MR. SHRINER:  -- and we interpreted what we were told

4       by the Department to tell us that at the end of a B-9

5       forbearance period, we should accrue interest that was owed

6       before, not during the B-9, but interest that was owed before.

7       So that's what this money is about.  He's absolutely correct.

8               THE COURT:  Okay.  Maybe I have a better handle on the

9       fundamental dispute here.  Again, I don't -- you say it's the

10      20 -- I had thought it was the 20 million just for standalone as

11      well, but, you know, that's --

12              MR. HARRIS:  Your Honor, that's what the record says.

13              THE COURT:  Fine.  It's a lot of money.  You know, it's

14      Everett Dirksen territory here.  I'm sorry, a reference that

15      Mr. Shriner is the only person in the courtroom old enough to

16      understand.

17              MR. SHRINER:  Are you talking about "real money," that

18      one?

19              THE COURT:  Yeah.  That's the one.  See, I told you.

20      Anybody else hear that?  Of course not.  Maybe our CSO.

21              MR. SHRINER:  $500 million here, a billion there.

22              THE COURT:  Yeah.  Pretty soon you're talking about

23      real money.

24              MR. SHRINER:  Congressional viewpoint.

25              THE COURT:  Yeah, yeah.  So I guess what I'm getting at

```
1    here is that -- let's just take this example:  We've got

2    somebody with a standalone B-9.  They're coming into it.  They

3    have a significant interest balance, and you say at the end of

4    that B-9 period, that interest does not get capitalized.  Sort

5    of current state of knowledge and regulations.

6              MR. HARRIS:  Correct.

7              THE COURT:  I'm confident that I've got your position

8    right.  Mr. Shriner, is that now your --

9              MR. SHRINER:  That's what's happening going forward.

10             THE COURT:  Okay.  All right.

11             MR. SHRINER:  But it isn't what we used to do, and we

12   still think we were correctly interpreting the guidance we

13   were --

14             THE COURT:  You were following orders.  Right or wrong,

15   you were following orders.

16             MR. SHRINER:  Absolutely.

17             MR. HARRIS:  Your Honor, the record shows -- Mr.

18   Shriner can say whatever he wants.  Ms. Kielhofer testified

19   repeatedly that that's not what they were doing leading up to

20   this lawsuit.  What the record shows is that leading up to this

21   lawsuit they reprogrammed the system to stop all standalone

22   capitalizations.  She testified in the GLELSI deposition, Docket

23   53.

24             THE COURT:  That's before the lawsuit did you say?

25             MR. HARRIS:  So mid-class period -- can I go in
```

1      chronological order?

2              THE COURT:  Sure.

3              MR. HARRIS:  So, Your Honor, what she testified during

4      the GLELSI deposition is that they had been treating standalones

5      as capping events leading up to the time when they received

6      Change Request 1492.  She testified that, "When we received

7      Change Request 1492, we read that request to say at the end of

8      the B-9 forbearance or noncappable forbearance, do not

9      capitalize any interest," period.  She said that five times in

10     the GLELSI deposition, that that's how Great Lakes read it.  She

11     further testified that, "Because we understood it that way, we

12     changed our system to comply with our understanding," and

13     there's no dispute that they, in fact, did that.

14             The problem we have that was the impetus for this suit was

15     not the current state of the system or the law at the time of

16     suit.  It was that once they realized they had been doing it

17     wrong for years, they should have gone back and complied with

18     the Department's instructions.  Instead, they delayed a few

19     years in implementing their understanding of the Department's

20     instructions, and when they did, they didn't go back and fix

21     people who should have had zero capitalization, and that's what

22     they're now saying, you know, they're willing to do two years

23     into the lawsuit.

24             Why didn't they say that when they first got sued?  They

25     couldn't email the Department, you know, a few weeks after we

1    sued them?  In fact, Your Honor, they admit that in response to

2    the complaint, they recognize that they had one last lingering

3    B-9 forbearance identifier in their system that was still

4    treating standalones as capping events, and they say -- this is

5    defendants saying this in response to the complaint -- they

6    changed it so that it would never capitalize, and then they come

7    into this court six weeks later and plead that they're capping

8    events with the Department just taking a sovereign immunity

9    position and getting out of Dodge.

10            MR. SHRINER:  Your Honor, I misspoke, and Mr. Harris is

11   correct.  We had three different categorizations, and we stopped

12   capitalizing on the one of them in April 2013, another one in

13   April 2014, and the last one in October 2015.  The lawsuit was

14   filed at the end of July.

15        My larger point, which I was trying to make and got the

16   details on this wrong, was that the theory that we knew what we

17   were doing was wrong and we were trying to hide it is just

18   nonsense and that we thought at the time that we were doing it

19   that we were doing it the right way.  And that's essentially it.

20   And since what we're doing is carrying out our contract with the

21   Department and doing what the Department tells us to do, you

22   know, we get back to this point.

23        You keep coming back to the point, and Mr. Harris adverted

24   to it too:  What does the contract say?  We don't breach the

25   contract.  Whatever we do, we don't breach the contract.  We

1    either correctly or incorrectly carry out the will of the

2    Department, which is the contract party, in servicing these

3    loans, and to the extent that we do something that they don't

4    want us to do, we change when they tell us to.  We don't hide

5    what we're doing from them.  We're doing what we're told, and

6    it's our best understanding at the time we're doing it as to

7    what we're supposed to do.

8         This is immensely complicated.  We talk about B-9, you're

9    talking about a pimple on a huge mass of loans and servicing of

10   loans.  You know, interest capitalization itself is a tiny part

11   of what goes on in the servicing, and the *Job Aid* that has just

12   come out is huge about all of the questions at every stage when

13   we've gotten into talking about capitalization of interest that

14   all of the servicers have had with the Department about, "What

15   do you mean?  Do you do it this way when this comes up?"  There

16   are just hundreds of different scenarios that arise.  These are

17   people -- complicated people leading complicated lives.  We get

18   all kinds of different things that come up, and we try to have

19   our system working in the way that we think comports with the

20   rule.

21        If we're wrong, then I still come to the point that I don't

22   think there's a claim against the servicer for being wrong.

23   Either we did it wrong and the Department will tell us to fix

24   it, which we've asked them to tell us to do, or they will tell

25   us, "Don't fix it," in which case by definition retroactively we

1   didn't do it wrong.  There is no -- this is not a source of law

2   that can be utilized by a borrower against the servicer because

3   the servicer didn't breach the contract.  If the servicer did

4   something incorrect, the government breached the contract.  And

5   no reason to believe that the government will not tell us to go

6   forward with this.

7        So we're really in the position where -- I raised this

8   point before -- what are the plaintiff's damages?  They aren't

9   out of pocket.  The plaintiff isn't out of pocket at all.  We

10  pay the plaintiff damages, what does the plaintiff do with the

11  money?  When we correct it, it gets fixed again.  It's a double

12  recovery.  It's either A or B.  You either go to court or you

13  get it solved in the Department, and since it's a departmental

14  issue, the relationship between the Department and its

15  borrowers, that's where it ought to get fixed.

16            THE COURT:  All right.  So here is the way I see this:

17  There are some threshold issues that I have to decide about

18  whether the case should go forward.  I'll kind of summarize

19  them -- sloganize it even; I'm not even as dignified as that.

20  You got no damages according to Mr. Shriner, so if I decide that

21  way, we don't go forward on that basis.  The concern that I had

22  coming in here is that we had a class that was kind of amorphous

23  and difficult to identify.  That doesn't seem to be that big of

24  a problem.  Mr. Shriner, it's really -- he's going to agree with

25  me, but what do you think?

```
 1              MR. SHRINER:  With respect, I think it is.  What I hear
 2      him saying is, "Well, you know, I can't come up with a theory
 3      about how the back-to-back people are going to be harmed once
 4      this gets fixed, but, you know" --
 5              THE COURT:  That's true of everybody.
 6              MR. WEGRZYN:  Your Honor, if I may?
 7              THE COURT:  You can talk too.
 8              MR. WEGRZYN:  We're getting to the fourth class --
 9              THE COURT:  I don't know what they bill you out as,
10      but, you know, it's not like the actors' union where they have
11      to pay you more because you said more than five words on camera.
12      So go ahead.  Talk.
13              MR. WEGRZYN:  I'm just raising for the fact that we're
14      now on to -- Mr. Harris raised the prospect of amending his
15      class definition on the fly here and cutting it back down
16      further.  We're on the fourth, you know, class definition.  It's
17      a little difficult for us to, you know, assess how many people
18      are in the class, whether it includes standalone, you know,
19      borrowers --
20              THE COURT:  There's a lot of people.  There's a lot of
21      people in the class.
22              MR. WEGRZYN:  I mean, there's a lot -- I mean, yes,
23      technically if we have a single definition of the class, these
24      are the types of people it's going to include.  We can, you
25      know, program something to identify them.
```

1        THE COURT:  Here's the bottom line:  It seems to me

2   that Great Lakes has a pretty good handle in its information

3   systems on the people who are in the various buckets, however

4   many buckets we think is appropriate.  Maybe it's only the

5   standalone people; maybe it's the standalone and the

6   back-to-back, but it doesn't seem to me that there's a real

7   problem in identifying who they are.

8        MR. WEGRZYN:  In terms of pulling up their contact

9   information and sending them a letter, no, but --

10        THE COURT:  And we can figure out, okay, these are the

11   people who had a B-9 -- standalone people.  They got a B-9

12   capitalization event.  We can identify those people.  Now, maybe

13   there are some other problems in calculating their damages and

14   stuff like that, but at the very just starting small, like, we

15   can identify those people who had a standalone B-9 forbearance

16   and it was a capitalization event.

17        MR. WEGRZYN:  Our issue is not with the mechanics of

18   finding people.

19        THE COURT:  Yeah.

20        MR. WEGRZYN:  It's with what is the class definition,

21   you know, what types of borrowers is it covering.  We don't

22   know.

23        THE COURT:  Well, I assume everybody who has got -- I

24   can't remember the acronym.  The FFEL loans?  Which loan

25   categories are we talking about?

1          MR. HARRIS:  FFELP and Direct loans, Your Honor.

2          THE COURT:  So FFELP and Direct loans, standalone B-9

3    capitalization.  The definition of the class does not seem to be

4    problematic.

5          MR. SHRINER:  Well, it is sort of because to the extent

6    that you've got people in the class who in my view don't have a

7    claim --

8          THE COURT:  Uh-huh.

9          MR. SHRINER:  -- and that's always significant in class

10   definition --

11         THE COURT:  I agree with you there.  That goes to that

12   threshold issue.  If I decide that your way, we're done.

13         MR. SHRINER:  It's the back-to-back people.

14         THE COURT:  Okay.  So the problem is going to be the

15   back-to-back people.

16         MR. SHRINER:  I think that's going to be the problem.

17   The other one is where do we get with January 2006?  We didn't

18   start servicing student loans until 2009.  I mean, where does

19   that come from other than a desire to have a big number.  We've

20   never had an explanation for how you could have a class -- I

21   mean, we didn't get the -- basically where he comes up with his

22   argument about we should have figured out that they were talking

23   about triggering events and so on until CR1492 that didn't come

24   out until over six years later.  I mean, what have we done wrong

25   that could possibly be the source of having a class that goes

1   back to two thousand -- six years before what we supposedly

2   didn't interpret right happened?  I mean, it's just -- to me

3   it's just -- it gets back to the point --

4              THE COURT:  Okay.  So I get it.  There's a problem with

5   defining the beginning class period.  What are the other issues

6   with the back-to-back class?

7              MR. SHRINER:  Well, other than the fact that I haven't

8   even heard of a plausible basis for thinking they have a claim?

9              THE COURT:  Uh-huh.

10             MR. SHRINER:  I mean, you know, we are --

11             THE COURT:  Again, that seems like the threshold issue,

12  that if I go your way on that, we're just done.  We don't have

13  to fuss over the details --

14             MR. SHRINER:  Yeah.

15             THE COURT:  -- of the claim.

16             MR. SHRINER:  Right.  No.  That's true.  I mean, I have

17  got other questions -- you're talking about class definition.

18  Well, those are my concerns about class definition and length of

19  time.

20             THE COURT:  All right.  Address the class period.

21             MR. HARRIS:  Sure, Your Honor.  January 2006 is when

22  the regulations that we allege were violated here were first

23  promulgated.  Great Lakes has been servicing FFELP loans for

24  decades, and they admit that --

25             THE COURT:  You said 2009 I thought.

1          MR. HARRIS:  Yeah, that's when they started servicing

2     Department of Education-held loans, Your Honor, but they've been

3     servicing FFELP loans that are guaranteed by the Department of

4     Education but that are actually held by private lenders for

5     quite a long time, and those FFELP loans that are held by some

6     of the outstanding private lenders have the same terms and are

7     subject to the same FFELP regulations as the Department-held

8     loans, and that's never been in dispute.

9          THE COURT:  All right.  So there's the answer on the

10     date.

11          MR. SHRINER:  Well --

12          MR. WEGRZYN:  So, I mean, that regulation that he's

13     referring to, this is what it states:  "Interest that accrues

14     during this period is not capitalized."  So that doesn't tell us

15     anything about what he now says his claim is.

16          THE COURT:  It doesn't answer --

17          MR. HARRIS:  Your Honor, we don't interpret statutes

18     and regulations in isolation.  They're part of a large

19     regulatory framework.

20          THE COURT:  I get it.  All right.  Well, I don't have

21     an answer for you.  I will give you a kind of an open-mic moment

22     here to tell me anything else you think I need to know, but I

23     think you've answered your questions -- my questions today.  So

24     let me -- I'll give you -- Mr. Harris, I'll start with you.

25     Anything else you want to tell me that directs my attention to

 1   the issues that I've raised or that you think ought to be raised

 2   here as long as we're all together?

 3        MR. HARRIS:  Sure, Your Honor.  You know, I'm not sure

 4   where the Court stands on the back-to-back people right now, but

 5   I would just like to reiterate that the way to go here if the

 6   back-to-back people are a problem is to just carve them out of

 7   the class, and that's pretty clear in Seventh Circuit law, and

 8   specifically the way we would do that is in the third prong of

 9   our class definition where we say "an administrative forbearance

10   status for a period of up to 60 days," we could simply add a

11   parenthetical that says "that is not immediately preceded by

12   another forbearance, deferment, or grace period," and that would

13   simply carve out all the back-to-back people right there, and

14   all you'd be left with is this perfect standalone class that

15   everyone agrees is uniform.

16        If you look at Docket 83, what the Department is saying in

17   their purported emails is that standalone forbearances were

18   never cappable events.  What Change Request 1492 says, the only

19   guidance ever in effect before apparently May 3rd of this year,

20   what that says is that standalone forbearances were never

21   capitalization events during the class period.  It says that,

22   "This is a clarification of our regs, and it provides no new

23   requirements."

24        Your Honor, what this case is, it's exactly what happened

25   before Your Honor in *Groshek v. Great Lakes Higher Education*.

1    You know, that was a fair debt collection practices case I think
2    or something like that, and there was an allegation of
3    willfulness, and they came into court on a motion to dismiss and
4    they said, "That's not what the law means.  You know, it means
5    this other thing, and that's why we're doing it the right way,"
6    and Your Honor rightly held that you can't just come in with a
7    legal ambiguity post-lawsuit and defeat allegations of
8    willfulness, much less change federal law via email from someone
9    named Cynthia Battle who hasn't even come into court with a
10   declaration or anything.  You know, so what we have here is a
11   classic *Groshek* case.

12       We should really be looking at the record of what happened
13   leading up to the lawsuit, and then we can evaluate the mess
14   that unfolded afterwards, but the law is really clear that the
15   Department can't change its own regs in response to a lawsuit
16   that alleges they violated the regs.  And so a lot of these
17   complications are going to be moot.  The Court is the arbiter of
18   what the law is.  These are official regulations promulgated
19   under the Higher Education Act incorporated into every single
20   contract, so that's sort of the first -- if we were going to
21   think about this, the merits of this case as a class action and
22   how we're actually going to resolve it, the first step would be
23   let's decide what the rules mean.

24       Great Lakes has said in the declaration, "Your Honor, we
25   will do whatever the Department says."  If they can do whatever

1    the Department says, they sure as heck can do whatever Your

2    Honor says the rules are, and maybe the Department, you know,

3    can get its act together at that point.  Whether it's screwing

4    around or just doesn't know what its own rules are, I don't know

5    what is going on at the Department in response to this lawsuit.

6    I can't explain why they were sued side by side, came in and

7    pled one regulatory theory seemingly together, even though it

8    wasn't technically together, and then a year later after the

9    evidence comes out of what their private guidance was, then they

10   suddenly reverse course?  You know, the complications really

11   only arose after the lawsuit, and I think the Court should look

12   at that, you know, certainly as a reason to not consider every

13   little thing the Department says post-lawsuit as law.  You know,

14   now these department musings that post-lawsuit aren't entitled

15   to judicial deference -- CR2785 they admit was never effective

16   even months into the lawsuit -- you know, what is the Court to

17   do with the Department's wishy-washiness post-lawsuit?

18       All of that goes, Your Honor, to whether Great Lakes was

19   negligent or whether they acted fraudulently.  It may be that

20   the Court decides that Great Lakes acted illegally here in

21   whatever fashion, and then the issue of what the Department told

22   Great Lakes to do, that may be, you know, at various points in

23   time, whether before or after a lawsuit, that may go very well

24   to whether they acted reasonably or whether they acted in good

25   faith in inflating these loans --

1        THE COURT:  And just to be clear, I sense that -- your

2    implicit agreement with Mr. Shriner that it's really not a

3    breach of contract case anymore.

4        MR. HARRIS:  Your Honor, yeah --

5        THE COURT:  The Department --

6        MR. HARRIS:  It was a breach of contract case against

7    the government, but we also alleged as part of our negligence

8    and RICO cases that as a third-party agent, they knowingly

9    caused the Department to violate its own loan terms and its own

10   regulations.

11       THE COURT:  Okay.

12       MR. HARRIS:  So there's definitely no breach of

13   contract claim here.  It's a RICO claim, and it's a common law

14   negligence claim, and I would like to address something that

15   Your Honor said previously in terms of determining here whether

16   anyone has a claim.  So the Supreme Court has been really clear.

17   One of the places is in *Amgen*.  It was a securities case back in

18   2013.  Really good opinion that explained whether or not to go

19   into particular merits issues under Rule 23, and what they said

20   is, and the Seventh Circuit has repeatedly adopted this in

21   recent years, is you only go into the merits insofar as

22   necessary to determine whether Rule 23's elements are satisfied.

23   And so what that means is once something is identified as a

24   common question, whether it's a common question of law or a

25   common question of fact like defendant's state of mind, that is

1    not to be adjudicated under Rule 23.

2        So what is the injury issue that can be properly

3    adjudicated under Rule 23?  It's the threshold issue of Article

4    III standing, and defendants have never challenged that at any

5    point in the case with respect to Ms. Dawson.  And, you know, in

6    fact, they cited the Seventh Circuit's *Bible* case in their

7    opening round of briefing implicitly conceding that this is a

8    valid injury because that's what the Seventh Circuit has made

9    pretty darn clear over and over again.  It's what the Second

10   Circuit held in the *Donziger* case that we cite in Docket 125.

11   It's that the imposition of wrongful debt is an injury to

12   property.

13       THE COURT:  They also -- they meaning the Great

14   Lakes -- has also said that under Rule 23 I can look at the

15   kinds of questions that would arise, so that for your RICO

16   claim, their argument is that reliance would be an element of

17   your RICO claim, and so as I look at this from the Rule 23

18   perspective, I have to look at what would undoubtedly be very

19   complicated and various set of answers about whether any of the

20   class members had actually relied on the alleged

21   misrepresentations here.

22       MR. HARRIS:  So, Your Honor, reliance is decidedly not

23   an element of RICO.  It often plays into whether there's

24   causation.

25       THE COURT:  Which is how they do -- that's -- their

1      analysis is causation is an element.  That means there has to be

2      reliance.  How else would you establish causation in this kind

3      of case?

4             MR. HARRIS:  So, Your Honor, according to the *BCS*

5      *Services* case from the Seventh Circuit that we relied on in our

6      reply brief on the renewed motion, what that case held at

7      summary judgment in a RICO case, and it was actually the appeal

8      on that *Phoenix Bond* case that we rely on pretty heavily for

9      injury purposes, what the Seventh Circuit said there is under

10     RICO and generally for tort claims, once the plaintiff

11     establishes the type of injury that would be, quote, "the

12     expected consequence of the alleged misconduct," you've done

13     enough to take that case to trial on causation.

14        The Seventh Circuit also held that -- I believe it was

15     *McMahon v. LVNV Funding* in 2015 or 2016 -- well, I don't know if

16     they held this, but they said it outright, you know, if you can

17     prove damages, then you've automatically proved causation, and

18     that's what we have here.  What they say in Docket 83 is, "We've

19     identified the caps that we think need to be removed," and then

20     they say, "We've submitted a plan to the Department that, you

21     know, takes care of everybody" --

22            THE COURT:  Which case is the one that equates damages

23     to causation?

24            MR. HARRIS:  Your Honor, I believe it was *McMahon v.*

25     *LVNV Funding,* and it was 2015 or 2016 in the Seventh Circuit.

1          THE COURT:  Okay.

2          MR. HARRIS:  But particularly the *BCS Services* case is

3    really instructive on causation.  It's practically a treatise on

4    RICO and tort causation from Judge Posner, and that was a case

5    that was far more unwieldy for causation purposes than this one

6    is, Your Honor, because here all we have to do is look in a

7    database and see what happened.  We don't have to go to Betsy

8    Borrower or Danny Debtor and say, "Hey, what happened to your

9    loans?  How were they miscalculated?"  We query the GOALS system

10   for -- and that is in the GLELSI deposition also when Ms.

11   Kielhofer talks about the back-off process that they use to

12   calculate damages --

13         THE COURT:  I'll tell you I just have a much more kind

14   of common-sense reaction to the idea that this is a RICO fraud

15   case, and that is that this all starts with some fraudulent

16   misrepresentation which I gather you're going to intend to --

17   simply when they send out a loan statement that reflects an

18   inflated balance.

19         MR. HARRIS:  Your Honor, actually our primary theory of

20   the RICO injury, the RICO causation, is found in the servicing

21   contract and in the deposition testimony about the servicing

22   contract.  They transmit these loan balances directly into the

23   Department's database.  No one looks at this information as it's

24   coming in.  It goes directly into the National Student Loan

25   database, directly into the federal Treasury's ledger, general

1    ledger, and then it goes, you know, to all the credit bureaus

2    and every Wall Street lender on the block.

3         So when they're transmitting these things ubiquitously

4    throughout the financial authoritative universe, what they say

5    the debt is is what it is, and the Court can see that in the

6    evidence because when they did the remediation project -- the,

7    quote/unquote, "remediation project" the first time around in

8    Docket 66, they identified over a hundred people who had

9    actually paid off --

10        THE COURT:  The issue is that the -- under that theory

11   any error, any common error, then ends up being a RICO fraud.

12   Where is the fraud part?

13        MR. HARRIS:  Your Honor, the fraud part comes in so

14   far -- we don't have a lot of evidence.  We've been denied

15   emails, and we've been denied some other discovery so far

16   pending class cert, but the fraud as we can see it today comes

17   from Change Request 1492 and Ms. Kielhofer's deposition

18   testimony about 1492.  It also comes from the fact that at the

19   end of the day before a jury, actions speak louder than words.

20   What they did following the change request is they reprogrammed

21   their system to comply with their understanding of the

22   regulations and of the Department's requirements, and so if you

23   understood it enough to reprogram your system, you understood it

24   enough that you could have, you know, stopped inflating people's

25   loans who you had already wrongfully inflated.

1      THE COURT:  Okay.  So when you're presenting all this

2  to the jury and Mr. Shriner stands up and says, "Great Lakes has

3  nothing to gain from doing this," how could this possibly be

4  best explained as a conspiracy to defraud the lenders?  They did

5  this all on behalf of the government?  Did they get a commission

6  somehow?  I don't --

7      MR. HARRIS:  So, Your Honor --

8      THE COURT:  It doesn't have the ring of plausibility.

9      MR. HARRIS:  Sure.

10     THE COURT:  I know I'm not answering that question now,

11  but it just, as I try to get my hands on this case, it just

12  doesn't scream out that this is a fraudulent conspiracy here.

13     MR. HARRIS:  So, Your Honor, if we want to talk about

14  motive, you know, our allegations in the complaint --

15     THE COURT:  It's simple.  Maybe they get paid by how

16  much they --

17     MR. HARRIS:  They do, Your Honor.  So here is what the

18  servicing contract says.  Servicing contract says you get paid

19  on a per-borrower basis every month, and you're required to

20  comply with our requirements and with the regulations.  If we

21  find out that you haven't complied, all of the servicing fees

22  that we have paid you are not -- come back to us.  These

23  borrowers aren't going to be billable going forward, and anyone

24  we've paid you for whose loans were noncompliant, all that money

25  comes back to us.  So when they realized they had been doing

1    this wrong for several years, and they may have looked, maybe

2    they didn't look, but the evidence now shows there were hundreds

3    of thousands of people --

4            THE COURT:  Okay.  So the theory is they made a

5    mistake, and they had to cover it up or they were going to

6    get --

7            MR. HARRIS:  Your Honor, that's the complaint's theory.

8    I mean, we really stand by the complaint's theory, and we think

9    it's been borne out by the evidence to an extreme throughout

10   this case.  The only thing we haven't really gotten to yet in

11   either direction is whether they changed their website to cover

12   up these transactions from borrowers.  We just haven't done the

13   discovery on that particular issue yet because we've had a lot

14   going on in every other area, but the complaint's allegations

15   have really been proven by the undisputed evidence so far.

16       There's a lot of discovery left to do.  Emails would be

17   very helpful in a fraud case, and, you know, we had an agreement

18   on those, but for whatever reason Judge Crabb denied those

19   agreed-upon 97,000 emails as moot, you know, with Docket 85.

20   But there is a motive and opportunity here that's colorable, and

21   at the end of the day, Your Honor, is the real answer I think:

22   They just don't care.  The Department just doesn't care.  Great

23   Lakes just doesn't care.  Nobody cares except the borrowers

24   whose loans are inflated by 20 million and are growing every

25   day.  These repayment periods are 10, 20 years sometimes.  So

1    that 20 million is going to become 100 million, and, you know,

2    yeah, we may have a $1.4 trillion student debt bubble, and, you

3    know, at the end of the day who cares, but, you know, it matters

4    to people like Ms. Dawson, and it matters to a lot of other

5    borrowers who already owe enough, and the least we can do is

6    follow the bad rules that are in place.

7              THE COURT:  Okay.  All right.  Mr. Shriner.

8              MR. SHRINER:  I want to say something before I get too

9    far, and that is I've referred a couple of times to the *Job Aid*.

10   What I'm referring to is Exhibit 1 to Mr. Harris's declaration.

11   It's -- you see how thick it is and how many post-it notes --

12             THE COURT:  What's the docket number on that?

13             MR. SHRINER:  It's Docket No. 120-9, and it is what I

14   have referred to earlier as a back-and-forth among the servicers

15   and the Department about what this capitalization thing ought to

16   be and how it ought to be done.  If anybody can read this and

17   say, you know, "It was perfectly clear what everybody should

18   have done, and we knew it, and when we found out that somebody

19   else had found out that we had been lying about it, we covered

20   it up," I absolutely don't understand this, how this could be a

21   fraud case.

22        I also don't understand how you can find a negligence claim

23   on the question of whether or not the servicer is properly

24   carrying out the instructions it gets from its principal if the

25   principal either backs them up, in which case it isn't, and if

1    the principal says, "No, I want you to change it now and pay it

2    back," there's no damages.  I don't understand that.  I mean,

3    that's a pretty basic point in this case.

4        Mr. Harris has made it perfectly clear who he's mad at.

5    He's mad at the government.  The government doesn't pay enough

6    attention or whatever it is the story is.  He sued the

7    government.  He was told he couldn't sue the government because

8    the government has sovereign immunity.  I didn't make that law.

9    They are the ones who are contract parties with Ms. Dawson and

10   with the people he wants to join in this class.  He can't go

11   after them -- he'd like to -- so he goes against us saying that

12   when we did what they told us to do, or at least what we

13   understood it to be, somehow we committed a tort.  I just don't

14   buy that.

15       Again, Great Lakes has no contractual relationship with

16   Ms. Dawson.  We're simply the agent of the Department and

17   servicing the accounts.  We have no incentive to capitalize

18   interest incorrectly, just the opposite, because, in fact, the

19   payment -- and this is in the record -- the Department might pay

20   Great Lakes, say, $1.05 for every borrower allocated to it that

21   is in school status, might pay the same amount for every

22   borrower who is in -- isn't paying, for every -- that's in

23   forbearance status, but it pays $2.85 for every borrower

24   allocated to current repayment.  The incentives are all the

25   other way.

```
 1          I mean, the record really will reflect -- Mr. Harris wants
 2     to talk about what he thinks the record is going to reflect --
 3     it's going to reflect people diligently trying to do their job
 4     and a Department that is slow in responding, but it's our boss,
 5     and we've all worked with the government; we know how that works
 6     sometimes.  And we're doing our best to try to carry out their
 7     instructions, but we're still following their instructions.
 8     We're following their guidance.  I just don't understand as a
 9     basic principle how that gives rise to a tort claim by the
10     borrower that is in a contractual relationship with the
11     government against --
12          THE COURT:  Well, I guess the explanation is you're
13     trying to follow it now, but you made errors in the past, and
14     you tried to cover them up.  That's the tort -- the RICO theory.
15          MR. SHRINER:  Yeah, I understand.
16          MR. HARRIS:  And, Your Honor --
17          THE COURT:  And I'm not going to answer that today, so
18     you don't even need to respond to it really but --
19          MR. HARRIS:  Your Honor, where was the motion to
20     dismiss?  I know they may have had other reasons for answering,
21     but if they really believed that there was no injury here, that
22     we were wrong about the regs or whatever --
23          THE COURT:  All right.  We're on Mr. Shriner's dime now
24     so --
25          MR. SHRINER:  Yeah.  Thank you, Your Honor.  There just
```

1    isn't any incentive out there for us to do it.  It doesn't make

2    any sense.

3         Let's get back because I don't want you to overlook what

4    really is the case here with Ms. Dawson.  There is a requirement

5    that somebody who wants to be a class representative have

6    standing.  We know that.  We also -- we know that the person is

7    supposed to be a typical representative of the class.  Someone

8    who has not suffered a penny of loss is going to be the

9    representative plaintiff in a class action for people who say

10   they've sustained loss.  The other thing:  Why is this an -- why

11   would -- wholly aside from the fact that you can sustain an

12   action for damages based on the principal's failure to follow

13   the -- the agent's failure to follow the principal's instruction

14   in collecting the debt that is owed to the principal, wholly

15   aside from that, the idea that the -- that anyone can not have

16   lost any money and that makes her fundamentally different from

17   thousands and thousands and probably hundreds of thousands of

18   people in this class.  How can she be an adequate class

19   representative?

20        You get back to what they're suing for.  They're suing for

21   damages.  Why aren't they suing for their clients simply to have

22   their accounts readjusted?  They didn't think of that.  Why?

23   Because, you know, you don't get fees for that.  You get fees if

24   you get money damages.  Now, what are those money damages going

25   to be?  If the Department tells us to go back and unscramble

1      these things, how could you possibly sustain a damage claim on

2      that?  It's not in the interest of -- the *Aqua Dots* case has to

3      do with whether she's an adequate class representative, the

4      Seventh Circuit case where the defendant was fixing things and

5      the plaintiff brought a lawsuit anyway.  That's really what this

6      case is about.  How can you be an adequate --

7              THE COURT:  I think their argument would be that you

8      didn't fix the things until the suit was brought.

9              MR. SHRINER:  What difference does it make?  I mean,

10     that's true in these other cases.  Why would you pursue

11     litigation, continue to pursue litigation -- and, again, I get

12     back to where we're stuck in the middle because we're the

13     agent -- we're not the principal; we can only do what we're told

14     to do -- with how this could possibly be a tort claim against

15     us.  The *Aqua Dots* case says why would you choose a litigation

16     alternative other than to have a basis for attorney's fees when

17     the proper way to do this is to get -- to get the thing fixed,

18     and when the defendant says we're causing it to be fixed, how do

19     you say that the class representative who insists on having

20     those very people who would like to get their money paid to them

21     without having to pay a percentage of it to the lawyers -- this

22     is the point *Aqua Dots* makes -- how do you impose that on the

23     members of the class when you yourself haven't suffered a

24     nickel's damage?  I mean, it seems to me it's a huge adequacy of

25     representation issue for this particular plaintiff and this

71

1    particular case.

2          And then I get back to the fact that, you know, I
3    respectfully suggest -- I know I don't have to with you because
4    you'll understand what I'm talking about -- this is not a case
5    for a federal district court to come in and supervise the way
6    the Department of Education runs its loan program.  That's
7    really what Mr. Harris is asking you to do:  "Make me the
8    private Attorney General to go in and make the Department of
9    Education follow its own instructions," which, of course, it's
10   free to change.  This just doesn't make any sense to me at all
11   as a class action, and it seems to me that the real problem with
12   it is these plaintiffs don't want damages.  You know, the *Bible*
13   case suggested -- Judge Crabb referred to this in her ruling --
14   the proper remedy is going to be to go back and fix it, not to
15   pay damages, not to pay damages with a third to the lawyers.
16   That isn't in anyone's interest, and someone who insists on
17   going that way is not an adequate class representative.  I think
18   that's the holding of *Aqua Dots*.

19         THE COURT:  Okay.  I need to give Mr. Harris a chance
20   to respond to that because I do think Ms. Dawson does have some
21   serious issues as the class representative because of the fact
22   that she's in this repayment plan that has not taken a dime out
23   of her pocket as a result of these errors, and if it gets fixed,
24   she's going to have a remedy that is a hundred percent for her.

25         MR. HARRIS:  So, Your Honor, when we talk about

1   adequacy, something Mr. Shriner said was completely contradicted

2   by the record, and he said she's somewhat unique in the sense

3   that she's on one of these repayment plans and hasn't paid more

4   than she owes on her loans, like she hasn't paid off her

5   wrongful debt yet.  Out of the 360-some-thousand people in

6   Docket 66, or maybe it was 330,000 people in Docket 66, their

7   remediation project, they could only find a hundred people who

8   actually had paid off more than they owed.

9       So this claim that people are uninjured, it doesn't go to

10   adequacy because the Seventh Circuit has held, and we cited this

11   case in our papers, that, you know, if it's a defense that's

12   generally applicable to the class, it's not a Rule 23 issue

13   because the class is going to stand or fall largely on that

14   decision, and, Your Honor, again, like, there just is no

15   out-of-pocket loss requirement under RICO.  If there was, then

16   *Phoenix Bond* was wrongly decided.  They had no answer for that

17   case, Your Honor, in their opposition to our renewed motion.

18   They didn't even address it.  And, you know, we fully briefed

19   that injury issue.  It really is a question of law for the Court

20   to decide on the merits once we have the full factual record of,

21   you know, who was inflated and who paid off and by how much.

22       But as far as the attorney's fees, Your Honor, and this

23   *Aqua Dots* case from the Seventh Circuit, I can't wrap my mind

24   around this argument every time Mr. Shriner makes it.  That was

25   a case where there was literally nothing that the plaintiff or

1    class counsel could possibly accomplish for the class, and it

2    was a case where, you know, literally a full remedy had already

3    been given.  There was no entitlement to triple damages as a

4    statutory matter.  There was no entitlement to attorney's fees

5    as a statutory matter.

6        What we have -- we have no problem -- if they want to

7    properly remedy people's accounts, we're not saying that that's

8    unacceptable.  We're saying it hasn't been done yet, and we're

9    saying that we have a statutory entitlement to threefold our

10   damages.  That's in the class's interest, Your Honor.  That's in

11   Ms. Dawson's interest to get threefold in damages.  It's in

12   300,000 other people's interest to get threefold their damages,

13   and, Your Honor, no matter whether the class receives cash

14   damages or receives some form of equitable relief in terms of

15   account adjustments downward, we have a statutory entitlement to

16   attorney's fees if we prevail from the defendants.  The class

17   isn't paying for this case.  They've never paid a cent.  They're

18   never going to pay a cent, you know, unless we get some common

19   fund, you know, above and beyond a hundred percent recovery.

20   Then maybe we could draw attorney's fees under a common fund

21   theory, but right now, Your Honor, we have a statutory

22   entitlement to triple damages and attorney's fees, and that's

23   why we're pursuing the case.

24        THE COURT:  Okay.  All right.  So I diverted to

25   Mr. Harris to address the damages issue for Ms. Dawson.  I'm not

1    sure you were finished.

2         MR. SHRINER:  Almost, Your Honor, and I'll just pick up

3    on this last point.  I think I just heard him say that he'll

4    rely entirely on whatever attorney's fees he recovers in his

5    RICO claim and won't claim any common fund attorney's fees

6    unless he recovers more for the class than they're entitled to

7    already.  That's odd.

8         No, I just wanted to say one other thing.  I listen to a

9    lot of what Mr. Harris thinks the proof is going to tell and

10   this and that and the other thing.  I simply want to point out

11   to Your Honor, 19 pages of this reply brief includes facts that

12   weren't included in the original complaint, in the original

13   briefing on this.  I haven't had an opportunity to respond to

14   that.  I don't particularly want to, and I don't think perhaps

15   that's where you're going.  You tell me if you do think that's

16   important, and, if so, I'll ask for the opportunity to respond

17   to it, but, you know, this is -- we're not doing so well on the

18   class certification.  Judge Crabb correctly pointed out that

19   this is not a certifiable class at this point.  I'm afraid

20   that's going to happen again because, of course, Judge Crabb was

21   the judge on the case when the briefs were submitted, so I'm

22   going to try to rile her up and tell her what bad people these

23   are, you know.  This isn't a jury so --

24        THE COURT:  All right.  I'll take the class

25   certification under advisement.  Thank you all very much for

1    coming in and making so many things clearer to me, and I'm not

2    giving myself a deadline on getting the decision out.  I'm busy

3    managing the affairs of the State of Wisconsin now and not the

4    federal Department of Education.  I'll get to them when I have

5    time.

6              MR. SHRINER:  Thank you, Your Honor.

7              MR. KASHIMA:  Thank you, Your Honor.

8              MR. HARRIS:  Thank you.

9              THE CLERK:  This court stands adjourned.

10         (Proceedings concluded at 2:47 p.m.)

11                              ***

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          I, JENNIFER L. DOBBRATZ, Certified Realtime and Merit

2    Reporter in and for the State of Wisconsin, certify that the

3    foregoing is a true and accurate record of the proceedings held

4    on the 18th day of May, 2017, before the Honorable James D.

5    Peterson, Chief U.S. District Judge for the Western District of

6    Wisconsin, in my presence and reduced to writing in accordance

7    with my stenographic notes made at said time and place.

8          Dated this 23rd day of May, 2017.

9

10

11

12

13

14                                    /s/ Jennifer L. Dobbratz

15                          Jennifer L. Dobbratz, RMR, CRR, CRC
                                    Federal Court Reporter

16

17

18

19

20

21

22

23

24    The foregoing certification of this transcript does not apply to
      any reproduction of the same by any means unless under the
25    direct control and/or direction of the certifying reporter.