UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WISCONSIN

---

MEREDITH D. DAWSON,

        Plaintiff,

   v.                                     Civil Action No. 15-cv-475-jdp

GREAT LAKES EDUCATIONAL
LOAN SERVICES, INC., et al.,

        Defendants.

---

**BRIEF IN SUPPORT OF DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT**

---

Thomas L. Shriner, Jr.
Elizabeth A. N. Haas
Eric G. Pearson
FOLEY & LARDNER LLP
777 East Wisconsin Avenue
Milwaukee, Wisconsin 53202-5306

Michael D. Leffel
FOLEY & LARDNER LLP
150 East Gilman Street, Suite 5000
Madison, Wisconsin 53703-1482

*Attorneys for Defendants Great Lakes
Educational Loan Services, Inc., Great Lakes
Higher Education Corporation, Jill Leitl,
David Lentz, and Michael Walker*

June 3, 2019

# TABLE OF CONTENTS

**Page No.**

TABLE OF AUTHORITIES ................................................................................. iii

INTRODUCTION ............................................................................................... 1

STATEMENT OF FACTS .................................................................................. 5

ARGUMENT ...................................................................................................... 12

I.   THE PLAINTIFFS' STATE-LAW CLAIMS ARE BARRED UNDER THE
DOCTRINES OF CONFLICT PREEMPTION, INTERGOVERNMENTAL
IMMUNITY, AND *YEARSLEY* IMMUNITY ................................................. 12

    A.   The HEA Preempts State Law That Would Impose Liability on Great
Lakes Despite Its Compliance with Department Directives. .............................. 13

        1.   Purposes and Objectives of the HEA ....................................... 15

        2.   The Department's Oversight of Servicers ................................. 18

            a.   Change Requests ....................................................... 19

            b.   Remediation Projects ................................................. 20

            c.   Day-to-Day Oversight ............................................... 21

        3.   Great Lakes' Compliance with Department Directives ............ 21

        4.   Dawson's Claims ...................................................................... 25

    B.   Intergovernmental Immunity Prohibits the Use of State Law to Regulate
How Great Lakes Performs Under Its Contract with the Department. ............... 32

    C.   Under *Yearsley*, Great Lakes Is Immune from Liability Arising Out of Its
Capitalization Practices ...................................................................................... 34

II.  GREAT LAKES IS ENTITLED TO SUMMARY JUDGMENT ON DAWSON'S
RICO CLAIMS. .......................................................................................... 35

    A.   Dawson Did Not Allege a Pattern of Racketeering Activity. .............. 37

1.    Because Dawson's RICO Predicate Acts Are Based on Fraud, She Must Satisfy Rule 9(b)'s Particularity Requirements, but the Complaint Does Not. ................................................................. 38

2.    Dawson Has Not Alleged the Requisite Pattern of Racketeering. ............ 43

B.    Dawson's Claims Under Each RICO Subsection She Raises Fail for Additional Reasons as Well. ................................................................. 49

1.    Dawson's Claims Under § 1962(b) Fail Because No Defendant Acquired or Maintained an Interest in Any Enterprise. ............................ 49

2.    Dawson's § 1962(c) Claim Does Not Allege an Enterprise Distinct from the Defendants and Does Not Allege that the Defendants Conducted or Participated in the Affairs of the Enterprise. ...................... 51

a.    Dawson's Claims Under § 1962(c) Fail Because There Is No "Distinctness" Between the RICO Enterprise Alleged and the Defendant "Persons." ........................................................ 52

b.    The Defendants Did Not Conduct or Participate in the Conduct of the Alleged Enterprise. ................................................ 54

3.    Dawson Does Not Allege a Violation of the RICO Conspiracy Statute, § 1962(d). ..................................................................... 56

III.    WITHOUT THE RICO CLAIMS, NEITHER DAWSON NOR THE UNCERTIFIED DAMAGES CLASS HAS ANY REMAINING DAMAGES AFTER THE FIRST AND SECOND REMEDIATIONS. ................................................ 57

CONCLUSION .............................................................................................. 60

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Armstrong v. Exceptional Child Center, Inc.*,
    135 S. Ct. 1378 (2015)....................................................................................12

*Baker v. IBP, Inc.*,
    357 F.3d 685 (7th Cir. 2004) .................................................................52, 53

*Bankcard Am., Inc. v. Universal Bancard Sys., Inc.*,
    203 F.3d 477 (7th Cir. 2000) ........................................................................39

*Barry Aviation, Inc. v. Land O'Lakes Mun. Airport Comm'n*,
    366 F. Supp. 2d 792 (W.D. Wis. 2005) .........................................................51

*Bible v. United Student Aid Funds, Inc.*,
    799 F.3d 633 (7th Cir. 2015) ....................................................29, 30, 31, 59

*Boeing Co. v. Movassaghi*,
    768 F.3d 832 (9th Cir. 2014) .....................................................32, 33, 34

*Boyle v. United Tech. Corp.*,
    487 U.S. 500 (1988)..............................................................................14, 18

*Campbell-Ewald Co. v. Gomez*,
    136 S. Ct. 663 (2016)....................................................................................34

*Cedric Kushner Promotions, Ltd. v. King*,
    533 U.S. 158 (2001)......................................................................................52

*Chae v. SLM Corp.*,
    593 F.3d 936 (9th Cir. 2010) ............................................................. *passim*

*In re ClassicStar Mare Lease Litig.*,
    727 F.3d 473 (6th Cir. 2013).......................................................................53

*College Loan Corp. v. SLM Corp.*,
    396 F.3d 588 (4th Cir. 2005) ................................................................29, 30

*Cornielsen v. Infinium Capital Mgmt., LLC,*
   916 F.3d 589 (7th Cir. 2019) ................................................................39

*Crosby v. Nat'l Foreign Trade Council,*
   530 U.S. 363 (2000) ..............................................................................13, 14

*Cunningham v. Gen. Dynamics Info. Tech., Inc.,*
   888 F.3d 640 (4th Cir. 2018) ................................................................34, 35

*D'Addario v. D'Addario,*
   901 F.3d 80 (2d Cir. 2018) ....................................................................50

*Decatur Ventures, LLC v. Stapleton Ventures, Inc.,*
   373 F. Supp. 2d 829 (S.D. Ind. 2005)...................................................54, 56

*Don't Tear It Down, Inc. v. Pa. Ave. Dev. Corp.,*
   642 F.2d 527 (D.C. Cir. 1980)...............................................................32

*First Capital Asset Mgmt. v. Satinwood, Inc.,*
   385 F.3d 159 (2d Cir. 2004) ..................................................................49

*Fitzgerald v. Chrysler Corp.,*
   116 F.3d 225 (7th Cir. 1997) ................................................................53, 54

*Foskett v. Great Wolf Resorts, Inc.,*
   518 F.3d 518 (7th Cir. 2008) ................................................................58

*Gade v. Nat'l Solid Wastes Mgmt. Ass'n,*
   505 U.S. 88 (1992)................................................................................13, 14

*Gamboa v. Velez,*
   457 F.3d 703 (7th Cir. 2006) ................................................................43, 44, 45, 46

*Goodyear Atomic Corp. v. Miller,*
   486 U.S. 174 (1988)..............................................................................32

*Goren v. New Vision Int'l,*
   156 F.3d 721 (7th Cir. 1998) ................................................................39, 54, 57

*H.J., Inc. v. N.W. Bell Tel. Co.,*
   492 U.S. 229 (1989)..............................................................................37

*Hedberg v. Ind. Bell Tel. Co.,*
    47 F.3d 928 (7th Cir. 1995) ................................................................. 37

*Hollingsworth v. Perry,*
    570 U.S. 693 (2013) .......................................................................... 57

*Jennings v. Emry,*
    910 F.2d 1434 (7th Cir. 1990) ............................................................. 37

*Jepson, Inc. v. Makita Corp.,*
    34 F.3d 1321 (7th Cir. 1994) ........................................................... 38, 43

*Johnson v. Oystacher,*
    2018 WL 5249229 (N.D. Ill. Oct. 22, 2018) .......................................... 50

*La. Pub. Serv. Comm'n v. FCC,*
    476 U.S. 355 (1986) .......................................................................... 13

*Leslie Miller, Inc. v. Arkansas,*
    352 U.S. 187 (1956) ...................................................................... 14, 26

*Little v. Bowers,*
    134 U.S. 547 (1890) .......................................................................... 58

*Lorenz v. CSX Corp.,*
    1 F.3d 1406 (3d Cir. 1993) .................................................................. 56

*Lujan v. Defenders of Wildlife,*
    504 U.S. 555 (1992) .......................................................................... 57

*Lynnbrook Farms v. Smithkline Beecham Corp.,*
    79 F.3d 620 (7th Cir. 1996) ................................................................. 13

*Merck Sharp & Dohme Corp. v. Albrecht,*
    No. 17-290, slip op. (U.S. May 20, 2019) ............................................. 13

*Michalowski v. Rutherford,*
    2016 WL 640433 (N.D. Ill. Feb. 18, 2016) ........................................... 48

*Midwest Grinding Co. v. Spitz,*
    976 F.2d 1016 (7th Cir. 1992) ......................................................... 44, 46

*Nesbitt v. Regas,*
    2015 WL 1331291 (N.D. Ill. Mar. 20, 2015) .......................................................................54

*New West, L.P. v. City of Joliet,*
    491 F.3d 717 (7th Cir. 2007) ...........................................................................................12

*North Dakota v. United States,*
    495 U.S. 423 (1990).........................................................................................................32

*Pizzo v. Bekin Van Lines Co.,*
    258 F.3d 629 (7th Cir. 2001) ...........................................................................................43

*Purcell v. Bank of Am.,*
    659 F.3d 622 (7th Cir. 2011) ...........................................................................................12

*Ray v. Spirit Airlines, Inc.,*
    836 F.3d 1340 (11th Cir. 2016) .......................................................................................52

*Riverwoods Chappaqua Corp. v. Marine Midland Bank, N.A.,*
    30 F.3d 339 (2d Cir. 1994) ..............................................................................................53

*Roger Whitmore's Auto Servs., Inc. v. Lake Cnty, Ill.,*
    424 F.3d 659 (7th Cir. 2005) ...........................................................................................46

*Selected Prods. Corp. v. Humphreys,*
    86 F.2d 821 (7th Cir. 1936) .............................................................................................59

*Slaney v. Int'l Amateur Athletic Fed'n,*
    244 F.3d 580 (7th Cir. 2001) ......................................................................................38, 44

*Smith v. Shawnee Library Sys.,*
    60 F.3d 317 (7th Cir. 1995) .............................................................................................36

*Spokeo, Inc. v. Robins,*
    136 S. Ct. 15140 (2016).....................................................................................................57

*Student Loan Servicing Alliance v. District of Columbia,*
    351 F. Supp. 3d 26 (D.D.C. 2018) .............................................................................. *passim*

*Uni\*Quality, Inc. v. Infotronx, Inc.,*
    974 F.2d 918 (7th Cir. 1992) ...........................................................................................38

*United Food & Commercial Workers Unions & Emp'rs Midwest Health Benefits*
  *Fund v. Walgreen Co.,*
  719 F.3d 849 (7th Cir. 2013) ........................................................................51, 57

*United States v. Leahy,*
  464 F.3d 773 (7th Cir. 2006) ....................................................................38

*Vicom, Inc. v. Harbridge Merch. Servs., Inc.,*
  20 F.3d 771 (7th Cir. 1994) ..........................................................38, 39, 43

*Walter v. Drayson,*
  538 F.3d 1244 (9th Cir. 2008) .................................................................55, 56

*Whaley v. Auto Club Ins. Ass'n,*
  891 F. Supp. 1237 (E.D. Mich. 1995) ....................................................49

*Widemshek v. Fale,*
  17 Wis. 2d 337, 117 N.W.2d 275 (1962) ...............................................58

*Yearsley v. W.A. Ross Constr. Co.,*
  309 U.S. 18 (1940) ......................................................................12, 34, 35

## Statutes

U.S. Constitution, Art. VI ...........................................................................12

18 U.S.C. § 1961 ......................................................................................37, 52

18 U.S.C. § 1962 ............................................................................... *passim*

20 U.S.C. § 1001-1155 ...............................................................................2

20 U.S.C. § 1071 .......................................................................................16

20 U.S.C. § 1082 .......................................................................................17

20 U.S.C. § 1087e .....................................................................................17

20 U.S.C. § 1087f .............................................................................17, 18, 35

20 U.S.C. § 1087i-1 ...............................................................................5, 17

34 C.F.R. § 682.211 ...........................................................................................7, 9

34 C.F.R. § 685.202 ...............................................................................................6

34 C.F.R. § 685.205 ........................................................................................6, 7, 9

Fed. R. Civ. P. 9 ........................................................................................... *passim*

Fed. R. Civ. P. 56 ..................................................................................................1

Ensuring Continued Access to Student Loans Act ("ECASLA"),
    Pub. L. No. 110-227, 122 Stat. 740 (2008) .............................................5

**Other Authorities**

139 Cong. Rec. S5628 (daily ed. May 6, 1993) ......................................................16

DOED Notice, Federal Preemption and State Regulation of the
    Department of Education's Federal Student Loan Programs and
    Federal Student Loan Servicers,
    83 Fed. Reg. 10619 (Mar. 12, 2018). ........................................... *passim*

Federal Student Aid, *Federal Student Loan Portfolio*,
    https://studentaid.ed.gov/sa/about/data-center/student/portfolio ..............................5

*U.S. Department of Education Principal Office Functional Statements* (Nov. 25,
    2016), https://www2.ed.gov/about/
    offices/list/om/fs_po/fsa/program.html#fio....................................................23

Great Lakes Educational Loan Services, Inc., three of its current or former

officers, and a former corporate affiliate[1] (collectively, "Great Lakes") respectfully move

for summary judgment, pursuant to Fed. R. Civ. P. 56.

## INTRODUCTION

Four years ago, in the summer of 2015, when the plaintiff filed this case, Great

Lakes (one of the Department of Education's ("Department") four principal nationwide

student-loan servicers) discovered two programming errors distorting the way that it

intended to capitalize interest following B-9 Forbearance periods.  Three years ago, in

late 2016, Great Lakes received clarification from the Department regarding the

Department's desired interest-capitalization procedures following B-9 Forbearance

periods.  Working at the Department's direction, Great Lakes developed Department-

approved plans to remedy both these issues.  Remediation of the programming errors

was accomplished in January 2017; remediation following the Department's

clarification was completed in August 2018.

Today, four years after this case began, nothing remains to be done to the

affected borrower accounts.  All borrowers with outstanding account balances had

those balances adjusted, and refund checks were issued to borrowers who had paid off

their accounts in full.  The Department reviewed and approved affected accounts.

---

[1] These other defendants are Great Lakes Higher Education Corporation, Jill Leitl, David Lentz, and Michael Walker.  (Dkt. 1.)

Ultimately, this case concerns the Federal Government's ability to administer a national student-loan program, to define the terms according to which it lends money, and to regulate and oversee the servicers it has chosen. Dawson is seeking to use state law to second-guess the Department and to impose her vision of how her loans should be serviced on top of—and in contradiction to—what the Department has directed, in a case in which Dawson and the class have already received all the balance adjustments or refund checks to which they were entitled. The plaintiff, in pursuing her claims for RICO violations and state-law negligence (and negligent misrepresentation), has requested and received hundreds of thousands of pages of documents from Great Lakes, deposed Department officials and Great Lakes employees and corporate representatives, filed two motions for class certification, obtained an order certifying a class as to liability only, and litigated numerous discovery disputes. Those efforts have not produced evidence that merit taking her case to trial. The Court should enter summary judgment in favor of Great Lakes for the following reasons.

*First*, the doctrines of conflict preemption, intergovernmental immunity, and *Yearsley* immunity prohibit States, including plaintiffs using state common-law claims, from imposing liability on a government contractor. Congress enacted the Higher Education Act (the "HEA"), 20 U.S.C. §§ 1001-1155, and its subsequent amendments to increase access to student loans and to streamline the administration of student-loan programs. To that end, it empowered the Department to contract with third-party loan

servicers, and it directed the Department to ensure that these programs are administered uniformly.  The Department has promulgated regulations and implemented a system of checks and balances to oversee and manage the performance of its servicers.  Subjecting them to tort liability, as the plaintiff seeks to do here with Great Lakes, despite the Department's determination that they have complied with its directives or remedied their mistakes, would fundamentally interfere with the Federal Government's ability to regulate its contractors uniformly throughout the country.  Simply stated, the plaintiff is not entitled to use state-law tort claims to interfere with the Department's efforts to oversee and to direct its student-loan servicers as they carry out its delegated functions. (*See infra* Part I.)

*Second*, the plaintiff has failed to plead a plausible claim under subsections § 1962(b)-(d) of RICO, and her efforts to unearth evidence for such a claim in the last four years have been singularly unsuccessful.  Her pleading was premised on a supposed scheme by Great Lakes to conceal improper capping practices following B-9 Forbearances, which she hoped to establish based on changes to a sentence describing forbearance capping in certain "control reports."  Great Lakes did not move to dismiss this count in 2015 when the complaint was filed.  It focused on identifying and fixing, first, the technical problems with its programming that were causing certain unintended sums to be capitalized and then on complying with the Department's later guidance regarding B-9 Forbearance capitalization.  Great Lakes' remediation efforts

3

have greatly changed the landscape of this case. The Court recognized at class certification that "major questions remain[ed]" concerning whether the plaintiff "could plausibly prove a RICO claim on the merits of this case." (Dkt. 171 at 18.) Yet Dawson has done nothing to develop her RICO claims or to fix the fundamental flaws in them revealed by her deficient pleadings. Her RICO claims never came close to stating a claim, particularly under Rule 9(b)'s exacting requirements, and they cannot withstand summary judgment, when her allegations are no longer entitled to any *arguendo* presumption of truth. (*See infra* Part II.)

*Third*, and finally, without being able to recover treble damages under the flawed RICO claims, nothing remains for the class to recover in this case. The Department and Great Lakes finished the last of their work related to the remediation of affected borrower accounts nearly a year ago. All account balances have been adjusted; any refunds have been paid. This Court previously refused to certify a class as to damages (*see* Dkt. 171 at 21-22 (noting that "Dawson has left too many questions unanswered to justify certifying damages issues")), and, under longstanding precedent, the voluntary remedy actually provided by the Department and Great Lakes over the last four years has eliminated any injury that might have supported the class's standing to sue and made their claims moot. Put differently, the absence of recoverable damages means that there is no tort claim under Wisconsin law for Dawson or the class, damages being a necessary element of proof to recover on such a claim. (*See infra* Part III.)

4

Ancillary issues, like class counsel's potential entitlement to fees, remain to be resolved.  But nothing remains to be tried, and the case should now be dismissed on its merits.

## STATEMENT OF FACTS

The Court is familiar with the factual background of this case from prior briefing on the motions to certify a class, but the complexity of these facts necessitates a brief recitation of the background and the case's current procedural posture.

Meredith Dawson borrowed $24,250 from the Department, which has entered into contracts with Great Lakes to service some of its loans.  (Dkt. 1.)  In 2015, she sued, alleging that Great Lakes was negligent by improperly capitalizing interest at the end of an administrative-forbearance period.

**1.  Federal Student Loans.** The Federal Government currently holds over $1.4 trillion in student loans.  Federal Student Aid, *Federal Student Loan Portfolio*, https://studentaid.ed.gov/sa/about/data-center/student/portfolio (last accessed June 3, 2019) (Federal Student Aid Portfolio Summary).  The Government's loan portfolio includes a combination of Direct Loans, which the Government itself made, and Federal Family Education Loan Program ("FFELP") loans that the Government purchased pursuant to the Ensuring Continued Access to Student Loans Act ("ECASLA"), Pub. L. No. 110-227, 122 Stat. 740 (2008) (codified at various provisions of 20 U.S.C; the provision enabling loan purchases is at 20 U.S.C. § 1087i-1).  For all federally held loans,

the Government is the creator, lender, regulator, and procurer of servicing activities. There are also commercial FFELP loans—which are held by lenders and guaranteed by FFELP guarantors and in turn guaranteed by the Government. Even for commercial FFELP loans, the Government has a considerable role and interest. It created FFELP and regulates and stands as the inchoate lender ultimately responsible for borrower obligations if they do not repay.

**2. Student-Loan Servicing.** Great Lakes has no contractual relationship with Dawson or any borrower. (Dkt. 171 at 3.) It is a Government contractor, the Department's agent in servicing borrowers' accounts. (*Id.*) The Department, not Great Lakes, owns Dawson's debt obligations, and Dawson's payments go to the Department, not Great Lakes. (*Id.*) As the Department's agent, Great Lakes is bound by the HEA, the Department's regulations, its contract with the Department, and sub-regulatory guidance and other direction from the Department. (*See infra* Part I.A.)

**3. Capitalization of Interest.** "Capitalization" is the practice of converting unpaid accrued interest into principal, upon which future interest will accrue. The Department's regulations provide: "The Secretary may add unpaid accrued interest to the borrower's unpaid principal balance. This increase in the principal balance of a loan is called 'capitalization.'" 34 C.F.R. § 685.202(b). Under 34 C.F.R. § 685.205(a), the general rule is that interest that accrues during a forbearance shall be capitalized: "[I]f payments of interest are forborne, they are capitalized."

6

**4. Forbearances.** "Forbearance" is a loan status that temporarily halts a borrower's repayment obligation, although interest continues to accrue. Borrowers may qualify for dozens of different types of forbearances—the majority of which are "cappable," meaning that interest accrued during a forbearance is capitalized to the borrower's principal balance at the end of the forbearance. (*See* Dkt. 66-3, Ex. C to Kielhofer Decl. (identifying 33 different types of forbearances).)

**5. B-9 Forbearances.** A "B-9" Forbearance is one type of forbearance available for federal student loan borrowers. A borrower may become eligible for a B-9 Forbearance by requesting:

(a)   A deferment;

(b)   A forbearance that requires supporting documentation from the borrower;

(c)   A change in repayment plan that requires documentation; or

(d)   A loan consolidation.

Unlike all other forbearances, both 34 C.F.R. § 682.211(f)(11) (which is applicable to FFEL loans) and 34 C.F.R. § 685.205(b)(9) (which is applicable to Direct Loans) state that "[i]nterest that accrues *during* this period is not capitalized." (Emphasis added).

**6. Dawson's Complaint.** Dawson's complaint was filed on July 31, 2015. (Dkt. 1.) She became aware of a potential class-action lawsuit after a co-worker (brother-in-law of one of the class counsel) asked her workplace whether anyone had a

student loan serviced by Great Lakes.  (Ex. A, Dawson Tr. at 12:15-15:17.)[2]  Dawson never asked Great Lakes about interest capitalization before filing.  (*Id*. at 125:1-15.)

Dawson's complaint alleged that Great Lakes' servicing system had been programmed to capitalize all outstanding interest at the end of B-9 Forbearances and that in 2011 Great Lakes had recognized that it was not authorized to do this but chose to "conceal" its capitalization practices from the Department.  (Dkt. 1, ¶¶ 19-22.)  Dawson asserted that Great Lakes' motive was to avoid adverse action by the Department, like transferring borrower accounts away from Great Lakes or demanding that it return fees it had received.  (*Id.*, ¶¶ 27-28.)

**7. Great Lakes' First Remediation Project.**  Promptly after suit was filed, Great Lakes investigated its B-9 Forbearance capitalization practices.  As Great Lakes disclosed in its October 2015 answer (Dkt. 24), its investigation uncovered two programming errors—*not* raised in the complaint—in how it was capitalizing interest following B-9 Forbearance periods.

First, Great Lakes discovered a problem with the order in which its software was applying payments made during B-9 Forbearances to outstanding interest balances. (Dkt. 24, ¶¶ 114-120.)  Second, Great Lakes learned that its systems had been incorrectly programmed to count the B-9 Forbearance *to* day 60, rather than *through* day 60, in effect

---

[2] References to Ex.__ are to the exhibits attached to the transmittal declaration of Eric Pearson, submitted with this brief.

shortening the period by one day and causing one additional day's worth of interest to be capitalized.  (*Id.*, ¶ 121.)

Upon discovering these two programming errors, Great Lakes prepared to correct them and fully remedy their consequences for affected borrowers' accounts (the "First Remediation Project").  (*Id.*, ¶ 127; Dkt. 66, Kielhofer Decl., ¶¶ 27-32.)  By July 2016, Great Lakes had (1) developed a Department-approved plan to remedy both issues; (2) fixed both errors; and (3) either adjusted affected borrowers' account balances (for loans that remained outstanding) or issued a refund check to the (112) borrowers who had paid off their accounts in full.  (Dkt. 66, ¶¶ 28-39.)  On November 9, 2015, Great Lakes notified Dawson's counsel of the corrections it had made to her account.  (Ex. B, Adjustment Confirmation Letter to Plaintiff.)

**8.  Great Lakes' Second Remediation Project.**  Later, during briefing on Dawson's first motion for class certification, a legal dispute arose as to whether *any* interest could be capitalized at the end of a B-9 Forbearance.  Dawson took the position in her motion that the allegations in her complaint concerned both the interest accrued *during* a B-9 Forbearance and the interest accrued *before* a B-9 Forbearance, such that no interest should have been capitalized at the end of her B-9 Forbearance.  The applicable regulations provide scant guidance.  *In their entirety*, they state:  "Interest that accrues *during this period* [*viz.*, a B-9 Forbearance] is not capitalized."  34 C.F.R. § 685.205(b)(9) (emphasis added); 34 C.F.R. § 682.211(f)(11) (emphasis added).

9

Great Lakes had understood this language to mean that, while interest that accrued *during* a B-9 Forbearance could never be capitalized, interest that had accrued *before* such a period began should be capitalized at its end.  (Dkt. 65 at 53-54.)  To confirm its understanding of the regulations, Great Lakes contacted the Department in August 2016.  (Dkt. 83-2, Brown Decl., ¶¶ 6-12.)

In the ensuing communications, a Department official told Great Lakes that neither Great Lakes' nor Dawson's interpretations were correct.  Instead, the official said that pre-forbearance accrued interest could be capitalized at the end of *some* B-9 Forbearances ("back-to-back" ones in which another forbearance or deferment period immediately preceded a B-9 Forbearance), but not at the end of "stand-alone" B-9 Forbearances, because the Department did not consider the latter to be capitalization "events."  (Dkt. 83-5, Ex. C to Brown Decl.)

Great Lakes was surprised by this distinction between stand-alone and back-to-back forbearances and requested further clarification and confirmation that this interpretation was truly that of the Department.  (Dkt. 83-2, ¶¶ 8-9; Dkt. 83-8, Ex. F to Brown Decl.)  Given the significance of this correspondence, Great Lakes filed a supplemental notice with the Court, while Dawson's first motion for class certification was pending, disclosing the informal guidance received and that it was preparing for the possibility that the Department "might direct the defendants to remove all capitalizations of pre-forbearance accrued interest applied at the end of B-9

10

Forbearances that were not preceded by a capping forbearance or deferment"—*i.e.*, stand-alone forbearances.  (Dkt. 83-1 at 2-4; *see also* Dkt. 83-2, ¶ 11.)

When this Court denied the first motion for class certification on September 28, 2016, it found that "the regulations do not make it clear whether the conclusion of a B-9 Forbearance qualifies as a 'triggering event' for purposes of capitalizing the interest that accrued *prior* to the forbearance."  (Dkt. 85 at 3 (emphasis in original).)

Clarification from the Department did not come until January 2017, when, with the renewed motion for class certification pending, the Department directed Great Lakes to prepare a plan to remove all capitalizations that had occurred after stand-alone forbearances.  (Dkt. 133, Kielhofer Decl.)  The process that the Department ultimately directed Great Lakes to use was time-intensive.  (*Id.*, ¶¶ 9-10.)  It required backing off all transactions on a borrower's account to the date of the earliest capitalization transaction at issue, removing that transaction, and reapplying all subsequent transactions in the same order.  Great Lakes took the additional step of manually reviewing a substantial number of the adjusted accounts to confirm that no irregularities had occurred.  On August 10, 2017, the Department directed Great Lakes to reverse all capitalization transactions that had taken place at the end of stand-alone forbearances.  Great Lakes did so, executing the proposed "Second Remediation Project" (Dkt. 165, Kielhofer Decl., ¶¶ 9-19; Dkt. 165-3, Ex. C to Kielhofer Decl.), which it completed by August 30, 2018 (Ex. C, Lapham Decl. ¶ 3.).

11

## ARGUMENT

### I. THE PLAINTIFFS' STATE-LAW CLAIMS ARE BARRED UNDER THE DOCTRINES OF CONFLICT PREEMPTION, INTERGOVERNMENTAL IMMUNITY, AND *YEARSLEY* IMMUNITY.

Because "the Laws of the United States … shall be the supreme Law of the Land," Const., Art. VI, cl. 2, state law that is incompatible with federal law must yield. *See Armstrong v. Exceptional Child Ctr., Inc.*, 135 S. Ct.  1378, 1383 (2015) (explaining that the Supremacy Clause "creates a rule of decision" that courts "must not give effect to state laws that conflict with federal laws"); *New West, L.P. v. City of Joliet*, 491 F.3d 717, 719 (7th Cir. 2007) (Supremacy Clause "provides that national law prevails over state and local law in the event of conflict"). Federal law can preempt both statutory and common law, including (as here) tort law.  *See, e.g.*, *Purcell v. Bank of Am.*, 659 F.3d 622, 624 (7th Cir. 2011) ("[A] federal statute preempts state common law to the same extent as it preempts state statutory law." (citing *PLIVA, Inc. v. Mensing*, 546 U.S. 604 (2011))).

This fundamental principle finds expression in several different preemption and immunity doctrines, at least three of which are applicable here and require dismissal of Dawson's tort claims.  First, under the doctrine of conflict preemption, state law is preempted to the extent that it interferes with the objectives of the HEA and the methods that Congress has chosen to accomplish those objectives.  Second, the doctrine of intergovernmental immunity prohibits the States from regulating the Federal Government through interfering with its contractors.  Finally, under *Yearsley v. W.A.*

*Ross Constr. Co.*, 309 U.S. 18 (1940), a contractor cannot be held liable under state law for conduct undertaken at the direction of the Federal Government.

> **A.    The HEA Preempts State Law That Would Impose Liability on Great Lakes Despite Its Compliance with Department Directives.**

"A fundamental principle of the Constitution is that Congress has the power to preempt state law." *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372 (2000) (citing Art. VI, cl. 2). It may do so expressly, by stating that a particular statute preempts state law, or impliedly, by evincing an intent that federal law "occupy the field" in a particular area or by enacting a statute that conflicts with state law. *Id.* Preemption "is compelled whether Congress' command is explicitly stated in the statute's language or implicitly contained in its structure and purpose." *Gade v. Nat'l Solid Wastes Mgmt. Ass'n*, 505 U.S. 88, 98 (1992) (quoting *Jones v. Rath Packing Co.*, 430 U.S. 519, 525 (1977)). A "federal agency acting within the scope of its congressionally delegated authority" may also preempt state law. *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 369 (1986); *see also Lynnbrook Farms v. Smithkline Beecham Corp.*, 79 F.3d 620, 623 (7th Cir. 1996) ("The 'Laws of the United States' encompasses both federal statutes and statutorily authorized federal agency regulations."). Whether an agency's directives conflict with state law is a question of law to be decided by a judge rather than a jury. *See Merck Sharp & Dohme Corp. v. Albrecht*, No. 17-290, slip op. at 15 (U.S. May 20, 2019).

At issue here is a type of conflict preemption sometimes referred to as "obstacle preemption," which occurs when state law "stands as an obstacle to the

accomplishment and execution of the full purposes and objectives of Congress." *Crosby*, 530 U.S. at 372-73.  What constitutes an obstacle "is a matter of judgment, to be informed by examining the federal statute as a whole and identifying its purpose and intended effects." *Id.* at 373 (quoting *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941)).

In making this determination, "it is not enough to say that the ultimate goal of both federal and state law is the same.  A state law also is pre-empted if it interferes with the methods by which the federal statute was designed to reach th[at] goal." *Gade*, 505 U.S. at 103 (quoting *Int'l Paper Co. v. Oullette*, 479 U.S. 481, 494 (1987)) (citations omitted); *see also Student Loan Servicing Alliance v. District of Columbia*, 351 F. Supp. 3d 26, 60 (D.D.C. 2018) (hereafter "SLSA") ("[T]he Supreme Court 'has recognized that a conflict in technique'—such as a conflict in the method of enforcement—'can be fully as disruptive to the system Congress erected as a conflict in overt policy.'" (quoting *Arizona v. United States*, 567 U.S. 387, 406 (2012))).  When a statute implicates "uniquely federal interests," the conflict between federal and state law "need not be as sharp" as what is ordinarily required.  *Boyle v. United Techs. Corp.*, 487 U.S. 500, 504, 507-08 (1988).  Applying these principles, the Supreme Court held in *Leslie Miller, Inc. v. Arkansas*, 352 U.S. 187, 189-90 (1956), that conflict preemption applies where state law interferes with the federal government's ability to choose its preferred contractors.  Since *Leslie Miller*, "[c]ourts have consistently held that any state law that impedes the [F]ederal

[G]overnment's ability to contract … [is] preempted." *SLSA*, 351 F. Supp. 3d at 62 (collecting cases).

In enacting the HEA, Congress' stated objectives were to increase access to student loans and to streamline the administration of student-loan programs. To that end, it empowered the Department to contract with third-party loan servicers in the administration of the FFEL and Direct Loan programs, and it directed the Department to ensure that these programs were administered uniformly. Pursuant to its statutory authority, the Department has promulgated regulations and implemented a system of checks and balances to oversee and manage the performance of the servicers with which it contracts. Subjecting these servicers to tort liability, as Dawson seeks to do, despite the Department's determination that they have complied with its directives, would fundamentally interfere with the Federal Government's ability to create and administer a national student-loan program, to define the terms according to which it lends money, and to select and oversee its contractors. Dawson's tort claims are thus preempted and should be dismissed.

## 1.    Purposes and Objectives of the HEA

Congress articulated a number of objectives in enacting the FFEL and Direct Loan programs, all of which relate to the overarching goals of increasing access to student loans and streamlining the administration of student-loan programs. The stated purposes of the FFEL program are to encourage the establishment of state and

private loan-insurance programs, to guarantee a portion of the interest on loans insured by these programs, to provide a federal program of student-loan insurance, and to pay a portion of the interest on loans to qualified students. 20 U.S.C. § 1071(a)(1). Each of these measures aims to increase access to student loans by encouraging lending. *See Chae v. SLM Corp.*, 593 F.3d 936, 943-44 (9th Cir. 2010) ("By covering student loans with layers of insurance and guarantees, Congress encourages private lenders to help fund higher education.").

Through creation of the Direct Loan program, Congress intended to simplify and streamline the administration of student-loan programs at the federal level. *See* 139 Cong. Rec. S5628 (daily ed. May 6, 1993); *see also* DOED Notice, Federal Preemption and State Regulation of the Department of Education's Federal Student Loan Programs and Federal Student Loan Servicers, 83 Fed. Reg. 10619, 10619 (Mar. 12, 2018) (hereafter "DOED Notice") (describing the purposes of the Direct Loan program as "simplifying the delivery of student loans to borrowers, eliminating borrower confusion, avoiding unnecessary costs to taxpayers, and creating a more streamlined student loan program that could be managed at the [f]ederal level"). To that end, the Direct Loan program eliminates the role of private lenders: "Under the program, the Federal [G]overnment is the direct lender to the borrower and is responsible for all aspects of the lending process from loan origination through repayment, including the proper servicing and collection of the loan." DOED Notice, 83 Fed. Reg. at 10620.

16

To accomplish these objectives, the HEA empowers the Secretary of Education to procure and oversee the conduct of third-party loan servicers under both the FFEL and Direct Loan programs.  With respect to the FFEL program, the Act calls for the Secretary to promulgate "regulations applicable to third party servicers," including regulations concerning "the assessment of liabilities for program violations."  20 U.S.C. § 1082(a)(1).  The Federal Government has a strong interest in ensuring that its regulations are uniformly applied and enforced, beyond just its legislative and administrative authority; it either itself holds or (by virtue of its guaranties) serves as the inchoate lender for all FFELP loans.   The Act further directs the Department to prescribe "standardized forms and procedures" governing all aspects of the FFEL program, including loan servicing.  20 U.S.C. §1082(l)(1).  These "instructions to the DOE on how to implement the student-loan statutes carry this unmistakable command:  Establish a set of rules that will apply across the board."  *Chae*, 593 F.3d at 943-44.

With respect to the Direct Loan program and Department-held FFELP loans, the Act directs the Secretary to award contracts for origination, servicing, and collection of loans, *see* 20 U.S.C. §§ 1087f, 1087i-1, and to ensure that these loans "shall have the same terms, conditions, and benefits, and be available in the same amounts, as loans made to borrowers under [the FFEL program]," 20 U.S.C. § 1087e(a)(1).  As the Department explained in its interpretive guidance issued early last year, these directives reflect Congress' intent to create "a program in which servicing would be 'provided at

competitive prices' by entities 'selected by and responsible to the Department of Education.'"  DOED Notice, 83 Fed. Reg. at 10620 (quoting 20 U.S.C. § 1087f(a)(1) and H.R. Rep. No. 103-11, at 107 (1993)).

### 2.    The Department's Oversight of Servicers

Invoking its statutory authority, the Department has promulgated comprehensive regulations governing all aspects of the FFEL and Direct Loan programs, including servicing of loans.  *See generally* 34 C.F.R. Subpt. B, Ch. VI, Pts. 682 & 685.  The terms of the Department's contracts with its servicers supplement these regulations as they relate to the Direct Loan program.  *See* DOED Notice, 83 Fed. Reg. at 10620 (explaining that "the Department's contracts with loan servicers further specify the program's rules and requirements").  As the United States recently emphasized in filing a statement of interest in another case seeking to impose liability on student-loan servicers, these contracts are voluminous and include detailed provisions governing the servicer's "financial controls, internal monitoring, communications with borrowers, and many other topics."  (Ex. D, Statement of Interest by the United States at 5.)  In all events, as the Department has underscored in interpretive guidance, "the servicing of Direct Loans is an area 'involving uniquely [f]ederal interests' that must be 'governed exclusively by [f]ederal law.'"  DOED Notice, 83 Fed. Reg. at 10619 (quoting *Boyle*, 487 U.S. at 504).

18

To manage its servicers' performance under their contracts and the HEA's implementing regulations, the Department uses a number of different processes and procedures, three of which are especially relevant here.

### a.    Change Requests

First, the Department periodically issues "change requests," which are essentially memoranda that ask servicers to implement a new program or to change some aspect of their operations.  *See id.* at 10620.  (*See also* Dkt. 66, Kielhofer Decl., ¶ 22 (describing change requests).)  A change request is the first step in a process through which the Department asks servicers to analyze the requested changes to their operations, identify any issues associated with those changes, and provide an estimate of how much it will cost and how long it will take to implement those changes.  (Dkt. 66, ¶ 22.)  Depending on the complexity of the change, this process may take months or even years.  (*Id.*)

At the end of the process, the Department confirms that servicers have properly implemented the requested operational changes by collecting validation artifacts and conducting "walkthroughs."  (Ex. E, Brown Decl., ¶¶ 4-5.)  The validation artifacts comprise data sets from affected borrower accounts, which the Department reviews. (*Id.*)  The specific artifacts that a servicer must submit for each change request are typically outlined in the request itself.  (*See, e.g.,* Ex. G, CR 2785 at 9.)  After a servicer submits the required validation artifacts, the Department may seek additional information and data as necessary to confirm proper implementation.  (Ex. E, ¶ 5.)  A

19

"walkthrough" entails a meeting of representatives of the Department's Office of Federal Student Aid ("FSA"), the servicer, and various subject matter experts during which the servicer "walks through" test scenarios using data provided by the FSA.  (*Id.*) The FSA uses the walkthrough to confirm that the servicer's coding produces the expected results.  (*Id.*)

### b.    Remediation Projects

A second way in which the Department manages its servicers' performance is through remediation projects.  A remediation project occurs after an error in a servicer's operations is discovered, whether through a formal audit or review, or by the servicer itself.  (*Id.*, ¶ 7.)  The project's purpose is to remediate any borrower accounts that were affected by the error.  (*Id.*)  Both in devising and implementing a plan to remediate the affected accounts, the Department and its servicers work collaboratively.  (*Id.*, ¶¶ 9-10.) For errors discovered through a formal audit or review, the proposed scope and timing of the remediation will be outlined in the final report of the audit or review, to which the servicer will respond with an assessment of the plan's impact.  (*Id.*, ¶ 9.)  When a servicer discovers an error in its operations, the servicer will work with the Department to define the scope and outline the timing of the remediation.  (*Id.*, ¶ 10.)  After conducting a remediation project, a servicer must submit the full population of impacted accounts for review, and the Department tests a sample to confirm that the remediation was properly conducted.  (*Id.*, ¶ 10.)

### c.   Day-to-Day Oversight

Finally, in addition to change requests and remediation projects, the Department also oversees the day-to-day operations of its servicers through FSA.  *See SLSA*, 351 F. Supp. 3d at 39-40.  FSA "audits the servicers and communicates daily with them, maintains a Feedback System, and receives complaints through the FSA Ombudsman Group—a neutral and confidential resource available to borrowers to resolve disputes related to their loans."  *Id.* (internal quotations omitted).  On a bi-weekly basis, FSA holds calls with servicers to discuss any ongoing operational issues and requires servicers to submit a package of reports covering all aspects of their operations.  (Ex. E, ¶ 14.)  On a monthly basis, servicers receive an Operational Services Report, which compiles data about each servicer's portfolio; FSA requires servicers to review these reports for any anomalies among servicers and to report their findings.  (*Id.*, ¶ 15.) Further, FSA is subject to annual audits of its financial statements, which requires the participation of its student-loan servicers, because student-loan account balances appear as part of accounts receivable on the balance sheet of FSA.  (*Id.*, ¶ 22.)

### 3.   Great Lakes' Compliance with Department Directives

On no fewer than five occasions, the Department expressly approved Great Lakes' efforts to comply with its directives regarding interest capitalization following a B-9 Forbearance period, including times during which Great Lakes' system was

programmed to capitalize eligible accrued interest at the conclusion of a B-9 Forbearance period.

The first of these occasions was in 2012, shortly after the promulgation of CR 1492, a change request issued by the Department "as clarification on Interest Capitalization Practices," whose purpose was to "standardize the interest capitalization events across all ED servicers." (Ex. F at 1.)  Great Lakes reviewed the requirements of the change request and then, in accordance with the Department's directives, submitted an impact analysis describing the changes that it would have to undertake to comply with the change request. (Ex. I, CR 1492 Impact Analysis.)  After making the necessary changes to its systems, Great Lakes submitted validation artifacts showing its implementation of the changes that it understood were required by CR 1492. (Ex. E, ¶ 23.)  The Department approved both, even though it would have been apparent to the Department that Great Lakes was continuing to capitalize interest at the conclusion of stand-alone B-9 Forbearance periods. (*Id.*)

Similarly in 2014, the Department issued CR 2785, to "provide[] clarification" and "seek[] confirmation from all servicers" regarding the requirements of CR 1492. (Ex. G at 1 ("In FY 2012, each federal loan servicer implemented the appropriate system enhancement to comply with [CR 1492]. … This change control provides clarification (and seeks confirmation from all servicers) on the proper interpretation of [one of CR 1492's requirements].").)  When Great Lakes submitted its impact analysis

describing the operational changes that it would have to undertake to comply with CR 2785, and when Great Lakes submitted validation artifacts showing its implementation of those changes (Ex. J, CR 2785 Impact Analysis; Ex. E, ¶ 24), the Department again approved both (Ex. E, ¶ 24).

Great Lakes is also subject to oversight and regular audit by FSA's Financial Institution Oversight Service Group ("FIOSG"). *U.S. Department of Education Principal Office Functional Statements* (Nov. 25, 2016), https://www2.ed.gov/about/offices/list/om/fs_po/fsa/program.html#fiog. FIOSG regularly "[c]onducts risk assessment[s]" and "comprehensive and/or focused program reviews of … servicers" as part of its responsibility "for administering a program of oversight of … servicers participating in the Department['s FFEL] Program." *Id.*[3]

And specifically in January 2016, FIOSG undertook a program review of Great Lakes' operations for the period beginning January 1, 2015 and ending October 31, 2016 "to determine whether Great Lakes['] loan servicing [was] in compliance with applicable federal law and requirements … described in FFEL Program and Direct Loan

---

[3] The Northern Division of FIOSG, in Great Lakes' case, has the following responsibilities (among others) with respect to its oversight of its principal (called "Title IV") servicers:  (1) "[M]onitor[ing] … servicers to obtain early warning and/or confirmation of issues related to program compliance and financial stability." (2) "Evaluat[ing] and act[ing] upon the findings, conclusions, and recommendations produced by audit resolution." (3) "Determin[ing] liabilities and/or recommend[ing] fines." (4) "Work[ing] closely with or referr[ing] matters to Office of Inspector General and the FSA Enforcement office."  *U.S. Department of Education Principal Office Functional Statements* (Nov. 25, 2016), https://www2.ed.gov/about/offices/list/om/fs_po/fsa/program.html#fiog.

23

Program regulations, 34 C.F.R. parts 682 and 685, respectively." (Ex. K, FSA Internal

Review Report at 3.)  As part of that program review, FIOSG selected for testing the

processes and procedures around forbearances.  (*Id.*)  FIOSG interviewed Great Lakes'

"Manager of Borrower Accounts Transitions and the Manager of Borrower Accounts to

determine Great Lakes' processes and procedures," and it then reviewed "a random

sample selected from NSLDS [the National Student Loan Data System]" consisting

entirely of loans that "had been in forbearance at some point during the scope period."

(*Id.* at 7.)  FIOSG tested that sample to determine whether, among other issues,

"[f]orbearances were processed to ensure interest accrued during this period is not

capitalized."  It determined that, "[i]n each case … , outstanding interest was not

capitalized" and that "[t]here were no issues identified for this area."  (*Id.* at 7-8.)  In

fact, FIOSG appears to have been operating under the same understanding as Great

Lakes at this time with respect to the proper capitalization of pre-forbearance interest.

It noted in its report that "[i]nterest that accrues *during* [a B-9 Forbearance] is not

capitalized" and made no further mention of the capitalization events that would have

been occurring on these accounts—and that it would have reviewed as part of its

sample—for pre-forbearance interest.  (*Id.* at 8 (emphasis added).)

 Finally, in 2016 and 2017, the Department expressly approved the remediation

projects that Great Lakes undertook after discovering through this litigation certain

errors in its capitalization practices.  With respect to the First Remediation, the

Department asked for, and Great Lakes provided, data containing transaction-level detail for the remediated borrower accounts.  (Dkt. 83-2, Brown Decl., ¶ 3.)  The Department sampled and reviewed the transactions on those accounts, which would have included accounts with capitalization events following B-9 Forbearance periods, and, on August 5, 2016, a Department employee confirmed that these accounts "didn't indicate any issues" and that "the remediation was appropriate."  (Dkt. 83-4, Ex. B to Brown Decl.)  With respect to the Second Remediation, Great Lakes carried out that project at the Department's direction and with its express approval.  (Dkt. 165, Kielhofer Decl, ¶¶ 8-11.)

Based on the Department's regular review and approval of its operations, Great Lakes believed that it was fully complying with the Department's directives regarding interest capitalization following a B-9 Forbearance period.  When the Department clarified its directives in August 2016, and Great Lakes learned that its practices were inconsistent with what the Department had intended, it worked with the Department to remediate all affected borrower accounts.

### 4.    Dawson's Claims

Despite Great Lakes' compliance with the Department's directives, Dawson alleges that Great Lakes' acted negligently with respect to its interest-capitalization practices.  (Dkt. 1, ¶¶ 89-96.)  Allowing Dawson to pursue her tort claims would directly conflict with the HEA in at least two respects.  First, by second-guessing the

Department's decisions, Dawson's claims would interfere with the Department's delegated authority to regulate the servicers with which it contracts.  Second, by seeking to impose liability on Great Lakes based on conduct that it undertook at the Department's direction, her claims threaten to impede the Department's efforts to exercise its administrative and procurement authority in accordance with Congress' intent.  Two recent decisions illustrate these points.

In *SLSA*, the D.C. district court enjoined enforcement of the District of Columbia's licensing requirements for servicers of FFEL and Direct Loan programs on the ground that the requirements were preempted by the HEA.  351 F. Supp. 3d at 75-76.  The court explained that enforcement of the District of Columbia's regulations could result in a servicer's being deemed unqualified to operate in D.C. despite the Department's decision to contract with that servicer after evaluating its qualification under applicable federal law and regulations.  *Id.* at 63.  Moreover, even if the District of Columbia were to reach the same conclusion as the Department regarding a particular servicer's qualifications, its mere participation in the process "would not only thwart the [F]ederal [G]overnment's general contracting discretion protected under *Leslie Miller*, but it would directly conflict with the HEA's explicit delegation to [the Department] to make that assessment."  *Id.*  Citing Congress' clear delegation of authority to the Department to contract with servicers under the FFEL and Direct Loan programs, the court concluded that "allowing a state to impose separate, and

potentially conflicting, contracting requirements would nullify that provision." *Id.* at 65.

Likewise here, the Department actively manages the performance of servicers pursuant to an explicit statutory delegation of authority. Through the various processes and procedures that it has established to carry out this function, the Department reviewed Great Lakes' processes and repeatedly concluded that Great Lakes' interest-capitalization practices complied with its obligations under the implementing regulations of the HEA and the terms of its contract with the Department. Subjecting Great Lakes to tort liability arising out of these same practices would effectively nullify this determination and would directly conflict with the Department's delegated oversight authority and direction to its servicers regarding the handling of its loans and borrowers. For this reason, Dawson's tort claims are preempted by the HEA and should be dismissed.

The second decision that is instructive is *Chae*, a case involving FFELP loans, in which the Ninth Circuit held that the HEA preempted claims brought under California law. 593 F.3d at 951. The plaintiffs were borrowers who had obtained loans under the FFEL program. *Id.* at 940. They challenged their lender's methods for calculating interest, assessing late fees, and setting repayment dates, alleging that the lender's methods, though compliant with the FFEL program's implementing regulations, violated the lender's contracts with borrowers and California's consumer-protection

27

laws. *Id.* at 940-41. The Ninth Circuit dismissed the borrowers' claims on the ground that they were preempted. *Id.* at 951. The court reasoned that subjecting lenders to exposure "under fifty separate sets of laws and court systems" would impair the uniform administration of the FFEL program and thereby threaten the programs' efficacy. *Id.* at 945 (citation omitted).

Dawson's claims likewise threaten to "impair the uniform administration" of the FFEL and Direct Loan programs by interfering with the processes and procedures that the Department uses to achieve uniformity. Through its issuance of change requests, the Department recognizes that its regulations may be subject to different interpretations by different servicers. Both CR 1492 and CR 2785 illustrate this point: The Department issued the former to "standardize the interest capitalization events across all ED servicers," while the latter "provide[d] clarification (and [sought] confirmation from all servicers) on the proper interpretation" of certain requirements of CR 1492. (Ex. F, G.) The Department works collaboratively with its servicers to resolve these differences, asking them to identify and correct areas of non-compliance through impact analyses. These efforts would be seriously compromised if servicers like Great Lakes were subject to liability under state law (and potentially multiple states' laws) for

conduct undertaken in response to a change request or other directive from the Department.[4]

Neither the Fourth Circuit's decision in *College Loan Corp. v. SLM Corp.*, 396 F.3d 588 (4th Cir. 2005), nor the Seventh Circuit's decision in *Bible v. United Student Aid Funds, Inc.*, 799 F.3d 633 (7th Cir. 2015), is to the contrary. *College Loan* involved state-law claims asserted by one lender against another, a relationship that the Fourth Circuit

---

[4] This argument also applies to the between 8,000 and 11,500 members of the class who have commercial FFELP loans that are not serviced pursuant to federal contracts.  (Ex. C, Lapham Decl., ¶ 5.)  As the Ninth Circuit explained in *Chae*, FFELP's "statutory design, its detailed provisions … , and its focus on the relationship between borrowers and lenders persuade us that Congress intended to subject FFELP participants to uniform federal law and regulations." 593 F.3d at 945, 947 (emphasis added).  That desire for uniformity across loan types, as *Chae* held, militates against state regulation by the "potentially conflicting standards of fifty states," because inconsistencies might "stand as a severe obstacle to the effective promotion of the funding of student loans."  *Id.* at 950.  As a result, *Chae* determined that state-law claims concerning FFELP loans were preempted.  *Id.* at 947-49; *see also* DOED Notice, 83 Fed. Reg. at 10620 (expressing the Department's view "that State regulation of the servicing of [FFELP] is preempted to the extent that it undermines uniform administration of the program").  The court in *SLSA* likewise recognized that state law may be preempted to the extent that it impairs uniform administration of the FFEL program, including commercial FFEL loans, by interfering with "*how* [servicers] service student loans."  351 F. Supp. 3d at 70 (emphasis in original).  In concluding that the D.C. licensing provision before it was not preempted with respect to commercial FFEL loans, the court emphasized that the provision governed only "*who* may service student loans."  *Id.* (emphasis in original).  The result might have been different, it suggested, if the provision affected the "mechanics of loan repayment"—that is, "the methods for calculating interest, assessing late fees, and setting repayment dates … ."  *Id.*

This case underscores the need for uniformity.  A contrary result would mean not only that similarly situated borrowers would be treated differently depending on what type of loans they happen to have, but also that borrowers with multiple types of loans would have different loans treated differently.  Such disparity would occur despite the fact that both FFELP and Direct Loans are subject to the same basic statutory and regulatory framework and despite the fact that the Federal Government regulates and has a strong financial interest in both (either as an immediate or inchoate lender).  That would be an untenable result.

described as having no bearing on any of the HEA's objectives.  396 F.3d at 597.  In this

specific context, the court held that the lender's claims were not preempted by the HEA

because they did not threaten to interfere with any of the HEA's objectives.  *See id.*

("Importantly, neither the district court nor the parties have explained how these

statutory purposes would be compromised by a lender, such as College Loan, pursuing

breach of contract or tort claims against other lenders or servicers." (citing 20 U.S.C.

§ 1070(a)(1)).

Unlike *College Loan*, the case here involves claims by a borrower against a

servicer that implicate the HEA's central purposes.  As the court in *SLSA* recently

explained, such claims threaten to "obstruct borrowers' access to federal student loans

by creating variations in the core aspects of the servicing of their loans—the methods

for calculating interest, assessing late fees, and setting repayment dates."  351 F. Supp.

3d at 70 (citing *Chae*).  The Department has likewise recently stated that "the servicing

of Direct Loans is an area 'involving uniquely Federal interests' that must be 'governed

exclusively by [f]ederal law.'"  DOED Notice, 38 Fed. Reg. at 10619 (quoting *Boyle*, 487

U.S. at 504).  Because Dawson's tort claims would interfere with the HEA's core

objectives, they are preempted and should be dismissed.

The Seventh Circuit's decision in *Bible* likewise dealt with a very different

relationship between the parties to the suit than the one here.  In *Bible*, the plaintiff was

a borrower who asserted a breach-of-contract claim against the guarantor of her loan on

30

the ground that the guarantor had assessed collection costs against her that were not authorized by the terms of the parties' loan contract. 799 F.3d at 638. The contract terms at issue were certain of the HEA's implementing regulations, which the contract incorporated by reference. *Id.* In this context, the court held that the plaintiff's breach-of-contract claim was not preempted because it did not conflict with either the HEA or its implementing regulations. *Id.* at 652-53. The court explained: "In this situation, federal law simply provides the standard of compliance, and the parties' duties are actually enforced under state law." *Id.* at 653. The court distinguished *Chae* on the ground that the plaintiff in that case was "attempting to require more of the defendant than was already required by the HEA and its regulations," whereas the plaintiff in *Bible* sought "only to enforce the federal standards that the parties agreed to in their contracts." *Id.* at 654. But it was key to the decision that the parties' contract voluntarily agreed to abide by those rules.

Unlike the plaintiff in *Bible*, Dawson has no contractual relationship with Great Lakes, while her claim that Great Lakes breached its duty of care conflicts directly with the Department's determination that Great Lakes has satisfied its obligations under the terms of its contract *with the Department*. In this regard, Dawson is like the plaintiffs in *Chae* who "d[id] not seek to buttress the FFELP framework, but rather to alter it in their home state." 593 F.3d at 946. Like the claims in *Chae*, Dawson's state-law tort claims are preempted and should be dismissed.

31

B.   **Intergovernmental Immunity Prohibits the Use of State Law to Regulate How Great Lakes Performs Under Its Contract with the Department.**

Also founded in the Supremacy Clause, the doctrine of intergovernmental immunity prohibits the States from (1) regulating the United States directly or (2) discriminating against the Federal Government or those with whom it deals. *North Dakota v. United States*, 495 U.S. 423, 435 (1990). The doctrine affords the Government a baseline level of protection against State interference that applies even without an affirmative congressional command. *See SLSA*, 351 F. Supp. 3d at 46 (citing *North Dakota*, 495 U.S. at 435, 442 & n.7); *see also Don't Tear It Down, Inc. v. Pa. Ave. Dev. Corp.*, 642 F.2d 527, 535 (D.C. Cir. 1980) (explaining that state laws that "substantially impede federal activities" are "presumptively invalid under the Supremacy Clause").

One way in which state law may directly regulate the United States is by interfering with a private contractor's ability to carry out its contractual obligations to the Federal Government. *See Goodyear Atomic Corp. v. Miller*, 486 U.S. 174, 181 (1988); *see also Boeing Co. v. Movassaghi*, 768 F.3d 832, 840 (9th Cir. 2014) (state law "directly interferes with the functions of the [F]ederal [G]overnment" by "mandat[ing] the ways in which [a contractor] renders services that the [F]ederal [G]overnment hired [the contractor] to perform"). Dawson's tort claims do precisely this. Despite the Department's clear direction to Great Lakes about how to fix its borrower accounts, and despite the Department's determination that Great Lakes fully complied with those

directives, Dawson alleges that Great Lakes' conduct amounts to negligence under Wisconsin law, based on her interpretation of the very regulations that the Department applied in giving that direction and making that determination.  The doctrine of intergovernmental immunity requires dismissal of these claims.

The Ninth Circuit's decision in *Boeing* is instructive.  The case involved a California environmental cleanup law covering a parcel of land where the Federal Government had conducted nuclear research and rocket testing.  *Boeing*, 768 F.3d at 834-35.  One of the contractors hired by the Government to conduct the site cleanup challenged the law on the ground that it imposed more stringent cleanup standards than those required by the Government.  *Id.* at 838.  The Ninth Circuit held that the California law "directly interfere[d] with the functions of the [F]ederal [G]overnment" and was, therefore, invalid under the doctrine of intergovernmental immunity.  *Id.* at 840.  The court explained that the law "mandate[d] the ways in which [the contractor] renders services that the [F]ederal [G]overnment hired [the contractor] to perform," thereby "regulat[ing] not only the federal contractor but the effective terms of the federal contract itself."  *Id.*

Here, Dawson's tort claims likewise attempt to mandate how servicers perform under their contracts with the Department by imposing a standard of care beyond that which the Department requires for its own loan program.  As the Ninth Circuit

33

concluded in *Boeing*, this direct regulation of a federal contractor's duties is improper and requires dismissal of Dawson's tort claims.

      **C.**    **Under *Yearsley*, Great Lakes Is Immune from Liability Arising Out of Its Capitalization Practices.**

In *Yearsley*, 309 U.S. at 20-21, the Supreme Court recognized that, under certain circumstances, government contractors enjoy derivative sovereign immunity. Specifically, a contractor is not subject to suit for actions authorized by the Federal Government, provided the authorization was validly conferred. *See id.*; *accord Cunningham v. Gen. Dynamics Info. Tech., Inc.*, 888 F.3d 640, 646 (4th Cir. 2018) ("[U]nder *Yearsley*, a government contractor is not subject to suit if (1) the government authorized the contractor's actions and (2) the government 'validly conferred' that authorization, meaning it acted within its constitutional power." (internal quotation marks omitted)). This immunity derives from "the government's unquestioned need to delegate governmental functions, and the acknowledgement that imposing liability on private agents of the government would directly impede the significant governmental interest in the completion of its work." *Cunningham*, 888 F.3d at 644 (internal quotation marks omitted). It extends to actions taken pursuant to all manner of federal contracts. *See, e.g.*, *Campbell-Ewald Co. v. Gomez*, 136 S. Ct. 663, 673-74 (2016) (discussing availability of derivative immunity under *Yearsley* to a contractor sued for text messages that it sent as part of a Navy recruitment campaign).

*Yearsely* is directly applicable here.  As discussed above (*see supra* at I.A), the Department had the opportunity to review and authorized the interest-capitalization practices about which Dawson complains at a number of different junctures, including when it reviewed and approved Great Lakes' implementation of CR 1492 and CR 2785, and when FIOSG audited Great Lakes' handling of forbearances in 2015.  This authorization was clearly validly conferred, in light of Congress' express delegation of authority to the Department to contract with third-party servicers in administering the FFEL and Direct Loan programs.  *See* 20 U.S.C. § 1087f; *accord Cunningham*, 888 F.3d at 646–47 ("Authorization is 'validly conferred' on a contractor if Congress authorized the government agency to perform a task and empowered the agency to delegate that task to the contractor, provided it was within the power of Congress to grant the authorization." (citing *Yearsley*, 309 U.S. at 20)).  Great Lakes is, therefore, immune from tort liability arising out of its interest-capitalization practices.  For this additional reason, Dawson's tort claims should be dismissed.

## II.   GREAT LAKES IS ENTITLED TO SUMMARY JUDGMENT ON DAWSON'S RICO CLAIMS.

Count I of Dawson's complaint alleges civil RICO violations under 18 U.S.C. § 1962(b)-(c) and conspiracy to violate RICO, but fails to state a RICO claim against any of the defendants.  Her pleading is still premised on Great Lakes' supposed scheme to conceal improper capping practices following B-9 Forbearances, which she tries to establish by homing in on changes to a sentence describing forbearance capping in

successive annual "control reports."  Great Lakes could have moved to dismiss Count I in 2015 when the complaint was filed but chose not to do so then.  Instead, Great Lakes focused on identifying and fixing the technical problems with its systems causing the capitalization problems to occur and then on complying with the Department's later guidance regarding B-9 Forbearance capitalization.  As evidenced by our discussion above (*supra* at Statement of Facts), Great Lakes' remediation efforts have greatly changed the landscape of this case, and it has been years since Dawson has even mentioned control reports.

Yet Dawson has done nothing to develop her RICO claims and has never amended her complaint to come up with a different theory.  The original complaint remains operative, so we explain now why her RICO claims never came close to stating a claim, particularly under Rule 9(b)'s exacting requirements.  It follows that at this stage of the case, when Dawson's allegations are no longer entitled to an analysis which deems them true if plausible, Count I cannot withstand summary judgment.  *Hedberg v. Ind. Bell Tel. Co.*, 47 F.3d 928, 931 (7th Cir. 1995) ("[c]onclusory allegations" insufficient "[to] defeat [summary-judgment] motion" (citing *First Commodity Traders v. Heinold Commodities*, 766 F.2d 1007, 1011 (7th Cir. 1985))); *accord Smith v. Shawnee Library Sys.*, 60 F.3d 317, 320 (7th Cir. 1995) ("A party opposing a motion for summary judgment may not rest on the allegations in his pleadings; instead, he must come forward with evidence of a genuine factual dispute.").

36

### A.      Dawson Did Not Allege a Pattern of Racketeering Activity.

A civil RICO claim under any of the statute's subsections requires Dawson to plead that defendants engaged in a "pattern of racketeering activity."  18 U.S.C. § 1962. Dawson's allegations fall short because she (1) did not plead with the required level of particularity any of the required predicate acts by any of the defendants; and (2) did not allege a "pattern."  Dawson's "predicate act" allegations are insufficiently detailed to state a RICO claim

RICO § 1961(1)(B) includes in the definition of "racketeering activity" certain "acts indictable under" identified provisions of Title 18 of the U.S. Code, including violations of the mail- and wire-fraud statutes, 18 U.S.C. §§ 1341 and 1343, respectively. A "'pattern of racketeering activity' requires at least two acts of racketeering activity"— known in RICO-speak as "predicate acts"—that occurred within ten years of each other, 18 U.S.C. § 1961(5), although two acts are usually insufficient.  *H.J., Inc. v. N.W. Bell Tel. Co.*, 492 U.S. 229, 237–38 (1989).  Predicate acts must be "indictable activities" to support a RICO claim, so the plaintiff must allege enough facts about the predicate acts to establish their indictability.  *Jennings v. Emry*, 910 F.2d 1434, 1438 (7th Cir. 1990) ("[I]n pleading predicate acts conclusory allegations that various statutory provisions have been breached are of no consequence if unsupported by proper factual allegations … .") (collecting authority).  The mail- and wire-fraud statutes comprising Dawson's allegations have three elements:  "(1) a scheme to defraud; (2) an intent to defraud; and

(3) use of the mails or wires in furtherance of the scheme." *United States v. Leahy*, 464 F.3d 773, 786 (7th Cir. 2006).

> **1.** **Because Dawson's RICO Predicate Acts Are Based on Fraud, She Must Satisfy Rule 9(b)'s Particularity Requirements, but the Complaint Does Not.**

RICO's predicate acts based on fraud must be pleaded with the heightened specificity of Rule 9(b). *See, e.g., Slaney v. Int'l Amateur Athletic Fed'n*, 244 F.3d 580, 597 (7th Cir. 2001) ("RICO plaintiff must, at a minimum, describe the two predicate acts of fraud with some specificity and state the time, place, and content of the alleged false representations, the method by which the misrepresentations were communicated, and the identities of the parties to those misrepresentations."). "Rule 9(b)'s particularity requirement serves an important purpose [in a RICO claim, because a]ccusations of fraud can seriously harm a business [and] accusations that the business engaged in racketeering" wound even more. *Uni*Quality, Inc. v. Infotronx, Inc.*, 974 F.2d 918, 924 (7th Cir. 1992); *accord Vicom, Inc. v. Harbridge Merch. Servs., Inc.*, 20 F.3d 771, 777 (7th Cir. 1994) (Rule 9(b) "serve[s] three main purposes:  (1) protecting a defendant's reputation from harm; (2) minimizing 'strike suits' and 'fishing expeditions'; and (3) providing notice of the claim to the adverse party").  Rule 9(b) forces the plaintiff to plead the "who, what, when, and where" of the alleged fraud.  *Uni*Quality*, 974 F.2d at 923.  And the plaintiff must "allege facts from which it reasonably may be inferred that the defendants engaged in the scheme with fraudulent intent." *Jepson, Inc. v. Makita Corp.*,

34 F.3d 1321, 1328 (7th Cir. 1994).  Without detail, alleged predicate acts do not count towards any racketeering pattern.  *See, e.g., id.* at 1327.  Lastly, in multiple-defendant cases like this one, "Rule 9(b) requires a plaintiff to plead sufficient facts to notify each defendant of his alleged participation in the scheme.  *Goren v. New Vision Int'l*, 156 F.3d 721, 726 (7th Cir. 1998).  RICO complaints that lump "defendants" together, without detailing their individual conduct, are inadequate.  *See, e.g., Vicom*, 20 F.3d at 778; *Cornielsen v. Infinium Capital Mgmt., LLC*, 916 F.3d 589, 599 (7th Cir. 2019).

Dawson's allegations, even if they could be assumed true, do not supply the "who, what, when, and where" she needs to satisfy Rule 9(b).  Nothing in her complaint permits the inference that Great Lakes did anything as part of a scheme to defraud or that it had the intent to defraud.  *Bankcard Am., Inc. v. Universal Bancard Sys., Inc.*, 203 F.3d 477, 485 (7th Cir. 2000) ("For a mail and wire fraud RICO violation to exist there must have been intent to defraud.").

The complaint alleges that Great Lakes' automated processing system "was programmed to capitalize accrued interest *every single time* that a borrower's FFELP or Direct loans switched from forbearance status to repayment status, regardless of whether the forbearance was a B-9 Forbearance," in violation of applicable regulations. (Dkt. 1, ¶ 36.)  Dawson agrees that when Great Lakes began improperly capitalizing (in or around 2007), it did not act on purpose.  (*Id.*, ¶ 51.)  Dawson says that Great Lakes realized its mistake in 2011, but decided not to fix the error out of fear the Department

would force Great Lakes to repay millions in fees, strip current business from Great Lakes, and stop sending Great Lakes new business in the future.  (*Id.*, ¶¶ 60-62.)

Dawson's allegations of Great Lakes' supposedly fraudulent motive home in on a single sentence in successive annual "control reports" issued by Great Lakes' auditor. (*Id.*, ¶ 41.)  Dawson starts with the control reports for 2007-2010, highlighting a sentence from the "Deferment and Forbearance Processing" portion that reads:  "The lender is authorized to capitalize the accrued unpaid interest at the end of any forbearance period."  (*Id.*, ¶ 43.)  She tries to contrast the earlier reports with the one from 2011, where the word "generally" appeared at the beginning of the same sentence.  Dawson claims that this addition shows that Great Lakes, "after four full years of admitted noncompliance[,] … finally realized their false claim of capitalization rights was contrary to the cited regulations … ."  (*Id.*, ¶¶ 48, 51.)  She then highlights Great Lakes' deletion of this sentence in the 2013 and 2014 control reports.  (*Id.*, ¶¶ 52, 55.)[5]

Dawson's allegations evince no plausible fraudulent intent by Great Lakes. "Control reports" are a specialized type of "auditor-to-auditor communication," issued by the auditor of a "service organization," such as a loan servicer.  (Dkt. 24, ¶ 130.)

---

[5] Dawson also cites the "Assertions" that accompany the 2011 and 2013 control reports, signed by the individual defendants.  These assertions state that the control report "fairly presents" Great Lakes' system, details "relevant … changes to the system" during the applicable period, and states that the "controls [described in the control report] were suitably designed and operated effectively."  (*Id.*, ¶¶ 50, 53.)

These reports contain a general description of Great Lakes' systems and are issued *by Great Lakes' auditors for use by the auditors of its customers* (*i.e.,* the Department's or private lenders' auditors).  The reports provide these users, in accounting phraseology, "with information about [Great Lakes'] system[s] that may be *relevant to the user entities' internal control over financial reporting.*"  (Ex. L, Service Organization Guide, § 3.36.)  In plain English, Great Lakes' control reports helped its lender-customers' auditors plan their audits of the lender.

Great Lakes' description of its systems in these reports was explicitly *not* designed to explain the complex rules and regulations governing the student-loan industry to borrowers or others lacking knowledge of those rules and regulations.[6] (Dkt. 24, ¶ 130.)  Quite to the contrary, because the control reports were designed *only* for the specific needs of lenders' auditors, the reports make plain that Great Lakes' description of its systems "may not … include every aspect of the service organization's system" and "need not address every aspect of the service organization's processing or the services provided to user entities."  (Ex. P, Reporting on Controls at a Service Organization, §§ 801.14(c), 801.A32.)  With this purpose in mind, Dawson's allegations

---

[6] These reports state that they are not prepared for general use.  (*See, e.g.,* Ex. M, 2014 Control Report at GL 000442_10 (explaining that the management description relied on by the plaintiff was prepared "for user entities of the Student Loan Servicing Program [*i.e.,* the lenders] … , and the independent auditors of such user entities, *who have a sufficient understanding to consider it*" and emphasizing that the "*report is not intended to be and should not be used by anyone other than these specified parties*") (emphasis added).)

reveal nothing nefarious about the accurate, general statements regarding forbearances and the capitalization of interest that Great Lakes included in the various control reports, as those descriptions were completely appropriate for the purposes of the lenders' auditors.[7]  (*See* Dkt. 24, ¶¶ 136-39.)

The rest of Dawson's allegations concerning Great Lakes' supposed fraudulent intent fare no better as the basis of a RICO claim.  Dawson tries to allege that Great Lakes used the wires and mails in its supposed scheme.  But all she can muster is the ministerial, robotic process of transmitting allegedly inflated account balances to borrowers and lenders using Great Lakes' automated systems, which Dawson does not even allege had anything to do with the scheme she identified.  (*Id.*, ¶¶ 57, 66.)  Finally, Dawson alleges that Great Lakes remodeled its website in order to conceal its fraud, by permitting borrowers to view only 12 months of their loan history, where before they could view the complete transaction history of the loans.  (*Id.*, ¶¶ 72-74.)

The plausibility of Dawson's allegations is undercut further by the complete absence of any fathomable motive for Great Lakes to have undertaken the fraud Dawson alleged.  (*See infra* at 48-50.)  None of the vague and conclusory allegations come close to plausibly satisfying Rule 9(b), thus depriving her RICO claims of any

---

[7]  From 2007 to 2009, Great Lakes issued control reports to its customers' auditors with a statement in the narrative description that "[t]he lender is authorized to capitalize the accrued unpaid interest at the end of any forbearance period."  (Dkt. 24 at 28.)

predicate acts at all.  *See, e.g., Jepson*, 34 F.3d at 1328 (dismissing RICO claim where "loose references to mailings and telephone calls in furtherance of a purported scheme" were insufficient to "provide either the defendant or the court with [enough] information to determine whether or not a pattern of racketeering activity has been alleged").[8]

### 2.    Dawson Has Not Alleged the Requisite Pattern of Racketeering.

Even if the predicate acts Dawson pleaded in her complaint were sufficient under Rule 9(b), they do not allege a pattern.  *See Pizzo v. Bekin Van Lines Co.*, 258 F.3d 629, 633 (7th Cir. 2001).  A pattern is essential to a RICO claim, because the statute "does not cover all instances of wrong-doing[, but r]ather is a unique cause of action that is concerned with eradicating organized, long-term, habitual criminal activity." *Gamboa v. Velez*, 457 F.3d 703, 705 (7th Cir. 2006).  To establish a pattern, "the alleged acts of wrongdoing must not only be related, but … must 'amount to or pose a threat of *continued* criminal activity.'" *Id.* (quoting *Corley v. Rosewood Care Ctr., Inc. of Peoria*, 388 F.3d 990, 1002 (7th Cir. 2004)) (emphasis added).

Courts treat allegations of RICO schemes based on wire and mail fraud with particular skepticism with respect to the existence of the requisite continuity.  Most

---

[8] Dawson's allegations are also insufficiently pleaded because they, with a few exceptions, describe all the actions taken by the lumped defendants, "Great Lakes."  *See Vicom*, 20 F.3d at 778; *Jepson*, 34 F.3d at 1328.

modern schemes involve the mails or wires and typically include numerous instances of such transmissions.  *E.g, Midwest Grinding Co. v. Spitz*, 976 F.2d 1016, 1025 (7th Cir. 1992) ("The widespread abuse of civil RICO stems from the fact that all modern business transactions entail use of the mails or wires ...."); *Slaney*, 244 F.3d at 599 ("[A] multiplicity of mailings does not necessarily translate into a 'pattern' of racketeering activity.").

The Seventh Circuit's decision in *Gamboa* demonstrates why Dawson cannot demonstrate a pattern here.  Gamboa and several others were wrongly charged with (and some convicted of) murder and other crimes in what Gamboa alleged was a scheme by Chicago Police Department detectives to frame them.  457 F.3d at 704. Gamboa brought a RICO claim against the officers, but the court concluded that his complaint did not successfully allege a pattern.  *Id.* at 705.  The court focused on the importance of the "threat of continued criminal activity" in pleading a pattern.  *Id.*  The problem with Gamboa's complaint was that it "present[ed] only a single, nonrecurring scheme (a frame-up of five individuals for a single murder) which, as alleged, [did] not carry any threat of continued criminal activity."  *Id.* at 706.  The court further observed:

> [A] complaint explicitly present[ing] a distinct and non-reoccuring scheme with a built-in termination point and provid[ing] no indication that the perpetrators have engaged or will engage in similar misconduct ... does not sufficiently allege continuity for § 1962(c) purposes even if the purported scheme takes several years to unfold, involves a variety of criminal acts, and targets more than one victim."

44

*Id.* at 709 (collecting authority).

Dawson's allegations are quite factually different, but she, like the plaintiff in *Gamboa*, cannot establish continuity because she did not allege, and cannot show, risk of continuing criminal activity or any continuing activity at all. Great Lakes' scheme, as alleged by Dawson, persisted for at most 3-4 years and did not begin maliciously, but with a misunderstanding by Great Lakes of the cappability of B-9 interest. (Dkt. 1, ¶ 47 ("[T]hrough four years … none of Great Lakes Defendants, their auditors, or the lender-recipients of these Control Reports seemed to recognize the discrepancy between the cited regulation … and Great Lakes' wrongful claim of capitalization rights … .").) Dawson says the real scheme kicked off by November 2011, when Great Lakes, having realized its capitalization mistake, elected to continue with the practice and cover up its previous mistakes (*id.*, ¶¶ 48-49), but ceased by spring 2015 when Great Lakes stopped its improper capitalization (*id.*, ¶¶ 70-71 (acknowledging that "Reprogramming occurred somewhere between February 1, 2014 and April 16, 2015: most likely in mid-2014")). Since Great Lakes fixed its program, Dawson says, it redesigned its website so that only 12 months of account history was available. (*Id.*, ¶¶ 72-74.)

The *most* that could be said of Dawson's allegations about Great Lakes—and it would be quite a stretch—is that Great Lakes engaged in a "cover up" of its erstwhile improper capitalization practices. Notably, "acts to conceal the underlying wrongdoing in a RICO suit do not carry with them the threat of future harm and generally do not

45

extend the duration of the underlying scheme." *Gamboa*, 457 F.3d at 708 n.2 (citing

*Midwest Grinding*, 976 F.2d at 1024).  It thus stands to reason that a RICO scheme

consisting entirely of a supposed cover up of an *innocent* (as opposed to criminal) act

poses no threat of future harm.  *See Roger Whitmore's Auto Servs., Inc. v. Lake Cnty., Ill.*,

424 F.3d 659, 673-74 (7th Cir. 2005) (no continuity where there existed "only one

overarching scheme" and "no indication that the defendants engaged in any other

racketeering scheme before or after that").

Great Lakes also poses no risk to offend in the future because it has no—and has

never had any—fathomable motive to undertake the fraudulent scheme that Dawson

alleged.  Great Lakes had no financial incentive to inflate borrowers' loan balances by

improper capitalization, because the Department does not compensate Great Lakes

based on loan balances, and Great Lakes does not receive any of the interest charged to

borrowers.  Rather, Great Lakes' and every other loan servicer's compensation is based

on borrower status.  (*See* Ex. E, Brown Decl., ¶¶ 20-21.)  The Department maintains a

confidential fee schedule corresponding to each of 12 fee loan statuses.[9]  (*Id.*, ¶ 20.)

Great Lakes bills the Department monthly based on the fee status the borrower

occupied on the last day of the month.  (*Id.*)

---

[9] The statuses are: IN SCHOOL, IN GRACE, IN REPAYMENT, SERVICE MEMBER, DEFERMENT, FORBEARANCE, DELINQUENT 6-30 DAYS, DELINQUENT 31-90 DAYS, DELINQUENT 91-150 DAYS, DELINQUENT 271-360 DAYS, AND DELINQUENT 361 OR MORE DAYS.  (*Id.*, ¶ 20.)

Dawson's claim that Great Lakes covered up its supposed scheme for fear that the Department would allocate Great Lakes' loan share to another servicer or demand fee refunds is fanciful.  (Dkt. 1, ¶¶ 60-61.)  While Dawson is correct that the Department retains the contractual right to allocate the shares of loans serviced by the various servicers (and could even terminate in the case of extreme non-compliance), her depiction of a retributive Department eager to fine, marginalize, or terminate its servicers is inaccurate.  As we described above (*supra* at Part I.A), the Department regularly and continuously evaluates servicers on numerous holistic metrics— everything from customer service to the results of site visits to operational mechanics— and the volume of loans that servicers are allocated can be determined in part from the resulting Department servicer ratings.  (*See* Ex. E, ¶¶ 14-18 (detailing the various reports and analyses through which the Department evaluates Great Lakes).)  Inevitably with the volume of loans serviced by Great Lakes and the other servicers, errors occur that require remediation.  When errors happen, Great Lakes does not wait to be told by the Department that it must fix mistakes or bury the mistakes and hide; rather, Great Lakes proactively remediates accounts as it discovers errors, and it has never been threatened by the Department with the sort of punitive measures Dawson imagines.  (*Id.*, ¶¶ 7-12; Ex. H, Leitl Tr. at 78:13–86:21 (explaining the relative frequency of remediation efforts and Great Lakes proactive efforts to correct accounts).)  In fact, since completion in August 2018 of the very substantial Second Remediation, the Department has never

asked for any refunds of any servicing fees in connection with the accounts of the affected borrowers.  (*See* Ex. E, ¶ 13.)  The idea that Great Lakes undertook a massive cover up out of fear that the Department would suddenly yank all of its business for one error is not plausible, given the actual relationship between the Department and its servicers, including Great Lakes.

Finally, the undisputed facts concerning the First and Second Remediations undertaken by Great Lakes (at the Department's direction) further cement the lack of risk of future criminality, and instead paint a picture of a government contractor trying to follow the terms of its contract.  As discussed above (*supra* at Statement of Facts), after the filing of Dawson's lawsuit Great Lakes discovered and fixed two programming errors in its system.  Then, the issue of whether *any* interest was to be capitalized at the end of a B-9 Forbearance surfaced, and Great Lakes gradually learned that the Department had refined its interpretation of the regulations.  So Great Lakes again fixed its system and corrected a great many accounts, all at the Department's direction.  (Dkt. 165; Ex. C, ¶¶ 2-3.)  Nothing about this experience permits a conclusion that Great Lakes is or has ever been bent on future lawlessness.  *See, e.g.*, *Michalowski v. Rutherford*, 2016 WL 640433, at * 5 (N.D. Ill. Feb. 18, 2016) (where "alleged scheme has a 'natural ending point,' plaintiffs effectively plead themselves 'out of showing a continuing

threat of continued [criminal] activity.'").  Dawson has not alleged and cannot allege a

pattern, dooming all of her RICO claims.[10]

> **B.    Dawson's Claims Under Each RICO Subsection She Raises Fail for Additional Reasons as Well.**

 In addition to not alleging a pattern of racketeering activity, Dawson's

RICO claims under each of the various subsections on which she relies fail for

additional, subsection-specific reasons, described next.

> **1.    Dawson's Claims Under § 1962(b) Fail Because No Defendant Acquired or Maintained an Interest in Any Enterprise.**

Section 1962(b) makes it "unlawful for any person through a pattern of

racketeering activity … to acquire or maintain, directly or indirectly, any interest in or

control of any enterprise."  Dawson does not explain *how* the defendants could have

violated this subsection.  They did not.  The provision targets "acqui[sition] or

maintain[ence of] any interest in or control of any enterprise."  Section 1962(b) does not

target acquisition of "just any interest, but a proprietary one, such as the acquisition of

stock, and the 'control' contemplated is the power gained over an enterprise's

operations by acquiring such interest."  *Whaley v. Auto Club Ins. Ass'n*, 891 F. Supp. 1237,

---

[10] In addition, Dawson's complaint fails to establish a pattern by any of the defendants individually, because of the way she lumped them together.  *See First Capital Asset Mgmt. v. Satinwood, Inc.*, 385 F.3d 159, 180 (2d Cir. 2004) ("In analyzing the issue of continuity, assuming arguendo that the alleged predicate acts constituting the pattern were adequately pled, we evaluate the RICO allegations with respect to each defendant individually.").

1240-41 (E.D. Mich. 1995) (citations and quotation marks omitted).  Accordingly, a § 1962(b) plaintiff must "demonstrate an injury arising from the defendants' acquisition of an interest in, or maintenance of control over, an alleged enterprise."  *D'Addario v. D'Addario*, 901 F.3d 80, 97 (2d Cir. 2018).  This injury must be "different from the damages that flow from the predicate acts [of racketeering] themselves."  *Id.* at 98; *accord Johnson v. Oystacher*, 2018 WL 5249229, at *6 (N.D. Ill. Oct. 22, 2018) ("A proper RICO claim under Section 1962(b) must contain two allegations:  (1) that the defendant acquired or maintained an interest or control of an enterprise through a pattern of racketeering activity; and (2) that the plaintiff suffered an injury through the defendant's acquisition or maintenance of an interest in or control of the pertinent enterprise that is separate from the injury or injuries resulting from the predicate acts.").

Dawson did not allege that any defendant acquired or maintained an interest in any alleged enterprise at all, much less through a pattern of racketeering.  Even if she had, her injuries would not flow from the acquisition or maintenance, as the only injury she alleges is inflated loan balances because of improperly capitalized interest.  If such an injury occurred, it would not and could not be conceptually tied to a defendants' acquisition or maintenance of any interest. Great Lakes is entitled to judgment on Dawson's § 1962(b) claim.

2.      **Dawson's § 1962(c) Claim Does Not Allege an Enterprise Distinct from the Defendants and Does Not Allege that the Defendants Conducted or Participated in the Affairs of the Enterprise.**

Section 1962(c) forbids "any person employed by or associated with any enterprise … to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity."  Dawson's § 1962(c) claim therefore requires her to demonstrate that Great Lakes "(1) conduct[ed] (2) an enterprise (3) through a pattern (4) of racketeering activity."  *Barry Aviation, Inc. v. Land O'Lakes Mun. Airport Comm'n*, 366 F. Supp. 2d 792, 802 (W.D. Wis. 2005) (quoting *Goren v. New Vision Int'l, Inc.*, 156 F.3d 721, 727 (7th Cir. 1998)).  Section 1962(c) further requires a plaintiff to identify a 'person'—*i.e.*, the defendant—"that is distinct from the RICO enterprise."  *United Food & Commercial Workers Unions & Emp'rs Midwest Health Benefits Fund v. Walgreen Co.*, 719 F.3d 849, 853–54 (7th Cir. 2013).  Dawson's "persons" are "the Great Lakes Defendants."  She defines this bunch as the two Great Lakes entities—GLELSI and GLHEC—along with GLELSI employees Leitl, Lentz, and Walker (dubbed the "individual defendants").  (Dkt. 1, ¶ 12 n.1.)

As we explained above, Dawson has not alleged a pattern of racketeering activity.  But she also fails to allege (1) that the defendant persons were sufficiently distinct from her pleaded enterprise and (2) that the defendants "conducted or participated in the conduct of the 'enterprise's affairs.'"

51

"Enterprise" is defined in § 1961(4) to include any "individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity."  Dawson's complaint asserts "Great Lakes" is an enterprise solely by citation to § 1961(4), without explanation.  (Dkt. 1, ¶ 83.)  This allegation does not even plead the existence of an enterprise,[11] because she defines "Great Lakes" to include both GLELSI and GLHEC.  "Great Lakes" is thus defined not as a corporation, but as a pair of corporations.  (*Id.*, ¶ 1.)

> **a.    Dawson's Claims Under § 1962(c) Fail Because There Is No "Distinctness" Between the RICO Enterprise Alleged and the Defendant "Persons."**

A § 1962(c) plaintiff must "allege and prove the existence of two distinct entities: (1) a 'person'; and (2) an 'enterprise' that is not simply the same 'person' referred to by a different name."  *Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158, 161 (2001).  This distinctness requirement comes straight from the statutory text, which refers to persons "employed by or associated with" the enterprise.  "In ordinary English, one speaks of employing, being employed by, or associating with others, not oneself."  *Id.*; *accord Ray v. Spirit Airlines, Inc.*, 836 F.3d 1340, 1355 (11th Cir. 2016).

Dawson did not allege distinctness between the Great Lakes Defendants (the persons) and Great Lakes (the enterprise).  A § 1962(c) claim fails where it "allege[s] a

---

[11] This would be separately fatal to her § 1962(c) claims.  *E.g.*, *Baker v. IBP, Inc.*, 357 F.3d 685, 691 (7th Cir. 2004) (describing inadequate enterprise allegations as a "fatal problem").

RICO enterprise that consists merely of a corporate defendant associated with its own employees or agents carrying on the regular affairs of the Defendant." *Riverwoods Chappaqua Corp. v. Marine Midland Bank, N.A.*, 30 F.3d 339, 344 (2d Cir. 1994); *accord, e.g., Baker*, 357 F.3d at 691 ("[T]he complaint comes perilously close to alleging that IBP plus its agents and employees is the 'enterprise,' a theory that won't fly.").  This is because "a corporation can only function through its employees and agents, [so] any act of the corporation can be viewed as an act of such an enterprise." *Riverwoods*, 30 F.3d at 344. Were it otherwise, "RICO liability [would] attach to any act of corporate wrong-doing and the statute's distinctness requirement will be rendered meaningless." *In re ClassicStar Mare Lease Litig.*, 727 F.3d 473, 492 (6th Cir. 2013); *accord Fitzgerald v. Chrysler Corp.*, 116 F.3d 225, 226 (7th Cir. 1997) ("Read literally, RICO would encompass every fraud case against a corporation, provided only that a pattern of fraud and some use of the mails or of telecommunications to further the fraud were shown; the corporation would be the RICO person and the corporation plus its employees the 'enterprise.'").

So if Dawson had pleaded one or both of the Great Lakes corporate entities as the persons/defendants and the Great Lakes Defendants (*i.e.*, the entities plus the natural persons) as the enterprise, her claim would plainly be barred for want of distinctness. Instead, she pleaded the mirror image of that forbidden formula, and from that it follows that she has not pleaded distinctness.  Her RICO "persons" consist of the Great Lakes entities (GLELSI and GLHEC) plus the individual defendants, who allegedly

control her RICO "enterprise," which consists of the Great Lakes entities (again, GLELSI and GLHEC).  Another way to conceive of the complaint's shortcomings is to consider that the "persons" are larger than the "enterprise."  As a matter of logic, these allegations must fall short, because RICO's purpose is to prevent an individual or group of individuals from colonizing and weaponizing enterprises larger than themselves to magnify their criminal capacity.  *Fitzgerald*, 116 F.3d 226-27 ("The prototypical RICO case is one in which a person bent on criminal activity seizes control of a previously legitimate firm and uses the firm's resources, contacts, facilities, and appearance of legitimacy to perpetrate more … criminal acts than he could do in his own person … .")  That Dawson's complaint strays so far from this paradigm further evidences its fatal defects.

### b.   The Defendants Did Not Conduct or Participate in the Conduct of the Alleged Enterprise.

"[I]n order to satisfy the 'conduct' element of § 1962(c), a plaintiff must allege that the Defendants 'participated in the operation or management of the [RICO] enterprise itself.'"  *Decatur Ventures, LLC v. Stapleton Ventures, Inc.*, 373 F. Supp. 2d 829, 837 (S.D. Ind. 2005) (quoting *Reves v. Ernst & Young*, 507 U.S. 170, 183 (1993)).  Accordingly, demonstrating "mere participation in the activities of the enterprise" is insufficient.  *Goren*, 156 F.3d at 727.  Dawson must demonstrate that "the defendants engaged in a degree of cooperation and coordination 'that fell outside the bounds of the parties' normal commercial relationships.'"  *Nesbitt v. Regas*, 2015 WL 1331291, at *8

(N.D. Ill. Mar. 20, 2015) (quoting *United Food*, 719 F.3d at 856).  This Court should, therefore, consider "whether the scheme's success depended on a particular defendant's knowing cooperation, or whether that particular defendant played a fungible role that could have been performed by outsiders" to the enterprise.  *Id.*  It "is not enough that [a defendant] failed to stop illegal activity."  *Walter v. Drayson*, 538 F.3d 1244, 1248 (9th Cir. 2008).  Nor does "[s]imply performing services for the enterprise does not rise to the level of direction, whether [the defendant] is 'inside' or 'outside.'"  *Id.* at 1249.

Dawson does not allege that the individual defendants participated in the operation or management of the RICO enterprise.  At paragraph 84 of her complaint, she conclusorily alleges that the individual defendants "have conducted and directly participated in the conduct of Great Lakes as a federal student loan servicer."  But Dawson does not explain how, and the only actual acts she attributes to any of the individual defendants are detailed at paragraph 50-56, comprising nothing more than the signing of control reports stating, to the best of GLELSI's "knowledge and belief," that the control report accurately described GLELSI's loan-servicing system.  (*See, e.g.*, Dkt. 1, ¶ 54 (by signing control report, "Leitl thus expressed to Great Lakes' lender customers her personal knowledge and control of Great Lakes' Servicing System").)

Even if a scheme to improperly capitalize interest existed, these allegations do not plausibly allege that the individual defendants "knowingly implemented" that scheme or that they did anything other than "simply perform[] services" for the

enterprise by carrying out their everyday job responsibilities.  *Walter*, 538 F.3d at 1249;

*see also Decatur Ventures*, 373 F. Supp. 2d at 837-38 (individual defendants did not

"conduct a RICO enterprise" where the complaint did not allege they "knowingly

implemented" decisions of upper management).

Dawson's complaint also does not allege that GLHEC had any part in conducting

the enterprise's affairs, though she obscures this problem by combining the separate

entities GLHEC and GLELSI as "Great Lakes."  The complaint does not allege that

GLHEC did *anything* other than be the parent of GLELSI, which is not sufficient.  *See,*

*e.g., Lorenz v. CSX Corp.*, 1 F.3d 1406, 1412 (3d Cir. 1993) (plaintiff must plead facts that

"would clearly show that the parent corporation played a role in the activities of its

subsidiary").[12]

### 3. Dawson Does Not Allege a Violation of the RICO Conspiracy Statute, § 1962(d).

Lastly, § 1962(d) also makes a conspiracy to commit any other of RICO's

provisions unlawful.  Dawson raises this subsection in a single sentence.  A RICO-

conspiracy claim "requires a showing that:  (1) the defendant agreed to maintain an

interest in or control of an enterprise or to participate in the affairs on an enterprise

through a pattern of racketeering activity, and (2) the defendant further agreed that

---

[12] GLELSI, the actual servicing company, of course participated in the management of its own affairs.  But, because GLELSI was not distinct from the enterprise, Dawson's RICO claim still fails.

someone would commit at least two predicate acts to accomplish these goals." *United Food*, 719 F.3d at 856 (internal quotation marks omitted). "[T]he touchstone of liability under § 1962(d) is an agreement to participate in an endeavor which, if completed, would constitute a violation of the substantive statute." *Goren*, 156 F.3d at 732. Thus, since Dawson's complaint does not "plead facts that would establish a violation of Section 1962(c) [or (b), she] cannot state a claim for conspiracy under Section 1962(d) based on those same facts." *United Food*, 719 F.3d at 857-58.

## III.   WITHOUT THE RICO CLAIMS, NEITHER DAWSON NOR THE UNCERTIFIED DAMAGES CLASS HAS ANY REMAINING DAMAGES AFTER THE FIRST AND SECOND REMEDIATIONS.

Federal courts' jurisdiction is limited to deciding actual "Cases" or "Controversies." *See Hollingsworth v. Perry*, 570 U.S. 693, 704 (2013). This limitation requires a plaintiff to demonstrate constitutionally adequate standing, *Spokeo, Inc. v. Robins*, 136 S. Ct. 15140, 1548-49 (2016), proving three things:  (1) injury in fact (a concrete and imminent invasion of a legally protected interest); (2) a causal connection between the injury and the defendant's conduct; and (3) that the injury is capable of judicial redress, *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992) ("[E]ach element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof.").

As this Court has previously recognized, the plaintiffs' case against Great Lakes suffers from "major questions" regarding the "plausib[ility of] a RICO claim on the

merits in this case."  (Dkt. 171 at 18.)  Without the RICO claim (*see infra* Part II), and in

light of the First and Second Remediations, Dawson and the class lack standing to sue,

and their claims have become moot.[13]

Moreover, the absence of recoverable damages means that there is no viable tort

claim under Wisconsin law, damages being an element of such a claim.  "Actual

damage is an essential element in the cause of action based on negligence or on fraud."

*Widemshek v. Fale*, 17 Wis. 2d 337, 343, 117 N.W.2d 275, 276, 278 (1962) ("[E]ven if

defendant was found negligent or fraudulent …[,] plaintiff could not maintain his

causes of action against him, for plaintiff cannot show … that he sustained any actual

damage."); *see also Foskett v. Great Wolf Resorts, Inc.*, 518 F.3d 518, 523 (7th Cir. 2008) ("A

negligence claim requires an actual loss or damage as a result of the injury.") (internal

quotation marks omitted).

Dawson and the class have suffered no injury in fact, as the law requires, because

they have received the full remedy to which they would have been entitled had she

succeeded on her claim.  Under longstanding precedent, the voluntary remedy actually

provided by the Department and by Great Lakes eliminated any injury that might have

supported their standing to sue, and made their claims moot.  *See Little v. Bowers*, 134

---

[13] The defendants do not seek to resolve issues concerning attorneys' fees for class counsel on summary judgment.  The class itself, however, including the plaintiff, has already received any compensation to which it might have been entitled under the state-law claims, even if they were not preempted.

U.S. 547, 558 (1890) (holding that a voluntary payment by a defendant to the plaintiff meant there was "no controversy" between the parties); *Selected Prods. Corp. v. Humphreys*, 86 F.2d 821, 823 (7th Cir. 1936) (lack of controversy following payment by defendant).

The Seventh Circuit previously noted in *Bible*, which involved a student loan, that, for a borrower who claims that she has been overcharged, the appropriate remedy is likely an account credit, not a damages payment.  799 F.3d at 651 ("[T]he remedy might take the form of a credit to her account rather than cash in her pocket[.]").  This is exactly what the Department and Great Lakes have accomplished here through the remediation projects, and, because of those projects, the great majority of class members never actually sustained a dollar loss.  (Dkt. 165, ¶¶ 14-21.)  They had misstated loan balances for a period of time, but now those errors have been erased, along with all their economic consequences.  (*Id.*; *see also* Ex. C, ¶¶ 3.)

Without the flawed RICO claims, therefore, there is no longer an actual "Case" or "Controversy" for the Court to decide.  Even the last to be remediated of the affected student-loan borrowers have been made whole for nearly a year—and most long before that.  Great Lakes has not been acting on its own in remediating or coming up with take-it-or-leave-it fixes; it has acted at the Department's direction, in its role as the Department's contractor servicing the Department's loans.  If the Court decides that the state-law claims have not been preempted, it should nevertheless grant summary

judgment on the state-law claims because, without the RICO claims, there is nothing left in this case for trial.

## CONCLUSION

There is no reason for the Court to allow the plaintiff and the class to interject themselves into the Department's relationship with one of its servicers.  The Court should grant summary judgment in favor of Great Lakes because the state-law claims are preempted and because the plaintiff never pleaded—and has not, in four years, proffered any evidence to support—her RICO claims.  The Court should grant summary judgment as to the state-law claims for the additional reason that the class has received the full remedy to which it was entitled and, without damages, has no claim under state tort law.

Dated this 3rd day of June, 2019.

s/ Eric G. Pearson

Thomas L. Shriner, Jr.
Elizabeth A. N. Haas
Eric G. Pearson
FOLEY & LARDNER LLP
777 East Wisconsin Avenue
Milwaukee, Wisconsin 53202-5306
(414) 271-2400 Telephone
(414) 297-4900 Facsimile
Email:  tshriner@foley.com
Email:  ahaas@foley.com
Email:  epearson@foley.com

60

Michael D. Leffel
FOLEY & LARDNER LLP
150 East Gilman Street, Suite 5000
Madison, Wisconsin  53703-1482
(608) 257-5035 Telephone
(608) 258-4258 facsimile
Email:  mleffel@foley.com

*Attorneys for Defendants Great Lakes*
*Educational Loan Services, Inc., Great Lakes*
*Higher Education Corporation, Jill Leitl,*
*David Lentz, and Michael Walker*

61