# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF WISCONSIN

| | |
|---|---|
| MEREDITH D. DAWSON, Individually and On Behalf of All Others Similarly Situated, | Case No. 15-cv-00475-jdp |
| Plaintiff, | |
| v. | **THE CLASS'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |
| GREAT LAKES EDUCATIONAL LOAN SERVICES, INC., GREAT LAKES HIGHER EDUCATION CORPORATION, JILL LEITL, DAVID LENTZ, and MICHAEL WALKER, | **\* \* \* FILED UNDER SEAL \* \* \*** |
| Defendants. | |

## TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................................. i

TABLE OF AUTHORITIES ........................................................................................ iv

INTRODUCTION AND SUMMARY OF ARGUMENT – A ROAD MAP ................... 1

    A.  Article III Jurisdiction (Part III) ..................................................................... 3

    B.  Common Law Negligence And Negligent Misrepresentation (Part IV) ........... 4

    C.  Class RICO Claims (Parts I and II) ................................................................. 6

STATEMENT OF FACTS ............................................................................................ 8

    A.  High-Level Summary Of Facts And Student Loan Issues ............................... 8

    B.  Key Terminology ......................................................................................... 12

    C.  Key Personnel ............................................................................................. 14

ARGUMENT AND AUTHORITY .............................................................................. 17

I.   THE COURT SHOULD DENY DEFENDANTS' RULE 56 MOTION AS
    FACIALLY DEFICIENT AND MISLEADING ................................................... 17

    A.  Defendants Have Not Negated The Class's Claims With "Affirmative Evidence"
        Because They Have Not Presented Proposed Findings Of Fact ..................... 18

    B.  The Court Should Deny Defendants' Motion With Respect To Class RICO Claims
        Because It Offers No Rule 56 Argument ...................................................... 21

    C.  Defendants Have Not Carried Their Initial Burden Because Their Motion Ignores
        Any Record Evidence Creating Genuine Factual Disputes ........................... 26

II.  DEFENDANTS ARE NOT ENTITLED TO SUMMARY JUDGMENT ON CLASS
    RICO CLAIMS ................................................................................................. 31

    A.  The Broad Reach Of The Federal Mail And Wire Fraud Statutes ................. 32

    B.  Defendants Engaged In "Schemes To Defraud" By Making Numerous Materially
        False And Misleading Statements Since 2011 .............................................. 34

        1.   "We do not cap in these situations." ................................................... 34

        2.   Leitl misrepresented GLELSI's ability to meet ED's implementation date
            for CR 1492. ..................................................................................... 35

        3.   GLELSI invoiced ED for millions of dollars in Loan servicing fees while
            concealing its non-compliance with ED's capitalization requirements. ...... 36

        4.   GLELSI made materially false and misleading Loan balance statements to
            Lenders, borrowers, credit bureaus, and federal agencies. ...................... 38

5.   GLELSI's B-9 Forbearance notices to Class members were materially misleading because they suggested that no capitalization would occur.............39

6.   Defendants' Counterclaim against Plaintiff Dawson (Dkt. 24) contained materially false and misleading statements of fact and opinion........................40

7.   Defendants discovered at least one of their (irrelevant) "programming errors" six months before this lawsuit...............................45

8.   Defendants' sham Errata Sheet (Dkt. 63) and Declaration (Dkt. 66) contained materially false and misleading statements........................46

9.   Defendants were not "surprised" in August 2016. ...............................47

10.  Defendants executed a divide-and-conquer strategy against ED officials in August 2016, to further conceal their intentional wrongdoing from ED and the Court. ...............................49

11.  Defendants served Plaintiff Dawson with at least one materially false and misleading interrogatory response...............................54

12.  Defendants have made material misrepresentations regarding their so-called "Second Remediation Project." ...............................55

C.  A Jury Could Reasonably Infer That Leitl And GLELSI's Managers Acted With Fraudulent Intent Beginning In 2011, And Continuing Through This Case ...................55

1.   "Sorry to be the bearer of bad news."...............................56

2.   Direct Evidence Concerning CR 1492. ...............................57

3.   As a matter of Seventh Circuit law, Defendants' Sham Errata Sheet (Dkt. 63) and declaration (Dkt. 66) "suggest guilty knowledge." ...............................58

4.   A jury can also infer Leitl's and GLELSI's intent from their contemporaneous change to the November 2011 Control Report...............................60

5.   "Whatever capping procedure you see on the System, assume it is correct." ...............................62

6.   The totality of Defendants' post-lawsuit conduct reasonably suggests their intent to defraud...............................65

7.   Leitl and GLELSI had motive and opportunity to defraud. ...............................66

D.  Leitl And GLELSI Have Used The Mails And Interstate Wires In Furtherance Of Their Schemes...............................69

E.  Defendants' Alleged Acts Of Mail And Wire Fraud Form A RICO "Pattern"...............................72

F.  A Jury Could Find That GLELSI Conducted, Or Participated In The Conduct Of, GLHEC's Affairs Within The Meaning Of 18 U.S.C. § 1962(c)...............................74

G. A Jury Could Find That Leitl Conducted The Affairs Of GLELSI Within The Meaning Of 18 U.S.C. § 1962(c) ......................................................................82

III. DEFENDANTS HAVE NOT "MOOTED" ANY CLASS CLAIMS UNDER ARTICLE III ..............................................................................................................83

A. Defendants Have Not Mooted The Article III Controversy Because They Have Not Afforded Class Members The Complete Relief Demanded On Any Claim....................83

B. Defendants Have Not Carried Their "Heavy Burden" Under The Voluntary Cessation Doctrine ...............................................................................................86

C. Many Class Members Have Not Been Compensated At All, And Many Have Suffered Further Financial Injuries From Defendants' "Remediation".........................88

    1. Defendants' "Remediation Projects" do not measure the "capitalization impact" on Class members' debt levels......................................................88

    2. Many Class members have suffered Loan balance increases, and Class member Elizabeth Mosser presents the most egregious example. .....................91

    3. For most paid-in-full Class members, GLELSI has not "issued reimbursement checks." ..........................................................................94

    4. There is no evidence that transferred Class members have been properly compensated. .......................................................................................98

D. The Court Cannot Decide The Merits Of An Uncertified Damages Class, On A Flawed Methodology, And Then Dismiss The Class For Lack Of Jurisdiction...............99

E. The Class Intends to Present A Common Sense Damages Model, Tied To The Theory Of Liability, At The Proper Time ....................................................101

IV. DEFENDANTS' PREEMPTION AND IMMUNITY ARGUMENTS ARE MERITLESS ..........................................................................................................102

A. The Class's Claims Are Not Conflict Preempted .................................................102

B. Defendants Have Waived Any Possible "Immunity" They Could Have Asserted Four Years Ago......................................................................................................107

C. Intergovernmental Immunity Is Inapplicable To This Case .................................108

D. *Yearsley* Immunity Is Inapplicable To This Case .........................................112

CONCLUSION.....................................................................................................................116

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Ackerson v. Dean Dredging LLC*, 589 F.3d 196 (5th Cir. 2009)................................................ 115

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ............................................................... 116

*Anderson v. Olson*, No. 13-cv-561-wmc, 2014 WL 5167610 (W.D.Wis., Oct. 14, 2014).......... 21

*Arreola v. Godinez*, 546 F.3d 788 (7th Cir. 2008) ..................................................................... 100

*Baker v. IDP, Inc.*, 357 F.3d 685 (7th Cir. 2004) ........................................................................ 79

*Bank of New York v. Fremont General Corp.*, 523 F.3d 902 (9th Cir. 2008)............................. 62

*BCS Services, Inc. v. Heartwood 88, LLC*, 637 F.3d 750 (7th Cir. 2011) ................................. 101

*Becker v. Tenenbaum-Hill Assoc., Inc.*, 914 F.2d 107 (7th Cir. 1990)........................................ 21

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) ..................................................... 23, 24, 25

*Bible v. United Student Aid Funds, Inc.*, 799 F.3d 633 (7th Cir. 2015)................................. passim

*Big O Tire Dealers, Inc. v. Big O Warehouse*, 741 F.2d 160 (7th Cir. 1984) ......................... 8, 31

*Blackburn v. U.S.,* 100 F.3d 1426 (9th Cir. 1996) ..................................................................... 108

*Boeing Co. v. Movassaghi*, 768 F.3d 832 (9th Cir. 2014) ................................................. 109, 111

*Bordelon v. Chicago School Reform Board of Trustees*, 233 F.3d 524 (7th Cir. 2000).............. 18

*Brady v. Roosevelt S.S. Co.* 317 U.S. 575 (1943) .............................................................. 114, 115

*Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639 (2008).............................................. 34, 69

*Cabalce v. VSE Corp.*, 922 F.Supp.2d 1113 (D. Haw. 2013).................................................... 115

*Campbell-Ewald Co. v. Gomez*, 136 S.Ct. 663 (2016) ......................................................... passim

*Carpenter v. U.S.*, 484 U.S. 19 (1987).......................................................................................... 70

*Casillas v. Madison Avenue Associates, Inc.*, 926 F.3d 329 (7th Cir. 2019)............................ 102

*Castle v. United States*, 2017 WL 6459514 (N.D.N.Y. 2017).................................................... 112

*Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158 (2001).................................................. 82

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ........................................................... 7, 18, 21, 26

*Chae v. SLM Corp.*, 593 F.3d 936 (9th Cir. 2010) ................................................... 103, 104, 105

*Chapman v. First Index, Inc.*, 796 F.3d 783 (7th Cir. 2015) ....................................................... 85

iv

*Chapman v. Yellow Cab Cooperative*, 875 F.3d 846 (7th Cir. 2017)....................................... 23, 78

*Citgo Petroleum Corp. v. Ranger Enterprises, Inc.*, 632 F.Supp.2d 878 (W.D. Wis. 2009) ....... 59

*City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*,
856 F.3d 605 (9th Cir. 2017) ............................................................................................ 40, 41, 43

*City of Worcester v. HCA Management Co., Inc.*, 753 F.Supp. 31 (D. Mass. 1990) ................ 115

*Comcast Corp. v. Behrend*, 569 U.S. 27 (2013) .......................................................... 88, 89, 101

*Contango Operators, Inc. v. U.S.*, 9 F.Supp.3d 735 (S.D. Tex. 2014) ...................................... 115

*Cosmopolitan Shipping Co. v. McAllister*, 337 U.S. 783 (1949)............................................... 114

*Eckhardt v. State Farm Bank, F.S.B.*,
18-cv-01180, 2019 WL 1177954 (C.D. Ill. Mar. 13, 2019) ........................................................ 8

*Fidlar Tech. v. LPS Real Estate Data Solutions, Inc.*, 810 F.3d 1075 (7th Cir. 2010);.......... 55, 62

*Fitzgerald v. Chrysler Corp.*, 116 F.3d 227 (7th Cir. 1997)..................................................... 80

*Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167 (2000) ............. 3, 86

*Fulton Dental, LLC v. Bisco, Inc.*, 860 F.3d 541 (7th Cir. 2017) .................................................. 85

*Gates v. Towery*, 430 F.3d 429 (7th Cir. 2005) ......................................................................... 84

*General Electric Capital Corp. v. Lease Resolution Corp.*, 128 F.3d 1074 (7th Cir. 1997)........ 19

*Genesis Healthcare Corp. v. Symczyk*, 569 U.S. 66 (2013)......................................................... 83

*Goka v. Bobbit*, 862 F.2d 646 (7th Cir. 1988) ..................................................................... passim

*Groshek v. Great Lakes Higher Education Corp.*,
No. 15-cv-143-jdp, 2015 WL 7294548 (W.D. Wis. Nov. 16, 2015)........................................... 55

*Groshek v. Time Warner Cable, Inc.*, 865 F.3d 884 (7th Cir. 2017) ........................................ 102

*H.J. Inc. v. Northwestern Bell Telephone Co.*, 492 U.S. 229 (1989)..................................... 72, 73

*Haroco, Inc. v. American Nat'l Bank and Trust Co. of Chicago*,
747 F.2d 384 (7th Cir. 1984) ............................................................................................. passim

*Helvering v. Gerhardt*, 304 U.S. 405 (1938) ........................................................................... 109

*In re ClassicStar Mare Lease Litig.*, 727 F.3d 473 (6th Cir. 2013)............................................ 79

*In re Fort Totten Metrorail Cases Arising Out of Events of June 22, 2009*,
895 F.Supp.2d 48 (D.D.C. 2012)............................................................................................ 115

*Jennings v. Auto Meter Products, Inc.*, 495 F.3d 466 (7th Cir. 2007)......................................... 73

*Koszola v. Board of Educ. of City of Chicago*, 385 F.3d 1104 (7th Cir. 2004)........................... 18

*Lamb v. Martin Marietta Energy Systems, Inc.*, 835 F.Supp. 959 (W.D. Ken. 1993)................ 112

*Lapides v. Bd. of Regents of Univ. Sys. of Georgia*, 535 U.S. 613 (2002) ................ 5, 6, 107, 108

*Logan v. Commercial Union Ins. Co.*, 96 F.3d 971 (7th Cir. 1996) ...................................... 18, 21

*Logan v. Zimmerman Brush Co.*, 455 U.S. 422 (1982) ................................................................. 24

*Lundin v. Shimanski*, 124 Wis. 2d 175 (1985)......................................................................... 40, 44

*Lust v. Sealy, Inc.*, 234 F. Supp. 2d 908 (W.D.Wis., 2002)........................................................... 21

*Memon v. Waukesha County Technical College*,
No. 13-cv-704-jdp, 2015 WL 505668 (W.D.Wis., Feb. 6, 2015)................................................... 21

*Metro. Life Ins. Co. v. Johnson*, 297 F.3d 558 (7th Cir. 2002)..................................................... 18

*Midwest Grinding Co., Inc. v. Spitz*, 976 F.2d 1016 (7th Cir. 1992).......................................... 72

*Modrowski v. Pigatto*, 712 F.3d 1166 (7th Cir. 2013)........................................................... passim

*Nelson v. Adam USA, Inc.*, 529 U.S. 460 (2000) ......................................................................... 24

*Nelson v. Great Lakes Educational Loan Services, Inc.*,
2019 WL 2636822 (7th Cir. 2019) ............................................................... 103, 104, 105

*North Dakota v. United States*, 495 U.S. 423 (1990) ................................................. 108, 110, 111

*Olsen v. Nelnet, Inc.*,
No. 18-CV-3081, 2019 WL 2189486 (D. Neb. May 21, 2019)............................................. 5, 104

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
135 S.Ct. 1318 (2015)............................................................................................ 40, 41, 43, 44

*Patzer v. Bd. of Regents of Univ. of Wisconsin Sys.*, 763 F.2d 851 (7th Cir. 1985) .................... 94

*Pavlick v. Mifflin*, 90 F.3d 205 (7th Cir. 1996)............................................................................. 56

*Pereira v. U.S.*, 347 U.S. 1 (1954)................................................................................................ 70

*Puffer v. Allstate Ins.*, 675 F.3d 709 (7th Cir. 2012)...................................................................... 8

*Ray v. Spirit Airlines, Inc.*, 836 F.3d 1340 (11th Cir. 2016).......................................................... 79

*Retzlaff v. City of Cumberland and Officer John Smith*,
No. 09-cv-692-slc, 2010 WL 1280330 (W.D.Wis., 2010) ........................................................... 21

*Reves v. Ernst & Young*, 507 U.S. 170 (1993)................................................................. 80, 81, 82

*Richmond v. Nationwide Cassel L.P.*, 52 F.3d 640 (7th Cir. 1995).......................... 74, 78, 79, 81

*Riverwoods Chappaqua Corp. v. Midland Bank, N.A.*, 30 F.3d 339 (2d. Cir. 1994) .................. 79

*Rowlands v. United Parcel Service – Fort Wayne*, 901 F.3d 792 (7th Cir. 2008)........... 23, 24, 78

*Schacht v. Brown*, 711 F.2d 1343 (7th Cir. 1983) ........................................................ 32

*Schmuck v. U.S.*, 489 U.S. 705 (1989) ........................................................................ 70

*Sedima, S.P.R.L. v. Imrex Co., Inc.*, 473 U.S. 479 (1985) .................................... passim

*Smith v. Greystone Alliance, LLC*, 772 F.3d 448 (7th Cir. 2014) ........................ 84, 100

*Sosna v. Iowa*, 419 U.S. 393 (1975) ........................................................................... 83

*Thorn v. Sundstrand Aerospace Corp.*, 207 F.3d 383 (7th Cir. 2000) ............ 58, 59, 60

*Trinity Lutheran Church of Columbia, Inc. v. Comer*, 137 S.Ct. 2012 (2017) ........ 3, 86

*U.S. ex rel. Grubbs v. Kanneganti* 565 F.3d 180 (5th Cir. 2009) ............................. 23

*U.S. Parole Commission v. Geraghty*, 445 U.S. 388 (1980) ...................................... 83

*U.S. v. Britton*, 289 F.3d 976 (7th Cir. 2002) ...................................................... 55, 66

*U.S. v. City of Arcata*, 629 F.3d 986 (9th Cir. 2010) .......................................... 110, 111

*U.S. v. Coffman*, 94 F.3d 330 (7th Cir. 2007)) ........................................................ 54

*U.S. v. Dick.*, 744 F.2d 546 (7th Cir. 1984) ........................................................ 55, 66

*U.S. v. Leahy*, 464 F.3d 773 (7th Cir. 2006) ............................................................ 32

*U.S. v. Powell*, 576 F.3d 482 (7th Cir. 2009) .............................................. 32, 34, 70, 71

*U.S. v. Serfling*, 504 F.3d 672 (7th Cir. 2007) .......................................................... 54

*U.S. v. Turner*, 551 F.3d 657 (2008) ............................................................ 32, 70, 71

*U.S. v. Weimert*, 819 F.3d 351 (7th Cir. 2016) .............................................. 32, 33, 34

*United Food and Commercial Workers Unions and Emps. Midwest Health Benefits Fund v. Walgreen Co.*, 719 F.3d 849 (7th Cir. 2013) ....................... 79

*United States v. California*, 921 F.3d 865 (9th Cir. 2019) .............................. 109, 110, 111

*United States v. Winstar Corp.*, 518 U.S. 839 (1996) ............................................. 105

*Waldridge v. Amer. Hoechst Corp.*, 24 F.3d 918 (7th Cir. 1994) ........................... 6, 20

*Washington v. U.S.*, 460 U.S. 536 (1983) ............................................................... 110

*Yearsley v. W.A. Ross Const. Co.*, 309 U.S. 18 (1940) ............................... 113, 114, 115

*Zingale v. Mills Novelty Co.*, 244 Wis. 144 (1943) ................................................... 40

**Statutes**

18 U.S.C. § 1341 ......................................................................................................... 31

18 U.S.C. § 1343 ......................................................................................................... 31

18 U.S.C. § 1961 ..................................................................................................... 74, 79

18 U.S.C. § 1962(c) ................................................................................................. passim

**Other Authorities**

Higher Education Act of 1965 ...................................................................................... 9

**Rules**

Fed. R. Civ. P.  7(a) ................................................................................................... 22

Fed. R. Civ. P.  8(c)(1) ............................................................................................... 85

Fed. R. Civ. P.  9(b) ............................................................................................... 22, 23

Fed. R. Civ. P. 11 ....................................................................................................... 29

Fed. R. Civ. P. 12 ................................................................................................. passim

Fed. R. Civ. P. 12(b)(6) ..................................................................................... 22, 23, 24

Fed. R. Civ. P. 12(c) ................................................................................................... 22

Fed. R. Civ. P. 12(h)(2) ............................................................................................... 22

Fed. R. Civ. P. 12(h)(2)(A) .......................................................................................... 23

Fed. R. Civ. P. 12(h)(2)(B) .......................................................................................... 23

Fed. R. Civ. P. 12(h)(2)(C) .......................................................................................... 23

Fed. R. Civ. P. 15 ....................................................................................................... 24

Fed. R. Civ. P. 15(b)(1) ............................................................................................... 25

Fed. R. Civ. P. 15(b)(2) ............................................................................................... 25

Fed. R. Civ. P. 23 ....................................................................................................... 83

Fed. R. Civ. P. 56 ................................................................................................. passim

Fed. R. Civ. P. 56(a) ............................................................................................. passim

Fed. R. Evid. 404(b) ................................................................................................... 69

Fed. R. Evid. 701(c) ................................................................................................... 91

Fed. R. Evid. 702 ........................................................................................................... 92

**Regulations**

34 C.F.R. § 682.202(a) .................................................................................................... 9

34 C.F.R. § 682.202(b)(2) ............................................................................................. 10

34 C.F.R. § 682.211(f)(11) .................................................................................... passim

34 C.F.R. § 682.406 ...................................................................................................... 77

34 C.F.R. § 685.202(a) .................................................................................................... 9

34 C.F.R. § 685.202(b) .................................................................................................. 10

34 C.F.R. § 685.205(b)(9) ..................................................................................... passim

Plaintiff Meredith D. Dawson and the Class respectfully submit this Memorandum of Law in Opposition To Defendants' Motion for Summary Judgment (Dkt. 217). Pursuant to the Court's procedures governing motions for summary judgment (Dkt. 182 at 2-7), the Class contemporaneously files the following supplemental papers in support of this Memorandum:

(1) Class's Proposed Findings of Fact ("CPFF");

(2) Declaration of David J. Harris, Jr. in Opposition to Defendants' Motion for Summary Judgment ("Harris Decl."), plus its corresponding Exhibits;

(3) Declaration of Class Member Elizabeth Mosser in Opposition to Defendants' Motion for Summary Judgment, ("E. Mosser Decl."), plus its corresponding Exhibits; and

(4) Declaration of Class Member Angela Monger in Opposition to Defendants' Motion for Summary Judgment, ("A. Monger Decl."), plus its corresponding Exhibits.

Because Defendants filed no Statement of Proposed Findings of Fact, as directed in the Court's summary judgment procedures (Dkt. 182 at 2-7), the Class will not file any separate response to a document that Defendants themselves did not file. *See Modrowski v. Pigatto*, 712 F.3d 1166, 1169 (7th Cir. 2013) (recognizing that courts cannot "enforce or relax" local rules governing summary judgment "unequally as between the parties"). The Court should not treat the absence of such a separate response as the Class's failure to dispute the various assertions of fact, opinion and/or legal conclusions scattered throughout Defendants' moving papers. *Id.*

## INTRODUCTION AND SUMMARY OF ARGUMENT – A ROAD MAP

The Class's claims concern one, and only one, question of liability concerning federal student loan regulations 34 C.F.R. §§ 682.211(f)(11) and 685.205(b)(9). That one loan-related question of liability is whether a standalone B-9 Forbearance period justifies any capitalization transaction on a borrower's FFELP and Direct loans ("Loans"). In other words, the only Loan-related question of liability is whether standalone B-9 Forbearances constitute "capitalization events" under the U.S. Department of Education's ("ED's") rules and guidance. After the Court

1

answers that one Loan-related question of liability, all remaining questions presented are more familiar, generally applicable questions of law and fact.

Conveniently, the parties now *agree* on the answer to that Loan-related question of liability. The parties agree that a B-9 Forbearance, standing alone, does not justify any interest capitalization on a borrower's Loans. In other words, the parties agree that a standalone B-9 Forbearance is not a permissible "capitalization event" under ED's rules. The parties also agree that, during the Class Period, Great Lakes Educational Loan Services, Inc. ("GLELSI") imposed capitalizations on Class members' Loans following their standalone B-9 Forbearances.

Additionally, the parties agree that during the pendency of this lawsuit, ED personnel told Defendants that the Class's standalone B-9 Forbearance capitalizations should never have occurred. The primary *dispute* of fact here is whether Defendants knew this before the lawsuit. Defendants contend that they first learned this in August 2016, a year into the lawsuit. Dkt. 218 at 10. The Class contends that Defendants learned this "in or before November 2011," four years before the lawsuit began. Dkt. 1, ¶5. The Class's evidence could well vindicate their position at trial. So summarily adjudicating this dispute, which pertains only to Defendants' state of mind, would be inappropriate.

Another point of material *agreement* between the parties is that standalone B-9 Forbearance capitalizations caused Class members' Loan balances to substantially increase over time. This occurred as daily interest charges accrued over time on principal debt that never should have existed. *Accord* Class Certification Order (Dkt. 171) at 13-14. The parties, however, continue to have material factual disputes regarding:

> (1) whether Defendants have properly *calculated* the Class's capitalization-induced interest charges; and

(2) the extent, if any, to which Defendants have properly *compensated* the Class for their capitalization-induced interest charges.

These two disputed issues are related, yet distinct.  Proper damages calculations are necessary, but not sufficient, to establish proper compensation.

Procedurally, since the Court has not certified a damages class, the Court need not (and cannot properly) resolve either dispute at this stage.   In an abundance of caution, however, the Class will present its substantive evidence adduced to date regarding both damages-related disputes.  The Class's evidence regarding both damages disputes is discussed in Part III, *infra*.

All remaining disputes between the parties turn on more familiar, generally applicable issues of law and fact.

## A.    Article III Jurisdiction (Part III)

The first resolvable dispute is whether the Court retains its original Article III jurisdiction over the Class's case.  Defendants argue that they have "mooted" this action under Article III.  But they have not come close.  As thoroughly discussed in Part III, *infra*, Defendants have not afforded Class members the complete relief they demand.  For this reason alone, as a matter of law, the case is not moot.

Defendants have also failed to carry their "heavy burden" of making it "absolutely clear" that their wrongful conduct cannot reasonably be expected to recur.  *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 137 S.Ct. 2012, n.1 (2017); *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 190-91 (2000) (holding that Article III "mootness" requires a defendant to make it "absolutely clear" that the challenged conduct "could not reasonably be expected to recur").   For this second, independent reason, the Class's case is not moot as a matter of law.

Finally, as a factual matter, the Class' evidence shows that Defendants' so-called "remediation projects" (or "reassessments," as Defendants call them outside of Court) do not redress the Class's alleged financial injuries. In fact, they do not even measure the Class's alleged financial injuries, *i.e.,* the impact of wrongful capitalization transactions on Class members' Loan balances. They measure something else entirely. In many cases, Defendants' "remedies" have resulted in Class members suffering brand new Loan balance *increases*. Piling more debt atop thousands of inflated Loan balances is not a "remedy" for the financial injuries alleged in this case.

There are also more than 6,000 "paid-in-full" Class members who paid off their inflated Loan balances pre-"remediation." The evidence shows that many of these Class members have not been financially compensated. There exist thousands if not tens of thousands of Class members for whom there is no evidence that they have been compensated at all: much less in the correct amounts.

For all of these reasons, as detailed in Part III, *infra*, Defendants have not "mooted" this Court's original Article III jurisdiction.

### B.    Common Law Negligence And Negligent Misrepresentation (Part IV)

Defendants make no argument concerning the merits of Class members' common law negligence or negligent misrepresentation claims. *See generally* Dkt. 218 (no discussion regarding the merits or elements of Class common law claims). Defendants contend only that the Class's common law claims fail as a matter of conflict preemption, and under inapposite doctrines of sovereign immunity.

Defendants' preemption and immunity arguments all rest on the false premise that the Class seeks to impose state law standards that conflict with, or add to, federal Loan standards. But that is not the Class's case at all. The Class's common-law case is only that Defendants *violated* ED's capitalization rules and requirements by treating their standalone B-9 Forbearances as

4

"capitalization events."  *See* Complaint (Dkt. 1), ¶34 (alleging violations of the "B-9 Forbearance Regulations").  State law claims and remedies that *rely upon* violations of federal law do not implicate conflict preemption.  *Bible v. United Student Aid Funds, Inc.*, 799 F.3d 633, 652-55 (7th Cir. 2015)  ("In this situation, federal law simply provides the standard of compliance, and the parties' duties are actually enforced under state law.  There is no conflict."); *Olsen v. Nelnet, Inc.*, No. 4:18-CV-3081, 2019 WL 2189486, at *4-5 (D. Neb. May 21, 2019) (sustaining class common law claims against federal Loan servicer where the claims merely sought to "enforce the federal regulatory standards").

For similar reasons, and then some, Defendants' "immunity" arguments fall flat.  First, the "immunity" cases relied upon by Defendants are inapposite because they address state *government* attempts to regulate *lawful* federal activities.  Here, no state *government* is imposing a rule that *offends* federal requirements or frustrates *lawful* federal activities. In fact, no State is imposing any federal Loan rules whatsoever.  The common law has merely afforded *private parties* rights of action to redress *private injuries* caused by *violations* of federal standards.  The Class lacks the power to "regulate" anything.  Class members, however, do have the right to protect what is theirs: namely, their own Loan contracts and their own money.  If those things are in jeopardy because some federal contractor *violated* federal Loan standards, then the Class can seek judicial relief as a constitutional matter.

Moreover, even if there was some form of quasi-sovereign immunity available to private Loan servicers generally (there is not), the Defendants in *this* case have long waived any such immunity by voluntarily litigating against the Class for four years.  *Cf. Lapides v. Bd. of Regents of Univ. Sys. of Georgia*, 535 U.S. 613, 619 (2002) (finding waiver of a state's sovereign immunity where the state "voluntarily invoked the federal court's jurisdiction").   In this particular case,

Defendants did not merely answer the Class's common law claims four years ago. Defendants affirmatively *counterclaimed* against Plaintiff Dawson under the Declaratory Judgment Act, and demanded that this Court finally resolve this case in their favor.[1] Defendants cannot possibly claim "immunity" from a lawsuit in which they themselves demanded judicial relief and voluntarily litigated against this Class for years on end. By their own conduct, Defendants have waived any "immunity" they might have imagined for themselves four years ago. To hold otherwise would "generate seriously unfair results." *Lapides*, 535 U.S. at 619.

For all of these reasons, Defendants are not entitled to summary judgment on the Class's common law claims.

### C.   Class RICO Claims (Parts I and II)

Finally, with respect to Class RICO claims, Defendants have not filed a summary judgment motion that requires the Class to present responsive arguments or evidence. Defendants simply have not carried their initial burden of production on a Rule 56 motion. This is true for three reasons.

First, Defendants declined to file any Statement of Proposed Findings of Fact, as instructed by the Court's summary judgment procedures. *See* Dkt. 182 at 2-7 (Preliminary Pretrial Packet). This omission alone entitles the Court to deny Defendants' motion, without further consideration. *Modrowski*, 712 F.3d at 1169; *see also Waldridge v. Amer. Hoechst Corp.*, 24 F.3d 918, 923 (7th Cir. 1994) (statements of proposed findings of fact "are, in short, roadmaps, and without them the

---

[1] *See generally* Dkt. 24 at ¶¶106-139; *id.* at p.30 (Defendants' Prayer for Relief) ("Great Lakes demands judgment against Dawson as follows . . . ."); *see also* Dkt. 36 at 3 (Defendants: "In an effort to resolve conclusively what actually happened, the Great Lakes Defendants have brought a counterclaim for a declaratory judgment against Dawson . . . .").

court should not have to proceed further, regardless of how readily it might be able to distill the relevant information from the record on its own").

*Second*, Defendants' motion includes no legal argument in support of a final merits judgment. Nowhere do Defendants' papers even discuss the legal standards for entering a final merits judgment under Rule 56. Rather, Defendants contend only that Plaintiff Dawson's initial Complaint "fails to state a claim" under Rule 12. *E.g.,* Dkt. 218 at 35; *id.* at 36 ("[W]e now explain why her RICO claims never came close to stating a claim."). *See also id.* at 37 (arguing that Plaintiff "did not plead the required level of particularity"); *id.* at 38 (RICO violations concerning fraud "must be pleaded with the heightened specificity of Rule 9(b)"); *id.* at 43, n.8 ("Dawson's allegations are also insufficiently pleaded because . . . ."); *id.* at 49, n.10 ("In addition, Dawson's *complaint* fails to establish a pattern . . . .") (emphasis added). As explained in Part I, *infra*, failure to state a claim is not a defense that warrants summary judgment. The plain text of Rule 12 prohibits even *raising* the defense of "failure to state a claim" at this stage of litigation. There are important reasons for this procedural limitation, as explained in Part I, *infra*. Because Defendants make no legal argument under Rule 56 — while also offering no Proposed Findings of Fact — the Court should deny Defendants' motion for summary judgment on Class RICO claims as defective.

*Third*, and additionally, a summary judgment movant cannot carry its initial burden by cherry-picking only those portions of the record which appear to support its factual conclusions. *Goka v. Bobbit*, 862 F.2d 646, 650 (7th Cir. 1988) ("Defendants have interpreted *Celotex* to require that they identify *only* those portions of the record which support their position on summary judgment, although there exists evidence to the contrary of which defendants are aware. [***] We do not agree.") (emphasis in original). Where a movant omits to mention evidence known to create material factual disputes, he cannot obtain summary judgment in his favor. *Id.* Here, to the extent

Defendants challenge Class RICO claims using materials outside the pleadings, Defendants' papers do not mention *any* of the deposition testimony or exhibits which create genuine factual disputes concerning Defendants' state of mind during the Class Period. *See generally* Part I.C., *infra* Defendants' misleading cherry-picking of the record is improper under *Goka*, and only further precludes a Rule 56 judgment in Defendants' favor.

At bottom, Defendants have failed on three independent fronts to carry their initial burden of production on a Rule 56 motion. Defendants offer no proposed findings of fact, contrary to this Court's summary judgment procedures. Dkt. 182 at 2-7. They offer no substantive Rule 56 argument against Class RICO claims, as opposed to Rule 12 arguments. And they omit from their papers *all* record evidence known to them to create genuine factual disputes. *But see Goka*, 862 F.2d at 650. Consequently, summary judgment against this Class is not warranted. A denial of Defendants' defective motion is more than warranted. *Cf. Eckhardt v. State Farm Bank, F.S.B.*, 1:18-cv-01180, 2019 WL 1177954, at *8 (C.D. Ill. Mar. 13, 2019) ("The Court declines to step into the role of advocate to make Defendant's argument for it . . . .") (citing *Puffer v. Allstate Ins.*, 675 F.3d 709, 718 (7th Cir. 2012)).

In any event, to the extent Defendants argue that the Class "fails to state a claim" with respect to certain elements of their RICO claims, the Class will thoroughly address those RICO elements with evidence and argument under Rule 56: not Rule 12. *See Big O Tire Dealers, Inc. v. Big O Warehouse*, 741 F.2d 160, 163 (7th Cir. 1984) ("As this court has warned, it is always prudent to respond to a motion for summary judgment, even if the opposing party believes that the movant has failed to sustain his initial burden.").

## STATEMENT OF FACTS

### A.   High-Level Summary Of Facts And Student Loan Issues

Plaintiff and the Class are former college and graduate students who took out student loans to fund their education, under the federal FFELP and Direct student loan programs ("Loans"). The terms of the Class's Loan agreements incorporate by reference, and are generally governed by, the Higher Education Act of 1965 ("HEA") and certain U.S. Department of Education ("ED") regulations promulgated thereunder. FFELP and Direct Loans come with relatively high interest charges, which accrue daily, at annualized rates of up to 10% of outstanding principal. *See, e.g.,* 34 C.F.R. § 685.202(a) (allowing annualized rates as high as 9.5% for Direct loans); 34 C.F.R. § 682.202(a) (allowing annualized rates as high as 10% for FFELP loans).

The Class's "Lenders," including ED and hundreds of private Lenders, all contracted with Defendant GLELSI to service these Loans. CPFF, ¶¶1-4, 81-87. As a servicer, GLELSI must manage the details of borrowers' Loan accounts, and continually report borrowers' Loan balances and statuses to borrowers, Lenders, federal agencies, the National Student Loan Data System ("NSLDS") and the major credit bureaus. *Id.* GLELSI's account management and reporting must conform to the Loans' financial terms, including those terms that are dictated by the HEA and ED's corresponding regulations. *Id.*

This Class action arises out of GLELSI's and certain of its officers' negligent or fraudulent inflation of Class members' Loan balances over a multi-year period. At various times between January 1, 2006 and the present ("Class Period"), GLELSI and its managers increased Class members' principal Loan balances by executing unauthorized interest "capitalization," or "capping," transactions on their accounts. In general, a capitalization transaction converts some or all of a Class member's outstanding interest charges into principal debt, thus causing additional interest to accrue on the Loan over time.

9

If Lenders were afforded the discretion to execute "capping" transactions at will, Lenders would be able to increase borrowers' Loan balances *exponentially* above the original Loan amounts. But this was never the intent of the FFELP and Direct Loan programs. Rather, the intent was to make higher education more affordable for potential students, particularly those who come of age facing economic hardship or poverty. Thus, the HEA and its implementing regulations do not allow Lenders to "capitalize" outstanding interest charges whenever they want. *Accord* Class Certification Order (Dkt. 171) at 3 ("Generally speaking, interest accumulates constantly on student loans, but accrued interest may not be capitalized at Great Lakes' discretion.").

Lenders and their servicers may only capitalize interest upon the occurrence of enumerated "capitalization events," or "capping events," occurring on borrowers' Loan accounts. "Capitalization events" include various types of borrower "deferment" and "forbearance" periods, during which borrower repayment obligations are suspended (sometimes for years on end). *See, e.g.,* 34 C.F.R. § 682.202(b)(2) (providing that for FFELP Loans, in general, "a lender may capitalize interest payable by the borrower that has accrued . . . [f]or a period of authorized deferment" or "[f]or a period of authorized forbearance"); 34 C.F.R. § 685.202(b) (providing that, in general, "for a Direct Loan not eligible for interest subsidies during periods of deferment, and for all Direct loans during periods of forbearance, the Secretary capitalizes the unpaid interest that has accrued on the loan upon the expiration of the deferment or forbearance").[2] Importantly, however, not all types of forbearances are "capitalization events."

---

[2] The parties agree that the Court's Class Certification Order misstated this aspect of deferments, and most types of forbearances. *See* Dkt. 171 at 3-4 ("For example, student borrowers may enter periods of loan deferment or forbearance for various reasons . . . . No capitalization of interest is allowed during these periods."); *id.* at 4-5 (identifying a "deferment or forbearance" as a "capitalization exception"). As a matter of law, however, deferments and *most* types of forbearances are capitalization *events*. *E.g.,* 34 C.F.R. § 682.202(b)(2); 34 C.F.R. § 685.202(b). While this distinction was not central to the Court's Class certification analysis in Dkt. 171, it is

In other words, there exist certain types of forbearances which, unlike most, may *not* trigger a capitalization transaction against the borrower.  Defendants and ED refer to these forbearance types colloquially as "non-capitalizing forbearances" or "non-capping forbearances."  Among such "non-capping" forbearance types are the ones that Plaintiff Dawson, in her Complaint (Dkt. 1), first labeled a "B-9 Forbearance."  *See* 34 C.F.R. §§ 682.211(f)(11) and 685.205(b)(9) (describing this "B-9," or "benign," type of forbearance).

The Loan-related problem that spawned this lawsuit was that at GLELSI treated Class members' "non-capping forbearances" as "capitalization events" for several consecutive years: even *after* ED personally directed them to stop. CPFF, ¶¶88-101.  Then, even after this lawsuit was filed, Defendants *continued* to treat Class members' "non-capping forbearances" as "capitalization events" for over a year: repeatedly pleading and declaring to the Court that this was permissible.  CPFF, ¶¶153-163, 171-172.

As a result, Plaintiff and the Class have personally incurred and/or paid tens of millions of dollars in unlawful interest charges from their unlawfully capitalized principal dollars.  CPFF, ¶195; Harris Decl., Ex. JJ at 4.  The Class here will offer evidence showing that this was not the result of mere miscommunications among Defendants.  It was instead the result of manipulation, years of manipulation which continued well into this lawsuit, and even today.

While Defendants argue that they've "mooted" the Class's original financial injuries-in-fact under Article III, the Class will show that their relevant financial injuries have not been "mooted" as a matter of fact or law.  Class members thus remain entitled to seek judicial relief in this Court, through a jury trial on their RICO claims and common law claims.

---

material to understanding the communications among Defendants and ED personnel during the Class Period.  Deferments and most types of forbearance are capitalization events.

### B.   Key Terminology

The word *"System,"* and the acronym *"GOALS,"* each refer generally to Defendants' "Guaranty, Origination And Loan Servicing" System. CPFF, ¶¶1-4. The System is a comprehensive database narrowly tailored to servicing FFELP and Direct student Loans. *Id.*; Dkt. 58-30. The System automatically processes routine Loan functions such as interest accrual, Loan balance calculations, borrower payments, borrower status changes (*e.g.,* from repayment status to forbearance status, or vice versa), interest capitalization transactions, and servicer-to-borrower communications. *Id.* In addition, the System conducts comprehensive Loan-data reporting functions that electronically update Lenders, the U.S. Treasury, credit bureaus, and the National Student Loan Database with the latest financial information for serviced borrowers. *Id.*

The phrase *"B-9 Forbearance"* refers to the type of "administrative forbearance" described in 34 C.F.R. §§ 682.211(f)(11) and 685.205(b)(9). *Id.*, ¶¶5-7. This was not a label that Defendants, ED, or anyone else started using until after Plaintiff Dawson filed her Complaint. *Id.* Before this lawsuit, Defendants and ED referred to such forbearances using a variety of related terms: including, *"non-capitalizing administrative forbearances," "non-capitalizing forbearances," "non-capping forbearances,"* or *"document forbearances." Id.* Frequently, Defendants (but not ED) also referred to B-9 Forbearances as one of the three database codes denoting B-9 Forbearance periods in the System. *Id.* Those three database codes are *"FO-ICR," "FO-IBR,"* and *"FO-DOCU."*

The phrase *"capitalization event,"* or *"capping event,"* refers to "something happening on a loan account that would justify a capitalization transaction." *Id.*, ¶8. A *"non-capping forbearance"* refers to a type of forbearance that is not a "capitalization event." *Id.*, ¶9.

The terms *"RULCAPEX"* and *"CAPEX"* rule both refer to Defendants' "capitalization exception" rule in the GOALS System: a programming structure that prevents capitalization

transactions from occurring in connection with particular Loan statuses (*i.e.,* particular forbearance types). *Id.,* ¶¶12-17. Adding the database code(s) for a particular type of forbearance into the CAPEX rule ensures that the given Loan status will *not* cause any future capitalization transactions. *Id.*[3] In other words, RULCAPEX is a forward-looking rule in the System, as opposed to a rule that removes or changes past capitalization transactions. *Id.*

"*Change Requests,*" or "*CRs,*" refer to instructional documents sent by ED to its Loan servicers from time to time. *Id.,* ¶¶18-19. The general purpose of a Change Request is to communicate new Loan servicing requirements, or to clarify existing Loan servicing requirements, for ED-held loans. *Id.* The standard Change Request process begins with ED's initial transmission of a Change Request to its servicers. *Id.,* ¶20. The servicer responds with an internal "impact analysis," describing for ED what (if anything) the servicer believes it would have to do to comply. *Id.,* ¶21. If ED ultimately approves the servicer's impact analysis, ED then gives the servicer authorization to actually begin working on the Change Request. *Id.,* ¶¶22-23. This "authorization to work" step is also called "putting the servicer under contract" for the Change Request. *Id.* Finally, ED works with the servicer to set a final "implementation date" for each CR: the date by which the servicer must be operationally compliant with the CR's servicing requirements. *Id.,* ¶24.

There are two primary CRs relevant to the Class's case. The first is CR 1492, which ED first issued in August 2011 to clarify its own *preexisting* capitalization requirements, and to standardize the allowable "capitalization events" across all of ED's servicers. *Id.,* ¶¶25-28. GLELSI received authorization to work on CR 1492 on February 28, 2012. *Id.* The implementation

---

[3] Importantly, however, merely adding a forbearance code into the CAPEX rule does *not* delete, or otherwise mitigate the financial impact of, *past* capitalization transactions triggered by that forbearance code. *Id.*

date for CR 1492 was June 30, 2012. *Id.* The second relevant CR is CR 2785, which ED first issued in September 2014 to clarify some of *CR 1492's* capitalization requirements. *Id.*, ¶¶29-30. ED authorized GLELSI to begin work on CR 2785 on November 17, 2015, after Defendants became parties to this lawsuit. *Id.,* ¶¶32-34. The final implementation date for CR 2785 was in May 2017. *Id.*

The "*Common Manual*," or "*CM*," is an industry-specific manual authored and maintained by a collaboration of private companies like Great Lakes (as opposed to ED). *Id.*, ¶35. The Common Manual provides "common," private-sector interpretations of the HEA and its implementing regulations, with the goal of providing uniform standards for managing privately held FFELP Loans (as opposed to ED-held FFELP loans). *Id.*, ¶36. The Common Manual is Defendants' "servicing Bible." *Id.*, ¶37.

### C.   Key Personnel

*Jill Leitl* became the Chief Servicing Officer of Defendant GLELSI in February 2010, after approximately two years of assisting her predecessor in that role. *Id.*, ¶¶38-41. Leitl later became GLELSI's Chief Operating Officer on or about May 3, 2015. *Id.* Leitl's vocational background is in computer programming. *Id.* Before Leitl became an officer of GLELSI, she was in charge of GLELSI's development staff who program the servicing System. *Id.* Before that, Leitl was a System analyst and programmer. *Id.*

*Tammy Kielhofer* became GLELSI's Chief Servicing Operations Officer in or about 2010, after two years of assisting Leitl, and Leitl's predecessor, in their respective roles. *Id.*, ¶¶42-48. Kielhofer became GLELSI's Chief Servicing Officer in or about May 2015, when Leitl became Chief Operating Officer. In each role, Leitl has been Kielhofer's boss for the last ten years. *Id.* The two also substantially shared their job duties as Chief Servicing Officer and Chief Servicing

Operations Officer. *Id.* Before Kielhofer became an officer of GLELSI, she worked in various roles, including System programmer, System analyst and project leader. *Id.*

Leitl and Kielhofer have worked together in various capacities at Great Lakes for approximately 29 years. *Id.* Their backgrounds in System programming and analysis allow them to effectively communicate about the technical, System-related issues involved in Loan servicing. *Id.*

**James ("Jim") Fahley** became the manager of GLELSI's Borrower Accounts team in 2008, and was a member of the Borrower Accounts team for years prior. *Id.*, ¶¶49-52. The Borrower Accounts team is responsible for handling borrower status changes (such as deferments and forbearances). *Id.* Also within the Borrower Accounts team is the Financial Adjustments team, which handles any financial changes that need to be made to borrowers' Loan accounts. *Id.* Fahley has worked for Leitl and Kielhofer throughout his time as Borrower Accounts manager. *Id.*

**Cynthia ("Cindy") Battle**

. *Id.*

Ms. Battle has had a working professional relationship with Leitl and Kielhofer throughout the last decade. *Id.* It is a normal occurrence for all of them to correspond by phone and email, and Battle has met with Leitl and Kielhofer several times in person. *Id.* Before this lawsuit was

filed, Ms. Battle was one of the key people at ED with whom Leitl and Kielhofer corresponded about ED's capitalization requirements. *Id.*

> ### *La Teata Jackson*[4]

*Id.*   These included both CR 1492 and CR 2785.   *Id.*

Ms. J ackson ha s ha d a  w orking pr ofessional  relationship w ith  Leitl  and K ielhofer throughout the last decade. *Id.*   It was a normal occurrence for all of them to correspond by phone and email, and Ms. Jackson has met with Leitl and Kielhofer a few times in person as well. *Id.* Ms. Jackson also worked with Ms. Battle on CR 1492 and CR 2785.

*Id.*

> ### *Sherika Roberts*

.  *Id.*

---

4

014.

*Id.*

**Tammy Connelly, Patrice Washington, and Lynn Smith** were among ED's

5. *Id.*

Leitl and Kielhofer have had professional relationships with Tammy Connelly, Patrice Washington and Lynn Smith for about a decade now. *Id.* They have corresponded with each other by phone and email up to *hundreds* of times over the last ten years, and they are all on a first name basis with each other. *Id.* Before this lawsuit was filed, all three of the above-named CORs were among the core group of ED officials with whom Leitl and Kielhofer normally corresponded about ED's capitalization requirements. *Id.*

## ARGUMENT AND AUTHORITY

**I.    THE COURT SHOULD DENY DEFENDANTS' RULE 56 MOTION AS FACIALLY DEFICIENT AND MISLEADING**

Rule 56 provides that a "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a

17

matter of law." Fed. R. Civ. P. 56(a).  "The court should state on the record the reasons for granting or denying the motion."  *Id.*  A parting moving for summary judgment bears "an initial burden of production" requiring the movant "to inform the district court why a trial is not necessary." *Modrowski v. Pigatto*, 712 F.3d 1166, 1168 (7th Cir. 2013).  This initial burden is "not onerous" where the opposing party will bear the ultimate burden of persuasion at trial.  *Id.*  At the same time, however, "overlooking the movant's initial burden of production where the nonmovant bears the burden of proof at trial" is "an unfortunately common error."  *Logan v. Commercial Union Ins. Co.*, 96 F.3d 971, 978 (7th Cir. 1996).

There are two ways for a movant to carry his initial burden of demonstrating why a trial is unnecessary.  The first is to proffer "affirmative evidence that negates an essential element of the opposing party's claim."  *Modrowski*, 712 F.3d at 1169 (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 331 (1986) (Brennan, J., dissenting)).  The second, "somewhat trickier" path is by showing that the opposing party's *evidence* is "insufficient to establish an essential element of the non-moving party's claim."  *Id.*

Here, the Court should deny Defendants' motion for summary judgment because it fails to satisfy either standard.  Defendants simply have not provided the Court with the requisite facts, evidence, or legal arguments to justify entering any final judgment on the merits.

### A.   Defendants Have Not Negated The Class's Claims With "Affirmative Evidence" Because They Have Not Presented Proposed Findings Of Fact

The Seventh Circuit has "consistently and repeatedly upheld a district court's discretion to require strict compliance with its local rules governing summary judgment."  *Koszola v. Board of Educ. of City of Chicago*, 385 F.3d 1104, 1109 (7th Cir. 2004) (quoting *Metro. Life Ins. Co. v. Johnson*, 297 F.3d 558, 562 (7th Cir. 2002)); *see also Bordelon v. Chicago School Reform Board of Trustees*, 233 F.3d 524, 527 (7th Cir. 2000) (holding that a district court can require "strict

compliance" with local rules governing summary judgment). This Court has established — and docketed for the parties — detailed procedures governing motions for summary judgment. *See generally* Preliminary Pretrial Packet (Dkt. 182) at 2-7 ("These procedures require careful preparation of statements of proposed findings of fact.").

The purpose of proposed findings of fact is "to clearly identify the essential facts material to the motion for summary judgment, and to help the court determine if those facts are genuinely disputed." *Id.* Statements of proposed findings of fact are necessary to show the admissibility of evidence supporting "all facts necessary to sustain the motion." *See id.* at 3 ("Each factual proposition must be followed by a reference to evidence supporting the proposed fact.").

Here, Defendants' motion for summary judgment is facially defective, in part because it fails to include any statement of proposed findings of fact. It is unclear from Defendants' papers which factual or quasi-factual assertions they view as "necessary to sustain the motion for summary judgment." *Id.* at 3. It is also unclear whether many of Defendants' assertions are "supported by admissible evidence." *Id.* at 5 ("Every factual proposition, whether made in support of or opposition to, a motion for summary judgment must be supported by admissible evidence."). The broad-sweeping mixtures of fact, opinion, legal conclusions and procedural history (revisions) scattered throughout Defendants' papers leave the Court (and the Class) to guess which "material facts" Defendants are ultimately relying upon in support of a final judgment. *See, e.g.,* Dkt. 218 at 6, 17 (wrongly claiming that ED "serves as the inchoate lender for all FFELP loans," without any evidence or legal support for that assertion); *id.* at 21 (asserting another court's factual finding from another case, which stated that ED "communicates daily" with servicers).[5]

---

[5] *But see General Electric Capital Corp. v. Lease Resolution Corp.*, 128 F.3d 1074, 1083 (7th Cir. 1997) (holding that factual findings from another case are inadmissible unless "beyond reasonable dispute").

To the extent that Defendants cite selected "evidence" for some of their quasi-factual assertions, much of their evidence is facially inadmissible. *See, e.g.,* Dkt. 219 (using the declaration of defense counsel to authenticate documentary evidence); Dkt. 219-6 (defense counsel's own highlighted, and otherwise marked-up, copy of a deposition exhibit); Dkt. 218 at 22 (having a GLELSI employee falsely declare what "would have been apparent" to ED from a particular document).

As another example, one of Defendants' documents (Dkt. 219-11) purports to be an internal government document; it does not purport to have been transmitted to anyone outside of ED. It is unclear how anyone at GLELSI — let alone anyone at Foley & Lardner LLP — could vouch for this document's authenticity. *But see* Dkt. 218 at 23-24 (relying upon the document in support of summary judgment). In any event, the document is no help to their cause because it suggests that mid-lawsuit — in March 2017 — ED approved of GLELSI *not* capping any interest in connection with B-9 Forbearances. Dkt. 219-11 at 8 ("In each case of reviewing the documentation, outstanding interest was not capitalized."). This is hardly tantamount to an approval of GLELSI's B-9 Forbearance capitalizations between 2010 and 2015. CPFF, ¶¶92, 154-155. But in any event, the document is improperly presented if not clearly inadmissible.

Defendants' factual corner-cutting is improper at this stage, and prejudicial to the Class. It leaves the Court and the Class at a disadvantage in discerning which "material" assertions or evidence Defendants are ultimately relying on in support of summary judgment. Fed. R. Civ. P. 56(a). The Class would literally have to parse out each line of Defendants' briefing, declarations, and supporting exhibits, and guess which assertions of fact or opinion are intended as "material" facts justifying a final judgment. *Id.* That would not be practicable, nor helpful to the Court. *Waldridge*, 24 F.3d at 923 (7th Cir. 1994) (proposed findings of fact "are, in short, roadmaps, and

20

without them the court should not have to proceed further, regardless of how readily it might be able to distill the relevant information from the record on its own").

This Court has repeatedly denied motions for summary judgment that fail to adhere to its requirements for submitting properly delineated, proposed findings of fact. *Lust v. Sealy, Inc.*, 234 F. Supp. 2d 908, 910 (W.D.Wis., 2002); *Memon v. Waukesha County Technical College*, No. 13-cv-704-jdp, 2015 WL 505668, *2 (W.D.Wis., Feb. 6, 2015); *Anderson v. Olson*, No. 13-cv-561-wmc, 2014 WL 5167610, *1 (W.D.Wis., Oct. 14, 2014); *Retzlaff v. City of Cumberland and Officer John Smith*, No. 09-cv-692-slc, 2010 WL 1280330, *2 (W.D.Wis., 2010). The Court may similarly exercise its discretion in this case to deny Defendants' motion as defective. *Modrowski*, 712 F.3d at 1169.

The broad-sweeping mixtures of factual assertions, opinions, legal conclusions and inadmissible "evidence" scattered across Defendants' papers do not constitute "affirmative evidence" negating the Class's claims. *Modrowski*, 712 F.3d at 1169; *see also* Dkt. 182 at 3 ("The court will not search the record for facts or evidence."). Thus, Defendants have not satisfied their initial burden of production under Rule 56.

### B.   The Court Should Deny Defendants' Motion With Respect To Class RICO Claims Because It Offers No Rule 56 Argument

A movant's second potential path to carrying its initial burden under Rule 56 is not satisfied by unsupported factual or legal conclusions. *See Logan*, 96 F.3d at 979. "Only after the movant has articulated with references to the record and to the law specific reasons why it believes there is no genuine issue of material fact must the nonmovant present evidence sufficient to demonstrate an issue for trial." *Id.* (citing *Celotex*, 477 U.S. at 323); *see also Becker v. Tenenbaum-Hill Assoc., Inc.*, 914 F.2d 107, 110-11 (7th Cir. 1990) ("Initially, we must consider whether the moving party

has produced sufficient evidence to support a conclusion that *there are no genuine issues for trial*.") (emphasis added).

Here, Defendants' motion papers are not only factually deficient, but also legally deficient because they offer no *Rule 56* argument with respect to Class RICO claims.  Instead, Defendants merely contend that the Class's "operative" Complaint "fails to state a claim."  Dkt. 218 at 35; *see also id.* at 36 ("[W]e now explain why her RICO claims never came close to stating a claim."; *id.* at 37 (arguing that Plaintiff "did not plead the required level of particularity"); *id.* at 38 (RICO violations concerning fraud "must be pleaded with the heightened specificity of Rule 9(b)"); *id.* at 43, n.8 ("Dawson's allegations are also insufficiently pleaded because . . . ."); *id.* at 49, n.10 ("In addition, Dawson's *complaint* fails to establish a pattern . . . .") (emphasis added).  Defendants entire RICO argument rests on these "failure to state a claim" arguments under Rule 12(b)(6) and Rule 9(b).

Even if such arguments had merit (and the Class disagrees), such pleading arguments are legally impotent at this stage of litigation.  "Failure to state a claim" is *not* a legal defense warranting summary judgment under Rule 56.  Rule 12 expressly provides four mechanisms for raising the defense of failure to state a claim.  The first mechanism is the most familiar: a timely Rule 12(b)(6) motion.  *See* Fed. R. Civ. P. 12(b)(6).  The other three mechanisms for arguing "failure to state a claim" are:

> (1) "in a pleading allowed or ordered under Rule 7(a)," such as an answer to a complaint;
>
> (2) by a motion for judgment on the pleadings under Rule 12(c); and
>
> (3) "at trial."

*See* Fed. R. Civ. P. 12(h)(2).

Here, Defendants admittedly chose not to file a Rule 12(b)(6) motion at the pleading stage. Dkt. 218 at 36 ("Great Lakes could have moved to dismiss Count I in 2015 when the complaint was filed but chose not to do so then."). And except for Defendant Great Lakes Higher Education Corporation ("GLHEC"), Defendants never "pleaded" failure to state a claim in their original Answer (Dkt. 24, ¶¶102-105), or even more recently in their Supplemental Answer (Dkt. 199, ¶¶35-56). *See* Fed. R. Civ. P. 12(h)(2)(A). Nor have Defendants filed a motion for judgment on the pleadings under Rule 12(c). *See* Fed. R. Civ. P. 12(h)(2)(B). Therefore, Defendants' only remaining mechanism for asserting "failure to state a claim" is *"at trial."* Fed. R. Civ. P. 12(h)(2)(C) (emphasis added).

Under Rule 12, a Rule 56 motion is expressly *not* a proper mechanism for arguing "failure to state a claim." This limitation is not merely a technicality; as explained below, there are important procedural due process reasons for this limitation.

Defendants say in conclusory fashion that *"[i]t follows"* from failure to state a claim that "Count I cannot withstand summary judgment." Dkt. 218 at 36 (emphasis added). But that is not the law. Rather, the law is that "once a claim has been stated adequately, it may be supported by showing *any set of facts* consistent with the allegations in the complaint." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 563 (2007) (emphasis added); *see also Rowlands v. United Parcel Service – Fort Wayne*, 901 F.3d 792, 800 (7th Cir. 2008) ("The Federal Rules of Civil Procedure require plaintiffs to plead *claims* rather than facts corresponding to the elements of a legal theory."); *Chapman v. Yellow Cab Cooperative*, 875 F.3d 846, 848 (7th Cir. 2017) ("Ever since their adoption in 1938, the Federal Rules of Civil Procedure have required plaintiffs to plead *claims* rather than facts corresponding to the elements of a legal theory.") (emphasis in originals); *U.S. ex rel. Grubbs v. Kanneganti* 565 F.3d 180, 186 (5th Cir. 2009) (recognizing that "Rule 9(b) does not

reflect a subscription to fact pleading"). Indeed, it would be "manifestly inappropriate for a district court to demand that complaints contain all legal elements (or factors) plus facts corresponding to each." *Rowlands*, 901 F.3d 792, 800.

Under Rule 12, *Twombly* and its progeny, the Class's RICO *claims* have long been "stated" for summary judgment purposes: because Defendants never filed any permissible motion or pleading to the contrary. *See generally* Fed. R. Civ. P. 12. It does not "follow" from the absence of facts in a complaint that there is no "genuine dispute as to any material fact" under Rule 56, or that Defendants are entitled to a final merits "judgment as a matter of law." Fed. R. Civ. P. 56(a).

Pleading standards and *judgment* standards are not the same thing. Rule 12(b)(6) and Rule 56(a) provide different legal standards — to be considered at different stages of litigation — because they have different consequences for plaintiffs asserting constitutionally guarded, "property" rights of action. *Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 428-29 (1982) (holding that a cause of action is a species of property protected by the due process clauses of the Fifth and Fourteenth Amendments); *Nelson v. Adam USA, Inc.*, 529 U.S. 460, 465 (2000) ("The Federal Rules of Civil Procedure are designed to further the due process of law that the Constitution guarantees.").

Under Rule 12, failure to state claim constitutes a mere pleading defect. On a proper Rule 12(b)(6) motion, courts evaluate whether a plaintiff has *articulated* ("stated") a viable claim for relief; courts do not decide whether a plaintiff *actually has* a viable claim for relief. If a plaintiff simply fails to state something in a pleading, such failures can often be cured by amendment. *See generally* Fed. R. Civ. P. 15. Contrary to Defendants' unsupported argument, it does not "follow" from failure to "state" a claim that a plaintiff, in fact, *has no claim* "as a matter of law." Fed. R.

24

Civ. P. 56(a).  For this reason mere pleading deficiencies, standing alone, do not warrant final

judgments (*i.e.*, a final judicial disposal of a plaintiff's asserted "property" rights).

A Rule 56 motion presents a different judicial inquiry, and movants must therefore satisfy

a different legal standard.  Under Rule 56, courts evaluate not whether a plaintiff has *articulated* a

viable claim, but instead, whether a plaintiff *in fact has* a viable claim under the law.  If after a full

and fair opportunity for fact "discovery," a plaintiff cannot proffer evidence "showing any set of

facts" supporting his *claims*, then there is no reason to convene a jury.  *Twombly*, 550 U.S. at 563.

At that juncture, procedural due process has been satisfied by the plaintiff's opportunity to

"discover" whatever evidence he can to support his causes of action.

Alternatively, if after discovery, a plaintiff *can* muster evidence supporting his legal claims,

then the jury gets to hear that evidence, regardless of whether it was *articulated* in a prior pleading.

*See* Fed. R. Civ. P. 15(b)(1) ("If, at trial, a party objects that evidence is not within the issues raised

in the pleadings, the court may permit the pleadings to be amended.").  The Court "should freely

permit" such mid-trial amendments if helpful to "presenting the merits," unless the defendant

somehow shows undue prejudice.  *Id.*  As a matter of law, a party may even move to amend the

pleadings "to conform them to the evidence and to raise an unpleaded issue," *after* a trial or

judgment.  Fed. R. Civ. P. 15(b)(2).

In sum, pleadings serve only limited purposes, with limited consequences, in the federal

adjudicative process. Consequently, even if Defendants *could* properly argue and establish failure

to state a claim at this stage (and under the plain text of Rule 12, they cannot), that defense would

hardly demonstrate Defendants' entitlement to summary judgment.  Rule 56 movants must show

more than mere pleading defects.  They must make some form of "showing" that "there is no

genuine issue as to any material fact and [that] the movant is entitled to judgment as a matter of

law." Fed. R. Civ. P. 56(a); *Celotex*, 477 U.S. at 323 ("Of course, a party seeking summary judgment always bears the initial responsibility of informing the district court of the basis of its motion," and "demonstrat[ing] the absence of a genuine issue of material fact.").

Defendants' Rule 56 motion makes no substantive attempt at such a showing, but instead rests their entire RICO argument upon attacking the legal sufficiency of a pre-discovery complaint: in a manner expressly prohibited by Rule 12. This is a fatal legal flaw in Defendants' Rule 56 motion. When combined with Defendants' failure to proffer *any* proposed findings of fact, there is no clear basis for the Court to enter a final merits judgment in Defendants' favor before trial.

### C.   Defendants Have Not Carried Their Initial Burden Because Their Motion Ignores Any Record Evidence Creating Genuine Factual Disputes

In *Goka v. Bobbit*, 862 F.2d 646 (7th Cir. 1988), the Seventh Circuit discussed the Supreme Court's *Celotex* decision, and concluded that a movant may not carry its initial burden under Rule 56 by cherry-picking only those portions of the record that appear to support its position. The appellate court explained as follows.

> Defendants have interpreted *Celotex* to require that they identify *only* those portions of the record which support their position on summary judgment, although there exists evidence to the contrary of which defendants are aware. Defendants maintain that the burden of producing such evidence was on Goka as the party opposing summary judgment, and that he failed to meet that burden. They conclude, therefore, that summary judgment was appropriate. We do not agree.
>
> Defendants' argument ignores the principal purpose of the summary judgment rule which is " to isolate and dispose of *factually unsupported* claims or defenses." *Celotex*, 477 U.S. at 323–24, 106 S.Ct. at 2553. When a party has obtained knowledge through the course of discovery, or otherwise, that a material factual dispute exists and yet proceeds to file a summary judgment motion, in hopes that the opposing party will fail or be unable to meet its burden in responding to the motion, he defeats that purpose; and, more importantly, violates the rules of procedure which govern the conduct of trial, specifically Rule 11.

*Goka*, 862 F.2d at 650.

Here, to the extent that Defendants' Rule 56 motion references portions of the record outside the Complaint, they do not mention *any* portions of the record which are "contrary" to their

positions, and which show "material factual disputes." *Id.* As a general proposition, Defendants contend that "Dawson has done nothing to develop her RICO claims" since filing the Complaint. Dkt. 218 at 36. Defendants, however, are well aware that Plaintiff Dawson has:

>    (1) Taken eight multi-hour depositions of relevant fact witnesses to date;
>
>    (2) Marked more than eighty deposition exhibits, many of which support the Class's claims;
>
>    (3) Served and obtained answers to interrogatories and requests for admissions; and
>
>    (4) Cooperatively obtained third-party discovery from non-parties ED and Ernst & Young LLP.

*See* Harris Decl., ¶2.

Defendants and their counsel have been personally involved in, and present for, all of these endeavors. Thus, their generalized assertion that Dawson "has done nothing to develop her RICO claims" is disingenuous, and amounts to a false and improper use of the summary judgment procedure. *Compare Modrowski*, 712 F.3d at 1170-71 (finding that a defendant "bare[ly]" carried its initial burden by *truthfully* arguing that the plaintiff failed to conduct any discovery), *with Goka*, 862 F.2d at 650 (holding that Rule 56 movants may not ignore evidence adduced through discovery, which is known to them to create genuine factual disputes). By way of example only, Defendants' summary judgment brief asserts that *GLELSI "was surprised" in August 2016* when:

>    [An ED] official said that pre-forbearance accrued interest could be capitalized at the end of *some* B-9 Forbearances ("back-to-back" on es in which another forbearance or deferment period immediately preceded a B-9 Forbearances), but not at the end of "stand-alone" B-9 Forbearances, because the Department did not consider the latter to be capitalization "events."

Dkt. 218 at 10. Yet during her deposition, Kielhofer testified that *in February 2015* — months before this lawsuit — GLELSI learned exactly that "distinction between stand-alone and back-to-back forbearances." *Compare id.*, *with* CPFF, ¶¶10-11, 147-149, *and* Harris Declaration, Ex. B, Ex. C.

Q. So to sum all that up in the context of this February 2015 e-mail, you were being informed that you would capitalize some amount of interest at the end of a non-capping forbearance only if that non-capping forbearance was preceded by some sort of capping event?

A. Correct.

Q. And that was their clarification to you and Great Lakes under CR 2785?

A. Correct. I don't think that was just given – that clarification was just given to Great Lakes. That clarification was given to – we were arguing with them about it, but the clarification was given to all of the servicers. We were the most vocal about it.

Q. [***] In the context of this February 2015 email, what were the situations where ED was telling you not to capitalize any interest at the end of a non-capping forbearance?

A. If there was no leftover capping event prior to the non-capping forbearance, maybe the borrower was in repayment – had been in repayment the whole time and called and said, "I want to switch repayment plans. So I – I need some time to get my paperwork in." In that case, we would cap nothing at the end of the non-capping forbearance.

Kielhofer Deposition at 119:10 – 120:13. Another way of saying the borrower "had been in repayment the whole time" is, "the borrower had a standalone B-9 Forbearance." *See* Class Certification Order (Dkt. 171) at 4 ("One distinction relevant to this question is the difference between 'standalone' B-9 Forbearances and 'back-to-back' B-9 Forbearances. In the standalone situation, a student borrower goes from loan repayment status, to a single 'standalone' B-9 Forbearance period (of no more than 60 days), and then immediately back into repayment status after the period expires. Dawson herself was in that situation, and underwent a standalone B-9 Forbearance."). Defendants' counsel argues that "Great Lakes was surprised by this distinction between stand-alone and back-to-back forbearances" in *August 2016*. Dkt. 218 at 10. Meanwhile, their own client has testified that she and GLELSI learned "this distinction" in *February 2015*. CPFF, ¶¶10-11, 147-149; Harris Declaration, Ex. B, Ex. C; Kielhofer Deposition at 119:10 – 120:13.

28

Defendants had three attorneys present for this deposition: two from Foley & Lardner LLP, and one from in-house. Yet their brief ignores their own client's testimony, and continues to assert the corporate talking point as if it is an undisputed fact. This precludes summary judgment under *Goka*. *Goka*, 862 F.2d at 650 ("When a party has obtained knowledge through the course of discovery, or otherwise, that a material factual dispute exists and yet proceeds to file a summary judgment motion, in hopes that the opposing party will fail or be unable to meet its burden in responding to the motion, he defeats that purpose; and, more importantly, violates the rules of procedure which govern the conduct of trial, specifically Rule 11.").

Similarly, Defendants' brief asserts that before this lawsuit, "Great Lakes had understood [34 C.F.R. §§ 682.211(f)(11) and 685.205(b)(9)] to mean that, while interest that accrued *during* a B-9 Forbearance could never be capitalized, interest that had accrued *before* such a period began should be capitalized at its end." *See* Dkt. 218 at 9-10 (citing their own legal brief at Dkt. 65). But during the First GLELSI Deposition, Kielhofer testified otherwise.

> Q. Is it Great Lakes' policy generally that when a forbearance period ends, all outstanding interest is capitalized at the time the forbearance period ends and repayment is entered?
>
> A. Prior to June 30th of 2012, our practice was that at the end of a noncap – a noncapping forbearance, we would capitalize the interest that accrued prior to that noncapping forbearance, but not the interest that accrued during the noncapping forbearance.
>
> Q. This is prior to June 30, 2012?
>
> A. Yes.
>
> Q. Isn't that the position you're taking now, though?
>
> A. So on – on June 30th or – we implemented a change on June 30, 2012 because the Department of Education had sent a change request to all of the servicers, giving them guidance on how interest should be capitalized. *We read that change request to say, at the end of a noncapping forbearance, do not capitalize any interest.*

First GLELSI Deposition (Dkt. 53) at 67:5-25 (emphasis added). *See also id.* at 70:16-22:

29

Q. So Great Lakes was reading the regulations, the official regulations, to say that pre-forbearance interest was what you guys call cappable at the end of a noncapping forbearance period, but then the change request came and said no, don't do that anymore; right?

A. *That is how we read the change request.*

(emphasis added).

Defendants' counsel nonetheless continues to argue that "Great Lakes had understood [34 C.F.R. §§ 682.211( f)(11) and 685.205( b)(9)] to mean that" pre-forbearance interest was "cappable" at the end of B-9 Forbearances, yet their client repeatedly testified that she and GLELSI understood the *opposite* during the Class Period. *See also* Kielhofer Deposition at 119:10 – 120:13. Defendants had three attorneys present for both of these depositions: two from Foley & Lardner LLP, and one from in-house at Great Lakes. Yet their brief ignores their own client's testimony, and continues to assert the corporate talking point as if it is an undisputed fact. This further precludes summary judgment under *Goka*.

These are just two of many examples. There are many others. *See also* Part III, *infra* (relating to Article III mootness). To belabor them all would be a lengthy and strenuous endeavor.

In the end, Defendants' motion papers fail to carry their initial burden of production under Rule 56 because: (1) they fail to include any proposed findings of fact, with appropriate citations to evidence; (2) with respect to Class RICO claims, they rest entirely on "failure to state a claim" arguments, which are expressly prohibited by Rule 12, and which do not entitle Defendants to a final judgment; and (3) they cherry-pick (and misrepresent) only those portions of the record that appear to support Defendants' positions, while ignoring known portions of the record supporting the Class's positions. For all three of these independent reasons, the Court must deny Defendants' motion for summary judgment as defective.

Nevertheless, since Defendants argue that the Complaint "fails to state a claim" with respect to certain elements of Class RICO claims, the Class will address those RICO elements, as if Defendants had filed a proper Rule 56 motion. *Big O Tire Dealers*, 741 F.2d at 163 ("As this court has warned, it is always prudent to respond to a motion for summary judgment, even if the opposing party believes that the movant has failed to sustain his initial burden.").

## II.   DEFENDANTS ARE NOT ENTITLED TO SUMMARY JUDGMENT ON CLASS RICO CLAIMS

The Racketeer Influenced and Corrupt Organizations Act provides that it "shall be unlawful for any person employed by or associated with any enterprise . . . to conduct or participate . . . in the conduct of such enterprise's affairs through a pattern of racketeering activity." 18 U.S.C. § 1962(c).  The elements of a civil RICO violation are (1) the conduct (2) of an enterprise's affairs (3) through a pattern (4) of racketeering activity.  *Sedima, S.P.R.L. v. Imrex Co., Inc.*, 473 U.S. 479, 495 (1985).  The statute defines "racketeering activity" to include violations of 18 U.S.C. § 1341 (relating to mail fraud) and 18 U.S.C. § 1343 (relating to wire fraud).  18 U.S.C. § 1961.

Defendants challenge only the following elements of Class RICO claims.  First, Defendants argue that they committed no mail or wire fraud under 18 U.S.C. §§ 1341 and 1343. Dkt. 218 at 37-43.   Second, even if Defendants violated the mail or wire fraud statutes, they say they did not engage in a "pattern" of mail and wire fraud under 18 U.S.C. § 1962(c).  *Id.* at 43-49.  Third, and finally, Defendants argue that there is no RICO "person" in this case who "conducted" the affairs of a RICO "enterprise," and who is sufficiently *distinct* from an alleged enterprise to be held liable. *Id.* at 51-56.

The Class will show that material factual disputes exist as to whether Defendant GLELSI conducted GLHEC's affairs through a pattern of mail and wire fraud, and whether Defendant Leitl

conducted GLELSI's affairs through a pattern of mail and wire fraud.  The Class will no longer pursue its RICO (or common law) claims against Defendants Lentz and Walker.[6]

### A.   The Broad Reach Of The Federal Mail And Wire Fraud Statutes

RICO's predicate acts of mail and wire fraud have substantially identical elements.  *See U.S. v. Leahy*, 464 F.3d 773, 786-87 (7th Cir. 2006) (recognizing that the elements of wire fraud "directly parallel" those of mail fraud); *U.S. v. Turner*, 551 F.3d 657, 666 at n.4 (2008) ("Cases construing the mail-fraud statute are equally applicable to cases involving violations of the wire-fraud statute.").  The elements of mail and wire fraud are: (1) a scheme to defraud; (2) fraudulent intent; and (3) the use of interstate wires or the mails in furtherance of the scheme.  *U.S. v. Powell*, 576 F.3d 482, 490 (7th Cir. 2009); *Leahy*, 464 F.3d at 786-87.

Courts interpret these elements broadly.  *U.S. v. Weimert*, 819 F.3d 351, 354 (7th Cir. 2016) (recognizing that "[f]ederal wire fraud is an expansive tool" for prosecution).  Such breadth exists because the mail and wire fraud statutes brought "into the federal ambit regulation of common law fraud," thereby effecting "a realignment of the federal-state role."  *Schacht v. Brown*, 711 F.2d 1343, 1355 (7th Cir. 1983); *see also Sedima,* 473 U.S. at 499  ("Instead of being used against mobsters and organized criminals, [ civil RICO] has become a tool for everyday fraud cases brought against 'respected and legitimate enterprises.' [citation omitted] Yet Congress wanted to reach both 'legitimate' and 'illegitimate' enterprises.").  "The fact that RICO has been applied in situations not expressly anticipated by Congress does not demonstrate ambiguity.  It demonstrates

---

[6] Despite the legal truth that no Defendant has carried their initial burden of production on a Rule 56 motion, the Class does not object to the Court entering summary judgment in favor of Defendants Lentz and Walker on all claims.  The evidence obtained through discovery does not suggest that Lentz or Walker was in charge of capitalization issues during the Class Period.  In addition, Lentz and Walker apparently retired from Great Lakes months before this lawsuit, so presumably, they have not been involved in Defendants' fraudulent defense of this case, discussed *infra*.

breadth."). *Sedima*, 473 U.S. at 499 (quoting *Haroco, Inc. v. American Nat'l Bank and Trust Co. of Chicago*, 747 F.2d 384, 398 (7th Cir. 1984)).

Decidedly, however, the breadth of the mail and wire fraud statutes is not limitless. For instance, the statutes do not reach misrepresentations regarding "the negotiating positions of parties to a business deal." *Weimert*, 819 F.3d at 354. In commercial negotiations, it is generally understood and accepted that sophisticated parties may "conceal from others their true goals, values, priorities, or reserve prices." *Id.* Accordingly, the federal fraud statutes do not reach misrepresentations concerning only the *subjective* states of mind of parties to a business deal. *See generally id.*[7] The mail and wire fraud statutes also do not reach overgeneralized, positive statements constituting "puffery," because puffery "cannot reasonably be deemed material." *Id.* at 365.

By contrast, the mail and wire fraud statutes can and do reach fraudulent overcharges against borrowers of various types of loans, including federal student loans. *See generally Haroco*, 747 F.2d 384 (sustaining RICO claims predicated on mail and wire fraud where lenders defrauded borrowers in the calculation of commercial loan interest rates); *Bible*, 799 F.3d 633 (sustaining RICO claims predicated on mail and wire fraud where FFELP loan holder concealed, and then imposed, unauthorized collection costs). In this case, there is evidence that Defendants Leitl, GLELSI and its managers imposed fraudulent overcharges against 129,492 Loan borrowers over a multi-year Class Period. The evidence further suggests that Defendants' fraud continues in substantial part today.

---

[7] This does not, however, mean that parties to a business deal are free from prosecution for whatever lies they might tell while making a deal. *Id.* (finding "no evidence that Weimert misled anyone about any material facts, or about promises of future actions" because "[a]ll the actual terms of the deal . . . were fully disclosed").

**B.**     **Defendants Engaged In "Schemes To Defraud" By Making Numerous Materially False And Misleading Statements Since 2011**

The elements of mail and wire fraud are: (1) a scheme to defraud; (2) fraudulent intent; and (3) the use of interstate wires or the mails in furtherance of the scheme. *Powell*, 576 F.3d at 490; *Leahy*, 464 F.3d at 786-87. A "scheme to defraud" includes "the making of a false statement or material misrepresentation, or the concealment of a material fact." *Powell*, 576 F.3d 490. This standard "is broad, reaching not only false statements of fact but also *misleading half-truths* and knowingly false promises." *Weimert*, 819 F.3d at 355 (emphasis added). Misleading statements and omissions "need not be made directly to the victim of the scheme. *Id.* "Deception of someone else can suffice if it carries out the scheme." *Id.* A scheme to defraud may exist even where "no one relied on any misrepresentation." *Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639, 647-48 (2008).

Here, GLELSI and its executives have made numerous, materially false and misleading statements and omissions during the Class Period, including during the course of this lawsuit.

**1.     "We do not cap in these situations."**

On September 15, 2011, GLELSI's then-Chief Servicing Operations Officer (Kielhofer) misrepresented GLELSI's interest capitalization practices to ED. Specifically, Kielhofer sent Cindy Battle and La Teata Jackson an email with the subject line, "CR 14 92 – Interest Capitalization." CPFF, ¶¶98-99; Harris Decl., Ex. K at GL 0003051_0001. The body of Kielhofer's email described a "situation where a forbearance is granted to allow the borrower to turn in their paperwork on something." *Id.* Kielhofer wrote to Cindy Battle and La Teata Jackson that, "[w]e do not cap in these situations." *Id.*[8]

---

[8] These "situations" described what the parties now call a "B-9 Forbearance" situation. *Id.*

The true facts, however, were that GLELSI was routinely capping in these situations. At all relevant times, "FO-ICR" was the predominant B-9 Forbearance code in GLELSI's System, and was programmed into the System as an automatic "capping" event: from at least August 2010 through April 2014. CPFF, ¶¶88, 92, 136. Hence, whenever borrowers incurred standalone FO-ICR periods, GLELSI was, in fact, imposing capitalization transactions. *Id.*

Cindy Battle believed Kielhofer's material misrepresentation in September 2011. *Id.*, ¶100. In fact, Cindy Battle did not learn that GLELSI was treating B-9 Forbearance periods as capitalization events until "approximately" *August 2016*, in the middle of this lawsuit. *Id.* La Teata Jackson did not learn this truth until early *2019*, when she was served with a subpoena in this case. *Id.*, ¶101.

### 2. Leitl misrepresented GLELSI's ability to meet ED's implementation date for CR 1492.

On February 28, 2012, Leitl requested an extension on ED's implementation date for CR 1492. CPFF, ¶109; Harris Decl., Ex. M at GL 0003036_0001. The next day, Tammy Connelly (one of ED's CORs) confirmed to Leitl that ED could move the implementation date back to June 30, 2012. *Id.* Connelly asked Leitl if that implementation date was "doable," and Leitl replied, "Yes, that is doable." *Id.*

The true facts, however, were that GLELSI would not finish implementing CR 1492's capitalization requirements until *April 2015*. *Id.*, ¶¶111-112; Harris Decl., Ex. O at GL 0002123_0001. GLELSI and its managers missed ED's final implementation date for CR 1492 by three years, and concealed that material fact from ED's change management group. *Id.* La Teata Jackson was the "project manager" who oversaw CR 1492's implementation on behalf of ED. *Id.*, ¶64. Despite their *extensive* interactions between 2012 and 2019, neither Leitl nor

Kielhofer ever informed La Teata Jackson that they had missed ED's implementation date for CR 1492. *Id.*, ¶113.

> Q. You testified earlier that one of the actions you might take in response to learning that a servicer failed to meet an implementation date is you might make some inquiries; right?
>
> A. Correct.
>
> Q. And one of the inquiries that I believe you mentioned, correct me if I'm wrong, was why did you fail to meet it?
>
> A. Yes.
>
> Q. And another inquiry, I believe that you stated, was why didn't you tell us that you failed to meet it?
>
> A. Yes.
>
> Q. Is the reason you would ask why they didn't tell you, because you would expect to be informed . . . of a failed implementation date?
>
> A. As a business analyst responsible for a change request, I would expect to be informed.
>
> Q. But Great Lakes never informed you personally that it failed to meet an implementation date for CR 1492?
>
> A. Correct.

La Teata Jackson (Jenkins) Deposition at 91:15 – 92:17. First, Kielhofer (with Leitl copied) misrepresented GLELSI's capitalization practices to ED officials in September 2011. *See supra*. Then, from 2012 to 2019, Leitl, Kielhofer and GLELSI concealed from ED's project manager the fact that GLELSI had missed CR 1492's implementation date by three years.

### 3. GLELSI invoiced ED for millions of dollars in Loan servicing fees while concealing its non-compliance with ED's capitalization requirements.

Defendants' misrepresentations to ED regarding their true capping practices, and their failure to implement CR1492's capping requirements, facilitated *additional* misrepresentations to ED during the Class Period.

Those additional misrepresentations came in the form of GLELSI's monthly invoices to ED for Loan servicing fees.  During the Class Period, GLELSI invoiced ED for approximately $13 million to $15 million per month in Loan servicing fees.  CPFF, ¶196.  That amounted to most of GLELSI's total monthly revenue.  *Id.*, ¶85.

GLELSI's E D S ervicing C ontract pr ovided t hat G LELSI w ould b e pa id i ts m onthly servicing fees on a per-borrower basis.  *Id.*, ¶83; Dkt. 58-29 at 17 (docket pagination).  Importantly, however, the ED Servicing Contract *also* provided.

> **Invoicing and Non-Compliance** — Borrowers whose loans are not being serviced in compliance with the Requirements, Policy and Procedures for servicing federally held debt due to the fault of the servicer (*i.e.,* correct interest calculations, correct balances, interest determination and calculations, notices sent properly, proper due diligence, etc.), *will not be billable to the Government from the initial point of non-compliance.*  Any funds that have been invoiced for these borrowers and paid shall be returned to the Government via a credit on the next invoice.

Dkt. 58-29 at 16 (docket pagination). (emphasis added). GLELSI's monthly invoices to ED were materially misleading during the Class Period because they concealed that: (a) GLELSI had missed ED's implementation date for CR 1492 by three years (CPFF, ¶¶108-114); (b) that GLELSI was treating non-capitalizing administrative forbearances as capitalization events, in violation of CR 1492's requirements (CPFF, ¶¶6-9, 88-92, 107, Harris Decl., Ex. A (CR 1492) and Ex. H (Masten Email)); an d (c) that this w as cau sing i ncorrect i nterest cal culations an d i ncorrect b alances for many serviced borrowers, including all 129,492 Class members (CPFF ¶¶138, 195; Harris Decl., Ex. JJ).

Under the E D S ervicing C ontract, E D paid GLELSI about $2 p er m onth, per damaged Class member, over a multi-year period. Dkt. 58-29 at 17 (docket pagination).  This translates to invoicing overcharges by GLELSI against the U.S. government of at least millions, perhaps tens of millions, of dollars during the Class Period.

### 4. GLELSI made materially false and misleading Loan balance statements to Lenders, borrowers, credit bureaus, and federal agencies.

Beginning in August 2010, through the filing of this lawsuit, GLELSI made materially false and misleading Loan balance statements to every major Loan stakeholder. Throughout the Class Period, GLELSI reported inflated Class Loan balance information to Class members, their Lenders, and credit bureaus nationwide on a daily basis. C PFF, ¶199. GLELSI made such statements through its daily Financial Management System ("FMS") data file transmissions to ED and the U.S. Treasury. *Id.*, ¶200. GLELSI's FMS data files are the mechanism by which the company "speaks" directly to the government's general ledger. *Id.*, ¶201. GLELSI also reported inflated principal and interest balances to the National Student Loan Data System ("NSLDS") on a weekly basis. *Id.*, ¶202.

To private FFELP Lenders, GLELSI sent "a collection of lender reporting documents" on a monthly basis, showing "all their transactions . . . so they could update their own general ledger[s]." *Id.*, ¶203. Also on a monthly basis, GLELSI transmitted "Metro 2" data files to the major credit bureaus showing each Class member's purported debt levels. *Id.*, ¶204.

Furthermore, GLELSI routinely sent Class members their inflated Loan balances via the borrower interface on www.mygreatlakes.org. *Id.*, ¶205. For Class members who lacked online accounts on mygreatlakes.org, GLELSI sent them monthly billing statements by mail displaying their falsely inflated principal and interest balances. *Id.*, ¶206.

The Loan balance statements GLELSI sent to all Loan stakeholders were falsely inflated by over $22 million in the aggregate. Harris Decl, Ex. JJ (Defendants' interrogatory responses).[9]

---

[9] The Class disputes that this dollar amount marks a complete and accurate calculation of their actual damages. *See* Part V, *infra*. Yet even Defendants' flawed damages calculations give the Court *some* idea of the order of magnitude by which Defendants misrepresented the Class's true debt obligations to every Loan stakeholder.

### 5.  GLELSI's B-9 Forbearance notices to Class members were materially misleading because they suggested that no capitalization would occur.

In *Bible*, the Seventh Circuit evaluated a FFELP Lender's imposition of collection costs which were prohibited by ED's regulations.  The Circuit court held that the Lender's form letters to borrowers were actionably misleading under the mail and wire fraud statutes because they reasonably "implied that collection costs would not be assessed": when in fact, collection costs would be assessed. *Bible*, 799 F.3d at 658.  *Bible* held that those form letters could be misleading to borrowers *even if* the collection costs "had been permitted by the regulations." *Id.*

In this case, from 2012 through the filing of this lawsuit, GLELSI transmitted comparable form letters and emails to Class members entering B-9 Forbearance status.  CPFF, ¶124; Harris Declaration, Ex. T at GL 0000047.  GLELSI's form B-9 Forbearance notices concealed the true fact that Class members would incur capitalizations if they declined to pay off their interest obligations by the end of their B-9 Forbearances.  *Id.*  GLELSI's notices stated only that interest would "continu[e] to accrue on your loan each month you're in forbearance"; they omitted to disclose that interest would be capitalized against the borrower if left unpaid.  *Id.*  No reasonable borrower could have surmised from GLELSI's B-9 Forbearance notices that capitalization was imminent unless they paid off their interest balances.

During the Class Period, ED *required* GLELSI to make such a disclosure before capitalizing interest against borrowers.  CPFF, ¶122; Harris Decl., Ex. S at GL 0003003_0001 ("Before the Servicer capitalizes interest, the Servicer is required to notify the borrower that unpaid interest will be capitalized and allow the borrower the opportunity to pay the interest balance before the capitalization event.").  GLELSI, however, concealed that material information from Class members, leaving them powerless to prevent or at least mitigate these damaging and unauthorized capitalizations for themselves.

The f act t hat E D r equired G LELSI t o p re-disclose c apitalizations o nly f urther "strengthens" the Class's claims that GLELSI's email notices were materially misleading when transmitted, particularly when coupled with ED's rules prohibiting such capitalizations in the first place. *See Bible*, 799 F.3d at 660-61 & n.9.

### 6. Defendants' C ounterclaim agai nst Plaintiff D awson ( Dkt. 24) c ontained materially false and misleading statements of fact and opinion.

At common law, courts have long recognized that fraudulent statements are not necessarily limited to statements of fact. Statements of *opinion* may be fraudulent "where the speaker knows of facts incompatible with his opinion." *Lundin v. Shimanski*, 124 Wis. 2d 175, 192 -93 (1985); *see also Zingale v. Mills Novelty Co.*, 244 Wis. 144 (1943). D rawing in part from common law principles, t he S upreme C ourt ha s he ld t hat opi nion s tatements m ay be m aterially f alse or misleading u nder t he f ederal s ecurities l aws. *See g enerally Omnicare, Inc. v. L aborers D ist. Council C onstr. I ndus. Pension F und*, 135 S .Ct. 1318 ( 2015) (evaluating f alse an d m isleading statements of opinion regarding a company's legal compliance); *see also City of Dearborn Heights Act 345 P olice & F ire R et. Sy s. v . A lign T ech., I nc.*, 856 F .3d 605 ( 9th C ir. 2017) (applying *Omnicare*'s standards to federal securities fraud cases).

In *Omnicare*, the Supreme Court established standards for evaluating the truth or falsity of opinion statements made in corporate disclosures. The High Court reasoned as follows.

> Consider an unadorned statement of opinion about legal compliance: "We believe our conduct is lawful." If the issuer makes that statement without having consulted a la wyer, it c ould b e mis leadingly in complete. In th e context o f th e s ecurities market, an investor, though recognizing that legal opinions can prove wrong in the end, still likely expects such an assertion to rest on some meaningful legal inquiry— rather than, say, mere intuition, however sincere. Similarly, if the issuer made the statement i n the face of its lawyers' c ontrary advice, *or with knowledge that the Federal Government was taking the opposite view*, the investor again has cause to complain: H e e xpects n ot j ust t hat t he i ssuer be lieves t he opi nion ( however irrationally), but that it fairly aligns with the information in the issuer's possession at the time.

*Omnicare*, 135 S .Ct. at 1328-29 (emphasis added). These principles are "not unique to" to the federal securities laws. *Id.* at 1330. "They inhere, too, in much of the common law respecting the tort of misrepresentation." *Id.*

> [I]t has been recognized very often that the expression of an opinion may carry with it an implied assertion, not only that the speaker knows no facts which would preclude such an opinion, but that he does know facts which justify it [internal citation omitted]. That is especially (and traditionally) the case . . . where . . . a speaker "holds himself out or is understood as having specialized knowledge of the matter which is not available to the plaintiff." [citations omitted]

*Id.* at 1330-31.

The Ninth Circuit applied *Omnicare*'s holdings to securities fraud allegations in *Dearborn Heights*. Under *Omnicare* and *Dearborn Heights*, there are three ways to show that an opinion statement was materially false or misleading when made. The first way is to show that the opinion was objectively wrong, and subjectively disbelieved, when stated by the speaker. *Dearborn Heights*, 856 F.3d at 614-15 (the "material misstatement theory"). The second way is to identify "particular (and material) facts going to the basis of the issuer's opinion—facts about the inquiry the [speaker] did or did not conduct or the knowledge it did or did not have—whose omission makes the opinion statement at issue misleading to a reasonable person reading the statement fairly and in context." *Id.* at 615 (the "material omissions theory"). The third method is to show that the speaker supplied false or misleading facts in support of his or her opinion (the "embedded facts theory"). *Id.* at 615-16. Here, Defendants' Counterclaim was false and misleading when filed with this Court, under all three prongs of *Omnicare* and *Dearborn Heights*.

Plaintiff Dawson filed a Complaint in July 2015 alleging that Defendants "wrongfully capitalized" $819.65 in accrued interest on her Loans in November 2013, in connection with a standalone B-9 Forbearance period. *See* Dkt. 1, ¶ 65. In response to her allegation, Defendants Counterclaimed that only $129.87 was "wrongfully" capitalized. Dkt. 24, ¶¶ 111, 122.

41

Defendants premised that Counterclaim on their purported legal opinion: that ED's regulations "permit[ted] interest accrued before the [B-9] forbearance to be capitalized at the end of the forbearance period." *Id.*, ¶132. The difference between Dawson's alleged $819.65 in "wrongful" capitalizations, and Defendants' alleged $129.87 in wrongful capitalizations, was Dawson's pre-forbearance interest, which Defendants said was "cappable" following her standalone B-9 Forbearance. *Id.*, ¶117. Defendants' assertion that Dawson's pre-forbearance interest was "cappable" was a fraudulent statement of opinion when made. *Id.*, ¶¶117, 132.

*First*, under the material misstatement theory, the evidence shows that as of October 2015, Defendants *subjectively disbelieved* their purported opinion. As recently as August 2015, Defendant Leitl had directed Fahley to *"update the FO-IBR rule such that it will become a non-capping event"* in the System. CPFF, ¶¶154-156; Harris Decl., Ex. CC at GL0035678_0001. During her deposition, Leitl testified that her email direction to Fahley reflected her understanding of ED's capitalization rules, as of August 2015. *Id.* Yet Defendants' Counterclaim proffered a contradictory opinion just weeks later: namely, that FO-IBR periods (*i.e.*, B-9 Forbearances) should be *capping events* that capitalize pre-forbearance interest. Dkt. 24, ¶¶117, 132. A jury could reasonably infer that Leitl subjectively disbelieved her own Counterclaim when it was filed.

Furthermore, shortly after Defendants filed their Counterclaim, GLELSI's managers were *internally* acknowledging the "general rule" that "*there should not be an interest cap* in association with a new payment schedule generated immediately after a FO-ICR period." CPFF, ¶¶161-163; Harris Decl., Ex EE at GL 0088198_0001. "Based on direction from the Dept of Ed," that was indeed GLELSI's *true* opinion on B-9 Forbearance capitalizations as of December 2015. *Id.* Yet Defendants had recently opined in their Counterclaim that B-9 Forbearances (*i.e.*, "FO-ICR" periods) should be capping events. Dkt. 24, ¶¶117, 132. A jury could reasonably infer that — as

42

of both August 2015 and December 2015 — Defendants *subjectively disbelieved* the core legal opinion supporting their Counterclaim against Plaintiff Dawson.  Thus, Defendants' Counterclaim was materially false and misleading when filed with the Court in October 2015.

*Second*, under *Omnicare*'s "embedded facts" theory, Defendants supported their fraudulent capping opinion with false and misleading facts.  Those included the following:

(a)   "*Great Lakes' system properly recognizes and accounts for these different types of interest—and thus does not wrongfully capitalize [intra-forbearance] interest.*"  Dkt. 24, ¶119.  The truth was that, as of October 2015, the System was "accounting for" these "different" interest types *in the same way* at the end of B-9 Forbearances; neither interest type was being capitalized.  FO-DOCU had been programmed this way since 2013.  CPFF, ¶135; Harris Decl., Ex. V.  FO-ICR had been programmed this way since April 2014.  CPFF, ¶136.  FO-IBR had been programmed in this way since Leitl herself ordered it in August 2015.  CPFF, ¶¶154, 155; Harris Decl., Ex. CC.

(b)   Defendants' Counterclaim also falsely and misleadingly addressed Dawson's "Reprogramming" allegations.  *See* Dkt. 1, ¶¶58, 70-71.  Read fairly and in context, the Counterclaim alleged that *no B-9 Forbearance Reprogramming ever occurred*, and that *[t]here was no interest-capitalization event after Dawson's [B-9 Forbearance] in 2015 because she was in an Income Based Repayment schedule.*"  Dkt. 24, ¶125.  The truth, however was that Defendants' B-9 Forbearance Reprogramming had occurred, and as a result, Dawson's 2015 "FO-ICR" period would not have triggered an "interest-capitalization event," *regardless of what repayment plan Dawson was on*.  CPFF, ¶¶136-140; Harris Decl. Ex. I, Ex. Y.

Though complex, Defendants' fraudulent factual allegations served a simple purpose: to create the false appearance of consistency between Defendants' stated opinion, and Defendants' contemporaneous conduct.  Actions speak louder than words.  The Counterclaim misrepresented the facts of Defendants' contemporaneous actions to lend false credibility to their proffered opinion on legal compliance.  *See Dearborn Heights*, 856 F.3d at 615 ("*Omnicare* also recognized that some opinion statements 'contain embedded statements of fact,' which 'may be read to affirm not only the speaker's state of mind ... but also an underlying fact.' [citation omitted]  For such statements, the Supreme Court held that falsity could be established 'not only if the speaker did

not hold the belief she professed *but also if the supporting facts he supplied were untrue.*'") (emphasis added). A jury could reasonably find as much on the evidence here. Defendants counter-alleged that at their System *was* capping pre-forbearance accrued interest following B-9 Forbearances, when in fact, the System was not. Defendants counter-alleged that no B-9 Forbearance Reprogramming had occurred, when in fact, it had. Moreover, it had occurred in within the exact time period alleged by Dawson. Dkt. 1, ¶¶69-71.

*Third*, under *Omnicare*'s "material omissions" theory, Defendants' Counterclaim omitted material facts rendering their stated opinion "misleading to a reasonable person reading the statement fairly and in context." *Id.* at 616 (quoting *Omnicare*, 135 S.Ct. at 1332). Defendants' Counterclaim omitted to disclose ED's repeated Class Period statements to Defendants that "non-capping" forbearances are not capping events under 34 C.F.R. §§ 682.211(f)(11) and 685.205(b)(9), CR 1492, and CR 2785. CPFF, ¶¶5-6; Harris Decl., Ex. A; CPFF, ¶¶97, 105-107, 115-120; Harris Decl., Ex. P at GL 0001734_0017 and _0018; Harris Decl., Ex. R at GL 006737_0028; CPFF, ¶148; Harris Decl., Ex. B and Ex. C; CPFF, ¶¶154-156; CPFF, ¶¶154-156; Harris Decl., Ex. CC at GL0035678_0001.

Defendants' Counterclaimed opinion — that Dawson's standalone B-9 Forbearance was a proper capping event under ED's rules (Dkt. 24, ¶¶117, 132) — was materially misleading because it concealed Defendants' "knowledge that the Federal Government was taking the opposite view." *Omnicare*, 135 S.Ct. at 1328-29; *accord Lundin*, 124 Wis.2d at 192-93 (holding that statements of opinion are fraudulent "where the speaker knows of facts incompatible with his opinion"). It was particularly misleading because Defendants held themselves out "as having specialized knowledge of the matter which [was] not available to the plaintiff." *Omnicare*, 135 S.Ct. at 1330-31. Defendants pleaded that "Dawson fundamentally misunderstands the calculation

of interest during an administrative-forbearance period." Dkt. 24, ¶ ¶76-81. Defendants then purported to apprise Plaintiff Dawson, and the Court, of the differences between different types of forbearances, and different types of interest "buckets," under ED's rules. *Id.*, ¶¶117, 125, 132. Dawson and the Court had no way of knowing that ED had privately informed GLELSI that "non-capping" forbearances were not permissible capping events. This was a material fact that rendered Defendants' counter-alleged capping opinion materially misleading.

A jury could reasonably find that Defendants' Counterclaim contained fraudulent statements of fact and opinion when filed with the Court in October 2015. The Court should not find otherwise on the record before it. *Omnicare* and *Dearborn* heights describe three independent ways for proving fraudulent statements of opinion; Defendants' Counterclaim tapped all three of them in one stroke, in response to pattern-fraud allegations. *Accord* Dkt. 1, ¶75 ("This has become Great Lakes Defendants' modus operandi: subtly tweaking their disclosures to lenders and borrowers in order to conceal their fraud, and hoping no one notices as they continue to overcharge hundreds of thousands of borrowers for years into the future.").

### 7. Defendants discovered at least one of their (irrelevant) "programming errors" six months before this lawsuit.

Defendants' Counterclaim conceded that GLELSI had wrongly capitalized *intra*-forbearance interest against Dawson, in part by applying her mid-forbearance payment to the wrong "bucket" of accrued interest. Dkt. 24, ¶ ¶115-120; *see also* CPFF, ¶207. Importantly, however, Defendants stated that "[i]t took Great Lakes' independent research to discover these issues *after reviewing Dawson's complaint*" in August 2015. Dkt. 24, ¶127 (emphasis added). This statement was also materially false and misleading when made.

The truth was that six months before "reviewing Dawson's complaint," Defendants identified problems in their System *"related to non-capping forbearance interest and how we*

*should be applying payments toward the different interest types."* Harris Declaration, Ex. FF at GL0004526_0002; C PFF, ¶¶168-169. Leitl, Kielhofer and several other GLELSI managers attended a meeting to discuss this issue on or about January 30, 2015. C PFF, ¶¶168-169; Harris Declaration, Ex. FF at GL0004526_0001). The notion that "[i]t took Great Lakes' independent research to discover these issues after reviewing Dawson's complaint" (Dkt. 24, ¶127) is untenable. GLELSI was looking at these very issues — at the executive level — six months before this lawsuit was filed.[10]

### 8. Defendants's ham Errata Sheet (Dkt. 63) and Declaration (Dkt. 66) contained materially false and misleading statements.

On June 29, 2016, Defendants served Plaintiff with an Errata Sheet that materially contradicted GLELSI's May 11, 2016 deposition testimony. CPFF, ¶¶170-174. The Errata falsely stated that ED "never told GLELSI that it is improper to capitalize otherwise-cappable interest that has accrued before a B-9 forbearance period at the end of the period." Dkt. 63 at 23.

On July 15, 2016, Defendants filed a declaration with the Court (Dkt. 66) that further contradicted GLELSI's May 11, 2016 deposition testimony. CPFF, ¶¶170-174. This sham declaration stated that "GLELSI never interpreted any change request issued by the Department to its servicers as directing GLELSI to refrain from capitalizing pre-forbearance accrued interest at the conclusion of a B-9 forbearance period." Dkt. 66, ¶23. Both the sham Errata (Dkt. 63) and sham Declaration (Dkt. 66) were materially false and misleading when filed with the Court.

---

[10] The Class's case has nothing to do with Defendants' purported "programming errors," or with different types of accrued interest. *Accord* Dkt. 218 at 8 (discussing "two programming errors — *not* raised in the complaint — in *how* [GLELSI] was capitalizing interest following B-9 Forbearances"). The Class's case was not and is not about *"how"* GLELSI was calculating the *amounts* of capitalization transactions. The Class's case was and is about *whether* GLELSI's System should have been using FO-DOCU, FO-ICR, and FO-IBR to trigger capitalization transactions. Defendants now agree that their System should not have done this, though their Counterclaim asserted the right to do it.

The true facts were that, in and after August 2011, GLELSI had known CR 1492 to mean that GLELSI should not capitalize any interest following a "non-capping" B-9 Forbearance period. CPFF, ¶¶97, 107.

Additionally, in and after February 2015, GLELSI and its managers knew CR 2785 to mean that GLELSI could "capitalize some of amount of interest at the end of a non-capping forbearance *only if* that non-capping forbearance was preceded by some sort of capping event." CPFF, ¶¶148-149, 154-156; Harris Decl., Ex. B and Ex. C.

**9. Defendants were not "surprised" in August 2016.**

Since A ugust 2016, D efendants ha ve c ontinuously asserted t he f ollowing f alse and misleading facts to the judges of this Court: first to Judge Crabb, and now to Judge Peterson.

> [In August 2016], a Department official told Great Lakes that . . . pre-forbearance accrued interest could be capitalized at the end of *some* B-9 Forbearances ("back-to-back" one s i n w hich a nother forbearance or de ferment pe riod i mmediately preceded a B-9 Forbearance), but not at the end of "stand-alone" B-9 Forbearances, because the D epartment did not c onsider t he l atter t o be c apitalization "events." [citation omitted, emphasis in original]

> *Great Lakes was surprised by t his di stinction be tween s tand-alone and b ack-to-back forbearances and requested further c larification and c onfirmation that this interpretation was truly that of the Department.*

*See* Dkt. 218 at 10 (citing Dkt. 83 and its attachments). These statements by Defendants and their counsel were materially false and misleading when made. The true facts were that GLELSI and its e xecutives l earned of "this di stinction" in F ebruary 2015, m onths be fore t his lawsuit be gan. *Compare id.*, *with* CPFF, ¶¶10-11, 147-149, *and* Harris Declaration, Ex. B at GL 0004439_0001 ("Can you get this out to the team. Looks like we lost. :( "); *see also* Harris Declaration, Ex. C.

> Q. So to sum all that up in the context of this February 2015 e-mail, you were being informed that you would capitalize some amount of interest at the end of a non-capping forbearance only if that non-capping forbearance was preceded by some sort of capping event?

> A. Correct.

Q.  And that was their clarification to you and Great Lakes under CR 2785?

A.  Correct.  I don't think that was just given – that clarification was just given to Great Lakes.  That clarification was given to – we were arguing with them about it, but the clarification was given to all of the servicers.  We were the most vocal about it.

Q.  [***]  In the context of this February 2015 email, what were the situations where ED was telling you not to capitalize any interest at the end of a non-capping forbearance?

A.  If there was no leftover capping event prior to the non-capping forbearance, maybe the borrower was in repayment – had been in repayment the whole time and called and said, "I want to switch repayment plans.  So I – I need some time to get my paperwork in."  In that case, we would cap nothing at the end of the non-capping forbearance.

Kielhofer Deposition at 119:10 – 120:13.  Another way of saying the borrower "had been in repayment the whole time" is — "the borrower had a standalone B-9 Forbearance."  *See* Class Certification Order (Dkt. 171) at 4 ("One distinction relevant to this question is the difference between 'standalone' B-9 Forbearances and 'back-to-back' B-9 Forbearances.  In the standalone situation, a student borrower goes from loan repayment status, to a single 'standalone' B-9 Forbearance period (of no more than 60 days), and then immediately back into repayment status after the period expires.  Dawson herself was in that situation, and underwent a standalone B-9 Forbearance.").  Contrary to Defendants' repeated declarations, Defendants learned exactly that distinction in February 2015.  It was therefore no "surprise" to them in August 2016.

Moreover, the distinction they learned in February 2015 is *not* that "standalones" are an exception to the general rule that B-9 Forbearance capitalizations are allowed.  Defendants instead learned that "back-to-backs" are an exception to the general rule that B-9 Forbearance capitalizations are *prohibited*.  The truth is: as of December 2015, GLELSI believed "[b]ased on direction from the Dept of Ed," that "*as a general rule there should not be an interest cap in association with a new payment schedule generated immediately after a FO-ICR period.*"  CPFF,

48

¶¶161, 162; Harris Decl., Ex. EE at GL 0088198_0001; *see also* Kielhofer Deposition at 166:22 –

167:

> Q.  So circling back to Exhibit 73 [Harris Decl., Ex. EE] in James Fahley's e-mail to his team on December 9th, 2015, he was correctly stating the general rule as you understood it at the time, right?
>
> A.  Correct.
>
> Q.  And to the best of your knowledge and belief, was that the same general rule that others in GLELSI's management understood at the time?
>
> A.  I would say assume so.
>
> Q.  But then there were other, let's call them, special circumstances that could potentially override the general rule as you guys understood it, right?
>
> A.  Correct.
>
> Q.  And Ms. Dawson's loan accounts did not have any of those special circumstances, right?
>
> A.  I can't tell that based on those letters that you showed me.
>
> Q.  If she had a standalone B-9 forbearance period that transitioned her from a standard repayment plan to an IBR repayment plan and nothing else happened, there would be no special circumstances to override the general rule, right?
>
> A.  If nothing else happened, correct. [***]

Defendants were not, in fact, "surprised" by Cindy Battle's August 2016 "distinction"

between standalones and back-to-backs.  They had learned that distinction quite well in February

2015, further revealing the intent behind Defendants' Counterclaim against the Class.

### 10. Defendants executed a divide-and-conquer strategy against ED officials in August 2016, to further conceal their intentional wrongdoing from ED and the Court.

In their October 2015 Counterclaim, Defendants alleged their intention to "correct"

Plaintiff Dawson's standalone FO-ICR capitalizations by removing only those portions of her

capitalizations which constituted *intra-forbearance* interest ($129.87 out of the $819.65 that was

49

capitalized).  Dkt. 24, ¶¶122, 127.  In the parties' November 2015 Rule 26(f) Report, Defendants said they had "begun the process of correcting the accounts of other borrowers" in a similar manner.  *See* Dkt. 36 at 3.  That "process of correcting the accounts of other borrowers" is what Defendants now refer to as their "First Remediation Project."  *Id.*  On July 15, 2016, in opposition to Plaintiff Dawson's initial motion for class certification, Kielhofer declared that GLELSI had completed the First Remediation Project.  Dkt. 66, ¶¶33-38.

Defendants' First Remediation Project resulted in net Loan balance reductions for the Class totaling *$296,874.85*.  CPFF, ¶178.  In effect, Defendants' First Remediation Project accomplished next to nothing, because it continued to treat the Class's standalone B-9 Forbearances as capping events.  Defendants continued to argue to Judge Crabb for their right to do this. *See generally* Dkt. 65; Dkt. 66.

On July 29, 2016, Plaintiff Dawson filed a brief exposing Defendants' improper revisions of the First GLELSI Deposition transcript.  Dkt. 70 at 21-28 ("Change Request 1492 and Defendants' Deposition Rewrites").  Dawson also showed how the early evidence supported the Complaint's allegations, and *not* the Counterclaim's allegations.  *Id.*

So the following week, Defendants played their last and best anti-fraud card.  Defendants played a stray ED employee — working in the wrong part of ED — who was substantially ignorant of the material facts and issues at hand.  *See generally* CPFF, ¶¶ 175-194; *see also id.*, ¶¶53-80 (Key Personnel).

On August 4, 2016, a GLELSI manager named Jamie Brown (formerly Jamie Napralla) emailed Sherika.Roberts@ed.gov, seeking "to confirm" that GLELSI's First Remediation Project was "proper."  Dkt. 83-3.  Sherika Roberts soon replied via email that *"[t]he accounts reviewed*

*didn't indicate any issues; the remediation was appropriate."* Dkt. 83-4 (emphasis added). These docketed email filings marked an additional fraud on ED officials and the Court.

This is true because (1) GLELSI concealed material facts from Sherika regarding the First Remediation Project, and (2) GLELSI isolated Sherika away from *at least five other ED officials* whom G LELSI kne w t o be m ore  authoritative a nd know ledgeable r egarding E D's  capping requirements.

*First*, upon seeking Sherika Roberts' approval of the First Remediation Project, GLELSI managers omitted to disclose to Sherika that:

    (a)  GLELSI's F irst R emediation P roject in cluded tr eating n on-capping f orbearances as capping events (CPFF, ¶¶187-192); and

    (b)  that several other ED officials — including Cindy Battle, La Teata Jackson, Tammy Connelly, Patrice Washington, and Lynn Smith — had *repeatedly* told GLELSI that such capping events were prohibited.[11]

Defendants di d not  e ven a sk S herika R oberts t o i nterpret or   clarify  ED's c apitalization requirements.  C PFF, ¶188.  T hey onl y asked he r t o va lidate t heir " remediation" of i rrelevant "programming errors" involving *how borrower payments are applied*, and how forbearance *end dates* are determined.  Dkt. 24 (the fraudulent Counterclaim's irrelevant "programming errors")

---

[11] CPFF, ¶¶5-6; Harris Decl., Ex. A; CPFF, ¶¶97, 105-107, 115-120; Harris Decl., Ex. P at GL 0001734_0017 and _0018; Harris Decl., Ex. R at GL 006737_0028; CPFF, ¶148; Harris Decl., Ex. B and Ex. C; CPFF, ¶¶154-156; CPFF, ¶¶154-156; Harris Decl., Ex. CC at GL0035678_0001.

*Id.* (emphasis added).

At bottom, Defendants misled Sherika to obtain her unwitting approval of their $296,000 "remediation," a nd t hen f loated S herika's  email i n f ront of  C indy  Battle a nd J udge C rabb (procedurally out of turn) to further conceal their fraud.  *See generally* Dkt. 83; Dkt. 84.

*Second*, upon m isleadingly s eeking S herika's  approval of G LELSI's  First Remediation Project, Defendants did not include any of Cindy Battle, La Teata Jackson, Patrice Washington, Tammy Connelly, or Lynn Murphy on their correspondence. CPFF, ¶182.  Yet since 2011, these five ED officials had consistently been the ones communicating ED's capitalization rules directly to GLELSI.[12] In fact, just weeks *before* this lawsuit was filed, when GLELSI and its executives had capitalization questions, they contacted those five ED officials, and not Sherika Roberts.[13]

---

[12] Harris Decl., Ex. A, Ex. B, Ex. C., Ex. G, Ex. H, Ex. J, Ex. K, Ex. L, Ex. M, Ex. N, Ex. R, Ex. S, Ex. Z, Ex. GG, Ex. HH, Ex. II.

[13] Harris Decl, Ex. GG, Ex. HH, Ex. II.

Sherika was never included on those *pre-lawsuit* emails between GLELSI and ED about ED's capitalization policies, and for good reason.  *See* n.14, *supra*.

CPFF, ¶¶68-74.

*Id.*, ¶¶53-80.

*Id.*  From their many years of experience, GLELSI and its executives had long known that any change requests or "official guidance" from ED comes through those CORs.  *Id.*, ¶79.

Based on the totality of facts, a jury could reasonably infer that GLELSI misled ED officials and the Court using the mid-lawsuit email exchanges in Dkt. 83.  A jury could find that Defendants intentionally isolated and misled Sherika Roberts.  This is the type of common sense inference that juries are made to adjudicate.  Defendants isolated the weakest of ED's herd, and then concealed material information from her, to counterfeit a response that they could "call out" to *other* ED officials and the Court.  Dkt. 83-7 at 1 ("Cindy, I also wanted to call out that FSA reviewed accounts related to this specific case and responded back that all accounts reviewed had been remediated properly.").  Defendants can "call out" Sherika all they want, but if anything, they must call her out to the jury on the totality of evidence: not to the Court in a procedurally improper, "supplemental brief" attached to contrived, mid-lawsuit emails.  *U.S. v. Serfling*, 504 F.3d 672,

679 (7th Cir. 2007) (holding that mail and wire fraud defendants may not defend themselves "by blaming the victim for being duped") (citing *U.S. v. Coffman*, 94 F.3d 330, 333-34 (7th Cir. 2007)).

"Non-capping forbearances" have always been, by definition, non-capitalization events under ED's rules and requirements.  Defendants have known this throughout the entire lawsuit.

> Q.  So immediately after seeing the complaint, you believed you already understood how you were supposed to be capitalizing or not capitalizing?
>
> A.  Yes.

Leitl Deposition at 39:24 – 40:2;  *see also*  CPFF, ¶¶154-156; Harris Declaration, Ex. CC. (Defendant Leitl ordering B-9 Forbearance code FO-IBR to be changed to a "non-capping event" in the System after seeing the Complaint).

> Q.  You're directing him to change the rule in the system to what you believe the requirements were, right?
>
> A.  To what we believe that it – yes, how it should be processing at that time.

Leitl Deposition at 43:23 – 44:2.

Defendants knew the truth.  Sherika Roberts did not.

### 11. Defendants served Plaintiff Dawson with at least one materially false and misleading interrogatory response.

During discovery, Plaintiff Dawson served Defendants with Interrogatory No. 12(g), which asked Defendants to identify "[t]he System developer(s) or programmer(s) who added the FO-IBR forbearance type to the 'Capitalization Exception business rules' within GOALS in or around August 2015,  *and*  the Great Lakes manager(s) and/or executive officer(s) who requested this System change."  Harris Decl., Ex. D at 3.  This Interrogatory was potentially relevant to learning who at GLELSI knew as of August 2015 that "non-capping" B-9 Forbearances were not valid capitalization events.  Defendants answered Interrogatory No. 12(g) by stating, "James Fahley added FO-IBR to the capitalization exception tables pursuant to direction from *Tammy Kielhofer*."

*Id.* at 6 (emphasis added).  This interrogatory response was materially false and misleading when served on the Class.

The truth was that *Defendant Leitl* directed Jim Fahley to add FO-IBR to the capitalization exception tables in August 2015.  Leitl Deposition at 39:24 – 40:2; *see also* CPFF, ¶¶154-156; Harris Declaration, Ex. CC.

### 12. Defendants have made material misrepresentations regarding their so-called "Second Remediation Project."

Defendants' so-called "Second Remediation Project" involved completely — and belatedly — removing Class members' standalone B-9 Forbearance capitalizations from their Loan histories. Dkt. 171 at 13 (the Court acknowledging that "time is money when it comes to interest") As detailed in Part III, *infra*, Defendants' declarations to this Court regarding their Second Remediation Project (Dkt. 165) were materially false and misleading when filed.

### C.    A Jury Could Reasonably Infer That Leitl And GLELSI's Managers Acted With Fraudulent Intent Beginning In 2011, And Continuing Through This Case

The "fraudulent intent" element of mail and wire fraud requires "a willful act by the defendant with the specific intent to deceive or cheat." *U.S. v. Britton*, 289 F.3d 976, 981 (7th Cir. 2002).  Such specific intent includes a defendant's actual knowledge of falsity, or a defendant's "[r]eckless disregard for truth or falsity" in making misrepresentations.  *U.S. v. Dick.*, 744 F.2d 546, 551 (7th Cir. 1984).  "Because direct evidence of intent is often unavailable, intent to defraud may be established by circumstantial evidence and by inferences drawn from examining the scheme itself which demonstrate that the scheme was reasonably calculated to deceive persons of ordinary prudence and comprehension." *Fidlar Tech. v. LPS Real Estate Data Solutions, Inc.*, 810 F.3d 1075, 1079 (7th Cir. 2010); *Groshek v. Great Lakes Higher Education Corp.*, No. 15-cv-143-jdp, 2015 WL 7294548, at *3 (W.D. Wis. Nov. 16, 2015) (explaining that "allegations about the

mental state of a defendant such as the willfulness allegation here, must necessarily be based on the circumstantial information available to the plaintiff") (citing *Pavlick v. Mifflin*, 90 F.3d 205, 209 (7th Cir. 1996) ("Direct evidence of knowledge is difficult—sometimes impossible—to obtain; therefore the Supreme Court has held that deliberate indifference need not be proven by direct evidence.").

In this case, there is an abundance of circumstantial (and direct) evidence that Leitl, Kielhofer and GLELSI knowingly, or with deliberate recklessness, inflated borrowers' Loan balances, and then continuously lied to cover it up.

### 1. "Sorry to be the bearer of bad news."

In July 2011, Nancy Masten of Great Lakes Higher Education Guaranty Corporation ("Guaranty Corp.") informed Kielhofer that — based on "the [Common Manual] and the regs" — "it looks like you cannot capitalize interest when granting an administrative forbearance while waiting for documentation from the borrower to change repayment plans." CPFF, ¶¶88-90; Harris Decl., Ex. H at GL 0006674_0001. Nancy Masten was a "Policy Supervisor" for Guaranty Corp. (a subsidiary of Defendant GLHEC) at the time. *See* Harris Decl., Ex. H at GL 0006674_0002. Nancy Masten is one of the policy "experts" who Leitl and Kielhofer "rely on when [they] have questions about the regulations." CPFF, ¶90.

Attached to Masten's July 2011 email were highlighted copies of 34 C.F.R. § 682.211(f)(11), and an excerpt from the Common Manual (Defendants' Loan servicing "Bible."). CPFF, ¶91; Harris Declaration Ex. H at GL 0006675_0001 to _0002, and GL 0006676_0001.

Masten concluded her email by saying, *"Sorry to be the bearer of bad news."* Harris Decl., Ex. H at GL 0006674_0001 (emphasis added). A jury could reasonably infer from this that Kielhofer and Masten knew GLELSI was capitalizing interest in a manner expressly prohibited by

"the CM and the regs."  *Id.*  Such a reasonable inference is only corroborated by other direct and circumstantial evidence.

### 2.  Direct Evidence Concerning CR 1492.

In August 2011, Tammy Connelly — one of ED's CORs — emailed CR 1492 directly to Leitl and Kielhofer.  CPFF, ¶¶94-95; Harris Decl. Ex. J, Ex. A.  Connelly copied other CORs on her email, including Patrice Washington and Lynn Smith.  *Id.*

"  CPFF, ¶96 (emphasis added).

Objectively, CR 1492 provided that "a non-capitalizing administrative forbearance, as specified in 34 CFR 685.205(b)(9) and 682.211(f)(11)" was not a permissible capitalization event under ED's "existing" rules and requirements.  Harris Decl., Ex. A.  There is no other serious, objective reading of this document.

Subjectively, Leitl, Kielhofer and GLELSI understood that objective maxim upon reviewing CR 1492.  CPFF, ¶97.

Q.  Is it Great Lakes' policy generally that when forbearance period ends, all outstanding interest is capitalized at the time the forbearance period ends and repayment is entered?

A.  Prior to June 30th of 2012, our practice was that at the end of a noncap – a noncapping forbearance, we would capitalize the interest that accrued prior to that noncapping forbearance, but not the interest that accrued during the noncapping forbearance.

Q.  This is prior to June 30, 2012?

A. Yes.

Q. Isn't that the position you're taking now, though?

A. So on – on June 30th or – we *implemented* a change on June 30, 2012 because the Department of Education had sent a change request to all of the servicers, giving them guidance on how interest should be capitalized. *We read that change request to say, at the end of a noncapping forbearance, do not capitalize any interest.*

First GLELSI Deposition (Dkt. 53) at 67:5-25 (emphasis added). *See also id.* at 69:2-16:

Q. Okay. You can't tell me what year the change request occurred?

A. It was June – it was definitely June 30th. I can't remember the year. But you are correct. Those are the rules that we had in place at the time we capitalized Ms. Dawson's account. We were following the regulations which said to cap – you can capitalize interest that accrued prior to the noncapping forbearance, but not the interest that accrued during the noncapping forbearance.

Q. But then the department intervened and said no, no, don't capitalize anything at the end of a noncapping forbearance period; right?

A. *That is how we read what the department said, yes.*

*See also id.* at 70:16-22:

Q. So Great Lakes was reading the regulations, the official regulations, to say that pre-forbearance interest was what you guys call cappable at the end of a noncapping forbearance period, but then the change request came and said no, don't do that anymore; right?

A. *That is how we read the change request.*

Defendants have long tried to erase this clear cut deposition testimony from the record in this case. But Defendants' "otiose," evidence-altering endeavors only further "suggest guilty knowledge." *Thorn v. Sundstrand Aerospace Corp.*, 207 F.3d 383, 389 (7th Cir. 2000).

### 3. As a matter of Seventh Circuit law, Defendants' Sham Errata Sheet (Dkt. 63) and declaration (Dkt. 66) "suggest guilty knowledge."

Defendants have repeatedly attempted to contradict the First GLELSI Deposition transcript (Dkt. 53) using a subsequent Errata Sheet (Dkt. 63) and declaration (Dkt. 66). As a matter of

Seventh Circuit law, these testimonial contradictions "suggest guilty knowledge" and must therefore be resolved by the jury, not by the Court.

> We also believe . . . that a change of substance which actually contradicts the transcript is impermissible unless it can plausibly be represented as the correction of an error in transcription, such as dropping a "not." Sundstrand didn't help itself by Linton's altering his deposition. If at trial Curran tried to use Linton's garbled phrase to impeach his testimony, or as an admission, Linton could explain what he meant, and it would be for the jury to decide whether the explanation was truthful. He could not remove the issue from the jury by altering the transcript of his deposition. The tactic was foolish rather than merely otiose because it suggests guilty knowledge . . . .

*Thorn*, 207 F.3d at 389; *see also Citgo Petroleum Corp. v. Ranger Enterprises, Inc.*, 632 F.Supp.2d 878, 883-84 (W.D. Wis. 2009) (parties may not use post-deposition writings to "provide new testimony under the guise of correcting errors").

The First GLELSI Deposition transcript states that Defendants understood CR 1492 to mean *"don't capitalize anything at the end of a noncapping forbearance period." See supra* (quoting Dkt. 53 at 67:5-25, 69:2-16, and 70:16-22). This testimony was taken on May 11, 2016.

On June 23, 2016, Defendants served Plaintiff Dawson with an extraordinary Errata Sheet (Dkt. 63), which included not only line-by-line testimonial "corrections," but also a 13-page narrative proffered to "clarify and correct" GLELSI's deposition testimony. *See* CPFF, ¶¶170-174; Dkt. 63 at 13-25. This sham Errata Sheet materially contradicts the First GLELSI Deposition transcript, by asserting that: "The Department has never told GLELSI that it is improper to capitalize otherwise-cappable interest that has accrued before a B-9 forbearance period at the end of the period." Dkt. 63 at 23. Clearly, this is not the type of testimonial contradiction that "can plausibly be represented as the correction of an error in transcription, such as dropping a 'not.'" *Thorn*, 207 F.3d at 389. This was "another thing entirely": namely, using a sham Errata Sheet to "add new testimony based on new evidence." *Citgo Petroleum*, 632 F.Supp.2d at 883-84. Such a

tactic is prohibited by this Court's published jurisprudence. *Id.* As a matter of law, Defendants' contradictory, "narrative form" Errata Sheet (Dkt. 63 at 13-25) only further "suggest guilty knowledge." *Thorn*, 207 F.3d at 389. Thus, it is not for this Court, but "for the jury to decide whether [Defendants'] explanation was truthful." *Id.*

Then, on July 15, 2016, Defendants filed a sham Declaration (Dkt. 66), which only reiterated the transcript-altering text contained in GLELSI's sham Errata Sheet. *See* Dkt. 66, ¶23 ("GLELSI never interpreted any change request issued by the Department to its servicers as directing GLELSI to refrain from capitalizing pre-forbearance accrued interest at the conclusion of a B-9 forbearance period."). For the same reasons stated above, as a matter of law, this evidence-altering tactic "suggests guilty knowledge," and it is "for the jury to decide whether [Defendants'] explanation was truthful." *Thorn*, 207 F.3d at 389.

### 4. A jury can also infer Leitl's and GLELSI's intent from their contemporaneous change to the November 2011 Control Report.

From 2006 to 2010, GLELSI issued annual operational "Control Reports" to its hundreds of FFELP Lender-customers. CPFF, ¶102. From 2006 to 2010, GLELSI always stated to its FFELP Lender-customers that:

> Forbearance requirements are explained in Parts 682.202 and 682.211 and various other sections of the regulations. When a borrower is in repayment and cannot make regular monthly payments, the lender may grant forbearance to that borrower to prevent default. There are certain circumstances, such as a period of internship that exceeds the deferment limit, during which the lender *must* grant forbearance. In addition, the lender is able to grant an "administrative forbearance" to cover a delinquency period that existed prior to the deferment eligibility date. *The lender is authorized to capitalize the accrued unpaid interest at the end of any forbearance period.*

*E.g.,* Dkt. 58-13 at EY-GLHE-EF-10-000581. From 2006 to 2010, that last quoted sentence was a statement of opinion, which was objectively incorrect. *See, e.g.,* Dkt. 58-13 at EY-GLHE-EF-10-000581. But in July 2011, Kielhofer and Leitl began hearing objectively *correct* opinions from

Nancy Masten, GLHEC's policy "expert," and from ED itself.  CPFF, ¶¶89-91; *see generally* Harris Decl., Ex. H.

In July 2011, Nancy Masten emailed Kielhofer the "bad news" that lenders "cannot capitalize interest when granting an administrative forbearance while waiting for documentation from the borrower to change repayment plans." *Id.*  This was contrary to the Control Reports' longstanding, objectively incorrect assertion.

Then, in August 2011, Leitl, Kielhofer and GLELSI received and understood CR 1492 to mean "don't capitalize anything at the end of a noncapping forbearance period."  CPFF, ¶¶94-97; First GLELSI Deposition (Dkt. 53) at 67:5-25, 69:2-16, and 70:16-22.  This too was contrary to the Control Reports' objectively incorrect assertion.

Consequently, the November 2011 Control Report revised GLELSI's longstanding, incorrect opinion as follows:

> Forbearance requirements are explained in Parts 682.202, 682.211 and 685.205 and various other sections of the regulations.  When a borrower is in repayment and cannot make regular monthly payments, the lender may grant forbearance to that borrower to prevent default.  There are certain circumstances, such as a period of internship that exceeds the deferment limit [for internships], during which the lender must grant forbearance.  In addition, the lender is able to grant an "administrative forbearance" to cover a delinquency period that existed prior to the deferment eligibility date.  *Generally,* the lender is authorized to capitalize the accrued unpaid interest at the end of *the* forbearance period.

This revised paragraph was part of the "Description" section of the Control Report, which Defendant Leitl signed and attested to as "fairly present[ing] the Loan Servicing System," and the operational "controls and related control objectives of the Company."  CPFF, ¶104; Dkt. 58-14 at EY-GLHE-EF-11-001006 to -001007.

Defendants contend that their subtle change to the Control Reports' longstanding — and objectively incorrect — opinion statement was nothing but a generalized, meaningless edit.  Dkt.

24, ¶¶128-139; Dkt. 218 at 40-42.  Such a defense, however, is not one for this Court to resolve in anyone's favor pretrial.  *See Bank of New York v. Fremont General Corp.*, 523 F.3d 902, 911 (9th Cir. 2008)  (holding that a subtle change in corporate letterhead could reasonably create an inference of intent, and that "[t]he finder of fact must resolve that question").   A jury could reasonably infer that Defendants' subtle change to their capping assertion occurred—exactly when it did, in November 2011 — because both Leitl and Kielhofer had recently learned the "bad news" that GLELSI's capping assertions and practices were objectively incorrect under both "the CM and the regs," and under CR 1492.  Harris Decl., Ex. H.

Quite plausibly, it was the combination of Masten's "bad news" in July 2011, and ED's CR 1492  in August 2011, that birthed Leitl's November 2011 revision to the annual Control Reports.  Based on the totality of evidence, the Court should not hold as a matter of law that the timing of this revision was a mere coincidence.  *Bank of New York*, 523 F.3d at 911; *see also Fidlar Tech.*, 810 F.3d at 1079 ("Because direct evidence of intent is often unavailable, intent to defraud may be established by circumstantial evidence . . . .").[14]

### 5.   "Whatever capping procedure you see on the System, assume it is correct."

In April 2014, Kielhofer belatedly told Fahley to "update the system rule" such that "*an interest cap will not occur* when a payment schedule is generated following a FO ICR type forbearance." CPFF, ¶¶92-93, ¶¶136-139; Harris Decl. Ex. I at GL 0012241_0001, Ex. Y at GL

---

[14] Plaintiff Dawson knew nothing about the existence of Masten's July 2011 email, or about the existence of something called a "Change Request," before conducting fact discovery.  Yet the Control Report revisions alone reasonably suggested that Defendants learned the error of their ways "in or before November 2011."  Dkt. 1, ¶5.  Now, fact discovery has revealed *how* Defendants learned the error of their ways "in or before November 2011."  *Id.*   It was through Masten's July 2011 email, and by ED's August 2011 transmission of CR 1492.  The only way for Defendants to contend otherwise is to deny their own audited assertions, their own email records, and their own deposition testimonies.  This is their fraud defense, arguing not with Plaintiff Dawson's or the Class's evidentiary records, but with their own.

0088161_0001 through _0003. Per "Tammy K," Fahley instructed members of GLELSI's Financial Adjustments Team to completely remove any capitalization associated with past FO-ICR periods. *Id.* But this instruction was not for all affected borrowers; it was only "borrowers who request the int cap removal." Harris Decl., Ex. I at GL 0012241_0001.

In other words, GLELSI adopted a pre-lawsuit, internal policy of removing B-9 Forbearance capitalizations *only* for borrowers who (1) saw the capitalizations on their accounts; (2) diagnosed them as wrongful; and (3) contested them with GLELSI. *Id.* For substantially all borrowers who suffered wrongful FO-ICR capitalizations before the April 2014 "Reprogramming" (*i.e.,* all 129,492 Class members), GLELSI's intenral policy was to *continue* assessing daily interest charges on wrongfully capitalized dollars indefinitely. *Id.*

By June 2014, at the latest, GLELSI was receiving *"a number of acr request[s] questioning why interest caps after a forb icr."* Harris Decl., Ex. Y at GL 0088161_0001 through _0003. "ACR" is an internal GLELSI acronym for "account correction request." *Id.*

Q.  What does the acronym ACR stand for in the context of the financial adjustments team?

A.  Account correction request. So if a borrower calls in and says, "I believe there's something wrong with my account," or another department finds an error with an account, they'll submit an ACR or account correction request that goes to Jim's team to rebuild the account or at least research the error.

Kielhofer Deposition at 108: 8-16. Despite GLELSI receiving "a number of acr requests questioning why interest caps after a [FO-ICR]," GLELSI did nothing to fix the problem, electing instead to sweep known, multi-borrower capitalization errors under the rug.

In the ordinary course of GLELSI's business, "each time" GLELSI discovers such multi-borrower errors on the System, the problem is "immediately" escalated to GLELSI's Chief Servicing Officer. CPFF, ¶ 141. The Chief Servicing Officer then decides how (if at all) to

prioritize fixing the problem.  *Id.*  As of 2014, GLELSI's Chief Servicing Officer was Defendant

Leitl.  *Id.*, ¶¶38-41.

GLELSI's top-down, internal policy of "hear no evil, see evil" persisted well into the

pendency of this lawsuit.  In December 2015, mid-level GLELSI analysts were *still* questioning

the propriety of "cap[ping] after FO-ICRs" against Class members.  *Id.*, ¶¶161-162; Harris Decl.,

Ex. EE at GL 0088198_0002.  Fahley then emailed a sizable group of GLELSI employees, telling

them the "general rule" that "there should not be an interest cap" following FO-ICR periods.

CPFF, ¶¶161-162; Harris Decl., Ex. EE at GL 0088198_0001.  Fahley further stated that GLELSI

was "not second guessing" whether Class members' FO-ICR capitalizations *should have*

*occurred*," but instead was "just adjusting the amount that was capped."  *Id.*

GLELSI's analysts quite accurately interpreted Fahley's tap-dancing email to mean,

*"whatever capping procedure you see on [the] system, assume it is correct."*  Harris Decl., Ex.

EE at GL 0088198_0001 (Sean Leudeman: "I'm taking this to mean 'whatever capping procedure

you see on system assume it is correct.' Is that a safe assumption?"; Nicole Farrington: "Yes – that

is my take from [Fahley's] response.  Thanks.").  Such internal confusion among GLELSI's astute,

mid-level analysts was only a natural consequence of GLELSI's fraudulent Counterclaim in this

Court.  GLELSI was not only saying one thing (to cap) and doing another (not capping) when they

filed their fraudulent Counterclaim.  *See supra*.  GLELSI was actually implementing *two opposite*

*System procedures simultaneously* in December 2015.  On the one hand, GLELSI was executing

zero standalone B-9 Forbearance capitalizations dated in December 2015. Harris Decl., Ex. I at

GL 0012241_0001. On the other hand, GLELSI was simultaneously using some "new Non-

Capping forb int program" to "*recap[]* a bunch of" standalone B-9 Forbearance capitalizations

against Dawson and the Class, as part of Defendants' fraudulent First Remediation Project. Harris Decl., Ex. EE at GL 0088198_0002.

GLELSI's own analysts could draw one, and only one conclusion from Fahley's top-down, contradictory nonsense. "[W]hatever capping procedure you see on [the] system, assume it is correct." *Id.* at _0001. This further suggests Defendants intent to defraud not just prior to the lawsuit, but during it. A jury could reasonably conclude that GLELSI's "hear no evil, see no evil" corporate policies — both before and after the lawsuit — suggest Defendants' intent to defraud the Class and the Court.[15]

### 6. The totality of Defendants' post-lawsuit conduct reasonably suggests their intent to defraud.

Leitl's and GLELSI's conduct immediately after this lawsuit was filed is probative of their actual knowledge, or at minimum, deliberate recklessness. Upon reviewing the Complaint, Leitl herself testified that she made *no inquiry whatsoever* into the correct capitalization rules for B-9 Forbearances. CPFF, ¶156. In her words, "I didn't need to. We know what the capitalization rules are." *Id.* Leitl repeatedly confirmed this during her deposition:

> Q. So immediately after seeing the complaint, you believed you already understood how you were supposed to be capitalizing or not capitalizing?
>
> A. Yes.

Leitl Deposition at 39:24 – 40:2. Based on her knowledge, Leitl directed Fahley to "update the FO-IBR rule such that it will become a non-capping event." CPFF, ¶¶ 154-156; Harris Decl., Ex. CC. Yet Leitl and GLELSI continued to treat *Plaintiff Dawson's* and *the Class's* B-9 Forbearances

---

[15] Just two weeks before this lawsuit, lower-level GLELSI employees knew quite well that B-9 Forbearances were not valid capitalization events. CPFF, ¶¶151-152; Harris Decl., Ex. AA at GL 0012716_0001 ("FOIBR should not be capping but yet it did."); Harris Decl. Ex. BB at GL 0012715_0001 ("[W]e would also ask to remove capped interest. FO IBR should not be capping but it did.").

as "capping events" throughout the first year of this lawsuit: knowing full well that this was not permitted. *See generally* Dkt. 24; Dkt. 65; Dkt. 66.

Even as Defendants were before Judge Crabb — insisting upon capping Dawson's and the Class's "pre-forbearance interest" — Defendants were *internally* acknowledging the "general rule" that no such capitalization should occur, "[b]ased on direction from the Dept of Ed." CPFF, ¶¶161-162; Harris Decl., Ex. EE at GL 0088198_0001. This was a fraud on the Court, one of many over the last four years.

Some of Defendants' other misrepresentations to this Court were particularly misleading and confusing. Defendants stated that they were "surprised" to learn in August 2016 that standalone B-9 Forbearances were an exception to the general rule that pre-forbearance interest is "cappable" following B-9 Forbearances. Dkt. 218 at 10 (citing Dkt. 83 attachments). The truth, however, was that Defendants learned in February 2015 that *back-to-back* B-9 Forbearances were an exception to the "general rule" that nothing is "cappable" following B-9 Forbearances. *See* Parts III.C and IV.A, *supra*.

As detailed in Parts I.C and II.A, *supra*, and Part III, *infra*, Defendants have made numerous, material misrepresentations to this Court: especially concerning their knowledge of ED's capitalization rules during the Class Period. A jury could reasonably infer from the totality of evidence that Defendants acted with "the specific intent to deceive or cheat," or at the very least, with "[r]eckless disregard for truth or falsity" at all times since 2011. *Britton*, 289 F.3d at 981; *Dick*, 744 F.2d at 551.

### 7. Leitl and GLELSI had motive and opportunity to defraud.

Proof of motive is neither a necessary nor sufficient requirement for a jury's finding of fraudulent intent, but motive existed here.

66

GLELSI and its managers have always been revenue-conscious, particularly with respect to t he r evenue "i ncentives" i n t heir E D S ervicing C ontract.   *See*  Harris D ecl., E x. X  at  G L 0015303_0001 to _0002 (

).[16]

In this case, before the lawsuit, GLELSI and its managers were motivated to conceal their rampant non -compliance w ith E D's c apitalization r equirements be cause i t w as a nything but "revenue positive."  *Id.*  As explained in Part II.B.3, *supra*, the ED Servicing Contract provided that G LELSI would be  paid monthly s ervicing fees on a per-borrower basis.  D kt. 58 -29 at 17 (docket pagination).  However, the ED Servicing Contract *also* provided.

> **Invoicing and Non-Compliance** — Borrowers whose loans are not being serviced in compliance with the Requirements, Policy and Procedures for servicing federally held debt due to the fault of the servicer (*i.e.,* correct interest calculations, correct balances, interest determination and calculations, notices sent properly, proper due diligence, etc.), *will not be billable to the Government from the initial point of non-compliance*.  Any funds that have been invoiced for these borrowers and paid shall be returned to the Government via a credit on the next invoice.

---

16

.

Dkt. 58-29 at 16 (docket pagination) (emphasis added).  That punitive provision was no empty

threat; it was one with which GLELSI and its officers were acquainted during the Class Period.

17

---

[17] There is currently no evidence that ED has invoked this provision in this case, to date. But whether or not ED invoked this provision *after* being named as a defendant in this lawsuit is irrelevant to the question of whether GLELSI's officers were motivated by their experiences with that provision *before* the lawsuit.  The best predictor of ED's future behavior at the time would have been ED's past behavior, which was indeed punitive.  Nor is an absence of evidence that ED punished GLELSI *during* this lawsuit any form of merits evidence in Defendants' favor.  ED could fairly be awaiting this case to play itself out — in a legitimate fact-finding venue — before

In sum, GLELSI and its managers were acutely revenue-conscious during the Class Period, particularly with respect to "incentives" in their ED Servicing Contract.  Harris Decl., Ex. X at GL 0015303_0001 to _0002; *see also* n.18.  GLELSI and its managers were also acutely aware of the revenue negative "Invoicing and Non-Compliance" provision, which ED demonstrated its own willingness to use during the Class Period.  C PFF, ¶¶125-134.  Hence, Leitl, Kielhofer and GLELSI were motivated to conceal their rampant non-compliance with ED's capitalization requirements. *Leahy*, 464 F.3d at 797 (holding that "[b]ad acts evidence may be admitted . . . to show intent, knowledge, lack of mistake, motive, or opportunity") (citing Fed. R. Evid. 404(b)).

At the end of the day, federal student loan servicing is not about maintaining regulatory compliance; it is about maintaining the "appearance" of regulatory compliance.  Either is "revenue positive," but the appearance method is far easier to achieve in practice.  Harris Decl., Ex. X at GL 0015303_0001 to _0002.

### D.  Leitl And GLELSI Have Used The Mails And Interstate Wires In Furtherance Of Their Schemes

Defendants do not meaningfully dispute that the mail and wire "use" element of the federal fraud statutes is satisfied.   They mention this element only in passing (*see* Dkt. 218 at 42), but the Class will address it for the sake of completeness.

The "use of the mails or wires" element includes "any mailing that is incident to an essential part of the scheme," and applies "even if the mailing itself contains no false information." *Bridge v. Phoenix Bond & Indemnity Co.*, 553 U.S. 639, 647 (2008).  The Supreme Court has deemed this element satisfied even "where the mailings have been routine."  *Schmuck v. U.S.*, 489 U.S. 705,

---

determining its own course of action.  Harris Decl., Ex. W.  Moreover, Defendants' hoodwinking of Sherika Roberts would probably tend to make it unclear among ED officials whether such a punitive contractual provision should be enforced.

715 (1989) (citing *Carpenter v. U.S.*, 484 U.S. 19, 28 (1987)). "The defendant himself need not personally cause the mailing or use of the wire; it is enough that the use of mail or wire will follow in the ordinary course of business, or where such use can reasonably be foreseen." *Turner*, 551 F.3d at 666 (citing *Pereira v. U.S.*, 347 U.S. 1, 8-9 (1954)); *see also Powell*, 576 F.3d at 493 (same).

Here, Defendants' transmission of false and misleading financial information involved constant mailings and wirings to the Class, the U.S. government, private Lenders, the National Student Loan Data System ("NSLDS"), and major credit bureaus. CPFF, ¶¶199-206. Specifically, GLELSI sent inflated Loan balance information through its daily Financial Management System ("FMS") data file transmissions to ED and the U.S. Treasury. *Id.* These FMS data files are the mechanism by which GLELSI "speaks" directly to the U.S. government's general ledger. *Id.* In addition, on weekly and monthly bases throughout the Class Period, GLELSI transmitted detailed Class Loan balance information to ED's NSLDS. *Id.*

To private FFELP Lenders, GLELSI sent "a collection of lender reporting documents" on a monthly basis, showing "all their transactions . . . so they could update their own general ledger[s]." *Id.* GLELSI also transmitted monthly, "Metro 2" data files to the major credit bureaus showing each Class member's purported debt levels. *Id.* Throughout the Class Period, Great Lakes provided daily Loan balance information to Class members via www.mygreatlakes.org. *Id.* Class members who lacked an account on mygreatlakes.org received monthly billing statements by mail displaying his or her false principal and interest balances. *Id.*

Clearly, Defendants' use of interstate wires and the mails to transmit inflated Loan balances to Class members, their Lenders, and credit bureaus flowed from "the ordinary course of business"

and was "reasonably foreseeable" to Defendants during the Class Period.  *Powell*, 576 F.3d at 493

(quoting *Turner*, 551 F.3d at 666).  Leitl herself has testified as much.

> Q.  Jill,  how doe s G LELSI t ransmit bor rower l oan ba lance i nformation t o E D i n t he ordinary course of GLELSI's business?
>
> A.  How do w e transmit borrower balance information to FSA? [ED's Office of Federal Student Aid]
>
> Q.  Yeah.
>
> A. There's a – we send a daily FMS file to them that contains financial transactions.  It's a way to speak to their general ledger . . . .
>
> Q.  Is it FSA's general ledger or the Treasury's general ledger?
>
> A.  I'm not sure who it belongs to, but it's called an FMS and therein they call it the FMS file.
>
> Q.  And that's a daily . . . transmission?
>
> A. Yes.
>
> Q.  Does FMS stand for financial management system?
>
> A.  Correct.
>
> Q.  How long have those daily FMS reports been in place?
>
> A.  Since we started the contract with FSA since the first loans were loaded on September 4th of 2009.  There's one date I remember.

Leitl Deposition at 103:25 – 104:25.

In addition to the false financial information transmitted by GLELSI, Defendants used a

combination o f e mail, ma il, v arious d ata f iles a nd o ther in terstate w ires  to m ake t he

misrepresentations discussed in Part II.B, *supra*.  Among other things, GLELSI and its officers:

> (a)  misrepresented G LELSI's t rue cap italization p ractices t o C indy B attle an d La Teata Jackson via email (Part II.B.1, *supra*);

(b) misrepresented via email that GLELSI could implement CR 1492 in time for ED's June 2012 implementation deadline, but then concealed a three-year delay (Part II.B.2, *supra*);

(c) fraudulently invoiced ED on a monthly basis throughout the Class Period, obtaining millions of dollars in Loan servicing fees to which GLELSI was never entitled (Part II.B.3, *supra*);

(d) sent materially misleading B-9 Forbearance approval letters and emails to Class members (Part II.B.4, *supra*); and

(e) used this Court's ECF system to file a series of materially false and misleading documents to justify their wrongful, and willful, student Loan overcharges (Parts II.B.5 through II.B.9, *supra*).

Defendants consistently used interstate wires and the mails in furtherance of their schemes to defraud ED, Lenders, Class members, and the Court throughout the Class Period.

### E.    Defendants' Alleged Acts Of Mail And Wire Fraud Form A RICO "Pattern"

A pattern of racketeering activity consists of at least two predicate acts of racketeering committed within a ten-year period." *Midwest Grinding Co., Inc. v. Spitz*, 976 F.2d 1016, 1019 (7th Cir. 1992). At the same time, "two *isolated* acts of racketeering activity do not constitute a [RICO] pattern." *Sedima*, 473 U.S. at n.14 (emphasis added). A plaintiff alleging a RICO "pattern" must satisfy the "continuity-plus-relationship" test. *Id.*; *see also H.J. Inc. v. Northwestern Bell Telephone Co.*, 492 U.S. 229, 239 (1989) (explaining that "the term 'pattern' itself requires a showing of relationship" between predicate acts, as well as some form of continuous activity). Such "continuous" and "relatedness" requirements are analytically distinct, but "in practice their proof will often overlap." *H.J. Inc.*, 492 U.S. at 239.

A defendant's acts of mail and wire fraud are sufficiently "related" to form a RICO pattern if they "have the same or similar purposes, results, participants, victims, or methods of commission, or otherwise are interrelated by distinguishing characteristics and are not isolated events." *Id.* at 240. The relatedness prong is easily satisfied in this case. Defendants' pattern of

fraud ha d a uni fied pu rpose: t o c onceal G LELSI's non -compliance w ith E D's c apitalization requirements, thereby keeping all "earned" revenues of the past, collecting *additional* servicing fees in the future, and most importantly, keeping GLELSI's largest customer happy at all times. Defendants' f raudulent misstatements a lso h ad similar " victims" a nd " results": n amely, th e perpetual i nflation of C lass m embers' pr incipal a nd i nterest obl igations. E D ha s also been consistently victimized by GLELSI's deception, through the invoicing and payment of servicing fees that ED never owed GLELSI under the Servicing Contract. "Relatedness" is clear here.

In general, there are two different ways to establish RICO "continuity." *First*, a plaintiff may show "closed-end" continuity by proving that the predicate acts have ceased, but "endured for such a substantial period of time that the duration and repetition of the criminal activity carries with it a n implicit threat of continued criminal activity in the future." *Jennings v. Auto Meter Products, Inc.*, 495 F .3d 466, 473 ( 7th Cir. 2007); *see also HJ Inc.,* 492 U.S. at 242 ("A party alleging a RICO violation may demonstrate continuity *over a closed period* by proving a series of related predicates extending over a substantial period of time.") (emphasis added). *Second*, a plaintiff demonstrates "open-end" continuity where the criminal activity is ongoing, or "by its nature projects into the future with a threat of repetition." *Jennings*, 495 F.3d at 473.

Here, t he " continuity" o f D efendants' fraudulent m isrepresentations be gan i n 2011 o r earlier, and continued through the filing of this lawsuit in 2015. *See generally* Parts II.B and II.C, *supra*. F our consecutive years of interrelated misrepresentations — to the U.S. government, to Lenders, to c redit bur eaus, a nd to ove r 100,000 bor rowers — is m ore t han s ufficient t o s how "closed-end" continuity. *See Bible*, 799 F.3d at 659-60 (RICO continuity satisfied where Lender "unlawfully imposed collection costs on thousands of borrowers," and sent them misleading "form document[s]," many times "over a period of several years").

73

Continuity w ould h ave be en  easily  established he re,  *even i f*  Defendants' f raudulent misrepresentations had ceased upon the filing of this lawsuit.  Defendants cite no case suggesting that a  c ivil R ICO d efendant c an pr eclude a  f inding of  c ontinuity s imply b y di scontinuing fraudulent activity *after* being sued.  *See generally* Dkt. 218.

Moreover, Defendants' fraudulent misrepresentations did *not* cease upon the filing of this lawsuit; their misrepresentations have persisted for years during this lawsuit.  *See* Parts II.B and II.C, *supra*.  Defendants' manifest, post-lawsuit willfulness only further demonstrates a continuity sufficient to satisfy RICO.  Their fraudulent misstatements continue today, in and outside of this Court.  *See generally* E. Mosser Decl.; *see also* Part III, *infra*.

Thus, a jury could reasonably find *either* closed-ended or open-ended continuity here.  The Class has evidence of both, but only one is necessary.

### F.    **A Jury Could Find That GLELSI Conducted, Or Participated In The Conduct Of, GLHEC's Affairs Within The Meaning Of 18 U.S.C. § 1962(c)**

A RICO "person" means "any individual or entity capable of holding a legal or beneficial interest in property." 18 U.S.C. § 1961.  A RICO "enterprise" means "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity."  *Id.*  Defendants do not dispute that each of them, standing alone, satisfy both definitions.  T he evidence in this case strongly suggests that G LELSI "conducted," and "participated in the conduct of," GLHEC's affairs through a pattern of mail and wire fraud. 18 U.S.C. § 1962(c).

The S eventh C ircuit h as r epeatedly he ld t hat a  corporate s ubsidiary m ay  be f ound t o conduct the affairs of its parent company within the meaning of 18 U.S.C. § 1962(c).  *Richmond v. N ationwide C assel L .P.*, 52 F .3d 640, 646 (  7th C ir. 1995)  ("*Haroco* established t hat an individual corporation could not be held liable as a 'person' that conducted *its own* affairs through

a pattern of racketeering, *but a subsidiary that had conducted the affairs of its parent corporation could be found liable under § 1962(c)*."); *see also Haroco*, 747 F.2d at 402-03 ("[T]he complaint alleges that ANB is a wholly owned subsidiary of Heller International, and *we think it virtually self-evident that a subsidiary acts on behalf of, and thus conducts the affairs of, its parent corporation*. [footnote omitted] We doubt that more detailed allegations on the subject would serve any useful purpose, and we see no reason to require them.") (emphasis added).

*Haroco* was a case, like this one, arising from allegedly fraudulent interest calculations on commercial loans. *Haroco*, 747 F.2d at 385. There, as here, the defendants were a corporate subsidiary, its officer, and its parent company. *Id.* The subsidiary was the plaintiffs' lender (here, the subsidiary is a servicer), and plaintiffs alleged generally that the "defendants had defrauded them" in the calculation of their variable interest rates. The defendants moved to dismiss on the ground that "plaintiffs failed to allege the requisite relationships between 'persons' and the 'enterprises,' the affairs of which were allegedly conducted through patterns of racketeering activity." *Id.* at 386. The district court dismissed the plaintiffs' claims without reaching this particular argument. *Id.*

The Seventh Circuit, however, did reach that argument. On appeal, the subsidiary ("ANB") argued that it could not be held liable under § 1962(c) "because the requisite relationship between a person and an enterprise is not alleged." *Id.* at 399. In opposition, plaintiffs proffered two distinct legal theories. *Id.* "First, they argue[d] that ANB was *both* the 'person' and the 'enterprise' under section 1962(c) so that it conducted *its own* affairs through a pattern of racketeering activity." *Id.* (emphasis added). "Second, they argue[d] that ANB was the 'person' conducting the affairs of its parent corporation, Heller International." *Id.*

75

The Seventh Circuit carefully considered both "the statutory language and the policies of RICO," and ultimately, expressly adopted the plaintiffs' second argument while rejecting the first. *Id.* at 400-03. The Circuit court reasoned that the statutory text "suggests that the liable person and the enterprise must be separate," and therefore subsidiary "ANB [could] not be held liable under section 1962 for conducting *its own* affairs through a pattern of racketeering activity." *Id.* at 402.

> Pivotally, however, *Haroco* held:

> The subsection [18 U.S.C. § 1962( c)] requires only some separate and distinct existence for the person and the enterprise, and a subsidiary corporation is certainly a legal entity distinct from its parent. Defendants do not challenge this point but argue only that the allegation does not adequately specify either the relationship between ANB and Heller International or the way in which ANB conducted or participated in Heller International's affairs. *However, the complaint alleges that ANB is a wholly owned subsidiary of Heller International, and we think it virtually self-evident that a subsidiary acts on behalf of, and thus conducts the affairs of, its parent corporation. [footnote omitted] We doubt that more detailed allegations on the subject would serve any useful purpose, and we see no reason to require them.*

*Id.* at 402-03 (emphasis added).

Here, GLELSI was a wholly owned subsidiary of GLHEC at all relevant times before February 2018.[18] During the Class Period, GLHEC owned two main companies operating two distinct businesses. CPFF, ¶210. Great Lakes Higher Education *Guaranty* Corp. ("Guaranty Corp."), as its name suggests, operated GLHEC's Loan guaranty business. Guaranty Corp. essentially acted as a credit insurer, guaranteeing that private FFELP Lenders would still be repaid

---

[18] In February 2018, one of GLELSI's publicly traded competitors, Nelnet, purchased 100% of GLELSI's corporate stock from GLHEC for $150 million in cash. CPFF, ¶ 209; *see also* https://www.sec.gov/Archives/edgar/data/1258602/000125860218000004/exhibit9912718pressre lease.htm (last visited July 15, 2019) ("February 7, 2018 – Nelnet (NYSE: NNI) announced today it has completed its previously announced acquisition of Great Lakes Educational Loan Services, Inc. (referred to as Great Lakes throughout this press release) from Great Lakes Higher Education Corporation. Nelnet paid $150.0 million in cash for 100% of the stock of Great Lakes, following the satisfaction of all required closing conditions.").

in the event of borrower defaults.  *Id.*, ¶211.  In the event of borrower defaults, private Lenders filed reimbursement claims with Guaranty Corp., to be paid by Guaranty Corp.  *Id.*  Guaranty corp. then maintained a reinsurance agreement with ED to cover its own losses.  *See generally* 34 C.F.R. § 682.406 (explaining the "conditions for claim payments from the federal fund and for reinsurance coverage").[19]

Separately, GLELSI operated GLHEC's Loan *servicing* business during the Class Period. In essence, GLELSI was responsible for bookkeeping and interfacing between borrowers, Lenders and the government, managing borrowers' Loan accounts as a fee-based service to Lenders.  This fee-based service was provided only to private FFELP Lenders until 2009, when GLELSI first procured its ED Servicing Contract. CPFF, ¶212.[20]

During the Class Period, GLELSI was a *for-profit* subsidiary of GLHEC, which was itself a *non-profit* corporation. *Id.*, ¶213.  The two companies had distinct management structures, which generally met once per week (on Tuesdays) to discuss operational and strategic issues.  *Id.*, ¶214. Occasionally, Loan servicing issues would be discussed at these inter-company meetings, but not often.  *Id.*, ¶215.  More often than not, GLELSI's executives "did not have servicing issues worthy of discuss[ing]" with GLHEC's management team.  *Id.*  GLELSI was almost solely responsible for handling GLHEC's Loan servicing business.  *Id.*, ¶216.

> Q.  But GLELSI was responsible at the end of the day for all servic[ing] issues, right?
>
> A.  Correct.  The Tuesday meetings were just informative.

---

[19] Such credit insurance has always been a vital part of the FFEL Program as a whole.  Without it, no private Lender would extend tens of thousands of dollars in *unsecured* Loans, at single-digit interest rates, to consumers who, by definition, usually have no substantial income.

[20] Unlike the credit insurance business, the third-party Loan servicing business was never vital to the FFEL Program.  Private Lenders (traditionally, banks) were certainly capable of handling large amounts of regulated consumer loans independently.   In fact, GLELSI's System was originally just a modification of preexisting bank software.

Leitl Deposition at 111:21-24.

On these facts, under both *Haroco* and *Richmond*, a jury could reasonably find that GLELSI was a "person" distinct from GLHEC who "conducted" or "participated, directly or indirectly, in the conduct of" GLHEC's affairs during the Class Period. 18 U.S.C. §§ 1961, 1962(c). To the extent Defendants could argue that the Complaint (Dkt. 1) did not put them on notice of this exact legal theory, the argument should fail for three reasons.

*First*, it "would be manifestly inappropriate for a district court to demand that complaints contain all legal elements (or factors) plus facts corresponding to each." *Rowlands*, 901 F.3d 792, 800; *see also Chapman*, 875 F.3d at 848 ("Ever since their adoption in 1938, the Federal Rules of Civil Procedure have required plaintiffs to plead *claims* rather than facts corresponding to the elements of a legal theory.") (emphasis in original); *Haroco*, 747 F.2d at 402-03 ("[T]he complaint alleges that ANB is a wholly owned subsidiary of Heller International, and we think it virtually self-evident that a subsidiary acts on behalf of, and thus conducts the affairs of, its parent corporation. [footnote omitted] We doubt that more detailed allegations on the subject would serve any useful purpose, and we see no reason to require them.").

*Second,* even if *the Complaint* failed to specify this exact legal theory, "failure to state a claim" is not a defense that warrants summary judgment. *See generally* Part I, *supra*. Any pleading defect may properly be cured by amending the Complaint before or at trial. *Id.*

*Third*, and importantly, the Class put Defendants on actual notice of this legal theory over a month before Defendants filed their summary judgment motion. Harris Decl., ¶3, Ex. MM (Shriner to Harris email dated April 29, 2019). Class Counsel requested in April 2019 that Defendants stipulate to GLELSI having "conducted" GLHEC's affairs within the meaning of 18

U.S.C. § 1962(c). *Id.* Defendants declined to stipulate, but in any event, were put on notice of the Class's precise legal theory well before filing their motion. *Id.*

Lastly, the cases cited by Defendants in opposition to GLELSI being a potentially liable "person," and GLHEC the *standalone* "enterprise," are inapposite. Those cases all addressed so-called "association-in-fact" enterprises under 18 U.S.C. § 1961. *See, e.g., United Food and Commercial Workers Unions and Emps. Midwest Health Benefits Fund v. Walgreen Co.*, 719 F.3d 849, 854 (7th Cir. 2013) (identifying the purported "enterprise" as an association-in-fact "consisting of Walgreens, Par, and management personnel from the two companies"); *Ray v. Spirit Airlines, Inc.*, 836 F.3d 1340, 1352 (11th Cir. 2016) ("The Supreme Court has instructed us that an *association-in-fact enterprise* must possess three qualities . . . ."); *Riverwoods Chappaqua Corp. v. Midland Bank, N.A.*, 30 F.3d 339 (2d. Cir. 1994) ("In Count I of the amended complaint, it was alleged that, through a pattern of racketeering activity, Marine Midland and two of its loan officers, Augustus Costaldo and Thomas Brennan, participated in the affairs of an *association-in-fact enterprise* known as the 'Restructuring Group.'"); *Baker v. IDP, Inc.*, 357 F.3d 685, 691 (7th Cir. 2004) ("[I]t is not altogether clear how this *'association-in-fact'* has a common purpose . . . ."); *In re ClassicStar Mare Lease Litig.*, 727 F.3d 473, 491 (6th Cir. 2013) ("[C]ourts disagree over whether and when a corporate *parent* can be held liable under RICO for participating in an *association-in-fact* that consists of itself, its owners and employees, and its subsidiaries.") (all emphasis added).

The Class here is not pursuing some amorphous, "association-in-fact" theory of RICO "enterprise," but rather, the plain textual theory that GLHEC, as a "corporation," *is* a standalone RICO enterprise by definition. 18 U.S.C. § 1961. Under *Haroco*, and as reaffirmed in *Richmond*,

"a subsidiary" like GLELSI that "conducted the affairs of its parent corporation could be found liable under § 1962(c)." *Richmond*, 52 F.3d at 646.

Judge Posner, in *Fitzgerald v. Chrysler Corp.*, 116 F.3d 225, 227 (7th Cir. 1997), stated that *Haroco* was "limited" by the Supreme Court's decision in *Reves v. Ernst & Young*, 507 U.S. 170, 179 (1993), because *Reves* requires the subsidiary to have some part in "controlling" the parent's affairs. *Fitzgerald*, 116 F.3d at 227. Importantly, however, "control" in this context does *not* mean absolute, totalitarian control over the enterprise. Rather, *Reves* "makes clear" that only "*some* part in directing the enterprise's affairs is required." *Reves*, 507 U.S. at 179 (original emphasis). *See also id.* at 178 ("We conclude, therefore, that [§ 1962(c)] requires *an element* of direction.") (emphasis added); *id.* at n.4 (rejecting the Court of Appeal's suggestion that § 1962(c) "requires '*significant control*' over an enterprise). Under *Reves*, a liable RICO "person" need only "participate in the operation or management" of the enterprise's affairs. *Id.* at 183.

In this case, GLELSI had "significant control" over the operation *and* management of GLHEC's Loan servicing business. CPFF, ¶¶209-216. GLELSI was almost *solely* responsible for managing and operating GLHEC's servicing business during the Class Period. *Id.* Defendant Leitl's testimony shows that GLELSI would simply keep GLHEC "inform[ed]" about "significant" Loan servicing issues during GLHEC-wide executive meetings. *Id.*; Leitl Deposition at 110:2 – 111:24. At the end of the day, GLELSI was responsible for managing all servicing-related issues. *Id.* This is not a case where a subsidiary existed only as a legal formality or corporate fiction.

Rather, enterprise GLHEC owned two very different, real-world businesses during the Class Period. One business (Guaranty Corp.) was providing *credit insurance* to FFELP Lenders; the other (GLELSI) was providing Loan *servicing*, a fee-based technology and customer service

business with a different primary customer (ED). GLELSI was in near-complete control of GLHEC's servicing business throughout the Class Period. Contrary to defense counsel's puzzling email suggestion (Harris Decl., Ex. MM), this was certainly *GLHEC's* servicing business. Nelnet didn't pay *GLELSI* $150 million in cash for the servicing business; Nelnet paid *GLHEC* $150 million cash for the servicing business and for all cash flows therefrom, because both were entirely *GLHEC's*. CPFF, ¶209. GLELSI simply "participate[d] in the management and operation" of GLHEC's business during the Class Period. *Reves*, 507 U.S. at 183.

*Haroco* and *Richmond* are still the binding law of this Circuit, even if "limited" somewhat by *Reves* and *Fitzgerald*. Based on the evidence, the plain text of RICO, and the totality of appellate and Supreme Court case law, this Court should not hold that corporate subsidiaries are essentially *immune* from RICO liability while running their parents' businesses. *See Sedima,* 473 U.S. at 499 ("Instead of being used against mobsters and organized criminals, [civil RICO] has become a tool for everyday fraud cases brought against 'respected and legitimate enterprises.' [citation omitted] Yet Congress wanted to reach both 'legitimate' and 'illegitimate' enterprises."). The fact "that RICO has been applied in situations not expressly anticipated by Congress does not demonstrate ambiguity. It demonstrates breadth." *Sedima*, 473 U.S. at 499 (*approvingly* citing *Haroco*, 747 F.2d at 398).

Whether GLELSI ultimately conducted GLHEC's affairs through a pattern of mail and wire fraud is a question best left for the jury. It is not really a bright-line question of law (*i.e.,* whether all corporate subsidiaries conduct their parent's affairs, or whether all corporate subsidiaries do *not* conduct their parents' affairs). It is more of a fact-specific, evidentiary inquiry (*i.e.,* the extent to which GLELSI in fact managed, operated, directed and/or controlled GLHEC's

servicing business).  Any legal niceties involved in that inquiry can be properly managed through jury instructions.

> ### G.      A Jury Could Find That Leitl Conducted The Affairs Of GLELSI Within The Meaning Of 18 U.S.C. § 1962(c)

In addition, corporate officers and owners may be found to conduct the affairs of their companies within the meaning of 18 U.S.C. § 1962(c).  *Cedric Kushner Promotions, Ltd. v. King*, 533 U.S. 158, 163-65 (2001); *see also Reves*, 507 U.S. 170, 179 (holding that "RICO liability is not limited to those with primary responsibility for the enterprise's affairs").  Here, Leitl is a potentially liable party because she personally conducted GLELSI's relevant operations: first as Chief Servicing Officer, and later as Chief Operating Officer.

During the Class Period, GLELSI's *in-house* technology officers and System programmers called Leitl and Kielhofer their "clients," because their jobs were merely to implement Leitl's and Kielhofer's instructions in the System. CPFF, ¶217.  In addition, "each time" GLELSI employees discovered System errors affecting multiple borrowers, it was the Chief Servicing Officer who decided how (if at all) GLELSI would prioritize fixing such multi-borrower errors. CPFF, ¶141. Leitl was GLELSI's Chief Servicing Officer until May 2015, shortly before this lawsuit was filed. CPFF, ¶¶38-39.

Moreover, even as Chief *Operating* Officer in August 2015, Leitl showed her continuing control and authority over GLELSI's Loan servicing System by directing Fahley to turn off all *future* FO-IBR capitalizations. CPFF, ¶¶154-156; Harris Decl., Ex. CC.  Leitl and Kielhofer were also ED's primary points of contact at GLELSI for communicating about ED's Loan servicing requirements.  CPFF, ¶218.

A jury could reasonably infer from the totality of facts that Leitl conducted GLELSI's affairs during the Class Period. And as discussed in Part II.A through II.E, *supra*, a jury could find that Leitl conducted GLELSI's affairs through a RICO pattern of mail and wire fraud.

## III.   DEFENDANTS HAVE NOT "MOOTED" ANY CLASS CLAIMS UNDER ARTICLE III

Defendants contend that their so-called "second remediation project" has mooted the Class's original claims under Article III. The purported factual basis for this argument is, they say, that "[a]ll borrowers with outstanding account balances had those balances adjusted, and refund checks were issued to borrowers who had paid off their accounts in full." Dkt. 218 at 1; *see id.* at 58 (asserting that Class members "have received the full remedy to which they would have been entitled"); *id.* ("Even the last to be remediated of the affected student loan borrowers have been made whole for nearly a year . . . .").

Defendants' mootness argument is legally flawed, and factually misleading, for multiple, independent reasons. Some of those reasons further suggest that Defendants' pattern of mail and wire fraud continues to this day.

### A.    Defendants Have Not Mooted The Article III Controversy Because They Have Not Afforded Class Members The Complete Relief Demanded On Any Claim

The Supreme Court has repeatedly held that "a class action is not rendered moot when the named plaintiff's individual claim becomes moot after the class has been duly certified." *Genesis Healthcare Corp. v. Symczyk*, 569 U.S. 66, 74 (2013) (citing *Sosna v. Iowa*, 419 U.S. 393, 399 (1975). The Supreme Court has extended this principle to situations where a named plaintiff's claim became moot before a class was certified, but where the claim was still alive at a time of an earlier, erroneous denial of Rule 23 certification. *Id.* (citing *U.S. Parole Commission v. Geraghty*, 445 U.S. 388, 404 (1980)). The rationale for this rule is that once a Rule 23 class is certified, absent class members "acquire a legal status separate from the interest asserted by the named

plaintiff, with the result that a live controversy may continue to exist, even after the claim of the named plaintiff becomes moot." *Id.*

As this Court has already held, Plaintiff Dawson sufficiently established her Article III standing at the outset of this case, and again at the class certification stage. *See* Dkt. 171 at 12-14. So for Defendants to prevail on their Article III mootness arguments, they must moot not only Dawson's claims for relief, but the entire Class's claims for relief.

Defendants' motion appears to appreciate this aspect of the law. Their assertion is not that Plaintiff Dawson, or just some Class members, have been made whole. Their assertion is that every Class member's original financial injuries have been fully redressed. Dkt. 218 at 1, 58. Even if that assertion were factually true (and as explained *infra*, it isn't true), that alone would not satisfy the standard for Article III mootness. Mooting a Class action under Article III, mid-litigation, requires more than just *negating* each Class member's original injuries-in-fact. It requires affirmatively providing all Class members with the full relief demanded on their legal claims.

Stated differently, "[i]f the plaintiff asks for the moon, only offering the moon extinguishes the controversy" under Article III. *Smith v. Greystone Alliance, LLC*, 772 F.3d 448, 450 (7th Cir. 2014). As a matter of law, "a jurisdictional dismissal is proper only if the defendant offers more than the plaintiff's demand." *Id.* (citing *Gates v. Towery*, 430 F.3d 429 (7th Cir. 2005)).

In *Campbell-Ewald Co. v. Gomez*, 136 S.Ct. 663 (2016), a class action defendant had offered the named plaintiff everything he could possibly recover under his cause of action. *Campbell-Ewald*, 136 S.Ct. at 667-68. The defendant's offer was *not* accepted. The majority held that "an unaccepted settlement offer or offer of judgment does not moot a plaintiff's case." *Id.* at 672. The dissenters protested, yet even they acknowledged that only an offer of *the complete relief*

84

*demanded* could possibly "moot" an existing Article III controversy. *Id.* at 683 (Alito, J., dissenting) ("I agree that a defendant may extinguish a plaintiff's personal stake in pursuing a claim by offering *complete relief on the claim* . . . .) (emphasis added).

The Seventh Circuit has repeatedly acknowledged this "complete relief" principle. In *Chapman v. First Index, Inc.*, 796 F.3d 783 (7th Cir. 2015), Judge Easterbrook observed that "many courts, this one included, have applied the label 'moot' when a plaintiff declines an offer *that would satisfy his entire demand.*" *Id.* at 786 (emphasis added).

Likewise, in *Fulton Dental, LLC v. Bisco, Inc.*, 860 F.3d 541, 543 (7th Cir. 2017), the appellate court rejected a defendant's attempt to divest a plaintiff of standing mid-suit: even where the defendant tendered treble damages, court costs, and agreed to have an injunction entered against it. *Fulton Dental*, 860 F.3d at 542-43. The *Fulton Dental* defendant went beyond merely tendering damages to the plaintiff, and actually *deposited* treble damages, fees and costs into the district court's registry (there, unlike here, there could be no serious dispute that the money was really there). *Id.* The defendant argued that depositing the complete relief plaintiff demanded deprived plaintiff of standing, but the Circuit court disagreed. It reasoned that defendant's deposit was "more like accord and satisfaction[,] or payment, both affirmative defenses recognized by Fed. R. Civ. P. 8(c)(1)." *Id.* at 544.

In this case, Defendants have not come close to giving Plaintiff Dawson or the Class the complete relief they demand on any of their claims. The Class has long demanded not only compensatory damages on their common law negligence claims, but also a permanent injunction against Defendants' imposition of wrongful interest charges: plus an award of pre-judgment and

post-judgment interest, and court costs. *See* Dkt. 1 at 40-41 (Prayer For Relief).[21]    Defendants, however, only purport to afford the Class GLELSI's version (not the Class's version) of actual, Class-wide damages. *But see Greystone Alliance*, 772 F.3d at 450 ("A defendant cannot have the suit dismissed by making an offer limited to *what it concedes the plaintiff is entitled to receive*, even if the defendant happens to be right about its view of the plaintiff's entitlement, because deciding that entitlement resolves the merits.") (emphasis added).    The Class here finds Defendants' latest, purported "remediation" insufficient to satisfy their longstanding claims for actual damages, permanent injunctive relief, plus interest and court costs.

Thus, because Defendants have not provided the complete relief demanded, even on Class common law claims, Defendants have failed as a matter of law to "moot" the Article III controversy in this case.

### B.    Defendants Have Not Carried Their "Heavy Burden" Under The Voluntary Cessation Doctrine

In addition to the complete-relief doctrine of Article III mootness, Defendants' so-called "remediation" projects do not satisfy the voluntary-cessation doctrine of Article III mootness.

The voluntary, mid-lawsuit cessation of a challenged practice does not moot a case under Article III unless the defendant carries a "heavy burden" of making it "absolutely clear" that the defendant will not revert back to its old ways. *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 137 S.Ct. 2012, n.1 (2017); *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 190-91 (2000) (holding that a defendant must make it "absolutely clear" that the challenged conduct "could not reasonably be expected to recur").

---

[21] Defendants' brief correctly concedes that they have not mooted the Class's RICO claims. Dkt. 218 at 58 (arguing that "[w]ithout the RICO claim[s]," the Class's remaining claims "have become moot"). Accordingly, the Class will address Article III mootness only with respect to their common law claims.

Here, Defendants' challenged practices are their treatment of standalone B-9 Forbearances as capitalization events, and their imposition upon Class members of unauthorized Loan interest obligations. Defendants concede that they continued these practices up through the filing of this lawsuit; Defendants even stood by their unlawful practices throughout the first year of this litigation, arguing (quite falsely) that ED agreed with their capping practices. Dkt. 24; Dkt. 36; Dkt. 65; Dkt. 66. Defendants *now* say — only mid-lawsuit — that they have stopped treating B-9 Forbearances as capping events, and that ED agrees with their stopping. Dkt. 165.

On these facts, it is hardly "absolutely clear" that Defendants will not revert back to treating B-9 Forbearances as capitalization events. Absent judicial relief, there is nothing stopping Defendants from resuming their same old capping practices after they are dismissed from this case, and *falsely* asserting that ED agrees with them.[22] The Class remains entitled to seek permanent injunctive relief against Defendants' standalone B-9 Forbearance capitalizations, and Defendants' imposition of the attendant interest charges.

Perhaps more importantly, Defendants have not even made it "absolutely clear" that they have removed these unauthorized interest charges from the Class's Loan accounts. As explained, *infra*, Defendants have *not* properly calculated or remedied these interest charges to date. The evidence clearly shows that many Class members have not been compensated with cash or account

---

[22] In fact, this is Defendants' *modus operandi*. No matter what Defendants do to borrowers' Loan balances, when challenged, they simply assert that ED mandated and agrees with their practices. *See generally* E. Mosser Decl.; *see also* Harris Decl., Ex. EE at GL 0088198_0001 ("whatever capping procedures you see on the system, assume it is correct"). *Compare* Harris Decl., Ex. B at GL 0004439_0001 (ED's Contract Office Representative, Patrice Washington, expressly rejecting GLELSI's interpretation of CR 2785's "Job Aid Example #5" in February 2015), *with* Dkt. 66, ¶24 (GLELSI asserting the exact same, *previously rejected* interpretation of CR 2785's Job Aid Example #5 to this Court in July 2016, as if ED was in agreement).

credits. And in some cases, Defendants' so-called "remediation" has resulted in Class members suffering additional Loan balance *increases*. That is not a remedy.

### C. Many Class Members Have Not Been Compensated At All, And Many Have Suffered Further Financial Injuries From Defendants' "Remediation"

As explained below, Defendants' so-called "remediations" (or "reassessments," as Defendants call them outside of Court) do not remedy the Class's relevant financial injuries for multiple, independent reasons.

#### 1. Defendants' "Remediation Projects" do not measure the "capitalization impact" on Class members' debt levels.

Any methodology for ascertaining Class damages must be reasonably tailored to, and consistent with, the theory of liability. *Comcast Corp. v. Behrend*, 569 U.S. 27, 35-36 (2013). Class-wide damages calculations "need not be exact," but at the same time, they cannot be "arbitrary." *Id.* Any model that fails to measure the damages resulting from the injuries on which liability is premised necessarily fails on the merits. *Id.*

The Class's alleged financial injuries are the amounts by which their overall Loan balances were increased from capitalizations occurring at the end of standalone B-9 Forbearances (*i.e.,* the "capitalization impact"). *See* Dkt. 1, ¶¶66-69. This is measured by the wrongful interest charges which accrued over time, based on the wrongfully capitalized principal dollars. *Id.*; *accord* Class Certification Order (Dkt. 171) at 13 ("By capitalizing accrued interest, and adding it to . . . principal instead of keeping it in a segregated interest pool, Dawson has incurred increased interest charges, due to larger principal debt."). Defendants' testimony shows that their "remediation" projects have not addressed these capitalization-induced injuries, as required by *Comcast*.

Defendants' purported remediation projects (or, "reassessments," as they call them outside of Court[23]) are premised upon what Defendants call their "account rebuilding methodology." CPFF, ¶219.  The account rebuilding methodology is an automated, database-altering process that involves removing, and then recreating, large portions of each borrower's Loan account histories in the GOALS database. *Id.*, ¶220.  The evidence reveals a fatal flaw in this methodology.  It does not "reflect only the capitalization impact on borrowers' accounts." *Id.*, ¶221.  *But see Comcast*, 569 U.S. at 35-36.

In fact, GLELSI has now testified that it is *"not feasible"* for their methodology to "isolat[e] only the impact of the capitalization removal." *Id.*, ¶222.  It is "not feasible," according to GLELSI, for two overarching reasons.  First, "many different borrowers have many different variable sets that are affecting their aggregate account balances." *Id.*, ¶ 223. Second, Class members' new Loan histories reflect not only the results of "removing" past capitalizations, but *also* the results of rebuilding large portions of borrowers' payment histories using new and different algorithms. *Id.*, ¶224.

> Q.    Are you sure, as you sit here today, that all payments were reapplied using the same algorithms that were used historically?
>
> A.    I couldn't tell you one way or another.

Second GLELSI Deposition at 33:21-23; *see also id.* at 36:7 - 37:2:

> Q.    [] One of the effects of the standard account rebuilding methodology was to remove the capitalization transaction from class members' accounts, right?
>
> A.    Correct.
>
> Q.    However, it's possible that the standard account rebuilding methodology had other effects on borrowers' accounts, correct?
>
> A.    Correct.

---

[23] *See generally* E. Mosser Decl.

Q. And . . . [t]hat might occur if the system applied new algorithms that were not previously part of the borrowers' account history; is that correct?

[Objection to form]

A. It could.

Critically, the end result of all this is that GLELSI has *no idea* what the "adjustments" they've made to Class Loan balances actually measure or reflect from a financial perspective:

Q. So what is GLELSI representing that the second remediation project accomplished for borrowers financially?

[Objection to form]

A. And when you say "financially," just account balance impact?

Q. Yes.

A. I'm not sure I know exactly how to answer your question. You want to know what we're asserting about the change to their balance, but I don't feel like we asserted anything in particular about the change to their balance.

*Id.* at 53:16 – 54:3; *see also id.* at 56:10-17:

Q. So when we look at the delta from the second remediation project, what we're really looking at is the impact from the account rebuilding methodology, right?

A. Right.

Q. And that may often be different from the isolated capitalization impact, correct?

A. It can be, yes.

This fundamental disconnect between Class members' capitalization-induced interest charges, and the "account rebuilding" impact on their overall Loan balances, has produced some unacceptable results for Class members. *See generally* E. Mosser Decl.

90

### 2. Many Class members have suffered Loan balance <u>increases</u>, and Class member Elizabeth Mosser presents the most egregious example.

On behalf of Defendants, Kielhofer declared to this Court and the Seventh Circuit that GLELSI removed all standalone B-9 Forbearance capitalization transactions from Class Loans, using the "account rebuilding methodology." *See generally* Dkt. 165. Her declaration acknowledges that GLELSI's account rebuilds caused some Class members to suffer "negative impacts" on their Loan balances: including, but not limited to, net Loan balance *increases*. *Id.* at Dkt. 165, ¶ 17. Such net Loan balance increases do *not* isolate or remedy the wrongful, capitalization-induced charges on Class members' Loans. CPFF, ¶225.

> Q.   [***] Over time, a capitalization transaction will generally increase the loan balance, right?
>
> A.   Right.
>
> Q.   So over time, removing a capitalization transaction will generally decrease the loan balance, correct?
>
> A.   In general.
>
> Q.   So if you see an aggregate impact of an account rebuild that's plus $15, that tells you that there's likely other variables in play besides removing the cap, right?
>
> A.   Oftentimes.

Second GLELSI Deposition at 59:1-13.

Kielhofer's declaration argues in threadbare fashion that these "negative impacts" were somehow "necessitated by mandatory Department-compliance requirements." Dkt. 165, ¶17. But this is not factual testimony from a fact witness. This is a totally unspecified legal conclusion, or series of legal conclusions, proffered by a non-lawyer without any citation to law. The Court cannot properly consider such half-baked legal conclusions as justification for exacerbating — rather than relieving — the Class's capitalization-induced interest charges. *See* Fed. R. Evid. 701(c) (providing that unless a witness is "testifying as an expert," he or she may *not* "testify in

the form of an opinion" unless, among other things, such opinion is "not based on scientific, technical, or other specialized knowledge within the scope of Rule 702").

Kielhofer then goes on to declare that GLELSI "reviewed any adjusted accounts with abnormal results (*e.g.,* an account balance that was $20+ higher after completion of the remediation project) and addressed any remaining issues." Dkt. 165, ¶ 18. This declaration was materially false and misleading when made.

In the most telling example of falsity, Class Member Elizabeth Mosser paid off all four of her inflated, GLELSI-serviced Loans in 2016 and 2017. *See generally* E. Mosser Decl.; CPFF, ¶¶226-249. When GLELSI later "remedied" Ms. Mosser's *zero-balance* accounts in 2018, GLELSI began sending Ms. Mosser account statements saying that she *owed money* on two of her accounts. *Id.*

Ms. Mosser, an attorney, competently disputed her "remediation"-induced debt obligations with GLELSI by phone and in writing between February 2018 and May 2019: for fifteen months. *Id.* For fifteen months, GLELSI responded by repeatedly (1) declining to remove these phantom balances; (2) reporting her as *delinquent* to major credit bureaus for refusing to pay; and (3) stating that her accounts had been "reassessed" as required by ED, and that there was nothing GLELSI could do. *Id.*

On May 29, 2019, however, GLELSI called her phone, as it had many times, demanding that she pay about $100 she never owed. *Id.* Ms. Mosser not only disputed the debt this time, but also told GLELSI that she was becoming a representative party in this case. *Id. Within two weeks*, "Bridget" from GLELSI called Ms. Mosser back and said it was abandoning ED's supposed "reassessments" of her accounts. *Id.* Bridget apologized for GLELSI's "reassessments,"

apologized for bothering Ms. Mosser with phone calls, and apologized for damaging Ms. Mosser's personal credit with delinquency reports for fifteen months.  *Id.*

For *fifteen months*, Ms. Mosser — a practicing lawyer — achieved nothing by informally and formally complaining to GLELSI outside of this Court.  *Id.*  She obtained no relief: only more financial damage, coupled with vague excuses involving the "Department of Education."  *Id.*  But *thirteen days* after threatening judicial review of GLELSI's "reassesments," GLELSI abandoned its threadbare, asinine excuses.  *Id.*

GLELSI now says it is "remediating" Ms. Mosser's *"remediation"-induced* injuries, but GLELSI has not refunded Ms. Mosser for her original, *capitalization-induced* injuries to date.  *Id.*

In sum, contrary to Defendants' declaration (Dkt. 165), GLELSI did not "review any adjusted accounts with abnormal results . . . and address[] any issues."  Dkt. 165, ¶18.  GLELSI instead:

    (a) imposed upon Ms. Mosser over $100 in new, phantom debt obligations that she never owed, *more than a year after she paid all her accounts in full*;

    (b) demanded that Ms. Mosser pay those phantom obligations, which GLELSI told her were required by the U.S. Department of Education;

    (c) continuously reported Ms. Mosser as delinquent for over a year, for not paying her falsely "reassessed" debts;

    (d) for fifteen months, repeatedly rejected Ms. Mosser's oral and written requests (on law firm letterhead) to remove her false debt obligations,

    (e) blamed non-party ED for all of this; and

    (f) suddenly agreed to remove Ms. Mosser's false debt *only shortly after* GLELSI learned Ms. Mosser was becoming a representative party in this Class action.

*See generally* E. Mosser Decl.; CPFF, ¶¶226-249.

While all of (a) through (e) were occurring, GLELSI was in this Court and in the Seventh Circuit Court of Appeals demanding that Ms. Mosser's claims be dismissed under Article III:

because they had fully "remedied" her Loan accounts and "addressed any issues." Dkt. 165, ¶18. This Court should not enter a final judgment against Ms. Mosser or any other Class member at this stage.[24]

### 3. For most paid-in-full Class members, GLELSI has not "issued reimbursement checks."

Kielhofer's second "remediation" declaration (Dkt. 165) asserts that "[f]or the small percentage of borrowers who had previously paid off their loans in full before the time of the adjustment, GLELSI conducted the same account rebuilding process it used for borrowers with outstanding loans serviced by GLELSI, *and GLELSI issued reimbursement checks to the paid-in-full borrowers if the amount of their account adjustment exceeded the Department's standard $5.00 reimbursement threshold.*" Dkt. 165, ¶16. (emphasis added) This declaration was materially false and misleading when made for several, independent reasons.[25]

*First*, most Class members had ED as their Lender during the Class Period, as opposed to some private Lender. CPFF, ¶251. For all paid-in-full Class members who had ED as their lender, *GLELSI did not, in fact, "issue reimbursement checks." Id.*, ¶252. Instead, GLELSI merely sent the U.S. Government a data file showing whatever refunds GLELSI alone id were needed. *Id.*. Having done *that*, GLELSI *assumes* that the U.S. Department of Treasury — not GLELSI — will

---

[24] If the Court enters any final judgment against the Class, the Court should make expressly clear that such judgment has *res judicata* effect *only* with respect to the Class's original, capitalization-induced injuries. As a matter of law, the Class must remain expressly free to seek judicial relief from their new, "reassessment"-induced financial injuries, which have never been duly litigated and are beyond the scope of this action. *See Patzer v. Bd. of Regents of Univ. of Wisconsin Sys.*, 763 F.2d 851, 856 (7th Cir. 1985) ("Wisconsin law does not treat *res judicata* as an ironclad rule which must be implacably applied whenever its literal requirements are met, regardless of any countervailing considerations.").

[25] There are approximately 6,000 paid-in-full Class members. CPFF, ¶250.

"actually issue[] the check out to the borrower."   *See* Second GLELSI Deposition (Dkt. 227) at 85:5-16:

> Q.  How did GLELSI go about issuing reimbursement checks to paid-in-full class members?
>
> A.  So if – if the account is owned by ED, we don't ever touch those funds.  They all go through the Department of Treasury.  So we – as far as I know, it's a daily file we send them with refunds that are needed.  And then the Department of Treasury actually issues the check out to the borrower.

*But see* Dkt. 165, ¶16 (filed in both this Court and the Seventh Circuit in June and September 2018, respectively).  Even today, GLELSI offers no evidence that the U.S. Treasury has, in fact, issued checks to paid-in-full Class members.  *See generally* Dkt. 218.

GLELSI simply declared to this Court and the Seventh Circuit that GLELSI, in fact, "issued reimbursement checks" to all paid-in-full Class members.  Dkt. 165, ¶16.  This was a materially false and misleading declaration of fact when filed in both Courts.  Undaunted, Defendants and their counsel are still relying on that fraudulent declaration today.  *See* Dkt. 221, ¶3 (Lapham relying on Dkt. 165 in support of the second remediation project, *after she herself testified* that Dkt. 165 was materially inaccurate); Dkt. 218 at 1 ("[R]efund checks were issued to borrowers who had paid off their accounts in full."); Dkt. 218 at 58 ("Under longstanding precedent, the voluntary remedy *actually provided by the Department and Great Lakes* eliminated any injury that might have supported their standing to sue, and made their claims moot.").  That is not at all what Foley & Lardner LLP's client testified.  Their client testified that for damaged, paid-in-full Class members who had ED as their Lender, "the *Department of Treasury* [is generally expected to] actually issue[] the check out to the borrower."  Second GLELSI Deposition (Dkt. 227) at 85:5-16.

The upshot of GLELSI's and its counsel's free-wheeling, uncensored misrepresentations to the Court are that many Class members have not, in fact, been financially compensated. By way of example only, Class Member Angela Monger took out a home-equity loan to pay off her GLELSI-serviced Loans in 2016 and 2017. CPFF, ¶253. Defendants' (fatally flawed) "reassessment" calculations show that Ms. Monger overpaid on her Loans by about $90. *Id.*, ¶¶254-255. Like Ms. Mosser, Ms. Monger *has never received any financial compensation for her overpayments*. *Id.*, ¶256. Ms. Monger and Ms. Mosser are just two of many examples of Class members who have no defensible "remedy" to date.[26]

*Second*, ED's supposed "standard $5.00 reimbursement threshold" is not what it appears to be in Kielhofer's declaration. *See* Dkt. 165, ¶16. Instead, ED's true policy, of which GLELSI is aware, is "to refund overpayments of less than $5 if the borrower requests it." CPFF, ¶¶258-259. In response to learning this, Class Counsel asked during the Second GLELSI Deposition if GLELSI realized "that the entire class in this case is demanding complete refunds." *Id.*; Second GLELSI Deposition (Dkt. 227) at 90:25 – 91:16. GLELSI's witness combatively responded, "no; and I don't believe you had asserted that somewhere." *Id.*

*Third*, some Class members "paid off" their inflated Loans by consolidating them into private student loans, originated by a private consolidation companies such as SoFi.[27] Neither GLELSI nor the U.S. government "issue[d] reimbursement checks" to Class members who privately consolidated their Loans. CPFF, ¶260; Second GLELSI Deposition (Dkt. 227) at 85:5 –

---

[26] As discussed *infra*, there are thousands if not tens of thousands of *other* Class members for whom there is no evidence they have been financially compensated, let alone in the correct amounts.

[27] Such private consolidation loans are no longer FFELP or Direct Loans at all, so they are not governed by the HEA or its implementing regulations.

89:5. For those Class members, GLELSI (or perhaps the U.S. Treasury) *might* have issued "reimbursement checks" to Class members' *new lenders*, but not to Class members. *Id.*

> Q. If GLELSI issued a check to a private consolidation company in connection with these – either of these remediation projects, GLELSI did that because GLELSI determined that that borrower's account balance had been too high at the time of consolidation, right?
>
> A. Correct.
>
> Q. And all consolidation does is take an existing account balance or balances, combine them into one, and transfer that balance to the private consolidation company, right?
>
> A. Yeah, in general.
>
> Q. So when the borrower whose balance was too high at GLELSI[,] consolidates with a private consolidation company, their balance is still going to be too high over there with the private company, right?
>
> A. Correct.
>
> Q. So my question is, as part of remediating, did GLELSI do anything to ensure the borrower balances with these private companies would be reduced?
>
> A. *We have no control over that.*
>
> Q. And that's because GLELSI has no contractual relationship with these private consolidation companies, right?
>
> A. And nor does the Department of Education. So it's not even like it's one of Department of Education's servicers where they can direct them as to what they should do.

Second GLELSI Deposition at 88:3 - 89:5; *see also id.* at 86:21 – 87:7:

> Q. And so Treasury, if the remitter of payment was a private consolidation company, would have issued a check to that company, right?
>
> A. Correct.
>
> Q. And it is GLELSI that would be telling Treasury who the remitter of payment was?
>
> A. I'm not sure. I'd have to check. I mean, all the payments go through Department of Treasury, so it's possible they have the information already.

This is not a defensible "remedy," legally or practically.  If anything, this is a gratuitous windfall for Class members' *private consolidation lenders*, who may now collect on the same Class overcharges from two different sources: first, from Class members (plus interest); and second, from the Class members' previous Lender (U.S. government), or alternatively, from Class members' previous servicer (GLELSI).  None of this is consistent with Defendants' repeated declarations to this Court and to the Seventh Circuit.

Defendants' Rule 56 motion papers decline to mention any of the above deposition testimony.  Defendants' brief simply rests on their *admittedly false* assertion that GLELSI "issued reimbursement checks" to paid-in-full Class members. Dkt. 218 at 58-59 (relying on Kielhofer's admittedly false declaration at Dkt. 165).  This only further precludes summary judgment under *Goka*, and warrants sanctions as a matter of law.  *See Goka*, 862 F.2d at 650; *see also* Part I, C., *supra*.

### 4.  There is no evidence that transferred Class members have been properly compensated.

Lastly, there are over 15,000 damaged Class members whose Loans were transferred to some other servicer before GLELSI got around to "reassessing" their Loan accounts, after years of fraudulent overcharges. CPFF, ¶¶261-265.   For these Class members, GLELSI could not complete its fatally flawed account rebuilding methodology, because GLELSI does not have these borrowers' latest account histories.  *Id.*

Long ago, GLELSI sent transferred Class members' new servicers a data file containing, *inter alia*, their inflated principal and interest balances: as of the time of transfer.  *Id.*  Thus, those borrowers' Loan balances have continued to be wrongly inflated in their *new* servicers' records, as well as ED's and other Lenders' records: increasingly so over time.  To "remedy" these Class members' ongoing injuries, GLELSI simply sent Class members' *new* servicers a data file telling

new servicers what Class members' Loan balances *should have been* on the original transfer dates.
*Id.*

Meanwhile, GLELSI does not — and for lack of personal knowledge, cannot — vouch for the truth or accuracy of such Class members' account "adjustments."

> Q. And for these 15,000-plus borrowers in paragraph 15 [of Dkt. 165], does GLELSI know whether the receiving servicers rebuilt all 15,000 of those borrowers' accounts on their own systems?
>
> A. That's the expectation from FSA. *I certainly wouldn't be able to validate what they completed.*

Second GLELSI Deposition (Dkt. 227) at 80:10 – 81:9; CPFF, ¶¶261-265.

To moot this Class action under Article III, the burden was on Defendants to provide the Class with the complete financial and judicial relief demanded. Transferred Class members never demanded that GLELSI send their new servicers a data file, which those new servicers *might somehow* use to create new Loan balances without notice or Court supervision. Transferred Class members demanded — and still demand — complete, confirmed financial relief from Defendants for the Loan-inflating injuries that *Defendants* admittedly caused. Defendants have not even asserted, much less proven, that they have compensated transferred Class members in any way.

For all of the above reasons, Defendants have not afforded Class members the complete relief they demand on their common law claims, and this Class action is not even arguably "moot" under Article III.

### D. The Court Cannot Decide The Merits Of An Uncertified Damages Class, On A Flawed Methodology, And Then Dismiss The Class For Lack Of Jurisdiction

Defendants' Article III "mootness" argument is fatally flawed for yet another, independent reason. It is inherently *not* an Article III, jurisdictional argument warranting dismissal. As a matter of law, the Court would lack the power to even enter a summary "judgment" against the Class if the Court was somehow deprived of jurisdiction.

"Although the two concepts unfortunately are blurred at times, standing and entitlement to relief a re n ot th e s ame thing." *Arreola v. G odinez*, 546 F .3d 788, 79 4-95 ( 7th C ir. 2008) . "Standing is a pr erequisite t o *filing s uit*, w hile the u nderlying me rits o f a c laim ( and the la ws governing its resolution) determine whether the plaintiff is *entitled to relief.*" *Id.* (emphasis in original); *see also Greystone Alliance*, 772 F.3d at 543 ("A court can't decide the merits and then dismiss for lack of jurisdiction.").

Even if Defendants *were* seriously arguing t hat t hey had personally credited al l C lass members' Loan accounts and personally issued adequate refund checks to all Class members — in the correct amounts — such an argument would not deprive this Court of Article III jurisdiction. *Fulton Dental*, 860 F.3d at 543 ("A decision that a certain amount of damages should be paid . . . is quintessentially a ruling on the merits of a case."). What Defendants are actually arguing is that the Court should make findings of fact — without them even filing proposed findings of fact — and c onclude *on t he m erits* that D efendants h ave co rrectly calculated an d p aid o ut C lass-wide damages.

The Court has expressly declined to certify a damages Class at this stage. *See* Dkt. 171 at 2 ("After the Court resolves liability, the parties may revisit the question of the best way to decide damages."); *id.* at 22 (same). Having so far declined to certify any Rule 23 class with respect to damages, the Court cannot properly decide the entire Class's financial damages on the merits, and then use that as justification for dismissing this case under Article III.

Even if the Court could properly reach the merits of Class-wide damages at this stage, the Class has shown that Defendants' damages methodology is *completely divorced* from the Class's theory o f lia bility in th is c ase. B y D efendants' ow n a dmissions, t heir " account r ebuilding methodology" doe s not m easure t he c apitalization i mpact on C lass members' l oans. T hus,

Defendants' damages model does not satisfy *Comcast*, and the burden is upon them to do so to the extent they are using a Class-wide damages methodology in an attempt to "moot" this Class action.

**E.    The Class Intends to Present A Common Sense Damages Model, Tied To The Theory Of Liability, At The Proper Time**

The Class intends to present a common sense damages model, pursuant to the Court's Class Certification Order, "[a]fter the Court resolves liability." Dkt. 171 at 2, 22.  That proper damages model will not involve rewriting everyone's Loan histories in a manner that has little or nothing to do with their capitalization-induced interest charges.  Instead, the Class will present a simpler, cognizable financial formula that accounts for, *inter alia*:

(a) the dollar amounts of Class members' standalone B-9 Forbearance capitalizations;

(b) the approximate length of time that such capitalized dollars remained part of their principle balances;

(c) the simple interest rates on their Loans.

As this Court has recognized, the ultimate damages case here is not about speculative rocket science. It's ultimately about arithmetic.  Dkt. 171 at 14 ("This is not speculation, but arithmetic.").

To be fair, the Class will not demand that Defendants "undo" their wholesale, oftentimes further-damaging account rebuilds, at least not as part of this case.  Undoing Defendants' two full rounds of financial-history revisions would appear to be wholly impractical and beyond the scope of this litigation.

The Class will, however, seek to be fully and fairly compensated for the capitalization-induced interest charges that originally prompted this case four years, and two "account rebuilds," ago.  *See BCS Services, Inc. v. Heartwood 88, LLC*, 637 F.3d 750, 759 (7th Cir. 2011) (holding that a plaintiff has a "more relaxed" burden of proof at the damages phase of litigation, "especially if as in this case the defendants' conduct has made it difficult for the plaintiff to prove the precise extent of his damages"). Defendants here have presented an unnecessarily convoluted and

101

inapposite damages "methodology," consisting of (1) overwriting the Class's Loan histories in ways that do *not* reflect the Class's capitalization-induced interest damages, and (2) not actually compensating Class members directly, but instead, relying on the mere hope that various third parties will do so.

Defendants' facially inadequate, extra-judicial endeavors do not deprive this Court of jurisdiction to adjudicate the Class's constitutionally guarded, property-rights of action.[28]

## IV.  DEFENDANTS' PREEMPTION AND IMMUNITY ARGUMENTS ARE MERITLESS

Defendants do not challenge the merits of the Class's common law claims.  Defendants instead ask the Court to hold that state law claims against a private company, who breached its own federal contract and violated federal rules, may not be brought by private plaintiffs injured by the company's breaches and violations.  No court has ever held this, and settled law precludes such an unprecedented extension of federal preemption and immunity doctrines.

### A.   The Class's Claims Are Not Conflict Preempted

Defendants' only preemption argument is that the Class's common law claims are barred by the doctrine of "conflict" preemption.  Dkt. 218 at 13-31.  "Conflict preemption can occur in two situations: (1) when 'it is impossible for a private party to comply with both state and federal requirements,' or (2) when 'state law stands as an obstacle to the accomplishment and execution

---

[28] Defendants have filed a notice of recent authority regarding *Casillas v. Madison Avenue Associates, Inc.*, 926 F.3d 329 (7th Cir. 2019). Dkt. 223. *Casillas* sets forth no new Article III law; it merely reiterates and reapplies the Seventh Circuit's standing decision in *Groshek v. Time Warner Cable, Inc.*, 865 F.3d 884 (7th Cir. 2017), which affirmed a similar, earlier Article III standing decision by this Court.  This Court already decided, after *Groshek*, that Plaintiff Dawson and the Class *established* their Article III standing. Dkt. 171.  Consequently, the question presented at this stage is no longer one of Article III standing, but rather, Article III mootness: two different doctrines.  Defendants have no meritorious argument under either doctrine, but constitutional mootness is the correct doctrine of law to apply here, not constitutional standing.  Defendants have not demonstrated Article III mootness as a matter of law or fact.

of the full purposes and objectives of Congress.'" *Bible*, 799 F.3d at 652; *see also Nelson v. Great Lakes Educational Loan Services, Inc.*, --- F.3d --- , 2019 WL 2636822, at *9-10 (7th Cir. 2019) (same).

As a general matter, conflict preemption does not apply to private rights of action that are not enforcing *substantive* state law.  *Compare Bible*, 799 F.3d at 652-54 (breach of contract claim not preempted where Lender "breached the [Master Promissory Note] *by acting contrary to the federal regulations* incorporated into the contract") (emphasis added), *with Chae v. SLM Corp.*, 593 F .3d 936,  947 -48 ( 9th C ir. 2010)   (conflict p reemption e xists w here C alifornia l aw *substantively* "prohibits the imposition of a late fee" allowed by regulations, or would *substantively* "lessen [a] sixty-day window" allowed by the regulations).

Conflict preemption doe s not "occur a ny t ime a c ourt w ould be r equired t o i nterpret a regulation t o d ecide a c ase arising unde r the co mmon l aw." *Bible*, 799 F .3d a t 652 .  Indeed, different "courts interpret federal regulations all the time without triggering preemption concerns." *Id.*  The mere fact that state law right of action require courts to interpret federal regulations does not show preemption. *Id.*  Instead, "the real question" is whether entertaining a common law right of action "actually conflicts with the HEA and its associated regulations." *Id.*

Here, Defendants argue that exposing them to tort *liability* — standing alone — "would fundamentally interfere with the Federal Government's ability to . . . d efine the terms according to which it lends money." Dkt. 218 at 15.  Not so.

Defendants' preemption argument rests on the false premise that the Class seeks to impose state law standards that conflict with, or add to, federal student Loan terms.  That is not the Class's case.  The Class's common-law case is only that Defendants *violated* ED's capitalization rules and requirements fo r  these  Loans, b y t reating t he C lass's s tandalone B -9 F orbearances as

103

"capitalization events."  State law claims and remedies that merely *rely upon* violations of federal law do not implicate conflict preemption.  *Bible*, 799 F.3d at 652-55 ("In this situation, federal law simply provides the standard of compliance, and the parties' duties are actually enforced under state law.  There is no conflict."); *Olsen v. Nelnet, Inc.*, No. 4:18-CV-3081, 2019 WL 2189486, at *4-5 (D. Neb. May 21, 2019) (sustaining class common law claims against student Loan servicer, GLELSI's new parent company, where the claims merely sought to "enforce the federal regulatory standards").  Defendants' own brief concedes, as it must, that their interest capitalizations "practices were inconsistent with what the Department had intended."  Dkt. 218 at 25.  Therefore, the only "federal-state conflict" in this case is the conflict between ED's capitalization requirements and the "state" of GLELSI's business operations throughout the Class Period.

Defendants have filed a notice of recent authority regarding their own recent case in *Nelson*, 2019 WL 2636822; Defendants suggest that the Class should address *Nelson* before they do.  *See* Dkt. 225.  It is unclear why.  *Nelson* overturned a district court dismissal, and found no conflict preemption on various state law claims. *See generally Nelson*, 2019 WL 2636822.  *Nelson* even rejected as *"not persuasive"* ED's "view that the HEA preempts all state *regulations* that 'impact' FFELP loan servicing."  *Id.* at n.2 (emphasis added: state "regulations," not "private rights of action").  *Nelson* also found a "compelling" state interest in "protecting consumers by providing oversight of federal student loan servicers."  *Id.* at n.3.  In sum, it is not clear why Defendants are notifying this Court of *Nelson* in support of their position on conflict preemption.

The Class will venture its best guess.  En route to finding an *absence* of conflict preemption, the Seventh Circuit in *Nelson* stated:

> The Ninth Circuit in *Chae* used broad language on conflict preemption and the value of uniformity in the federal loan program: "Congress intended uniformity within the [FFELP]. The statutory design, its detailed provisions for the FFELP's operation, and its focus on the relationship between borrowers and lenders persuade

> us that Congress intended to subject FFELP participants to uniform federal law and regulations." 593 F.3d at 947. That broad language, however, focused on different sorts of claims, where the value of uniformity would be more compelling than it is here. *Chae* focused on uniformity in the method of setting late fees, repayment start dates, an d i nterest calculations. S ee *id.* a t 944 –47. W e as sume t he n eed f or nationwide consistency on those sorts of administrative mechanics is substantial. That n eed d oes n ot extend t o t he claims N elson as serts b ased o n af firmative misrepresentations — not required by federal law — to borrowers having trouble making their payments.

*Id.* at *10 (emphasis added). The Class predicts (on a mere guess) that Defendants would use this language to argue that state law *causes of action* that address "administrative mechanics" like "late fees, r epayment s tart d ates, an d i nterest cal culations" ar e co nflict p reempted. If t hat's t heir argument, Defendants are missing the point of both *Chae* and *Nelson*.

Both *Chae* and *Nelson* — unlike *Bible* and *Olsen* — involved state law doing more than merely providing private rights of action to enforce *substantive federal requirements*. In *Chae* and *Nelson*, *state law itself was imposing substantive rules* impacting what Loan servicers could and could not do, what Loan servicers should or should not say, and how Loan servicers could or could not c alculate t hings. S uch *substantive* state r ules w ere at le ast p otentially in te nsion w ith *substantive* federal rules, thus creating at least the *potential* for a true federal-state conflict. *Nelson* ultimately found no substantive conflict, while *Chae* ultimately found one. But it was only the presence o f *substantive* state r ules t hat cr eated even t he *potential* for i nterstate " uniformity" problems to arise in the first place.

Neither *Nelson* nor *Chae* is remotely applicable to the Class's common law claims here. Wisconsin's c ommon l aw ne gligence cause of act ion has *nothing at a ll* to s ay a bout w hat Defendants should or should not be doing capitalization-wise, other than this: Defendants should have, and could have, done what ED's rules and requirements told them to do. *See United States v. Winstar Corp.*, 518 U.S. 839, 918 (1996) (recognizing that "the government is ordinarily treated

like a private party when it enters into contracts").  There is no potential conflict here, much less

an actual conflict.

To the extent that 50 States' negligence laws could theoretically be applied to Class claims

(and they can't, because the Court has certified a nationwide Class under one state's common law),

that could only mean that different courts nationwide may interpret *the same federal requirements*.

This happens all the time under *federal* causes of action, and it hardly creates "uniformity"

problems that federal agencies are incapable of handling.

The Class's tort claims here assert that Defendants violated ED's regulations, violated ED's

"directives" to them, breached their ED Servicing Contract, and caused ED to unwittingly breach

its own Loan agreements ("MPNs"), which "define the terms according to which [ED] lends

money." Dkt. 218 at 15.  The Class is not seeking to enforce any *substantive* State law telling

Defendants how — or how not — to capitalize or charge interest on federal Loans.  Wisconsin has

established no such law, and even if Wisconsin had, such *substantive* state law would not form

any part of this Class's common law rights of action.

The Class is simply holding Defendants accountable at common law, for doing the *opposite*

of what ED's regulations and "directives" told Defendants to do.  The Class says that Defendants

violated 34 C.F.R. §§ 682.211(f)(11) and 685.205(b)(9), and ED's interpretations and "directives"

to Defendants concerning those rules.

ED itself has *never* denied that its own substantive rules, its own Loan contracts, and its

own Servicing Contact were breached by these Defendants in this case.  *See generally* Dkt. 22.


*See* Harris Decl., Ex. W; CPFF, ¶198.  CR 1492 sets forth

uniform, nationwide rules for how servicers can and cannot capitalize interest on these Loans.

Harris Decl., Ex. A.  Every private citizen residing in every State in this nation can demand that GLELSI follow such uniform, substantive federal rules.

*Bible* is controlling in this case, and there is no conflict.  *Bible*, 799 F.3d at 652-55; *see also Olsen v. Nelnet, Inc.*, No. 4:18-CV-3081.

## B.   Defendants Have Waived Any Possible "Immunity" They Could Have Asserted Four Years Ago

For related reasons, there is no conceivable form of "immunity" available to Defendants in cases like this.   But even if there were,  these particular  Defendants have long waived any conceivable immunity from this lawsuit.

"Government contractors obtain certain immunity in connection with work which they do pursuant to their contractual undertakings with the United States." *Campbell-Ewald*, 535 U.S. at 672.  "That immunity, however, unlike the sovereign's, is not absolute." *Id.*  "When a contractor violates both federal law and the Government's explicit instructions, as here alleged, no 'derivative immunity' shields the contractor from suit by persons adversely affected by the violations." *Id.* That is precisely what the Class alleges in this case, that Defendants violated the B-9 Forbearance regulations and "the Government's explicit instructions," thus injuring student Loan borrowers. *Id.*  But the Court need not even get that far.

Even assuming, *arguendo*, that GLELSI could assert "absolute" sovereign immunity here, the Supreme Court has repeatedly held that sovereign immunity is waived where the sovereign "*voluntarily* becomes a party to a cause and submits its rights for judicial determination." *Lapides*, 535 U.S. at 619  (emphasis in original).  Here, Defendants voluntarily answered the Class's Complaint (Dkt. 24) and proceeded to vigorously defend themselves in this Court for years.

Additionally, Defendants filed a  *Counterclaim*  against Plaintiff Dawson under the Declaratory Judgment Act, and *demanded* that this Court finally resolve this case in their favor.

*See generally* Dkt. 24 at ¶¶106-139; *id.* at p.30 (Defendants' Prayer for Relief) ("Great Lakes demands judgment against Dawson as follows . . . ."); *see also* Joint Rule 26(f) Report (Dkt. 36) at 3 (Defendants' Position: "In an effort to resolve conclusively what actually happened, the Great Lakes Defendants have brought a counterclaim for a declaratory judgment against Dawson . . . ."). Defendants cannot with straight faces claim immunity from a lawsuit in which they themselves demanded judicial relief, and voluntarily litigated for years on end.  ED may have washed its own hands of contractual liability in this case (Dkt. 22), but even ED has sufficient regard for these proceedings to have its employees *voluntarily* appear as fact witnesses.   Harris Decl., ¶2.

By their own affirmative conduct, Defendants have waived any possible "immunity" they might have creatively imagined for themselves four years ago.  To hold otherwise would "generate seriously unfair results."  *Lapides*, 535 U.S. at 619.  This Court need not reach the merits of Defendants' immunity arguments, but in any event, there is no merit to them.  Class members are nonetheless compelled to address those arguments only to avoid any possible waiver of their own.

### C.    <u>Intergovernmental Immunity Is Inapplicable To This Case</u>

In general terms, intergovernmental immunity invalidates direct regulation of the United States government and discrimination against the government "or those with whom it deals." *North Dakota v. United States*, 495 U.S. 423, 435, 110 S. Ct. 1986, 109 L. Ed. 2d 420 (1990) (citations omitted).

The intergovernmental immunity doctrine has been invoked to invalidate direct regulation of the government's operations or property. *Blackburn v. U.S.,* 100 F.3d 1426, 1435 (9th Cir. 1996).  The doctrine does not, however, invalidate "state regulation which *indirectly* regulates the Federal Government's activity…." *North Dakota*, 495 U.S. at 434 (emphasis added).  Neutral regulations imposed on third parties that happen to burden the government are "normal incidents

of the organization within the same territory of two governments." *Id.* (quoting *Helvering v. Gerhardt*, 304 U.S. 405, 422, 58 S. Ct. 969, 82 L. Ed. 1427 (1938)).

Direct governmental regulation occurs when a state imposes regulations on governmental actions, or actions performed by governmental contractors. In this case, there is no state regulation. The Class is pursuing tort claims for Defendants' failure to follow federal regulations, and their misrepresentations relating to regulatory compliance. To the extent this somehow burdens the government, a survey of relevant case law shows that no unit of the U.S. government is being directly "regulated" here.

In *Boeing Co. v. Movassaghi*, the Ninth Circuit held that California's contamination cleanup standards necessitated intergovernmental immunity because they exceeded federal standards, and were created specifically for one federal testing site. *Boeing*, 768 F.3d 832, 842 (9th Cir. 2014). This was a direct and specific power-grab by the State of California. The federal government was wholly responsible for the contamination at the site, yet California wanted control of the cleanup and remediation efforts. *Id.* at 839. Because the state law directly targeted and regulated one specific federal activity, it was found discriminatory, and therefore invalidated. *Id.* There is no such direct and targeted regulation, by a state government, in this case. There is only a generally applicable common law, which discriminates against no one.

Similarly, in *U.S. v. California*, one of the challenged state regulations specifically targeted immigration facilities. *United States v. California*, 921 F.3d 865, 882 (9th Cir. 2019). The regulation called for California government oversight of the standard of care and due process afforded to those detained in the federal immigration facilities. *Id.* at 882-83. The Ninth Circuit invalidated the regulation under the doctrine of intergovernmental immunity because the desired regulatory scheme directly affected a federal activity. *Id.* at 883.

Likewise, in *U.S. v. City of Arcata*, the Ninth Circuit held that an ordinance prohibiting the military from recruiting individuals under the age of 18 was invalid because it directly regulated the government by "constraining the conduct of federal agents and employees." *U.S. v. City of Arcata*, 629 F.3d 986, 991 (9th Cir. 2010).

In stark contrast to these direct regulations, a state law will not be invalidated on intergovernmental immunity grounds solely because it addresses some area that is governed by federal law. For example, in *U.S. v. California*, the Ninth Circuit rejected an argument that a regulation on private employers dealing with federal immigration was invalid under the doctrine, since the regulations impacted private employers, not the government or its agents. *U.S. v. California*, 921 F.3d at 880. Likewise, in *North Dakota v. U.S.*, the Supreme Court held that state regulations regarding liquor labeling and sale reporting were not invalid simply because the regulations affected the government's purchase of liquor for military bases. *North Dakota*, 495 U.S. at 434-36. The state-imposed rules impacted suppliers, not the government. *Id.* at 436-37. The only impact on the government was incidental; prices increased and certain suppliers refused to ship to the state because of the additional burdens imposed by state law. *Id.* at 429.

Here, any impact on the U.S. government is incidental. Merely using private, state-law rights of action to enforce federal standards does not amount to a state directly regulating the government or its contractor. Thus, intergovernmental immunity would only apply if there were discriminatory action. There is none.

A state "does not discriminate against the Federal Government and those with whom it deals unless it treats someone else better than it treats them." *Washington v. U.S.*, 460 U.S. 536, 544-45, 103 S. Ct. 1344, 75 L. Ed. 2d 264 (1983). In order to be non-discriminatory, the regulation must be "imposed on some basis unrelated to the object's status as a Government contractor or

supplier, that is, that it be equally imposed on other similarly situated constituents of the State." *North Dakota*, 495 U.S. at 438 (citation omitted).

For example, in *Boeing*, the court held that the state law mandating the site contamination was discriminatory because it directly targeted the government's actions regarding the cleanup of one specific federal laboratory. *Boeing*, 768 F.3d at 837, 842. Likewise, in *City of Arcata*, the Court held that the ordinance prohibiting recruiting minors was discriminatory because the ordinance specifically targeted government action. *City of Arcata*, 629 F.3d at 991.

However, the regulations at issue in *North Dakota* were not discriminatory because they were applied equally to all liquor purchases. *North Dakota*, 495 U.S. at 438-39Brady. Likewise, one of the regulations at issue in *U.S. v. California* also was not discriminatory because the regulation did not treat the government any differently than others impacted by the regulation. *California*, 921 F.3d at 881.

The above-referenced cases, and all cases cited by Defendants in their summary judgment brief, deal with challenges to a state law imposing some sort of regulation on the federal government or its contractor. While illustrative to demonstrate the reasons why intergovernmental immunity does not apply, they are all inapposite.

In this case, private Class members merely assert private tort claims. They are not challenging the efficacy of any federal regulation, and pursuing tort *remedies* does not directly impact any federal regulation.

There are scant decisions in which a party challenged the imposition of tort liability under the intergovernmental immunity doctrine or the Supremacy Clause generally. For example, in *Lamb v. Martin Marietta Energy Systems, Inc.*, the court held that federal facilities and contractors "are not entirely exempt from state tort law under the intergovernmental immunity

principles," but held that "state tort law may not apply a standard of care that is inconsistent with any applicable federal laws and guidelines." *Lamb v. Martin Marietta Energy Systems, Inc.*, 835 F.Supp. 959, 965 (W.D. Ken. 1993).

Here, the Class contends that Defendants wrongfully capitalized and misrepresented their lack of compliance with federal capitalization requirements. The Class's negligence claims are uniformly applicable to any private party who violates federal standards, regardless of whether that private party has a government contract or not. The Class is not imposing a standard of care or otherwise alleging liability that is inconsistent with federal laws and guidelines. To the contrary, the Class's common law claims are based on Defendants' failures to follow and adhere to federal laws and guidelines.

In *Castle v. United States*, the plaintiff had a negligence claim brought under the Federal Tort Claims Act against the United States for injuries he sustained in an accident with a USPS truck. *Castle*, 2017 WL 6459514, at *1 (N.D.N.Y. 2017). Specifically, plaintiff argued that the USPS driver violated his duty of care by violating a state traffic law, and therefore was negligent *per se. Id.* at *5. The government argued that its driver could not be held liable for violating a state traffic law under the Supremacy Clause. *Id.* at *12. Ultimately, the court held that the Supremacy Clause did not preclude state law regulation of drivers through state traffic laws because the law did not discriminate against the government and because the regulation did not conflict with any federal regulation or mandate. *Id.* at *12-14.

Again, here, the Class asserts tort claims for common law negligence and negligent misrepresentation. Defendants failed to follow federal requirements, while misrepresenting and concealing the true facts of their non-compliance. The imposition of tort liability does not conflict with any federal standards, but rather enforces them.

D.    *Yearsley* **Immunity Is Inapplicable To This Case**

112

Eighty years ago, the Supreme Court in *Yearsley* ruled that a federal contractor could not be held liable for his actions damaging an individual's property when the contractor acted on behalf of the government. *Yearsley v. W.A. Ross Const. Co.*, 309 U.S. 18, 20-21, 60 S. Ct. 413, 84 L. Ed. 554 (1940) (citations omitted). The case established the rule that an agent performing work for the government will not be held liable for actions that Congress validly sanctioned, so long as the agent did not exceed the authority granted to him. *Id.* at 21.

The Supreme Court more recently addressed government contractor immunity in *Campbell-Ewald*. There, the Navy engaged the contractor to send recruiting text messages to individuals who had consented to receiving them. *Campbell-Ewald*, 126 S. Ct. at 667. A plaintiff, who did not consent, filed suit against the contractor for violations of the TCPA after receiving texts. *Id.* The contractor asserted derivative immunity by virtue of its contractual relationship with the Navy. *Id.* at 672-73.

The Supreme Court disagreed, finding that the contractor had exceeded its delegated authority. *Id.* at 673-74. Specifically, the Navy had instructed the contractor to text-message only people who had consented, and also "relied on [the contractor's] representation that the [service] list was in compliance." *Id.* at 674. The record did not show that the contractor complied with the Navy's instructions, and thus immunity was denied. *Id.* The Court expressly held that "[w]hen a contractor violates both federal law and the Government's explicit instructions, as alleged here, no 'derivative immunity' shields the contractor from suit by persons adversely affected by the violation." *Id.* at 672.

So too here – the federal government directed Defendants to administer student loans in a particular manner, specifically as to capitalization issues. Defendants failed to follow the government's direction, causing economic harm to the Class. Like the defendant in *Campbell-*

*Ewald* that failed to follow the Navy's instructions, Defendants here cannot be afforded derivative immunity under *Yearsley*. *Id.* at n.7 ("Critical in *Yearsley* was not the involvement of public works, but the contractor's performance *in compliance with all federal directions*.").

As Defendants themselves recognize, that is not this case.  Dkt. 218 at 25 (conceding that their capitalization "practices were inconsistent with what the Department had intended"); *see also* Harris Declaration ( GLELSI's need for remediation "stem[s] from 'miss understandings' of CR1492"); *see generally* Dkt. 83 (same).

After *Yearsley*, the United States Supreme Court again addressed the scope of a government contractor's immunity while performing government work in *Brady v. Roosevelt S.S. Co*.  There, the Court recognized that " government contractors obtain certain immunity in connection with work which they do pursuant to their contractual undertaking with the United States." *Brady*, 317 U.S. 575, 583, (1943) (citing *Yearsley*, 309 U.S. 18). However, the Supreme Court noted that contractors are not afforded blanket immunity by virtue of their affiliation with the government.  *Brady*, 317 U.S. at 582-84;  *see also Campbell-Ewald*, 136 S. Ct. at 672 (Government contractor "immunity, however, unlike the sovereign's, is not absolute.").

The *Brady* Court noted that, unlike *Yearsley*, where the issue was whether the contractor had Congressional authority to perform certain actions, the question in *Brady* was whether a government contractor can escape liability for the negligent exercise of delegated power.  *Id.* at 583. The Court rejected the idea no private right of action could lie against the contractor by virtue of its relationship with the government. *Id.* at 584. Subsequent court decisions have summarized the *Brady* holding as follows: "that an action could be maintained against agents of the United States at common law for the agents' own torts." *Cosmopolitan Shipping Co. v. McAllister*, 337 U.S. 783, 789, 69 S. Ct. 1317, 93 L. Ed. 1692 (1949).

114

Courts have applied the negligence "exception" from *Brady* in other, subsequent contractor immunity cases. *See, e.g., Cabalce v. VSE Corp.*, 922 F.Supp.2d 1113, 1125 (D. Haw. 2013) (citation omitted); *Contango Operators, Inc. v. U.S.*, 9 F.Supp.3d 735, 752 (S.D. Tex. 2014) (citation omitted); *In re Fort Totten Metrorail Cases Arising Out of Events of June 22, 2009*, 895 F.Supp.2d 48, 74 (D.D.C. 2012).

Similarly, in *City of Worcester v. HCA Management Co., Inc.*, the Court relied on *Brady* to deny immunity on the grounds that the government is not the real party in interest when the contractor is being sued for his own negligent acts. *See City of Worcester v. HCA Management Co., Inc.*, 753 F.Supp. 31, 38 (D. Mass. 1990) (citing *Brady*, 317 U.S. at 582-85). The Fifth Circuit also has recognized this negligence exception in *Ackerson v. Dean Dredging LLC*, 589 F.3d 196, 207 (5th Cir. 2009) ("These allegations attack Congress's policy…not any separate act of negligence by the Contractor Defendants.").

There is ample case law to support the negligence exception to *Yearsley*. Again, since the Class is pursuing negligence claims for Defendants' own failure to adhere to federal servicing requirements, this Court should follow the negligence exception and not immunize Defendants from liability.

Specifically, the ED Servicing Contract between GLELSI and ED provides:

> The contractor[s] will be responsible for maintaining a full understanding of all federal and state laws and regulations and FSA requirements and ensuring that all aspects of the service continue to remain in compliance as changes occur.

Dkt. 59-29 (§ C.1.4.3). It goes on to state: "Servicers will be required to meet all statutory and legislative requirements." Dkt. 59-29 (Addendum Attachment A-1).

Defendants had a contractual obligation to service Class Loans in compliance with federal requirements, including ED's Change Requests. When they failed to service the loans in

accordance w ith f ederal  capitalization r equirements,  they cl early  deviated f rom  their ow n contractual a uthority,  thus s ubjecting th emselves to  n egligence c laims  for w hich th ere is  n o immunity. *Campbell-Ewald*, 126 S. Ct. at 672.

## CONCLUSION

For all of the foregoing reasons, Defendants' motion for a summary judgment should be denied.   There are genuine disputes of material fact in this case.  ED is not backing up Defendants' story.  Defendants are not backing up Defendants' story: which has changed from programming errors (Dkt. 24), to *following* capitalization Change Requests (Dkt. 53), to *denying the meaning of* capitalization Change Requests (Dkt. 63, 66), to *misunderstanding the meaning of* capitalization Change R equests ( Dkt. 83) , t o  *misunderstandings  among E D of ficials*  (*id.*), t o  finally "remediating" the wrongful capitalizations alleged in the Complaint (Dkt. 165), except not really. *See generally* Part III.  Defendants offer no proposed findings of fact to help nail down which story or stories they ultimately stand by.

Defendants ha ve not  c ome c lose t o c arrying t heir pr ocedural bur den of s howing t heir entitlement to a final "judgment as a matter of law."  Fed. R. Civ. P. 56(a).  If at trial, Defendants' evidence cl early s hows th eir e ntitlement to  a  f inal ju dgment, th en D efendants c an mo ve f or a directed verdict under the same legal standards provided by Rule 56.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250-51 (1986).  This Court's proper denial of Defendants' Rule 56 motion does not preclude the Court from entering the same judgment Defendants now seek, at a later date, when and i f D efendants c an  establish t heir e ntitlement t o s uch a  j udgment.  D efendants ha ve not sufficiently established their entitlement to date.

Respectfully submitted,

FINKELSTEIN & KRINSK LLP

Dated: July 18, 2019                    By:    s/ David J. Harris, Jr.
                                                  David J. Harris, Jr., Esq.

                                                  Jeffrey R. Krinsk, Esq.
                                                  Trenton R. Kashima, Esq.
                                                  550 West C Street, Suite 1760
                                                  San Diego, California 92101-3579
                                                  Telephone: (619) 238-1333
                                                  Facsimile:  (619) 238-5425

                                                  *Counsel for Plaintiff and the Class*