UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WISCONSIN

---

MEREDITH D. DAWSON,

        Plaintiff,

v.                                              Civil Action No. 15-cv-475-jdp

GREAT LAKES EDUCATIONAL
LOAN SERVICES, INC., et al.,

        Defendants.

---

### DEFENDANTS' BRIEF IN OPPOSITION TO
### PLAINTIFF'S MOTION TO COMPEL PRODUCTION OF UNPRODUCED CLASS MEMBER IDENTITIES, AND FOR CIVIL CONTEMPT SANCTIONS

---

### INTRODUCTION

Defendants disagree with the contention at the heart of Plaintiff's motion: that certain borrowers at issue—dubbed the CAPGONE borrowers—are class members. In Judge Crabb's class-certification decision in September 2016, the Court ruled that the claims of borrowers involved in the First Remediation Project were "too far removed from the claims plaintiff alleged in her complaint" and held that Plaintiff would need "to obtain leave to file an amended complaint" if she sought to pursue claims on behalf of such borrowers. (Dkt. 85 at 9.) Plaintiff never did that.

Now three years later, Class Counsel Mr. David Harris contends that these borrowers are in fact class members who should receive class notice, despite Judge

Crabb's order. When Mr. Harris notified Defendants of this contention on October 14, 2019, Defendants immediately began investigating and working to identify the borrowers at issue. Defendants informed Mr. Harris that they were looking into the issue. (Dkt. 282-4.) But before Defendants could respond substantively, and less than two weeks after the issue was first raised, Mr. Harris sent Defendant's counsel an email indicating he would no longer meet and confer (Dkt. 282-5) and filed the motion hours later. (Dkt. 280.)

The motion is unnecessary and without merit. While these CAPGONE borrowers are not class members, Defendants have no objection (and would have informed Mr. Harris in the meet-and-confer process that they had no objection) to providing the class-notice administrator with the names and contact information for the 10,765 CAPGONE borrowers who had a standalone B-9 Forbearance capitalization applied to their accounts years ago. (Pearson Decl. ¶ 11; Declaration of Tammy Kielhofer ("Kielhofer Decl.") ¶ 6.) Of those, 3,428 borrowers have already received notice of this case because they otherwise fall within the class definition. (Kielhofer Decl. ¶ 6.) As far as Defendants are concerned, Mr. Harris may send notice to the remaining non-class members if he so chooses.

None of this rises to the level of sanctionable conduct on the part of Defendants. There is no clear and convincing evidence that Defendants failed to make a reasonable and diligent effort to comply with an order of this Court. On February 4, 2019,

Defendants provided names and contact information for over 129,000 absent class members to KCC, in compliance with the Court's order dated January 30, 2019 (Dkt. 197). (Declaration of Eric Pearson ("Pearson Decl.") ¶ 2.) Most of the CAPGONE borrowers are indisputably not class members—as they did not have a standalone B-9 Forbearance to which the Court limited the certified class in its August 2018 class-certification order. (Dkt. 171 at 24.) And as to those CAPGONE borrowers who did have such a capitalization at one point, which was removed following the First Remediation Project, Judge Crabb's order continues to control. (Dkt. 85 at 9.) Regardless, Defendants were already in the process of identifying such borrowers when Mr. Harris halted the meet-and-confer process last Friday night and filed this motion at 10:32pm. (Dkt. 285-5.)

The Court should deny Plaintiff's motion in its entirety.

## BACKGROUND

The Court is familiar with the procedural and substantive developments in this litigation from Defendants' fully briefed summary-judgment motion. (Dkts. 217, 218, 235, 262.) This section focuses on the key points related to the present motion. (Dkts. 280.)

### A. First Remediation Project

Shortly after Plaintiff filed this lawsuit in 2015, Defendant Great Lakes Educational Loan Services, Inc. ("GLELSI") conducted an independent investigation into its interest-capitalization practices (Dkt. 199 ¶ 2), uncovering two technical

3

programming errors in the way that GLELSI was then capitalizing interest. (Dkt. 199 ¶¶ 3–4.) These errors affected capitalization transactions occurring in both standalone B-9 Forbearance situations (a B-9 Forbearance not preceded or followed by another, "capping" forbearance) and back-to-back B-9 Forbearance situations. Defendants promptly informed both Plaintiff's counsel and the Court in their answer of these programming errors (Dkt. 24 ¶¶ 114–122) and proceeded to correct them and remove improperly capitalized interest from student-loan borrowers' accounts. (Dkt. 199 ¶5.) This process involved Allen Werner, an Ad Hoc and Specialty Reporting Coordinator at GLELSI, writing a complex computer program to scan for all borrowers who had had interest capitalized within seven days of the end of a B-9 Forbearance period. (Dkt. 279 at 12.) The parties refer to Defendants' effort in this regard as the First Remediation Project.

In her original class-certification motion, Plaintiff attempted to certify a class consisting of all borrowers on whose accounts GLELSI had applied a B-9 Forbearance. (Dkt. 54 at 1.) Judge Crabb denied Plaintiff's motion, holding that her proposed class definition was "overbroad" and ruling that any claims based on the programming errors addressed by the First Remediation Project were "too far removed from the claims plaintiff alleged in her complaint." (Dkt. 85 at 5–6, 9.) The Court ordered that, if Plaintiff wanted to include such claims in the case, she would "have to obtain leave to file an amended complaint." (Dkt. 85 at 9.) Plaintiff has never done that.

4

**B. Second Remediation Project**

Plaintiff subsequently filed a renewed motion for class certification (Dkt. 89) in which she contended that no interest whatsoever should be capitalized at the end of any B-9 Forbearance period. (Dkt. 90 at 2 ("Defendants were always required to treat every B-9 Forbearance as a Capitalization *Exception* (zero capitalization, always) rather than a Capitalization *Event* (partial or total capitalization) during the Class Period.").) GLELSI's understanding at the time was that the Department of Education's regulations prohibited the capitalization of interest that "accrued during [the B-9 Forbearance] period," but not the capitalization of interest that had accrued before the B-9 Forbearance period began. 34 C.F.R. § 682.211(f)(11) ("Interest that accrues during this period is not capitalized."); 34 C.F.R. § 685.205(b)(9) (same language).

While Plaintiff's renewed motion was pending, GLELSI received clarification from the Department distinguishing between standalone and back-to-back B-9 Forbearances for capitalization purposes. The Department indicated that pre-forbearance accrued interest should capitalize at the end of back-to-back B-9 Forbearances but not standalone B-9 Forbearances. (Dkt. 83-5.) Again, Defendants promptly informed the Court and Plaintiff's counsel of this new guidance from the Department and set about adjusting borrowers' accounts accordingly, under the direction and supervision of the Department. (Dkt. 83; Dkt. 199 ¶¶ 9–34.) The parties refer to this as the Second Remediation Project.

To identify accounts for the Second Remediation Project, Mr. Werner again wrote a detailed computer program to scan for affected borrowers. (Dkt. 279 at 39.) In doing this, Mr. Werner's new scan began from the population of borrowers identified in his scan for the First Remediation Project. (Dkt. 279 at 37–39.) Unlike his earlier scan, which identified all borrowers who had had interest capitalized in connection with any B-9 Forbearance period, Mr. Werner's new scan needed to isolate only those borrowers who had had interest capitalized in connection with standalone B-9 Forbearances. (Dkt. 279 at 49.) As a control, Mr. Werner also checked to see whether the capitalization transactions identified at the time of the First Remediation Project remained on GLELSI's live servicing system. (Dkt. 279 at 74.) His program identified those capitalization transactions that no longer existed on GLELSI's live system and were listed in an output file labeled "CAPGONE."[1]

**C. Class Notice**

In August 2018, the Court certified the following class of student-loan borrowers:

> All persons who, between January 1, 2006 and the present: (i) were borrowers of a student loan issued under the Federal Family Education Loan Program ("FFEL" or "FFELP"), or of a student loan issued under the Federal Direct Loan Program ("Direct"); (ii) had their FFELP and/or Direct student loan(s)

---

[1] Mr. Werner did not investigate the exact cause for why a borrower's capitalization transaction was removed between the scans for the First and Second Remediation Projects. But as Mr. Harris notes (Dkt. 281 at 6), the most obvious explanation is that it was removed as part of the First Remediation Project, although it may be possible that some other circumstance unique to the borrower's account was at play.

6

> serviced by Great Lakes Educational Loan Services, Inc. or Great Lakes Higher Education Corporation (collectively, "Great Lakes"); (iii) had Great Lakes place their FFELP and/or Direct student loan(s) in an administrative forbearance status for a period of up to 60 days that is not immediately preceded by another forbearance, deferment, or grace period, concurrent with the processing of their application for a deferment, forbearance, consolidation loan, or change in repayment plan; _and_ (iv) had any amount of accrued interest capitalized at the end of the administrative forbearance period.

(Dkt. 171 at 24 (emphasis in original).)

In response to the Court's subsequent order regarding class notice, GLELSI provided KCC with names and contact information for over 129,000 absent class members. (Pearson Decl. ¶ 2.) To do so, GLELSI looked to the computer scans performed by Mr. Werner in connection with the Second Remediation Project, as those scans isolated capitalizations performed at the conclusion of standalone B-9 Forbearance periods (as opposed to back-to-back B-9 Forbearance periods). (Kielhofer Decl. ¶ 3.) Beginning with the output files from Mr. Werner's scans, another GLELSI employee worked to create an Excel spreadsheet containing the names and contact information for the student-loan borrowers involved in the Second Remediation Project. (Kielhofer Decl. ¶ 2–3.) That spreadsheet was provided to KCC as the list of borrowers to be notified. (Pearson Decl. ¶ 2.)

7

**D. Request for Admission No. 2**

During his second deposition of GLELSI's Rule 30(b)(6) witness on April 29, 2019, Mr. Harris asked GLELSI's designee (Ms. Bridget Lapham) a number of questions regarding the scans GLELSI used to identify the population of borrowers for the class list provided to KCC on February 4, 2019. The scans consist of complex computer code, and were designed by another individual, so Ms. Lapham was unable to answer one of his questions from memory:

> Q. And so in that time, GLELSI would have taken the first remediation population and told the database to go get every borrower who's in that population that, one, had a standalone B-9 forbearance and, two, had a capitalization occur at the end of that standalone B-9 forbearance, correct?
>
> A. So I don't recall if it was scanning the full database or if it was scanning the initial files that we had already pulled. But the same general concept, yes.
>
> Q. So you're not sure, but it's possible that the second scan occurred on the database as it existed at the time of the scan?
>
> A. Correct.
>
> Q. . . . Is that something that GLELSI could verify upon further review?
>
> A. Absolutely.

(Dkt. 227, April 29, 2019 Lapham Dep. at 74:4-25.) The parties recessed for lunch a few minutes after this exchange. (*Id.* at 76:3-9.) During lunch, Ms. Lapham conferred with her colleagues at GLELSI and confirmed that GLELSI had begun with the output files from the initial scans associated with the First Remediation Project to identify class

8

members. When the deposition resumed after lunch, Thomas Shriner (one of Defendants' attorneys) told Mr. Harris that Ms. Lapham was now prepared to answer this line of questioning, but Mr. Harris chose not to follow up:

> MR. SHRINER: Ms. Lapham has done some further research over the lunch hour to answer your question about scans. I won't go beyond that. If you want to — if you want to, you can get it. If not, it's up to you.
>
> MR. HARRIS: Okay.
>
> Q. Let's talk about transfer borrowers who were identified as class members. If you look at paragraph 15 –

(*Id.* at 76:10-18.)

Rather than getting an answer to his questions at Ms. Lapham's deposition, Mr. Harris served the Defendants with four requests for admission nine days later. (Pearson Decl. ¶ 3.) Request for admission number 2 read as follows:

> Admit that Defendants did not produce to the Notice Administrator, on or before February 5, 2019, the names and contact information of certified Class members who: (1) had one or more Standalone B-9 Forbearance capitalization(s) occur during the Class Period; and (2) had all of their Standalone B-9 Forbearance capitalization(s) removed from their Account(s), after this Action commenced, by the remediation project described in the Declaration of Tammy Kielhofer. See Dkt. 66, ¶32.

Although Mr. Harris characterizes this request for admission as "highly specific," "extremely precise," and "pinpointed" to the CAPGONE issue (*see* Pls.' Br. 3, 7, 11 & 15), the request never mentions CAPGONE borrowers. Defendants read the request for admission against the backdrop of the issue that Mr. Harris left unresolved

9

at Ms. Lapham's deposition (Pearson Decl. ¶ 3), and they provided Mr. Harris with the answer that Ms. Lapham was prepared to offer during her deposition—namely, that Defendants used the scans taken immediately before the First Remediation Project as the starting point to identify class members, rather than scans based on the live system, as it existed immediately before the start of the Second Remediation Project:

> Deny. Great Lakes provided the Notice Administrator, on February 4, 2019, with the names and contact information of all certified Class members who had a Standalone B-9 Forbearance capitalization existing on their Account(s) as of September 2015. To identify all certified class members, Great Lakes scanned its database as it existed before the remediation project described in the Declaration of Tammy Kielhofer (see Dkt. 66, ¶ 32).

(Dkt. 282-1.) Defendants continue to assert that they have provided the class-notice administrator with the names and contact information for all members of the certified class.

Had Defendants' counsel understood Mr. Harris to be seeking an admission that CAPGONE borrowers were not included within the class list, they would have clarified that such borrowers were not included on the list provided to KCC and, at that point, explored Mr. Harris's basis for asserting that those borrowers should receive notice. But that is simply not how Defendants and their counsel understood the request. (Pearson Decl. ¶ 3.)

**E. Aborted Attempt To Meet and Confer**

Several months later, in August of this year, Mr. Harris served a set of written requests for production on several issues. (Pearson Decl. ¶ 4.) Defendants responded to these discovery requests and provided him with additional responsive documents. (Pearson Decl. ¶ 4.) On September 24, 2019, counsel held a meet-and-confer conference regarding Defendants' responses. (Pearson Decl. ¶ 5.) Chief among Mr. Harris's stated concerns were another subset of borrowers who had experienced capitalizations in connection with forbearance periods that he had not previously identified as being at issue (known as FO-SUSP and FO-DELQ forbearances), whom he contended should be treated as class members. (Pearson Decl. ¶ 5.) Defendants investigated and responded to these allegations by letter on October 18, 2019. (Dkt. 282-4.) As of the date of the current filing, Mr. Harris has not responded to Defendants' letter regarding the FO-SUSP and FO-DELQ borrowers. (Pearson Decl. ¶ 6.)

In a letter dated October 14, Mr. Harris for the first time raised questions about CAPGONE borrowers' inclusion in the class list provided to KCC. (Dkt. 282-3.) Defendants immediately investigated his contentions. This required a detailed analysis of CAPGONE borrowers' accounts, in order to isolate those CAPGONE borrowers who had undergone a capitalization at the conclusion of a standalone B-9 Forbearance period from those who had not. (Pearson Decl. ¶ 7–8.) Counsel for Defendants asked Mr. Werner to write a new computer scan to do this, which required a substantial amount of

time during Mr. Werner's already busy work schedule. (Pearson Decl. ¶ 8.) Given Mr. Harris's explicit threats to bring a motion for sanctions (Dkt. 282-3 at 2–3), Defendants then conducted additional due diligence to ensure the accuracy of the information that Defendants intended to provide to him. (Pearson Decl. ¶ 9.) This required time and considerable efforts on the part of GLELSI's employees. (Kielhofer Decl. ¶ 4–6.)

GLELSI has now identified 10,765 unique CAPGONE borrowers who underwent a standalone B-9 Forbearance. (Kielhofer Decl. ¶ 5.) GLELSI then compared those identified CAPGONE borrowers to the class-notice list provided to KCC on February 4, 2019, finding that 3,428 of the standalone CAPGONE borrowers had been included in the class-notice list, while 7,337 had not. (Kielhofer Decl. ¶ 6.) While GLELSI was trying to determine why some CAPGONE borrowers had received notice and others had not—and, as Defendants were finalizing their response to Plaintiff's latest contentions—Mr. Harris sent Defendants' counsel an email on Friday, October 25, at 8:25 p.m., announcing that he was "withdrawing [his] offer to stipulate" and that "[y]ou and your clients' credibility … is now thoroughly exhausted in my view." (Dkt. 282-5 at 1.)

Mr. Harris's own email recognized that, by aborting the meet-and-confer process, he was risking later learning that his motion was without merit. (*Id.* at 2 ("If after we file our motion to compel and for sanctions, your clients somehow blow my mind[, … I] will consider withdrawing Plaintiff's forthcoming motion[.]").) But, throwing caution to the wind, he filed his motion to compel and for sanctions

12

approximately two hours later, at 10:32 p.m. (Dkt. 280.) Had he continued to participate in the meet-and-confer process, he would have learned earlier this week that, although Defendants disagree with him on the merits of his position that these 7,337 borrowers are class members, they were willing to produce the names and contact information of the CAPGONE borrowers to KCC. (Pearson Decl. ¶ 10.)

## ARGUMENT

### I. The Court Should Not Find Defendants in Civil Contempt, Because They Have Not Violated the Class-Certification Order.

Any finding of civil contempt must meet a high legal standard. The Plaintiff here "must establish by clear and convincing evidence that (1) a court order sets forth an unambiguous command; (2) the alleged contemnor violated that command; (3) the violation was significant, meaning the alleged contemnor did not substantially comply with the order; and (4) the alleged contemnor failed to make a reasonable and diligent effort to comply." *SEC v. Hyatt*, 621 F.3d 687, 692 (7th Cir. 2010). "[C]ivil contempt," furthermore, "'should not be resorted to where there is [a] *fair ground of doubt* as to the wrongfulness of the defendant's conduct.'" *Taggart v. Lorenzen*, 139 S. Ct. 1795, 1801-02 (2019) (quoting *California Artificial Stone Paving Co. v. Molitor*, 113 U.S. 609, 618 (1885)) (emphasis in *Taggart*).

Plaintiff's submission does not satisfy any of the four elements. The first three require that Plaintiff prove by clear and convincing evidence that Defendants have

violated an "unambiguous" court order. *Id.* Simply stated, Plaintiff has not done that. Mr. Harris argues that the certified class should include a small subset of student-loan borrowers who, by virtue of the fix applied to the two programming errors in the First Remediation Project, no longer had any interest capitalized on their accounts after a B-9 Forbearance period. This argument is in tension with the Court's order certifying the class, which explicitly required that a class member must have "had any amount of accrued interest capitalized at the end of the administrative forbearance period[.]" (Dkt. 171 at 24.) At the time of the Court's class-certification decision, which followed completion of the First Remediation Project, CAPGONE borrowers did not have "any amount of accrued interest capitalized" on their student-loan accounts.

To support her motion for civil contempt, Plaintiff characterizes the First Remediation Project as Defendants' having "delet[ed] thousands of B-9 Forbearance capitalizations mid-lawsuit."[2] She simply presumes that these borrowers are class members. (Pls.' Br. at 8.) This runs headlong into the more fundamental problem with her argument. Plaintiff overlooks entirely that the Court previously declined to "certify…claims based on these two [programming] errors" that made up the First Remediation Project because they were "too far removed from the claims plaintiff

---

[2] There is nothing improper about Defendants having removed interest capitalization transactions from borrowers' accounts. Plaintiff's central allegation is that such transactions harm student-loan borrowers.

14

alleged in her complaint." (Dkt. 85 at 9.) The Court specifically held that, "[i]f plaintiff wishes to certify a class based on these alleged errors, she will have to obtain leave to file an amended complaint." *Id.* In other words, borrowers affected only by the First Remediation Project were out of class bounds under the Plaintiff's only operative complaint. And that remains the case today. Plaintiff has not amended her complaint, and the Court did not revisit this line of reasoning in its first class-certification decision when it ultimately certified a class in 2018. (Dkt. 171; *see also Minch v. City of Chicago*, 486 F.3d 294, 301 (7th Cir. 2007) ("[T]he law of the case doctrine embodies the notion that a court ought not to re-visit an earlier ruling in a case absent a compelling reason, such as manifest error or a change in the law, that warrants re-examination.")..)

    Plaintiff also fails to demonstrate by clear and convincing evidence the fourth element needed for a finding of civil contempt—namely, that Defendants "failed to make a reasonable and diligent effort to comply" with the Court's class-certification order. *Hyatt*, 621 F.3d at 692. First, as is undisputed, Defendants provided KCC with names and contact information for over 129,000 absent class members within the one-week deadline afforded by the Court's order. (Pearson Decl. ¶ 2.) The fact that a small subset of borrowers who Mr. Harris now argues should have been included in the class list were not included in the list provided in February does not begin to prove that Defendants' compliance efforts were unreasonable.

15

Second, and more recently, Mr. Harris cut off the parties' ability to resolve this matter by completing the meet-and-confer process that they were engaged in when he decided to pull the plug. Instead of allowing Defendants to demonstrate their efforts "to make a reasonable and diligent effort to comply," he preferred to litigate through motion practice what the parties could have resolved between themselves. *See* Part E ("Aborted Attempt To Meet and Confer"). Had Mr. Harris continued to meet and confer, he would have learned earlier this week that, although Defendants disagree with him on the merits of his position on the breadth of the class, they were (and are) willing and prepared to produce the names and contact information of the CAPGONE borrowers to KCC.

Lastly, Plaintiff's request for civil-contempt sanctions "to pay (1) the costs and expenses of administering a supplemental round of Class Notices and exclusion requests … and (2) the attorneys' fees and expenses incurred by the Class to discover and prove Defendants' lack of compliance…" is improper. (Pls.' Br. at 13.) Civil-contempt sanctions are available "to compensate an aggrieved party for losses sustained as a result of the contemnor's disobedience of a court's order or decree made for the aggrieved party's benefit." *CQ Sand, LLC v. Range Mgmt. Sys., LLC*, 278 F. Supp.

3d 1115, 1125 (W.D. Wis. Sept. 30, 2017) (quoting *Jones v. Lincoln Elec. Co.*, 188 F.3d 709, 738 (7th Cir. 1999)).[3]

The Class has not sustained any losses from Defendants' actions. Mr. Harris would have been responsible for the costs of notifying the CAPGONE borrowers, along with the rest of the class, had he had their names and account information earlier this year. *See Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 356 (1978) (noting that the general rule is that the representative plaintiff bears the burden of notifying absent class members, along with the associated cost of doing so); *see also* 1 MCLAUGHLIN ON CLASS ACTIONS § 5:84 (16th ed. Oct. 2019 supp.) ("Absent unusual circumstances, however, the expense defendants incur in assisting with the provision of notice should be borne by plaintiffs."). Not having included this small subset of borrowers in the initial class list does not justify shifting the costs for notice to Defendants. Nor does it justify what amounts to Mr. Harris's premature request for attorneys' fees related to his discovery efforts on the CAPGONE issue. FED. R. CIV. P. 23(h) (governing the procedures for any application for attorney's fees by class counsel). The proper time to determine any compensation for Class Counsel is after a determination on the merits. 5 William B.

---

[3] Furthermore, "a party's good faith, even where it does not bar civil contempt, may help to determine an appropriate sanction." *Taggart*, 139 S. Ct. at 1802 (citing *Young v. United States ex rel. Vuitton et Fils S.A.*, 481 U.S. 787, 801 (1987) ("[O]nly the least possible power adequate to the end proposed should be used in contempt cases.")).

Rubenstein, NEWBERG ON CLASS ACTIONS § 15:9 (5th ed. July 2019 supp.) ("In class action lawsuits, counsel typically apply for attorney's fees at the conclusion of the case.").

## II. Defendants' Denials of Plaintiff's Requests for Admission Were not "Materially False and Misleading When Served" and Do Not Warrant Sanctions under Fed. R. Civ. P. 37(c)(2).

These circumstances do not warrant sanctions under Rule 37, which are to "be imposed only 'where a party displays willfulness, bad faith, or fault.'" *Frazier v. Layne Christensen Co.*, 486 F. Supp. 2d 831, 845 (W.D. Wis. July 21, 2006) (quoting *Langley by Langley v. Union Elec. Co.*, 107 F.3d 510, 514 (7th Cir. 1997)). "Fault" requires an assessment of "'the reasonableness of [Defendants'] conduct—or lack thereof[.]'" *Id.* (quoting *Marrocco v. General Motors Corp.*, 966 F.2d 220, 224 (7th Cir. 1992)).

As explained in subpart D ("Request for Admission No. 2"), Plaintiff's Request for Admission No. 2 never mentioned these CAPGONE borrowers and were, in fact, broadly worded, somewhat cryptic, and tendentious—asking Defendants to admit that they had violated the Court's order to produce class-member names and contact information to KCC. (Dkt. 282-1.) The requests made sense to Defendants only against the backdrop of the issue that Class Counsel left unresolved at Ms. Lapham's April 29, 2019 deposition, and Defendants thus answered the requests by denying them and explaining that they had, in fact, used the scans taken immediately before the First Remediation Project. (Dkt. 282-1.)

Defendants' answers are not evidence of "willfulness, bad faith, or fault." *Frazier*, 486 F. Supp. 2d at 831. Furthermore, Defendants had a "reasonable ground" or "other good reason" for denying the Plaintiff's requests under subparts (C) and (D) of Rule 37(c)(2), given the Court's first decision on class certification. *See* Fed. R. Civ. P. 37(c)(2)(C) (providing that the court must order sanctions "unless … the party failing to admit had a reasonable ground to believe that it might prevail on the matter"); Fed. R. Civ. P. 37(c)(2)(D) (same if "there was other good reason for the failure to admit").

## CONCLUSION

The Court should deny Plaintiff's motion to compel, for civil contempt, and for sanctions.

This case should remain scheduled for trial on March 2, 2020. To expedite matters, and in light of Mr. Harris's decision to stop participating in the meet-and-confer process, Defendants have provided KCC with the names and contact information for the CAPGONE borrowers as of today. Defendants are amenable to his giving these borrowers class notice, with the question of whether they are actually class members reserved for later determination, if necessary.

Dated this 1st day of November, 2019.

        s/ Eric G. Pearson

Thomas L. Shriner, Jr.
Eric G. Pearson
Aaron R. Wegrzyn
FOLEY & LARDNER LLP
777 East Wisconsin Avenue
Milwaukee, Wisconsin 53202-5306
(414) 271-2400 Telephone
(414) 297-4900 Facsimile
Email:  tshriner@foley.com
Email:  epearson@foley.com
Email:  awegrzyn@foley.com

*Attorneys for Defendants Great Lakes Educational Loan Services, Inc., Great Lakes Higher Education Corporation, Jill Leitl, David Lentz, and Michael Walker*

4832-1183-7611