## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF WISCONSIN

| | |
|---|---|
| MEREDITH D. DAWSON, Individually and On Behalf of All Others Similarly Situated, | Case No. 15-cv-00475-jdp |
| Plaintiff, | |
| v. | **REPLY BRIEF IN SUPPORT OF PLAINTIFF'S MOTION TO COMPEL PRODUCTION OF UNPRODUCED CLASS MEMBER IDENTITIES, AND FOR CIVIL CONTEMPT SANCTIONS** |
| GREAT LAKES EDUCATIONAL LOAN SERVICES, INC., GREAT LAKES HIGHER EDUCATION CORPORATION, JILL LEITL, DAVID LENTZ, and MICHAEL WALKER, | |
| Defendants. | |

I.      **Borrowers Who Suffered Standalone B-9 Forbearance Capitalizations During The Class Period, And During This Lawsuit, Are Class Members.**

For the first time in this case, Defendants now dispute both the meaning and the legality of the Court's Class definition, set forth on Page 8 of the Court's Certification Order (Dkt. 171).

As to the legality of the Class definition, Defendants assert that the Court's earlier opinion denying certification (Dkt. 85) prevented the Court from certifying a Class of borrowers affected by Defendants' purported "programming errors."  *See* Opposition Brief (Dkt. 285) at 1, 3-4, 14-15.  Defendants contend that because CAPGONE borrowers were purportedly affected by Defendants' "programming errors," they cannot be Class members.  *See id.*  There are many problems with this argument, but here are four of the most glaring ones, succinctly stated.

First, the Court's Certification Order (Dkt. 171) expressly certified as a *subclass* borrowers who were affected by Defendants' purported "programming errors."[1]  So Defendants are not really arguing that CAPGONE borrowers are not Class members; Defendants are effectively arguing that the Court *erred* by certifying them. *See* Opposition Brief at 1, 3-4, 14-15.

Second, an order denying certification of one proposed class cannot possibly "control" the definition of a *different* class that was later certified based on new briefing and new evidence. *Id.*  It is inherently inconsistent to contend that Dkt. 85 is somehow "the law of the case," while

---

[1] *See, e.g.,* Certification Order (Dkt. 171) at 9-10 ("As a result, the court will create subclasses for each of the three types of alleged errors."); *id.* at 19 ("There is no dispute that the court can resolve key questions related to liability across each subclass[;] [s]pecifically, the court can determine whether Great Lakes violated the law when it capitalized interest (1) that accrued during the B-9 Forbearance, (2) that accrued before the B-9 Forbearance period, (3) *as a result of procedural or programming errors*."); *id.* at 22-23 ("To sum up, the court concludes [that] . . . the court will certify subclasses for each of the three types of capitalization errors at issue in this case . . . ."); *id.* at 24 ("IT IS SO ORDERED that: . . . Included in the class are three subclasses of class members subjected to capitalization of the following types of interest: (a) interest that accrued during the B-9 Forbearance period; (b) interest that accrued before the B-9 Forbearance period; and (c) *interest that Great Lakes capitalized [via] procedural or programming errors*.") (emphasis added).

1

suggesting that Dkt. 171 is somehow not "the law of the case."  *Id.*  This is particularly true after Defendants placed and argued both orders before the Seventh Circuit in their Rule 23(f) Petition; the Seventh Circuit left both orders untouched.  *See* Dkt. 179 (Seventh Circuit Order denying Defendants' petition to appeal the Court's Certification Order).

Third, if Defendants still believed that Dkt. 85 somehow legally precluded the Court from certifying a "programming errors" subclass, then the proper mechanism for asserting that belief was a motion for reconsideration, or a Rule 23(f) argument in the Seventh Circuit.  Defendants may not act in contempt of the Court's Class Production Order (Dkt. 197), and then oppose a motion for sanctions by challenging the legality of a different Order (the Certification Order).

Fourth, Defendants themselves have stated that CAPGONE borrowers are also members of the "intra-forbearance interest" subclass, not just the "programming errors" subclass.[2]  Hence, *even if* Dkt. 85 precluded Dkt. 171's certification of borrowers affected by "programming errors," Dkt. 85 never precluded certification of borrowers who had intra-forbearance interest capitalized following standalone B-9 Forbearance periods.  *See generally* Dkt. 85.  And that is exactly who these CAPGONE borrowers are, as Defendants admit.

With respect to the *meaning* of the Court's Class definition, Defendants assert that standalone CAPGONE borrowers are not Class members because their relevant capitalizations were removed from their principal balances by August 28, 2018, the date of the Court's Certification Order.  *See* Opposition Brief at 14 ("At the time of the Court's class-certification

---

[2] *See, e.g.,* Defendants' Responses to the Class's Proposed Findings of Fact (Dkt. 261) at 84, ¶167 ("Defendants Counterclaim further alleged that: (1) GLELSI inadvertently *capitalized intra-forbearance interest* by applying one of her payments to the wrong 'bucket' of accrued interest (Dkt. 24, ¶¶115-120); and (2) that '[i]t took Great Lakes' independent research to discover these issues after reviewing Dawson's complaint' in August 2015.  [emphasis added] **GL's Response:** Undisputed.").

decision, which followed completion of the First Remediation Project, CAPGONE borrowers did not have 'any amount of accrued interest capitalized' on their student-loan accounts."). This argument ignores the certified Class Period (a key part of most class definitions), as well as other portions of the Court's Certification Order. The Court did not certify a class of borrowers who had standalone B-9 Forbearance capitalizations on their accounts *as of August 28, 2018*; the Court expressly certified borrowers who suffered standalone B-9 Forbearance capitalizations "between January 1, 2006 and the present." *See* Certification Order at 8. Defendants concede that these CAPGONE borrowers suffered standalone B-9 Forbearance capitalizations during the Class Period, and even during this lawsuit. But Defendants' new, *post hoc* argument is that if they removed a borrower's relevant capitalizations *mid-suit*, then the borrower is not a Class member. *See* Opposition Brief at 14. Defendants cite no law in support of that assertion.

No court has held that a class action defendant can eliminate putative or certified class members from a class, mid-suit, by deleting mere *records* of the *fact* of class membership. That is all that Defendants did here with respect to CAPGONE Class members. Defendants removed these borrowers' standalone B-9 Forbearance capitalizations *from GLELSI's Database* mid-suit, and now act as if the capitalizations never occurred. This is not how the law works.[3] Class action defendants may not remove putative or certified class members from a class, mid-suit, simply by erasing some records of class membership.[4]

---

[3] *Cf. Parko v. Shell Oil Co.*, 739 F.3d 1083, 1084-85 (7th Cir. 2014) (holding that class action defendants could not defeat certification by arguing that a portion of the class had no injury).

[4] Defendants' contention is not only legally absurd, but also factually absurd in this particular case. Defendants identified and produced these CAPGONE Class members two weeks ago, thereby proving that they had *other records* of the *fact* of Class membership, outside of GLELSI's live Database tables. *See* Kielhofer Declaration (Dkt. 287, ¶¶5-6); Pearson Declaration (Dkt. 286, ¶¶8-11). Defendants simply chose to disregard these "CAPGONE" records of Class membership.

Furthermore, the Court's Certification Order expressly acknowledged Defendants' representations that they had removed "programming error" capitalizations from their Database mid-suit.  *See* Certification Order at 16 ("Great Lakes raises another issue about adequacy, which is that *it has already granted borrowers account credits to correct programming errors* that were brought to its attention . . . .") (emphasis added).  While acknowledging Defendants' representations in this regard, the Court still certified a subclass of borrowers who suffered standalone B-9 Forbearance capitalizations related to "programming errors."  *Id.* at 9-10, 19, 24.  Defendants are disregarding — and openly challenging — the Court's Certification Order to justify acting in contempt of the Class Production Order.  This is no justification, but rather, further cause for sanctions.

Through nineteen pages of their Opposition Brief, Defendants use one of Class Counsel's names thirty-two times.  *See generally* Opposition Brief (Dkt. 285) (referencing "Mr. Harris," undersigned).  Plaintiff's motion for sanctions is not about any of Class Counsel.  Plaintiff's motion for sanctions is about Rule 23, due process for the Class, and good-faith adherence to Court Orders, all of which are necessary to maintain the integrity of these proceedings.

## II. Plaintiff's RFAs Did Not Identify The "CAPGONE" Computer Code, But They Unambiguously Identified The CAPGONE Problem.

Defendants say they misunderstood Plaintiff's Requests for Admissions (Set One) (Dkt. 282-1) ("RFA") — particularly RFA No. 2 — because "the request never mentions CAPGONE borrowers."  Opposition Brief at 9.  This argument is meritless.  "CAPGONE" was merely a *label* that GLELSI assigned to standalone B-9 Forbearance capitalizations it deleted from the Database mid-lawsuit.  The label is convenient for computer coding as well as legal briefing, but the label itself is entirely arbitrary. Plaintiff's RFAs clearly described these unproduced, CAPGONE transactions, without using the label "CAPGONE."

4

> **REQUEST FOR ADMISSION NO. 2:**  Admit that Defendants did not produce to the Notice Administrator, on or before February 5, 2019, the names and contact information of all certified Class members who: (1) had one or more Standalone B-9 Forbearance capitalization(s) occur *during the Class Period*; and (2) had all of their Standalone B-9 Forbearance capitalization(s) *removed from their Account(s), after this Action commenced, by the [first] remediation project described in the Declaration of Tammy Kielhofer.  See* Dkt. 66, ¶32.

Dkt. 282-1 (emphasis added).  To blame Plaintiff for not using an arbitrary "CAPGONE" label, months before the Werner Deposition revealed the label's existence, is simply disingenuous finger-pointing.

In fact, Defendants' understanding of Plaintiff's RFAs is reflected in their own unambiguous (albeit false) explanation for denying these RFAs:

> Great Lakes provided the Notice Administrator, on February 4, 2019, with the names and contact information of *all certified Class members who had a Standalone B-9 Forbearance capitalization existing on their Account(s) as of September 2015.  To identify all certified class members, Great Lakes scanned its database as it existed before the remediation project described in the Declaration of Tammy Kielhofer* (*see* Dkt. 66, ¶32).

*See* Dkt. 282-1 (emphasis added).  Defendants' RFA response clearly shows that their denial was based on a (false) *factual* conclusion that they had produced all borrowers who, "as of September 2015," had a Standalone B-9 Forbearance capitalization on the Database.  *Id.*  Defendants now seek to mislead the Court by saying their RFA denial was, instead, based on their (equally false) *legal* conclusion that standalone, CAPGONE borrowers are not Class members.  *See* Opposition Brief at 10:

> Had Defendants' counsel understood [Plaintiff] to be seeking an admission that CAPGONE borrowers were not included within the class list, *they would have clarified that such borrowers were not included on the list provided to KCC* and, at that point, explored [Plaintiff's] basis for asserting that those borrowers should receive notice.

(emphasis added).  This is a deceptive argument in light of Defendants' own clear explanation, *supra*, for denying these RFAs.  Defendants' explanation "clarified" that GLELSI *"identif[ied] all certified class members" by "scan[ing] its database as it existed before the remediation project described in the Declaration of Tammy Kielhofer,"* and produced "*all certified Class members who had a Standalone B-9 Forbearance capitalization existing on their Account(s) as of September 2015*."  Dkt. 282-1 at 3 (emphasis added).  Defendants understood these RFAs loud and clear, but served Plaintiff with a factually false denial.

Defendants' now assert to the Court false legal denials, but only to try to justify and conceal *post hoc* their false factual denials.

### III.   There Is No Federal Or Local Requirement To Meet And Confer Under These Circumstances, But Defendants (Not Plaintiff) Failed To Timely Meet And Confer.

Defendants argue that Class Counsel "aborted" the meet and confer process.  Opposition Brief at 11-13.  Defendants cite no law requiring litigants to meet and confer in a situation like this, because there is no such law.  *See generally* Opposition Brief.

 Nevertheless, Class Counsel met and conferred in good faith to resolve this problem, even *after* Defendants' violations of a Court Order, and even *after* Defendants were proven to have falsely denied Plaintiff's RFAs.  *See* Plaintiff's October 14 Letter to Defendants (Dkt. 282-3), at 1-3, 6-7.  Class Counsel offered to resolve this problem cooperatively if only Defendants would agree to amend their RFA denials and pay for the necessary, supplemental round of Class Notice.  *See id.*  In transmitting that offer (which did not include a demand for attorneys' fees and expenses) via email on a Monday morning, Class Counsel highlighted the urgency of this matter.  *See* Harris Reply Declaration, Ex. B at 1.

Defendants' counsel, however, did not respond until the ensuing *Friday evening*.  Upon responding on Friday evening, Defendants' counsel provided a weak excuse for having nothing

to discuss, after a full business week.  *See* Defendants' October 18 Letter to Plaintiff (Dkt. 282-4) at 1 ("Mr. Werner has been out of work sick this week . . . .")  In addition, Defendants' counsel expressly stated that they would "respond at some point next week."  *See id.*   Class Counsel then waited *another full week*, until after the close of business (in all time zones), and still had not heard from Defendants, despite their prior representations that they would respond "next week."  *See* Class Counsel's October 25 Email To Defendants' Counsel (Dkt. 282-5).  It was only after Defendants failed to respond within their own stated timeframe that the Class filed the instant motion for sanctions.  *Id.*

Defendants argue that Class Counsel "cut off the parties' ability to resolve this matter by completing the meet-and-confer process" (Opposition Brief at 16), but that is demonstrably untrue.  This was not an "aborted" meet-and-confer on the part of Class Counsel (Opposition Brief at 11-13).  It was an "avoided" meet-and-confer on the part of Defendants.[5]  But again, Plaintiff had no legal obligation to meet and confer here, so all of this is a moot point.

## IV.    Monetary Sanctions Are Warranted.

Defendants contend generally that attorneys' fees and costs cannot be recovered by class attorneys until after the merits of a class action are resolved.  *See* Opposition Brief at 17 (citing Fed. R. Civ. P. 23(h)).  That is incorrect because federal courts often impose monetary sanctions,

---

[5] Indeed, after Plaintiff filed the instant motion, defense counsel represented to Class Counsel that "by the time that you sent the [October 25] email below and filed your motion last Friday night, Great Lakes had [already] identified the standalone CAPGONE borrowers and had [already] decided that, even though it does not believe that standalone CAPGONE borrowers are members of the class, it is willing to produce their names and contact information to the class administrator, [while imposing the costs of a *second* notice campaign upon Plaintiff].  Dkt. 286-2 at 1 (*post-motion* email from Defendants' counsel).  If Defendants and their counsel had already done all of that work, and had already made all of those "decisions," before Class Counsel emailed Defendants' counsel on the night of October 25, and before Plaintiff filed her motion hours later, then it is unclear why Class Counsel was never informed of any of this pre-motion.

in the form of attorneys' fees and costs, long before the merits of a class case are resolved.  *E.g.,*
*Craftwood Lumber Co. v. Interline Brands, Inc.*, No. 11 C 4462, 2013 WL 4598490 (N.D. Ill.
Aug. 29, 2013) (awarding Rule 37 sanctions of fees and costs to a class action plaintiff); *Fautek*
*v. Montgomery Ward & Co., Inc.*, 96 F.R.D. 141, 146-47 (N.D. Ill. 1982) (imposing monetary
sanctions of attorneys' fees and costs in a class action where defendant "intentionally, recklessly,
or negligently" failed to provide accurate discovery responses) (collecting cases).   Rule 23 does
not govern motions for Rule 37 sanctions, much less motions for civil contempt sanctions.

Defendants further contend that they cannot be made to pay for the necessary *second*
round of Class Notice because "the general rule is that the representative plaintiff bears the
burden of notifying absent class members."  *See* Opposition Brief at 17 (citing *Oppenheimer*
*Fund, Inc. v. Sanders*, 437 U.S. 340 (1978).  It is true that the "general rule" is class plaintiffs
pay for class notice campaigns: but once, not *twice*.   No court has held that class action
defendants can impose the costs of *two separate notice campaigns* upon plaintiffs by concealing
class contact information in contempt of a court order.

Here, but for Defendants' violations of the Class Production Order, Plaintiff might have
had to pay additional postage fees, but would *not* have needed to pay for two full rounds of data
analysis and validation by KCC, two full rounds of KCC Call Center services, two full rounds of
opt-out processing, plus additional hourly fees from KCC as its employees work with Class
Counsel to manage "Round Two" of Class Notice.   To impose such duplicative costs of Class
Notice (Round Two) on Plaintiff and her counsel would be unfair, unjust and unprecedented
under these circumstances.  *See Latrobe Steele Co. v. United Steelworkers of America, AFL-CIO*,
545 F.2d 1336, 1343-44 (3d. Cir. 1976) (recognizing that "the objective of a civil contempt
decree is to benefit the complainant"); *Jones v. Lincoln Elec. Co.*, 188 F.3d 709, 737 (7th Cir.

1999) ("Civil contempt proceedings are coercive and remedial, but not punitive, in nature and sanctions for civil contempt are designed to compel the contemnor into compliance with an existing order or to compensate the complainant for losses sustained as a result of the contumacy.") (emphasis added); *Casale v. Kelly*, 710 F.Supp.2d 347, 359 (S.D.N.Y. 2010) ("Civil as distinguished from criminal contempt is a sanction to enforce compliance with an order of the court or to compensate for losses or damage sustained by reason of noncompliance.").

Defendants alone created this problem, so Defendants alone should bear the financial burden of rectifying this problem. *Select Creations, Inc. v. Paliafito America, Inc.*, 906 F.Supp. 1251, 1271-72 (E.D. Wis. 1995) ("[A] district court ordinarily does not have to find that the violation was 'willful' to find a party in civil contempt . . . and it may find a party in civil contempt if he has not been 'reasonably diligent and energetic in attempting to accomplish what was ordered.'") (collecting cases).

## V.    Conclusion

After reviewing Defendants' Opposition Brief and supporting papers, Class Counsel requested from the Court-approved Notice Administrator, KCC, a cost estimate for conducting a second Class Notice campaign for the 7,337, newly produced CAPGONE Class members. *See* Harris Reply Declaration, ¶2.   KCC came back with an estimate totaling over $20,000. *See* Harris Reply Declaration, Ex. A.

Class Counsel has already incurred well over $200,000 in hard litigation costs in this case, including but not limited to funding the first full round of Class Notice.  Harris Reply Declaration, ¶3.  Before spending another $20,000 to fund a *second* round of Class Notice, Class Counsel will await the Court's decision on the instant motion, to see whether the Court agrees with Defendants that standalone CAPGONE borrowers are not Class members. *Id.*

9

When and if the Court grants Plaintiff's instant motion (or denies it while still holding that CAPGONE borrowers must be sent Class Notice), Class Counsel and KCC will promptly execute Class Notice, Round Two. *Id.*, ¶4.  If the Court grants Plaintiff's request for monetary sanctions, thus establishing an entitlement to reasonable attorneys' fees and expenses, then pursuant to the Court's Standard Attachments for Civil Cases (Dkt. 182 at 39), Plaintiff and her counsel will "adequately support [their] request" with a detailed accounting of all fees and expenses incurred to (1) uncover and correct Defendants' violations of the Class Production Order, and (2) disprove Defendants' false RFA denials in June 2019.  *Id.*

For all of the foregoing reasons, Plaintiff and the Class respectfully request that the Court grant their motion for sanctions, reiterate the true scope of the certified Class, and direct that Class Notice be disseminated (at Defendants' expense) to 7,337 previously undisclosed, "CAPGONE" Class members.

Respectfully submitted,

FINKELSTEIN & KRINSK LLP

Dated: November 19, 2019          By:    s/ David J. Harris, Jr.
                                         David J. Harris, Jr., Esq.

                                 Jeffrey R. Krinsk, Esq.
                                 550 West C Street, Suite 1760
                                 San Diego, California 92101-3579
                                 Telephone: (619) 238-1333
                                 Facsimile:  (619) 238-5425

                                 *Counsel for Plaintiff and the Class*