# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF WISCONSIN

| | |
|---|---|
| MEREDITH D. DAWSON, Individually and On Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br>  v. <br><br> GREAT LAKES EDUCATIONAL LOAN SERVICES, INC., GREAT LAKES HIGHER EDUCATION CORPORATION, JILL LEITL, DAVID LENTZ, and MICHAEL WALKER, <br><br><br> Defendants. | Case No. 15-cv-00475-jdp <br><br><br> **MEMORANDUM OF LAW IN SUPPORT OF THE CLASS'S MOTION FOR FED. R. CIV. P. 11 SANCTIONS** |

## TABLE OF CONTENTS

I.  INTRODUCTION ........................................................................................................1

II.  MERITS CLAIMS AND DEFENSES RELEVANT TO THIS MOTION .............................2

III.  STUDENT LOAN TERMINOLOGY AND FACT WITNESSES RELEVANT TO THIS
     MOTION..................................................................................................................5

    A.  Key Terminology Relevant To This Motion ..................................................5

    B.  Fact Witnesses Relevant To This Motion.....................................................7

IV.  LEGAL STANDARDS ................................................................................................9

    A.  General Rule 11 Standards..........................................................................10

    B.  Specific Standards Applicable To Summary Judgment Motions ...............11

V.  DEFENDANTS' RENEWED MOTION PAPERS CONTAIN NUMEROUS
    IMPROPRIETIES THAT VIOLATE RULE 11(b)....................................................13

    A.  Defendants' Attorneys Continue To Rely Upon Facts And Evidence They Know
        To Be Currently Disavowed By Their Own Clients. ....................................13

        1.  Defense Counsel's Own Clients Say They Were Not "Surprised"
            in August 2016 ................................................................................13

        2.  Defense Counsel Asserted That "GLELSI Issued Refund Checks"
            To All Paid-in-Full Class Members, While Knowing GLELSI's
            Testimony That It Did Not Issue Refund Checks To All Paid-In-
            Full Class Members ........................................................................19

    B.  Defendants' Attorneys Continue To Violate The Court's Summary Judgment
        Procedures In Several Material Respects, After Being Warned. ................24

        1.  Defendants' Attorneys Have Once Again Defied This Court's
            Procedures, This Time For The "Improper Purpose" Of
            Manufacturing An End-Run Around The Law Of Thorn, Citgo
            Petroleum And Similar Cases ..........................................................25

        2.  Compound Narratives .....................................................................29

    C.  Defense Counsel Offers No Legal Argument Supporting The Admissibility Of
        Their Clients' Myriad Opinions Regarding Class Damages.......................30

    D.  Each Substantive Sentence On Page 1 Of Defendants' Brief Was Knowingly
        False Or Misleading When Filed. ...............................................................32

VI.  DEFENSE COUNSEL WAS MADE FULLY AWARE OF THESE ISSUES DURING
     THE FIRST ROUND OF SUMMARY JUDGMENT BRIEFING........................................35

VII.  CONCLUSION.......................................................................................................40

i

# TABLE OF AUTHORITIES

**Cases**

*Bank of Illinois v. Allied Signal Safety Restraint Systems*,
75 F.3d 1162 (7th Cir.1996) ............................................................... 13, 38, 42

*Bordelon v. Chicago School Reform Board of Trustees*,
233 F.3d 524 (7th Cir. 2000) ....................................................................... 25

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986).............................................................................. 12, 20

*City of Livonia Emps. Ret. Sys. and Local 295/Local851 v. Boeing Co.*,
711 F.3d 754 (7th Cir. 2013) .......................................................... 19, 34, 36, 37

*Citgo Petroleum Corp. v. Ranger Enterprises, Inc.*,
632 F.Supp.2d 878 (W.D. Wis. 2009) ..................................................... passim

*Divane v. Krull Elec. Co., Inc.*,
200 F.3d 1020 (7th Cir. 1999) ................................................................ 20, 37

*Eckhardt v. State Farm Bank, F.S.B.*,
No. 18-cv-1180, 2019 WL 1177954 (C.D. Ill. Mar. 13, 2019)........................ 19, 34, 36

*Fries v. Helsper*,
146 F.3d 452 (7th Cir.1998) ......................................................................... 34

*Goka v. Bobbit*,
862 F.2d 646 (7th Cir. 1988) .................................................................. passim

*Harlyn Sales Corp. Profit Sharing Plan v. Kemper Fin. Servs., Inc.*,
9 F.3d 1270 (7th Cir. 1993) .......................................................................... 11

*Koszola v. Board of Educ. of City of Chicago*,
385 F.3d 1104 (7th Cir. 2019) ...................................................................... 25

*McGreal v. Village of Orland Park*,
928 F.3d 556 (7th Cir. 2019) ........................................................................ 10

*Melrose v. Shearson/American Express, Inc.*,
898 F.2d 1215 (7th Cir. 1990) .............................................................. 10, 42, 43

*Metro. Life Ins. Co. v. Johnson*,
297 F.3d 558 (7th Cir. 2002) ........................................................................ 25

*Modrowski v. Pigatto*,
712 F.3d 1166 (7th Cir. 2013) ...................................................................... 25

*Pacific Dunlop Holdings, Inc. v. Barosh*,
22 F.3d 118 (7th Cir. 1994) .......................................................................... 11

*Piscione v. Ernst & Young, L.L.P.*,
171 F.3d 527 (7th Cir.1999) .............................................................. 13, 38, 42

*Raskin v. Wyatt Co.*,
125 F.3d 55 (2d Cir.1997)............................................................................ 13

*Russell v. Acme-Evans Co.*,
51 F.3d 64 (7th Cir.1995) ................................................................. 13, 38, 42

*Schiernbeck v. Davis*,
143 F.3d 434 (8th Cir.1998) ......................................................................... 13

ii

*Thorn v. Sundstrand Aerospace Corp.*,
207 F.3d 389 (7th Cir. 2000) ................................................................................... passim

*Thornton v. Wahl*,
787 F.2d 1154 (7th Cir. 1986) ................................................................................... 10

*Wingad v. John Deere & Co.*,
187 Wis.2d 441 (1994) ................................................................................................ 20

**Rules**

Fed. R. Civ. P. 11(b) ...................................................................................................... 10, 23

Fed. R. Civ. P. 11(b)(1) .................................................................................... 12, 30, 32, 34

Fed. R. Civ. P. 11(b)(2) .................................................................................... 12, 30, 37

Fed. R. Civ. P. 11(b)(3) .................................................................................... 20, 21

Fed. R. Civ. P. 11(c)(2) .................................................................................... 40

Fed. R. Civ. P. 11(c)(4) .................................................................................... 40

Fed. R. Evid. 701 .......................................................................................... 31, 32

Fed. R. Evid. 701(c) ...................................................................................... 22, 30

**Regulations**

34 C.F.R. § 685.205(b)(9) ............................................................................ 5

34 C.F.R. § 682.211(f)(11) .......................................................................... 5

**Other Authorities**

AM.JUR.2d *Damages* § 908 (1988) ............................................................. 20

Pursuant to Fed. R. Civ. P. 11, Plaintiff Meredith Dawson and the Class (including, but not limited to, Class Members Elizabeth Mosser and Angela Monger) hereby move the Court to impose sanctions on Foley & Lardner LLP, attorneys for Defendants, who signed and filed Defendants' Renewed Motion for Summary Judgment (Dkt. 308), the Brief in Support of Defendants' Renewed Motion for Summary Judgment (Dkt. 309) and the Statement of Proposed Findings of Fact in Support of Defendants' Renewed Motion for Summary Judgment (Dkt. 310).

## I.    INTRODUCTION

For five years, Defendants' attorneys have consistently and repeatedly undermined the proper conduct of this litigation.  Defense counsel's undermining began with an Answer and Counterclaim that counsel now concedes as having rested on materially false and misleading statements of fact and opinion when filed.  *See* Renewed Opposition Brief (Dkt. 330) at 39-44 (demonstrating this in detail); Renewed Reply Brief (Dkt. 340) (no rebuttal).  Defense counsel's undermining continued through both fact discovery and the class certification stage.  *See, e.g.,* Order (Dkt. 197) at 2-3 ("Now Great Lakes is raising a new issue that it should have raised before. *** The bottom line is this: Great Lakes neither cites any precedent for its proposal nor provides a coherent rationale for it."); *id.* at 4 ("Again, Great Lakes neither cites any legal precedent for these extraordinary measures nor explains why they are necessary . . . . *** Great Lakes doesn't cite a single case in which a court required a party to sign an indemnification agreement as a condition of discovery."); *see also* Dkt. 295 (imposing, over defense counsel's arguments, civil contempt and discovery sanctions for impeding Class Notice under Rule 23(c)).

Defense counsel's undermining of these proceedings persisted into the summary judgment stage, when they attempted to introduce documentary evidence based on their own declaration (Dkt. 219), and filed a fact-heavy summary judgment motion without any proposed findings of fact.  Dkt. 242.  Counsel claimed to be ignorant of this Court's twice-docketed

Summary Judgment Procedures (Dkt. 38, Dkt. 182), but the Court found no justification for "defense counsel's failure to follow this district's summary judgment procedures, particularly one so well-known and long-standing as the required statement of undisputed facts." Order (Dkt. 242) at 1-2.

After all of that impropriety, at every stage of this action, Defendants' Renewed Motion for Summary Judgment is not just flawed on the merits, but also improperly presented on many levels. Defense counsel persists in undermining the proper conduct of this action, because the proper conduct of this action requires a trial on at least the following factual disputes: (1) whether Defendants acted knowingly, recklessly or negligently in wrongfully increasing the Class's student debts; and (2) the extent to which Class members have been damaged. To avoid a fair trial of these disputes, defense counsel has once again pulled out all the stops. Defendants' attorneys have misrepresented and obfuscated some of the most important issues to be decided at summary judgment, and in doing so, have unnecessarily multiplied the burden on Class members, Class Counsel, and the Court of addressing Defendants' Renewed Motion.

This motion for sanctions is not only about procedural improprieties, nor is it only about frivolous or misleading litigation tactics. This motion is about using established procedural improprieties to achieve substantively misleading ends on a dispositive motion. This motion is about candor to the Court, the integrity of an evidentiary record at summary judgment, and ensuring fair play in the course of zealous advocacy.

## II.    MERITS CLAIMS AND DEFENSES RELEVANT TO THIS MOTION

Plaintiff and the Class are current and former federal student loan borrowers. Defendants are a federal student loan servicer ("GLELSI"), its former, non-profit parent corporation ("GLHEC"), and certain of GLELSI's current and former officers. Defendants manage borrowers' federal student loan accounts pursuant to servicing contracts with the U.S.

Department of Education ("ED") and various private lenders.[1]  The Class alleges that GLELSI and its managers knowingly (or at best, negligently) increased Class loan balances by compounding, or "capitalizing," borrowers' accrued interest obligations in a manner prohibited by ED's rules and requirements for servicing federal student loans.

One of the primary factual disputes in this case concerns when Defendants first knew that their capitalization practices were contrary to ED's capitalization requirements.  Class members maintain that Defendants knew this during and after 2011.  *E.g.,* Dkt. 231-1; Dkt. 231-2; Dkt. 231-8 ("Sorry to be the bearer of bad news.").  Defense counsel asserts that GLELSI and its officers did not know until August 2016, one full year into this litigation.  *E.g.,* Dkt. 309 at 1, 21.  As shown below, defense counsel's "August 2016" assertion contradicts their own clients' repeated deposition testimony and documentary evidence.

Another primary factual dispute concerns the extent, if any, to which GLELSI compensated Class members for their financial injuries, during the pendency of this case, outside of Court.  Defendants assert that they correctly adjusted all Class members' loan balances during the pendency of this case.[2]  As relevant to this motion, defense counsel repeatedly asserts that "GLELSI issued refund checks" to all Class members who had paid off their loans before GLELSI "adjusted" their loan balances.  *See, e.g.,* Dkt. 309 at 27 ("For the small percentage of borrowers whose accounts were paid-in-full before the remediation projects, ***GLELSI issued***

---

[1] Defendants, however, will only be servicing ED's student-loan portfolio for a few more months.  *See, e.g.,* http://www.nelnetinvestors.com/news/press-release-details/2020/Nelnet-Issues-Statement-Regarding-Department-of-Education-NextGen-Business-Process-Operations-Proposal/default.aspx (last visited Jun. 22, 2020) ("The federal student loan program is very complicated to administer, and [for ED] to simply throw away the training and experience of Nelnet, Great Lakes, and our dedicated associates is a recipe for an implementation disaster that will negatively impact borrowers.").

[2] The Class genuinely disputes this conclusion for many reasons, but many of those disputes are outside the scope of this motion.  *See* Class's Renewed Opposition Brief (Dkt. 330).

*refund checks.*"); *id.* at 49 ("Those few class members — not including Dawson — who actually paid off loans with misstated balances *have long ago received refund checks, with interest*, as part of the First and Second Remediation Projects. (PFOF ¶179.)") (emphasis added). It was originally undisputed that there are approximately 6,000 paid-in-full Class members in this case. *See* CPFF 1 (Dkt. 261) at 104, ¶250 (undisputed).[3]

The Class maintains that defense counsel's "refund checks" arguments once again contradict their own client's testimony. *E.g.,* Second GLELSI Deposition (Dkt. 227) at 85:5-16 ("So if – if the account is owned by ED, we don't ever touch those funds."); *see also* E. Mosser Declaration (Dkt. 232) (paid-in-full Class member who did not receive a refund check); A. Monger Declaration (Dkt. 233) (paid-in-full Class member who did not receive a refund check); Lapham Declaration (Dkt. 255) (GLELSI manager conceding that paid-in-full Class members Mosser and Monger did not "receive refund checks," and then arguing for the first time that they were not entitled to refund checks). Defense counsel cannot fairly argue that all paid-in-full Class members "received refund checks, with interest," while their own client is declaring that not all paid-in-full Class members "received refund checks."

As detailed herein, Defendants' attorneys have engaged in several, procedurally improper and misleading arguments concerning the above two material disputes and others.

---

[3] GLELSI now seems to be saying that there are 14,349 paid-in-full Class members. *See* Dkt. 342, ¶8(a). This latest dispute that Defendants appear to have *with themselves* can easily be resolved by Class Counsel before trial if the Court permits.

## III.   STUDENT LOAN TERMINOLOGY AND FACT WITNESSES RELEVANT TO THIS MOTION[4]

### A.   Key Terminology Relevant To This Motion

The phrase *"capitalization event,"* or *"capping event,"* refers to "something happening on a loan account that would justify a capitalization transaction."   CPFF 1 (Dkt. 261) at 46, ¶8 (undisputed).

The phrase *"B-9 Forbearance"* refers to the type of "administrative forbearance" described in 34 C.F.R. §§ 682.211(f)(11) and 685.205(b)(9).   Complaint (Dkt. 1) at 12, n.7. Before and during this lawsuit, Defendants and ED referred to such forbearances using a variety of related terms: including, *"non-capitalizing administrative forbearances," "non-capitalizing forbearances," "non-capping forbearances,"* or *"document forbearances."*   CPFF 1 (Dkt. 261) at 46, ¶5 (undisputed).   Defendants also referred to B-9 Forbearance periods using one of the three computer codes denoting B-9 Forbearance periods in their loan-servicing System: namely, *"FO-ICR," "FO-IBR,"* or *"FO-DOCU." Id.*, ¶7 (undisputed).[5]

The phrase *"standalone"* B-9 Forbearance refers to a situation where a student borrower's account goes from repayment status, into a B-9 Forbearance period of up to 60 days in duration, and then back into repayment status.   Certification Order (Dkt. 171) at 4.[6]

---

[4] This Part III is intended only for the Court's use as a reference section.   It details the undisputed facts and terminology relevant to understanding the arguments and evidence presented elsewhere in this brief.

[5] The word *"System"* refers to Defendants' "Guaranty, Origination And Loan Servicing" System. CPFF 1 (Dkt. 261) at 45, ¶¶1-4.   The System is a network of computers and databases specifically tailored to servicing student loans.   *Id.*; Dkt. 58-30 (GOALS System Overview).

[6] Plaintiff's and each Class member's claims in this case are limited to "standalone" B-9 Forbearance periods.   *See* Certification Order (Dkt. 171) at 7-8.

The phrase *"back-to-back"* B-9 Forbearance refers to a situation where a student borrower may go from a deferment status or other type of forbearance status, into a B-9 Forbearance status. *Id.* at 4-5.[7]

*"Change Requests*,*"* or *"CRs*,*"* refer to instructional documents sent by ED to its Loan servicers from time to time. *Id.* at 49, ¶¶18-19 (undisputed). The general purpose of a Change Request is to communicate new Loan servicing requirements, or to clarify existing Loan servicing requirements, for ED-held loans. *Id.*

There are two primary CRs relevant to this case. The first was *CR 1492*, which ED first issued in August 2011 to clarify its preexisting capitalization requirements, and to standardize the allowable "capitalization events" across all of ED's servicers. *Id.*, ¶¶25-28 (undisputed). GLELSI received authorization to work on CR 1492 on February 28, 2012. *Id.* The implementation date for CR 1492 was June 30, 2012. *Id.* The second primary Change Request was *CR 2785*, which ED first issued in September 2014 to clarify some of CR 1492's capitalization requirements. *Id.*, ¶¶29-30 (undisputed).

The "*Common Manual*," or *"CM*,*"* is an industry-specific manual authored and maintained by a collaboration of private companies (as opposed to ED). *Id.* at 52, ¶35 (undisputed). The Common Manual provides "common," private-sector interpretations of the Higher Education Act of 1965 and its implementing regulations, with the goal of providing uniform standards for managing privately held loans (as opposed to ED-held loans) originated under the Federal Family Education Loan Program ("FFELP" loans). *Id.*, ¶36 (undisputed).

---

[7] The Class Certification Order eliminated so-called "back-to-back" B-9 Forbearance periods from the scope of this action. *See* Certification Order (Dkt. 171) at 7-8. The initial Complaint (Dkt. 1) was and remains ignorant of this "back-to-back" concept, which Defendants first introduced as a fake defense one full year into this action. Dkt. 83.

GLELSI's former Chief Servicing Officer, and now Chief Operating Officer, Defendant Leitl, refers to the Common Manual as GLELSI's "servicing Bible." *Id.*, ¶37 (undisputed).

### B.    Fact Witnesses Relevant To This Motion

*Jill Leitl* became the Chief Servicing Officer of Defendant GLELSI in February 2010. *Id.*, ¶38 (undisputed).  Leitl later became GLELSI's Chief Operating Officer on or about May 3, 2015.  *Id.*, ¶39 (undisputed).  Leitl's background is in computer programming. *Id.*, ¶40 (undisputed).

*Tammy Kielhofer* became GLELSI's Chief Servicing Operations Officer in or about 2010, after about two years of assisting Leitl and Leitl's predecessor in their roles.  *Id.*, ¶42 (undisputed).  Kielhofer became GLELSI's Chief Servicing Officer in or about May 2015, when Leitl became Chief Operating Officer.  *Id.*, ¶43 (undisputed).  In each role, Leitl has been Kielhofer's boss for the last ten years. *Id.*, ¶44 (undisputed).  The two also shared some job duties as Chief Servicing Officer and Chief Servicing Operations Officer. *Id.*, ¶45 (undisputed). Before Kielhofer became an officer of GLELSI, she worked in various roles, including System programmer, System analyst and project leader.  *Id.*, ¶46 (undisputed).  Leitl and Kielhofer have worked together in various capacities at Great Lakes for approximately 29 years.  *Id.*, ¶47 (undisputed).  Their backgrounds in programming and analyzing GOALS allow them to effectively communicate about the System-related issues involved in student-loan servicing.  *Id.*, ¶48 (undisputed).

*James ("Jim") Fahley* became GLELSI's Borrower Accounts team manager in 2008, and was a Borrower Accounts team member for years prior.  *Id.* at 54, ¶¶49-52 (undisputed).  The Borrower Accounts team is responsible for handling borrower status changes (such as deferments and forbearances). *Id.*  Also within Borrower Accounts is the Financial Adjustments team, which handles various financial adjustments to borrowers' accounts when requested. *Id.*

Throughout his time as Borrower Accounts manager, Fahley has worked directly for Leitl and Kielhofer. *Id.*

Cynthia (*"Cindy"*) *Battle* is a Supervisory Management Analyst in ED's Office of Federal Student Aid ("FSA"). *Id.* at 55, ¶¶53-59 (undisputed).  Ms. Battle has worked for ED since 1993. *Id.*  Between approximately 2009 and 2018, Ms. Battle supervised a team of analysts at ED who are responsible for handling requirements, changes, and decisions ED makes around student loan processes. *Id.*  This included establishing and communicating ED's capitalization requirements to servicers.  *Id.*  Ms. Battle and her team of analysts were personally responsible for drafting and communicating the interest capitalization requirements contained in CR 1492 and CR 2785.  *Id.*  Ms. Battle has had a working professional relationship with Leitl and Kielhofer throughout the last decade. *Id.*  It is a normal occurrence for all of them to correspond by phone and/or email, and Battle has met with Leitl and Kielhofer several times in person. *Id.*

*La Teata Jackson*[8] was a Lead Management and Program Analyst within FSA's change management division from approximately 2009 until December 2017; she was then promoted within that division to Supervisory Management and Program Analyst.  *Id.* at 57, ¶¶61-68 (all undisputed).  La Teata has worked for ED since 1991. *Id.* Throughout the last decade, La Teata's job responsibilities have included managing the full life cycles of Change Requests issued by ED: from the point of initial issuance, to negotiating impact analyses with servicers, up to the point of final implementation. *Id.*  La Teata essentially acted as a "project manager" for ED, with her "projects" being ED's various Change Requests.  *Id.*  Her projects included both CR 1492 and CR 2785.  *Id.*  Ms. Jackson has had a working professional relationship with Leitl and

---

[8] Ms. Jackson's last name changed to Jenkins in 2019, but for ease of reference to the evidence discussed herein, this brief will refer to her as Ms. Jackson, or as La Teata.

Kielhofer throughout the last decade. *Id.*   It was a normal occurrence for all of them to correspond by phone and/or email, and Ms. Jackson has met with Leitl and Kielhofer a few times in person as well. *Id.*  Ms. Jackson also worked with Ms. Battle on CR 1492 and 2785. *Id.*   As ED's project manager for CR 1492 and CR 2785, Ms. Jackson worked with approximately 10 to 25 other ED officials.  *Id.*

  *Tammy Connelly, Patrice Washington*, and *Lynn Smith* were among ED's Contracting Office Representatives, known as "CORs," during the Class Period.  *Id.* at 59, ¶75 (undisputed). CORs function as "liaisons" between ED and its servicers, including Defendant GLELSI.  *Id.*, ¶76 (disputed on other grounds not asserted herein).  According to GLELSI's Chief Servicing Officer, any change requests or "official guidance" from ED comes to GLELSI through those CORs.  *Id.* (disputed on other grounds not asserted herein); *see also* Kielhofer Deposition (Dkt. 226) at 41:20-25 ("Any change requests or official guidance comes through those contract office representatives.").  Ms. Connelly, Washington, and Smith were all among the 10 to 25 ED officials with whom La Teata Jackson worked in managing CR 1492 and CR 2785.  *Id.*, ¶77 (undisputed).

## IV.   LEGAL STANDARDS

  "By presenting to the court a pleading, written motion, or other paper—whether by signing, filing, submitting, or later advocating it—an attorney . . . certifies that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances:

> (1) it is not being presented for *any* improper purpose, such as to . . . cause unnecessary delay, or needlessly increase the cost of litigation;

(2) the claims, defenses, and other legal contentions *are warranted by existing law or by a nonfrivolous argument* for extending, modifying, or reversing existing law, or for establishing new law;

(3) the factual contentions *have evidentiary support* or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and

(4) the denials of factual contentions *are warranted on the evidence* or, if specifically so identified, are reasonably based on belief or a lack of information."

Fed. R. Civ. P. 11(b) (emphasis added).  A violation of any of these subsections is a violation of Rule 11(b).  *Id.*

### A.    General Rule 11 Standards

To find that a pleading, motion, or other paper violates Rule 11(b), courts need not find that the challenged paper violates Rule 11(b) in its entirety.  *Melrose v. Shearson/American Express, Inc.*, 898 F.2d 1209, 1215 (7th Cir. 1990) ("A litigant cannot expect to avoid all sanctions under Rule 11 merely because the pleading or motion under scrutiny was not *entirely* frivolous.") (emphasis in original).  Point-by-point violations contained within a challenged paper are subject to sanctions.  *Id.*

Moreover, courts need not find that the proponents of the challenged paper acted in bad faith.  "An empty head but a pure heart is no defense."  *Thornton v. Wahl*, 787 F.2d 1151, 1154 (7th Cir. 1986); *see also McGreal v. Village of Orland Park*, 928 F.3d 556, 560 (7th Cir. 2019) ("The test is objective.  An attorney cannot avoid sanctions by claiming subjective good faith if a reasonable inquiry into the facts and law would have revealed the frivolity of the position."); *Harlyn Sales Corp. Profit Sharing Plan v. Kemper Fin. Servs., Inc.*, 9 F.3d 1263, 1270 (7th Cir. 1993) (holding that attorneys must conduct a "reasonably inquiry, objectively analyzed, into the

basis for the facts alleged and into the law"); *Pacific Dunlop Holdings, Inc. v. Barosh*, 22 F.3d 113, 118 (7th Cir. 1994) ("We determine whether a party's conduct was imposed for an improper purpose by an objective standard.").

### B.    Specific Standards Applicable To Summary Judgment Motions

The Seventh Circuit and this Court have clear and specific rules established for litigants on motions for summary judgment.

First, this Court has established its own detailed procedures for presenting proper motions for summary judgment. *See generally* Preliminary Pretrial Packet (Dkt. 182) at 2-7 ("These procedures require careful preparation of statements of proposed findings of fact."). "The purpose of these statements of proposed findings of fact is to clearly identify the essential facts material to the motion for summary judgment, and to help the court determine if those facts are genuinely disputed." *Id.* at 2. This Court has broad discretion to properly enforce its own rules governing summary judgment. *See generally* Order (Dkt. 242).

Second, in *Goka v. Bobbit*, 862 F.2d 646 (7th Cir. 1988), the defendants moved for summary judgment based in part upon their own version of a purported fact, while knowing that fact to be genuinely disputed by the non-movant. The Seventh Circuit explained as follows.

> Defendants have interpreted [*Celotex Corp. v. Catrett,* 477 U.S. 317 (1986)] to require that they identify *only* those portions of the record which support their position on summary judgment, although there exists evidence to the contrary of which defendants are aware. Defendants maintain that the burden of producing such evidence was on Goka as the party opposing summary judgment, and that he failed to meet that burden. They conclude, therefore, that summary judgment was appropriate. We do not agree.
>
> Defendants' argument ignores the principal purpose of the summary judgment rule which is "to isolate and dispose of *factually unsupported* claims or defenses." *Celotex,* 477 U.S. at 323–24, 106 S.Ct. at 2553. When a party has obtained knowledge through the course of discovery, or otherwise, that a material factual dispute exists and yet proceeds to file a summary judgment motion, in hopes that the opposing party will fail or be unable to meet its burden in

> responding to the motion, he defeats that purpose; and, more importantly, violates
> the rules of procedure which govern the conduct of trial, specifically Rule 11.

*Id.* at 650 (emphasis in original).  In other words, the proper purpose of a summary judgment motion is to argue that the undisputed evidentiary record legally precludes the non-movant's claims.  *Id.*  It is a decidedly "improper purpose" to argue that the movant's version of a fact, which the movant's counsel knows to be genuinely disputed, legally precludes the non-movant's claims.  *Id.*; Fed. R. Civ. P. 11(b)(1).  The latter purpose "needlessly increase[s] the cost of litigation," and is simply not "warranted by existing law or by [any] nonfrivolous argument."  *See* Fed. R. Civ. P. 11(b)(1) and 11(b)(2).

Third, a clear corollary to *Goka* is that parties may not move for summary judgment based on written testimony that contradicts the same witness's deposition testimony.  The Seventh Circuit has repeatedly held that "a subsequent affidavit may not be used to contradict the witness's deposition" on a motion for summary judgment.  *Thorn v. Sundstrand Aerospace Corp.*, 207 F.3d 383, 389 (7th Cir. 2000); *see also Piscione v. Ernst & Young, L.L.P.*, 171 F.3d 527, 532-33 (7th Cir.1999); *Bank of Illinois v. Allied Signal Safety Restraint Systems*, 75 F.3d 1162, 1168-69 (7th Cir.1996); *Russell v. Acme-Evans Co.*, 51 F.3d 64, 67-68 (7th Cir.1995); *Schiernbeck v. Davis*, 143 F.3d 434, 437-38 (8th Cir.1998); *Raskin v. Wyatt Co.*, 125 F.3d 55, 63 (2d Cir.1997); *Citgo Petroleum Corp. v. Ranger Enterprises, Inc.*, 632 F.Supp.2d 878, 883-84 (W.D. Wis. 2009) (imposing sanctions for attempting to contradict deposition transcripts with subsequent written testimony).

As detailed herein, Defendants' Renewed Motion for Summary Judgment (Dkt. 308), Brief in Support (Dkt. 309), and Proposed Findings of Fact (Dkt. 310) violate all three of the above-settled standards, and clearly do so for "improper purpose[s]" in violation of Rule 11(b).  Fed. R. Civ. P. 11(b)(1).

12

V.    **DEFENDANTS' RENEWED MOTION PAPERS CONTAIN NUMEROUS IMPROPRIETIES THAT VIOLATE RULE 11(b)**

   A.    **Defendants' Attorneys Continue To Rely Upon Facts And Evidence They Know To Be Currently Disavowed By Their Own Clients.**

One of the core disputes in this case concerns whether and when Defendants knew ED prohibited treating standalone B-9 Forbearance periods as capitalization events. This dispute goes directly to the intent element of Class members' fraud claims. Yet on this core dispute, defense counsel continues to overtly misrepresent the known evidentiary record to this Court. *But see Goka*, 862 F.2d at 650.

Defense counsel engages in similar, misleading tactics regarding a second core dispute. Defense counsel argues at length that there are no "uncompensated damages" among Class members, in part because they say "GLELSI issued refund checks" during the pendency of this action to all Class members who had repaid their loans in full. *See, e.g.,* Dkt. 309 at 5 ("No remaining damages" after "Remediation Project[s]"); *id.* at 25 (no "remaining uncompensated damages"); *id.* at 47 ("No Damages Remain, Meaning that No Claim Remains"); *id.* at 27 ("For the small percentage of borrowers whose accounts were paid-in-full before the remediation projects, *GLELSI issued refund checks*.") (emphasis added).

Defense counsel continues to seek summary judgment based on facts they know to be currently disavowed by their own clients, while omitting their client's actual testimony from their Renewed Motion for Summary Judgment. As demonstrated herein, such misconduct is clearly within the ambit of Rule 11(b).

   1.    **Defense Counsel's Own Clients Say They Were Not "Surprised" in August 2016**

Defense counsel repeatedly argues that "August 2016" was the first time GLELSI learned standalone B-9 Forbearances were not permissible capitalization events under ED's rules. In their Renewed Summary Judgment Brief, defense counsel states it this way: "the Department

13

provided GLELSI with guidance in August 2016 distinguishing between 'standalone' B-9 Forbearances and 'back-to-back' B-9 Forbearances (*i.e.,* those that immediately follow other deferments or forbearances)."  Dkt. 309 at 1; *see also id.* at 21 ("Defendants were surprised by this distinction between back-to-back and standalone B-9 Forbearances . . . ."); *id.* at 38-39 ("The Department corrected GLELSI's understanding of its regulatory guidance ***in August 2016*** . . . .") (emphasis added).

> In their Renewed Proposed Findings of Fact, they state it this way:

> 158.    In light of Dawson's legal arguments in this lawsuit, GLELSI contacted the Department in August 2016 to confirm its understanding of the regulations governing B-9 Forbearances. (9.15.16 Brown Decl., Dkt. 83-2, ¶¶6–12.)

> 159.    In the ensuing communications, a Department official named Cynthia Battle indicated that pre-forbearance accrued interest could be capitalized at the end of some B-9 Forbearances ("back-to-back" ones in which another forbearance or deferment period immediately preceded a B-9 Forbearance), but not at the end of "standalone" B-9 Forbearances, because the Department did not consider the latter to be capitalization "events." (8.11.16 Battle Email to Brown, Dkt. 83-5.)

> 160.    ***GLELSI employees were surprised to learn of the Department's interpretation on this issue because GLELSI had understood the applicable regulations to mean that, while interest that accrued during a B-9 Forbearance could never be capitalized, interest that had accrued before such a period began should be capitalized at its end.*** (7.15.16 Kielhofer Decl., Dkt. 66, ¶26; 9.15.16 Brown Decl., Dkt. 83-2, ¶8.)

Dkt. 310 at 31, ¶¶158-160 (emphasis added).  For that August 2016 "surprise" proposition, counsel cites the July 15, 2016 declaration of Kielhofer, GLELSI's Chief Servicing Officer.  *Id.*

Meanwhile, defense counsel knows that Kielhofer herself has since contradicted that proposed finding, repeatedly, after reviewing her own emails during her April 2019 deposition. For instance, during her deposition, Kielhofer reviewed some February 2015 email correspondence between herself and ED officials, in which ED had stated: "No, again because the [n]on [c]apping forb is not a capping event that interest should not be capped."  *See* Dkt. 231-

14

2 (Deposition Ex. 69) at GL 0004439_0001 (highlighted yellow in original).  After reviewing

that email during her deposition, Kielhofer testified as follows.

> Q. So to sum all that up in the context of this February 2015 e-mail, you were being
> informed that you would capitalize some amount of interest at the end of a non-
> capping forbearance only if that non-capping forbearances was preceded by some sort
> of capping event?
>
> A. Correct.
>
> Q. And that was their clarification to you and Great Lakes under CR 2785?
>
> A. Correct.  I don't think that was just given – that clarification was just given to Great
> Lakes.  That clarification was given to – we were arguing with them about it, but the
> clarification was given to all of the servicers.  We were the most vocal about it.
>
> Q. [***]  *In the context of this February 2015 email, what were the situations where
> ED was telling you not to capitalize any interest at the end of a non-capping
> forbearance?*
>
> A. *If there was no leftover capping event prior to the non-capping forbearance, maybe
> the borrower was in repayment – had been in repayment the whole time and called
> and said, "I want to switch repayment plans.  So I – I need some time to get my
> paperwork in."  In that case, we would cap nothing at the end of the non-capping
> forbearance.*

Kielhofer Deposition (Dkt. 226) at 119:10 – 120:13 (emphasis added).  Another way of saying

the borrower "had been in repayment the whole time" is: "the borrower had a standalone B-9

Forbearance."  *See* Class Certification Order (Dkt. 171) at 4 ("One distinction relevant to this

question is the difference between 'standalone' B-9 Forbearances and 'back-to-back' B-9

Forbearances.  In the standalone situation, a student borrower goes from loan repayment status,

to a single 'standalone' B-9 Forbearance period (of no more than 60 days), and then immediately

back into repayment status after the period expires.  Dawson herself [and every other Class

member] was in that situation, and underwent a standalone B-9 Forbearance.").

Kielhofer further confirmed her testimony later in the same deposition, upon reviewing a

different email.  *See generally* Dkt. 231-31 (Deposition Ex. 73) at GL 0088198_0001.   That

December 2015 email from James Fahley, one of her direct subordinates, stated *"that as a general rule there should not be an interest cap in association with a new [re]payment schedule generated immediately after a [FO-ICR] period."*   *Id.* (emphasis added). Upon reviewing this second email, Kielhofer testified as follows.

> Q. So circling back to [Deposition] Exhibit 73 in James Fahley's e-mail to his team on December 9th, 2015, *he was correctly stating the general rule as you understood it at the time, right*?
>
> A. *Correct*.
>
> Q. *And to the best of your knowledge and belief, was that the same general rule that others in GLELSI's management understood at the time?*
>
> A. *I would say assume so.*
>
> Q. But then there were other, let's call them, special circumstances that could potentially override the general rule as you guys understood it, right?
>
> A. Correct.
>
> Q. And Ms. Dawson's loan accounts did not have any of those special circumstances, right?
>
> A. I can't tell that based on those letters that you showed me.
>
> Q. If she had a *standalone* B-9 forbearance period that transitioned her from a standard repayment plan to an IBR repayment plan and nothing else happened, there would be no special circumstances to override the general rule, right?
>
> A. *If nothing else happened, correct*. [***]

Kielhofer Deposition (Dkt. 226) at 166:22 – 167:20.

In sum, during a live deposition (Dkt. 226), GLELSI's Chief Servicing Officer repeatedly testified that August 2016 was not when GLELSI first learned that "standalone" B-9 Forbearance capitalizations were prohibited by ED.   *Accord, e.g.,* Dkt. 231-1 (CR 1492); Dkt. 231-2 (Kielhofer email); Dkt. 231-3 (Leitl email); Dkt. 231-8 (2011 Masten email); First GLELSI

Deposition (Dkt. 53) at 67:5-25; *id.* at 69:2-16; *id.* at 70:16-22..  *See also* Kielhofer Deposition

(Dkt. 226) at 71:6-19:

> Q.     Am I correct that your takeaway from this May 2012 all-servicers meeting was
> that when ED said the phrase, quote "non-capping administrative forbearance," they
> meant a forbearance that does not result in any interest capitalization, right?
>
> A.     Based on some follow-up research that I did yesterday, I actually found out that
> we had received this guidance earlier than the May meeting, and there were additional
> discussions with [ED] prior to that May meeting. *So it was actually in February [2012]
> that we had come away with that conclusion.*

Additionally, on May 1, 2019, Defendant Leitl testified that she understood B-9

Forbearance periods to be "non-capping events" as of August *2015*, immediately after being

served with the Complaint in this case.  Specifically, during her deposition, Leitl reviewed her

own email dated August 14, 2015, in which she instructed her subordinate, James Fahley, to

"update the FO-IBR [or B-9 Forbearance] rule *such that it will become a non-capping event*."

*See generally* Dkt. 231-29 (Deposition Ex. 81) (emphasis added).  Leitl testified as follows.

> Q. So immediately after seeing the complaint, you believed you already understood how
> you were supposed to be capitalizing or not capitalizing?
>
> A. Yes.

Leitl Deposition at (Dkt. 224) at 39:24 – 40:2.  Regarding her August 2015 email, she testified:

> Q. You're directing him [Fahley] to change the rule in the system to what you believe the
> requirements were, right?
>
> A.   To what we believe that it – yes, how it should be processing at that time.

*Id.* at 43:23 – 44:2.

Defense counsel has not accurately represented their own clients' testimonies pertaining

to the element of intent, in a multi-million dollar fraud case.  Instead, defense counsel has sought

summary judgment based on a verifiably false, "August 2016" fact that counsel knows to be

currently and repeatedly disputed *by their own clients*. *But see Boeing* 711 F.3d at 762

("Representations in a filing in a federal district court that are not grounded in an 'inquiry reasonable under the circumstances' or that are unlikely to 'have evidentiary support after a reasonable opportunity for further investigation or discovery' violate Rule 11(b) and Rule 11(b)(3)."). *Eckhardt v. State Farm Bank, F.S.B.*, No. 18-cv-1180, 2019 WL 1177954, at *6 (C.D. Ill. Mar. 13, 2019) ("Misleading statements are unacceptable and run afoul of Federal Rule of Civil Procedure 11(b)."). If such overt, material misrepresentations to this Court are not within the ambit of Rule 11(b), then it is unclear what would be.

Class members raised these same "August 2016" arguments in their Original Summary Judgment Opposition Brief. *See* Original Opposition Brief (Dkt. 235) at 26-31, 58-60. Defense counsel then conceded the Class's arguments on this point in their Original Reply Brief. *See generally* Dkt. 262. Hence, defense counsel's improper and misleading evidentiary tactics regarding this dispute ***should have been eliminated from their Renewed Motion***. But defense counsel's own fraudulent tactics were not eliminated; they were doubled down on. *See generally supra*. Even after Class Counsel challenged these same tactics for the second time, in opposition to the Renewed Motion (*e.g.,* Dkt. 330 at 11-20), defense counsel has continued to concede that their misleading evidentiary tactics offend the longstanding laws of this Circuit and of this Court. *See generally* Dkt. 340 (no rebuttal).

There is simply no excuse for such repeated, misleading and decidedly improper summary judgment tactics. *Goka*, 862 F.2d at 650; *cf. City of Livonia Emps. Ret. Sys. and Local 295/Local851 v. Boeing Co.*, 711 F.3d 754, 762 (7th Cir. 2013) ("Recidivism is relevant in assessing sanctions."); *Divane v. Krull Elec. Co., Inc.*, 200 F.3d 1020, 1028 (7th Cir. 1999) (in deciding a Rule 11 motion, courts consider "whether the signer of the documents had sufficient time for investigation"). Five years into this case, such tactics are a waste of Class Counsel's

18

and the Court's resources, which are not continuously replenished by the hour like defense counsel's are.[9]

> **2. Defense Counsel Asserted That "GLELSI Issued Refund Checks" To All Paid-in-Full Class Members, While Knowing GLELSI's Testimony That It Did Not Issue Refund Checks To All Paid-In-Full Class Members**

Defendants have always born the burden of proof regarding facts associated with their mid-lawsuit "remediation projects."  *See, e.g., Wingad v. John Deere & Co.*, 187 Wis.2d 441, 452 (1994) ("Generally, it is the plaintiff's burden to establish damages which result from a defendant's tortious acts or breach of contract.  However, it is the defendant's burden to establish matters asserted in mitigation or reduction of the amount of plaintiff's damages.") (citing AM.JUR.2d *Damages* § 908 (1988)).  Hence, it has always been Defendants' ***initial*** burden on their two summary judgment motions to proffer "affirmative evidence that negates an essential element of the opposing party's clam": here, the damages element.  *Modrowski* 712 F.3d at 1169 (quoting *Celotex*, 477 U.S. at 331 (Brennan, J., dissenting)).  Knowing this, defense counsel first sought to introduce their Class-wide, damages-"remediation" evidence two years ago.

In June 2018, GLELSI's Chief Servicing Officer (Kielhofer) declared she had "personal knowledge" that "GLELSI issued reimbursement checks to [all] paid-in-full borrowers" in this case.  Dkt. 165, ¶¶1,16 ("For the small percentage of borrowers who had previously paid off their loans in full before the time of the adjustment, GLELSI conducted the same account rebuilding process it used for borrowers with outstanding loans serviced by GLELSI, ***and***

---

[9] It is continuous misrepresentations like this by defense counsel that have ultimately led this case to remain pending for over half a decade: without any future trial date, and without any substantive merits decision by this Court.  *See* Part I, *supra*, at 1-2.

***GLELSI issued reimbursement checks to the paid-in-full borrowers if the amount of their account adjustment exceeded the Department's standard $5.00 reimbursement threshold***.").[10]

In April 2019, GLELSI itself contradicted that declaration during a Rule 30(b)(6) deposition. Dkt. 227.

- First, GLELSI testified that it did not, in fact, "issue refund checks" for paid-in-full Class members who had ED as their lender.[11] Instead, GLELSI's actual testimony is that it sent ED or the U.S. Treasury (it is unclear which agency) some unproduced ***data file*** showing whatever refund amounts, if any, GLELSI said were necessary.[12] GLELSI's deposition testimony reflected a mere assumption by the company that the U.S. Treasury — not GLELSI — would "issue[] the check out to the borrower." Second GLELSI Deposition (Dkt. 227) at 85:5-16.
- Second, GLELSI testified that "the Department's standard $5.00 reimbursement threshold" ***does not exist*** when overpaying borrowers demand such small refunds, and that ED affirmatively requires GLELSI to provide such small refunds on demand. *Id.* at 89:6 – 91:6; *see also* CPFF 1 (Dkt. 261) at ¶¶258-259 (undisputed).

In June 2019, defense counsel moved for summary judgment — absent any proposed findings of fact (Dkt. 242) — arguing that "refund checks were issued to borrowers who had paid off their accounts in full." Dkt. 218 at 1; *id.* at 2, 4. Defense counsel proffered no actual evidence that ED or the U.S. Treasury had issued any "refund checks" to Class members. *But see* Fed. R. Civ. P. 11(b)(3).

---

[10] It is undisputed that the "small percentage" of Class members referenced here by Kielhofer consists of approximately 6,000 Class members, such as Elizabeth Mosser (Dkt. 232) and Angela Monger (Dkt. 233). *See* CPFF 1 (Dkt. 261) at 104, ¶250 (undisputed). *But see* Lapham Decl. (Dkt. 342), ¶8(a) (declaring 14,329 paid-in-full Class members).

[11] According to GLELSI, the vast majority of Class members had ED as one of their lenders, or as their sole lender. *See* Lapham Declaration (Dkt. 221), ¶5 ("Of the 129,492 borrowers comprising the class, between 8,000 and 11,500 had commercial FFELP loans ***not*** serviced pursuant to the [servicing] contract with the Department.") (emphasis added).

[12] *See* Second GLELSI Deposition (Dkt. 227) at 85:5-16 ("**Q.** How did GLELSI go about issuing reimbursement checks to paid-in-full class members? **A.** So if – if the account is owned by ED, ***we don't ever touch those funds***. ***They all go through the Department of Treasury***. So we – ***as far as I know***, it's a daily file we send them with refunds that are needed. And then ***the Department of Treasury issues the check out to the borrower***.") (emphasis added).

On July 18, 2019, the Class argued based on GLELSI's own deposition (Dkt. 227) that there was, in fact, no admissible evidence that "refund checks were issued" by the U.S. Treasury. Furthermore, the Class proffered affirmative evidence of two (of the more than two) Class members who contacted Class Counsel upon receiving Class Notice and testified that ***they never received any "refund checks."*** *See* E. Mosser Decl. (Dkt. 232); A Monger Decl. (Dkt. 233); Original Opposition Brief (Dkt. 235) at 91-98.

On July 29, 2019, defense counsel filed proposed findings of fact, again asserting that "GLELSI issued reimbursement checks to the paid-in-full borrowers if the amount of their account adjustment exceeded the Department's standard $5.00 reimbursement threshold." Dkt. 248, ¶74. Defense counsel cited the debunked Kielhofer Declaration for that proposition, and ***ignored GLELSI's own deposition testimony contradicting those assertions***. *Id. But see Goka*, 862 F.2d at 650; *Thorn*, 207 F.3d at 389. Defense counsel continued to offer no evidence whatsoever that ED or the U.S. Treasury issued any "reimbursement checks" to paid-in-full Class members. *But see* Fed. R. Civ. P. 11(b)(3).

On August 16, 2019, defense counsel filed reply papers that failed to present any such evidence of government "refund checks" for paid-in-full Class members, and in fact, affirmatively argued that paid-in-full Class members Elizabeth Mosser (Dkt. 232) and Angela Monger (Dkt. 233) ***were not entitled to*** any "refund checks." *E.g.,* Lapham Decl. (Dkt. 255); Dkt. 262 at 38-41, 44-45.

Yet somehow, on February 18, 2020, defense counsel filed their Renewed Motion for Summary Judgment, continuing to argue that "***GLELSI*** issued refund checks" to all Class

members who had paid off their loans in full.[13]   Even after the Class's *original* arguments

highlighting the lack of government "refund check" evidence (Dkt. 235 at 91-98), *defense*

*counsel continued to present no competent witness or documentary evidence of the proposed*

*"fact" that the U.S. Treasury had issued refund checks to paid-in-full Class members.*   *But see*

Fed. R. Civ. P. 11(b)(3).  Defense counsel continued to assert this unsubstantiated "fact," even as

they and their clients argued — absurdly, and inadmissibly[14] — that paid-in-full Class members

Mosser (Dkt. 232), Monger (Dkt. 233) and thousands of others did not receive any "refund

checks" because they were never entitled to any.  *See generally* Lapham Decl. (Dkt. 255);

Lapham Decl. (Dkt. 342).  Which is it: did all paid-in-full Class members "receive refund

checks," or did thousands of paid-in-full Class members not receive refund checks because (in

GLELSI's disingenuous and inadmissible opinion) they were not entitled to any?  *See* Fed. R.

Evid. 701(c).

  *On their Renewed Reply,* defense counsel now tries to obfuscate their clear misconduct

by introducing brand new, purported "evidence" that the U.S. Treasury and other third parties

have somehow "issued refund checks" or otherwise compensated Class members (in unspecified

dollar amounts).  *See generally* Lapham Declaration (Dkt 342) (plus corresponding Exhibits).

---

[13] *See, e.g.,* Dkt. 309 at 5 ("No remaining damages" after "Remediation Project[s]"); *id.* at 25 (no "remaining uncompensated damages"); *id.* at 27 ("For the small percentage of borrowers whose accounts were paid-in-full before the remediation projects, *GLELSI issued refund checks*."); *id.* at 49 ("Those few [admittedly, many thousands of] class members—not including Dawson—who actually paid off loans with misstated balances *have long ago received refund checks, with interest*, as part of the First and Second Remediation Projects."); *see also* Dkt. 310, ¶179 ("GLELSI . . . issued reimbursement checks (*through the Department*) to the paid-in-full borrowers if the amount of their overpayment exceeded the Department's standard $5.00 reimbursement threshold. (6.12.18 Kielhofer Decl., Dkt. 165, ¶16; 4.29.19 GLELSI Dep., Dkt. 227, at 85:5-16).") (emphasis added)

[14] Fed. R. Evid. 701(c).

This purported "evidence" has been at Defendants' disposal for years. *See* Dkt. 342-5 (emails dated in mid-2017); Dkt. 342-3 (emails dated in mid-2018). Defense counsel had every obligation and opportunity to introduce all of this evidence sooner because: (1) Defendants have the burden of proof on such post-lawsuit, damages-"remediation" assertions; and (2) the Class had already challenged the absence of "refund check" evidence in their ***Original*** Summary Judgment Opposition Brief. *See generally* Dkt. 235 at 91-99 (filed in July 2019). That defense counsel withheld these years-old emails and declaration narratives for the ***reply*** phase of their ***second*** motion for summary judgment clearly suggests an "improper purpose." Fed. R. Civ. P. 11(b)(1).[15]

Had defense counsel properly presented their new documentary evidence (Dkt. 342) in their "Renewed" opening papers, then the Class could have attempted to rebut the admissibility and import of such documents in opposing Defendants' Renewed Motion. Likewise, if counsel had supplied the Lapham Declaration (Dkt. 342) — and all its new data and narratives — within their opening papers, then the Class could have ***cross-examined*** Lapham in a deposition, and included the fruit of such cross-examination in their Renewed Opposition to Summary Judgment. Instead, defense counsel asks this Court to find "undisputed" facts and grant summary judgment based on new narratives they first introduced on their ***second*** summary judgment ***reply***.

Such obstructive tactics are wholly improper and warrant sanctions. *See generally* Fed. R. Civ. P. 11(b); Summary Judgment Procedures (Dkt. 182) at 2-7; Order Requiring Declarations of Defense Counsel and Compliance with Summary Judgment Procedures (Dkt. 242).

---

[15] Defense counsel also withheld for Defendants' second summary judgment reply (Dkt. 342) their ***initial***, purported evidence that at least some of 15,701 transferred Class members had ***other servicers*** "adjust" their account balances in some unknown manner. *See* Class's Original Opposition Brief (Dkt. 235) at 98-99; Class's Renewed Opposition Brief (Dkt. 330) at 113-114; Dkt. 165, ¶15. *See also* Second GLELSI Deposition (Dkt. 227) at 80:10 – 81:9 ("I certainly wouldn't be able to validate what they have done.").

**B.**     **Defendants' Attorneys Continue To Violate The Court's Summary Judgment Procedures In Several Material Respects, After Being Warned.**

The Seventh Circuit has "consistently and repeatedly upheld a district court's discretion to require strict compliance with its local rules governing summary judgment." *Koszola v. Board of Educ. of City of Chicago*, 385 F.3d 1104, 1109 (quoting *Metro. Life Ins. Co. v. Johnson*, 297 F.3d 558, 562 (7th Cir. 2002)); *see also Bordelon v. Chicago School Reform Board of Trustees*, 233 F.3d 524, 527 (7th Cir. 2000) (holding that a district court can require "strict compliance" with local rules governing summary judgment). This Court has established its own detailed procedures governing motions for summary judgment. *See generally* Preliminary Pretrial Packet (Dkt. 182) at 2-7 ("These procedures require careful preparation of statements of proposed findings of fact."). District courts have broad discretion to manage their own rules and procedures governing summary judgment. *Modrowski v. Pigatto*, 712 F.3d 1166, 1169 (7th Cir. 2013). District courts may not, however, "enforce or relax" their summary judgment rules "unequally as between the parties." *Id.*

Here, the Court has already afforded defense counsel multiple opportunities to correct major procedural deficiencies in their summary judgment submissions. *See* Dkt. 242 at 2 ("In another case, the court might simply deny the motion for summary judgment, and deem the offending party to have forfeited its right to ask for summary judgment."); Dkt. 295 at 12 (denying Plaintiff's meritorious Motion to Strike as "moot," and without comment); *Id.* (inviting Defendants to file an unrequested, Renewed Motion for Summary Judgment); *see generally* Part VI, *infra* (procedural history on summary judgment). This Court has gone so far as to order all defense counsel to file declarations affirming they have reviewed the Court's Summary Judgment Procedures. Dkt. 242; Dkt. 243; Dkt. 244; Dkt. 245; Dkt. 246; Dkt. 275.

Notwithstanding all of those warnings and second chances, counsel continues to disregard this Court's Summary Judgment Procedures in multiple, material respects.

### 1. Defendants' Attorneys Have Once Again Defied This Court's Procedures, This Time For The "Improper Purpose" Of Manufacturing An End-Run Around The Law Of Thorn, Citgo Petroleum And Similar Cases

The Court's Summary Judgment Procedures provide, "Do not propose multiple facts restating the individual provisions of a document," and "[d]o not propose facts stating your argument about the meaning of the document." Dkt. 182 at 3, ¶5.

Here, however, Defendants' attorneys have repeatedly restated the individual provisions of various documents in isolation. *See, e.g.,* Dkt. 310, ¶¶92-95 (quoting isolated provisions of a document, and proposing nothing more); *id.*, ¶¶100, 117, 119, 121, 129. This is more than a series of technical violations on Defendants' Renewed Motion. This is defense counsel's manipulative use of Proposed Findings of Fact to focus the Court's attention onto isolated document contents, and to falsely imply the documents' import without actually arguing the documents' import (if any). If such tactics have not succeeded in manipulating the Court's view of the facts, then they have at least succeeded in forcing Class Counsel to respond to numerous proposed findings of fact that are improperly presented: thereby wasting Class Counsel's time and "needlessly increas[ing] the cost of litigation." Fed. R. Civ. P. 11(b)(1).

Further offending the Court's Procedures, Defendants' attorneys submit multiple Proposed Findings of Fact ***"stating [their] argument about the meaning of [a] document."*** Dkt. 182 at 3, ¶5. *But see* Dkt. 310, ¶¶102-103, 107. Once again, these are more than mere technical violations. Specifically, Dkt. 310, ¶¶102-03 are of particular concern, as explained below, because they are contrived to skirt the Seventh Circuit's and this Court's settled jurisprudence. Defendants' Renewed Proposed Finding of Fact, ¶102, states as follows:

> In describing its scope, Change Request 1492 excluded "a non-capitalizing administrative forbearance, as specified in 34 CFR 685.205(b)(9) and 682.211(f)(11)." (Change Request 1492, Dkt. 231-1.)

Dkt. 310, ¶102.  This is a clear violation of the Court's prohibition against proposing facts "stating your argument about the meaning of [a] document."   Dkt. 182 at 3, ¶5.   Paragraph 103 constitutes a similar violation because, like ¶102, it merely proposes as a "fact" Defendants' argument about the meaning of Change Request 1492 (or "CR1492").

> By its terms, Change Request 1492 did not address what should happen to unpaid interest that accrued before a B-9 Forbearance period. (Change Request 1492, Dkt. 231-1; 12.3.19 Freundel Report, Dkt. 313-1, ¶52.)

Renewed Proposed Findings (Dkt. 310), ¶103.

Importantly, GLELSI's Rule 30(b)(6) deponent previously testified about *GLELSI's* interpretation of CR1492.   And GLELSI's deposition testimony directly contradicts Defendants' Renewed Proposed Findings of Fact, ¶¶102-103.

> Q. So Great Lakes was reading the regulations, the official regulations, to say that pre-forbearance interest was what you guys call cappable at the end of a noncapping forbearance period, but then the change request came and said no, don't do that anymore; right?
>
> A. That is how we read the change request.

First GLELSI Deposition on May 11, 2016 (Dkt. 53) at 70:16-22 (emphasis added); *see also id.* at 67:5-25 (***"We read that change request to say, at the end of a noncapping forbearance, do not capitalize any interest."***). As a matter of law, defense counsel's Renewed Proposed Findings ¶¶102-103 contradict GLELSI's own testimony about the company's interpretation of Change Request 1492.

These "Renewed" Proposed Findings of Fact derive straight from Defendants' Errata Sheet dated June 29, 2016 and Declaration dated July 15, 2016.  *Compare* Errata Sheet (Dkt. 63) at 13 ("CR1492 . . . expressly did not apply to B-9 Forbearances."), *and* Renewed Proposed

26

Finding of Fact (Dkt. 310), ¶102 (arguing that CR1492 "excluded" B-9 Forbearances from its "scope"). Whether one asserts that "CR1492 did not apply to B-9 Forbearances," or that "CR1492 excluded B-9 Forbearances from its scope," both statements assert the same *interpretation* of CR1492. Defendants' Renewed Proposed Finding of Fact, ¶102, was actually first stated in Defendants' sham Errata Sheet of June 29, 2016. Dkt. 63 at 13. And that deposition Errata overtly contradicted GLELSI's relevant deposition testimony. *But see Thorn*, 207 F.3d at 389; *Citgo Petroleum*, 632 F.Supp.2d at 883-84.

The same is true of ¶103 and Kielhofer's Declaration dated July 15, 2016. *Compare* Declaration (Dkt. 66), ¶23 ("GLELSI never interpreted any change request issued by the Department to its servicers as directing GLELSI to refrain from capitalizing pre-forbearance accrued interest at the conclusion of a B-9 forbearance period."), *with* Renewed Proposed Finding of Fact (Dkt. 310), ¶103 ("By its terms, Change Request 1492 did not address what should happen to unpaid interest that accrued before a B-9 Forbearance period."). Whether one asserts that, "I did not interpret CR1492 as prohibiting GLELSI from capitalizing pre-forbearance accrued interest," or asserts that, "by its terms, CR1492 did not address what should happen to pre-forbearance accrued interest," each assertion proffers a similar interpretation of CR1492. Defendants' Renewed Proposed Finding of Fact ¶103 was actually first stated in Defendants' Declaration dated July 15, 2016 (Dkt. 66), ¶23. And that Declaration had contradicted GLELSI's prior deposition testimony. *But see Thorn*, 207 F.3d at 389; *Citgo Petroleum*, 632 F.Supp.2d at 883-84.

Class members have long argued that Defendants' sham Errata Sheet (Dkt. 63) and sham Declaration (Dkt. 66) contradicted GLELSI's own stated interpretation of CR1492 during the company's deposition. *See, e.g.,* Original Opposition to Summary Judgment (Dkt. 235) at 46-47,

58-60.  Class members argued that this was improper and precluded summary judgment under *Thorn*, 207 F.3d at 389 and *Citgo Petroleum*, 632 F.Supp.2d at 883-84.  *See* Dkt. 235 at 46-47, 58-60.  Importantly, ***nowhere did defense counsel dispute this in their Original Summary Judgment Reply Brief***.  *See generally* Original Reply Brief (Dkt. 262) (nowhere mentioning *Thorn*, *Citgo Petroleum* or similar Seventh Circuit case law).

But now, on their Renewed Motion, counsel's ¶¶102-103 regurgitate the ***contents*** of Defendants' sham Errata and Declaration (Dkt. 63; Dkt. 66), without actually citing to those sham documents.  This is extremely misleading, and by design.  It is less dangerous to violate a court's summary judgment rules on a technicality — *i.e.,* Dkt. 182 at 3, ¶5 ("Do not propose facts stating your argument about the meaning of the document.") — than it is to openly violate *Thorn* and *Citgo Petroleum* on a core factual dispute.  So rather than citing their sham Errata and Declaration this time around, Defendants' attorneys' have willfully stepped in as surrogate fact witnesses for their clients, ***and again contradicted their own clients' deposition testimony***, because the law will simply not allow GLELSI to contradict its own deposition testimony on a summary judgment motion.  Defense counsel is proffering the substance of the sham Errata and Declaration, but citing to CR 1492 itself and ignoring their client's deposition.

At bottom, Defendants' attorneys have merely converted their years-old violations of *Thorn*, *Citgo Petroleum*, and similar cases into violations of this Court's Summary Judgment Procedures.  Dkt. 182 at 3, ¶5 ("Do not propose facts stating your argument about the meaning of the document.").   All of this is extremely misleading.  What appears to be only a sloppy, technical violation of the Court's Procedures is carefully calculated to obfuscate the material factual and legal disputes between the parties.  Paragraphs 102 and 103 of Defendants' Renewed

Proposed Findings of Fact are a disguised, end-run around the binding law of *Thorn*, *Citgo Petroleum* and similar Seventh Circuit case law.

There are only sophisticated attorneys, companies, and executives on the defense side of this action.  They are not clumsily forgetting this Court's Summary Judgment Procedures, particularly after the Court made all defense counsel declare that they reviewed such Procedures for compliance purposes.  *See* Dkt. 242; Dkt. 243; Dkt. 244; Dkt. 245; Dkt. 246; Dkt. 275.

### 2.  Compound Narratives

The Court's Summary Judgment Procedures provide that movants "must propose each fact in a separate, numbered paragraph, limited as nearly as practical to a single factual proposition." Dkt. 182 at 3, ¶3.  Defendants, however, now submit Renewed Proposed Findings of Fact like this one.

> GLELSI also adjusted the accounts of borrowers who were no longer on GLELSI's live servicing system as of the date of the execution of the First Remediation Project. Where a borrower's loan went into default and the [sic] was paid by the guarantor, GLELSI issued a refund check to the loan guarantor. Where a defaulted borrower's account had been referred to the Department's Debt Management and Collection System (DMCS), GLELSI prepared an adjustment spreadsheet to inform DMCS what the principal and accrued interest balances should have been at the time of the referral and transfer; the Department later confirmed that these adjustments were made by DMCS. For borrowers transferred to other servicers, GLELSI's Financial Adjustments team manually rebuilt each borrower's account and prepared account adjustment spreadsheets to each borrower's new servicer; these servicers then confirmed to GLELSI that the appropriate account adjustments were made. (7.15.16 Kielhofer Decl., Dkt. 66, ¶37.)

Renewed PFF (Dkt. 310), ¶146 (emphasis added).

This paragraph is not "limited as nearly as practical to a single factual proposition."  Dkt. 182 at 3, ¶3.  It is a nonsensical, run-on series of narratives.   Such narratives are not amenable to succinct responses on paper, and this is by Defendants' design.  It is humanly impossible for the Class to rebut this Proposed Finding "succinctly," as required elsewhere in this Court's Procedures. Dkt. 182 at 4, ¶D.2. ("All responses should be succinctly stated.").  This is more

than another technical violation.  Defense counsel's ¶146 concerns the ***disputed*** extent to which Defendants and various third parties have financially compensated Class members.

In addition to ¶146, there are many other examples of compound narratives sprinkled throughout Defendants' Renewed Proposed Findings of Fact.  *See, e.g.,* Dkt. 310, ¶¶67, 144, 147-148, 178-179.  Each serves the "improper purpose" of obfuscating key factual disputes in this case, and "needlessly increasing" the Class's burden in responding to Defendants' Renewed Motion.  Fed. R. Civ. P. 11(b)(1).

### C.   Defense Counsel Offers No Legal Argument Supporting The Admissibility Of Their Clients' Myriad Opinions Regarding Class Damages

"If a witness is not testifying as an expert, testimony in the form of an opinion is limited to one that is:

(a) rationally based on the witness's perception;

(b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and

(c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702."

Fed. R. Evid. 701.  Here, defense counsel's Renewed Motion relies upon many volumes of opinion testimony from their clients, which clearly fail to satisfy one or more of the above criteria for admitting opinion testimony.  Defense counsel offers no legal justification for this.  *But see* Fed. R. Civ. P. 11(b)(2).

For example only[16], defense counsel relies heavily upon Lapham's opinion that "all [136,829] class members have either had their account balances ***accurately*** adjusted to reflect the ***correct*** amounts owed (either by GLELSI ***or the Class member's new loan servicer***) or received

---

[16] There are too many examples of this to number.

an *appropriate* refund for overpayments . . . ." Dkt. 342, ¶13 (emphasis added).  Such testimony clearly fails the requirements of Fed. R. Evid. 701 because, at minimum:

> (1) Lapham admits she and GLELSI have no firsthand "perception" regarding "all class members," and no "perception" of what "Class members' new loan servicers" have actually done to Class members' loan accounts;[17] and

> (2) Lapham's opinion that all class members' loan balances have been "accurately adjusted" is manifestly an opinion based on her "technical" and "specialized" knowledge of federal student loan programs, ED's rules governing those programs, and the unique specifications of GLELSI's loan servicing System.[18]

Moreover, this Court's Summary Judgment Procedures provide, "Do not propose facts reciting expert opinions or parties' arguments."  Dkt. 182 at 3, ¶6.  Defense counsel, however, has repeatedly used their Renewed Proposed Findings of Fact to proffer their clients' inadmissible, opinionated arguments.  *See, e.g.,* Dkt. 310, ¶146 (arguing that some other companies have "confirmed," *i.e.,* opined to GLELSI outside of Court, that "appropriate" adjustments were made to Class accounts); *id.*, ¶197 (arguing that Plaintiff's loan accounts "now display accurate amounts owed"); *id.*, ¶207 (arguing that, when GLELSI retroactively deemed Class member Elizabeth Mosser *delinquent on Loans she repaid years ago*, such retroactive delinquency *"represented her [lawful] obligation to repay"*).  These are not proposed findings of "fact."   These are inadmissible, improperly presented assertions of opinion by defense counsel's clients.

---

[17] Second GLELSI Deposition (Dkt. 227) at 80:10 – 81:9 (Lapham testifying: "I certainly wouldn't be able to validate what [other servicers] have done."); *id.* at 41:12-16 ("Q. You guys didn't manually review every class member's account, right?  A. Correct.  Q.  That would be totally impractical, right?  A. Correct.").

[18] *See generally* Dkt. 342 (lots of specialized and technical knowledge forming the basis for Lapham's purported opinions); *e.g.*, ¶¶5,8,10.

31

If defense counsel had various factual or legal opinions to proffer, then defense counsel should have proffered those with legal argument and citation in their brief, or properly presented expert testimony regarding damages.  Instead, defense counsel aims to force Class Counsel to debate various legal issues and regulatory *opinions* with their layperson-clients: under the false guise of proposing "facts."  That is clearly contrary to the Federal Rules of Evidence (Fed. R. Evid. 701), as well as this Court's Summary Judgment Procedures (Dkt. 182 at 3, ¶6).  That tactic has no basis in law, and it "needlessly increase[s] the cost of litigation."  Fed. R. Civ. P. 11(b)(1) and 11(b)(2).

### D.     Each Substantive Sentence On Page 1 Of Defendants' Brief Was Knowingly False Or Misleading When Filed.

There are literally too many significant tricks and falsities contained in Defendants' Renewed Motion papers for the Class to expose them all.  If the Court has any doubt about this, then the Court need look no further than the introductory section to defense counsel's web of lies: Page 1 of the Brief in support of Defendants' Renewed Motion.  Dkt. 309 at 1.  Each and every substantive sentence on that first page is a verifiably false and misleading statement.  *But see Boeing* 711 F.3d at 762 ("Representations in a filing in a federal district court that are not grounded in an 'inquiry reasonable under the circumstances' or that are unlikely to 'have evidentiary support after a reasonable opportunity for further investigation or discovery' violate Rule 11(b) and Rule 11(b)(3)."); *Eckhardt*, 2019 WL 1177954, at *6 ("Misleading statements are unacceptable and run afoul of Federal Rule of Civil Procedure 11(b)."); *Fries v. Helsper,* 146 F.3d 452, 458 (7th Cir.1998) ("[A] court may impose sanctions on a party for making arguments or filing claims that are frivolous, legally unreasonable, without factual foundation, or asserted for an improper purpose.").  Take each substantive sentence on defense counsel's front page: one by one.

"Dawson originally accused Defendants of improperly capitalizing interest that accrued *during* certain administrative forbearance periods (called 'B-9 Forbearances' by the parties), contrary to regulations issued by the United States Department of Education. (Compl., Dkt. 1, ¶36)." Dkt. 309 at 1.    As defense counsel knows, the Complaint alleged that Defendants wrongfully capitalized the Class's *"B-9 Interest"* obligations.  *E.g.,* Dkt. 1 at pp. 13, 19 (headings); *id.* at ¶¶37, 39, 54, 56, 57(e), 58, 65, 67, 70-71, 75 ("Plaintiff seeks relief on behalf of the Class from all of Great Lakes Defendants' wrongful *B-9 Interest* capitalizations occurring over nearly nine years.").  As defense counsel knows, the Complaint always defined "B-9 Interest" not as "interest that accrued *during* . . . 'B-9 Forbearances,'" but instead, as "any accrued interest on a FFELP or Direct loan that remains unpaid at the end of a B-9 Forbearance period."  *Id.* at n.7.[19]  Even if defense counsel initially misread the Complaint five years ago (they didn't), the parties have repeatedly litigated this issue, and the Court found that Dawson's "capitalization event" theory was "rooted in the allegations of the Complaint."  *E.g.,* Certification Order (Dkt. 171) at 171, n.3; *see also* Dkt. 55 (Plaintiff's *Original* Class Certification Brief in June 2016) at 18 ("In Plaintiff's view of [ED's] rules, no interest whatsoever may be capitalized at the end of one of these 'non-capitalizing' forbearance periods; these 'B-9' Forbearance periods are intended to be *benign*.") (emphasis in original).  The Complaint simply used different, arbitrary terminology ("B-9 Interest") to express the same concept because Plaintiff had no access to discovery at that time.[20]

---

[19] Because the term "B-9 Interest" has no English-language meaning, any legal practitioner would have sought out the definition for this meaningless term.  Moreover, defense counsel could not have learned the meaning of "B-9 Forbearance" without reading the same footnote in which "B-9 Interest" was defined.

[20] This is not the first time that defense counsel has deceptively manipulated Plaintiff's use of pre-discovery *terminology* into a verifiably false argument that Plaintiff altered the *substance* of her case.  Defendants were already sanctioned once upon using this tactic, yet defense counsel

"Later, after it became apparent that GLELSI's servicing systems did not capitalize such interest . . . ."  Dkt. 309 at 1.  Defense counsel is well aware that GLELSI's servicing system, in fact, did "capitalize such interest": that is, "interest that accrued **during** . . . 'B-9 Forbearances.'" Dkt. 309 at 1.  *See, e.g.,* First GLELSI Deposition (Dkt. 53) at 54:21 – 55:13 (Kielhofer testifying that GLELSI's servicing system capitalized "interest that accrued during the B9 forbearance period"); Lapham Declaration (Dkt. 220-3) at ¶4 (GLELSI manager declaring the System capitalized "interest accrued during [the] B-9" Forbearance period for 14,648 Class members).  Counsel's assertion that "GLELSI's servicing systems did not capitalize such interest" is objectively false and misleading, and it serves multiple "improper purpose[s]" which undermine the integrity of these proceedings.  Fed. R. Civ. P. 11(b)(1); *Eckhardt*, 2019 WL 1177954, at *6 ("Misleading statements are unacceptable and run afoul of Federal Rule of Civil Procedure 11(b).").

"Finally, when the Department provided GLELSI with guidance in August 2016 distinguishing between 'standalone' B-9 Forbearances and 'back-to-back' B-9 Forbearances (i.e., those that immediately follow other deferments or forbearances) . . . ."  Dkt. 309 at 1.  As proven in Part V.A.1, *supra*, defense counsel knew that according to their own clients, their "August 2016" assertion was false and misleading when filed in February 2020.  *See also* Class's Renewed Opposition Brief (Dkt. 330) at 16-19, 45-54; Class's Original Opposition Brief (Dkt. 235) at 26-30, 47-54.  Leading a summary judgment motion with facts known to be disavowed by one's own clients clearly crosses the line under Rule 11.  *See City of Livonia Emps. Ret. Sys. v. Boeing*, 306 F.R.D. 175 (N.D. Ill. 2014) (imposing Rule 11 sanctions on remand, as counsel

---

continues to deploy this same misleading tactic today.  *See* Contempt Order (Dkt. 295) at 8-9 ("CAPGONE is simply the name that defendants gave the electronic file . . . . Defendants identify no way that Dawson would have known the names that defendants gave their files . . . .").

knew that information provided from a witness "was unverified and potentially unreliable," that the witness had changed his position, "and yet [counsel] repeatedly made assurances to the court as to the truth" of the witness's prior assertions).  If it is a Rule 11 violation to promote the prior factual assertions of a recanting, third-party witness, then it is certainly a Rule 11 violation to promote the prior assertions of recanting *clients*, like Leitl and Kielhofer here.  *Id.*

Every substantive sentence on the front page of defense counsel's Renewed Brief is objectively misleading.  It would be a big mistake — indeed, many mistakes — for this Court to trust or credit the remainder of Defendants' Renewed Motion papers.

## VI.    DEFENSE COUNSEL WAS MADE FULLY AWARE OF THESE ISSUES DURING THE FIRST ROUND OF SUMMARY JUDGMENT BRIEFING

Defendants' Renewed Motion is not the first time that Defendants' attorneys have engaged in procedurally improper summary judgment tactics.  *Cf. City of Livonia Emps. Ret. Sys. and Local 295/Local851 v. Boeing Co.*, 711 F.3d 754, 762 (7th Cir. 2013) ("Recidivism is relevant in assessing sanctions."); *Divane v. Krull Elec. Co., Inc.*, 200 F.3d 1020, 1028 (7th Cir. 1999) (in deciding a Rule 11 motion, courts should consider "whether the signer of the documents had sufficient time for investigation").

On June 3, 2019, over a year ago, Defendants filed their Original Motion for Summary Judgment and Brief in Support.  Dkt. 217; Dkt. 218.

On July 18, 2019, Class members filed their Original Opposition Brief (Dkt. 235) and supporting papers.  Class members first argued that they were entitled to a denial of Defendants' Original Motion because Defendants failed to carry their initial burden under Rule 56.  *See* Dkt. 235 at 6-8, 17-31.  First, defense counsel failed to file a Statement of Proposed Findings of Fact, as required by this Court's Summary Judgment Procedures (Dkt. 182).  *See generally* Original Opposition Brief (Dkt. 235) at 6-8, 17-31.  Second, counsel relied only upon inapposite Rule

12(b)(6) defenses to seek final judgments on Class RICO claims. *Id.* Third, counsel's Original Motion papers relied upon written testimonies contradicting the witness's prior deposition testimonies, and otherwise relied upon Defendants' versions of facts which their counsel knew to be genuinely disputed. *But see Goka*, 862 F.2d at 650; *Thorn*, 207 F.3d at 389; *Piscione*, 171 F.3d at 532-33; *Bank of Illinois*, 75 F.3d at 1168-69; *Russell*, 51 F.3d at 67-68; *Citgo Petroleum*, 632 F.Supp.2d at 883-84.[21]

On July 25, 2019, Defendants filed a Motion for Leave to file a Statement of Proposed Findings of Fact, a full week after the Class opposed summary judgment. Dkt. 240. Defense counsel asserted that they were unaware of the Court's Summary Judgment Procedures. *See Id.* at 2 ("Failing to file a separate document with proposed findings of fact resulted from not knowing the Court's procedures."). Defense counsel requested that the Court allow them to file Opening Proposed Findings of Fact, two months late. Dkt. 240 at 2. The Court granted Defendants' Motion for Leave. *See* Dkt. 242. The Court expressly found an absence of good cause for Defendants' failure to file Opening Proposed Findings of Fact. *Id.* at 1-2. The Court said that "[i]n another case, the court might simply deny the motion for summary judgment, and deem the offending party to have forfeited its right to ask for summary judgment." *Id.* at 2. The Court nevertheless granted Defendants' motion, ordering that "[t]o avoid giving defendants an unfair advantage, defendants' proposed findings of fact ***should be limited to facts discussed in their opening brief***." *Id.* (emphasis added).

On July 29, 2019, defense counsel filed their *post hoc*, "Opening" Proposed Findings of Fact (Dkt. 248). Contrary to the Court's Order (Dkt. 242 at 2), counsel filed a brand new client declaration (Dkt. 247) to support the disputed authenticity of previously challenged documents,

---

[21] *See* Original Opposition Brief (Dkt. 235) at 26-31, 58-60.

and otherwise submitted new proposed facts contained nowhere in Defendants' opening brief. *See generally* Brief in Support of Motion to Strike (Dkt. 268) at 1-2 (detailing Defendants' infractions).

On August 12, 2019, Class members filed their responses to Defendants' belatedly filed Proposed Findings of Fact.  Dkt. 251.

On August 16, 2019, Defendants filed their Reply Brief in Support of their Original Motion for Summary Judgment.  Dkt. 262.  Nowhere in Defendants' 55-page Reply Brief did they dispute that their Original Motion offended the Seventh Circuit's holding in *Goka*.  *See generally* Dkt. 262 (nowhere discussing or mentioning *Goka*).  Defendants also declined to dispute that their Original Motion relied upon a sham Errata (Dkt. 63) and Declaration (Dkt. 66), in violation of *Thorn* and *Citgo Petroleum*.  *See generally* Dkt. 262 (nowhere mentioning *Thorn*, *Citgo Petroleum*, or any other related case law).  Defendants' Reply Brief simply argued, in passing, that: ***"[Plaintiff] refuses to accept [the witness's] revisions and her explanation for them."***  Dkt. 262 at 53.  Defense counsel offered no argument whatsoever beyond this, and thereby conceded their own substantial improprieties on their Original Motion.  *But see* Fed. R. Civ. P. 11(b)(2) (all "claims, defenses, and other legal contentions" must be "warranted by existing law or by a nonfrivolous argument" for modifying existing law).

Along with Defendants' Reply Brief, Defendants' attorneys filed twenty-three (23) new, "Supplemental Proposed Findings of Fact" (*see* Dkt. 261 at 42-44, ¶¶76-98), without seeking leave of Court.  These Supplemental Proposed Findings of Fact, first introduced on reply, marked another clear and substantial violation of this Court's Summary Judgment Procedures. Dkt. 182 at 2-7.  Defendants' "Supplemental" facts were ***also*** an end-run around the Court's Order that "defendants' proposed findings of fact should be limited to facts discussed in their

opening brief." Dkt. 242 at 2. Defense counsel's Reply Brief relied substantially on these "Supplemental" Proposed Findings of Fact, improperly arguing that their newly introduced facts were "indisputable." Defendants' Original Reply Brief (Dkt. 262) at 29-31.

On August 30, 2019, Plaintiff filed a Motion to Strike (Dkt. 267) and supporting brief (Dkt. 268), challenging Defendants' deployment of new "opening" proposed facts after the Class opposed summary judgment, and further, challenging Defendants' "Supplemental" facts introduced on Reply. *See generally* Brief in Support of Motion to Strike (Dkt. 268).

On September 10, 2019, Defendants opposed the Motion to Strike, ***frivolously*** arguing that this Court's Summary Judgment Procedures (Dkt. 182 at 2-7) somehow permit movants to propose brand new facts on reply, without leave, whenever movants see fit. *See* Defendants' Opposition to Motion to Strike (Dkt. 276) at 4.

On September 20, 2019, Class members filed a reply in further support of the Motion to Strike. Dkt. 278. At this point, Defendants' Original Motion for Summary Judgment (Dkt. 217) and Plaintiff's Motion to Strike (Dkt. 267) were fully briefed.

On October 25, 2019, Class members properly moved for civil contempt and discovery sanctions. Dkt. 280. The Class had recently proven that Defendants declined to produce thousands of Class member identities to the Notice Administrator, in violation of the Court's Class Notice Order (Dkt. 197) nine months prior. *See generally* Dkt. 281. Class members also sought discovery sanctions because Defendants falsely denied Requests for Admissions on this very issue. *Id.* Defendants and their counsel were effectively seeking summary judgment against more than 7,000 certified Class members, ***while knowing those Class members had never been sent notice of this action***. *See generally* Dkt. 295.

On November 1, 2019, Defendants' counsel filed a brief in opposition to Plaintiff's motion for civil contempt and discovery sanctions. *See generally* Dkt. 285. Defense counsel deceptively argued: (1) that the concealed Class members were somehow not Class members; and (2) that they misunderstood the Class's Requests for Admissions ("RFAs") on this very issue. *Id.*

On December 5, 2019, the Court imposed civil contempt and discovery sanctions notwithstanding defense counsel's frivolous arguments. *See* Contempt Order (Dkt. 295). The Court recognized its own Class definition as unambiguous, finding that Defendants and their counsel had "no basis" for ***purporting*** to believe that concealed Class members were not Class members. Dkt. 295 at 5 ("Thus, there is simply no basis for reading the class certification order as excluding the omitted borrowers from the class."). Second, the Court found "defendants had no basis for denying a request for admission about who received class notice." *Id.* at 2.

In the same Order, however, the Court denied Defendants' Original Motion for Summary Judgment, without addressing its merits, permitting Defendants to file a Renewed Motion for Summary Judgment. *Id.* at 12. The Court also denied the Class's meritorious Motion to Strike as "moot," without comment. *Id.*

On February 18, 2020, defense counsel filed the Renewed Motion for Summary Judgment. Dkt. 308. As detailed throughout this brief, the Renewed Motion and supporting papers only continue to skirt this Court's Summary Judgment Procedures, and to otherwise offend the long-settled law of this Court and the Seventh Circuit. *Goka*, 862 F.2d at 650; *Thorn*, 207 F.3d at 389; *Piscione*, 171 F.3d at 532-33; *Bank of Illinois*, 75 F.3d at 1168-69; *Russell*, 51 F.3d at 67-68; *Citgo Petroleum*, 632 F.Supp.2d at 883-84.

On May 8, 2020, the Class opposed Defendants' Renewed Motion for Summary Judgment, arguing that the Class is independently entitled to a procedural denial, as well as a merits denial, of Defendants' Renewed Motion.

On June 19, 2020, defense counsel filed their Renewed Summary Judgment Reply papers.

On July 1, 2020, the Class served defense counsel with a copy of the instant motion and brief, requesting that they affirmatively withdraw their Renewed Motion papers as defective, at least with respect to the elements of fraudulent intent and damages, for the many reasons discussed herein and in the Class's Renewed Opposition Brief (Dkt. 330). To date, Defendants' attorneys have declined to withdraw or otherwise correct their latest, clearly improper papers in support of summary judgment. *See generally* Harris Declaration in Support of the Class's Motion for Fed. R. Civ. P. 11 Sanctions (plus Exhibits, filed concurrently herewith). Therefore, this motion is properly before the Court as of July 27, 2020, and must be decided impartially on its own merits. Fed. R. Civ. P. 11(c)(2); *Melrose v. Shearson/American Express, Inc.*, 898 F.2d 1209, 1215 (7th Cir. 1990) ("Counsel are reminded that 'Rule 11 fees may be awarded even *against* a prevailing party[.]'") (collecting cases).

## VII.   CONCLUSION

For all of the foregoing reasons, Plaintiff and the Class (including but not limited to Class members Elizabeth Mosser and Angela Monger) respectfully request that this Court grant the Class's Motion for Rule 11 Sanctions on Defendants' Renewed Motion for Summary Judgment.

The Class primarily requests that this Court impose a nonmonetary sanction that denies Defendants' Renewed Motion for Summary Judgment as fatally defective on all claims not expressly conceded in the Class's Renewed Opposition Brief. *See* Fed. R. Civ. P. 11(c)(4) (a judicial sanction "may include nonmonetary directives"); Class's Renewed Opposition Brief

(Dkt. 330) at 20, n.7 (identifying for the Court Class members' conceded claims).  Defendants' Renewed Motion is simply too inherently defective to be salvaged by this Court, and Class members have provided the Court with a clear path toward a manageable, long overdue trial on the merits.  *See generally* Dkt. 330.

Alternatively, Plaintiff and the Class request that this Court impose appropriate monetary sanctions, even if the Court grants Defendants' Renewed Motion for Summary Judgment in full. *See* Fed. R. Civ. P. 11(c)(4) (appropriate sanctions may include "an order directing payment to the movant of part or all of the reasonable attorneys' fees and other expenses directly resulting from the violation[s]"); *Melrose*, 898 F.2d at 1215 ("Counsel are reminded that 'Rule 11 fees may be awarded even *against* a prevailing party[.]'") (collecting cases).  Regardless of any merits determinations in this case, the Court cannot properly deny this motion as "moot." *Id.*

Respectfully submitted,

FINKELSTEIN & KRINSK LLP

Dated: July 27, 2020                   By:   s/ David J. Harris, Jr.
                                             David J. Harris, Jr., Esq.

                                             Jeffrey R. Krinsk, Esq.
                                             550 West C Street, Suite 1760
                                             San Diego, California 92101-3579
                                             Telephone: (619) 238-1333
                                             Facsimile:  (619) 238-5425

                                             *Counsel for Plaintiff and the Class*