IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

MEREDITH D. DAWSON,

                    Plaintiff,

   v.

GREAT LAKES EDUCATIONAL LOAN SERVICES,
INC., GREAT LAKES HIGHER EDUCATION
CORPORATION, JILL LEITL, DAVID LENTZ, and
MICHAEL WALKER,

                    Defendants.

OPINION and ORDER

15-cv-475-jdp

---

This case is about the capitalization of student loan interest. Capitalization is the practice of adding accrued but unpaid interest to the account's principal balance. When accrued interest is capitalized, the borrower's principal debt increases, and so too does the amount on which future interest will accumulate.

Plaintiff Meredith Dawson has federal student loans that are serviced by defendant Great Lakes Educational Loan Services, Inc. (GLELSI). As a servicer, GLELSI doesn't own Dawson's debt. Instead, GLELSI has a contract with the U.S. Department of Education to manage the account, including by determining when to capitalize interest in accordance with federal law. Defendant Great Lakes Higher Education Corporation (GLHEC) is GLELSI's parent company. The individual defendants are GLELSI officers.

Dawson received what the parties call a "B-9 Forbearance" (named after 34 C.F.R. § 685.205(b)(9)) on her student loans. When a borrower receives a forbearance, the borrower's repayment obligation is temporarily halted, but interest continues to accrue on the outstanding principal balance of the loan.

Dawson alleges that, at the end of the B-9 forbearance period, GLELSI wrongly capitalized interest that had accrued both before the forbearance period (pre-forbearance interest) and during the forbearance period (intra-forbearance interest), and that defendants misrepresented the amount Dawson owed in communications to her. She asserts claims for fraud under the Racketeer Influenced and Corrupt Organizations Act (RICO) and for negligence and negligent misrepresentation under Wisconsin common law.

The court has certified a class of borrowers who received a B-9 forbearance and whose federal student loans were serviced by GLELSI between 2006 and the present. *See* Dkt. 171, at 24.[1] But the court limited the certification order to liability issues and deferred a decision on certifying damages. The court later invited the parties to include in their summary judgment materials arguments on whether damages should be decided on a class-wide basis. *See* Dkt. 305.

Defendants concede that GLELSI erred by capitalizing interest that accrued both before and during the forbearance period. They say that the capitalization of intra-forbearance interest was the result of what they call "programming errors," Dkt. 341, ¶ 135, and that the capitalization of pre-forbearance interest was the result of a misunderstanding of Department regulations, *id.*, ¶ 160. But defendants deny that their errors give rise to liability under state or federal law, and they move for summary judgment on all claims. Dkt. 308.

 Defendants don't challenge Dawson's claims on the ground that she can't prove fraud or negligence. Instead, defendants say that Dawson's RICO claims fail because she hasn't met multiple requirements of the relevant statute, and that her state-law claims are preempted by

---

[1] All citations to page numbers for docket entries reflect the numbering used on the CM/ECF headers.

federal law or barred under an immunity doctrine. Defendants also contend that Dawson can't show any harm because GLELSI has since corrected the errors on the class members' accounts.

The court will grant defendants' motion in part and deny it in part. Dawson concedes that she can't prevail on her claims against individual defendants David Lentz and Michael Walker, Dkt. 330, at 30 n.7, so the court will dismiss those defendants. The court will also dismiss Dawson's RICO claims. Dawson hasn't shown that the parties have the type of relationship with which RICO is concerned.

The court will allow Dawson's state-law claims against the corporate defendants to proceed. Defendants haven't shown a conflict between Dawson's claims and state law, so their preemption argument fails. And they don't meet the requirements for the immunity doctrines that they cite.

As for defendants' contention that Dawson hasn't shown harm, defendants are confusing Dawson's burden with their own. It is undisputed that GLELSI improperly capitalized the class members' interest, so Dawson has shown harm. It is defendants' burden to show that their remediation efforts made the class whole, which defendants haven't done. Defendants rely solely on conclusory declarations from their employees to demonstrate that class members' accounts have been corrected, so it is impossible at this stage to assess the accuracy of defendants' efforts.

The court agrees with Dawson that the remaining damages issues can be resolved on a class-wide basis. The court will amend the certification order accordingly and grant Dawson's motion to hold a conference to set a schedule for the remainder of the proceedings.

Dawson has also filed a motion for sanctions. She hasn't identified any persuasive reasons for sanctioning defendants, so the court will deny that motion.

## I. DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

### A.  Alleged procedural violations

Dawson devotes 13-pages of her 144-page opposition brief to her contention that she is entitled to "a procedural denial" of defendants' motion for summary judgment. Dkt. 330, at 18–30. Her first three reasons in support of that contention involve alleged violations of the court's summary judgment procedures: (1) some of defendants' proposed findings of fact are not limited to a single factual proposition; (2) some of defendants' proposed findings of fact recite expert opinions or parties' arguments; and (3) some of defendants' proposed findings of fact include restatements of documents or interpretations of the meaning of documents. Dawson also contends that the court must deny defendants' summary judgment motion because defendants falsely represented that some facts are undisputed. According to Dawson, a decision to grant any aspect of defendants' summary judgment motion will be proof that the court applied its rules "unequally as between the parties." Dkt. 330, at 25 (quoting *Modrowski v. Pigatto*, 712 F.3d 1166, 1168 (7th Cir. 2013)).

The alleged procedural violations are not independent grounds for denying summary judgment, and Dawson cites no authority to the contrary. Dawson accurately identifies several of the court's rules for preparing proposed findings of fact, *see* Dkt. 182, at 2, but the consequence for violating a rule isn't an automatic denial of the offending party's summary judgment motion. Rather, the court has discretion to disregard any improper proposed findings of fact. *See Petty v. City of Chicago*, 754 F.3d 416, 420 (7th Cir. 2014).

The court did not consider proposed findings of fact that violated the court's rules. But defendants' motion for summary judgment relied primarily on legal contentions rather than factual propositions, and most of defendants' proposed findings of facts aren't relevant to issues

4

that that are properly before the court. So many of Dawson's objections simply have no bearing on resolving defendants' motion.

Dawson also contends that *Goka v. Bobbitt*, 862 F.2d 646 (7th Cir. 1988), requires the court to deny defendants' summary judgment motion because defendants failed to acknowledge evidence undermining their proposed finding of fact that GLELSI employees were "surprised" when the Department of Education informed them in 2016 that B-9 forbearances aren't a "capitalization event." Dkt. 330, at 27 (citing Dkt. 341, ¶ 160).[2] As the court of appeals has explained, *Goka* stands for the proposition that "[a] lawyer has an ethical obligation, enforceable under Rule 11, not to seek summary judgment if the facts show that his client is not entitled to that relief." *Herman v. City of Chicago*, 870 F.2d 400, 404 (7th Cir. 1989) (citing *Goka*, 862 F.2d at 650–51). *Goka* doesn't say that a district court must deny a motion for summary judgment anytime a moving party wrongly identifies a proposed finding of fact as undisputed. In this case, defendants aren't contending that they are entitled to summary judgment because they were "surprised" by the Department's notice. So *Goka* simply doesn't apply.

As for Dawson's contention that it is evidence of unequal treatment if the court rejects her request for a "procedural denial," Dawson neither explains what she means nor points to any unequal treatment. Specifically, Dawson doesn't cite any examples in which the court has applied its rules more strictly against her. So the court will deny Dawson's request and consider the merits of defendants' summary judgment motion.

---

[2] The phrases "capitalization event" or "capping event" simply refer to "something happening on a loan account that would justify a capitalization transaction." Dkt. 261, at 46, ¶ 8.

## B. RICO

Dawson's RICO claims arise under 18 U.S.C. § 1962(c), which provides: "It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt."[3] Racketeering activity is defined in 18 U.S.C. § 1961 as a list of prohibited predicate acts, including mail fraud as defined by 18 U.S.C. § 1341, and wire fraud as defined by 18 U.S.C. § 1343. In this case, Dawson alleges that defendants committed mail and wire fraud in the form of misrepresentations about when defendants were capitalizing interest on student loans.

Both sides devote most of the discussion about RICO to Dawson's claim that GLELSI conducted the affairs of GLHEC through a pattern of racketeering activity. But Dawson also says that defendant Jill Leitl (GLELSI's former chief serving officer and current chief operating officer) conducted the affairs of GLELSI, and that GLELSI conducted the affairs of the Department of Education.

For the purpose of their motion for summary judgment, defendants don't deny that they engaged in racketeering in the form of mail fraud and wire fraud.[4] Instead, defendants contend that Dawson hasn't satisfied other elements of § 1962(c).

---

[3] Dawson's complaint asserts violations of § 1962(b) and (d) as well, but she doesn't dispute defendants' contention that she can't prevail on those claims, *see* Dkt. 309, at 37, so the court will grant defendants' motion for summary judgment on Dawson's claims under those two sections.

[4] For reasons she doesn't explain, Dawson devotes nearly 40 pages of her summary judgment brief to arguing that defendants committed mail and wire fraud. Dkt. 330, at 42–80. Because defendants aren't seeking summary judgment on that ground, and Dawson didn't file her own

### 1. Claim that GLELSI conducted the affairs of GLHEC

Defendants challenge this claim on three grounds: (1) GLELSI and GLHEC are not a distinct "person" and "enterprise"; (2) GLELSI did not conduct GLHEC's affairs; and (3) there is no "pattern" of racketeering activity. The first two grounds are related, and they show that defendants are entitled to summary judgment on this claim. This makes it unnecessary to consider defendants' third argument.

A "person" under RICO is "any individual or entity capable of holding a legal or beneficial interest in property." 18 U.S.C. § 1961(3). For this claim, Dawson says that that GLELSI is the "person." *See Liquid Air Corp. v. Rogers,* 834 F.2d 1297, 1306 (7th Cir. 1987) ("A corporation may be a 'person' under RICO."). An "enterprise" is "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). Dawson says that GLHEC is the enterprise.

To support a claim under § 1962(c), the plaintiff must "identify a 'person'—i.e., the defendant—that is distinct from the RICO enterprise." *United Food & Commercial Workers Unions & Employers Midwest Health Benefits Fund v. Walgreen Co*., 719 F.3d 849, 853 (7th Cir. 2013). *See also King,* 533 U.S. at 162 ("[There must be] some distinctness between the RICO defendant and the RICO enterprise."). To show that the person "conduct[ed]" the "enterprise's affairs," the plaintiff must adduce evidence that "the defendant participated in the operation or management of the enterprise itself, and that the defendant played some part in directing

---

motion for summary judgment, the court need not consider these arguments.

the enterprise's affairs." *Roppo v. Travelers Commercial Ins. Co.*, 869 F.3d 568, 589 (7th Cir. 2017) (internal quotation marks omitted).

When the person and the enterprise are a parent and a subsidiary, the Seventh Circuit rule is clear: "A parent and its wholly owned subsidiaries no more have sufficient distinctness to trigger RICO liability than to trigger liability for conspiring in violation of the Sherman Act unless the enterprise's decision to operate through subsidiaries rather than divisions somehow facilitated its unlawful activity." *Bucklew v. Hawkins, Ash, Baptie & Co., LLP*, 329 F.3d 923, 934 (7th Cir. 2003). *Bucklew* cites *Emery v. American General Financial, Inc.*, which articulated a similar rule when it stated that liability would be appropriate under § 1962(c) if "criminals took over a corporate subsidiary which then managed to wrest control of the parent and use the parent as an instrument for further criminal activities." 134 F.3d 1321, 1324 (7th Cir. 1998). In other words, whether the parent or subsidiary is the "person" or "enterprise," the person "must be shown to use its agents or affiliates in a way that bears at least a family resemblance to the paradigmatic RICO case in which a criminal obtains control of a legitimate (or legitimate-appearing) [enterprise] and uses the [enterprise] as the instrument of his criminality." *Id.*

So, under *Bucklew* and *Emery*, a subsidiary and a parent can be a separate "person" and "enterprise" under certain circumstances. But to show that the subsidiary was distinct from the parent company and conducted the affairs of the parent, the plaintiff must show that the subsidiary committed the unlawful acts by controlling the parent. *See Fitzgerald v. Chrysler Corp.*, 116 F.3d 225, 227 (7th Cir. 1997).

Dawson has adduced no evidence that GLELSI exercised any control over GLHEC to commit fraud. Instead, Dawson says that GLHEC was the "100% owner" of GLELSI, so

GLELSI was necessarily conducting GLHEC's affairs when GLELSI was making decisions about interest capitalization. Dkt. 330, at 85. But under this view, *all* subsidiaries would be a person that conducts an enterprise's affairs. That view is inconsistent with circuit law holding that affiliated corporate entities cannot be held liable under RICO simply because they are affiliated corporate entities. *See Emery*, 134 F.3d at 1324 ("[S]howing that the pattern of predicate acts (the mail frauds, in this case) were committed by a firm that has agents or affiliates . . . is not enough."); *Fitzgerald*, 116 F.3d at 226 (rejecting view that a corporation and its employees create a RICO enterprise in every case involving fraud by the corporation, even though employees are acting on corporation's behalf). Again, the plaintiff must show that the "person" exercised control over the "enterprise."

Alternatively, Dawson contends that GLELSI can be held liable under § 1962(c) because it disregarded a directive from GLHEC's "policy expert" in 2011 to stop capitalizing interest in connection with B-9 forbearances. Dkt. 330, at 85–86. But Dawson doesn't explain why that matters, even if it's true. Disobedience is not control. If anything, that allegation shows that GLELSI was conducting its own affairs rather than the affairs of GLHEC. Dawson cites no authority to the contrary.

Finally, Dawson contends that "*Bucklew*, *Fitzgerald*, and its progeny . . . are irreconcilable with the Supreme Court's decision in *King*." Dkt. 330, at 89. That's simply incorrect. *King* decided only one issue, which is that an individual owner of a company is legally distinct from the company itself for the purpose of RICO liability. 533 U.S. at 163. None of the cases cited in this opinion contradict that holding. *King* didn't address the broader question of what it means for a "person" to "conduct" an "enterprise's affairs." And *King* doesn't undermine *Reves v. Ernst & Young*, which held, "[i]n order to 'participate, directly or indirectly, in the conduct

of such enterprise's affairs,' one must have some part in *directing* those affairs. 507 U.S. 170, 179 (1993) (emphasis added). The Seventh Circuit's rule that a person must have some control over the enterprise comes from *Reves*. *See Fitzgerald*, 116 F.3d at 227.

The bottom line is that Dawson hasn't adduced evidence that GLELSI conducted GLHEC's affairs, so GLELSI is entitled to summary judgment on this claim.

### 2. Claim that Leitl conducted GLELSI's affairs

Alternatively, Dawson contends that defendant Jill Leitl was the "person" and GLELSI was the "enterprise" within the meaning of § 1962(c). The question raised in defendants' motion for summary judgment is whether Leitl is someone who "conduct[ed]" GLELSI's affairs through a pattern of racketeering activity. Again, this requires Dawson to show that Leitl "participated in the operation or management of the enterprise itself, and . . . played some part in directing the enterprise's affairs." *Roppo*, 869 F.3d at 589 (internal quotation marks omitted).

Dawson contends that a reasonable jury could make that finding because, as GLELSI's chief servicing officer, Leitl "decided how (if at all) GLELSI would prioritize fixing multi-borrower errors" and she was one of the "primary points of contact for the company's servicing compliance-related interactions with" the Department. Dkt. 330, at 91. Dawson also says that, as the chief operating officer, Leitl directed the borrower accounts team manager to stop capitalizing interest under certain circumstances after Dawson filed this lawsuit. *Id.*

At most, these allegations suggest that Leitl was involved in *correcting* GLELSI's errors. But that's not enough. To satisfy this element of the claim, "the plaintiff must show that the named defendants actually controlled and directed the corporation's fraudulent activity." *Kuryakyn Holdings, Inc. v. Ahhe*, No. 09-cv-702-wmc, 2013 WL 12234625, at *9 (W.D. Wis.

Mar. 4, 2013) (citing *Emery*, 134 F.3d at 1324–25). Dawson doesn't point to any evidence that Leitl was controlling or directing the alleged fraud in this case, so this claim fails.

### 3. Claim that GLELSI conducted the affairs of the Department

In her summary judgment brief, Dawson asserts a claim that GLELSI conducted the Department's affairs through a pattern of racketeering activity. Dawson acknowledges that she didn't plead this claim, but she contends that she didn't have to because it is an "issue" or a "factor" rather than a claim. She cites Federal Rule of Civil Procedure 15(b), which allows a court during trial to admit "evidence [that] is not within the issues raised in the pleadings," and *Rowlands v. United Parcel Serv.–Fort Wayne*, which says that a complaint doesn't have to include "all legal elements (or factors) plus facts corresponding to each." 901 F.3d 792, 800 (7th Cir. 2018)

Neither Rule 15(b) nor *Rowland* support Dawson's argument. Dawson isn't simply asserting new evidence or a new legal theory based on already pleaded facts. Dawson is attempting to establish a new basis for liability by relying on facts that she admits were not pleaded in the complaint. It is well established that a plaintiff cannot raise new claims in response to a motion for summary judgment. *See Anderson v. Donahoe*, 699 F.3d 989, 997 (7th Cir. 2012).

In any event, this new claim would fail for the same reason that Dawson's other RICO claim against GLELSI failed. Specifically, Dawson cites no evidence that GLELSI exercised any control over the Department, which is a requirement of a claim under § 1962(c). *See Fitzgerald* 116 F.3d at 227.

The court will grant defendants' motion for summary on all of Dawson's claims under RICO.

### C. State-law claims

Dawson asserts state-law claims for negligence and negligent misrepresentation. Dawson's allegations appear to be directed against GLELSI specifically, but the complaint asserts these claims against both corporate defendants. Neither side treats the corporate defendants differently for the purpose of deciding the state-law claims, so the court will refer to the two corporate entities simply as "defendants" in this section.

The court has jurisdiction over the state-law claims under 28 U.S.C. § 1332(d)(2)(A), which applies when the amount in controversy of a class action is more than $5,000,000 and at least one class member is a citizen of a different state from "any defendant." Dawson is seeking well over $5,000,000 for the class, and her citizenship (California) is diverse from defendants' citizenship (Wisconsin and Illinois). See Dkt. 341, ¶¶ 1–6.

The basis for the state-law claims is that defendants made misrepresentations about the interest that was being capitalized on student loans, and that defendants failed to comply with federal regulations that govern the calculation of student loan interest. Defendants' summary judgment motion doesn't challenge Dawson's ability to prove those allegations. Instead, defendants contend that Dawson's state-law claims are barred on three procedural grounds: (1) federal law preempts Dawson's state-law cause of action; (2) defendants have "intergovernmental immunity"; and (3) defendants have "*Yearsley* immunity." The court rejects each of these contentions.

### 1. Conflict preemption

Defendants' primary contention is that Dawson's state-law claims are preempted by the Higher Education Act, a federal law regulating student loans. Preemption doctrines are grounded in the Supremacy Clause, U.S. Const. art. VI, clause 2, which says that "every State

shall be bound" by federal law, "notwithstanding" any state law "to the Contrary." There are three types of preemption: express, field, and conflict. *See Aux Sable Liquid Products v. Murphy*, 526 F.3d 1028, 1033–34 (7th Cir. 2008). "Express preemption occurs when a federal statute explicitly states that it overrides state or local law. As for field preemption, it exists when federal law so thoroughly occupies a legislative field as to make it reasonable to infer that Congress left no room for the states to act." *Aux Sable*, 526 F.3d at 1033–34 (internal quotation marks and citations omitted). Defendants rely only on the doctrine of conflict preemption, so the court won't consider the other two.

A state-law claim is barred by conflict preemption if: (1) it would be "impossible" to uphold the state-law claim without violating federal law; or (2) recognizing the state-law claim would create an "obstacle" to satisfying the purposes and objectives of Congress. *See C.Y. Wholesale, Inc. v. Holcomb*, 965 F.3d 541, 547 (7th Cir. 2020). Defendants don't contend that it would be impossible to comply with both state and federal law in this case. Instead, they say that holding defendants liable for negligence or negligent misrepresentation would create an obstacle to satisfying congressional intent regarding the administration of student loan programs, citing 20 U.S.C. § 1082(a)(1), § 1087f, and § 1087i-1. Section 1082(a)(1) gives the Department of Education the authority to regulate third-party student-loan servicers such as GLELSI; § 1087f directs the Department to award contracts for loan servicing; § 1087i-1 allows the Department to contract with lenders to service student loans purchased by the government.[5] Defendants contend that Dawson's claims conflict with two objectives embedded

---

[5] In their reply brief, defendants also cite 20 U.S.C. § 1087e, which governs the terms and conditions of student loans. But Dawson isn't trying to change any terms or conditions, so the court doesn't see the relevance of this provision.

in those provisions: (1) to maintain uniformity in the administration of student loan programs; and (2) to make the Department solely responsible for policing the servicers' conduct.

### a. General principles

Before considering the specific conflicts alleged by defendants, the court begins with three general preemption principles. First, there is a presumption that state law is not preempted, and the party raising preemption as a defense has the burden to show that preemption was "the clear and manifest purpose of Congress." *Arizona v. United States*, 567 U.S. 387, 400 (2012). The Supreme Court has recognized an exception to the general rule in some cases, *e.g.*, *Buckman Co. v. Plaintiff's Legal Comm.*, 531 U.S. 341, 347 (2001), but the parties don't dispute that a presumption against preemption should apply in this case.

Second, the significance of a potential conflict must be evaluated in the context of the pertinent interests of the state and federal governments. Defendants cite *Boyle v. United Techs. Corp.*, for the principle that a preemptive conflict "need not be as sharp" when the state law involves "an area of uniquely federal interest" rather than "in a field which the States have traditionally occupied." 487 U.S. 500, 507 (1988). Defendants don't develop this point, but presumably they mean to say that the student loans at issue in this case concern "uniquely federal interests." The point is debatable, depending on how one defines the field. The federal student loan program may involve uniquely federal interests, but protecting borrowers from wrongful conduct is an area of traditional state concern. That is what this court found in *Weber v. Great Lakes Educ. Loan Services, Inc*, a case in which the court rejected a claim by GLELSI that the HEA preempted claims under the Wisconsin Consumer Act against loan servicers., No. 13-cv-291-wmc, 2013 WL 3943507, at *2 (W.D. Wis. July 30, 2013).

In *Nelson v. Great Lakes Educ. Loan Servs., Inc.*, another case involving preemption in the context of the HEA, the court noted *Boyle* and observed that "the federal government has an interest in protecting the rights and obligations established in its contracts, and that this interest extends to liability to third persons." 928 F.3d 639, 651 n. 3 (7th Cir. 2019). But the court also said that a state has "a compelling interest in protecting its consumers by providing oversight of federal student loan servicers." *Id.* The court did not decide how those competing interests should be balanced in the context of a preemption inquiry. Instead, the court applied the standard under *Boyle*, which requires the party claiming preemption to show that a "significant conflict exists between an identifiable federal policy or interest and the [operation] of state law, or the application of state law would frustrate specific objectives of federal legislation." *Id.* (quoting *Boyle*, 487 U.S. at 507). This court will take the same approach as *Nelson* and apply the *Boyle* standard.

Third, the parties dispute the significance of the express preemption provisions in the HEA. The statute expressly preempts state usury laws, 20 U.S.C. § 1078(d); statutes of limitations, § 1091a(a)(2); collections costs and infancy defenses, § 1091a(b); garnishment requirements, § 1095a(a), and disclosure requirements, § 1098g. Dawson says that the express preemption provisions make it "basically impossible" for defendants to prevail on a conflict preemption argument. Dkt. 330, at 95. Defendants disagree, citing the Supreme Court's statement that "the existence of an express preemption provision does not bar the ordinary working of conflict preemption principles or impose a special burden that would make it more difficult to establish the preemption of laws falling outside the clause." *Arizona*, 567 U.S. at 406 (internal quotation mark and alterations omitted).

15

*Arizona* makes it clear that a court may conclude that a claim is subject to conflict preemption despite the existence of express preemption provisions to do not apply to that claim. But *Arizona* does not hold that express preemption provisions are irrelevant to a conflict preemption analysis. In other cases, the Supreme Court has stated that the existence of express preemption provisions "supports a reasonable inference . . . that Congress did not intend to pre-empt other matters." *Freightliner Corp. v. Myrick*, 514 U.S. 280, 288 (1995). The court of appeals has continued relying on that language in recent cases involving alleged conflict preemption. *E.g.*, *Kaiser v. Johnson & Johnson*, 947 F.3d 996, 1009 (7th Cir. 2020).

More directly relevant to this case is *Nelson*, in which the court of appeals considered whether the HEA preempted fraud and negligent misrepresentation claims arising from statements that GLELSI made on its website "offer[ing] to provide guidance to borrowers struggling to make their loan payments." 928 F.3d. at 641. In rejecting GLELSI's claim of conflict preemption, the court relied in part on the HEA's express preemption provisions: "The number of those provisions and their specificity show that Congress considered preemption issues and made its decisions. Courts should enforce those provisions, but we should not add to them on the theory that more sweeping preemption seems like a better policy." *Id.* at 650. *Arizona, Freightliner*, and *Nelson* together show that the presence and scope of express preemption provisions don't create categorical rules. But the court must "examin[e] the federal statute as a whole" when conducting a preemption analysis, and express preemption provisions would be part of this examination. *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 373 (2000).

To sum up the general preemption principles, the court concludes that a presumption against preemption applies, that defendants must show there is a significant conflict between

16

state and federal law, and that the existence of express preemptions is relevant to the court's determination whether a conflict exists. The court now turns to the specific conflicts on which defendants base their preemption argument.

### b. Maintaining uniformity

Defendants contend that Dawson's state-law claims "threaten[] the Department's ability to work collaboratively with its servicers to maintain uniformity nationwide." Dkt. 309, at 53. The first question is whether "uniformity" is a purpose of the HEA at all. Evidence of a preemptive purpose must come from the text and structure of the statute; defendants can't rely on "abstract and unenacted legislative desires." *Virginia Uranium, Inc. v. Warren*, 139 S. Ct. 1894, 1907 (2019). The statutory provisions defendants cite do not invoke the principle of uniformity, and defendants cite little other evidence that it is one of the purposes of the HEA.

In *Nelson*, the court of appeals described the HEA's purposes as "keep[ing] the college door open to all students of ability, regardless of socioeconomic background" and encourage[ing] lenders to loan money to students and their parents on favorable terms." 928 F.3d at 642–43 (internal quotation marks omitted). *See also* 20 U.S.C. § 1071(a)(1) (listing statutory purposes). Defendants don't contend that Dawson's claims undermine either of those purposes.

Two federal appellate courts have rejected the view that uniformity was a purpose of the HEA, citing a lack of evidence in the text or structure of the statute. *See Lawson-ross v. Great Lakes Higher Educ. Corp.*, 955 F.3d 908, 921 (11th Cir. 2020) ("[W]e remain unconvinced that the purpose Great Lakes advances—uniformity for uniformity's sake—is in fact a goal of the HEA."); *Coll. Loan Corp. v. SLM Corp.*, 396 F.3d 588, 597 (4th Cir. 2005) ("We are unable to

confirm that the creation of "uniformity" . . . was actually an important goal of the HEA.").[6] Defendants rely on *Chae v. SLM Corp.*, in which the Court of Appeals for the Ninth Circuit concluded that an intent to maintain uniformity could be inferred from "the comprehensive framework that Congress set up to govern the $2 billion per year [student-loan] program." 593 F.3d 936, 944 (9th Cir. 2010).

The Court of Appeals for the Seventh Circuit hasn't decided the issue. In *Nelson*, the court noted *Chae*'s finding on uniformity but concluded that it wasn't instructive because *Chae* involved "different sorts of claims." *Nelson*, 928 F.3d at 651. Specifically, *Chae* involved state laws that created additional, substantive requirements for servicers on setting late fees, repayment start dates, and interest calculations. The *Nelson* court "assume[d]" that "the need for nationwide consistency on those sorts of administrative mechanics is substantial." *Id.* But the court concluded that such a need "does not extend to the claims Nelson asserts based on affirmative misrepresentations—not required by federal law—to borrowers having trouble making their payments." *Id.*

The *Nelson* court didn't adopt the reasoning in *Chae*. But even if the court assumes that uniformity is a purpose of the HEA, Dawson's state-law claims don't threaten uniformity because those claims are based on the view that defendants acted negligently by violating *federal* regulations and guidelines on calculating loan interest. Defendants say that *Chae* is on point because it involved "interest calculations," but the state-law at issue in *Chae* imposed additional

---

[6] *See also Daniel v. Navient Sols., LLC*, 328 F. Supp. 3d 1319, 1324 (M.D. Fla. 2018) ("Uniformity, however, is not one of Congress's expressed goals in enacting the HEA."); *Brooks v. Salle Mae, Inc.*, No. FSTCV096002530S, 2011 WL 6989888, at *9 (Conn. Super. Ct. Dec. 20, 2011) ("[B]ecause uniformity is not mentioned as a goal of the HEA, [compliance with the Connecticut Unfair Trade Practices Act] "is not an obstacle to the achievement of the objectives of the HEA.").

requirements on servicers regarding how to calculate loan interest. Unlike the plaintiffs in *Chae*, Dawson isn't trying to supplant federal law, but only to obtain a civil remedy under state law for federal violations.

*Bible v. United Student Aid Funds, Inc.*, 799 F.3d 633 (7th Cir. 2015), is on point. In that case, the plaintiff sued a guaranty agency for assessing collection costs against her, in violation of a contract governed by the HEA. The agency contended that the plaintiff's breach-of-contract claim was preempted by the HEA, relying on *Chae* and an alleged threat to uniformity in enforcing the HEA. The court rejected the agency's view and concluded that *Chae* was distinguishable because the plaintiff was "not attempting to require more of the defendant than was already required by the HEA and its regulations." *Id.* at 654. Rather, she was seeking "only to enforce the federal standards that the parties agreed to in their contract." *Id.* In other words, the plaintiff's "state law claims were complementary to, not in conflict with, the federal requirements." *Id.*

It is the same in this case. Dawson's state-law claims rest on alleged violations of federal standards. So *Chae* doesn't support a finding of conflict preemption.

Defendants contend that *Bible* is distinguishable because Dawson's tort claims do more than simply adopt a federal standard. Citing *Gritzner v. Michael R.*, 2000 WI 68, ¶ 24, 235 Wis. 2d 781, 792, 611 N.W.2d 906, 913, defendants say that the court will have to consider whether "public-policy considerations" bar recovery even if Dawson shows that defendants acted negligently in violating federal regulations.[7] Defendants believe that it is the Department's responsibility to decide which public-policy considerations should preclude

---

[7] Both sides assume that Wisconsin law will govern the state-law claims.

liability, and they compare this case to *Chae*, in which the court found that the plaintiffs "d[id] not seek to buttress the FFELP framework, but rather to alter it in their home state." 593 F.3d at 946.

This argument isn't persuasive. *Gritzner* identifies five public-policy factors that may preclude liability in a negligence case: (1) the injury is too remote from the negligence, (2) the injury is too wholly out of proportion to the tortfeasor's culpability, (3) in retrospect it appears too highly extraordinary that the negligence should have resulted in the harm, (4) allowing recovery would place too unreasonable a burden on the tortfeasor, (5) allowing recovery would be too likely to open the way for fraudulent claims, and (6) allowing recovery would enter a field that has no sensible or just stopping point. 2000 WI 68, at ¶ 27. Defendants identify no basis for concluding that any of these factors would apply in this case, and the court sees none.

More fundamentally, the situation in this case is very different from that in *Chae*, which involved state-law claims that would have imposed more requirements on *servicers*. If a state-law requires a servicer to calculate interest differently from federal law, there is a strong argument that the state-law is interfering with the uniform application of a federal standard. But there's no interference with federal law in this case. Even if Wisconsin law would require courts to consider public-policy considerations before imposing liability, those considerations would simply place an additional burden on *plaintiffs*. Defendants fail to explain how any federal interest is undermined in that situation. Any federal statutes or Department regulations will still have full effect; servicers will simply have another layer of protection under state law. Perhaps state-law claims brought in different states could have different results, but that wouldn't affect uniformity in applying federal standards, which is the only interest in

20

uniformity that Congress might have. So even if uniformity is an objective of the HEA, the court discerns no obstacle that Dawson's claims would impose on achieving that objective.

### c.  Preventing interference with the Department's oversight of servicers

Defendants also contend that Dawson's state-law claims would "interfere[] with the Department's oversight of [its] servicers' core operational functions," Dkt. 309, at 49. The court will assume that the HEA would preempt a state-law cause of action that interfered with the Department's ability to regulate and supervise student loan servicers. The question is whether defendants have pointed to evidence in the text or structure of the HEA showing that providing borrowers with a remedy under state law would create such interference.

Defendants point to three pieces of evidence: (1) the HEA doesn't create a private right of action for borrowers; (2) the Department has created a mechanism for borrowers to file complaints about loan servicers; and (3) the HEA gives the Department regulatory authority over loan servicers, including the power to remediate violations.[8] None of this evidence shows that there is a "significant conflict" between Dawson's claims and the Department's oversight over defendants or that allowing Dawson's claims to proceed "would frustrate specific objectives" of the HEA. *Nelson*, 928 F.3d at 651 n. 3.

As for a private right of action, defendants are correct that the HEA doesn't provide one. *See Slovinec v. DePaul Univ.*, 332 F.3d 1068, 1069 (7th Cir. 2003). But the court of appeals has rejected the "novel assumption that where Congress does not create a private right of action for violation of a federal law, no right of action may exist under state law, either." *Wigod v.*

---

[8] Defendants don't cite specific provisions related to the Department's enforcement powers, but 20 U.S.C. § 1082(g) and (h) gives the Department the authority to assess civil penalties and sanctions against a servicer for violating the HEA and its implementing regulations and for making a "substantial misrepresentation of the nature of its financial charges."

*Wells Fargo Bank, N.A.*, 673 F.3d 547, 581 (7th Cir. 2012). So the absence of a private right of action in the HEA doesn't provide a basis for finding preemption.

As for the Department's program for borrowers to file complaints about a servicer, defendants don't cite any provisions in the HEA that required the Department to set up such a program. Rather, it appears to be a program that the Department has decided on its own to implement. A program that isn't even mentioned in the authorizing statute can't provide a basis for inferring anything about congressional intent to preempt state law.

As for the statute's delegation of remedial powers to the Department, the Supreme Court has required more than the existence of a federal enforcement scheme before finding preemption of state-law claims. *See Bates v. Dow Agrosciences LLC,* 544 U.S. 431, 448 (2005) (declining to find preemption for state-law cause of action when the federal statute "does not preclude States from imposing different or additional remedies"); *English v. General Electric Co.,* 496 U.S. 72, 87 (1990) ("Ordinarily, the mere existence of a federal regulatory or enforcement scheme, even one [that is] detailed . . . does not by itself imply pre-emption of state remedies."); *Hillsborough County v. Automated Medical Laboratories, Inc.,* 471 U.S. 707, 717 (1985) ("To infer preemption whenever an agency deals with a problem comprehensively is virtually tantamount to saying that whenever a federal agency decides to step into a field, its regulations will be exclusive.").

This principle was recognized in two appellate decisions rejecting claims that the HEA preempts state law. In *Lawson*, a case involving state-law misrepresentation claims, the court held that "we do not infer preemption from the comprehensive nature of a regulation alone." 955 F.3d at 922. The court cited *N.Y. State Dep't of Soc. Servs. v. Dublino*, which recognized that "subjects of modern social and regulatory legislation often by their very nature require intricate

and complex responses from the Congress, but without Congress necessarily intending its enactment as the exclusive means of meeting the problem." 413 U.S. 405, 415 (1973). In *College Loan*, a case involving state-law claims for tortious interference and breach of contract, the court concluded that "the existence of the [Department's] exclusive authority to enforce the HEA and its regulations does not, standing alone, mandate the conclusion that a state law claim which relies on HEA violations for support 'obstructs' the federal scheme." 396 F.3d at 598–99.

These authorities are consistent with both *Nelson* and *Bible*, which allowed state-law claims to proceed despite the Department's ability to enforce its own regulations. So defendants must point to stronger evidence of a real conflict.

Defendants contend that *Nelson* and *Bible* are limited to claims involving a breach of contract or an "affirmative misrepresentation." But this contention is misplaced for two reasons. First, Dawson is asserting a negligent misrepresentation claim, just as the plaintiffs in *Nelson* were. Defendants don't explain how or why the claims in *Nelson* are different from those in this case. Second, defendants' argument is based on the view that Dawson's state-law claim interferes with the Department's oversight of loan servicers, but defendants don't explain why a negligence claim would lead to more interference than a breach-of-contract claim.

Defendants also rely on *Arizona* for the proposition that preemption can apply even when state law "attempts to achieve one of the same goals as federal law," if there is "a conflict in the method of enforcement." 567 U.S. at 406. But *Arizona* was not about providing a civil remedy for a violation of federal standards. It was about a state's effort to intrude on an area traditionally governed by federal law—immigration—by criminalizing conduct (seeking employment by undocumented immigrants) that the federal government had treated as a civil

23

matter. *Id.* Further, in concluding that the state law conflicted with federal law, the Court relied on "the text, structure, and history" of the Immigration Reform and Control Act. In this case, defendants point to nothing in the text, structure, or history of the HEA that supports a view that Congress intended to immunize servicers from liability under state law.

In their reply brief, defendants rely on *Buckman*, 531 U.S. 341, contending that its reasoning is "directly applicable" here because both cases involve state-law claims that would interfere with Congress's chosen method of enforcement. Dkt. 340, at 30. But there are numerous differences between *Buckman* and this case. In *Buckman*, the plaintiffs were private parties who were trying to use state law to sue a federal contractor for misrepresentations to the Food and Drug Administration to get a medical device approved. The plaintiffs' theory was that they wouldn't have been harmed by the medical device if the FDA hadn't approved the device, and the FDA wouldn't have approved the device in the absence of fraud.

In concluding that the state-law claim was preempted, the Court noted that: (1) policing fraud against a federal agency wasn't an area of traditional state concern; (2) the plaintiffs were attempting to displace federal law regarding a contractor's communication with the FDA with "50 States' tort regimes," *id*. at 350; (3) there was "clear evidence that Congress intended that the [Medical Device Amendments] be enforced exclusively by the Federal Government," *id.* at 352; and (4) allowing the plaintiffs' state-law claim to proceed would "skew[]" the "somewhat delicate balance of statutory objectives" related to "regulating the marketing and distribution of medical devices without intruding upon decisions statutorily committed to the discretion of health care professionals," *id.* at 348–50.

None of the above concerns are present in this case. Dawson is seeking a state-law remedy for conduct directed at the members of the class, not at the Department; Dawson is

relying on a federal substantive standard; defendants haven't identified "clear evidence" that Congress intended the Department to provide the sole remedy for violations; and defendants haven't pointed to a "delicate balance of statutory objectives" that would be threatened by allowing plaintiffs' state-law claims to proceed.

The bottom line is that defendants haven't identified any way that Dawson's claims interfere with the Department's oversight of defendants. Permitting a negligence claim against defendants doesn't prevent the Department from taking any action it wishes against servicers. It simply provides injured borrowers with a civil remedy. Under these circumstances, defendants haven't met their burden to show that there is a conflict between state and federal law.

### 2.  Intergovernmental immunity and *Yearsley* immunity

In a footnote, defendants contend that Dawson's state-law claims are barred under the doctrines of intergovernmental immunity and *Yearsley* immunity. Dkt 309, at 48 n.4. Defendants don't include any argument on these issues but instead refer the court back to arguments in other briefs that defendants filed earlier. Dkt. 218, at 41–44 and Dkt. 262, at 12–17.

The court is not persuaded by these arguments. Intergovernmental immunity is a rarely invoked doctrine, grounded in the Supremacy Clause, that prohibits states from "regulat[ing] the United States directly or discriminat[ing] against the Federal Government or those with whom it deals." *North Dakota v. United States*, 495 U.S. 423, 435 (1990). When applied, it is usually in the context of state taxes. *See Travis v. Reno*, 163 F.3d 1000, 1002–03 (7th Cir. 1998) (describing intergovernmental immunity as "a rule of nondiscrimination, under which the governmental body's protection is vicarious: one government may tax (or regulate) another's

25

trading partners only to the extent it imposes equivalent burdens on those who do business with private citizens").

Intergovernmental immunity doesn't apply because Dawson's state-law claims aren't an attempt to regulate the federal government or to "discriminate" against federal contractors. Dawson is relying on generally applicable common-law theories that do not target defendants specifically.

Defendants cite *Goodyear Atomic Corp. v. Miller*, 486 U.S. 174, 181 (1988), for the proposition that "state law may directly regulate the United States . . . by interfering with a private contractor's ability to carry out its contractual obligations to the Federal Government." Dkt. 218, at 41. But *Goodyear* espouses no such principle. The question in *Goodyear* was whether states could regulate the activities of federally owned facilities. 486 U.S. at 180. And even if defendants had correctly summarized the holding in *Goodyear*, their argument would fail because they haven't shown that Dawson's state-law claims prevent them from carrying out their obligations to the Department. Rather, Dawson's claims are an attempt to require defendants to comply with those obligations.

*Yearsley* immunity, also called "derivative sovereign immunity," is an even more obscure doctrine. The name comes from *Yearsley v. W.A. Ross Constr. Co.*, 309 U.S. 18, 60 (1940), which held that government contractors could not be held liable for performing work "as the Government directed." *Campbell-Ewald Co. v. Gomez*, 577 U.S. 153, 167 (2016). Defendants aren't entitled to immunity under *Yearsley* because they don't allege that the Department instructed them to capitalize interest that accrued before or during a B-9 forbearance.

Defendants contend that they are entitled to immunity because they followed the Department's directions in attempting to remediate the capitalization errors after Dawson filed

this lawsuit. But as will be discussed more below, defendants are conflating liability with damages. Dawson isn't suing defendants for their attempts at remediation, so *Yearsley* doesn't apply. In any event, defendants allege only that the Department directed GLELSI to correct their interest calculations; defendants don't say that the Department told GLELSI how to correct the errors. So even if *Yearsley* applied to remediation efforts, defendants haven't shown that it applies here.

### D. Harm

Defendants contend that damages are an element of all of Dawson's claims and that Dawson can't prove damages for any class member, so they are entitled to summary judgment on those claims. This contention is based on defendants' assertion that they have cured all the capitalization errors related to this case through two "remediation projects," in which GLELSI adjusted the borrowers' account balances to remove the effects of the improper capitalizations. Defendants say that it is Dawson's burden to show that the remediation projects didn't make the class whole and that she has failed to meet that burden because she hasn't identified any mistakes in GLELSI's calculations.

Because the court has granted summary judgment to defendants on Dawson's RICO claims for other reasons, the court will limit its consideration to Dawson's state-law claims. Claims for negligence and negligent misrepresentation, like all tort claims, require the plaintiff to prove that she was harmed by the defendant's conduct. *See Hoida, Inc. v. M & I Midstate Bank*, 2006 WI 69, ¶ 23, 291 Wis. 2d 283, 302, 717 N.W.2d 17, 27 ("actual loss or damage" is one element of a negligence claim); *Goossen v. Estate of Standaert*, 189 Wis. 2d 237, 250, 525 N.W.2d 314, 320 (Ct. App. 1994) (in a negligent misrepresentation claim, plaintiff must show that he "relied upon [the misrepresentation] to his detriment"). But the undisputed facts show

that the class members did suffer harm in the form of interest that was incorrectly capitalized, as shown by the fact that defendants conducted two remediations. The remediation projects were completed after plaintiffs filed this lawsuit, so, Dawson says, any remediation by defendants is simply evidence of a reduction in damages, not proof that the class wasn't harmed. As a result, Dawson says that it is defendants' burden to prove that the class has been made whole, not Dawson's burden to show that the remediation was flawed. She cites *Wingad v. John Deere & Co.*, 187 Wis. 2d 441, 452, 523 N.W.2d 274, 278 (Ct. App. 1994), which says that "it is the defendant's burden to establish matters asserted in mitigation or reduction of the amount of plaintiff's damages."

Defendants don't respond to Dawson's argument, so they have forfeited the point. And it makes sense that it would be defendants' burden to prove that they fully remediated harm that even they acknowledge they caused by misapplying Department regulations.

So the question isn't whether Dawson can prove liability. The questions are the amount of damages that Dawson and the class have sustained and whether defendants can show that they have already cured any harm they caused to the class members. But before considering those questions, the court must first determine whether it can answer them on a class-wide basis. When ruling on Dawson's motion for class certification, the court declined to certify a class on the issue of damages because Dawson had failed to show that common issues predominate. Dkt. 171, at 20–22. But the court left the door open to certifying the damages issue at a later date. In a subsequent order, the court directed the parties to "include in their summary judgment submissions proposals on a process for resolving damages questions in the event that any of Dawson's claims survive summary judgment. Specifically, the parties should address whether and, if so, how damages can be resolved on a class-wide basis." Dkt. 305, at

28

2. Both sides addressed these issues in their summary judgment briefs, so the court will turn to those questions now.

## E.  Class certification of damages issues

Defendants contend that the evidence shows that all class members' accounts are now accurate, and yet they also contend that the court can't certify damages issues for class treatment. They identify three reasons for denying class certification: (1) Dawson hasn't yet filed a renewed motion to certify the damages issues; (2) Dawson's damages model is unreliable; and (3) individualized damages issues predominate over common issues. The court rejects each of these contentions and will certify a class on damages issues. As explained below, the court also disagrees with defendants' contention that the court can find as a matter of law that the class has no damages.

### 1.  Failure to renew motion for class certification

Defendants' first argument fails because the court invited both sides to address class certification in their summary judgment briefs. Defendants don't cite any authority requiring the plaintiffs to file a separate motion.

### 2.  Problems with Dawson's damages model

The second argument is more about the merits than class certification. The question at the certification stage isn't whether the plaintiff's damages calculation is correct; it's whether damages are capable of being determined across the class. *See Chicago Teachers Union, Local No. 1 v. Bd. of Educ. of City of Chicago*, 797 F.3d 426, 433–34 (7th Cir. 2015). Defendants essentially concede that it is feasible to determine how much interest was wrongly capitalized for all class members. In fact, defendants contend that they have *already* made that determination in the context of performing the remediation projects. Defendants' primary objection to Dawson's

damages model is that it doesn't take those projects into account. But, as discussed above, it isn't Dawson's burden to prove the inadequacy of the remediation projects, so her failure to address that issue isn't a sufficient ground on its own to disregard her evidence, let alone to deny certification. Defendants raise other objections to Dawson's damages evidence, but none of them are related to class certification, so they are premature.

### 3. Individual issues related to the remediation projects

Defendants' third argument is also related to the remediation projects. Specifically, defendants say that individual questions will predominate in determining damages because GLELSI considered factors other than the interest capitalization errors at issue in this case when it "rebuilt" a borrower's account. Dkt. 309, at 67 (the remediation projects "involved individualized rebuilds of each borrower's student-loan accounts, addressing each borrower's particular loan status and transaction histories"). Thus, defendants say, to determine whether the class was made whole by the remediation projects, the court or the jury would have to consider how these other factors affected each of the class members' balances.

Defendants point to two examples of these individual factors, both of which Dawson cites as evidence that some class members haven't been made whole. First, defendants say, when GLELSI corrected the interest capitalizations for borrower Elizabeth Mosser, this "resulted in a reduction in the size of the income-driven repayment interest subsidy that she had received previously," and the removal of the subsidy led to an overall *increase* in her account balance despite the contemporaneous reduction in Mosser's interest. *Id*. at 68. Second, defendants say, borrower Angela Monger didn't receive a refund after the remediation because the Department required GLELSI to apply the overpayment toward another student loan that still had a balance. In a declaration they submitted with their reply brief, defendants say that

30

there are other borrowers in the same situation as Mosser and Monger, and they identify other issues that caused borrowers not to receive a refund or a credit as a result of the remediation projects, including that GLELSI was complying with new Department guidance that required capitalizing interest in situations that hadn't been required before. *See* Dkt. 342.

Dawson asks the court to disregard GLELSI's remediation projects for multiple reasons. None of those arguments are persuasive, but the court nevertheless concludes that the remediation projects don't preclude class certification of damages.

### a.   Evidentiary issues

Dawson's primary response to defendants' arguments about the remediation projects is that defendants' evidence of remediation is deficient in numerous respects, so the court should disregard that evidence. The court agrees with Dawson that defendants haven't proven at this point that all class members have been made whole. Defendants offer little more than conclusory statements from lay witnesses to support their allegation that they erased the effect of the improper capitalizations. They haven't submitted a report from an expert or any other evidence to establish that the remediation is complete and correct. The court cannot simply take defendants' word that all is well now.

But just as it is premature to consider the adequacy of Dawson's damages evidence, it would be premature to hold as a matter of law that defendants haven't corrected the capitalization errors. Again, the court hadn't yet certified damages issues for class treatment when the parties filed their summary judgment materials. But even if class damages were an issue properly before the court, Dawson didn't file her own motion for summary judgment, so defendants weren't required to come forward at this stage with evidence that proves or disproves the class members' damages.

31

### b. Collateral source rule

Dawson contends that both remediation projects are simply irrelevant in light of the collateral source rule, under which "the damages that a plaintiff is entitled to recover from a defendant cannot be reduced by payments or benefits from other sources." *Koffman v. Leichtfuss*, 2001 WI 111, ¶ 29, 246 Wis. 2d 31, 630 N.W.2d 201. Dawson's contention is based on the fact that any refunds or credits that the class received as a result of the two remediations came from the federal government as the owner of the debt, not defendants themselves, so Dawson says that defendants can't reduce their liability through those refunds and credits.[9] Dawson relies on *Molzof v. United States*, in which the court held that, despite Wisconsin's collateral source rule, a veteran could sue the United States for future medical expenses caused by government negligence, even though the veteran was entitled to free medical care from the Veterans Administration. 6 F.3d 461 (7th Cir. 1993).

Like *Molzof*, most cases involving the application of the collateral source rule involve payment of medical expenses. In fact, in *Leitinger v. DBart, Inc.*, the court "summarized" the collateral source rule as a doctrine that "help[s] claimants recover the reasonable value of the medical services, without limitation to the amounts paid." 2007 WI 84, ¶ 27, 302 Wis. 2d 110, 124–25, 736 N.W.2d 1, 8 (internal quotation marks omitted). Neither side cites any cases in which a court considered the application of the collateral source rule in a situation like this one involving student loans. But the court concludes that the doctrine shouldn't apply in this case, both because doing so would be inconsistent with the ordinary practice of the rule and

---

[9] As a student loan servicer, GLELSI doesn't own any student-loan debt, it doesn't enter into a direct contractual relationship with the borrower, and it doesn't keep any payments from borrowers.

the primary reason for it, and because any credits or refunds that the class received didn't come from a truly "collateral" source.

As for the operation of the collateral source rule, it "ordinarily works in tandem with the legal principle of subrogation." *Weborg v. Jenny*, 2012 WI 67, ¶ 47, 341 Wis. 2d 668, 688–89, 816 N.W.2d 191, 201–02. In other words, the third party who made payments to the injured party generally has a right of recovery, either by being joined as a party to the tort action or by seeking reimbursement from the prevailing plaintiff. *Id.* This right of subrogation "prevents the injured party from being unjustly enriched through a double recovery, i.e., recovery from both the subrogated party and the tortfeasor." *Id.* In this case, there is no subrogated party. And there is no mechanism for allowing the owner of the debt to obtain "reimbursement" from the class if they receive a double recovery. After all, it was the debt owner, not GLELSI, that benefitted from any balance increases caused by GLELSI's alleged negligence, so it would make no sense to return any money to the debt owner.

As for the policy behind the rule, it is "that the tortfeasor should not be permitted to reap the benefits of the plaintiff's foresight in obtaining coverage for future harm or his good fortune in obtaining compensation gratuitously." *Molzof*, 6 F.3d at 465. In this case, any credits or refunds that the class received through the remediation projects were not the result of Dawson's "foresight" or "good fortune." Rather, they were the direct result of GLELSI attempting to correct its own mistakes. Dawson doesn't allege that the Department issued any refunds on its own, independent of GLELSI's instructions.

This leads to the conclusion that any credits and refunds issued by the federal government are not really from a "collateral" source in a meaningful sense. In *Leitinger v. DBart, Inc.*, the court stated that the collateral source rule doesn't apply when the plaintiff receives a

payment from "someone identified with the tortfeasor," such as the tortfeasor's insurer. 2007 WI 84, ¶ 26, 302 Wis. 2d 110, 123, 736 N.W.2d 1, 7. In this case, the federal government is identified with GLELSI because of their contractual relationship. And, again, any credits or refunds that a class member received would be the result of GLELSI's efforts in conducting the remediation projects. For these reasons, the court concludes that the collateral source rule doesn't apply, and the court concludes that defendants' remediation is pertinent to damages.

### c.  Legal objections to factors GLELSI considered

Dawson raises legal objections to some of the factors that affected whether GLELSI determined that a particular class member should receive a credit or a refund. First, Dawson says that the court shouldn't consider defendants' contention that it was required under Department regulations and guidance to increase the interest charged to borrowers for reasons unrelated to the claims in this case, which is what happened in Mosser's case. Second, Dawson says that GLELSI wasn't entitled to apply a borrower's overpayment on one student loan toward another student loan serviced by GLELSI and owed by the same borrower, which was what happened in Monger's case. Rather, Dawson says that GLELSI was required to provide a refund in that circumstance.

As for Dawson's first contention, the court agrees with Dawson that other interest increases on the class members' accounts have "nothing to do with this case." Dkt. 330, at 126. The primary question in this case is whether defendants violated the class's rights by wrongly capitalizing the class's student-loan interest that accrued both before and during a B-9 forbearance period. Whether defendants made other errors in calculating the balance on a borrower's account is not properly before the court.

34

But this doesn't mean that GLELSI was required to ignore other adjustments it believed were necessary when performing the remediation projects. Rather, in the court's view, it simply means that this case isn't the proper vehicle for resolving any disputes about those other adjustments. In other words, to prove that it made the class whole, GLELSI will have to show that it properly removed the effects of the improperly capitalized interest related to forbearances. It will not have to show that *other* adjustments it made are correct. Dawson implicitly recognizes this in another part of her brief when she contends that any judgment entered in this case should be limited to "the original, capitalization-induced injuries," and that the class should be free in another case to "seek relief from any new, 'reassessment'-induced injuries." *Id.* at 330, at 118 n.37. The court agrees with this view, which has the effect of significantly reducing individual questions related to the remediation projects, and thus removes a primary objection to the certification of damages issues for class treatment.

As for Dawson's contention that GLELSI didn't have lawful authority to provide a credit on a different loan rather than a refund, her argument is limited to a footnote, and she doesn't cite any authority that is on point. Dkt. 330, at 120 n.38. In any event, the court isn't persuaded that it must decide the issue now. Again, the issue before the court is whether there are any insurmountable barriers to resolving damages on a class-wide basis. This is not such a barrier. There may be a set of legal issues that the court must decide before or after the jury considers damages, but the parties have identified only a small number of these, and there is no indication that individual issues will overwhelm the proceedings.

In determining whether class certification is appropriate, a primary question is whether a class action "is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). In this case, a class action is the best way to resolve

35

damages because the damages determination appears to be primarily mechanical, even if the calculations are complicated and disputed. There may be some individual issues as a result of the remediation projects, but most of the issues identified by defendants relate to adjustments that the court has determined aren't relevant to this case. In any event, "[i]t has long been recognized that the need for individual damages determinations at this later stage of the litigation does not itself justify the denial of certification. . . . As long as the defendant is given the opportunity to challenge each class member's claim to recovery during the damages phase, the defendant's due process rights are protected." *Mullins v. Direct Digital, LLC*, 795 F.3d 654, 671–72 (7th Cir. 2015).

Defendants don't cite any authority for the view that a court may deny class treatment on account of individualized issues created by the defendant's own efforts to provide a remedy or reduce the class's damages. And defendants don't identify a better alternative to resolving damages. *Id.* at 664 ("Rule 23(b)(3)'s superiority requirement . . . is comparative: the court must assess efficiency with an eye toward other available methods." (internal quotation marks omitted)). So the court will allow the case to proceed as a class action on both liability and damages.

In their reply brief, defendants contend in the alternative that damages subclasses (and presumably additional class representatives) are needed because Dawson doesn't allege that any of the individual issues caused by the remediation projects affected her. But, again, defendants don't cite any authority for this view, and the court isn't persuaded that subclasses are necessary or appropriate simply because defendants' arguments for reducing damages may not apply to all class members.

**F.  Next steps**

The next question is what additional steps are needed to bring this case to a resolution. The court agrees with Dawson that no additional class notice is needed because the original notice states that Dawson is seeking damages. Dkt. 180-2, at 4. Defendants don't argue otherwise.

Another issue relates to the three subclasses that the court certified for class members with capitalization errors from (1) interest that accrued during the B-9 forbearance period (intra-forbearance interest); (2)  interest that accrued before the B-9 forbearance period (pre-forbearance interest); and (3) interest that GLELSI capitalized because of programming errors.[10] The court's reasoning for creating subclasses was that the circumstances for each of them were different, and they would be subject to different defenses because GLELSI's reasons capitalizing interest in each situation were different. *See, e.g.*, *Torres v. Rhoades*, No. 15-cv-288-bbc, 2015 WL 9304584, at *3 (W.D. Wis. Dec. 21, 2015) (creating subclasses when the plaintiff's claims were subject to different defenses).

Dawson contends that the subclasses aren't necessary because her claims are based on a single theory of wrongful conduct. Specifically, she says that defendants erred by treating B-9

---

[10] Defendants discuss two such errors:

> One error related to GLELSI's servicing system accidentally cutting short B-9 Forbearances by one day, with the practical effect of capitalizing one-day's worth of intra-forbearance period interest. The second dealt with the order in which GLELSI's servicing system applied borrower payments made during a B-9 Forbearance (applying such payments first to non-capping B-9 Forbearance period interest rather than applying them first to pre-forbearance accrued interest).

Dkt. 309, at 61 (citations omitted).

forbearances as "capitalization events," and that defendants' decision led to improper capitalization of both pre-forbearance and intra-forbearance interest at the conclusion of the forbearance period. Dkt. 330, at 132. Although Dawson acknowledges that "programming errors" contributed to mistakes in capitalizing intra-forbearance interest, she says that the programming errors have "no consequence to the claims or defenses in this action" because those errors wouldn't have led to improper capitalization if defendants had previously classified B-9 forbearances as capitalization "exceptions" as they should have rather than capitalization events. *Id.* In other words, Dawson's position is that her theory of the case isn't affected even if it is assumed that GLELSI could have avoided the improper capitalization of intra-forbearance interest by preventing the programming errors.

The court will grant Dawson's request to eliminate the subclasses. Neither side has relied on any differences between the subclasses when litigating this case thus far, and defendants do not contend that they plan to do so in the future. In fact, defendants do not respond at all to Dawson's contention that there are no meaningful differences between the three subclasses. So Dawson is free to focus on a single theory of negligence, if that is what she wishes to do. The court understands her to be waiving any contention that the programming errors were the result of defendants' negligence, or that any conduct by defendants other than the decision regarding how to classify B-9 forbearances was negligent. As a result of that waiver, Dawson will not be permitted to assert other theories at trial.

The court will hold a video conference with the parties to schedule the remainder of the case, including the trial. Now that the class is certified on the issue of damages, the court will allow the parties to complete damages discovery, along with preparing or supplementing expert reports. The court will also set deadlines for filing legal challenges to any expert under *Daubert*

*v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579 (1993), and for filing all pretrial materials. To facilitate the conference, the parties are to submit a proposed schedule no later than seven days before the conference. The parties are encouraged to collaborate and submit a joint proposal, but if the parties cannot reach an agreement, they may set out their competing proposals on points of disagreement.

## II. DAWSON'S MOTION FOR SANCTIONS

After the parties completed briefing defendants' summary judgment motion, Dawson filed a 45-page brief in support of a motion for sanctions under Federal Rule of Civil Procedure 11 for what she says are "numerous improprieties." Dkt. 347, at 17. Despite filing such a lengthy brief, Dawson devotes less than a page to the relief she is requesting. First, she asks for a "nonmonetary sanction that denies Defendants' Renewed Motion for Summary Judgment as fatally defective on all claims not expressly conceded in the Class's Renewed Opposition Brief." Dkt. 347, at 44. She cites no authority for this request other than Rule 11(c)(4), which states that a sanction "may include nonmonetary directives." Second, she asks for "appropriate monetary sanctions," *id.* at 45, without explaining what she means by that. Dawson's failure to clearly articulate and support the relief she is seeking would be reason enough to deny her motion. But her motion fails on the merits as well.

Dawson says that she is entitled to sanctions for many of the same reasons that she said she was entitled to a "procedural denial" of defendants' motion for summary judgment. *See supra* § I.A. In fact, much of her argument appears to be cut and pasted from her summary judgment brief. The court has already discussed those issues, so it is unnecessary to do so again.

This leaves Dawson's contentions that defendants violated Rule 11 by: (1) falsely asserting that they had issued refund checks to all class members who had already paid off their student loans; and (2) failing to provide legal support for the admissibility of their evidence related to class damages. The court isn't persuaded that sanctions are appropriate for either issue.

## A. Statements about reimbursement checks

Dawson's first contention is based on statements in defendants' summary judgment filings that GLELSI issued reimbursement checks to class members after the remediation projects revealed that they had overpaid their loans. *See, e.g.*, Dkt. 165, ¶ 16 and Dkt. 309, at 29. Those statements were false, Dawson says, because GLELI hasn't issued reimbursement checks to anyone. Instead, GLELSI simply informed the Department of its calculations so that the U.S. Treasury could issue refunds.

Defendants' statements were sloppy shorthand, and defendants should have been more precise when discussing the reimbursement process. But the court doesn't see any intent to deceive. As Dawson herself acknowledges, defendants' own Rule 30(b)(6) witness acknowledged that GLELSI itself hadn't issued reimbursement checks. Dkt. 347, at 24. And why would it? GLELSI hadn't received any of the overpayments, so it makes sense that refund would come from the owner of the debt.

After Dawson challenged defendants' inaccurate statements, defendants provided more clarity in their reply materials. They wrote:

> For the 1,421 class members who had fully paid all of their loan accounts held by the Department through payments and had an overpayment exceeding the Department's $5.00 de minimis refund threshold, GLELSI sent instructions to the to the United States Department of the Treasury (routed through the Department of Education) to issue a refund to the borrower,

> either through a mailed check or an electronic Automated
> Clearing House payment transaction, and GLELSI received
> confirmation of these payments from the Department.

Dkt. 341, ¶ 179.  Because defendants had already corrected the record before Dawson filed her

Rule 11 motion, there is no basis for a sanction. *See* Fed. R. Civ. P. 11(c)(2) (party not entitled

to sanctions if the record is "appropriately corrected within 21 days after service" of the motion

on the opposing party).

Dawson also challenges the evidence that defendants submitted with their reply brief

to show that the Department of the Treasury had in fact issued refunds. Dawson says that

defendants had access to that evidence long ago and that Dawson was deprived of the

opportunity to rebut the evidence. She says that such "obstructive tactics . . . warrant

sanctions," Dkt. 347, at 27, and she cites generally to Rule 11(b). But she doesn't identify any

specific provisions in Rule 11 that defendants violated, and the court sees none. It is true that

parties generally may not rely on new evidence submitted with a reply brief, but the only

appropriate "sanction" for doing so is simply to disregard the evidence. As already discussed,

the court isn't resolving substantive damages issues in this opinion because those issues weren't

certified for class treatment until now. So the court didn't rely on the challenged evidence for

any purpose. Dawson will have an opportunity to challenge defendants' evidence at trial or in

a pretrial motion.

## B.  Admissibility of damages evidence

Dawson also says that defendants should be sanctioned because they relied on

conclusory lay opinion evidence in an attempt to show that the class's student-loan accounts

have been fully corrected. She again cites generally to Rule 11(b) without explaining how any

of the provisions in Rule 11(b) apply.

The court has already discussed this issue as well. The court agrees with Dawson that defendants haven't shown as a matter of law that any member of the class has been made whole. But they weren't required to do so at this stage of the case, and, even if they were, relying on inadmissible evidence generally isn't a basis for sanctioning a party. Again, the court didn't rely on the challenged evidence, so there is no prejudice to Dawson.

## CONCLUSION

Dawson's RICO claims will be dismissed, along with the claims against Leitl, Lentz, and Walker. Absent a settlement, the state-law claims will proceed to trial.

One last point. Throughout this litigation, the parties' conduct has been unnecessarily contentious and uncooperative. Overly long briefs filled with inflammatory language do little to advance a party's position. *See First Weber Grp., Inc. v. Horsfall*, 738 F.3d 767, 779 (7th Cir. 2013). At the same time, carelessness in complying with court rules creates more work for a party's opponent and the court, and it undermines counsel's credibility. The parties' summary judgment submissions continued both of these unfortunate trends. For the remainder of the proceedings, the court expects the parties to make greater efforts to resolve their disputes more efficiently and with less rancor, and to pay greater heed to the rules of procedure.

In the meantime, the parties are encouraged to attempt settlement of their remaining disputes. Although many issues in this case have been hotly disputed, the primary remaining question appears to be whether GLELSI accurately adjusted the class member's accounts, an issue that could be resolved without the assistance of a jury. The parties are encouraged to contact the clerk's office to schedule a mediation with Magistrate Judge Peter Oppeneer.

ORDER

IT IS ORDERED that:

1.  The motion for summary judgment filed by defendants Great Lakes Educational Loan Services, Inc. (GLELSI), Great Lakes Higher Education Corporation (GLHEC), Jill Leitl, David Lentz, and Michael Walker, Dkt. 308, is GRANTED in part and DENIED in part. The motion is granted on plaintiff Meredith Dawson's claims under the Racketeer Influenced and Corrupt Organizations Act. The motion is DENIED on Dawson's claims for negligence and negligent misrepresentation against GLELSI and GLHEC.

2.  Defendants Leitl, Lentz, and Walker DISMISSED from the case.

3.  Dawson's motion for sanctions, Dkt. 346, is DENIED.

4.  Damages issues are certified for class treatment and the subclasses are eliminated.

5.  Dawson's motion to hold a scheduling conference, Dkt. 352, is GRANTED. The clerk of court is directed to contact the parties to determine a date within the next 30 to 45 days to hold a video conference for the purpose of setting a schedule for the remainder of the proceedings. As discussed in the opinion, the parties are to submit a proposed schedule no later than seven days before the conference.

Entered March 29, 2021.

BY THE COURT:

/s/

_____
JAMES D. PETERSON
District Judge