IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

MEREDITH D. DAWSON,

Plaintiff,

v.

GREAT LAKES EDUCATIONAL LOAN SERVICES,
INC. and GREAT LAKES HIGHER EDUCATION
CORPORATION,

Defendants.

OPINION and ORDER

15-cv-475-jdp

---

This is a certified class action in which plaintiff Meredith Dawson alleges that defendants Great Lakes Educational Loan Services, Inc. and Great Lakes Higher Education Corporation (collectively "Great Lakes") negligently increased student loan balances of approximately 137,000 borrowers by improperly capitalizing interest on loans that were in forbearance. Great Lakes denies that it was negligent, but it doesn't dispute Dawson's contention that it capitalized interest in situations that aren't permitted under current guidance from the U.S. Department of Education. Specifically, at the end of the forbearance period, defendants incorrectly capitalized interest that had accrued both before and during the forbearance period.

The case is scheduled for trial on June 13, 2022, but a review of the some of the parties' pretrial submissions raised the question of whether there were any genuine issues of material fact on damages. This is because Great Lakes has submitted reports from three experts who collectively opine that Great Lakes has fixed the problem by removing the effects of the improperly capitalized interest from the class's accounts. Dawson didn't move to strike any of those reports, and she didn't submit her own expert report to challenge those opinions. So the

court gave Great Lakes an opportunity to file a motion for summary judgment on damages. Dkt. 383 and Dkt. 386. Dawson asked for permission to file her own summary judgment motion on damages issues, and the court granted that request. Dkt. 390.

Both sides have now moved for summary judgment on damages. Dkt. 412 and Dkt. 419.[1] Great Lakes contends that the class hasn't suffered any damages because the class's loan balances have been recalculated to remove the effects of the improper interest capitalization. Dawson contends that Great Lakes' remediation efforts fell short by approximately $6.6 million.

The court concludes that Great Lakes' fact and expert testimony is prima facie evidence that it remediated the effects of the improper capitalizations from the class's accounts. Dawson's argument to the contrary is based on a faulty theory that Great Lakes' alleged negligence caused other increases—mostly unrelated to the improper capitalizations—in some class members' account balances. Dawson has submitted no evidence to rebut Great Lakes' proof of remediation, so the court concludes that Great Lakes is entitled to summary judgment on most of the class's claims.

But the court agrees with Dawson on one point, which is that Great Lakes wasn't entitled to withhold refunds to class members who paid off their loans before the remediation simply because the refunds would have been less than five dollars. The court will deny summary judgment on the claims of those class members and give the parties an opportunity to submit proposals on a fair and efficient method of resolving the few remaining issues in dispute.

---

[1] Dawson also includes approximately one-page of argument in her summary judgment brief that Great Lakes was negligent as a matter of law. Dkt. 413, at 22. But the court didn't invite that argument, and the court isn't persuaded that it can resolve negligence as a matter of law, so that part of Dawson's motion will be denied.

ANALYSIS

For the purpose of the parties' cross motions for summary judgment, the court will assume that Dawson can prove that the improper interest capitalization was the result of Great Lakes' failure to exercise ordinary care. But Dawson must also prove that the class was harmed by the improper interest capitalizations. *See Hoida, Inc. v. M & I Midstate Bank,* 2006 WI 69, ¶ 23, 291 Wis. 2d 283, 302, 717 N.W.2d 17, 27 ("actual loss or damage" is one element of a negligence claim). To meet her burden, Dawson relies on the expert report of Mark Kantrowitz, who says that Great Lakes' capitalization errors led to an increase of almost $29 million in class members' account balances. Dkt. 367. In a previous opinion, the court concluded that Dawson could rely on Kantrowitz's testimony to prove that it was reasonably certain that class members would suffer harm in the future in the form of overpayments. Dkt. 383.

For the purpose of their summary judgment motion, defendants don't dispute that they incorrectly capitalized some interest on class members' student loan balances. And they assume that Kantrowitz is essentially correct that the errors increased the class's loan balances by approximately $29 million. But they say that they have reduced the class's damages to zero by conducting two "remediations" to remove the effects of the improper capitalizations on the class's account balances.[2] They rely on three expert reports to support their view. Dkt. 417-1; Dkt. 418-1; Dkt. 422-1.

It's undisputed that Dawson cannot prevail on her claims in the absence of harm. And Dawson concedes in both her opening brief and her opposition brief that defendants'

---

[2] There were two remediations because there were two sets of errors that led to improper capitalizations.

remediation efforts *reduced* the harm to the class. *See* Dkt. 413, at 4 and Dkt. 425, at 8.[3] But she says that there is still a discrepancy of approximately $6.6 million dollars between the harm that defendants caused and the amount that they remediated. Dkt. 413, at 4–5.

Defendants don't directly dispute Dawson's math for the most part, but they deny that there is a real discrepancy, and they contend that they have fully remediated the harm to the class. They say that what Dawson calls a discrepancy is actually a result their compliance with directives from the Department of Education to make other adjustments to borrowers' accounts.

Defendant first point to something they call "Change Request 2785," which required them to capitalize interest in situations where they hadn't done so before. Dkt. 342, ¶ 10. For example, if a borrower on an income-driven payment plan was no longer eligible for a financial hardship deferment, interest was to be capitalized on the day eligibility lapsed rather than at the time a new repayment schedule was generated, which was often a few days later. *Id.*, ¶ 10.c. Also, interest was to be capitalized even when the account balance was less than $15, which was contrary to defendants' past practice. *Id.*, ¶ 10.d. When defendants "rebuilt" the class members' accounts to remove the effects of the improper capitalizations, defendants also incorporated this new guidance from the department, and they made those changes retroactive, leading to increases in account balances for class members affected by Change Request 2785. Dkt. 437, ¶ 52 and Dkt. 434, ¶¶ 22–24, 27.

---

[3] In her reply brief, Dawson attempts to withdraw this concession, and she raises multiple, new arguments for the first time. The court will address those arguments in Section C of this opinion.

4

Defendants also point to a preexisting policy that affected the remediation. Specifically, defendants say that some class members on income-driven repayment plans received an "interest subsidy." Dkt. 416, ¶ 31. When the improper capitalizations were removed, defendants say that it also decreased the amount of the interest subsidy, and sometimes the decrease in the subsidy was larger than the amount that had been improperly capitalized. *Id.* Dawson doesn't dispute the existence of the policy on subsidies, and she doesn't adduce evidence that Great Lakes calculated the subsidies incorrectly.

According to defendants, these other changes are responsible for the $6.6 million discrepancy between the impact of defendants' improper capitalizations and the reduction in class members' account balances as a result of the recalculation of account balances.

Dawson doesn't dispute that the other adjustments are the reason for the $6.6 million discrepancy, and she doesn't dispute that Great Lakes made those changes to comply with department directives. Dkt. 434, ¶ 25. But she says that she is entitled to summary judgment for the $6.6 million because it's undisputed that Great Lakes' negligence was a cause of those damages to the class. And she denies that Great Lakes has shown that it remediated all harm to the class.

Before considering Dawson's arguments, the court clarifies an important difference between the changes to the interest subsidies and the adjustments made in response to Change Request 2785. Specifically, the interest subsidies are qualitatively different from the other changes Great Lakes made because they are an example of a way that some class members *benefitted* from the improper capitalizations. Under Dawson's own view of the law, she must show what the class would have received but for Great Lakes' alleged negligence. So it was Dawson's burden to show that Great Lakes incorrectly calculated the changes in the interest

subsidies, not Great Lakes' burden to show that their calculations were correct. Dawson hasn't adduced any evidence of errors, so Great Lakes is entitled to summary judgment on that issue, and the following discussion is limited to the adjustments made in response to Change Request 2785.

## A. Scope of duty to remediate

The central issue now is the scope of Great Lakes' duty to remediate. Does Great Lakes satisfy its burden so long as it removed the effects of the improper capitalizations from the class's accounts, as Great Lakes contends? Or, as Dawson contends, is Great Lakes obligated to refund or credit the full $29 million to the class members, disregarding the $6.6 million in other adjustments?

This issue previously came up in the context of considering whether the class should be certified on the issue of damages. *See* Dkt. 355, at 29–36. Great Lakes contended that the remediation projects "involved individualized rebuilds of each borrower's student-loan accounts, addressing each borrower's particular loan status and transaction histories," so individual issues would predominate. Dkt. 309, at 67. In response, Dawson made the same argument that she is making now, which is that the class's damages should be calculated without regard to any adjustments that defendants say they made for reasons unrelated to the claims in this case.

The court rejected both sides' contentions:

> [T]he court agrees with Dawson that other interest increases on the class members' accounts have "nothing to do with this case." Dkt. 330, at 126. The primary question in this case is whether defendants violated the class's rights by wrongly capitalizing the class's student-loan interest that accrued both before and during a B-9 forbearance period. Whether defendants made other errors in calculating the balance on a borrower's account is not properly before the court.

6

> But this doesn't mean that GLELSI was required to ignore other adjustments it believed were necessary when performing the remediation projects. Rather, in the court's view, it simply means that this case isn't the proper vehicle for resolving any disputes about those other adjustments. In other words, to prove that it made the class whole, GLELSI will have to show that it properly removed the effects of the improperly capitalized interest related to forbearances. It will not have to show that other adjustments it made are correct. Dawson implicitly recognizes this in another part of her brief when she contends that any judgment entered in this case should be limited to "the original, capitalization-induced injuries," and that the class should be free in another case to "seek relief from any new, 'reassessment'-induced injuries." *Id.* at 118 n.37. The court agrees with this view, which has the effect of significantly reducing individual questions related to the remediation projects, and thus removes a primary objection to the certification of damages issues for class treatment.

Dkt. 355, 34–35. Thus, the court made it clear that defendants would have to show only that they removed the effects of the improper capitalizations on class members' account balances. And if Dawson believed that other adjustments were improper, she would have to bring a separate lawsuit. Dawson never moved for reconsideration of that decision, and she didn't move for leave to amend her complaint to challenge the legality of any other account adjustments.

Without expressly challenging the court's ruling, Dawson contends again that any adjustments that resulted in increases to the class members' accounts during the remediation should be treated as class damages. She makes two arguments, one related to the law of causation and another about the class's right to due process.

### 1.  Causation

To support her causation argument, Dawson relies on the statement in *Dumer v. St. Michael's Hospital* that "[d]amages are measured by comparing the condition plaintiff would have been in, had the defendants not been negligent, with plaintiff's impaired condition as a

result of the negligence." 69 Wis. 2d 766, 773, 233 N.W.2d 372, 375 (1975). She also cites *Kim v. American Family Mutual Insurance Co.*, which stated that "[t]he legal system attempts to place the injured party in as good a position as he or she would have been in had the tortious conduct not occurred." 176 Wis. 2d 890, 898, 501 N.W.2d 24, 27 (1993).

Dawson says that putting class members in the position they would have been in but for Great Lakes' negligence in accordance with *Dumer* and *Kim* means reducing their loan balances the amount that those balances were increased because of the improper capitalizations, without regard to other increases that occurred because of the new guidance from the Department of Education. Dawson's contention appears to rest on a quirk in the new guidance provided by the department. Specifically, the department didn't require servicers to make the new changes retroactively "in the ordinary course of business," *but* the department did require retroactive application *if* a servicer "needed to adjust or remediate a borrower's loan account(s) for some other reason." Dkt. 434, ¶ 26. So, Dawson's argument goes, Great Lakes wouldn't have needed to perform the remediation had it not been for Great Lakes' negligence, and if Great Lakes hadn't performed the remediation, it wouldn't have needed to make the retroactive changes. Thus, Dawson says that Great Lakes' alleged negligence is the "but for" cause of the increases to their loan balances.

Dawson's argument overlooks that there are two components to causation under Wisconsin law: (1) cause-in-fact and (2) legal cause, which is sometimes referred to as proximate cause. *Morden v. Continental AG*, 2000 WI 51, ¶ 60. 235 Wis. 2d 325, 611 N.W.2d 659. The plaintiff must satisfy both types of causation. *Fandrey ex rel. Connell v. Am. Fam. Mut. Ins. Co.*, 2004 WI 62, ¶ 14, 272 Wis. 2d 46, 62, 680 N.W.2d 345, 353. Dawson's argument is about cause-in-fact, which means that the event was "a substantial factor in producing the

injury or damage." *Alvarado v. Sersch*, 2003 WI 55, ¶ 34 n. 2, 262 Wis. 2d 74, 662 N.W.2d 350. An event isn't necessarily a cause-in-fact simply because the second event would not have occurred without the first event. *See Cefalu v. Cont'l W. Ins. Co.*, 2005 WI App 187, ¶ 2, 285 Wis. 2d 766, 703 N.W.2d 743 (truck driver's negligence in causing initial accident was not a cause-in-fact of a collision 30 minutes later between another motorist and a fire truck that had responded to the scene). But the court will assume for the purpose of the parties' summary judgment motions that a reasonable jury could find that Great Lakes' alleged negligence was a substantial factor in producing increases in some of the class members' account balances after the remediations.

The problem is with legal causation. Wisconsin courts no longer refer to this as proximate cause, but it means the same thing. *See Fandrey*, 2004 WI 62, at ¶ 10. An instructive example of the difference between cause-in-fact and proximate cause is provided in *Koziara v. BNSF Railway Co.*, 840 F.3d 873 (7th Cir. 2016). The plaintiff had been injured on the job, and he reported the injury to his employer. *Id.* at 874. In response, the employer conducted an investigation, which ultimately led to the plaintiff's termination after it was discovered during the investigation that the employee had stolen company property. *Id.* at 875. One of the questions before the court was whether the plaintiff's report of his injury was "a contributing factor" to his termination. *Id.* at 877. The plaintiff argued that it was because "because the railroad never would have discovered the theft had he not filed an injury report (which led to the investigation, which led to the discovery of the theft)." *Id.* The court rejected that argument because it

> failed to distinguish between causation and proximate causation.
> The former term embraces causes that have no legal significance.
> Had the plaintiff never been born or never worked for BNSF he
> would neither have been hurt by the plank flung at him by the

> energetic front-end loader nor have stolen railroad ties from the
> railroad. But that doesn't mean that his being born or his being
> employed by the railroad were legally cognizable causes of his
> being fired.

*Id.* In other words, the report wasn't a proximate cause of the employee's termination because "there [was] no evidence that the railroad's decision to fire him was related to his having made the report." *Id.* at 879.

The court reached a similar conclusion in *Movitz v. First Nat. Bank of Chicago*, 148 F.3d 760 (7th Cir. 1998). The plaintiff had bought a building in Houston in reliance on what he claimed was the defendant's misrepresentation of its value. Had it not been for the misrepresentation he would not have bought it. Shortly after the purchase, the Houston real estate market collapsed, and his investment was wiped out. The misrepresentation had not caused that collapse, but it had been a cause of the plaintiff's buying the building and thus had contributed to his loss. The court found that there was enough evidence to find that the defendant's alleged misrepresentation was the "but for" cause of the loss, but it wasn't the legal cause because there was no relationship between the defendant's negligence and the collapse of the real estate market. *See id.* at 762–65.

These cases show that "but-for cause is not always (in fact not often) a cause relevant to legal liability" because there are countless events that qualify as a but-for cause. *See U.S. v. Hatfield*, 591 F.3d 945, 948 (7th Cir. 2010). In determining legal causation when there are multiple but-for causes, courts look at the connection between the defendant's alleged wrongful conduct and the event that ultimately caused the harm. How foreseeable was that event? Did the defendant's conduct make that event more likely? *See BCS Services, Inc. v. Heartwood 88, LLC*, 637 F.3d 750, 754 –56 (7th Cir. 2011); *Hatfield*, 591 F.3d at 948. Liability is precluded "in situations where the causal link between conduct and result is so attenuated that the

consequence is more aptly described as mere fortuity." *Paroline v. United States*, 527 U.S. 434, 443 (2014).

That is the situation here. It may be true that Great Lakes wouldn't have made the other adjustments to the class members' accounts if it hadn't incorrectly capitalized the class members' interest. But Great Lakes' alleged negligence didn't make it more likely that the Department of Education would adopt other rules in the meantime that could adversely affect the class. And Great Lakes could not have reasonably foreseen that at the time of its alleged negligence. It was a fortuity that the department would adopt new guidance around the same time that Great Lakes was performing the remediations.

Wisconsin's approach to legal causation is consistent with the above cases. Wisconsin courts look at several policy factors, including whether the injury is too remote from the negligence, whether in retrospect it appears too highly extraordinary that the negligence should have brought about the harm, whether the injury is out of proportion to the culpability of the negligent tort-feasor, and whether allowance of recovery would enter a field that has no sensible or just stopping point. *Beacon Bowl, Inc. v. Wisconsin Elec. Power Co.*, 176 Wis. 2d 740, 761, 501 N.W.2d 788 (1993). A court may find that liability is precluded on the basis of any one of these factors. *Casper v. Am. Int'l S. Ins. Co.*, 2011 WI 81, ¶ 95, 336 Wis. 2d 267, 306, 800 N.W.2d 880, 900.

In this case, the connection between the alleged harm (increased loan balances from the department's new directives) and Great Lakes' alleged negligence is simply too remote to support liability. It was not Great Lakes' choice to impose new rules regarding capitalizing interest. If the court were to accept Dawson's argument, it would mean that a servicer in Great Lakes' position would have to choose between disregarding the department's directives or

11

simply absorbing the costs of the new rules. That result would be of out of proportion to the servicer's negligence.

Wisconsin courts haven't hesitated to preclude liability when, as in this case, the harm was unpredictable at the time of the defendant's negligence or when there was an intervening cause with a more direct causal relationship to the harm.[4] The cases that Dawson cites aren't remotely similar to her situation. *Dumer* involved a wrongful birth claim. The court rejected a claim brought by the infant plaintiff because it was impossible to measure the difference between the infant's "life with defects against the utter void of nonexistence." 69 Wis. 2d at 772–73. In *Kim*, the court held that a vehicle owner could recover for loss of use of a damaged vehicle even if the owner didn't acquire temporary replacement vehicle. 176 Wis. 2d at 892. Neither case supports a conclusion that Great Lakes should be held liable for the new rules imposed by the department.

The point of the language cited by Dawson is that the plaintiff is entitled to be fully compensated for the harm that is fairly attributable to the defendant's negligence. *Kim* made

---

[4] *See, e.g., Tutkowski v. Rudesill*, 2017 WI App 56, ¶ 8, 377 Wis. 2d 730, 902 N.W.2d 809 (nonprecedential) (plaintiff alleged that she was injured by officers when she was served with a temporary restraining order requested by the defendant; the defendant couldn't be held liable for maliciously prosecuting the TRO because officer's conduct was an intervening cause of her injuries); *Casper*, 2011 WI 81, at ¶¶ 98—100 (plaintiffs were injured by a truck driver; employer couldn't be held liable for negligently approving driver's route because the employer's negligence was too remote from the harm); *Smaxwell v. Bayard*, 2004 WI 101, ¶¶ 47–48, 274 Wis. 2d 278, 682 N.W.2d 923 (a three-year-old child was seriously injured by wolf-hybrid dogs; landlord couldn't be held liable for negligently allowing dogs on property, disregarding complaints about the dogs, or failing to ensure that dogs were properly restrained because she did not have control over or custody of the dogs, and allowing liability "would simply have no sensible or just stopping point"); *Conroy v. Marquette University*, 220 Wis. 2d 81, 83, 582 N.W.2d 126, 127 (Ct. App. 1998) (university employee was attacked off-campus by an expelled student; university couldn't be held liable for negligently failing to warn employee that student was dangerous because incident was too remote from the university's negligence).

this clear when it stated that "damages naturally and proximately caused by a tort are recoverable." *Id.* at 898. The increases to the class's loan balances were naturally and proximately caused by the department's new guidance, not by Great Lakes' negligence, so Dawson isn't entitled to summary judgment on her theory of causation.

### 2. Due process

Dawson's argument under the Due Process Clause doesn't require extended discussion. She says that she has undisputed evidence that the improper capitalizations caused the class nearly $29 million in increased loan balances, so it would be a deprivation of property under the Due Process Clause to reduce the class's loan balances by anything less than that amount unless Great Lakes pleads and proves that it had a right to do so. In other words, Great Lakes should have asserted a counterclaim or filed its own lawsuit if it believed that it needed to make other adjustments to the class's loan balances.

This argument fails because it rests on an incorrect premise that the other adjustments are a set off of the class's damages or that Great Lakes used the other adjustments to reduce the class's damages. As will be explained in the next section, Great Lakes has submitted unrefuted evidence that it completely removed the effects of the improper capitalizations that led to the class's balance increases. In other words, the class's loan balances *are* approximately $29 million lower than they would be if Great Lakes hadn't removed the improper capitalizations. Class members don't have a "right" to more than that, and the Due Process Clause didn't prohibit Great Lakes from making other, unrelated adjustments to the class member's accounts that had the incidental effect of increasing balances.

If Great Lakes had reduced the class's account balances by approximately $29 million on one day and then the following day increased the balances by $6.6 million for unrelated

reasons, would that also violate due process under Dawson's view? Presumably not, because Dawson's core contention is that the class's balances never reflected the full $29 million reduction. So Dawson's argument hinges on the fact that Great Lakes made both sets of adjustments at the same time. But the court can discern no constitutional significance of that, so long as Great Lakes is able to isolate the effect of the improper capitalizations from the effect of the other adjustments, an issue the court will discuss in the next section.

Dawson cites no authority that supports her novel view of the law. She relies on *Logan v. Zimmerman Brush Co.*, 455 U.S. 422 (1982), and *Nelson v. Adams USA, Inc.*, 529 U.S. 460 (2000), but neither case bears any resemblance to this one. The issue in *Logan* was "whether a State may terminate a complainant's cause of action because a state official, for reasons beyond the complainant's control, failed to comply with a statutorily mandated procedure." 455 U.S. at 424. *Logan* doesn't apply because nothing in this opinion deprives Dawson of her right to bring a lawsuit. In *Nelson*, the Supreme Court held that it violated due process to allow the amendment of a complaint to add a defendant at the same time the court entered judgment against the new defendant. 529 U.S. at 463. Dawson has received an opportunity to be heard, so *Nelson* doesn't apply either, and the Due Process Clause doesn't require that the class receive the $6.6 million.

## B. Evidence of remediation

The next question is whether Great Lakes has proven as a matter of law that it fully removed the effects of the improper capitalizations from the class's accounts. The court will first summarize Great Lakes' evidence and then consider Dawson's objections to that evidence.

Great Lakes relies on a combination of fact and expert testimony. Its employees describe the process for conducting both remediations. Great Lakes used an "account rebuilding"

14

approach, which involved "backing off all financial transactions and accrued interest since the date of the erroneous capitalization transactions." Dkt. 437, ¶¶ 35, 50. Great Lakes then reapplied those transactions without the improper capitalizations and adjusted borrowers' accounts accordingly. *Id.*, ¶¶ 36–37, ¶¶ 52–54.

If a borrower was entitled to a refund after the remediation, Great Lakes issued instructions to the Department of Education to issue the refund if the amount was more than five dollars. *Id.* ¶ 60; Dkt. 342, ¶ 8a.i. If the remediation showed that a borrower had overpaid on one account, but the borrower still had a balance on one or more other accounts serviced by Great Lakes, the overpayment was applied to the other accounts. *Id.*, ¶ 59. If Great Lakes was no longer servicing an account, Great Lakes calculated the change in the borrower's principal and interest balance and sent a spreadsheet of the information to the department for forwarding to the borrower's current servicer so that the new servicer could make the necessary changes. *Id.*, ¶¶ 55–57.

Great Lakes relies on three expert reports to prove that the remediations were successful. Charlie C. Sanders was a vice president of a company that serviced student loans, and during his tenure he oversaw approximately one dozen remediation projects. Dkt. 417, ¶ 10. He offered the opinion that Great Lakes' remediation plans were "reasonably constructed and appropriately designed to restore the borrowers' accounts to the position that they should have been in, given the Department's revised interpretation of the rules governing the capitalization of pre-forbearance interest." Dkt. 417, ¶ 18.c.

W. Barefoot Bankhead is a certified public accountant with 25 years of experience. Dkt. 418, ¶¶ 5–6. Bankhead reviewed a sample of approximately 1,800 accounts that were involved in the remediation projects, and he concluded that the sample size provided a

confidence level of 95 percent and a 3 percent margin of error. *Id.*, ¶¶ 18–22. Looking at account information from both before and after the remediation, Bankhead concluded Great Lakes had "removed the interest incorrectly capitalized after an administrative forbearance from borrowers' account balances" and "remediated the impact of capitalized interest related to the Administrative Forbearance Types." *Id.*, ¶ 53.

Mark Weadick is a certified public accountant who specializes in student loans. Dkt. 422, ¶¶ 7–16. He responded to the opinion of Kantrowitz (Dawson's damages expert) that the capitalization errors led to approximately $29 million in increased loan balances. Weadick didn't significantly dispute Kantrowitz's calculations, but he took the additional step of considering the effect that both remediations had on Kantrowitz's figure, using updated account information. *Id.*, ¶¶ 24–28, 32–33. Weadick concluded that Great Lakes' "remediation work has eliminated all of the 'capitalization impact' to borrowers identified by Mr. Kantrowitz, thus resulting in no remaining improper capitalization amounts or interest on interest sustained by borrowers." *Id.*, ¶ 35.c.

Dawson doesn't dispute any of the above fact testimony. And she hasn't challenged any of the experts' qualifications or methodology. But she raises several other objections, both evidentiary and legal: (1) the experts' opinions are "immaterial"; (2) Great Lakes hasn't adduced admissible evidence that accounts serviced by third parties were properly adjusted; (3) Great Lakes hasn't adduced admissible evidence that any class member received a refund; (4) Great Lakes wasn't entitled to use overpayments toward a different account; and (5) Great Lakes wasn't entitled to disregard overpayments of less than five dollars.

1.  **Experts**

Dawson first says that Sanders's opinion is "immaterial" because it shows only that "Great Lakes was operationally thorough in leaving class members legally damaged." Dkt. 425, at 24. This objection appears to relate to a contention that Great Lakes' experts should have considered the effect of the remediations without regard to other adjustments required by the Department of Education. The court has already rejected that contention in the context of explaining the scope of Great Lakes' duty to remediate, so the court need not explain its reasoning again.

Next, Dawson says that Bankhead's opinion is "immaterial" because it "analyzes loan records instead of loan balances." Dkt. 425, at 19. Dawson's argument on this point isn't clear, but it appears to be that Bankhead should have offered an opinion about what class members' actual loan balances were rather than whether Great Lakes removed the effect of the improper capitalizations from those balances. But Dawson doesn't explain why Bankhead's opinion is deficient. Bankhead's opinion addresses the central issue identified by the court. If Great Lakes removed the effect of the improper capitalizations, it follows that account balances reflected that change, at least in the absence of contrary evidence, which Dawson hasn't supplied.

If Dawson means to contend that Bankhead should have an offered an opinion on whether Great Lakes actually made the adjustments that are reflected in Great Lakes' records, that contention also fails because that isn't an issue for expert testimony. Great Lakes' employees testified that they made the changes to the class's accounts, and Dawson has offered no evidence to suggest that Great Lakes' records don't accurately reflect those changes.

Finally, Dawson contends that Weadick's opinion is "immaterial" because "it compares loan balance increases that admittedly happened to loan balance decreases that admittedly

never happened." Dkt. 425, at 17. Again, Dawson's argument isn't clear, but it seems to be that Weadick's opinion is unhelpful because it isolates the effect of removing the improper capitalizations from the effect of the other adjustments Great Lakes made in response to new guidance from the department. This is yet another iteration of Dawson's argument that Great Lakes' experts shouldn't have considered the effect that the other adjustments had on the class's loan balances. For reasons the court has already explained, that argument isn't persuasive.

The bottom line is that Great Lakes has submitted prima facie evidence that it accurately removed the effects of the improper capitalizations from the class members' accounts. And Dawson hasn't submitted any contrary evidence. But Dawson also raises questions about whether Great Lakes properly followed through in making the necessary changes to each account. The court turns to those issues next.

### 2. Evidence of remediation to accounts no longer serviced by Great Lakes at the time of the remediations

There were approximately 16,000 class members whose accounts were being serviced by third parties at the time of the remediations. Dkt. 342, ¶ 10.c. Great Lakes could not make adjustments to accounts that it no longer serviced, so it calculated the changes that needed to be made, put the necessary information on a spreadsheet, and sent the information to the department so that the department could direct the new servicer to make the necessary changes. Dkt. 437, ¶¶ 56–57; Dkt. 342, ¶ 8.c.i. This is the standard protocol that servicers use for making adjustments to transferred accounts. Dkt. 437, ¶ 55. The department later sent Great Lakes emails to confirm that that the new servicer made the adjustments. *Id.*, ¶ 58.

18

Dawson objects to this evidence as insufficient because neither Great Lakes nor the department has personal knowledge that the new servicers actually made the changes as directed. But Dawson cites no authority establishing that Great Lakes' employees needed to personally investigate the status of accounts being serviced by third parties. Instead, she relies on *Nelson v. City of Chicago*, 810 F.3d 1061 (7th Cir. 2016), a case about a traffic stop involving an alleged use of excessive force. An officer made a judicial admission that he had "no recollection" of the traffic stop, but the district court allowed him to testify about hypothetical scenarios that would have justified the use of force. *Id.* at 1074–75. The court of appeals held that the testimony wasn't relevant, and it was unfairly prejudicial because it invited the jury to speculate that the plaintiff had acted in the way that the officer described, even though the officer admitted that he didn't remember what the plaintiff did or didn't do. *Id.*

*Nelson* isn't instructive. Great Lakes isn't speculating about events that it doesn't remember. Rather, it is contending that it is reasonable to presume that student-loan servicers followed their normal protocols and the instructions provided by the Department of Education. In the absence of contrary evidence, the court agrees that a presumption is appropriate. *Cf. Godfrey v. United States*, 997 F.2d 335, 338 (7th Cir. 1993) (when party mails a letter, it is presumed that letter carrier delivered the letter). Dawson cites no evidence that the new servicers failed to comply with the instructions they received, and she identifies no reason why they wouldn't comply. So the court concludes that Great Lakes has adduced sufficient evidence to prove that the third-party servicers made the appropriate adjustments to the class members' account balances.

### 3. Evidence of refunds

Some class members had paid off all of their student loans with the department at the time of the remediations. If the class member had overpaid by more than five dollars, Great Lakes sent instructions to the Department of Education to issue a refund. Dkt. 437, ¶ 60; Dkt. 342, ¶ 8a.i. Dawson raises two objections to Great Lakes' evidence.

First, Dawson contends that the court should exclude any evidence about refunds because a Great Lakes' employee submitted a declaration in 2018 that Great Lakes itself had issued reimbursement checks, Dkt. 165, ¶ 16, even though it's undisputed that Great Lakes didn't issue any checks itself. Dawson raised the same issue at summary judgment, arguing that that the court should sanction Great Lakes for providing false testimony. Dkt. 347, at 23–27. The court denied Dawson's request, concluding that Great Lakes had been "sloppy" but that there was no intent to deceive. Dkt. 355, at 40. Dawson provides no persuasive grounds for reconsidering that decision, so the court won't exclude Great Lakes' evidence.

Second, Dawson again contends that Great Lakes' evidence isn't admissible because its employees don't have personal knowledge of the relevant facts. But the court concludes that the instructions Great Lakes sent to the department are prima facie evidence that the federal government issued the refunds. Dawson hasn't submitted any contrary evidence, so there is no genuine dispute.

### 4. Crediting overpayments to other accounts

Some class members had multiple student loan accounts. If the remediations showed that a class member had overpaid one account but still had a balance on at least one other account, Great Lakes applied the overpayment to the other account rather than offering a refund.

20

Dawson contends that the law required Great Lakes to provide a refund under these circumstances, and she again relies on the principle that class members were entitled to be in as good a position as they would have been in had Great Lakes not been negligent. But Dawson doesn't explain how any class member was worse off by receiving a credit rather than a refund. *See Bible v. United Student Aid Funds, Inc.*, 799 F.3d 633, 651 (7th Cir. 2015) (acknowledging that improper charge on student loan account "might take the form of a credit to [the plaintiff's] account rather than cash in her pocket"). In the absence of such evidence or any authority holding that a credit was insufficient under these circumstances, the court concludes that Great Lakes is entitled to summary judgment on this issue.

### 5.   Overpayments of less than five dollars

It's undisputed that Great Lakes didn't direct the department to issue refunds for overpayments of less than five dollars. Great Lakes defends that decision on the ground that the department generally doesn't issue refunds for that amount.

Dawson points out two problems with Great Lakes' argument. First, the document that Great Lakes relies on states that the five-dollar rule doesn't apply if "the borrower requests a refund." Dkt. 415-5, ¶ 2)c)iii. Great Lakes says that the exception doesn't apply because it "provided the reimbursements at issue automatically without receiving a request from any class member." Dkt. 437, ¶ 60. But that's inaccurate. This lawsuit represents a request by the entire class to receive a full refund, so Great Lakes should have acted as if the class members had requested a refund, regardless of how small the refund was.

Second, Great Lakes doesn't explain why the department's five-dollar rule has any bearing on this lawsuit. Regardless of whether the rule makes sense from the standpoint of administrative costs and benefits, Great Lakes doesn't point to a "de minimis" rule for damages

under Wisconsin tort law. As Dawson points out numerous times throughout her summary judgment briefs, the class is entitled to be put in the same position that they would have been in without Great Lakes' alleged negligence, and that position includes refunds of less than five dollars. The court concludes that Great Lakes isn't entitled to summary judgment for this group of class members.

## C.  New arguments in reply brief

Dawson raises multiple new arguments for the first time in her reply brief. Her primary new argument is that the class is entitled to approximately $29 million in damages, the total amount of loan balance increases calculated by her damages expert. She says that she is entitled to that amount because Great Lakes has admitted that it has no evidence of the effect that its remediation efforts had on the class members' loan balances.

It is well established that a party forfeits any argument that is raised for the first time in a reply brief, so it isn't necessary to consider this argument or any of the other new arguments that she raises. *White v. United States*, 8 F.4th 547, 552–53 (7th Cir. 2021); *Wonsey v. City of Chicago*, 940 F.3d 394, 398 (7th Cir. 2019). Dawson asks the court to look past the forfeiture because of the limited amount of time that was available for preparing her summary judgment submissions. But in arguing that Great Lakes has conceded a lack of admissible evidence, she points to a deposition that her counsel took nearly three years ago. *See* Dkt. 227 (Lapham Dep.). So the court sees no excuse for Dawson choosing to change her litigation position so significantly at the last minute.

In any event, the court isn't persuaded that Great Lakes has conceded anything. Dawson points to Great Lakes' response to one of her proposed findings of fact:

> [Great Lakes] admit[s] that [it] captured snapshots of each class member's accounts before and after conducting the relevant

> remediation procedures. [Great Lakes] dispute[s] that [it] recorded the "arithmetic differences between the before-and-after loan balances"; accurately determining the difference in a class member's account balance before and after GLELSI's remediation work would have required individualized analysis of each class member's account. (4.29.19 GLELSI Rule 30(b)(6) Dep., Dkt. 227, at 40:14–41:14; 54:4–56:14.) The Post-Remediation Spreadsheets used by Mr. Weadick did not include any loan balance information but rather the amounts of capitalized interest and the amounts of capitalized interest removed during GLELSI's remediation work. (9.30.21 Weadick Report, Dkt. 374, at 5 & App'x B.).

Dkt. 434, ¶ 19. Dawson interprets this response as a concession that Great Lakes can't determine whether it remediated the impact of the improper capitalizations. But that's incorrect. Dawson's position appears to be that Great Lakes can't meet its burden without direct evidence of every class member's loan balances before and after the remediation. But she cites no authority for that view. Great Lakes has submitted unrefuted evidence that it removed all the improperly capitalized interest during the remediation, and that's all it was required to do.

## D. Next steps

The question remains how the case should proceed. The court has concluded that Great Lakes didn't fully remediate the harm for a subset of class members—those who overpaid by less than five dollars. But the court can't grant summary judgment to Dawson on this issue because Dawson must first prove negligence, which she hasn't done yet. The court also can't determine as a matter of law what the potential damages to these class members are because neither side has submitted evidence about the number of class members who didn't receive refunds because their overpayment was less than five dollars.

But it's clear that the remaining amount at issue is relatively small. Great Lakes says that fewer than 15,000 class members made overpayments of any size, and some of those class

members received refunds of more than five dollars, and some of them still owed money on other accounts. *See* Dkt. 342, ¶ 8.a. So the total amount of potential damages is probably less than $50,000. The court is reluctant to hold a trial when so little remains in genuine dispute, so the court will give the parties an opportunity to inform the court of how they wish to proceed. Specifically, Great Lakes should state whether it will provide refunds to this subset of class members, and, if so, what process it proposes to identify who is entitled to a refund and how much that refund should be. If Great Lakes does not wish to provide refunds, it should submit any alternative proposals for bringing this case to a resolution in a fair and efficient manner. Dawson will also be given an opportunity to respond. The court will determine whether to strike the trial date after reviewing the parties' submissions.

## ORDER

IT IS ORDERED that:

1. Meredith Dawson's motion for summary judgment, Dkt. 412, is DENIED.

2. The motion for summary judgment filed by defendants Great Lakes Educational Loan Services, Inc. and Great Lakes Higher Education Corporation, Dkt. 419, is GRANTED in part and DENIED in part. The motion is DENIED as to class members who should have received a refund of less than five dollars after the remediation. The motion is GRANTED as to all other class members.

3. Defendants may have until May 17, 2022, to submit a proposal to the court regarding how they would like to proceed. Dawson may have until May 20, 2022, to respond.

Entered May 12, 2022.

BY THE COURT:

/s/

_____
JAMES D. PETERSON
District Judge